```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                      TYLER DIVISION

 3   LONE STAR TECHNOLOGICAL        )(
     INNOVATIONS, LLC,              )(
 4        PLAINTIFF,                )(    CIVIL ACTION NO.
                                    )(    6:19-CV-59-RWS
 5                                  )(
     VS.                            )(
 6                                  )(
                                    )(    TYLER, TEXAS
 7                                  )(
     ASUSTEK COMPUTER, INC.,        )(    MAY 17, 2021
 8        DEFENDANT.                )(    8:21 A.M.

 9                 TRANSCRIPT OF JURY TRIAL

10        BEFORE THE HONORABLE ROBERT W. SCHROEDER, III

11               UNITED STATES DISTRICT JUDGE

12
     FOR THE PLAINTIFF:       Mr. Joshua J. Bennett
13                            Mr. Bradley D. Liddle
                              Ms. Monica Litle
14                            CARTER ARNETT, PLLC
                              8150 N. Central Expressway
15                            5th Floor
                              Dallas, Texas 75206
16
                              Mr. John D. Saba, Jr.
17                            WITTLIFF & CUTTER, PLLC
                              1209 Nueces Street
18                            Austin, Texas 78701

19                            Mr. John Lee
                              BANIE & ISHIMOTO, LLP
20                            2100 Geng Road
                              Suite 210
21                            Palo Alto, California 94303

22   COURT REPORTER:         Ms. Kate McAlpine, RPR, CSR, CCR
                              Federal Official Court Reporter
23                            Texarkana Division
                              500 N. State Line Avenue
24                            Texarkana, Texas 75501

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

2

```
 1   FOR THE DEFENDANT:        Mr. Vinay V. Joshi
                               Mr. Andrew T. Oliver
 2                             AMIN, TUROCY, & WATSON
                               160 W. Santa Clara Street
 3                             Suite 975
                               San Jose, California 95113
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

08:20:54  1

08:21:08  2          THE COURT:  Okay.  We are on the record.

08:21:10  3          It's 8:20 back in chambers.  The panel should be

08:21:15  4  ready for us fairly soon once they have been qualified.

08:21:20  5  Each side has been given 30 minutes for voir dire and then

08:21:25  6  openings.  I know there were a number of filings over the

08:21:28  7  weekend, both Saturday and yesterday.

08:21:31  8          Anything we need to address before voir dire?

08:21:37  9          MR. BENNETT:  Yes, Your Honor.  Plaintiffs have an

08:21:39  10  issue with -- an objection to Exhibit 26 and its subparts.

08:21:46  11  We filed a brief, it's Exhibit -- it's Document 205 on

08:21:50  12  this.

08:21:50  13          THE COURT:  I read it.

08:21:51  14          MR. BENNETT:  Okay.  So what we've proposed there

08:21:54  15  is that the exhibit should come in.  They waived objections

08:21:58  16  or the objections have no merit.  There's authentication

08:22:01  17  objections.  They have no merit because the documents are

08:22:06  18  ASUS manuals.  We've brought examples here if Your Honor

08:22:10  19  wants to inspect them -- Your Honor's version of that -- a

08:22:11  20  copy of Exhibit 26 and its subparts.

08:22:14  21          So they're authenticated because they're all ASUS

08:22:18  22  manuals, bear ASUS's tradename, trademarks, copyright.

08:22:19  23  It's all about ASUS products.  They compare with the ASUS

08:22:21  24  manuals on their exhibit list -- on ASUS's exhibit list.

08:22:24  25          So for all those reasons, they're authentic, and

08:22:27   1   then they're just not hearsay at all and that's part of

08:22:30   2   their objection, if they have an objection at all and they

08:22:33   3   didn't waive it.

08:22:34   4        So we would submit that they should -- they're not

08:22:37   5   automatically admitted, but those objections shouldn't keep

08:22:41   6   them out and we need to get them through a sponsoring

08:22:41   7   witness, which in this case will be Dr. Ducharme for us.

08:22:43   8   So he could take the stand today.  It's possible.  That's

08:22:45   9   why part of this is -- that's why part of this is relevant

08:22:51  10   for today's purposes.

08:22:52  11        Some of these exhibits may also come up on

08:22:55  12   Mr. Lin, one of the witnesses that we've called of theirs.

08:22:58  13             THE COURT:  Is he an engineer?

08:23:01  14             MR. BENNETT:  He is a technical person, yes, Your

08:23:05  15   Honor.

08:23:05  16             THE COURT:  All right.

08:23:06  17             MR. JOSHI:  So, Your Honor -- so firstly, I'll

08:23:09  18   address waiver, then authentication, then hearsay.

08:23:13  19        These -- what happened at the pretrial conference,

08:23:16  20   that the exhibit list had a summary document.  And the

08:23:18  21   summary document was -- it had numbers, then it had

08:23:21  22   their -- referenced their infringement chart, then each

08:23:25  23   number had one, two, three, or four documents associated

08:23:28  24   with it.  And then they had a web link where they got it

08:23:31  25   from.  That summary document is what they wanted to be the

08:23:34   1   exhibit.

08:23:34   2        Then, during the meet and confer, they -- later on
08:23:38   3   after pretrial conference when you said each witness -- we
08:23:41   4   have to use it with a witness before the document comes in,
08:23:45   5   they said essentially all of these are our documents.

08:23:49   6        Well, the problem is we don't know who pulled
08:23:52   7   them.  And if you look at the websites, they're from
08:23:54   8   different websites.  They're not ASUS websites.  They're
08:23:56   9   Walmart, they're this, they're that.  We -- then -- now,
08:23:58   10  they -- later on they reduced it down to just 139
08:24:01   11  documents.  We pick one, use it for each product, okay?

08:24:05   12       So firstly, we couldn't have waived it because the
08:24:08   13  exhibits aren't the way they are now at the time that we
08:24:12   14  had the pretrial conference.  Authentication, they're not
08:24:15   15  going to bring a witness -- they don't have a witness on
08:24:17   16  their witness list who can say:  I got these documents from
08:24:21   17  here.  That's the first thing.

08:24:22   18       They cited a number of cases.  We read those
08:24:26   19  cases.  There was always a witness.  It was either produced
08:24:29   20  by the other side or it had a signature of the person that
08:24:34   21  they were saying it's the signature of.  Even in the cases
08:24:40   22  of it was a trademark, there was always like their -- that
08:24:41   23  company's trademarks but then other things also.

08:24:44   24       So somehow if you get past authentication, then
08:24:48   25  they have a hearsay problem.  Now, with respect to hearsay

08:24:53  1  they make a very circular argument.  They say -- first of

08:24:53  2  all, they say it's -- one argument is it's not hearsay

08:24:57  3  because these are instructions, and instructions are not

08:24:59  4  proffered for the proof of the matter asserted.  But then

08:25:02  5  what they really want to use them for -- so they want to

08:25:03  6  get around hearsay that way by saying --

08:25:07  7          THE COURT:  So can you respond to that

08:25:08  8  specifically?  Why is it hearsay?  Why is it being offered

08:25:12  9  for the truth of the matter asserted?

08:25:19  10          MR. JOSHI:  Well, because these user guides are --

08:25:20  11  they want to use it for inducement.  So what they want to

08:25:23  12  say is that these user guides tell customers what to do.

08:25:27  13  So the truth of the matter asserted is --

08:25:27  14          UNIDENTIFIED PERSON:  (Whispering.)

08:25:33  15          MR. JOSHI:  Right.  Right.

08:25:34  16          And also, not just for inducement but also to

08:25:37  17  prove this is how the products operate.  So their expert

08:25:40  18  reviewed them to say, I believe there is infringement

08:25:44  19  because the products operate according to these user

08:25:44  20  manuals.

08:25:48  21          So we think that a compromised solution here is

08:25:52  22  that he can use them as a demonstrative, he can rely on

08:25:54  23  them, but they can't come in as exhibits.

08:25:57  24          THE COURT:  Were these -- all of these exhibits

08:26:01  25  disclosed timely?

08:26:02   1          MR. BENNETT:  They were disclosed timely in this

08:26:05   2   fashion.  And we talked about this at the May 11 hearing.

08:26:09   3   We did list them on our exhibit list as Exhibit 26 because

08:26:13   4   those were the documents that Dr. Ducharme had relied on.

08:26:18   5   All of them included the user manuals.

08:26:19   6          When Your Honor directed us to confer, we

08:26:24   7   conferred.  And we heard their objection about it's too

08:26:26   8   much.  We said:  Okay.  We understand.  We'll just strip

08:26:29   9   off and leave the user manuals.  So that's what we did.

08:26:33  10          We heard argument at length on May 11th about how

08:26:36  11   Mr. Joshi didn't want those documents back in the jury

08:26:39  12   room, and that's why he was objecting because he didn't

08:26:42  13   think we had a sponsoring witness.

08:26:44  14          So we tried to address that in our meet and confer

08:26:46  15   and showed them, look, we reduced the materials.  We --

08:26:52  16   fits squarely within the 250 exhibit limit under the

08:26:56  17   Court's order.  All of these materials are the user

08:26:58  18   manuals.  Dr. Ducharme, yes, he relied on them, but they're

08:27:03  19   your documents.

08:27:04  20          I think what he's saying is we didn't produce

08:27:07  21   them.  Well, that's a problem.  They didn't produce them.

08:27:10  22   That's why we engaged in self-help and got them ourself.

08:27:14  23          So we've done that.  They didn't produce them.

08:27:17  24   Now they want to use that against us as a means of not

08:27:21  25   authenticating the documents even though on their face

08:27:24   1   they're ASUS documents.

08:27:24   2          So I think the authentication problem is a

08:27:27   3   non-issue.

08:27:28   4          As for hearsay, either way, whether it's what they

08:27:31   5   say for the truth of the matter to prove infringement, it's

08:27:36   6   not hearsay still under 801(d) because it's a statement of

08:27:39   7   a party opponent, right?  Or on the other side, if it's not

08:27:43   8   -- if it's just instructions, then it's not hearsay

08:27:46   9   under -- if it's not a statement for the truth of the

08:27:48  10   matter.

08:27:49  11          So if it's just to show the instructions are given

08:27:51  12   to users, that's all it's for.  It's not for the truth.  If

08:27:55  13   it is to prove infringement, then it's a party admission,

08:27:57  14   and it comes in under 801(d).

08:28:00  15          THE COURT:  Well, let me say this, Mr. Joshi.

08:28:02  16   With respect to the waiver issue, our orders, I believe,

08:28:06  17   are quite clear that we expect any objections to exhibits

08:28:11  18   to be raised at the pretrial conference.  That avoids

08:28:15  19   having, you know, matters like this pop up on the eve of

08:28:19  20   trial.  We had a pretrial conference.  We could have

08:28:24  21   discussed this.

08:28:26  22          So, I mean, I think that's the point to requiring

08:28:29  23   objections be served on the other side so that you-all can

08:28:34  24   try to resolve any issues prior to that.  And if you can't,

08:28:39  25   bring it to my attention so that we can get those issues

08:28:43 1  resolved well before the trial to avoid, frankly, precisely

08:28:49 2  these kinds of events.

08:28:52 3      My question at the end of the day -- I want to

08:28:55 4  think about what you all have said about this -- is does

08:29:00 5  any of this need to be resolved before voir dire?  In other

08:29:06 6  words, could we -- could we go ahead and get the jury

08:29:11 7  selected and then before openings, I will tell you how I'm

08:29:15 8  going to deal with this?

08:29:18 9      MR. BENNETT:  Yes, I think -- for Plaintiff's

08:29:20 10 part, that would be acceptable, Your Honor.

08:29:22 11     MR. JOSHI:  We think that's fine, too, Your Honor.

08:29:25 12 And I'll just make one minor correction.

08:29:28 13     I don't want to quibble, but it's not true that we

08:29:31 14 didn't produce these user manuals.  They are ASUS user

08:29:35 15 manuals with ASUS Bates stamps on them, and they will

08:29:37 16 100 percent be party admissions by us.  And they come from

08:29:40 17 -- coming from us, it's also verified that they get sold in

08:29:43 18 the United States.  There are many English speaking

08:29:45 19 countries.  And just because a manual is in English,

08:29:50 20 doesn't mean it's meant for United States, but if we

08:29:52 21 produced it, then it does so they can use those.

08:29:54 22     THE COURT:  So why were these not produced?

08:29:57 23     MR. JOSHI:  Because they -- I don't believe they

08:29:58 24 are -- many of them are from third parties, and so we

08:30:01 25 attached a sample of that.  You know, and these electronic

08:30:05    1   parts come out, many people write about them, they have

08:30:08    2   their own user guides and such, but the ones --

08:30:13    3           THE COURT:  These are not ASUS-produced documents?

08:30:16    4           MR. JOSHI:  We haven't verified every one, but we

08:30:17    5   found many in that -- the 26 group.  There's like a company

08:30:18    6   called Eizo.  There are a couple of documents from them we

08:33:21    7   found.  And then we found the -- we found the -- you know,

08:33:21    8   because on the P-26, they mention the websites where they

08:33:21    9   got them from, and there are many non-ASUS websites.

08:33:21   10           THE COURT:  So do we have some representative

08:33:21   11   copies that you can leave us?

08:33:21   12           MR. BENNETT:  There were two attached to 205, the

08:33:21   13   document that brings out the issues.  If you want to look

08:33:21   14   at all of them, they're in these binders here for

08:33:21   15   Your Honor.

08:33:21   16           THE COURT:  Okay.

08:33:21   17           MR. BENNETT:  And we brought this for you.

08:33:21   18           THE COURT:  Excellent.  If you'll just leave that,

08:33:21   19   that would be very helpful.

08:33:21   20           MR. BENNETT:  Yes, Your Honor.

08:33:21   21           THE COURT:  Okay.  Anything else we need to

08:33:21   22   address before we select the jury?

08:33:21   23           MR. BENNETT:  There were some objections to

08:33:21   24   demonstratives that we may need -- if we pick a jury -- I

08:33:21   25   guess we're going to have a break in between.

08:33:21  1          THE COURT:  We will.

08:33:21  2          MR. BENNETT:  So we can handle that then, I guess

08:33:22  3   if that's what Your Honor wants to.

08:33:22  4          THE COURT:  We will.

08:33:22  5          Let me tell you the only other thing I want you

08:33:22  6   all to think about during voir dire is -- as I told you all

08:33:22  7   at the pretrial conference, I do a fairly thorough voir

08:33:22  8   dire myself.

08:33:22  9          At some point in there, maybe midway through, I

08:33:22  10  will call upon each side to stand up, introduce yourself,

08:33:22  11  introduce your client, those who are at the table with you,

08:33:22  12  and then I'll ask you to go through the names of any

08:33:22  13  witnesses who may be called to testify so that I can voir

08:33:22  14  dire the jury about any knowledge of law firms, lawyers,

08:33:22  15  witnesses.  So just a little heads-up in that regard.

08:33:22  16         Okay.  Anything else?

08:33:22  17         MR. BENNETT:  Not right now.

08:33:22  18         THE COURT:  All right.  Do we have the -- looks

08:33:22  19  like we have the seating chart.

08:33:22  20         COURT DEPUTY:  Uh-huh.  The seating chart and then

08:33:22  21  the questionnaires.  I think she's got more questionnaires

08:33:22  22  to make copies of.

08:33:22  23         MR. BENNETT:  Thank you.

08:33:22  24         COURT DEPUTY:  I gave you four copies.  If you

08:33:22  25  need more, I can get them.

08:33:22   1          MR. JOSHI:  Thank you so much.

08:33:22   2          MR. BENNETT:  Thank you very much.

08:33:22   3          THE COURT:  Let me tell you one other thing.  We

08:33:22   4   will deal with hardship issues at the very end.  And if

08:33:22   5   there are persons in the panel that you -- on the panel you

08:33:22   6   want to or need to question further outside the presence of

08:33:22   7   the other panel members for purposes of cause challenges or

08:33:22   8   anything like that, at the very end of both party's

08:33:22   9   voir dires, I will ask you to hand up a list of juror names

08:33:22  10   and/or numbers of people you want to voir dire separately,

08:33:22  11   and we will ask them to remain in the courtroom, and we

08:33:23  12   will dismiss everybody else to be taken to another

08:33:23  13   courtroom to wait for a few minutes while we do that.

08:33:23  14          I'm not suggesting that you will have anyone like

08:33:23  15   that, but if you do, there's somebody who had said

08:33:23  16   something during the voir dire process that you want to ask

08:33:23  17   further questions of with respect to a potential cause

08:33:23  18   challenge, just tell me their name and number.  You can

08:33:25  19   write it down.  I'll ask you to hand those lists up, and

08:33:29  20   we'll do that at the very end of the voir dire.  I'll

08:33:32  21   dismiss everybody else, and then we'll bring them up one by

08:33:38  22   one.

08:33:38  23          Any questions about that?

08:33:39  24          Okay.  See you out there.

08:57:13  25          (Recess.)

09:44:20  1          THE COURT:  Please be seated.

09:44:23  2          Mrs. Schroeder, would you call the case for us?

09:44:30  3          COURT DEPUTY:  Civil Action No. 6:19-CV-59, Lone

09:44:37  4  Star Technological Innovations, LLC, versus ASUSTeK

09:44:40  5  Computer, Inc.

09:44:40  6          THE COURT:  Is the Plaintiff ready to proceed?

09:44:43  7          MR. BENNETT:  We are, Your Honor.

09:44:45  8          THE COURT:  Is the Defendant ready to proceed?

09:44:48  9          MR. JOSHI:  We're ready, Your Honor.

09:44:49  10          THE COURT:  Very well.

09:44:50  11          Good morning, ladies and gentlemen.  I want to

09:44:52  12  thank you for being here on this wet May morning.  I wish

09:44:56  13  the weather had been a little better for you all getting

09:45:01  14  into the courthouse.

09:45:02  15          I want to thank you for being here, and I want to

09:45:07  16  welcome you to jury service in the United States District

09:45:11  17  Court for the Eastern District of Texas.

09:45:13  18          I'm Judge Trey Schroeder.  You've already met some

09:45:20  19  of our court personnel this morning, but I want to

09:45:25  20  introduce the members of my court staff.

09:45:28  21          My courtroom deputy is Ms. Betty Schroeder.

09:45:31  22          Ms. Kate McAlpine is our court reporter.

09:45:33  23          The law clerks who assist me are Jonathan Powers,

09:45:38  24  Susan Stradley, and Elizabeth Conners.

09:45:43  25          Today and for the rest of the week, our court

09:45:48  1    security officer will be Mr. Steven Richardson.

09:45:51  2        I want to begin by thanking you for serving your

09:45:55  3    country.  These are especially trying times.  Obviously, we

09:46:02  4    have new responsibilities in terms of the restrictions on

09:46:06  5    our lives that the pandemic has placed.  I am asking

09:46:13  6    everybody to wear their mask in the courtroom unless you're

09:46:16  7    speaking.

09:46:18  8        All of our life responsibilities right now are a

09:46:22  9    little more serious, and our intrusion as a court into your

09:46:27  10   lives by asking you to potentially serve as jurors in this

09:46:31  11   matter may be even more jarring.

09:46:33  12       As I wrote to you in my letter regarding jury

09:46:38  13   service, we've taken a number of important steps to enhance

09:46:41  14   your health and safety during jury selection and the trial

09:46:45  15   if you are selected as a juror.

09:46:47  16       You all obviously know we've got social distancing

09:47:00  17   requirements here in the courtroom.  As I said, everyone

09:47:03  18   has masks on.  We do have gloves and hand sanitizer

09:47:08  19   throughout the courtroom if anyone needs them.

09:47:10  20       Once the trial begins, we will be providing lunch

09:47:14  21   each day, and the courtroom has been reconfigured to meet

09:47:20  22   the needs of social distancing.

09:47:22  23       The jury will be seated where you are seated now

09:47:26  24   in the gallery.  The witness will actually be in what's

09:47:29  25   normally the witness box.

09:47:32   1          There's also some air purifiers throughout the
09:47:37   2   courtroom to help keep the air clean and circulating.
09:47:41   3          As I said, I'm Judge Schroeder.  I'm a United
09:47:45   4   States District Judge for the Eastern District of Texas.  I
09:47:46   5   live in Texarkana where I was born and grew up.  I
09:47:51   6   practiced law for about 15 years before I went on the bench
09:47:59   7   six years ago.  I have a few remaining cases in Tyler.  I
09:48:05   8   have responsibility for the docket in Texarkana, and I have
09:48:08   9   a few cases in Marshall and Sherman, as well.
09:48:13  10          I'll just tell you a little bit about myself, and
09:48:16  11   the reason I do that is in a few minutes, I'm going to ask
09:48:20  12   all of you to tell us something about yourself, as well,
09:48:23  13   and I think you are as entitled to know as much about me as
09:48:28  14   we will soon learn about you.
09:48:30  15          As I said, I grew up in Texarkana.  I went to
09:48:34  16   college in Missouri and then in Arkansas, and I graduated
09:48:37  17   from law school in Washington, D.C.  I was, as I said, in
09:48:44  18   private practice for about 15 years.  Before that, I
09:48:47  19   clerked for a federal appellate judge, and I also worked in
09:48:54  20   the government in Washington as an attorney for a couple of
09:48:58  21   years.
09:48:58  22          I'm married.  I have two daughters who are juniors
09:49:02  23   in college.  And my wife is a lawyer, too, but she doesn't
09:49:06  24   practice law anymore.
09:49:09  25          I want to tell you a little bit about this trial

09:49:13  1  and what we're going to be doing here this week.  This is a

09:49:17  2  civil case involving patent infringement.

09:49:21  3       You, as potential jurors, are performing a pivotal

09:49:26  4  role in our system of justice, and I hope that you will

09:49:29  5  consider it an honor to serve in this important role

09:49:33  6  because that's what it is.

09:49:35  7       By asking you to be here to potentially serve as

09:49:38  8  jurors in this matter, we're asking you to be away from

09:49:43  9  your jobs, your families, and your other responsibilities.

09:49:47  10  For those of you who have children at home, I know how

09:49:50  11  hectic your lives are.  The same goes for those of you who

09:49:54  12  may be a caregiver to a family member or a friend.

09:49:58  13       By asking you to be here and to potentially serve

09:50:01  14  as a juror, we are creating an intrusion into your lives,

09:50:04  15  but the reason we do it is we have important work for you

09:50:09  16  to do.

09:50:10  17       This is the 42nd case I will have tried as a

09:50:15  18  judge, and I believe that your experience as a juror, if

09:50:18  19  you are selected to serve, will depend in large part on

09:50:22  20  what your initial frame of mind is.  So I want to give you

09:50:25  21  a little bit of context about the role of the jury in our

09:50:29  22  system of government.

09:50:31  23       Our Constitution begins with the words "We the

09:50:36  24  People," and in its most in inclusive form, it invites the

09:50:39  25  people to join in the creation and maintenance of

09:50:42   1   government.  Those words recognize that the power of the

09:50:46   2   government come from the people and -- comes from the

09:50:51   3   people.  And just as suffrage ensures the people's ultimate

09:51:00   4   control in the legislative and executive branch, the jury

09:51:03   5   trial is meant to ensure their control in the judiciary.

09:51:07   6        Jury service is an exercise of responsible

09:51:11   7   citizenship by all members of our community.  Our

09:51:15   8   Constitutional system postulates a conscious duty of

09:51:22   9   participation in the machinery of justice, and it is an

09:51:25  10   opportunity for you, as an ordinary citizen, to help

09:51:28  11   administer justice.  It's an opportunity that has been

09:51:32  12   recognized as one of the principal justifications for

09:51:35  13   retaining the jury system under our Constitution.

09:51:39  14        No doubt many of your parents served on juries,

09:51:43  15   and perhaps grandparents, as well.  The tradition of jury

09:51:47  16   trials in our country stretches back many generations from

09:51:52  17   today all the way back, in fact, to 1776.  So, yes, while

09:51:57  18   it may be an inconvenience for you at some level to be

09:52:03  19   here, I hope you will understand that it is much more than

09:52:06  20   that.

09:52:06  21        I firmly believe that jury service is one of the

09:52:10  22   highest forms of public service that you can render to your

09:52:17  23   country as a citizen.

09:52:19  24        Of course, the highest form of public service

09:52:22  25   centers around those young men and women who serve in our

| | | |
|---|---|---|
| 09:52:29 | 1 | Armed Forces and who put their lives on the line every day |
| 09:52:32 | 2 | to protect and to guarantee for all of us the rights and |
| 09:52:36 | 3 | the freedoms that we enjoy as Americans.  Those young men |
| 09:52:42 | 4 | and women in the Armed Forces, they don't get to decide |
| 09:52:45 | 5 | where it is they're going.  They go where their country |
| 09:52:49 | 6 | asks them to when their country asks them to. |
| 09:52:51 | 7 | So by being here today and by participating as you |
| 09:52:54 | 8 | are, you're doing what your country is asking you to do, |
| 09:52:58 | 9 | too.  And jury service is our chance, in a way, perhaps not |
| 09:53:01 | 10 | to repay the debt we owe to our country, but at least to |
| 09:53:08 | 11 | acknowledge it in some way and to recognize it. |
| 09:53:11 | 12 | So I hope you will think about your time here this |
| 09:53:14 | 13 | morning serving on this panel and on the jury if you're |
| 09:53:17 | 14 | selected to serve, perhaps in a little bit different light, |
| 09:53:21 | 15 | as an opportunity for you to serve your country by seeking |
| 09:53:25 | 16 | to do justice between these two parties. |
| 09:53:28 | 17 | As I said, this is a patent infringement case |
| 09:53:31 | 18 | where the Plaintiff, Lone Star, claims that the Defendant, |
| 09:53:39 | 19 | A-S-U-S, ASUSTeK, infringes its patent. |
| 09:53:48 | 20 | ASUS denies infringing the patent and says that |
| 09:53:52 | 21 | the patent is invalid.  I and the parties will have much |
| 09:53:56 | 22 | more to say about what this case involves, but for now, I |
| 09:53:59 | 23 | wanted you to have some basic knowledge of what the case is |
| 09:54:06 | 24 | about. |
| 09:54:06 | 25 | I anticipate that the presentation of evidence |

09:54:08    1    will take about four days.  We'll begin the trial this

09:54:11    2    afternoon.  So we will conclude -- should conclude no later

09:54:13    3    than this Friday, May 21st.  Those of you who are selected

09:54:18    4    as our jury, of course, will need to be available this

09:54:23    5    week.

09:54:23    6            If any of you have any prepaid vacations planned

09:54:27    7    that you have already bought nonrefundable tickets for, if

09:54:33    8    you have a surgery that is scheduled this week, or anything

09:54:36    9    else that is serious enough to make it very difficult for

09:54:39   10    you to serve, then I need for you to identify yourself.

09:54:43   11            If there's anybody on the panel who has those

09:54:46   12    types of reasons that they could not serve, if you would,

09:54:49   13    please raise your hand, and we'll discuss the specifics

09:54:54   14    later, but I'd just like to know if there's anyone now who

09:54:57   15    falls into that category.

09:54:59   16            Anybody on the left side of the room at all?

09:55:03   17            On to right side?

09:55:05   18            Let's see, is it Mr. Wilkinson?

09:55:13   19            PANEL MEMBER:  Yes, sir.

09:55:21   20            THE COURT:  Okay.  All right.  Yes, ma'am.  Is it

09:55:24   21    Ms. Elson?

09:55:25   22            PANEL MEMBER:  Yes, sir.

09:55:26   23            THE COURT:  Okay.  Thank you, ma'am.

09:55:28   24            And someone else?  Ms. Morrow?

09:55:31   25            Ms. Decco?

09:55:32   1          PANEL MEMBER:  Yes.

09:55:33   2          THE COURT:  Okay.  All right.  Thank you,

09:55:37   3   Ms. Decco.

09:55:38   4          Anyone else?  All right.  Very well.

09:55:39   5          Now, I want to give you a little overview about

09:55:42   6   what is going to be happening over the next few days.

09:55:47   7          Right now, we are beginning the first stage of the

09:55:50   8   trial, what we call the voir dire examination of the panel,

09:55:53   9   and that is where I and the attorneys will be asking you

09:55:56   10  some questions to help us evaluate you as a potential

09:56:00   11  juror.

09:56:01   12         When the parties address you this morning, they

09:56:05   13  will be asking you various questions, and I want you to

09:56:10   14  understand that they are not seeking to pry unduly into

09:56:13   15  your private affairs.  They are entitled to ask questions

09:56:17   16  to secure a fair and impartial jury.

09:56:22   17         I don't know if it will happen today, but

09:56:24   18  sometimes panel members are asked a question that they

09:56:29   19  don't really want to talk about in front of the whole

09:56:32   20  panel, and if you have any hesitancy about giving a

09:56:37   21  complete answer to something that is private, you just need

09:56:40   22  to say that you want to talk about it to Judge Schroeder,

09:56:44   23  and I'll give you that opportunity to answer the question

09:56:47   24  outside the presence of the other panel members.

09:56:49   25         The important thing this morning is that you give

09:56:52  1  full, complete, and truthful answers to any of the

09:56:55  2  questions that are asked.  There really are no wrong

09:56:58  3  answers as long as the -- your response is full, complete,

09:57:03  4  and truthful.

09:57:04  5        After that, each side will be allowed to strike a

09:57:08  6  certain number of jurors, and the first eight panel members

09:57:14  7  will become our eight jurors.

09:57:18  8        Once the jury is selected, the attorneys for each

09:57:21  9  side will make opening statements, followed by presentation

09:57:25  10 of evidence.

09:57:26  11       After the evidence has been presented, I will

09:57:29  12 instruct you on the law that you must apply in reaching

09:57:33  13 your decision.

09:57:34  14       After that, the parties will present their closing

09:57:37  15 arguments to you, and then you will retire to the jury room

09:57:41  16 to begin your deliberations.

09:57:43  17       The purpose of voir dire is to enable the Court to

09:57:47  18 determine whether or not any prospective juror should be

09:57:53  19 excused from jury service, either by the Court for what we

09:57:59  20 call cause, or by counsel for the parties by way of what is

09:58:02  21 called peremptory challenges, which are challenges for

09:58:07  22 which no reason need be given.

09:58:09  23       Voir dire is an Old French phrase that means to

09:58:14  24 speak the truth, and I know that you will speak the truth

09:58:16  25 as you answer the questions that I and the parties ask you

| | | |
|---|---|---|
| 09:58:19 | 1 | this morning. |
| 09:58:20 | 2 | As I said, please listen carefully to all of the |
| 09:58:24 | 3 | questions, and don't be timid about speaking up if you |
| 09:58:28 | 4 | think they apply to you. |
| 09:58:29 | 5 | Now, I would like to have everybody give us a |
| 09:58:34 | 6 | little bit of basic information about yourselves. |
| 09:58:38 | 7 | We'll start with -- Ms. Ayers [sic], if you would, |
| 09:58:44 | 8 | come to the microphone, please.  And tell us your name, |
| 09:58:54 | 9 | where you live, your city of residence, your occupation, |
| 09:58:58 | 10 | favorite thing to do in your spare time, and if you're |
| 09:59:01 | 11 | married, your spouse's name and occupation. |
| 09:59:05 | 12 | PANEL MEMBER:  My name is Colby Ayers.  I live in |
| 09:59:08 | 13 | White Oak.  I work at Halliburton.  I'm a frac hand. |
| 09:59:14 | 14 | THE COURT:  Could you come up to the microphone |
| 09:59:15 | 15 | for me a little bit? |
| 09:59:17 | 16 | PANEL MEMBER:  Is that okay? |
| 09:59:18 | 17 | THE COURT:  What did you say you did for |
| 09:59:20 | 18 | Halliburton? |
| 09:59:21 | 19 | PANEL MEMBER:  I'm a frac hand for hydraulic |
| 09:59:23 | 20 | fracturing. |
| 09:59:25 | 21 | THE COURT:  Okay.  All right.  So start over if |
| 10:00:01 | 22 | you would. |
| 10:00:02 | 23 | PANEL MEMBER:  My name is Colby Ayers.  I live in |
| 10:00:04 | 24 | White Oak.  I'm a frac hand for Halliburton.  I spend a lot |
| 10:00:09 | 25 | of time away from home.  I work long hours.  Free time, I |

```
10:00:13   1   just like to relax.
10:00:15   2            THE COURT:  Okay.
10:00:15   3            PANEL MEMBER:  Spend time with family and friends.
10:00:18   4            THE COURT:  Okay.  All right.  Thank you,
10:00:20   5   Mr. Ayers.
10:00:22   6            Ms. Ray?
10:00:25   7            PANEL MEMBER:  My name is Wilma Ray.  I reside in
10:00:29   8   Tyler.  I am an employee of the Smith County Tax Office
10:00:33   9   where I am a title clerk there.  I've worked there for
10:00:36  10   26 years.  I am married.  I have two sons, six
10:00:40  11   grandchildren, five great-grandchildren.  And my hobbies
10:00:44  12   and my free time is gardening and watching movies and
10:00:49  13   reading.
10:00:50  14            THE COURT:  All right.  Thank you, ma'am.
10:00:52  15            Let's see, Ms. Glezen?
10:00:58  16            PANEL MEMBER:  My name is Kelsie Glezen.  I reside
10:01:04  17   in Tatum.
10:01:04  18            THE COURT:  Could you get a little closer?
10:01:04  19            PANEL MEMBER:  My name is Kelsie Glezen.  I live
10:01:08  20   in Tatum.  And I work for Llama.  It's a gas station in
10:01:11  21   Longview.  I have no kids.  I'm not married.  And in my
10:01:14  22   free time, I spend time with my family.
10:01:18  23            THE COURT:  All right.  Thank you, ma'am.
10:01:22  24            Ms. Stanford?
10:01:25  25            PANEL MEMBER:  My name is Debbie Stanford.  I'm an
```

| | | |
|---|---|---|
| 10:01:28 | 1 | activity director.  I live in Grand Saline.  I've worked in |
| 10:01:33 | 2 | the healthcare field for 35 years.  My husband is a miner |
| 10:01:38 | 3 | at Morton Salt Company.  And we like to go to the lake and |
| 10:01:41 | 4 | fish a lot whenever we're off. |
| 10:01:43 | 5 | THE COURT:  All right.  Thank you, ma'am. |
| 10:01:44 | 6 | Ms. Vaughan? |
| 10:01:48 | 7 | PANEL MEMBER:  My name is Karen Vaughan.  I live |
| 10:01:51 | 8 | in Flint.  I work in the financial industry for the last |
| 10:01:56 | 9 | 27 years.  My husband is retired from the coal industry. |
| 10:02:05 | 10 | Free time is spent with family and friends. |
| 10:02:09 | 11 | THE COURT:  Thank you. |
| 10:02:13 | 12 | Mr. Mitchell? |
| 10:02:24 | 13 | PANEL MEMBER:  My name is Steve Mitchell.  I'm |
| 10:02:27 | 14 | from Henderson.  I'm retired.  I have a wife.  She works |
| 10:02:31 | 15 | for Lowe's.  And in my spare time, I piddle around the |
| 10:02:34 | 16 | house. |
| 10:02:35 | 17 | THE COURT:  All right.  Thank you, Mr. Henderson. |
| 10:02:38 | 18 | Mr. Hailey? |
| 10:02:42 | 19 | PANEL MEMBER:  Artie Hailey.  Mabank, Texas.  I |
| 10:02:46 | 20 | work for the City of Dallas for 28 years, been married 44, |
| 10:02:52 | 21 | got two kids, and I enjoy woodworking. |
| 10:02:58 | 22 | THE COURT:  All right.  Thank you, sir. |
| 10:03:00 | 23 | Mr. Gross? |
| 10:03:07 | 24 | PANEL MEMBER:  Good morning.  I'm Freeman Gross, |
| 10:03:09 | 25 | III.  I go by Trey.  I grew up in Van.  I live in Tyler, |

10:03:14  1  have for the last 20 years.  I'm a senior store manager for

10:03:19  2  Helzberg Diamonds.  August will be 33 years with the

10:03:22  3  company.  Married for almost 28 years.  My wife, Dana,

10:03:27  4  works for Bassett Furniture here in town.

10:03:33  5          THE COURT:  Thanks, Mr. Gross.

10:03:39  6          Ms. Willis?

10:03:42  7          PANEL MEMBER:  My name is Karen Michelle Willis.

10:03:47  8  I go by Michelle.  I'm an administrative assistant for an

10:03:52  9  insurance office.  My husband is retired.  And in my spare

10:03:56  10  time, I help him rebuild old cars.

10:03:59  11          THE COURT:  All right.  Thank you, Ms. Willis.

10:04:02  12          Mr. Bostic?

10:04:04  13          PANEL MEMBER:  My name is Todd Bostic.  I live in

10:04:09  14  Gun Barrel City.  I sell health and life insurance.  My

10:04:14  15  wife works for an IT health company.  In my spare time, I

10:04:20  16  just like spending it with my family.

10:04:22  17          THE COURT:  All right.  Mr. -- is it Lambeth?

10:04:27  18          PANEL MEMBER:  Yes, Your Honor.  My name is Jim

10:04:45  19  Lambeth.  I'm an attorney with the Linebarger Law Firm here

10:04:48  20  in Tyler, former Assistant DA in Smith County.  Married for

10:04:50  21  35 years, three children, three grandchildren -- two

10:04:53  22  adopted actually but still grandchildren.  Exchange

10:04:59  23  students.  Two of those in Tyler, Texas.  Take care of

10:05:04  24  kids, parents, family, a little bit of gardening, a little

10:05:12  25  repairing on the house.

| | | |
|---|---|---|
| 10:05:12 | 1 | THE COURT:  I bet you've tried a few cases in your |
| 10:05:14 | 2 | day? |
| 10:05:16 | 3 | PANEL MEMBER:  55. |
| 10:05:16 | 4 | THE COURT:  55. |
| 10:05:17 | 5 | PANEL MEMBER:  To jury trial. |
| 10:05:18 | 6 | THE COURT:  Thank you, sir. |
| 10:05:20 | 7 | Ms. Lawrence? |
| 10:05:23 | 8 | PANEL MEMBER:  My name is Ronda Lawrence.  I work |
| 10:05:35 | 9 | for Encore Electric.  My husband works for Tyler Car & |
| 10:05:40 | 10 | Truck.  And enjoy hanging out with family. |
| 10:05:43 | 11 | THE COURT:  Thank you, ma'am. |
| 10:05:55 | 12 | Let's see, Ms. Skoog (pronouncing)? |
| 10:05:55 | 13 | PANEL MEMBER:  Skoog. |
| 10:06:00 | 14 | THE COURT:  Skoog.  Sorry about that. |
| 10:06:00 | 15 | PANEL MEMBER:  That's okay.  My name is Sandra |
| 10:06:02 | 16 | Skoog.  I live in Longview.  I'm a retired school |
| 10:06:07 | 17 | counselor.  My husband is a chemical engineer for Eastman. |
| 10:06:10 | 18 | And we love to travel.  We have one son and daughter-in-law |
| 10:06:13 | 19 | and a grandson. |
| 10:06:14 | 20 | THE COURT:  Thank you, ma'am. |
| 10:06:15 | 21 | Ms. Johnson. |
| 10:06:20 | 22 | PANEL MEMBER:  My name is Judy Johnson.  I live in |
| 10:06:23 | 23 | Quitman, Texas, where I am an 8th grade science teacher.  I |
| 10:06:28 | 24 | have four children, three of which are still here.  And in |
| 10:06:31 | 25 | my spare time, I chase them around, along with my husband |

| | | |
|---|---|---|
| 10:06:36 | 1 | who is a paramedic. |
| 10:06:37 | 2 | THE COURT:  Thank you, ma'am. |
| 10:06:38 | 3 | Ms. Rogers? |
| 10:06:45 | 4 | PANEL MEMBER:  My name is Joan Rogers.  I was born |
| 10:06:49 | 5 | and raised in northwest Kansas, so I'm not a native Texan. |
| 10:06:56 | 6 | I've been living here -- |
| 10:06:56 | 7 | THE COURT:  But you got here as quickly as you |
| 10:06:59 | 8 | could? |
| 10:06:59 | 9 | PANEL MEMBER:  Yeah, just in time for the cold |
| 10:07:01 | 10 | weather that I left when I came to Texas. |
| 10:07:03 | 11 | Anyway, I have been widowed for about three and a |
| 10:07:07 | 12 | half years.  I live with my daughter.  I'm a regional |
| 10:07:11 | 13 | financial assistant -- |
| 10:07:16 | 14 | THE COURT:  Did you say for Christus? |
| 10:07:19 | 15 | PANEL MEMBER:  Christus.  In my spare time, I like |
| 10:07:22 | 16 | to listen to music and in the winter I'm an avid football |
| 10:07:27 | 17 | fan.  Go Chiefs. |
| 10:07:28 | 18 | THE COURT:  Thank you, Ms. Rogers. |
| 10:07:30 | 19 | Mr. Wilkinson? |
| 10:07:38 | 20 | PANEL MEMBER:  My name is Larry Wilkinson.  I have |
| 10:07:46 | 21 | three small businesses in the pet care industry.  I live in |
| 10:07:47 | 22 | Henderson, Texas.  In my spare time, what little I have, I |
| 10:07:52 | 23 | enjoy some cycle riding and spending time with the |
| 10:07:56 | 24 | grandchildren -- two daughters, five grandchildren. |
| 10:07:59 | 25 | Married.  My wife works at a -- she's a librarian for a |

10:08:04  1   local school district.

10:08:06  2           THE COURT:  All right.  Thank you, Mr. Wilkinson.

10:08:09  3           Ms. Rodgers?

10:08:10  4           PANEL MEMBER:  Good morning.  My name is Celsey

10:08:18  5   Rodgers.  I have two children, which are in school.  And my

10:08:20  6   husband works for Bi-State Energy.  I work for Trinity

10:08:25  7   Valley Community College, and I also work for Texas

10:08:29  8   Department of Criminal Justice for offenders and free world

10:08:35  9   college enrollment students.  And in my spare time, I spend

10:08:39  10  time with my children and kids.

10:08:41  11          THE COURT:  Thank you, ma'am.

10:08:49  12          Mr. Bittick?

10:08:52  13          PANEL MEMBER:  Brian Bittick.  I'm an insurance

10:08:54  14  agent for 35 years.  My wife is a real estate agent for 20.

10:08:58  15  And I live in Kilgore.  I spend time with my grandkids and

10:09:02  16  kids when I can and mow the yard too much.

10:09:11  17          THE COURT:  All right.  Thank you, Mr. Bittick.

10:09:15  18          Ms. Elson?

10:09:16  19          PANEL MEMBER:  My name is Hannah Elson.  I work

10:09:21  20  for Visiting Angels out of Longview, home health.  I have

10:09:26  21  one daughter, and I'm not married.

10:09:28  22          THE COURT:  Okay.  Thank you, Ms. Elson.

10:09:30  23          Ms. Miller?

10:09:39  24          PANEL MEMBER:  My name is Kelly Miller, and I work

10:09:43  25  at Trane.  I am married.  I have two kids and one grandkid.

10:09:47  1   And all my spare time, we just like to spend time at home

10:09:51  2   and have barbecues.

10:09:55  3            THE COURT:  All right.  Thank you, Ms. Miller.

10:09:58  4            Mr. Lyle?

10:09:59  5            PANEL MEMBER:  Good morning.  My name is Lance

10:10:02  6   Lyle.  I'm a supervisor for the distribution department for

10:10:07  7   Tyler Pipe.  I have been married for seven years.  Me and

10:10:11  8   my wife adopted twin baby girls about a year and a half

10:10:16  9   ago, and that's obviously something I like to brag about

10:10:18  10  and talk about in my free time.  And I also work out.

10:10:23  11           THE COURT:  Well, I have twins, too, Mr. Lyle, and

10:10:26  12  I will tell you, you will survive.

10:10:28  13           PANEL MEMBER:  They just started walking.

10:10:30  14           THE COURT:  You may not -- oh, well, that's --

10:10:31  15  then your life got a whole lot more complicated.

10:10:35  16           PANEL MEMBER:  Everything everybody says is true.

10:10:37  17           THE COURT:  It is.

10:10:37  18           PANEL MEMBER:  Yes, sir.

10:10:38  19           THE COURT:  You have to go to a zone defense.  No

10:10:42  20  more man-to-man defense.

10:10:44  21           PANEL MEMBER:  It takes a team for sure.

10:10:46  22           THE COURT:  It does.  Good luck with that.

10:10:49  23           Let's see.  Ms. Assenheimer?

10:10:56  24           PANEL MEMBER:  My name is Devin Assenheimer.  I'm

10:11:01  25  a nurse.  And my fiance is a forester.  And in my free time

10:11:09  1   I like to fish and hike or do anything that's outdoors.

10:11:13  2         THE COURT:  Okay.  Thank you.

10:11:24  3         Let's see, Ms. Decco?

10:11:27  4         PANEL MEMBER:  My name is Tanya Decco.  I work

10:11:33  5   for -- I'm a cashier at Super 1 Foods in Longview, Texas.

10:11:40  6   My mother has COPD.  It's getting severe.  I'm taking care

10:11:45  7   of her.  And my husband -- I am married for eight years.

10:11:48  8   My husband is disabled.  He had -- he has personal reasons

10:11:55  9   why he's on disability.  If you need to know, I'll be glad

10:12:00  10  to share.

10:12:02  11        THE COURT:  That's okay.

10:12:03  12        PANEL MEMBER:  I have one stepdaughter and a

10:12:06  13  grand -- grand-baby by her.  I have a son that's in the

10:12:11  14  Navy, active.  And I have a 12-year old that I'm also

10:12:19  15  taking care of.

10:12:21  16        THE COURT:  Yes, ma'am.

10:12:22  17        PANEL MEMBER:  I thought that we're supposed to

10:12:25  18  tell you the reason why --

10:12:27  19        THE COURT:  Well, at the very end we'll discuss

10:12:30  20  about what would make this week a difficult week for you to

10:12:37  21  serve as a juror.  Sounds like you've got your plate full

10:12:41  22  as it is.

10:12:42  23        PANEL MEMBER:  I really do.

10:12:43  24        THE COURT:  I understand.  We'll get through the

10:12:45  25  voir dire process, and the attorneys may have some

10:12:48  1   questions for you, but we'll address what we call hardship

10:12:51  2   things at the very end.  But I appreciate your comments,

10:12:55  3   Ms. Decco.

10:12:57  4          PANEL MEMBER:  Okay.  For my spare time, I just

10:12:59  5   like taking care of my child and everybody else -- pretty

10:13:04  6   much everybody else.

10:13:04  7          THE COURT:  Doesn't sound like you have much spare

10:13:09  8   time.

10:13:09  9          PANEL MEMBER:  I don't.

10:13:11  10         THE COURT:  All right.  Thank you, ma'am.

10:13:11  11         PANEL MEMBER:  Thank you.

10:13:12  12         THE COURT:  Ms. Morrow?

10:13:23  13         PANEL MEMBER:  My name is Sheila Morrow.  I'm a

10:13:27  14  widow.  I live in Chapel Hill.  I have two kids.  Music.

10:13:40  15         THE COURT:  Okay.  Thank you, ma'am.

10:13:43  16         Okay.  I'm now going to ask counsel for the

10:13:47  17  Plaintiff to introduce himself and his client, as well as

10:13:52  18  members of their team who will be presenting this case, as

10:13:58  19  well as any witnesses who will testify during the

10:14:00  20  Plaintiff's presentation of its case-in-chief.

10:14:04  21         As he comes forward to speak to you, I'm going to

10:14:10  22  ask the panel to have a few questions in mind for the

10:14:13  23  people who are introduced and identified.  Do you know the

10:14:19  24  people who are introduced or identified?  Are you related

10:14:25  25  to them?  Do you have any kind of connection to them at

10:14:30  1   all, a social connection, a business connection, through

10:14:37  2   church or the community or something like that?  Have you

10:14:39  3   had any kind of business dealings with them?

10:14:42  4        With respect to the attorneys, were you ever

10:14:45  5   represented by them or by members of their law firm?

10:14:49  6   Really, just any kind of knowledge about or familiarity

10:14:52  7   with any of the people who are either introduced here in

10:14:55  8   the courtroom or identified.

10:14:57  9        Mr. Bennett?

10:15:00  10        MR. BENNETT:  Thank you, Your Honor.  Joshua

10:15:03  11   J. Bennett here on behalf of Lone Star Technological

10:15:06  12   Innovations, LLC.

10:15:06  13        THE COURT:  Mr. Bennett, if you would go to the

10:15:09  14   podium.

10:15:10  15        MR. BENNETT:  Yes, Your Honor.  Here with us is

10:15:13  16   Jesse Rice on behalf of Lone Star.  My co-counsel is John

10:15:21  17   Saba.  And Jason Bloom is here with us, as well.  We have

10:15:25  18   other lawyers who may help us out who couldn't fit into the

10:15:28  19   room.  But Monica Litle and Brad Liddle who work with me in

10:15:33  20   my office.  And then John Lee who is a lawyer out of

10:15:38  21   California.  So that's my legal team and our client.

10:15:40  22        Our witnesses will be -- our first witness will be

10:15:43  23   Mr. Rice, and then we'll call on other witnesses -- a

10:15:46  24   couple of experts.  One will be Dr. Al Ducharme, as well as

10:15:52  25   Glenn Perdue.  So those will be our witnesses.  There will

| | | |
|---|---|---|
| 10:15:56 | 1 | be witnesses called, as well, from the other side, so those |
| 10:16:00 | 2 | are our witnesses and parties, Your Honor. |
| 10:16:05 | 3 | THE COURT:  Thank you, Mr. Bennett. |
| 10:16:06 | 4 | Okay.  So, ladies and gentlemen of the panel, of |
| 10:16:09 | 5 | the people introduced by Mr. Bennett or identified as |
| 10:16:12 | 6 | potential witnesses in the case, do any of you know any of |
| 10:16:16 | 7 | them, any -- any relationship with them?  With respect to |
| 10:16:20 | 8 | the attorneys, have you ever been represented by them or by |
| 10:16:23 | 9 | members of their firm?  Are you related to anybody, know |
| 10:16:28 | 10 | them in any way, go to church with anyone? |
| 10:16:33 | 11 | I take it by your silence, no one is familiar with |
| 10:16:36 | 12 | any of those folks.  Okay.  All right. |
| 10:16:39 | 13 | Very well.  Let me ask Mr. Joshi to come forward |
| 10:16:43 | 14 | at this time. |
| 10:16:45 | 15 | Oh, I'm sorry.  Mr. Oliver, you're selecting the |
| 10:16:48 | 16 | jury. |
| 10:16:50 | 17 | Mr. Oliver, if you would, please go to the podium, |
| 10:16:52 | 18 | and we'll do the same thing with respect to the Defendants. |
| 10:16:55 | 19 | And, ladies and gentlemen, I'll ask you to have |
| 10:16:57 | 20 | the same questions in mind for the people introduced by |
| 10:17:01 | 21 | Mr. Oliver and identified by him as witnesses in the case. |
| 10:17:08 | 22 | MR. OLIVER:  Thank you, Your Honor. |
| 10:17:09 | 23 | Good morning.  I think it's still morning.  My |
| 10:17:11 | 24 | name is Andrew Oliver.  I'm a lawyer for ASUSTeK.  I'll |
| 10:17:16 | 25 | probably refer to them as ASUS during the course of the |

10:17:19   1   trial.

10:17:20   2          I am in Tyler from time to time but haven't been

10:17:24   3   here since before COVID.  So if you saw me before and knew

10:17:28   4   me from before, then you would have seen me with a

10:17:31   5   respectable hair cut, not a long haircut that my pastor

10:17:35   6   almost didn't recognize me in.

10:17:37   7          My co-counsel is Vinay Joshi.  We worked together

10:17:41   8   as lawyers for about twenty -- we started working together

10:17:44   9   about 20 years ago.

10:17:46   10         Mr. Michael McCarady is going to be the corporate

10:17:52   11   representative for ASUS.  He is from Dallas, lived in

10:17:56   12   Dallas long-term.  ASUS tried to send him out of Texas, and

10:18:00   13   he refused.  But Mr. McCarty represents -- works in

10:18:06   14   customer service and has teams that all over South America

10:18:10   15   and Central America and some of the United States that he

10:18:14   16   supervises for ASUS.

10:18:15   17         We're going to have a few witnesses that are not

10:18:18   18   here today.  Jaime or Jaime Morquecho.  He is from

10:18:22   19   California, works for ASUS.

10:18:25   20         Mr. Alvin Lin will be a witness.  He is from

10:18:31   21   Taiwan.  It's probably unlikely you have met him, but I

10:18:34   22   wanted to give his name just in case.

10:18:42   23         Dr. Robert Stevenson, you may have seen him

10:18:47   24   briefly walk in.  He is a professor at the University of

10:18:47   25   Notre Dame.  He'll be testifying.

10:18:55   1          And also Brett Reed, who you may have seen walk in

10:18:55   2    earlier -- and they both left when they were asked to

10:19:00   3    leave -- is a witness from a company called Competition

10:19:00   4    Economics.

10:19:01   5          We won't have any other lawyers coming into the

10:19:04   6    courtroom, and those are all the witnesses and the

10:19:06   7    corporate representative.

10:19:09   8          THE COURT:  Thank you, Mr. Oliver.

10:19:11   9          So, ladies and gentlemen, of the people who were

10:19:16   10   introduced or identified by Mr. Oliver as either attorneys

10:19:20   11   working in the case or witnesses in the matter, do any of

10:19:26   12   you know any of them, familiar with them at all, or related

10:19:30   13   to them at all, go the church with them?  Anyone have any

10:19:35   14   familiarity at all with any of the people identified or

10:19:38   15   introduced by Mr. Oliver?

10:19:40   16          Okay.  I take it by your silence, you do not.

10:19:43   17          Now, my next question relates to prior jury

10:19:51   18   service you all have -- may have had.  And so I'm looking

10:19:53   19   for a number of categories.  It can be any kind of a case,

10:19:57   20   a criminal case or a civil case, or a -- were you've served

10:20:00   21   as members of a jury or a grand jury, either in state court

10:20:05   22   or federal court.  I just need to know generally what kind

10:20:08   23   of case it was, where it was, and whether the jury reached

10:20:11   24   a verdict.

10:20:13   25          So anybody on the left side of the room already

| | | |
|---|---|---|
| 10:20:16 | 1 | served on a jury? |
| 10:20:18 | 2 | All right.  Let's just take it row by row. |
| 10:20:21 | 3 | We'll start with you, Ms. Vaughan. |
| 10:20:25 | 4 | Ms. Vaughan, would you come forward, please. |
| 10:20:29 | 5 | PANEL MEMBER:  Previously, I've served on two |
| 10:20:33 | 6 | juries.  One was an assault case, and one was a shoplifting |
| 10:20:37 | 7 | case. |
| 10:20:38 | 8 | THE COURT:  Were both of those in Smith County? |
| 10:20:40 | 9 | PANEL MEMBER:  They were. |
| 10:20:41 | 10 | THE COURT:  And did a jury reach a verdict in both |
| 10:20:44 | 11 | cases? |
| 10:20:47 | 12 | PANEL MEMBER:  Yes. |
| 10:20:47 | 13 | THE COURT:  Okay.  Thank you, ma'am. |
| 10:20:48 | 14 | All right.  Who else? |
| 10:20:52 | 15 | Let's see.  Yes, sir.  Mr. Hailey?  If you'll just |
| 10:20:54 | 16 | come forward. |
| 10:20:54 | 17 | PANEL MEMBER:  I was on two trials.  Both civil. |
| 10:20:58 | 18 | THE COURT:  And whereabouts was that? |
| 10:20:59 | 19 | PANEL MEMBER:  One was in Dallas back in the '70s, |
| 10:21:02 | 20 | and one was in Van Zandt County about two years ago. |
| 10:21:07 | 21 | THE COURT:  All right.  Did you reach a verdict |
| 10:21:10 | 22 | both times? |
| 10:21:12 | 23 | PANEL MEMBER:  Yes, sir. |
| 10:21:12 | 24 | THE COURT:  Okay.  Thank you, Mr. Hailey. |
| 10:21:15 | 25 | Who else in the first -- Mr. Mitchell? |

10:21:27    1              PANEL MEMBER:  I served on -- I served on one in

10:21:31    2    Henderson -- Rusk County.  It was a sexual case, and we

10:21:32    3    found him not guilty.

10:21:34    4              THE COURT:  Okay.  Thank you, sir.

10:21:42    5              Mr. Bostic?

10:21:44    6              PANEL MEMBER:  I served on one, and it was a

10:21:47    7    statutory rape case, and it was -- he was found guilty.

10:21:51    8              THE COURT:  Okay.  Thank you, sir.

10:21:53    9              Mr. Lambeth, did you raise your hand?

10:21:57   10              PANEL MEMBER:  Yes.  Yes, Your Honor.

10:22:04   11              I served on a civil case that was a contract

10:22:09   12    dispute case out of Kaufman County.

10:22:12   13              THE COURT:  And where was it?

10:22:13   14              PANEL MEMBER:  Kaufman County --

10:22:13   15              THE COURT:  Kaufman.

10:22:13   16              PANEL MEMBER:  -- where I formerly lived.

10:22:17   17              THE COURT:  Oh, okay.  All right.  Reach a verdict

10:22:17   18    in that case?

10:22:19   19              PANEL MEMBER:  Yes, Your Honor, we did.

10:22:21   20              THE COURT:  Okay.  Thank you, sir.

10:22:21   21              Let's -- right side of the room.  Ms. Skoog?

10:22:28   22              PANEL MEMBER:  I previously served in a civil

10:22:30   23    trial in Gregg County, personal injury, and it was probably

10:22:34   24    about 30 years ago.

10:22:36   25              THE COURT:  Reach a verdict?

10:22:36   1          PANEL MEMBER:  Yes, we did.

10:22:38   2          THE COURT:  Okay.  Who else?

10:22:40   3          Let's see, Ms. Rodgers?

10:22:43   4          PANEL MEMBER:  I served on a trial, DWI, in

10:22:46   5   Anderson County.

10:22:47   6          THE COURT:  Reach a verdict?

10:22:49   7          PANEL MEMBER:  Yes.

10:22:49   8          THE COURT:  Thank you, ma'am.

10:22:57   9          Who else on the right side of the room?  Anybody

10:22:59  10   else?  Nobody else?

10:23:01  11          Okay.  All right.  My next question relates to any

10:23:05  12   previous involvement that you may have had, a family member

10:23:09  13   might have had, or a close, personal friend might have had

10:23:12  14   in some sort of a legal proceeding.  And -- so it can be

10:23:16  15   any court, it can be a criminal matter, it can be a civil

10:23:20  16   matter that concerned yourself, a member of your family, or

10:23:24  17   close personal friend, and the categories are Plaintiff,

10:23:30  18   Defendant, witness, or victim.

10:23:33  19          And I don't need to know a lot of details or you

10:23:35  20   know, exactly what happened.  If you'd just generally tell

10:23:39  21   me what kind of case it was and sort of which categories

10:23:44  22   you would fall in, in that regard.

10:23:47  23          All right.  Left side of the room.  Anybody?

10:23:50  24          Ms. Vaughan, if you would.

10:23:57  25          PANEL MEMBER:  It was a child custody case for my

| Time | # | Text |
|---|---|---|
| 10:24:00 | 1 | grandchildren. |
| 10:24:00 | 2 | THE COURT:  Okay.  Thank you, ma'am. |
| 10:24:11 | 3 | Who else on the left side of the room?  Anyone |
| 10:24:13 | 4 | else on the left side of the room? |
| 10:24:15 | 5 | Right side of the room? |
| 10:24:18 | 6 | Yes, ma'am.  Ms. Johnson? |
| 10:24:19 | 7 | PANEL MEMBER:  I was a Plaintiff in a medical |
| 10:24:20 | 8 | malpractice suit for my mother's death. |
| 10:24:24 | 9 | THE COURT:  Okay.  Thank you, ma'am. |
| 10:24:34 | 10 | Mr. Wilkinson? |
| 10:24:34 | 11 | PANEL MEMBER:  I had a case on an adoption in Rusk |
| 10:24:38 | 12 | County for my daughter. |
| 10:24:39 | 13 | THE COURT:  Where you -- when you were adopting |
| 10:24:41 | 14 | her? |
| 10:24:41 | 15 | PANEL MEMBER:  Yes. |
| 10:24:42 | 16 | THE COURT:  Okay.  Thank you, Mr. Wilkinson. |
| 10:24:46 | 17 | Who else on the right side of the room? |
| 10:24:50 | 18 | Ms. Miller? |
| 10:24:58 | 19 | PANEL MEMBER:  For my son.  He had got in trouble |
| 10:25:01 | 20 | with -- got caught with some marijuana, so... |
| 10:25:05 | 21 | THE COURT:  Okay.  All right.  Thank you, ma'am. |
| 10:25:06 | 22 | Who else on the right side of the room? |
| 10:25:08 | 23 | Yes, sir.  Mr. Bostic? |
| 10:25:12 | 24 | PANEL MEMBER:  I don't know if this counts.  My |
| 10:25:14 | 25 | wife and I had to go to court over the adoption of my son. |

| | | |
|---|---|---|
| 10:25:18 | 1 | THE COURT:  That's fine.  That's fine.  Thank you |
| 10:25:20 | 2 | for telling me that. |
| 10:25:21 | 3 | One more. |
| 10:25:22 | 4 | Ms. Rodgers? |
| 10:25:26 | 5 | PANEL MEMBER:  This is very difficult for me to |
| 10:25:28 | 6 | even say.  I'm not sure if it's going to be a case or -- or |
| 10:25:32 | 7 | a case. |
| 10:25:33 | 8 | THE COURT:  Yes, ma'am. |
| 10:25:34 | 9 | PANEL MEMBER:  My brother was murdered a month |
| 10:25:36 | 10 | ago. |
| 10:25:36 | 11 | THE COURT:  Oh, ma'am, I'm so sorry. |
| 10:25:38 | 12 | PANEL MEMBER:  So I'm not sure if there will be |
| 10:25:41 | 13 | justice or not. |
| 10:25:42 | 14 | THE COURT:  Okay.  Okay.  All right.  Thank you |
| 10:25:44 | 15 | for telling me that, Ms. Rodgers. |
| 10:25:48 | 16 | PANEL MEMBER:  I have a family member -- sorry -- |
| 10:25:50 | 17 | that was involved with a drug case. |
| 10:25:51 | 18 | THE COURT:  All right.  Thank you, ma'am. |
| 10:25:54 | 19 | Anyone else? |
| 10:25:57 | 20 | So let me just -- of those who came forward and |
| 10:26:01 | 21 | told us a little bit about your involvement with the |
| 10:26:05 | 22 | judicial system prior to today, is there anything about |
| 10:26:09 | 23 | anyone's experience that you think would make it difficult |
| 10:26:14 | 24 | for you to serve as a juror in this case and be fair and |
| 10:26:19 | 25 | impartial to both sides? |

10:26:21   1          Is there anything about your experience with

10:26:24   2   the -- our justice system in light of that experience that

10:26:31   3   would -- that would sort of start you out, before you know

10:26:36   4   anything about the facts of this case, leaning one side or

10:26:40   5   the other?  Anybody think they would have any trouble

10:26:44   6   setting any previous experience aside?

10:26:47   7          I take it by your silence you would not.

10:26:50   8          All right.  My next question is this:  Will you,

10:26:55   9   if you are selected to be a member of this jury, be able to

10:27:00   10  render a verdict that is solely based on the evidence that

10:27:04   11  is presented at trial and in the context of the law as I

10:27:09   12  give it to you in my instructions, disregarding any other

10:27:14   13  ideas or notions or beliefs about the law that you may have

10:27:20   14  encountered in reaching your verdict?

10:27:26   15         Does anyone think they would have any trouble

10:27:28   16  doing that?  I take it by your silence you would not.

10:27:31   17         If you're selected as a juror in this case, one of

10:27:36   18  the rules that I will tell you about is that you can't talk

10:27:39   19  about the case with anyone until all of the evidence has

10:27:43   20  been presented and you have been instructed on the law.

10:27:46   21  That means you can't talk to your family members in the

10:27:50   22  evenings about it, you can't talk to your fellow jurors

10:27:54   23  during the course of the trial, until at the very end and I

10:27:57   24  tell you, you can begin your deliberations at that point.

10:28:02   25         So that means you -- you can't communicate with

10:28:05  1  anyone in any way, whether in writing or email or text

10:28:09  2  messaging or commenting or blogging on any social media

10:28:18  3  site like Twitter or Facebook or Instagram or any of those.

10:28:26  4  And if you feel like you would have trouble doing that,

10:28:30  5  then you can't let yourself become a member of the jury in

10:28:33  6  this case.

10:28:34  7       Is there anyone here today who would not be able

10:28:37  8  to comply with that restriction?

10:28:40  9       Okay.  I take it by your silence you all could.

10:28:43  10      I will also instruct you that you cannot conduct

10:28:47  11  any type of independent or personal research or

10:28:51  12  investigation regarding any of the matters involved in this

10:28:54  13  case.  So you can't use your cellphone or a tablet or a

10:29:01  14  computer or any kind of device to do any kind of research

10:29:05  15  or investigation regarding the case, the matters in the

10:29:07  16  case, the legal issues, the parties involved, or the

10:29:10  17  attorneys involved.

10:29:11  18      So in the evenings, you can't go home and, you

10:29:15  19  know, Google the parties' names or the attorneys' names or

10:29:22  20  try to find out anything about the case.

10:29:24  21      Likewise, if you happen inadvertently to come

10:29:28  22  across any type of information, you must ignore that

10:29:33  23  information.  I doubt there will be anything in the

10:29:36  24  newspapers about this case or on television or the radio,

10:29:41  25  but if there is, I would ask that you just ignore that, and

10:29:45   1   don't read the article or change the -- change the channel.

10:29:52   2          Having said that, if you feel you cannot follow my

10:29:56   3   instructions in that regard, again, you can't let yourself

10:29:59   4   become a member of the jury.

10:30:01   5          Is there anyone here who feels like they could not

10:30:05   6   comply with my instructions in that regard?

10:30:08   7          All right.  I take it by your silence, you could

10:30:11   8   all follow the rules on that.

10:30:14   9          Is there any other reason that you could think

10:30:17  10   about that you could not sit on the jury in this case and

10:30:21  11   render a verdict, a fair verdict based upon the evidence

10:30:27  12   that's presented to you and in the context of the

10:30:30  13   instructions I give you about the law that you are to

10:30:35  14   apply?  Is there anyone who would not be able to do that?

10:30:45  15          All right.  I want to say a couple more things

10:30:48  16   before I turn the questioning over to the parties.

10:30:53  17          The jurors who are selected will actually serve in

10:30:56  18   the role of judges of the facts and will make the sole

10:31:00  19   determination about what the facts are in the case.

10:31:06  20          My job as the Judge is to rule on questions of

10:31:09  21   law, evidence, and procedure, and to control the courtroom

10:31:11  22   and the flow of the trial.

10:31:13  23          I want to say a couple of things about our

10:31:16  24   judicial system that will hopefully put things in proper

10:31:21  25   perspective.  Our judicial system is an adversary system.

10:31:30   1  That means that during the trial, each side and their

10:31:33   2  lawyers are going to try to present their respective cases

10:31:36   3  to the jury in the very best light possible.

10:31:38   4       And with regard to the lawyers, they, I know --

10:31:41   5  not these particularly but larger -- lawyers as a whole

10:31:46   6  sometimes are criticized by the public and the media, and I

10:31:50   7  think this often results from a basic misunderstanding of

10:31:54   8  our adversary system in which lawyers are required to act

10:32:02   9  as advocates for competing parties and are ethically and

10:32:06  10  legally obligated to zealously assert his or her client's

10:32:11  11  position under the rules of our system.

10:32:13  12       By presenting the very best case possible, I think

10:32:18  13  that attorneys assist the jurors in better weighing the

10:32:24  14  relevant evidence in order for the jury to determine the

10:32:27  15  truth and to arrive at a just verdict based on the

10:32:37  16  evidence.

10:32:37  17       This is a system of justice that has served our

10:32:41  18  nation well for more than 200 years.  And our lawyers --

10:32:44  19  America's lawyers have been and continue to be a critical

10:32:47  20  part of that process.

10:32:47  21       So as the trial goes forward, I may frown at these

10:32:53  22  attorneys from time to time, I may growl at them from time

10:32:56  23  to time, but it's just because I'm trying to make sure they

10:32:59  24  don't get outside the boundaries of our adversary system

10:33:03  25  and our rules of procedure.  But I would ask that you keep

| | |
|---|---|
| 10:33:06 | 1 |
| 10:33:08 | 2 |
| 10:33:12 | 3 |
| 10:33:13 | 4 |
| 10:33:16 | 5 |
| 10:33:23 | 6 |
| 10:33:26 | 7 |
| 10:33:29 | 8 |
| 10:33:32 | 9 |
| 10:33:34 | 10 |
| 10:33:40 | 11 |
| 10:33:43 | 12 |
| 10:33:48 | 13 |
| 10:33:51 | 14 |
| 10:33:54 | 15 |
| 10:33:57 | 16 |
| 10:33:58 | 17 |
| 10:34:03 | 18 |
| 10:34:05 | 19 |
| 10:34:09 | 20 |
| 10:34:10 | 21 |
| 10:34:16 | 22 |
| 10:34:16 | 23 |
| 10:34:18 | 24 |
| 10:34:20 | 25 |

1  in mind that they're just doing their jobs, and I think
2  it's all important for us -- all of you to be aware that
3  that's the case as we go forward.
4       The parties will now have an opportunity to ask
5  some questions of you.  Again, there are no wrong answers.
6  As long as your answer is a truthful response to the
7  question that's asked, that's the right answer.
8       The lawyers and their clients are entitled to the
9  information to be gained through these questions, and they
10  are not here to unduly pry into your private affairs but to
11  gather information for the purpose of selecting a fair and
12  impartial jury.
13       Now, if I don't think they're entitled to ask a
14  question, I'll certainly let them know that, but these
15  attorneys are familiar with the rules of our court and I
16  know they will follow those.
17       Again, if any of you have any serious hesitancy at
18  all about answering a question in front of the entire
19  panel, just let me know that, and we can deal with that at
20  the very end.
21       I will now allow counsel for the Plaintiff to voir
22  dire the jury.
23       MR. BENNETT:  Thank you, Your Honor.  May I have a
24  five-minute warning, please, Your Honor?
25       THE COURT:  Yes.

10:34:21   1          MR. BENNETT:  Thank you.

10:34:25   2          Ladies and gentlemen of the jury panel, I'll echo

10:34:27   3    the Judge's appreciation.  We appreciate you taking time

10:34:31   4    out of your lives to do your civic duty.

10:34:35   5          Y'all shared information about yourselves.  I

10:34:37   6    think it's only fair I do the same.  I have been married

10:34:42   7    21 years.  I have four kids.  And if Judge and Mr. Lyle

10:34:46   8    permit me, I'll join the twins club.  The last two I had

10:34:50   9    were twins.  We had my oldest daughter, my boy, and then

10:34:55   10   twins.  It was a surprise, so we quit at four before we had

10:35:00   11   quadruplets.  We stay busy.  When I'm not at work, I'm at

10:35:04   12   home having fun with my family.  We like to hit national

10:35:07   13   parks when we can.  We've hit a few of those.  We've spent

10:35:08   14   time in the Ozarks.  That's what we like to do.

10:35:13   15          So in a prior life, I was a school teacher, and I

10:35:17   16   taught down in McAllen, Texas.  I coached some sports,

10:35:20   17   helped them start their first wrestling team.  Taught

10:35:23   18   government, and that's actually what got me kind of

10:35:25   19   thinking about law.  I taught basically constitutional law

10:35:29   20   to high school seniors, and I made the decision and it's

10:35:32   21   been a good decision.

10:35:33   22          But teaching is a little bit what we're talking

10:35:35   23   about today.  We call it patents, but that's what patents

10:35:39   24   do, they teach.  They teach an idea to the public.  And

10:35:41   25   that's what we're here to talk about, an idea, an

10:35:43  1   innovation that Lone Star owns that it's seeking to protect

10:35:46  2   the unauthorized use from another company, and that's ASUS.

10:35:52  3           It's sort of like a rental property.  We open it

10:35:56  4   up to the public.  If they want to come and use it, they

10:35:59  5   have to pay for that use.  Those who take it and don't pay,

10:36:03  6   we have rights to assert.  That's what we're here to do is

10:36:05  7   assert those rights and protect it.

10:36:08  8           I've got the patent here.  It's not terribly long

10:36:11  9   for a patent.  I won't be able to do it justice in the time

10:36:17  10  I have.  I don't have a lot of time.  I need to ask some

10:36:20  11  questions.  But a high level summary of the patent is it's

10:36:23  12  a method -- you'll hear more about this -- for displaying

10:36:28  13  real-time video images on a monitor and a way to enhance

10:36:31  14  and control color use on that monitor, and a change of

10:36:37  15  color and only that one color as desired by the user.  And

10:36:40  16  we'll show later in the trial that that innovation has some

10:36:43  17  value.

10:36:43  18          Now, of course, ASUS -- they deny all that, that

10:36:46  19  they infringe on our rights, that they're using -- we call

10:36:50  20  it infringement.  It's -- trespassing is another way of

10:36:52  21  thinking about that, that they trespass on our rights.

10:36:55  22  They say they don't.

10:36:56  23          They'll also say that we've overstated what we

10:37:00  24  think the worth of that invention is.  They think it's

10:37:03  25  pennies on the dollar at best, and we say it's worth a lot

| | | |
|---|---|---|
| 10:37:06 | 1 | more than that, 57 cents or so.  Multiplied over hundreds, |
| 10:37:11 | 2 | maybe thousands of devices, that's gets to be a big |
| 10:37:14 | 3 | difference.  And that's part of our dispute.  We're far |
| 10:37:18 | 4 | apart -- really why we're here, why we need you to help us |
| 10:37:21 | 5 | resolve that dispute. |
| 10:37:23 | 6 | In fact, we really can't do that without you. |
| 10:37:24 | 7 | This is the last refuge we have to resolve that dispute and |
| 10:37:31 | 8 | stick up for our property. |
| 10:37:33 | 9 | So with that background of the case, picking a |
| 10:37:37 | 10 | jury is sort of how I took my ACTs, SATs when I was going |
| 10:37:42 | 11 | to college.  It's sort of you pick what you think works and |
| 10:37:44 | 12 | you eliminate the rest, right?  It's best guess.  So that's |
| 10:37:47 | 13 | really what this is about.  We're asking questions to find |
| 10:37:48 | 14 | out fairness.  The Judge touched on that earlier, right? |
| 10:37:51 | 15 | All of us are a product of our life experiences, and all of |
| 10:37:54 | 16 | those life experiences influence how we lean, one way or |
| 10:37:57 | 17 | the other.  The Judge mentioned that earlier. |
| 10:37:59 | 18 | So, for example, having been a teacher, if this |
| 10:38:02 | 19 | were a case about a teacher maybe giving a little too much |
| 10:38:07 | 20 | discipline, having spent some time in the classroom, I |
| 10:38:09 | 21 | might lean towards that teacher's side because I empathize |
| 10:38:13 | 22 | a little bit.  That's okay to lean.  Lean doesn't |
| 10:38:15 | 23 | disqualify you.  What's wrong is if you lean, and you don't |
| 10:38:19 | 24 | tell us.  That's what we're here to find out, which way do |
| 10:38:19 | 25 | you lean? |

10:38:24  1          So my questions, if I ask them, I'm not picking on

10:38:26  2   you.  If you need a private answer, like the Judge said, we

10:38:30  3   can wait until the end.  You can tell me that, and we'll

10:38:32  4   hold it until the end.  But fairness to both sides is what

10:38:36  5   we're after here.  And so let's just talk about which way

10:38:38  6   you lean on some issues.

10:38:38  7          So let's start with just the obvious one,

10:38:41  8   lawsuits.  How many folks think there's just too many

10:38:46  9   lawsuits?  Anyone out there?

10:38:50  10          PANEL MEMBER:  Too many lawsuits?

10:38:52  11          MR. BENNETT:  Too many lawsuits, yes.  All right.

10:38:55  12   Hands up -- hands up high.

10:38:57  13          Mr. Ayers, tell me about that.  Why do you think

10:39:00  14   there's too many lawsuits.

10:39:02  15          THE COURT:  Mr. Ayers, could you come to the

10:39:05  16   microphone?

10:39:07  17          PANEL MEMBER:  There's enough stuff that people

10:39:11  18   argue about.  I feel like it comes down to whose ego is

10:39:16  19   bigger than whose, and nobody wants to tuck tail and admit

10:39:20  20   a wrongdoing at a time when we're all adults.  You

10:39:23  21   understand someone did something wrong, and it's just -- no

10:39:28  22   one want to feel inferior, I feel like, in life.  It's

10:39:33  23   just -- egos get in the way, and everybody wants to cause

10:39:35  24   an argument and just -- it just happens too much.

10:39:40  25          MR. BENNETT:  Okay.  Thank you, Mr. Ayers.

10:39:43  1   Appreciate that.  Anyone feel like Mr. Ayers, too many

10:39:46  2   lawsuits?

10:39:46  3          Ms. Skoog?

10:39:48  4          PANEL MEMBER:  Well, I just think there are too

10:39:53  5   many.  I think they're filed frivolously many times, but I

10:39:57  6   also realize that sometimes it's the only way matters get

10:40:00  7   resolved.

10:40:00  8          MR. BENNETT:  Okay.  And so --

10:40:01  9          PANEL MEMBER:  It's a question of number.

10:40:02  10         MR. BENNETT:  Right.  There may be a lot, but each

10:40:05  11  case can be decided on its own merits?

10:40:09  12         PANEL MEMBER:  Right.

10:40:10  13         MR. BENNETT:  And some of them have merit and some

10:40:12  14  don't?

10:40:12  15         PANEL MEMBER:  Right.

10:40:13  16         MR. BENNETT:  Thank you, Ms. Skoog.  Anyone else?

10:40:16  17  Too many lawsuits?

10:40:19  18         Ms. Morrow?

10:40:30  19         PANEL MEMBER:  I just think there's too many --

10:40:30  20         MR. BENNETT:  Is it --

10:40:33  21         PANEL MEMBER:  Like McDonald's.

10:40:33  22         MR. BENNETT:  Okay.  Do you feel, though, like --

10:40:37  23  like Ms. Skoog, that sometimes there may be too many but

10:40:39  24  there's good ones and there's bad ones and that if -- you

10:40:43  25  could weigh the evidence fairly on a good one?

10:40:46   1          PANEL MEMBER:  Yeah.

10:40:47   2          MR. BENNETT:  Okay.  Let me ask this question.

10:40:49   3   When you got a dispute like this -- please feel free to

10:40:52   4   take your seat, Ms. Morrow.  Thank you.

10:40:55   5          When you have a dispute, you really have two

10:40:57   6   choices.  You can do nothing, right, and let it go?  And

10:41:00   7   some people feel that way, morally that they just should

10:41:04   8   let it go, or you can stick up for yourself and stick up

10:41:08   9   for your rights.

10:41:11  10          Anyone feel like the first way, if you have a

10:41:13  11   right, even if it's trespassed, just -- you feel like that

10:41:16  12   it's wrong to file a lawsuit, you shouldn't file one to

10:41:19  13   enforce your rights?  Even if it's a small -- what if it's

10:41:22  14   a really small right, maybe a tiny piece of property,

10:41:27  15   anybody feel that way, you should just let it go?  No

10:41:31  16   hands?  Okay.

10:41:32  17          How about anyone involved with any associations,

10:41:42  18   East Texans Against Lawsuits, anything like that?  Any

10:41:44  19   hands?  Anyone a part of that?  Okay.

10:41:47  20          Anyone been a witness in a case?  Anybody ever

10:41:50  21   been a witness in a court case?  Okay.  Seeing no hands --

10:41:58  22   oh, sorry.  Yes?

10:42:02  23          PANEL MEMBER:  Again, I was just a witness in a

10:42:04  24   medical malpractice suit with my mom.

10:42:08  25          MR. BENNETT:  Okay.

| | | |
|---|---|---|
| 10:42:09 | 1 | PANEL MEMBER:  Just a witness, so... |
| 10:42:10 | 2 | MR. BENNETT:  All right.  And any experience there |
| 10:42:13 | 3 | make you feel one way or the other about the -- leaning one |
| 10:42:15 | 4 | way or the other toward Plaintiff or Defendant? |
| 10:42:17 | 5 | PANEL MEMBER:  No, sir. |
| 10:42:18 | 6 | MR. BENNETT:  Okay.  Thank you. |
| 10:42:22 | 7 | Now, I want to talk about Lone Star's business |
| 10:42:25 | 8 | model, all right?  It's going to come up in the case.  We |
| 10:42:28 | 9 | own patents.  In this particular one, there's one patent. |
| 10:42:32 | 10 | We'll call it the '435 patent.  That's how you heard it |
| 10:42:35 | 11 | referred to during the lawsuit.  And when folks infringe on |
| 10:42:38 | 12 | the patent, we sue them because that's what the law permits |
| 10:42:42 | 13 | us to do, to enforce that right, to ensure that that right |
| 10:42:46 | 14 | is maintained.  And we -- we sue, we collect settlements. |
| 10:42:50 | 15 | We also call those licenses.  There's a license right that |
| 10:42:53 | 16 | goes with the patent. |
| 10:42:55 | 17 | So anyone have a problem with that business model? |
| 10:42:57 | 18 | That just sounds strange to you?  You don't like it? |
| 10:43:02 | 19 | Ms. Ray, what do you think about that business |
| 10:43:05 | 20 | model?  Can you come to the mic, ma'am?  Thank you. |
| 10:43:12 | 21 | PANEL MEMBER:  I think it's fine.  I have no |
| 10:43:14 | 22 | problem with it.  If something is going wrong and you think |
| 10:43:20 | 23 | you -- a right or somebody is infringing on your behalf or |
| 10:43:25 | 24 | patent or whatever, they have a right to stick up for it. |
| 10:43:29 | 25 | MR. BENNETT:  Mr. Lambeth, back in the corner |

10:43:32  1  there.  Sorry to pick on you all the way back there, but

10:43:35  2  what do you think about that, what Ms. Ray said?

10:43:43  3      PANEL MEMBER:  I have to plead ignorance.  I don't

10:43:46  4  understand it.  I'm interested in hearing more about it.  I

10:43:49  5  don't really know.

10:43:50  6      MR. BENNETT:  All right.  Anyone feel like

10:43:52  7  Mr. Lambeth?  Not heard much about it?  Don't know much

10:43:57  8  about it?  Hands up high.  Okay.  Most of you.

10:44:00  9      How about anyone here who's sued a company before,

10:44:07  10 other than Ms. Johnson?  Anyone here filed a lawsuit

10:44:15  11 against a company?

10:44:16  12     Mr. Lambeth, I think we understand now you've --

10:44:19  13 you don't have to come all the way up.  As a lawyer, you've

10:44:22  14 had a few trials.  We heard about that.  Thank you.

10:44:24  15     How about in terms of the amount of money asked?

10:44:32  16 You're going to hear later, there's a few million involved

10:44:38  17 in our demand.  Anyone think that's just -- as a

10:44:41  18 categorical matter, just can't award that much in damages?

10:44:45  19 It's just too much for any lawsuit?  Anyone feel that way?

10:44:49  20 No?  Seeing no hands.

10:44:50  21     How about a property owner or an athlete who tries

10:44:54  22 to get top dollar for what they do, for their invention,

10:44:58  23 for their property, for what they contribute?  Anyone have

10:45:01  24 a problem with that, an athlete who holds out, not showing

10:45:05  25 up until you give me my -- my big money contract?  Anyone?

10:45:09  1          Tell me about that.  Why, Ms. Stanford, please?

10:45:15  2          PANEL MEMBER:  Just a personal belief as far as

10:45:17  3  the athletes go and the money that they get and they have

10:45:21  4  to have, and we have starving children on the street.

10:45:21  5          MR. BENNETT:  Okay.

10:45:24  6          PANEL MEMBER:  It's a personal thing.

10:45:25  7          MR. BENNETT:  Thank you, Ms. Stanford.

10:45:29  8          Mr. Bostic, please?

10:45:34  9          PANEL MEMBER:  I sometimes feel like athletes

10:45:37  10  on -- are not -- whenever they get their contract, they

10:45:44  11  kind of go backwards, if that makes sense.  But in this

10:45:51  12  situation, I would have to hear more before I made my

10:45:56  13  decision.  So a contract versus an athlete are two

10:46:00  14  different situations.

10:46:01  15          MR. BENNETT:  Okay.  Thank you, Mr. Bostic.

10:46:04  16  Appreciate you.

10:46:04  17          How about stock market, right?  The idea behind

10:46:09  18  the stock market is you buy a stock at a certain price, you

10:46:14  19  hope it's low, and you hope to sell high.

10:46:16  20          Anyone find any problems?  You don't like the

10:46:18  21  stock market?  Maybe it's a little too much like gambling?

10:46:23  22  You don't favor it?  You don't like to use it?  Don't like

10:46:26  23  it when others do it?

10:46:27  24          No?  Okay.

10:46:28  25          Now, the Judge mentioned a little bit about

10:46:37  1   burdens of proof, the way the burdens of proof work out,

10:46:40  2   what we have to prove to show that ASUS infringed on our

10:46:44  3   rights.  It's called the preponderance of the evidence, and

10:46:46  4   that's basically the scales are dead even, and we throw one

10:46:50  5   more piece of paper on there that weighs in favor of us.

10:46:53  6   That means we've shown by a preponderance of the evidence,

10:46:55  7   proven our right to protect our property.

10:46:58  8        Anyone have a problem with that standard?  Just

10:47:00  9   that doesn't sound right to you if you're going to hold

10:47:04  10  somebody liable for potentially millions of dollars, you

10:47:09  11  need more than that?  You feel like that 50-50 plus one is

10:47:12  12  not enough for you?  You can't follow the Judge's

10:47:16  13  instructions if he told you that's the standard that must

10:47:18  14  be followed?  Anyone feel that way?

10:47:20  15       Anyone feel it should be higher?

10:47:23  16       Anyone feel it should be lower?  You shouldn't

10:47:25  17  need to prove even that much?

10:47:27  18       Okay.  Seeing no hands.

10:47:28  19       What about in a case that involves mostly

10:47:31  20  circumstantial evidence, right?  Judge will tell you a

10:47:35  21  little later about that.  I don't want to get too deep into

10:47:39  22  the weeds.  But there's direct evidence, what we call the

10:47:42  23  proverbial smoking gun, and there's circumstantial

10:47:43  24  evidence.  It's evidence that tends to prove that fact but

10:47:45  25  not quite like that smoking gun.  The case is based mostly

10:47:50  1   on that kind of evidence, circumstantial evidence.

10:47:52  2        How many of y'all just couldn't -- you need direct

10:47:55  3   evidence to hold somebody liable for potentially millions

10:47:59  4   of dollars?

10:47:59  5        Mr. Bostic, tell me about that.  Why?

10:48:05  6        PANEL MEMBER:  I'm the type of person where you

10:48:07  7   show me the evidence, I've got proof.  You tell me about

10:48:11  8   what's happened -- you tell me, okay, this is what happened

10:48:15  9   but you got no proof.  Okay.  Why?  Why don't you -- why

10:48:21  10  can't you prove to me that's what happened?

10:48:24  11       MR. BENNETT:  So circumstantial evidence is a form

10:48:25  12  of proof.  Could you follow circumstantial evidence and

10:48:29  13  still hold someone liable?

10:48:33  14       PANEL MEMBER:  If there's enough of it there.  You

10:48:35  15  got to have enough of it there.  You got to show me why

10:48:38  16  there's enough -- why there's evidence there.  Why -- you

10:48:39  17  got to show me the evidence, if that makes -- you got to

10:48:43  18  have enough -- something there to show me that there's a

10:48:47  19  reason.  That's proof.

10:48:49  20       You got to show me.  You got to have something

10:48:52  21  physical there.  You got to have -- you got to give me a

10:48:55  22  reason.  You got make me -- give me a reason that there --

10:48:58  23  there's evidence there.

10:48:59  24       MR. BENNETT:  Understood.  Thank you, Mr. Bostic.

10:49:03  25       Anyone feel like Mr. Bostic?

10:49:03  1          Ms. --

10:49:07  2          PANEL MEMBER:  Rodgers.

10:49:07  3          -- Rodgers.  Thank you.  We used to have numbers.

10:49:11  4          PANEL MEMBER:  I agree with Mr. Bostic.  If you

10:49:17  5  don't have the evidence in front of you or something,

10:49:19  6  whether it's hearsay, whether it's on social media, whether

10:49:23  7  it's anything with that matter, I need physical evidence.

10:49:25  8  I want it laid out.  I want to be able to see it.  I want

10:49:29  9  to be able to hear it.

10:49:31  10         Speaking of preference from experience that I'm

10:49:33  11 going through right now, I don't care about what's on

10:49:35  12 social media, what statements, anything.  I want it --

10:49:38  13 evidence.  I want to be able to see it.  I want to be able

10:49:40  14 to hear it.  I want to be able to review it, go through it

10:49:43  15 step-by-step, and understand the process of the evidence

10:49:45  16 that you have, that you can defend in court.

10:49:49  17         MR. BENNETT:  Okay.  Thank you.

10:49:51  18         Mr. Ayers, tell me about that.

10:49:58  19         PANEL MEMBER:  I was always told not to assume

10:50:00  20 anything.  So if it's black and white, it's black and

10:50:05  21 white.  If you don't know, don't guess.

10:50:09  22         MR. BENNETT:  Okay.  Thank you.

10:50:10  23         Anyone feel like Mr. Ayers?

10:50:12  24         All right.  In terms of hobbies, any gamers here

10:50:12  25 anywhere?

| | | |
|---|---|---|
| 10:50:24 | 1 | Mr. Ayers? |
| 10:50:24 | 2 | Any hands high?  Play a lot of video games? |
| 10:50:26 | 3 | Social media?  iPad?  Whatever it is.  No? |
| 10:50:29 | 4 | How about IT profession?  Been in IT, worked in |
| 10:50:32 | 5 | IT, networking?  Anything like that? |
| 10:50:38 | 6 | Yes, Mr. Bostic, you have? |
| 10:50:40 | 7 | PANEL MEMBER:  In the past. |
| 10:50:41 | 8 | MR. BENNETT:  In the past? |
| 10:50:42 | 9 | Okay.  Anyone else? |
| 10:50:44 | 10 | How about digital photography?  Really into it, |
| 10:50:49 | 11 | sort of a hobby, use software that involves digital |
| 10:50:58 | 12 | photography?  Anyone?  Hands high if you do.  No? |
| 10:51:00 | 13 | How about social media users?  Instagram?  TikTok? |
| 10:51:05 | 14 | Whatever it is. |
| 10:51:05 | 15 | Mr. Ayers, okay. |
| 10:51:05 | 16 | Hands high, hands high. |
| 10:51:07 | 17 | All right.  Those of you with your hands up edit |
| 10:51:10 | 18 | photos through that social media?  Any photo editing done |
| 10:51:10 | 19 | there?  No. |
| 10:51:13 | 20 | All right.  Ms. Elson; is that right?  All right. |
| 10:51:16 | 21 | Thank you. |
| 10:51:30 | 22 | Your Honor, that concludes my examination. |
| 10:51:33 | 23 | THE COURT:  Very well. |
| 10:51:34 | 24 | At this time, the Defendant may voir dire the |
| 10:51:36 | 25 | panel. |

10:51:40   1            MR. OLIVER:  Again, folks, thank you for -- thank

10:51:48   2    you for being here.

10:51:49   3            My name is Andrew Oliver.  Like my colleague here,

10:51:54   4    I'll share a little bit about myself so that you have a

10:51:57   5    little bit of familiarity with me.

10:51:58   6            I've been married for about 24 years.  I have two

10:52:02   7    kids.  They're both daughters.  One's a preteen; one's a

10:52:06   8    teen.  So while I don't have the one-year-old twin issue,

10:52:11   9    I've got my own issues to deal with.

10:52:15  10            In my free time, I tend to spend a lot of time

10:52:20  11    with my kids.  So I'm teaching Sunday school for their

10:52:24  12    Sunday school classes, going to soccer games, and we like

10:52:28  13    to take road trips.  Like my colleague here said he likes

10:52:33  14    to visit national parks, this summer, we're road-tripping

10:52:39  15    up to Montana to see Glacier National Park and Yellowstone.

10:52:39  16    So that's what we like to do with our free time.

10:52:41  17            My colleague, Mr. Joshi, also has two kids a

10:52:44  18    little older than mine.  His son just finished his first

10:52:49  19    year at Baylor, and his daughter is in high school.  And he

10:52:52  20    also spends a lot of time at soccer games like myself.

10:52:56  21            Questions for you, you heard a few of -- a few

10:53:00  22    questions about photography and so on and digital editing.

10:53:04  23            Is anybody here a professional artist or a graphic

10:53:08  24    designer, or have you done work in that area, including

10:53:13  25    electronic work or photo work?  Anybody with that type of

10:53:18   1   experience?

10:53:18   2         Okay.  This is a little bit sensitive of a

10:53:21   3   question.  So maybe Your Honor can say whether they should

10:53:27   4   answer once I ask it.

10:53:28   5         But the question is:  Is anybody color blind, or

10:53:33   6   would you have difficulty seeing representations of color?

10:53:35   7         Is that okay to ask, Your Honor?  Okay.

10:53:37   8         THE COURT:  I think so.

10:53:38   9         MR. OLIVER:  Anybody color blind?  Okay.

10:53:41   10         Would anybody have difficulty seeing something on

10:53:44   11   a screen, like reading words on that big screen there or if

10:53:49   12   we're looking at a smaller screen like this, seeing images

10:53:57   13   on it?  Would anybody have a hard time seeing that from

10:54:01   14   where you're sitting?  And you'll probably be a little

10:54:05   15   closer if you're actually on the panel.

10:54:07   16         Okay.  Does anybody have any issues with somebody

10:54:17   17   having rights that they feel are violated for 14 or 16

10:54:21   18   years and then suing the person violating those rights

10:54:25   19   without ever contacting them before the lawsuit?

10:54:28   20         So you feel like somebody has been violating your

10:54:30   21   rights for 10 years, but you never tell them, and then you

10:54:34   22   sue them for millions of dollars?  Any problems with that?

10:54:40   23         Okay.  Does anybody ever feel like a Defendant is

10:54:42   24   guilty just because they get sued because Plaintiff must

10:54:46   25   have had a reason to sue them, so they must be guilty?  No?

10:54:50  1          Okay.  Does anybody feel like the Plaintiff should
10:54:58  2  get the benefit of the doubt coming into the trial because
10:55:01  3  they filed a lawsuit, and you're now in court?
10:55:06  4          You saw my colleague briefly hold up a copy of the
10:55:14  5  patent.  You didn't get to see what's in it.  You'll get a
10:55:19  6  chance to see what's in it, but the patent is issued by the
10:55:23  7  U.S. Patent Office.  It comes with a presumption that it's
10:55:27  8  valid.
10:55:28  9          But if you're asked to decide based on evidence
10:55:30  10  that the patent is invalid and if Judge Schroeder tells
10:55:35  11  you, take this evidence, apply these principles of law, and
10:55:38  12  decide whether the patent is valid or invalid, you have the
10:55:42  13  power to overturn the Patent Office, do you feel like you
10:55:46  14  would not be able to do that, that you would be blocked
10:55:49  15  because you feel like the Patent Office issued a patent,
10:55:52  16  and, therefore, there's no way for me as a juror to turn it
10:55:57  17  over?
10:55:58  18          Okay.  Final question.  Don't want to take up all
10:56:09  19  of your time.  Do you feel like -- do any of you have any
10:56:12  20  feelings that you would not be able to be fair to an
10:56:17  21  international company?  ASUS is international.  They have
10:56:21  22  got operations here.  They have got operations in Taiwan
10:56:24  23  and other countries.
10:56:26  24          As I mentioned, Mr. McCarty's oversees teams that
10:56:30  25  help service ASUS products in South America.

```
10:56:34   1              But do you feel like you would not be able to be
10:56:36   2   fair to an international company that manufactures products
10:56:40   3   outside of the United States and sells them within the
10:56:42   4   United States?  No?
10:56:44   5              Okay.  Well, thank you.  I didn't get to -- didn't
10:56:52   6   have to have anybody come up to the stand.
10:56:54   7              Appreciate your time.
10:56:55   8              THE COURT:  Thank you, Mr. Oliver.
10:56:57   9              Let me ask counsel for the parties to pass up
10:57:01  10   lists for any additional questions.
10:57:18  11              MR. BENNETT:  We have just a few, Your Honor.
10:57:23  12              THE COURT:  If you would, pass those up.
10:57:23  13              MR. OLIVER:  Your Honor, we don't have any further
10:57:27  14   questions.
10:57:52  15              MR. BENNETT:  May I approach, Your Honor?
10:57:58  16              THE COURT:  Yes, please.
10:58:21  17              Okay.  Ladies and gentlemen of the jury, thank you
10:58:25  18   for your attention and your patience this morning.
10:58:27  19              I'm going to ask three jurors to remain in the
10:58:31  20   courtroom, and I want to tell you a little bit about the
10:58:35  21   next phase.
10:58:36  22              I'm going to dismiss everyone to adjourn to Judge
10:58:42  23   Mitchell's courtroom for a short period.  We have to have
10:58:45  24   further discussion outside of your presence, and all of
10:58:48  25   that will take I think about somewhere between 20 and
```

10:58:51  1   30 minutes.

10:58:52  2          And I hope to have you walk -- brought back in,

10:58:56  3   and by the time we have you brought back in, we will have

10:58:59  4   the jury selected, and those of you who are not on the jury

10:59:04  5   will be able to get your week started.

10:59:07  6          What I would like for you to do is to remember a

10:59:10  7   couple of rules.  Don't discuss anything about the case

10:59:14  8   with anyone.  When the jury begins its deliberations at the

10:59:20  9   end of the week, it'll base its decision solely upon the

10:59:25  10  evidence that comes through that witness stand and through

10:59:27  11  the admission of exhibits.

10:59:32  12         So nothing you've seen so far this morning, of

10:59:36  13  course, will have anything to do with the jury's actual

10:59:38  14  deliberations.  So don't start forming opinions in your

10:59:42  15  mind about the case based on some conversation you might

10:59:45  16  have with someone.

10:59:46  17         Talk about the nasty weather we had this morning

10:59:50  18  and what it's -- looks like it's going to be like all week,

10:59:55  19  talk about football or grandkids or whatever you want to

10:59:59  20  talk about, just not about the case.

11:00:01  21         Also, don't do any research about the case into

11:00:05  22  the parties or the attorneys.

11:00:08  23         I'm going to ask, let's see, Mr. Wilkinson,

11:00:13  24  Ms. Elson, and Ms. Decco, if you would, to remain back, and

11:00:20  25  everyone else is going to be dismissed at this time.

| | | |
|---|---|---|
| 11:00:23 | 1 | Please keep your masks on, and observe social |
| 11:00:29 | 2 | distancing protocols, get a drink of water, use the |
| 11:00:33 | 3 | restroom.  We'll get you back into the courtroom as quickly |
| 11:00:38 | 4 | as we can. |
| 11:01:30 | 5 | (Jury panel out.) |
| 11:01:33 | 6 | THE COURT:  Okay.  You all may be seated. |
| 11:01:37 | 7 | Okay.  Mr. Wilkinson, if you would come forward. |
| 11:01:37 | 8 | (Panel member brought forward.) |
| 11:01:54 | 9 | THE COURT:  Mr. Wilkinson, you raised your hand in |
| 11:01:58 | 10 | the beginning when I asked about anything that you might |
| 11:02:02 | 11 | have had planned for this week that would create a problem |
| 11:02:04 | 12 | for you serving on the jury.  I've got a couple of jurors |
| 11:02:09 | 13 | still -- panel members still in here.  Can we talk about it |
| 11:02:14 | 14 | in front of everybody? |
| 11:02:16 | 15 | PANEL MEMBER:  Yes. |
| 11:02:16 | 16 | THE COURT:  Okay. |
| 11:02:17 | 17 | PANEL MEMBER:  The businesses that I own is kind |
| 11:02:18 | 18 | of -- basically they're the boarding kennels.  I have two |
| 11:02:23 | 19 | boarding kennels and a dog grooming service.  The one I |
| 11:02:27 | 20 | have at my residence, full-time, I work it from sometimes |
| 11:02:32 | 21 | 6:00 o'clock to about 8, 9:00 o'clock at night, for the |
| 11:02:38 | 22 | health of the dogs, you know, let them out and stuff. |
| 11:02:41 | 23 | Since the COVID, I've laid off six people -- |
| 11:02:41 | 24 | THE COURT:  Yes, sir. |
| 11:02:44 | 25 | PANEL MEMBER:  -- and I've got two of them back. |

| | | |
|---|---|---|
| 11:02:47 | 1 | We are running low.  We don't -- we haven't had that much |
| 11:02:51 | 2 | business.  We're just now starting to get the business. |
| 11:02:54 | 3 | THE COURT:  Okay. |
| 11:02:54 | 4 | PANEL MEMBER:  So I've got one person that helps |
| 11:02:57 | 5 | me, and I'm not paying overtime, so she can only work about |
| 11:03:02 | 6 | 40 hours a week -- |
| 11:03:03 | 7 | THE COURT:  Yes, sir. |
| 11:03:04 | 8 | PANEL MEMBER:  -- which is about half of what I |
| 11:03:06 | 9 | normally run.  But her days is -- you know, she's had to |
| 11:03:11 | 10 | have people take her kid to school this morning so she can |
| 11:03:15 | 11 | come to work early, and we were no -- you know, advance |
| 11:03:18 | 12 | about that.  On Thursdays she's got prior arrangements, and |
| 11:03:24 | 13 | she's off on Thursdays so I can get her to work some of the |
| 11:03:27 | 14 | weekends for me. |
| 11:03:28 | 15 | THE COURT:  Okay. |
| 11:03:28 | 16 | PANEL MEMBER:  So on Thursday, I'm the only one |
| 11:03:32 | 17 | running the main facility.  It's not our biggest facility, |
| 11:03:37 | 18 | but it's our main facility. |
| 11:03:39 | 19 | THE COURT:  Yes, sir.  Okay.  Tell you what, |
| 11:03:42 | 20 | Mr. Wilkinson, let me ask you to step out in the hall very |
| 11:03:46 | 21 | briefly, and let me visit with the attorneys. |
| 11:03:48 | 22 | PANEL MEMBER:  Okay. |
| 11:03:49 | 23 | THE COURT:  I'll have you brought right back in. |
| 11:03:52 | 24 | (Panel member excused to hallway.) |
| 11:03:52 | 25 | THE COURT:  Either side have any objection to |

```
11:04:01   1   releasing Mr. Wilkinson?
11:04:05   2            MR. BENNETT:  No objection, Your Honor.
11:04:07   3            MR. JOSHI:  No objection.
11:04:08   4            THE COURT:  Would you have him brought back in?
11:04:11   5            (Panel member brought into courtroom.)
11:04:16   6            THE COURT:  Mr. Wilkinson, you can stand right
11:04:22   7   there.  I appreciate you telling us what your situation is.
11:04:25   8        I hope once we get past the pandemic and life gets
11:04:29   9   back more normal for you that you will be able to come back
11:04:33  10   and serve as a juror for us, but I'm going to release you
11:04:36  11   at this time.
11:04:37  12            PANEL MEMBER:  Thank you very much.
11:04:37  13            THE COURT:  Thank you very much.
11:04:39  14            MR. BENNETT:  Thank you, Mr. Wilkinson.
11:04:43  15            (Panel member excused from courtroom.)
11:04:43  16            THE COURT:  Ms. Elson.
11:04:48  17            MR. BENNETT:  Your Honor, if I may, I miscounted.
11:04:52  18   It's my fault.  I think we've got enough jurors left after
11:04:56  19   Mr. Wilkinson still.  We probably don't need to talk to
11:05:01  20   Ms. Elson --
11:05:02  21            THE COURT:  I think I need to talk to them because
11:05:04  22   they mentioned that they had a hardship.
11:05:04  23            (Panel member brought into courtroom.)
11:05:07  24            THE COURT:  Yes, ma'am, Ms. Elson?
11:05:08  25            PANEL MEMBER:  I have a 9-month-old daughter, and
```

```
11:05:10    1   right now she can't go to daycare because of COVID.  She's
11:05:15    2   not old enough.
11:05:15    3            THE COURT:  Yes, ma'am.
11:05:16    4            PANEL MEMBER:  So I have somebody outside of
11:05:18    5   there.  A tree just fell on her house, so they're getting a
11:05:22    6   camper, and that's the day that it's being delivered and
11:05:26    7   she can't watch my daughter.
11:05:27    8            THE COURT:  Okay.  It sounds like to me you
11:05:29    9   probably got more an your plate this week than you can say
11:05:34   10   grace over.  If you will step out in the hall real quick,
11:05:37   11   let me visit with the attorneys.
11:05:39   12            (Panel member excused to hallway.)
11:05:39   13            THE COURT:  Either side have any objection to
11:05:42   14   releasing Ms. Elson?
11:05:44   15            MR. BENNETT:  No objection, Your Honor.
11:05:46   16            MR. JOSHI:  No objection.
11:05:47   17            THE COURT:  All right.  Have her brought back in.
11:05:51   18            (Panel member brought into courtroom.)
11:05:51   19            THE COURT:  Ms. Elson, I'm going to release you.
11:05:54   20   Thank you.  I hope you will come back some time and be on a
11:06:03   21   jury for us.
11:06:04   22            PANEL MEMBER:  Thank you.
11:06:04   23            THE COURT:  All right.  Thank you, ma'am.
11:06:04   24            MR. BENNETT:  Thank you, Ms. Elson.
11:06:06   25            THE COURT:  Ms. Decco, if you would.
```

```
11:06:08   1              (Panel member brought forward.)
11:06:08   2          THE COURT:  Ms. Decco, you went into some of the,
11:06:11   3   I guess, hardships maybe that you've got going on in your
11:06:14   4   life right now, and it seems to me you've got plenty to
11:06:20   5   worry about without serving on a jury.  I appreciate your
11:06:24   6   service.  I don't think either of the parties have any
11:06:26   7   objection to releasing you.
11:06:28   8          MR. BENNETT:  None.
11:06:31   9          MR. OLIVER:  No objection.
11:06:32  10          THE COURT:  Okay.  Thank you, Ms. Decco, for being
11:06:36  11   here.  I hope you will come back some time and be on a jury
11:06:41  12   for us.
11:06:42  13          PANEL MEMBER:  Thank you.
11:06:43  14          THE COURT:  Thank you, ma'am.
11:06:43  15              (Panel member excused from courtroom.)
11:06:43  16          THE COURT:  Okay.  Cause challenges?  Any?
11:06:47  17          MR. BENNETT:  No, Your Honor.  Plaintiff has none.
11:06:56  18          MR. OLIVER:  Your Honor, just one.  I'm not
11:06:58  19   sure --
11:06:59  20          THE COURT:  Could you go to the podium so I can
11:07:01  21   hear you well?
11:07:02  22          MR. OLIVER:  Your Honor, just one.  I don't know
11:07:04  23   if this rises to your standard, but just want to raise it.
11:07:09  24   Celsey Rodgers mentioned her brother was murdered, and she
11:07:16  25   wasn't sure if she could get justice.  And I'm not sure
```

11:07:22    1   whether she'll be able to fairly deliver justice.

11:07:22    2           THE COURT:  Mr. Oliver, I'd like to hear from

11:07:25    3   Mr. Bennett about this.  And, Mr. Bennett, I will just tell

11:07:26    4   you candidly, I think Ms. Rodgers is a little bit of a

11:07:27    5   problem.

11:07:28    6           MR. BENNETT:  We agree, Your Honor.

11:07:29    7           THE COURT:  Okay.  Let's release Ms. Rodgers by

11:07:33    8   agreement of the parties.  And I think that if that is the

11:07:35    9   case, based upon the shuffled list, which you all have

11:07:42   10   before you or should have before you, Ms. Rodgers is Juror

11:07:47   11   No. 10, correct?

11:07:54   12           MR. BENNETT:  That's correct, Your Honor.

11:07:58   13           MR. OLIVER:  Yes, that's correct.

11:08:00   14           THE COURT:  We have released Mr. Wilkinson due to

11:08:05   15   a hardship, and we are releasing Ms. Rodgers by agreement

11:08:24   16   of the parties.

11:08:55   17           I'm informed that Mr. Gross would like to speak to

11:08:59   18   us, and I think we better do that.

11:08:59   19           (Panel member brought into courtroom.)

11:09:53   20           THE COURT:  Come around, Mr. Gross.

11:09:55   21           PANEL MEMBER:  Where do you want me?

11:09:56   22           THE COURT:  Come up to the podium -- or to the

11:10:00   23   microphone, please.

11:10:00   24           PANEL MEMBER:  Yes, sir.

11:10:01   25           THE COURT:  Do you have something that you need to

11:10:03   1    speak to us about that didn't come up before?

11:10:06   2         PANEL MEMBER:  Yes.  I just wanted to bring it up.

11:10:09   3    I thought in some of questionnaire or questioning, it would

11:10:11   4    come up a little bit.  When I filled out my questionnaire

11:10:14   5    or my survey or -- you know, and sent it in and everything,

11:10:17   6    my wife kind of got on me that I didn't bring it up -- I

11:10:21   7    guess you could call it a medical condition.  But I have a

11:10:24   8    real issue -- kind of chronically -- of nodding off and

11:10:29   9    getting very sleepy.  And I had sleep apnea surgery in

11:10:34   10   2003.  I've been on a CPAP machine since about 2015.  Lost

11:10:41   11   about 35 pounds in the last two years, so that has helped.

11:10:41   12   I still have some issues.  I just went through another

11:10:44   13   sleep study -- third -- third one, I guess, I've had.  And

11:10:45   14   home study and then where you go to the place.  And I went

11:10:47   15   to a new -- it's called the Sleep Institute of Tyler, new

11:10:57   16   place that I hadn't been before.

11:11:00   17        Anyway, I'm about to switch to a BiPAP machine

11:11:03   18   instead of a CPAP.  My wife is convinced that -- has told

11:11:08   19   the doctor, and he thinks there are some reasons to be

11:11:11   20   concerned about like slight narcolepsy.  Not the kind where

11:11:15   21   you just collapse or fall asleep like that, but like where

11:11:20   22   you go into REM sleep immediately.  I can just be sitting

11:11:24   23   and nod off for a second and kind of go into a dream state.

11:11:28   24   Anyway, it just causes some issues with concentration.

11:11:34   25        THE COURT:  Focus and attention?

11:11:35  1          PANEL MEMBER:  Yeah.  And my attention.  So,

11:11:37  2   anyway, I don't want to be in a situation where I'm

11:11:40  3   embarrassing myself, and I get -- usually get pretty good

11:11:44  4   sleep, I got about 7 hours sleep last night.  That's really

11:11:48  5   good for me.

11:11:48  6          THE COURT:  That's a lot more than I got.

11:11:48  7          PANEL MEMBER:  That's really good for me.

11:11:51  8   Sometimes it's five and a half or six hours.  But anyway --

11:11:53  9   and I'm not trying to make some kind of excuse.  If I had

11:11:55  10  my phone, I could show you all the appointments and all

11:11:58  11  that kind of stuff, which I can't.

11:11:59  12         THE COURT:  I understand.

11:12:00  13         PANEL MEMBER:  But I don't want to embarrass

11:12:02  14  myself.  I don't want to be in a position where I'm trying

11:12:02  15  to remember --

11:12:02  16         THE COURT:  Right.

11:12:03  17         PANEL MEMBER:  -- if somebody else is talking

11:12:04  18  about something and we're deliberating or something like

11:12:06  19  that, and I'm like I don't even remember that and that kind

11:12:08  20  of thing.  Anyway, that's just my concern with that.

11:12:09  21         THE COURT:  Okay.  Let me ask -- Mr. Bennett, do

11:12:13  22  you have any questions for Mr. --

11:12:16  23         PANEL MEMBER:  Gross.

11:12:17  24         THE COURT:  -- Mr. Gross?

11:12:18  25         MR. BENNETT:  Just a couple, if I may, Your Honor.

11:12:24  1          THE COURT:  Yes.

11:12:24  2          MR. BENNETT:  Mr. Gross -- and I'm not fussing at

11:12:26  3  you -- but is it the case today you nodded off a little bit

11:12:29  4  during the selection?

11:12:30  5          PANEL MEMBER:  Probably.  I mean, there were a

11:12:32  6  couple of times I was kind of fidgeting, and, you know, I

11:12:35  7  kind of -- yeah, probably.

11:12:36  8          MR. BENNETT:  Okay.  And if you were on the jury,

11:12:38  9  would you have difficulty paying attention, focusing on

11:12:40 10  some -- what's going to be highly exhilarating to me and

11:12:44 11  pretty dry maybe to some other folks?

11:12:47 12          PANEL MEMBER:  Maybe.  My work -- I'm on my feet

11:12:51 13  all day.  When I sit down, it's not for real long periods

11:12:55 14  of time.  The only time I struggle with it is in -- last

11:13:01 15  year, we had meetings -- Zoom-type meetings.  My supervisor

11:13:03 16  knows about it.  He knows that I may get up and stand over

11:13:06 17  to the side and that kind of thing in a meeting, especially

11:13:08 18  after lunch, something like that, but possibly -- possibly.

11:13:11 19          MR. BENNETT:  Thank you.  Appreciate it.

11:13:13 20          THE COURT:  Mr. Oliver, any questions you have?

11:13:15 21          MR. OLIVER:  No, Your Honor.

11:13:16 22          THE COURT:  Okay.  Mr. Gross, let me ask you to go

11:13:19 23  back in the hall and let me visit with the attorneys and

11:13:23 24  we'll make a decision.  I appreciate very much you bringing

11:13:28 25  this to my attention and the parties' attention and your

11:13:35  1   candor about it.  And I'll visit with them, and we'll

11:13:38  2   decide the proper approach.  But thank you very much and

11:13:40  3   best of luck with getting it resolved.

11:13:43  4        PANEL MEMBER:  Thank you.  Appreciate it.

11:13:47  5        (Panel member excused to hallway.)

11:13:47  6        THE COURT:  What do you want to do about

11:13:52  7   Mr. Gross?

11:13:52  8        MR. BENNETT:  I think probably for cause, we have

11:13:54  9   to strike him.  I saw him nod off during presentations

11:13:58  10  today, during voir dire.

11:14:00  11       THE COURT:  Mr. Oliver, any objection to that?

11:14:02  12       MR. OLIVER:  No objection.

11:14:03  13       THE COURT:  All right.  We'll just release him by

11:14:05  14  agreement of the parties.

11:14:06  15       All right.  So that removes Mr. Gross, which I

11:14:06  16  think means we now strike -- each side will have three

11:14:06  17  preemptory strikes.

11:14:25  18       As you know, we have released Mr. Gross, we have

11:14:29  19  released Mr. Wilkinson based on a hardship, and we've

11:14:30  20  released Ms. Rodgers by agreement of the parties.  With the

11:14:40  21  eight jurors who will be among the jury and three

11:14:42  22  preemptory strikes assigned, that should put us through

11:14:46  23  Juror No. 17.

11:14:47  24       Do the parties agree with that?

11:14:49  25       MR. BENNETT:  That would be Ms. Miller,

| | | |
|---|---|---|
| 11:14:51 | 1 | Your Honor -- Mr. Lyle, excuse me. |
| 11:14:53 | 2 | THE COURT:  I'm sorry, Mr. Bennett? |
| 11:14:56 | 3 | MR. BENNETT:  I wasn't sure who No. 17 was, |
| 11:14:58 | 4 | Your Honor.  I was just making sure I had my notes right. |
| 11:15:01 | 5 | THE COURT:  17 is Mr. Lyle.  Do the parties agree |
| 11:15:04 | 6 | with the strike zone as I have described it? |
| 11:15:07 | 7 | MR. BENNETT:  Yes, Your Honor. |
| 11:15:08 | 8 | MR. OLIVER:  Yes, Your Honor.  Meaning everyone |
| 11:15:11 | 9 | below 17 won't be on it regardless? |
| 11:15:14 | 10 | THE COURT:  That is correct.  That's correct. |
| 11:15:16 | 11 | All right.  So you guys will have 15 minutes to |
| 11:15:19 | 12 | make your strikes, and we'll go back on the record then. |
| 11:15:24 | 13 | We'll be in recess. |
| 11:15:26 | 14 | (Recess taken.) |
| 11:19:28 | 15 | COURT SECURITY OFFICER:  All rise. |
| 11:38:01 | 16 | THE COURT:  Please be seated. |
| 11:38:10 | 17 | Okay.  Thank you, ladies and gentlemen, for your |
| 11:38:14 | 18 | patience with us.  It took -- took maybe a little bit |
| 11:38:18 | 19 | longer than I -- than I suggested it would. |
| 11:38:29 | 20 | Mrs. Schroeder, if you would now call the names of |
| 11:38:31 | 21 | the jurors selected. |
| 11:38:32 | 22 | COURT DEPUTY:  Kelly Miller. |
| 11:38:34 | 23 | Steve Mitchell. |
| 11:38:37 | 24 | Debra Stanford. |
| 11:38:42 | 25 | Brian Bittick. |

11:38:43  1          Jim Lambeth.

11:38:46  2          Wilma Ray.

11:38:48  3          Judy Johnson.

11:38:59  4          Karen Vaughan.

11:39:01  5          THE COURT:  Okay.  Ladies and gentlemen of the

11:39:05  6    panel, those who were not selected to serve as members of

11:39:10  7    the jury, I am about to excuse you, and I do so with the

11:39:14  8    thanks of the Court for your being here.

11:39:17  9          I know it's been a long morning.  As I explained

11:39:20  10   earlier, you all have performed a great public service by

11:39:23  11   being here today, and I hope that the next time you are

11:39:27  12   called to appear for jury service that you come with the

11:39:31  13   same positive, helpful attitude that you have shown to all

11:39:35  14   of us today.

11:39:36  15         So as I said at the very beginning, I really do

11:39:38  16   believe that jury service is one of the most important

11:39:41  17   public services you can render to your nation.  And by

11:39:45  18   being here today and by participating as you have, you

11:39:49  19   have -- you're doing what your country has asked you to do,

11:39:53  20   too.

11:39:54  21         So on behalf of the Eastern District of Texas, the

11:39:57  22   parties involved in this lawsuit and the attorneys, I want

11:39:59  23   to thank you for your presence here today.

11:40:02  24         Those of you not selected as members of the jury

11:40:06  25   are dismissed at this time.  Thank you.

11:40:10   1          (Venire panel out.)

11:40:50   2          THE COURT:  Okay.  You all may be seated.

11:40:53   3          Okay.  Ladies and gentlemen of the jury, if you

11:40:56   4   would, please stand at this time, and Mrs. Schroeder will

11:41:01   5   administer the oath.

11:41:04   6          (Jurors sworn.)

11:41:18   7          THE COURT:  Okay.  Ladies and gentlemen of the

11:41:22   8   jury, I -- the good news is we've got lunch for you.  We

11:41:28   9   will be providing lunch for you throughout the course of

11:41:31  10   the week.

11:41:32  11          The bad news is it's not quite here yet --

11:41:32  12          COURTROOM DEPUTY:  Yes, it is here.

11:41:36  13          THE COURT:  Oh, I thought it was noon.

11:41:36  14          COURTROOM DEPUTY:  No, it's here.

11:41:39  15          THE COURT:  Okay.  Your lunch is here.

11:41:41  16          Let me give you a couple of instructions.  When

11:41:46  17   you get back from lunch, I will have some more fulsome

11:41:50  18   instructions for you about what the case is about and some

11:41:54  19   rules I'm going to ask you to follow throughout the course

11:41:57  20   of the week.

11:41:59  21          For now, the rules are fairly simple.  Don't talk

11:42:04  22   about anything you have seen so far.  You haven't heard any

11:42:08  23   testimony.  You haven't heard any instructions on the law.

11:42:11  24   You haven't heard any arguments of the attorneys.  So the

11:42:16  25   things that you will base your deliberations and your

11:42:20  1  verdict on haven't started yet.

11:42:24  2        So don't talk about the case.  Don't do any

11:42:27  3  investigation about the case.  Don't Google the parties or

11:42:31  4  the subject matter or the attorneys or anything of that

11:42:35  5  nature, and, likewise, please don't post anything about the

11:42:38  6  proceedings so far.

11:42:40  7        And, essentially, those are the rules I'm going to

11:42:43  8  ask you to follow.  As I said, I'll give you further

11:42:47  9  instructions when you get back from lunch.

11:42:50  10        Let me tell you a little bit about what the trial

11:42:52  11  week will be like.  I will ask you all to be here by 8:45

11:42:58  12  in the morning, and we'll start promptly with you here in

11:43:02  13  the courtroom at 9:00.

11:43:06  14        We will go somewhere until the mid morning, and

11:43:08  15  we'll take a 15-minute break in the morning.  We'll break

11:43:12  16  over the lunch hour for about an hour.  We'll come back,

11:43:16  17  and we'll go until somewhere in the neighborhood of 3:00 in

11:43:19  18  the afternoon and we'll take a 15-minute break, and then

11:43:22  19  we'll go until about 5:00 at the end of the day.

11:43:27  20        If we have a witness whose testimony might take a

11:43:31  21  little bit longer to -- in order to get him or her off the

11:43:34  22  stand and completed, we might go a little bit after 5:00.

11:43:39  23  If we have a witness whose testimony is about to begin and

11:43:42  24  it will be a longer examination and it's, you know,

11:43:47  25  10 minutes until 5:00 o'clock, we might stop a little early

11:43:51   1   for that day.  It'll just be subject to witness

11:43:53   2   availability and scheduling, but that is generally what our

11:43:56   3   trial day will look like.

11:43:58   4           As I said, we will provide lunch for you each day

11:44:03   5   here, and that will, you know, eliminate the need of your

11:44:10   6   having to arrange for that and get in and out of the

11:44:14   7   courthouse.  Besides the weather is going to be bad all

11:44:17   8   week long, too.

11:44:19   9           So that's generally what our trial day will look

11:44:22   10  like.  I will give you, as I said, further instructions.

11:44:26   11          One other thing that I will tell you is the

11:44:28   12  attorneys and I will get here early in the morning to try

11:44:32   13  to resolve any evidentiary matters that need to be resolved

11:44:35   14  outside of your presence.  We'll do that over the lunch

11:44:38   15  hours, as well, and we will stay here in the evenings to

11:44:41   16  resolve anything so that we don't make you wait for us in

11:44:45   17  the courtroom -- I mean, in the jury room.

11:44:47   18          I'm not a big fan of making the jury wait, and we

11:44:51   19  will do our very best, I know, to avoid that where at all

11:44:57   20  possible.

11:44:57   21          However, they are a necessary part of any trial

11:45:05   22  occasionally, and there might be something that we have to

11:45:08   23  discuss outside of your presence and that will require you

11:45:12   24  to wait for us in the jury room.  But I'll promise you,

11:45:15   25  we're going to keep that to a bare minimum, and we'll do

| | | |
|---|---|---|
| 11:45:18 | 1 | all -- we will all do our very best and -- and keep that to |
| 11:45:22 | 2 | a minimum. |
| 11:45:24 | 3 | So let me go ahead and release you now. |
| 11:45:27 | 4 | Mr. Richardson, is their lunch back in the jury |
| 11:45:32 | 5 | room? |
| 11:45:33 | 6 | COURT SECURITY OFFICER:  Yes, sir. |
| 11:45:34 | 7 | THE COURT:  Your lunch is in the jury room right |
| 11:45:36 | 8 | through those double doors right there. |
| 11:45:45 | 9 | We will plan on resuming here in the courtroom at |
| 11:45:48 | 10 | 1:00.  That will give you a little extra time.  And then |
| 11:45:49 | 11 | we'll begin with preliminary instructions, and then |
| 11:45:52 | 12 | immediately following that, the attorneys will present |
| 11:45:54 | 13 | their opening statements to you. |
| 11:45:56 | 14 | So we'll be in recess at this time. |
| 11:45:59 | 15 | COURT SECURITY OFFICER:  All rise for the jury. |
| 11:45:59 | 16 | (Jury out.) |
| 12:37:04 | 17 | (Recess.) |
| 01:06:50 | 18 | COURT SECURITY OFFICER:  All rise. |
| 01:06:50 | 19 | THE COURT:  Please be seated. |
| 01:06:56 | 20 | Okay.  Just a couple of things before we get |
| 01:06:59 | 21 | started. |
| 01:07:03 | 22 | Mr. Joshi, I have reviewed documents that were |
| 01:07:05 | 23 | marked as Plaintiff's Exhibit 26.  I guess what I want to |
| 01:07:10 | 24 | understand from you is, candidly, I think what's there is |
| 01:07:17 | 25 | okay. |

01:07:19  1          Is it your contention that there is anything

01:07:24  2  inconsistent in the documents that would weigh against what

01:07:29  3  the Plaintiff has represented to us that those are ASUS

01:07:32  4  user manuals?

01:07:34  5          MR. JOSHI:  So the ones that I have reviewed, I

01:07:38  6  couldn't review all 139 of them, they are -- they look like

01:07:42  7  our manuals.

01:07:44  8          What -- the bigger concern is the bigger

01:07:47  9  collection, there were many non-ASUS things.  Some of the

01:07:53  10  ASUS manuals that -- that they look very similar to ours,

01:07:57  11  they're not from -- they were not pulled down from an ASUS

01:08:00  12  website.  So I can't be sure, but --

01:08:02  13          THE COURT:  Well, I guess my question for you and

01:08:05  14  what I would request is if there are some that you think

01:08:10  15  that -- if there are, indeed, some that you believe are

01:08:13  16  inconsistent, then you're going to need to raise that with

01:08:16  17  me and let me know that.

01:08:18  18          But based on my review, I do think there is

01:08:22  19  sufficient evidence to authenticate these user manuals

01:08:26  20  under Federal Rule of Evidence 901(b)(4).  So I'm going to

01:08:31  21  overrule ASUS's objection based on authentication.

01:08:35  22          Certainly, to the extent you want to

01:08:49  23  cross-examine, you know, any witness about where the

01:08:52  24  documents came from, you may do so, but I think there is

01:08:56  25  enough evidence for the jury to consider these documents as

01:08:56   1   exhibits.

01:09:03   2        And I also don't believe that the user manuals are

01:09:03   3   hearsay because they're a statement of a party opponent

01:09:03   4   under 801(d)(2).

01:09:15   5        And then was there a question -- you all didn't

01:09:17   6   raise this or we didn't discuss it, but with respect to

01:09:19   7   Claim 17 being invalidated, was there an issue that we

01:09:23   8   needed to discuss regarding that?

01:09:24   9        MR. BENNETT:  Yes, that was Plaintiff's issue,

01:09:26  10   Your Honor.

01:09:27  11        Let me grab the microphone, sorry.  Is it on?

01:09:28  12   There we go.

01:09:30  13        Okay.  That was Plaintiff's issue.  There were

01:09:31  14   some -- Your Honor will recall -- it went off.  There we

01:09:34  15   go.  You got to be really close.  Sorry about that.  Okay.

01:09:37  16   Try again.

01:09:37  17        So you'll recall at the end of the May 11th,

01:09:43  18   pretrial hearing, Mr. Joshi raised the issue of talking

01:09:47  19   about Claim 17.  Your Honor asked us to discuss it.  We

01:09:51  20   didn't agree.  And it's in their opening slides.

01:09:55  21        They want to talk about the invalidated -- the

01:10:01  22   other -- the second invalidated independent claim.  We

01:10:04  23   think that's unduly prejudiced under 403, likely to confuse

01:10:07  24   the jury, and not helpful to the case.

01:10:10  25        THE COURT:  Mr. Oliver?

01:10:12  1          MR. OLIVER:  Yes, Your Honor.

01:10:13  2          The intent, just so you know the context, is we

01:10:15  3  plan to tell the jury that only the method claims are at

01:10:19  4  issue, and when they look at the patent, Claim 17 and all

01:10:23  5  of the system claims are not at issue, and that's because

01:10:27  6  Your Honor invalidated those claims already.

01:10:30  7          The issue that Plaintiff has raised is whether

01:10:36  8  it's prejudicial to discuss that.

01:10:38  9          As you recall, I was not at the hearing, but

01:10:42 10  Plaintiff wanted to discuss the procedural history of the

01:10:47 11  patent and said it was entirely acceptable to address the

01:10:51 12  jury and to say whether there had been challenges to

01:10:56 13  invalidity.  And Plaintiff has taken the position that

01:11:00 14  that's okay.

01:11:02 15          And our response was if it's okay for you to

01:11:05 16  address that and whether there have been challenges to

01:11:09 17  invalidity, we should be able to raise the same issues, as

01:11:13 18  well.

01:11:13 19          THE COURT:  May I see the slide?

01:11:14 20          MR. BENNETT:  I have it -- I have it here,

01:11:16 21  Your Honor, if I may approach.

01:11:18 22          MR. OLIVER:  The slide just shows a cut-out from

01:11:21 23  Claim 17, but my intent in speaking, just to make sure

01:11:26 24  you're fully aware, is to say Claim 17 isn't at issue.

01:11:31 25  There's no issue with selling the products.

01:11:33   1          THE COURT:  So this is not the slide where it says

01:11:35   2   the claim was invalidated.  You're talking about that's

01:11:40   3   just the claim --

01:11:41   4          MR. OLIVER:  I'm talking about what I'm going to

01:11:43   5   say when that slide is up.  I'm going to say, you don't

01:11:48   6   have to consider Claim 17.  Judge Schroeder

01:11:51   7   already invalidated Claim 17 --

01:11:51   8          THE COURT:  You can say you don't have to consider

01:11:54   9   Claim 17.  That's no longer in the case.

01:11:55  10          MR. OLIVER:  Okay.

01:11:56  11          THE COURT:  Does that solve it?

01:11:57  12          MR. BENNETT:  Yes, Your Honor.

01:11:58  13          MR. OLIVER:  Thank you.

01:12:02  14          THE COURT:  I think that's too prejudicial under

01:12:08  15   403, Mr. Oliver.

01:12:09  16          MR. OLIVER:  Okay.

01:12:09  17          THE COURT:  Anything else we need to address

01:12:11  18   before we have the jury brought in?

01:12:13  19          MR. BENNETT:  Yes, Your Honor.  We have one other

01:12:16  20   issue with slides.  This one has to do with their motion

01:12:19  21   for reconsideration, as well, which we responded to.  They

01:12:20  22   want to raise inoperability --

01:12:20  23          THE COURT:  There should be an order out for

01:12:22  24   motion for consideration on the docket.

01:12:24  25          MR. BENNETT:  Oh, okay.

01:12:30  1          THE COURT:  It's not yet.

01:12:31  2          MR. BENNETT:  Okay.  So this is in their slide

01:12:33  3  deck.  They intend to address it apparently, so we raised

01:12:37  4  it to prevent it being raised or similar issues, confusing

01:12:43  5  the jury, Rule 403.

01:12:45  6          MR. OLIVER:  Yes, Your Honor.  Your Honor has said

01:12:47  7  that -- in the order that inoperability is a question of

01:12:52  8  law only in this case, and we asked for reconsideration and

01:12:55  9  pointed out the case law that said Section 101 issues go to

01:13:01  10  the jury as an issue of fact.

01:13:03  11          So we don't know whether you've reconsidered that,

01:13:07  12  but if you say it's only a question of law, then we'll

01:13:11  13  delete it.  But we weren't completely clear because your

01:13:14  14  order said:  If Plaintiff continues to urge this matter,

01:13:19  15  you know, there could be another challenge by -- or I mean,

01:13:24  16  if Defendant continues to urge the matter, there might be

01:13:27  17  another challenge by Plaintiff.  And so we weren't sure of

01:13:30  18  the context of where we would be urging that --

01:13:32  19          THE COURT:  Sure.  So I appreciate that, and it

01:13:34  20  hasn't -- it's not on the docket yet, and my apologies

01:13:38  21  about that.  We will email you a copy of it.  You will have

01:13:41  22  it.  You'll understand what the analysis was, but

01:13:45  23  ultimately it's a question for the Court, not the jury.

01:13:45  24          MR. OLIVER:  Okay.  Thank you.

01:13:54  25          THE COURT:  So you will get that slide --

01:13:56   1          MR. OLIVER:  I will delete this slide.  It won't

01:13:59   2   be a --

01:13:59   3          THE COURT:  All right.  Let's have the jury

01:14:01   4   brought in.

01:14:04   5          COURT SECURITY OFFICER:  All rise for the jury.

01:14:06   6          (Jury in.)

01:15:00   7          THE COURT:  Please be seated.

01:15:03   8          Okay.  Ladies and gentlemen of the jury, you have

01:15:15   9   now been sworn in as the jury that will try this case.  As

01:15:19  10   the jury, you will decide disputed questions of fact.  And

01:15:23  11   as the Judge, I'll decide questions of law and procedure.

01:15:27  12          From time to time during the trial and at the end

01:15:30  13   of the trial, I'll instruct you on the law that you must

01:15:35  14   follow in making your decision.

01:15:37  15          Very soon the lawyers for each side will make what

01:15:41  16   is called an opening statement.  Opening statements are

01:15:45  17   meant to help you understand the evidence.  However, what

01:15:49  18   the lawyers say during their opening statements is not

01:15:53  19   evidence.  It's only what they expect the evidence to show.

01:15:56  20          You should base your decision only on the evidence

01:16:00  21   that you hear and that comes in from the witness stand into

01:16:04  22   evidence through depositions and from the exhibits that I

01:16:11  23   have admitted into evidence.

01:16:11  24          You will rely on this evidence in making your

01:16:15  25   decision as to the verdict in this case.

01:16:17   1          The party who brings a lawsuit is called the

01:16:21   2   Plaintiff, and the Plaintiff in this case is Lone Star

01:16:26   3   Technological Innovations, LLC, who will be referred to as

01:16:28   4   Plaintiff or Lone Star during the trial.

01:16:30   5          The party against whom the suit is brought is

01:16:33   6   called the Defendant, and in this action the Defendant is

01:16:39   7   ASUSTeK Computer, Inc., who will be referred to as the

01:16:43   8   Defendant or ASUS during the trial.

01:16:46   9          As I told you during voir dire this morning, this

01:16:49   10  is a case of alleged patent infringement.  After the

01:16:54   11  opening statements, Lone Star will call witnesses and

01:16:57   12  present evidence, and then ASUS will have an opportunity to

01:17:01   13  call witnesses and present evidence.

01:17:03   14         After the parties' main cases are completed, Lone

01:17:09   15  Star may be permitted to present what is called rebuttal

01:17:12   16  evidence.  After all of the evidence is in, I will instruct

01:17:15   17  you on the applicable law, and I will give you detailed

01:17:20   18  instructions, both orally as I am doing now, and at the end

01:17:25   19  of the case you will also have written instructions to take

01:17:28   20  with you to the jury room.

01:17:30   21         After I have given you your final instructions,

01:17:33   22  after all of the evidence is in and after you have heard

01:17:37   23  those instructions, then you will hear the closing

01:17:41   24  arguments of the party -- of the parties.  And after you

01:17:45   25  have heard their closing arguments, then and only then will

01:17:51   1   you retire to the jury room to start discussing the case to

01:17:54   2   deliberate and to reach a verdict.

01:17:56   3          Throughout the course of the trial, I want you to

01:17:58   4   keep an open mind.  Don't decide any fact until you have

01:18:02   5   heard all of the evidence, then the closing arguments, and

01:18:06   6   then my instructions.

01:18:08   7          You should pay close attention to the evidence and

01:18:13   8   the testimony.  If you would like to take notes during the

01:18:15   9   trial, you may do so.  And we've got some notebooks that --

01:18:20  10   do you have your notebooks yet?  Okay.

01:18:23  11          You can make notes in your notebooks any time you

01:18:27  12   want to.  And if you decide to do that, be careful not to

01:18:30  13   get so involved in your note taking that you become

01:18:33  14   distracted or miss part of the testimony.  You don't need

01:18:37  15   to write down everything that happens.  Just take the notes

01:18:40  16   that you feel are appropriate or would be helpful to you.

01:18:44  17          Your notes, however, are only to be used as an aid

01:18:49  18   to your memory.  And if later your memory is different from

01:18:52  19   your notes, you should rely upon your memory and not your

01:18:56  20   notes.  Just because something gets written down on the

01:18:59  21   note pad doesn't make it any more important than your own

01:19:04  22   recollection or another person's recollection.

01:19:07  23          So don't be influenced by any notes that either

01:19:10  24   you take or someone else takes.  A juror's notes are not

01:19:15  25   entitled to any greater weight than the recollection of

01:19:19   1   each juror concerning the testimony.

01:19:25   2        Now, we do have a court reporter who is present

01:19:26   3   and taking down stenographic notes in the courtroom, but a

01:19:30   4   copy of that testimony will not be available for your use

01:19:33   5   during deliberations.

01:19:35   6        On the other hand, any exhibits that are

01:19:37   7   introduced into evidence, that would be documents and other

01:19:40   8   physical evidence, will be available for you during your

01:19:47   9   deliberations.

01:19:48  10        Now, my next instruction is very important.  Our

01:19:53  11   Constitution guarantees a trial by an impartial jury, and

01:19:57  12   that means that you as jurors must decide the case solely

01:20:03  13   based on the evidence that's presented here in the

01:20:07  14   courtroom and on the law that I give to you that you must

01:20:12  15   follow in your deliberations.

01:20:13  16        Until all of the evidence has been presented and

01:20:15  17   the arguments have been made and I have given you

01:20:18  18   instructions, you may not discuss this case with anyone,

01:20:21  19   even your fellow jurors.

01:20:23  20        So when you go to lunch or you take a break, you

01:20:27  21   all feel free to talk about whatever you want to, just

01:20:30  22   don't talk about the case.

01:20:32  23        After you begin your deliberations, of course, you

01:20:40  24   can discuss the case with your fellow jurors, but you can't

01:20:46  25   discuss it with anyone else until the very end and the case

01:20:49  1   is over with and I have released you from that restriction.

01:20:53  2        So during the trial, you may also not conduct any

01:21:04  3   independent investigation about the case or the matters or

01:21:12  4   legal issues, attorneys involved in the case.  Don't learn

01:21:15  5   anything -- don't try to learn anything about the case from

01:21:17  6   any outside source.  And that's very important.

01:21:20  7        The bottom line for the important work you're

01:21:23  8   going to be doing as jurors is that you have to base your

01:21:26  9   verdict only on the testimony that has been given under

01:21:30  10  oath that complies with the rules of evidence we are

01:21:34  11  required to follow and the exhibits that have been legally

01:21:37  12  admitted into evidence here in the courtroom, along with

01:21:43  13  the instructions that I give you about the law.  So don't

01:21:45  14  go to any other source to receive information, don't read

01:21:50  15  anything in the newspaper or listen to anything on the

01:21:56  16  radio or watch television.

01:21:59  17       If something should appear there, and as I said

01:22:03  18  before, I think it's unlikely it will, but if it does, just

01:22:07  19  don't read the article, don't watch the article or

01:22:09  20  listen -- don't watch the story or listen to the radio

01:22:13  21  report.

01:22:15  22       Don't use the Internet or Google to find out any

01:22:19  23  information about the case or the parties or the attorneys.

01:22:22  24  So don't go home and try to do your own investigation about

01:22:25  25  the facts of the case.  That would be extremely improper.

01:22:30  1          And the reason, again, is very important.  It

01:22:35  2  would violate your oath as a juror because you would be

01:22:39  3  considering something other than the evidence that has been

01:22:42  4  presented here in the courtroom.  And if that were to

01:22:47  5  happen, it could result in a mistrial.

01:22:52  6          There's been an enormous amount of time and effort

01:22:54  7  and expenditures by the parties to get this case to this

01:22:59  8  point.  And if you were to engage in behavior like that, it

01:23:03  9  potentially could jeopardize getting a verdict.  So please

01:23:15  10  remember that rule.

01:23:16  11          I will remind you about these rules throughout the

01:23:19  12  course of the case and I do that, of course, not because I

01:23:22  13  have any concern about your ability to follow those rules

01:23:25  14  but just to emphasize their importance.

01:23:27  15          I told you earlier you can't talk to anybody, and

01:23:35  16  that includes your family and your friends.  So in the

01:23:40  17  evenings you can't talk to them about the case.  I -- I

01:23:46  18  think it's unlikely to happen, but if someone should

01:23:51  19  approach you to talk to you about the case, you should

01:23:57  20  refuse to do so and inform me immediately.

01:24:01  21          You should also not allow the case to be discussed

01:24:04  22  in your presence.  And that means during a trial like this,

01:24:11  23  kind of holding yourself apart from anybody, except your

01:24:16  24  fellow jurors, who you run into in the courthouse, in the

01:24:20  25  halls, in the elevators waiting to go through the security

01:24:25  1  line in the morning.

01:24:26  2       It is important for you not only to be fair and

01:24:30  3  impartial but also to appear to be fair and impartial.  So

01:24:37  4  that is an important rule I'll ask you to follow, as well.

01:24:41  5       The attorneys and the parties are all very

01:24:46  6  personable, nice folks, and I'm sure they would like

01:24:51  7  nothing other than to visit with you while you're in the

01:24:53  8  courthouse, but they're following my rules in this regard

01:24:56  9  and so they won't be speaking to you.  And they're doing

01:24:59  10 that not because they are rude or impolite or anything like

01:25:04  11 that, but just they know what my rules are in this regard,

01:25:08  12 and they're certainly going to want to follow those.

01:25:12  13      So you will have a juror badge on throughout the

01:25:15  14 course of the trial and -- so people will know who you are

01:25:21  15 and they should not be approaching you.

01:25:24  16      Now, we all use smartphones and tablets and

01:25:33  17 computers in our daily lives.  You can't communicate with

01:25:38  18 anyone about the case at all.  Don't post any updates on

01:25:41  19 any social networking site or anything like that.  No

01:25:47  20 tweets on Twitter or status updates on Facebook.  No

01:25:53  21 mention about the case on any kind of site.  Don't text

01:25:58  22 anyone about anything or email anyone about this case for

01:26:00  23 the same reason I gave you before.  It could potentially

01:26:04  24 result in a waste of a lot of time and expense that

01:26:07  25 everybody has put into getting the case ready to trial.  So

01:26:10  1    I'll ask you to follow that instruction very carefully.

01:26:14  2         As I told you before we broke for lunch, there

01:26:17  3    will be occasions when I have to visit with the attorneys

01:26:21  4    outside your presence.  I'll try to keep those times to a

01:26:25  5    bare minimum.  We'll be here in the morning to deal with

01:26:30  6    things, we'll deal with things over the lunch hour, and at

01:26:33  7    the conclusion of the day, after you have left, but they

01:26:36  8    are an inevitable part of any trial.  And it almost

01:26:41  9    certainly will happen that we ask you to wait for us in the

01:26:44  10   jury room while we resolve some legal or evidentiary

01:26:50  11   matter.

01:26:51  12        I'd ask you not to speculate or worry about what

01:26:55  13   we're discussing outside of your presence, and I'll ask you

01:26:59  14   for your patience in the event you do have to wait.

01:27:02  15        All right.  Let me explain to you a little bit

01:27:06  16   about the parties and the nature of the case.  It is a

01:27:09  17   patent case, and it involves a patent that's been

01:27:13  18   identified as U.S. Patent No. 6,724,435.  And that patent

01:27:19  19   will also be known throughout this trial by its last three

01:27:24  20   digits, the '435 or the '435 patent.

01:27:28  21        Generally, the patent relates to technology for

01:27:31  22   color control for digital video images.  Lone Star contends

01:27:42  23   that certain ASUS products infringe Claims 1, 2, 3, 5, 6,

01:27:47  24   13, 14, and 15 of the '435 patent, and these claims will be

01:27:51  25   referred to as what we call asserted claims.  Lone Star

```
01:27:56   1   also contends that it is entitled to damages as a result of
01:28:01   2   this alleged infringement.
01:28:03   3         ASUS -- or ASUS denies that it has infringed the
01:28:07   4   asserted claims of the '435 patent, and it contends that
01:28:11   5   the patent is invalid.  It further contends that Lone Star
01:28:15   6   is not entitled to damages.
01:28:18   7         Now, all of this may sound like Greek to you.  I
01:28:22   8   know it's a lot of new words that are thrown at you.  I
01:28:27   9   will define a lot of the words for you as we go through the
01:28:30  10   instructions, and the attorneys will discuss them with you
01:28:33  11   in their opening statements.  And the witnesses are going
01:28:38  12   to help you understand the words.  So don't feel
01:28:42  13   overwhelmed at this point.  You're going to get a lot of
01:28:44  14   education this week and a lot of help from the attorneys
01:28:47  15   and the witnesses for both sides.
01:28:49  16         I do want to explain to you a little bit about our
01:28:53  17   patent system generally in the United States.  You saw the
01:28:55  18   video this morning before jury selection.
01:28:59  19         Patents are issued by the Patent and Trademark
01:29:02  20   Office, which is part of the United States government.  The
01:29:06  21   government is empowered by our Constitution to enact patent
01:29:11  22   laws and to issue patents to protect inventions.
01:29:15  23         Inventions that are protected by patents may be
01:29:18  24   products, compositions, or methods for doing something or
01:29:24  25   for using or making a product or a composition.
```

01:29:28   1          The purpose of the patent system is to help

01:29:31   2   advance science and technology, and it -- our system

01:29:40   3   achieves this purpose by granting to the owner of the

01:29:43   4   patent the right for the term of the patent to exclude any

01:29:47   5   other person from making, using, offering for sale,

01:29:51   6   selling, or importing the invention covered by the patent

01:29:54   7   anywhere in the United States.

01:29:55   8          A patent is granted for a set period of time.

01:29:58   9   Once a patent expires, the invention then becomes part of

01:30:03  10   what we call the public domain, which means that anyone is

01:30:07  11   free to use it, and the patent owner may no longer exclude

01:30:11  12   anyone from making use of the invention that is claimed in

01:30:15  13   the patent.

01:30:16  14          During the term of the patent, however, if another

01:30:20  15   person without the patent owner's permission makes, uses,

01:30:25  16   sells, offers to sell, or imports into the United States

01:30:28  17   something that is covered by the claims of the patent, then

01:30:31  18   that person is said to infringe the patent.

01:30:34  19          The patent owner may enforce a patent against

01:30:38  20   persons or companies believed to be infringers in a lawsuit

01:30:44  21   in federal court just as in this case.  The law does not

01:30:47  22   require that the patent owner give advance notice to a

01:30:51  23   Defendant that the Plaintiff intends to file suit.

01:30:55  24          Everyone, however, has the right to use existing

01:31:00  25   knowledge and principles.  A patent cannot remove from the

01:31:03  1   public the ability to use what was known or obvious before

01:31:08  2   the invention was made or patent protection was sought.

01:31:12  3        Thus, to be entitled to patent protection, an

01:31:20  4   invention must be new, useful, and nonobvious.

01:31:23  5        To obtain a patent, the applicant must file a

01:31:26  6   patent application with the United States Patent Office.

01:31:32  7   After the applicant files this application, a patent

01:31:34  8   examiner exams the application to determine whether the

01:31:38  9   invention described in the patent application meets the

01:31:42  10  requirements of the patent laws for patentable inventions.

01:31:47  11       If the examiner concludes that the legal

01:31:50  12  requirements for a patent have all been satisfied, he or

01:31:53  13  she allows the claims, and the application issues as a

01:31:58  14  patent.

01:31:58  15       The process from the filing of the application to

01:32:01  16  the issuance of a patent is called patent prosecution.  The

01:32:07  17  record of papers that is related to the patent prosecution

01:32:13  18  is referred to as prosecution history or file history.

01:32:18  19       The granting of the patent by the Patent Office

01:32:23  20  carries with it the presumption that the patent is valid.

01:32:27  21       From the issuance of a patent, it is presumed that

01:32:31  22  its subject matter is new, useful, and constitutes an

01:32:35  23  advance that was not at the time the invention was made

01:32:39  24  obvious to one of ordinary skill in the art.  However, that

01:32:43  25  presumption may be rebutted at trial, and you, the finder

01:32:46  1  of fact, may find the patent to be invalid.

01:32:50  2       I want to instruct you about the significance of

01:32:53  3  the patent claims.

01:32:54  4       The claims of a patent are the main focus of a

01:32:59  5  patent case because the claims are what define the patent

01:33:03  6  owner's rights under the law.  That is, the claims define

01:33:08  7  what the patent owner may exclude others from doing during

01:33:12  8  the term of the patent.

01:33:13  9       The claims of a patent serve two purposes.  First,

01:33:18  10 they set the boundaries of the invention covered by the

01:33:23  11 patent, and, second, they provide notice to the public of

01:33:27  12 those boundaries.

01:33:29  13      Thus, when a method is accused of infringing a

01:33:32  14 patent, the patent claims are compared to the accused

01:33:36  15 method to determine whether there is infringement.  The

01:33:40  16 claims of the patent are what infringed when patent

01:33:44  17 infringement occurs -- or are what are infringed when

01:33:47  18 patent infringement occurs because the claims define what

01:33:51  19 the invention is.

01:33:52  20      In researching your determinations with respect to

01:33:56  21 infringement, you must consider each claim separately.

01:34:00  22      Now, when claims define the invention, sometimes

01:34:03  23 there's disagreement between the parties as to what certain

01:34:06  24 words or terms in the claims mean.  And when this happens,

01:34:10  25 they ask the Court to interpret those terms in light of the

01:34:14   1   patent as a whole, and this is to help solve their

01:34:20   2   disagreement and to give you, the jury, guidance in

01:34:23   3   applying the claims to the facts of the case.

01:34:26   4         This happened in this case, and at some time prior

01:34:30   5   to the trial, we had a hearing, and I heard arguments and

01:34:33   6   then rendered a claim interpretation of the disputed terms.

01:34:36   7         My interpretation of the language of the claims

01:34:40   8   should not be taken as an indication by you that I have a

01:34:44   9   personal opinion or any opinion at all regarding issues

01:34:49  10   such as infringement.  Those issues are yours alone to

01:34:54  11   decide.  But you must use the meanings when you decide the

01:34:58  12   issues of infringement.

01:35:00  13         I want to give you some information about the

01:35:03  14   issue that will be presented to you in the trial, as well

01:35:07  15   as a short overview of the applicable law.

01:35:11  16         At the close of the trial, I will give you some

01:35:14  17   specific instructions that you must follow in reaching your

01:35:17  18   verdict, and you will also be given a verdict form and

01:35:22  19   questions that you must answer in providing your verdict.

01:35:26  20         All of that will happen at the very end of the

01:35:28  21   case, but I want you to understand and provide you with

01:35:31  22   some instructions that will help you -- that you will need

01:35:36  23   to follow in deciding the case.

01:35:37  24         We talked this morning, the attorneys did, about

01:35:41  25   some burdens of proof.

01:35:43  1          In any legal action, the facts are -- the facts

01:35:47  2    are proven by a acquired standard of evidence that is known

01:35:51  3    as the burden of proof.  And as I told you before -- or the

01:35:56  4    attorneys may have mentioned, you may have heard about it

01:36:01  5    in connection with a criminal case, the burden of proof

01:36:05  6    that is called proof beyond a reasonable doubt is not used

01:36:11  7    in this case or any other civil case.  That's used in

01:36:15  8    criminal cases.

01:36:16  9          In this case, Lone Star must prove its claims of

01:36:20  10   patent infringement and damages by what we call a

01:36:25  11   preponderance of the evidence.  And when a party has the

01:36:28  12   burden of proof by a preponderance of the evidence, it

01:36:36  13   means that you must be persuaded that what the party seeks

01:36:41  14   to prove is more probably true than not true.

01:36:44  15         Put another way, if you were to put the evidence

01:36:48  16   for and against the party into scales -- opposite sides of

01:36:53  17   the scales, preponderance of the evidence means that the

01:36:57  18   scale must tip at least somewhat toward the party who has

01:37:01  19   the burden of proof.

01:37:02  20         ASUS -- or ASUS has the burden of proving

01:37:09  21   invalidity by clear and convincing evidence, and that means

01:37:14  22   evidence that produces in your mind a firm belief or

01:37:17  23   conviction as to the matter at issue.

01:37:21  24         Although proof to an absolute certainty is not

01:37:27  25   required, clear and convincing evidence does require a

01:37:30  1  greater degree of persuasion than is necessary for the

01:37:35  2  burden -- for the preponderance of the evidence standard.

01:37:39  3  If the proof establishes in your mind a firm belief or

01:37:44  4  conviction, then that standard has been met.

01:37:50  5        Again, the standard that is called beyond a

01:37:53  6  reasonable doubt is one that is used in criminal cases, and

01:37:57  7  you should put it out of your mind.

01:37:59  8        Now, let me visit with you about your duties as

01:38:03  9  jurors.

01:38:04  10        You really will have two duties as jurors.  The

01:38:11  11  first is to decide the facts based upon the evidence that

01:38:14  12  is presented.  That is your job and your job alone.

01:38:17  13        Your second duty is to apply the law as I give it

01:38:21  14  to you to those facts that you find.  You must follow those

01:38:25  15  instructions on the law even if you disagree with them.

01:38:29  16        Each of the instructions that I have given you now

01:38:33  17  and the instructions I will give you at the end of the

01:38:36  18  trial are important, and you must follow all of those.

01:38:39  19        I want you to do that, and I know that you will do

01:38:43  20  that, because it is important for you to be able to perform

01:38:47  21  your duties fairly and impartially.  You should not allow

01:38:53  22  sympathy, prejudice, fear, public opinion, or anything else

01:38:56  23  to influence you in any way.

01:39:00  24        Nothing that I have said this morning, this

01:39:02  25  afternoon, or at any part during the trial is meant to

01:39:09   1   indicate in any way any opinion on my part about what I

01:39:13   2   believe the facts are or what I believe your verdict should

01:39:16   3   be.  Again, you, the jury, will be the sole judges of the

01:39:23   4   facts in this case.

01:39:25   5          You will hear testimony from a number of witnesses

01:39:29   6   in the case.  Some of them will be here present in the

01:39:33   7   courtroom.  But some have not been able to travel from

01:39:37   8   their homes for medical or other reasons concerning the

01:39:42   9   pandemic.  And you will see those witnesses who testify

01:39:50   10  remotely through screens, the screen in the courtroom.  And

01:39:55   11  you should give those witnesses the same -- or you should

01:40:01   12  examine their testimony according to the same weight and

01:40:05   13  credibility as you would any other witness, and you should

01:40:08   14  consider their testimony as if they were here, present in

01:40:12   15  the courtroom and testifying in the courtroom.

01:40:19   16         All right.  That concludes my opening instructions

01:40:21   17  for you.

01:40:22   18         I have given you some logistical information about

01:40:26   19  what your trial day will be like, so you have a general

01:40:30   20  idea of what to expect as the trial proceeds.

01:40:34   21         And with those preliminary comments, at this time,

01:40:37   22  the Plaintiff may present its opening statement.

01:40:44   23         MR. SABA:  Thank you, Your Honor.  May it please

01:40:54   24  the Court.  Counsel.

01:40:56   25         Ladies and gentlemen, good afternoon.

01:40:59  1             As Americans and Texans, we have to respect the

01:41:04  2    property rights of others, and when someone takes another

01:41:09  3    property right without permission, we have a legal system

01:41:11  4    in place to correct that.  And, ladies and gentlemen, that

01:41:16  5    is why you have been called today.

01:41:17  6             We are here today because Defendant, ASUS, has

01:41:21  7    wrongfully used and continues to use Lone Star's

01:41:25  8    technology.  My name is John Saba.  I'm a lawyer

01:41:32  9    representing Plaintiff, Lone Star, over here.  I was born

01:41:34  10   and raised in Dallas and now live in Austin.  And I want to

01:41:39  11   thank all of you for your time serving in this case today.

01:41:42  12            This is a patent infringement case.  Plaintiff,

01:41:44  13   Lone Star, owns a patent on display technology.  And

01:41:47  14   Defendant, ASUSTeK, a Taiwanese company, has infringed on

01:41:52  15   that patent.

01:41:53  16            You may or may not be familiar with patents.

01:41:56  17   Patents are granted for inventions.  It's a property right,

01:42:00  18   an intellectual property right granted by the

01:42:04  19   U.S. government for an invention.  And the owner of a

01:42:06  20   patent owns the rights to the invention.

01:42:08  21            Intellectual property rights are no different than

01:42:12  22   regular property rights.  If you own a piece of property,

01:42:15  23   like your home, then you have the right to control that

01:42:18  24   property.  You can control who comes on and off your

01:42:22  25   property, you can charge rent if you want to rent it out,

01:42:25  1   and if you own a patent, then you have the right to control

01:42:28  2   how that invention is used.  Be it real property or

01:42:33  3   intellectual property, it's essentially the same.

01:42:37  4        Over the course of the next few days, you're going

01:42:40  5   to hear a fair amount of technology, displays and monitors

01:42:46  6   and color changes, and while some of that may seem

01:42:50  7   complicated, this case is really quite simple.  The

01:42:53  8   evidence will show that this case really comes down to

01:42:57  9   three things.

01:42:59  10        Number one, Lone Star owns United States -- a

01:43:03  11  United States patent for an invention to make color

01:43:05  12  correction changes on displays, monitors, and televisions,

01:43:09  13  an invention that essentially has made its way into many,

01:43:13  14  many modern televisions, monitors and displays.

01:43:17  15        Number two, ASUS infringes on that patent.  ASUS

01:43:23  16  sells monitors and displays in this country that contain

01:43:26  17  the patented invention color-changing technology.  And the

01:43:30  18  evidence will show that Lone Star's expert, who we'll talk

01:43:35  19  about more in a second, tells you how the products infringe

01:43:39  20  because he tested the products, he reviewed the ASUS

01:43:42  21  product manuals and other technical documents, and he even

01:43:46  22  reviewed the source code on the chips contained in some of

01:43:50  23  the ASUS displays.  ASUS even advertises the infringing

01:43:55  24  technology themselves.

01:43:56  25        And, number three, Lone Star is entitled to

01:44:00    1    damages.

01:44:01    2            And, ladies and gentlemen, that is why you're

01:44:03    3    here, and I want to talk to you briefly about each of

01:44:07    4    these.

01:44:07    5            Lone Star is a Texas company which owns the patent

01:44:12    6    at issue in this matter.  The patented invention involves

01:44:15    7    the ability to change individual colors on a display.

01:44:18    8            Specifically, Lone Star owns U.S. Patent

01:44:27    9    No. 6,724,435.

01:44:28   10            And as Judge Schroeder informed you, we

01:44:32   11    refer -- we'll be referring to the patent as the '435

01:44:35   12    patent throughout this week.  That's the last three digits

01:44:40   13    of the registration number.

01:44:42   14            The patent is titled:  Method for Independently

01:44:47   15    Controlling Hue Or Saturation of Individual Colors in a

01:44:48   16    Real Time Digital Video Image.  The '435 patent describes

01:44:52   17    an invention that you're probably already familiar with.

01:44:55   18    The evidence will show it's an important feature in many,

01:45:00   19    if not all, modern televisions and displays.  And it

01:45:05   20    teaches, as we say in patent law, the concept of changing

01:45:08   21    an individual color without changing the other colors.

01:45:11   22            In order to understand the importance of the

01:45:15   23    invention, I want to talk to you a little bit about the

01:45:19   24    problem that existed before the patent was invented.  And

01:45:23   25    before I do, I need to tell you a little about some terms

01:45:26   1   that you're going to hear about this week, terms that I

01:45:29   2   learned from taking this case on -- and like, for example,

01:45:33   3   hue or saturation of a color.  I had no idea what those

01:45:36   4   terms meant.

01:45:37   5          Hue is the shade of color or tint.

01:45:41   6          Saturation is the intensity of color.

01:45:44   7          So let me explain to you the problem that existed.

01:45:47   8   In the early 2000s, before the patented invention, a user

01:45:52   9   was only able to change the hue or saturation of all the

01:45:57  10   colors on a monitor.  It was all or nothing.  You couldn't

01:46:03  11   change one color.

01:46:04  12          And so on the far left, you see the picture of the

01:46:07  13   television that looks like it's in black and white.  That's

01:46:11  14   without any saturation whatsoever.  That's an unsaturated

01:46:16  15   photo.  And as saturation is increased, you get the super

01:46:20  16   vividness over there on the right.

01:46:21  17          But what was needed was the ability to select one

01:46:26  18   color and change that color without changing the other

01:46:29  19   colors.  For example, this picture of a parrot, if you

01:46:32  20   wanted to change the hue of blue to green, there needed to

01:46:37  21   be a way to do that.  So here, you see the picture of a

01:46:41  22   parrot with blue feathers, and then it changes to green,

01:46:45  23   but the yellow feathers don't change.

01:46:48  24          The problem of color changing technology becomes

01:46:53  25   more complex when we're talking about televisions and

01:46:56    1    monitors, i.e., videos.  And let me use this as an example.

01:47:02    2    Because I'm from Dallas, I'm a lifetime Cowboys fan.  This

01:47:09    3    is a picture of Roger Staubach.  Assume for purposes of

01:47:16    4    this example, that this is a 60-second YouTube clip of

01:47:21    5    Roger Staubach.  In order for this image to be displayed,

01:47:25    6    just a still image to be displayed, it typically requires

01:47:29    7    about 2 million pixels of data.

01:47:32    8            So that picture, without any playing, consists of

01:47:36    9    about 2 million pixels of data, which are the color dots on

01:47:42   10    that screen.  Every video or most videos have about 30 to

01:47:46   11    60 frames per second.  So that means for one second of

01:47:49   12    video, we're talking about 50 million -- approximately 50

01:47:53   13    million pixels of data.  And that's a lot of date.

01:47:59   14            So if I wanted to change the blue in

01:48:01   15    Mr. Staubach's jersey, I have to essentially sift through

01:48:04   16    about 50 million pixels of data.  Now you have an idea of

01:48:10   17    how complicated the problem is.

01:48:13   18            The '435 invention solved it with the ability to

01:48:18   19    change hue or saturation of one individual color without

01:48:22   20    changing the other colors.  The invention was appealing to

01:48:27   21    so many, but nowadays it is -- it became more or less a

01:48:32   22    standard feature.

01:48:33   23            When we talk about patents, we talk about patent

01:48:39   24    claims.  And patent claims define the boundaries of the

01:48:46   25    invention just like a fence line -- just like a fence line

01:48:54   1   puts the metes and bounds on any boundary of real estate.

01:49:00   2   All right.  And this is a copy of the patent that my

01:49:03   3   co-counsel was talking about this morning.  And it's

01:49:07   4   about 18 pages long.

01:49:08   5         To get to the claims, you go to the back, and it

01:49:11   6   says:  What is claimed, Number 1.  And it starts off:  A

01:49:15   7   method of independently controlling hue or saturation,

01:49:20   8   these steps consisting of.  And I want to talk to you very

01:49:24   9   briefly about that because you're going to be hearing more

01:49:27  10   about Claim 1, which is the primary claim.

01:49:30  11         Now, Claim 1 may seem like a lot of information,

01:49:33  12   but if you break it down into five steps, it's not that

01:49:36  13   complicated.  And you're going to hear Plaintiff, Lone

01:49:39  14   Star, talk all about the Claim 1 steps.

01:49:41  15         The first step of Claim 1, Step 1(a), is:

01:49:45  16   Receiving and characterizing the digital input image.  That

01:49:50  17   is getting a signal.  Whether your television or monitor is

01:49:54  18   plugged into cable, whether it's plugged into a computer,

01:49:56  19   it's getting a signal from something.

01:49:58  20         Step 1(b):  Selecting to independently change the

01:50:04  21   hue or saturation.  That is the monitor or display's

01:50:07  22   ability to change one color.  We're going to talk about

01:50:10  23   that more in a second.

01:50:11  24         Three:  Identifying a plurality of input image

01:50:19  25   pixels containing that color range.

01:50:22    1          Four:  Determining the output image pixel values.

01:50:29    2          And, five:  Displaying the image.

01:50:31    3          The evidence will show that ASUS's products also

01:50:36    4    do these five steps.

01:50:38    5          The evidence will show that typically this color

01:50:41    6    changing feature is included on displays, and what we'll

01:50:45    7    refer to during the trial as an on-screen display.  An

01:50:49    8    on-screen display or OSD is usually -- this is an example

01:50:53    9    of a monitor -- is usually hued from one of the buttons on

01:51:00   10    the display itself.

01:51:02   11          So, for example, if there's an on/off button and

01:51:04   12    some selection buttons, you pull it up and you see a menu

01:51:06   13    similar to that, and then you can effectuate a number of

01:51:10   14    changes, including selecting the input, changing hue or

01:51:15   15    saturation, et cetera.

01:51:15   16          And the devices at issue in this case regard what

01:51:19   17    we'll refer to as 6-axis color control or 3-axis color

01:51:28   18    control.  3-axis is red, green, and blue.  6-axis is red,

01:51:36   19    green, blue, cyan, magenta, and yellow.

01:51:48   20          Let's talk about Point No. 2.  ASUS is a large

01:51:50   21    computer and display manufacturer located in Taiwan,

01:51:53   22    Republic of China.

01:51:54   23          Now, you may or may not be familiar with ASUS or

01:51:56   24    its brands.  ASUS sells a number of computer -- excuse me,

01:52:00   25    consumer electronic products here in the United States.

01:52:02  1   The types that are at issue in this case are monitors or

01:52:05  2   displays, whichever you prefer to call them.  And we'll

01:52:08  3   refer to those products throughout the trial as the accused

01:52:12  4   products.

01:52:12  5        The evidence will show that the accused products

01:52:15  6   infringe on the patent because they include functionality

01:52:18  7   for a user to change individual color without affecting

01:52:25  8   other colors.

01:52:26  9        ASUS does not have permission to use the patented

01:52:29  10  technology in their products.  Unlike other display

01:52:32  11  companies that actually have a license to use the patented

01:52:35  12  technology, like Sharp, Acer, and NEC, ASUS does not, and

01:52:41  13  therefore is liable for patent infringement.

01:52:42  14       There are approximately 135 accused product

01:52:52  15  families at issue in this lawsuit, all displays, and all of

01:52:57  16  the ASUS products are sold in the United States for

01:53:00  17  millions of dollars.

01:53:01  18       And the evidence will show, ladies and gentlemen,

01:53:04  19  that ASUS advertises on its website the patented

01:53:12  20  technology.  You're going to be presented with

01:53:15  21  Plaintiff's 14 -- Exhibit 14, pardon me, where ASUS

01:53:19  22  advertises on its website 6-axis independent color

01:53:26  23  adjustment, customized hue or saturation control with 6

01:53:30  24  color adjustment allows you to adjust 6 colors

01:53:33  25  independently without affecting the other colors.

01:53:37    1          THE COURT:  Mr. Saba, hold on just one moment.

01:53:39    2          MR. OLIVER:  Your Honor, this is one of the slides

01:53:41    3   that we objected to and were told was changed for the

01:53:44    4   presentation.

01:53:45    5          MR. SABA:  Your Honor, I don't believe this slide

01:53:48    6   was objected to in our opening.  I think it was objected to

01:53:52    7   in Dr. Ducharme's.  And it's Plaintiff's 14, as I told

01:53:57    8   Mr. Oliver yesterday.

01:53:58    9          MR. OLIVER:  I guess -- I believe we objected to

01:53:59   10   it.  I'm not going to press the issue.  We'll drop the

01:54:03   11   objection at this point.  I do not think it's in

01:54:06   12   Exhibit 14, but I'll let him continue.  I'm sorry.

01:54:10   13          MR. SABA:  Thank you.

01:54:10   14          THE COURT:  Continue.

01:54:11   15          MR. SABA:  Ladies and gentlemen, you will be

01:54:15   16   presented at trial how the language of this advertisement

01:54:17   17   is nearly -- it's similar, if not identical, to the '435

01:54:22   18   patent.

01:54:22   19          Over the course of the next few days, you're going

01:54:26   20   to hear from several Lone Star witnesses, including Lone

01:54:29   21   Star's expert technical witness, Dr. Al Ducharme.

01:54:34   22   Dr. Ducharme is an expert in display technology.  He's a

01:54:38   23   professor, a Ph.D. of electrical engineering where he

01:54:44   24   taught display technology at the University of Central

01:54:48   25   Florida.  He has over 30 years of experience in the field

01:54:51   1   of display technologies.

01:54:53   2         Dr. Ducharme will testify on why the ASUS

01:54:55   3   products -- the accused products infringe on the patent.

01:54:58   4   He actually tested a -- two ASUS displays with

01:55:04   5   sophisticated color sensing equipment to confirm his

01:55:08   6   theories.  He examined the source code on the display chips

01:55:17   7   in the accused products, and he reviewed technical

01:55:23   8   documentations and specifications.

01:55:26   9         Dr. Ducharme will testify that ASUS's products

01:55:28   10   infringe on the patented invention, and he will provide a

01:55:32   11   detailed analysis of how each step of each claim asserted

01:55:37   12   infringes on the '435 patent.

01:55:37   13         The evidence will show that the bottom line is if

01:55:41   14   the monitor can change one color at a time without changing

01:55:44   15   the other colors, it's using Lone Star's technology and

01:55:48   16   infringing Lone Star's patent.

01:55:49   17         You're going to hear from ASUS, as well, after the

01:55:57   18   Plaintiff rests in their case.  ASUS is going to tell you

01:55:59   19   that their products don't infringe.  The evidence that will

01:56:02   20   show that they're going to criticize Dr. Ducharme for only

01:56:07   21   testing a few products, but I will submit to you that you

01:56:12   22   don't need to eat all the cookies in the package to know

01:56:14   23   that they're chocolate chip.

01:56:19   24         They are going to criticize Dr. Ducharme's

01:56:21   25   analysis of the source code, but the evidence will show

01:56:23  1  that ASUS did not inspect the source code.  At the end of

01:56:28  2  the day, Lone Star believes it will easily meet its burden

01:56:33  3  of proof to show infringement.

01:56:35  4        ASUS will also likely argue that the patent that

01:56:39  5  the United States government issued, the '435, is not

01:56:44  6  valid.  And -- but as -- but as you heard this morning in

01:56:51  7  the video, a patent is presumed to be valid just like your

01:56:54  8  driver's license is presumed to be valid.

01:56:57  9        Finally, ASUS will probably argue that they don't

01:57:01  10  have to pay anything.  But the evidence will show that if

01:57:06  11  you find infringement, that the -- the law -- the law

01:57:13  12  affords Lone Star what is called a reasonable royalty.

01:57:17  13        So after you decide infringement and validity, you

01:57:20  14  will then be asked to award a damages amount of no less

01:57:24  15  than a reasonable royalty.

01:57:25  16        You're going to hear from Lone Star's damages

01:57:28  17  expert, Mr. Glenn Perdue, who -- he will walk you through

01:57:33  18  his calculations to arrive at a reasonable royalty.

01:57:40  19        He's going to discuss something called a

01:58:01  20  hypothetical negotiation.  It's a special construct, and

01:58:01  21  it's unlike a regular negotiation.  In a hypothetical

01:58:01  22  negotiation, you will assume that the patent is infringed.

01:58:01  23  The evidence will show that it is.  You assume that the

01:58:01  24  patent is valid.  The evidence will show that it is.  And

01:58:02  25  you will assume that ASUS wants the technology.  The

01:58:04  1   evidence will show why else is it in their product.

01:58:08  2           And at the conclusion of evidence, we are going to

01:58:11  3   ask you to award Lone Star at least $2.8 million for ASUS

01:58:20  4   infringing its intellectual property rights.

01:58:23  5           Thank you.

01:58:31  6           THE COURT:  Okay.  At this time, ASUSTeK may

01:58:34  7   present its opening statement.

01:58:36  8           MR. OLIVER:  Can we switch the monitors to -- we

01:59:28  9   kept it plugged in when we tested it this morning.  Should

01:59:28  10  we plug them into the cable that they used?

01:59:31  11          THE COURT:  Yeah, why don't we try that.

02:00:38  12          MR. OLIVER:  Thank you for your patience.  I'm

02:00:40  13  sorry about that slight technical difficulty.  Hopefully my

02:00:45  14  controller will work.  Okay.  Good.

02:00:49  15          Ladies and gentlemen, once again, I want to start

02:00:51  16  by thanking you for being here and thank you for your

02:00:55  17  service.  I know there are places that you would rather be

02:00:58  18  than sitting in a courtroom listening to this exciting

02:01:02  19  patent case about monitors and color technology.  But

02:01:06  20  because you're here, we really appreciate it and appreciate

02:01:09  21  what you're doing to help us reach justice.

02:01:13  22          As I said this morning, my name is Andrew Oliver.

02:01:17  23  I'm a lawyer for ASUS.  My colleague, Vinay Joshi, is here

02:01:23  24  at the table with me.  Michael McCarady, the ASUS

02:01:29  25  representative, is here from Dallas.  Mr. McCarady is a

02:01:33  1  long-time Texan.  And like I said, he refused to leave

02:01:37  2  Texas when ASUS asked him to move to Indiana.  He's been

02:01:44  3  married for 30 years, has four kids, grandkids, Air Force

02:01:49  4  veteran, loves working for ASUS, and was able to move into

02:01:55  5  a job where he is managing a bunch of people in South

02:01:59  6  America and different places in the United States, serving

02:02:02  7  these products when somebody has a problem with them.

02:02:05  8          Jaime Morquecho is a witness that's going to be

02:02:09  9  appearing by video from California.  He was planning to be

02:02:12  10  here, as well, had a very unfortunate family health

02:02:17  11  situation where his brother is essentially in terminal

02:02:24  12  illness and getting very close and he needs to be with his

02:02:27  13  brother, but he is going to testify by video.

02:02:29  14          Mr. Alvin Lin is going to testify from Taiwan by

02:02:38  15  video.  He is not here because of COVID because once

02:02:42  16  somebody leaves Taiwan and then tries to step back in, they

02:02:45  17  have to go into a two-week quarantine where they're locked

02:02:49  18  up in their house or hotel for two weeks and can't do

02:02:52  19  anything else.

02:02:52  20          So you'll also see -- I'm going to ask the other

02:02:56  21  witnesses that are here to stand up.

02:03:02  22          Dr. Robert Stevenson, he's an electrical

02:03:06  23  engineering professor from Notre Dame.  He'll be talking

02:03:13  24  about the technology that's at issue.

02:03:14  25          And Mr. Brett Reed is an economist, and he'll be

02:03:17   1   talking about the value of the patent when we get to that

02:03:20   2   point in the case.

02:03:27   3          I just wanted to put up here an image for you from

02:03:30   4   the ASUS website just to give you -- it might be hard to

02:03:33   5   read, but give you an idea.

02:03:34   6          Up at the top, you can see ASUS manufactures

02:03:36   7   mobile phones, laptops, displays, desktops, motherboards,

02:03:42   8   networking equipment, different computer accessories.

02:03:45   9          We have a few of them here.  I've got some boxes

02:03:48   10  here that we'll show you at some point.  We have a couple

02:03:51   11  of monitors here that we'll be showing.  I'll use one of

02:03:56   12  those during the demonstration.  We have got an ASUS

02:04:05   13  projector here that we'll also be showing you.

02:04:07   14         But the company is headquartered in Taiwan but is

02:04:13   15  a worldwide company, and they have about -- the testimony

02:04:18   16  you'll hear is that they have about 300 employees in the

02:04:22   17  United States.  A good chunk of those are in California,

02:04:25   18  but the other employees are spread around, like

02:04:31   19  Mr. McCarty, and operate at different places in the

02:04:34   20  country.

02:04:34   21         I wasn't real familiar with ASUS until I went to

02:04:38   22  Taiwan once.  My brother is a long-term missionary in

02:04:42   23  Taiwan, and I went to his wedding, and I saw the products

02:04:46   24  everywhere in Taiwan.  They seem to be a big seller there.

02:04:50   25  They're not as big in the market here in the United States,

02:04:53   1   but you will see ASUS laptops or monitors from time to time

02:04:58   2   if you go to, say, a Walmart or a Best Buy or something

02:05:01   3   like that.

02:05:01   4         This case is a patent infringement case, and given

02:05:04   5   that it's a patent infringement case and it's about

02:05:07   6   monitors, you might be wondering why does this guy have a

02:05:12   7   picture of a gun up on the screen and a word like "hunting"

02:05:17   8   or "murderer" or something like that.

02:05:19   9         We're going to get into some complex technology,

02:05:23   10  and I want to give you an analogy that will help you center

02:05:27   11  this around something you're really familiar with.

02:05:29   12        When I was a kid, I grew up in a pretty small town

02:05:32   13  in Arizona, way smaller than Tyler.  Just about everybody I

02:05:36   14  knew had a gun, and we knew that we had a right to have a

02:05:39   15  gun.  People used it for hunting.  People used it to go

02:05:44   16  target shooting.  Some people had gun collections.

02:05:48   17        Where I lived, there wasn't much need for having a

02:05:50   18  gun to protect yourself.  There wasn't a lot of crime, but

02:05:56   19  some people keep guns legally to protect themselves.  And

02:05:59   20  while we know having a gun is legal, selling a gun, buying

02:06:03   21  a gun is legal, but there are certain things you can't do

02:06:06   22  with it.  And one of the things that I put up there that I

02:06:09   23  thought of is you can't murder somebody.

02:06:13   24        Am I permitted to take the mask off?

02:06:15   25        THE COURT:  Yes, you are.  Yes.

02:06:16  1          MR. OLIVER:  It's getting a little uncomfortable

02:06:18  2    to speak with the mask on.

02:06:19  3          Murdering is a method of using the gun, right?

02:06:23  4    You point it at someone, and you pull the trigger.  That's

02:06:25  5    one way to use it.

02:06:27  6          Hunting is another way.  You point it at something

02:06:31  7    else, not a person, and shoot.

02:06:34  8          Same with collecting, that's one way of using it.

02:06:36  9    You display it.

02:06:38  10          If this were a case about guns, the situation we

02:06:41  11    have here is Lone Star would be telling us you can't own

02:06:45  12    guns because having that gun is something that's not legal,

02:06:48  13    because what they're going to be telling you is selling

02:06:54  14    these ASUS products in the United States is enough to show

02:06:58  15    infringement.  But it's not.

02:06:59  16          What they need to show is they need to show that

02:07:04  17    somebody actually uses a very specific, very obscure menu

02:07:09  18    item in the United States, and they won't show that.

02:07:11  19          And what I'm going to -- I'm going to tell you a

02:07:17  20    little bit about the claims of the patent.

02:07:19  21          As Mr. Saba showed you, the patent -- you'll have

02:07:25  22    a copy of this.  It's got numbered claims in it.  They're

02:07:30  23    numbered 1 to 38.  And you will see claims starting at

02:07:35  24    Claims 17 to 38 that talk about the system, okay?  That's a

02:07:40  25    claim on a monitor, a device itself.

02:07:45    1          If that claim were something we were considering,

02:07:48    2   actually selling the device could potentially infringe the

02:07:53    3   patent.  But Claim 17 and all of the ones below it, 17

02:07:57    4   through 38, they're not at issue in this case.  They have

02:08:01    5   been removed from the case.

02:08:04    6          So we're just talking about Claims 1 and a couple

02:08:08    7   of the other claims that talk about -- not a system but a

02:08:11    8   method.  A method is a way of using a product.  What's at

02:08:17    9   issue in this case is the particular way a product is used.

02:08:22   10          So, you know, briefly going back to the gun

02:08:25   11   analogy, having the gun, having the system is not at issue.

02:08:32   12   It's the question of how you use it.  Everybody can have a

02:08:35   13   gun; nobody can murder someone.

02:08:39   14          Here, everybody can have this monitor.  Nobody can

02:08:43   15   use it in a very particular way.  What I want you to listen

02:08:47   16   for is evidence that people in the United States use that

02:08:51   17   and there's -- and whether there's evidence that anybody

02:08:55   18   uses that method, because there won't be evidence of that.

02:08:59   19          Now, I want to talk to you a little bit more about

02:09:02   20   the technology, and to do that, I want to talk a little bit

02:09:07   21   about pixels on the monitor.

02:09:09   22          When you look at a computer monitor, you see an

02:09:11   23   image, that image is made up of millions of dots.  Each of

02:09:15   24   those dots, if you got out a magnifying glass and you

02:09:19   25   looked at it, each of them would have a blue, a red, and a

02:09:24   1   green component, little crystals -- crystals change when

02:09:28   2   electrical voltages are applied to them.  They change how

02:09:32   3   much light they let through.

02:09:33   4        And those three little crystals make up a pixel,

02:09:38   5   and then each -- you know, they can be changed in intensity

02:09:43   6   to vary the color.  A lot of red and no blue or green means

02:09:47   7   it looks red.  A lot of blue and no red or green means it

02:09:51   8   looks blue.  And mixing them, you can show millions -- in

02:09:57   9   fact, some monitors, I can't even comprehend it, but some

02:10:00  10   monitors can show billions of colors, and I didn't even

02:10:06  11   know there were such things as billions of colors.

02:10:09  12        But this is some background for you because you're

02:10:12  13   going to hear a lot of talk about changing red, green, or

02:10:19  14   blue, but the important thing is -- in this case to focus

02:10:22  15   on is the menus.  And we've already seen some menus.

02:10:28  16        This is what Lone Star is calling a 6-axis and

02:10:31  17   ASUS calls a 6-axis menu.  And you can see at the top of

02:10:35  18   that menu on the right, it says 6-axis hue, and it says

02:10:38  19   6-axis saturation.  And I will flip forward to the

02:10:41  20   saturation selection.

02:10:43  21        You can -- as I go back and forth, you can see

02:10:46  22   somebody can move between hue and saturation, and they can

02:10:49  23   also move to something called gain which is a completely

02:10:53  24   different thing.

02:10:55  25        And then they can choose one of those colors:

02:10:58  1  red, green, blue, cyan, which is kind of an aqua blue,

02:11:01  2  magenta, which is almost purple, and, yellow, which we all

02:11:10  3  know.  And they can adjust components of that in the 6-axis

02:11:14  4  menu.

02:11:15  5        Those menus only appear in these ProArt, which are

02:11:20  6  essentially professional artist products.  And one of the

02:11:23  7  ProArt products, if you look up at the upper left, you can

02:11:27  8  see "PA" for ProArt.

02:11:29  9        The ProArt products have the 6-axis menu that Lone

02:11:33  10  Star is focused on.  Those ProArt products are

02:11:37  11  about 2 percent of these dollars that ASUS makes off of its

02:11:43  12  sales.  So Lone Star's case is based on 2 percent of the

02:11:46  13  sales, but it's asking you to award damages on a 100

02:11:50  14  percent of the sales.

02:11:51  15        So what you would need to consider and think about

02:11:54  16  is any number that they give you is probably going to be --

02:11:58  17  need to be divided by at least 50 to account for just the

02:12:02  18  ProArt products, unless you find that the other products

02:12:05  19  infringe.

02:12:06  20        And if we look at the other products, we'll see

02:12:09  21  that they have menus that are different.  So focus on the

02:12:13  22  menus that you see and the menus that you hear about.  This

02:12:18  23  menu has brightness, contrast, saturation, and color

02:12:22  24  temperature.  And there is within some of these menu, not

02:12:26  25  all of them, within some of them, there's a way to adjust

02:12:31  1  red, green, or blue, those three colors that I showed you

02:12:36  2  on the pixel.

02:12:38  3        But not every product has a menu like that.

02:12:42  4  There's also products that have only the ability to control

02:12:45  5  brightness.  And here you can see, you know, just as a

02:12:48  6  representation, we've got two light bulbs.  One is off,

02:12:54  7  it's dark.  One is on, it's bright.  They're both the same

02:12:59  8  color white.  One is just brighter than the other.

02:13:01  9        Brightness controls that aspect of it, not whether

02:13:04 10  it's red versus green versus blue, and not the saturation,

02:13:10 11  which is what Mr. Saba showed you goes from gray to an

02:13:13 12  intense color.

02:13:14 13        And I have a product here, this S -- this S1

02:13:27 14  projector, which only has a menu like this.

02:13:29 15        Your Honor, may I move a little closer to the

02:13:33 16  jury?

02:13:33 17        THE COURT:  Not without a microphone, you may not.

02:13:36 18  If you have a microphone, you may.

02:13:38 19        MR. OLIVER:  So the S1 product is a projector.

02:13:44 20  I'll try to project it here on the wall next to you.  It

02:13:47 21  may or may not be visible in the court.

02:13:53 22        And it's got a menu in it -- oh, it's going to be

02:13:56 23  tough to see, but I'm hoping you will have it in the jury

02:14:05 24  room.  But as we look at it here on the screen or on the

02:14:08 25  wall, you can control volume, brightness, contrast.  This

02:14:16   1   is a display selection, splendid.  You can either choose

02:14:27   2   standard color or theater, and aspect ratio.  You can

02:14:31   3   choose the projection position.  If you're going to put it

02:14:33   4   on the table or hang it upside down, it'll flip the image.

02:14:38   5   And then there's setup that just gives you the language

02:14:41   6   basically.  And there's an information, that's not a

02:14:56   7   setting, and then back to display.

02:14:58   8          In this product, I'm hoping you'll have this, but

02:15:02   9   if not, we'll at least have some testimony about it.  There

02:15:06   10   is no way to control red, green, or blue.  There's no way

02:15:10   11   to control hue or saturation, as shown in the patent.  Yet

02:15:21   12   Lone Star's expert witness, Dr. Ducharme, claimed that that

02:15:24   13   product infringed.  He says, they all operate the same.

02:15:34   14   Pay close attention to the menus that we show you.

02:15:38   15          What Dr. Ducharme did was he analyzed one ASUS

02:15:45   16   product, and he said -- or two ASUS products, and he said,

02:15:48   17   from this, I conclude that 130 products infringe, including

02:15:52   18   screens and projectors.

02:15:55   19          We're going to show you about -- during the trial

02:16:01   20   about 10 or 15 other products that don't infringe, that

02:16:06   21   don't have the same menus, that don't have the same

02:16:09   22   features.  We're also going to show you even the products

02:16:12   23   he analyzed don't infringe because they don't meet the

02:16:17   24   requirements of the claim.

02:16:18   25          Now, remember, this is about using a method, not

02:16:21   1   using a product.  When you or I sit down and we do work --

02:16:26   2   most of us aren't artists -- we plug in the monitor, and we

02:16:30   3   use it.  We don't ever use that menu to alter things.

02:16:33   4   Somebody might use it once in a while, but, again, watch

02:16:36   5   for evidence that they won't be able to show you that

02:16:39   6   people actually use those menus in the United States.

02:16:42   7          We're not sitting with a professional artist setup

02:16:48   8   to manage the color of an image.  These products are

02:16:54   9   sold -- other than the 2 percent of ProArt products, these

02:16:57   10  products are sold to ordinary people that are using

02:17:00   11  monitors.

02:17:01   12         Again, a U.S. patent covers what happens in the

02:17:05   13  United States.  I realize I'm missing Alaska and Hawaii

02:17:08   14  there, but you get the idea.  It doesn't matter if somebody

02:17:12   15  uses the method in another country.  It doesn't matter if

02:17:16   16  the factory were to use that menu to calibrate it outside

02:17:19   17  of the U.S., because what we're talking about with the U.S.

02:17:23   18  patent laws is what happens inside the U.S.

02:17:25   19         Now, these products get manufactured, they get put

02:17:29   20  in a box somewhere in the world, and they get shipped to

02:17:33   21  distributors.  You might see them at Amazon, Best Buy,

02:17:39   22  Walmart, some other less famous distributors.  A lot of

02:17:44   23  these distributors are international, and you'll hear that

02:17:48   24  Lone Star won't even show how many of these products

02:17:51   25  actually went to consumers in the U.S.  They may have been

02:17:56  1  shipped by UM or Sonex through somebody in Canada or Europe

02:18:00  2  or Mexico or another country.

02:18:02  3        As I said, Mr. McCarady runs teams that service

02:18:06  4  these products in South America.

02:18:14  5        The products go into a box, and so on the box,

02:18:17  6  ASUS doesn't perform the method, and the box comes to the

02:18:20  7  U.S.  Just like -- I realize Colt is a U.S. manufacturer,

02:18:20  8  but when a manufacturer puts a product in a box and ships

02:18:25  9  it, they don't take it out and shoot it.  They don't take

02:18:28  10 it out and murder somebody once it gets there.

02:18:29  11       The other thing we'll look at and we'll hear about

02:18:32  12 is a bunch of these products are made by companies other

02:18:36  13 than ASUS.  ASUS contracts with multiple companies called

02:18:48  14 original device manufacturers, or you may have heard the

02:18:48  15 term ODM.  ASUS says, I want a screen that's this big, that

02:18:48  16 displays this many colors, that has these features that

02:18:54  17 looks like this, and if you can build it, we'll put the

02:18:57  18 ASUS name on it, and we'll buy it from you.  Those

02:19:01  19 companies make the screens.

02:19:03  20       ASUS doesn't even know what goes into a lot of the

02:19:05  21 screens.  They just know what they see when they look at

02:19:09  22 it.  They don't know what chips are in the screen.  They

02:19:12  23 don't make the software or know what software goes in the

02:19:16  24 screens.  They just sell what comes to them in the box

02:19:19  25 after testing some of them to make sure they meet the

02:19:22   1   standards.

02:19:22   2        And you will hear from Dr. Ducharme that he did a

02:19:25   3   test.  He took apart one of these monitors, and he found a

02:19:29   4   chip in it.  And he then goes on to claim that all of the

02:19:32   5   products from this little projector to monitors, to other

02:19:40   6   projectors, and other size monitors have the same chip in

02:19:43   7   it and have the same software.

02:19:46   8        And pay very close attention because when he shows

02:19:53   9   you the chip and he shows you the software, you will see

02:19:56  10   that the chip number doesn't even match the software

02:19:59  11   number.  And you'll also see that he mixed and matched

02:20:03  12   software from different products such that he doesn't even

02:20:06  13   have a complete package of software for one product.

02:20:10  14        The software is not a huge deal.  The menus are

02:20:13  15   the huge deal.  But this -- what this is going to show is

02:20:16  16   that his analysis is flawed, and he hasn't even fairly

02:20:20  17   considered what may be in those products.  Look for the

02:20:24  18   menus.  Look for the hue and saturation adjustment in each

02:20:30  19   product.

02:20:31  20        The other thing that Dr. Ducharme will show you is

02:20:34  21   he tested either three colors or he tested six colors.

02:20:39  22   These monitors have 60 million colors or they might have a

02:20:44  23   billion colors.  Like I said, it's hard for me to

02:20:49  24   comprehend.

02:20:50  25        The method here talks about independently

02:20:53  1  controlling hue or saturation of individual colors,

02:20:56  2  selecting to independently change the hue or saturation of

02:20:59  3  an individual color.  And then when you go down to the

02:21:03  4  bottom of the claim, it says:  Without affecting the hue or

02:21:07  5  saturation of any other individual color.

02:21:09  6       The question is:  Out of those 16 billion colors,

02:21:14  7  and he tested either three or six colors, how does he --

02:21:20  8  how can he prove to you that none of the others changed?

02:21:24  9  He can't.  And what we're going to do -- if Mr. Joshi will

02:21:28  10  come up here and help me for a minute -- we're going to

02:21:31  11  show you a few colors.  We're going to show you that the

02:21:36  12  mon- -- that -- the monitor that Dr. Ducharme testified

02:21:40  13  about.  We're going to show you that, indeed, the other

02:21:54  14  colors change --

02:21:55  15       THE COURT:  Mr. Oliver, I need you with a

02:21:57  16  microphone if you're going to be away from the --

02:22:03  17       Mr. Saba?

02:22:06  18       MR. SABA:  Your Honor, we would like to object for

02:22:08  19  the -- for the Defendants doing a demonstration in opening

02:22:12  20  of this sort.

02:22:13  21       THE COURT:  Well, I'm going to give him a little

02:22:16  22  latitude.

02:22:18  23       MR. SABA:  Thank you, Your Honor.

02:22:24  24       MR. OLIVER:  Hello?

02:23:00  25       What we've got here is the color that's in -- on

02:23:03   1   the screen.  And what I'm going to do, I'm going to go to

02:23:08   2   the menu.  And this product -- the menu is down on the --

02:23:14   3   on the bottom, and I'm going to move to the color

02:23:17   4   selection, and I'm going to show you that when we change

02:23:24   5   the -- what's -- when we change the red, green, or blue,

02:23:29   6   I'm going to decrease red, you're going to see at least a

02:23:34   7   couple of others change in color.  You can see that the

02:23:44   8   magenta changed to a dark blue.  Yellow changed to green.

02:23:50   9   I'll take that back up so you can see.

02:23:54   10          But changing red changes other colors, but you can

02:23:57   11   also look at what was white here.  As I altered it, white

02:24:07   12   changes to blue.  As I bring the red back up, white changes

02:24:13   13   red.  The same thing is going to be true if you change

02:24:16   14   green or blue.

02:24:17   15          As we listen to the testimony and as we listen to

02:24:22   16   Dr. Ducharme who tested only a couple of colors, he is not

02:24:25   17   going to be able to tell you what actually happened.  He

02:24:28   18   has to show that you can change red without changing any

02:24:33   19   other colors.

02:24:35   20          It's going to become blatantly obvious that other

02:24:39   21   colors change when you change red.  That's one of the

02:24:41   22   reasons that ASUS says they don't infringe this patent,

02:24:46   23   because they don't.

02:24:47   24          Another feature we'll talk about with Dr. Ducharme

02:24:50   25   is saturation.  In some of the products, he talks about how

02:24:54  1  a single saturation control for the whole screen is

02:24:58  2  infringing.  And that saturation control, if we go to it --

02:25:23  3  if I decrease the saturation, it's going to take this down

02:25:26  4  to gray.  You see the whole -- the whole screen turns gray

02:25:35  5  when I change the saturation.

02:25:36  6        You may or may not recall from the -- from Lone

02:25:41  7  Star's opening statement that -- that the -- they said the

02:25:54  8  problem was the whole screen turned gray.  The solution was

02:25:58  9  something different.  But yet, Dr. Ducharme is going to

02:26:02  10  come up here and tell you that -- doing exactly what was

02:26:05  11  around before the patent infringes.

02:26:08  12        The other thing -- so there will be much more time

02:26:53  13  for demonstrating this during the trial, these color

02:26:56  14  changes, and you'll see it in more detail, exactly what

02:27:00  15  happens.  But you could see when I showed you that -- I'm

02:27:03  16  just a lawyer so you can't take what I showed you as

02:27:07  17  evidence -- but when one of the witnesses shows you, then

02:27:09  18  you will be able to take that as evidence.  They will be

02:27:12  19  able to show you with multiple colors.  I'm running low on

02:27:16  20  time.  I've only got a couple minutes left, so I'm going to

02:27:21  21  rush through a couple of other things I want to talk to you

02:27:23  22  about.

02:27:24  23        If somebody invents something before the patent,

02:27:27  24  that can invalidate the patent.  And in this case,

02:27:35  25  Mr. Brett -- I don't know Mr. Brett, but Mr. Brett invented

02:27:39   1   a patent in 1998 before the application for this '435

02:27:42   2   patent was filed in 2001.  Three years earlier Mr. Brett

02:27:50   3   had a system that does what we're talking about.  The upper

02:27:53   4   left, you can see an input.  If you go to the right just a

02:27:57   5   little bit, you can see RGB there.  Drops down to the

02:28:02   6   middle, hue and saturation and luminance, the three -- I'm

02:28:13   7   going to walk over because my laser printer doesn't work.

02:28:18   8   RGB, that comes down here, hue, saturation, and luminance.

02:28:24   9   They go across.  Delta means it's change.

02:28:29   10          So what changes, RGB, goes back up, adds in,

02:28:36   11   outputs the signal.  This was three years before the '435

02:28:39   12   patent was filed.

02:28:47   13          We're also going to show you something called

02:28:48   14   double-patenting.  Double-patenting is a concept that

02:28:52   15   basically is when somebody tries to cheat on the Patent

02:28:54   16   Office a little bit.  The U.S. government says:  You file a

02:28:58   17   patent application, you get 20 years of exclusivity.

02:29:03   18          Sometimes what people do is a couple years later

02:29:06   19   they file another patent application and they try and get

02:29:08   20   another patent on the same thing.

02:29:10   21          And what you will see here is 6,122,012 and the

02:29:15   22   '435 patent.  If we zoom in on them, you will see the same

02:29:19   23   inventor, Yosef Segman of Zichron Yaacov, Israel -- Yosef

02:29:26   24   Segman of Zichron Yaacov.  Oplus Technology is the company

02:29:30   25   that owns the technology.  And look down at the bottom,

02:29:32  1   filed March 1999.  Filed August 2001.  So two years later

02:29:39  2   he filed another patent on the same thing to try and get

02:29:42  3   more length, more exclusivity, more money out of it even

02:29:46  4   though you're only allowed to file a patent once.  So there

02:29:50  5   will be testimony about exactly what's shown in these

02:29:54  6   patents.

02:29:54  7        The final thing I want to discuss with you is

02:29:57  8   money.  We don't think there's infringement, as I have told

02:29:59  9   you.  The menus don't support it.  They don't do the things

02:30:04  10  that Dr. Ducharme said.  The colors change when they're not

02:30:08  11  supposed to to infringe the patent.  But if you do find

02:30:12  12  infringement on something, a reasonable royalty is what is

02:30:15  13  going to be calculated.  Mr. Reed is going to come up, and

02:30:22  14  he's going to tell you why he thinks there's some problems

02:30:24  15  with the methodology that Lone Star used.

02:30:28  16        They're asking for money too early.  They can't

02:30:29  17  get money before they notify ASUS of alleged infringement.

02:30:32  18  They didn't even notify ASUS until they filed a lawsuit.

02:30:36  19        There's too many products, including about 40

02:30:40  20  products in their damages that aren't even accused of

02:30:44  21  infringement.  They're asking for too high of a royalty

02:30:47  22  because of a flat analysis.

02:30:49  23        Mr. Reed will explain that further.

02:30:52  24        Thank you for your patience.  Thank you for your

02:30:54  25  time.  I'll see you later in the case, and turn it over to

| | | |
|---|---|---|
| 02:30:57 | 1 | the Plaintiff at the time. |
| 02:31:03 | 2 | THE COURT:  Thank you, Mr. Oliver. |
| 02:31:05 | 3 | Does either party wish to invoke the Rule? |
| 02:31:08 | 4 | MR. BENNETT:  There's no witnesses to invoke the |
| 02:31:10 | 5 | Rule against, Your Honor.  Plaintiff does not. |
| 02:31:12 | 6 | THE COURT:  Okay. |
| 02:31:13 | 7 | MR. OLIVER:  No, Your Honor. |
| 02:31:14 | 8 | THE COURT:  Okay.  Very well. |
| 02:31:19 | 9 | Ladies and gentlemen of the jury, before the |
| 02:31:22 | 10 | Plaintiff presents its first witness, we're going to take |
| 02:31:25 | 11 | our afternoon break at this time. |
| 02:31:27 | 12 | I'm going to ask you all to adhere to social |
| 02:31:31 | 13 | distancing as best you can.  And as I mentioned to you in |
| 02:31:36 | 14 | my preliminary instructions, don't talk to anybody about |
| 02:31:39 | 15 | the case until you have heard all of the evidence and I |
| 02:31:43 | 16 | have instructed you on the law.  Feel free to talk about |
| 02:31:47 | 17 | the weather or football or baseball or whatever you want to |
| 02:31:50 | 18 | talk about, just don't talk about what you have heard thus |
| 02:31:53 | 19 | far in the case. |
| 02:31:54 | 20 | So we will be in recess about 15 minutes. |
| 02:32:03 | 21 | COURT SECURITY OFFICER:  All rise for the jury. |
| 02:32:06 | 22 | (Jury out.) |
| 02:32:52 | 23 | THE COURT:  Please be seated. |
| 02:32:54 | 24 | Okay.  There were a couple of objections.  I think |
| 02:32:57 | 25 | one objection each in opening.  I don't know if the parties |

02:33:01  1  wish to say anything further about that.  I had understood

02:33:03  2  the slides were agreed.

02:33:07  3        Mr. Oliver -- and I confirmed that, so I don't

02:33:10  4  know what the issue was with respect at least to

02:33:13  5  Defendant's objection.

02:33:15  6        MR. OLIVER:  I'm sorry, Your Honor.  We did object

02:33:21  7  to that slide in the expert witness presentation.  It was

02:33:23  8  taken out.  It was my mistake.  I apologize.

02:33:28  9        THE COURT:  Okay.

02:33:29  10        MR. SABA:  On our objection, Your Honor?

02:33:33  11        THE COURT:  Yeah.

02:33:34  12        MR. SABA:  Well, candidly, I don't believe we knew

02:33:39  13  they were going to do a demonstration, but I think the ship

02:33:41  14  has sailed on that, so...

02:33:43  15        THE COURT:  I'm sorry?

02:33:45  16        MR. SABA:  I think it's already too late, so,

02:33:45  17  yeah.

02:33:46  18        THE COURT:  That ship has sailed.

02:33:48  19        MR. SABA:  Thank you, Your Honor.

02:33:48  20        THE COURT:  Okay.  We'll be in recess.

02:48:13  21        (Recess taken.)

02:51:03  22        THE COURT:  Anything we need to discuss before we

02:51:07  23  have the jury brought in?

02:51:10  24        MR. BENNETT:  No, Your Honor.

02:51:12  25        THE COURT:  Mr. Richardson, if you would have the

02:51:16   1   jury brought in.

02:51:17   2         MR. OLIVER:  Your Honor, Mr. Joshi is going to be

02:51:19   3   attending to the Plaintiff's first witness.

02:51:21   4         THE COURT:  Okay.  Very well.

02:51:27   5         (Jury in.)

02:53:29   6         THE COURT:  Please be seated.

02:53:43   7         Okay.  At this time, the Plaintiff may call its

02:53:46   8   first witness.

02:53:47   9         MR. BENNETT:  Your Honor, the Plaintiff calls

02:53:50  10   Jesse Rice.

02:54:00  11         (Witness sworn.)

02:54:19  12         THE COURT:  You may proceed.

02:54:20  13         MR. BENNETT:  Thank you, Your Honor.

02:54:22  14            JESSE RICE, PLAINTIFF'S WITNESS, SWORN

02:54:22  15                     DIRECT EXAMINATION

02:54:22  16   BY MS. BENNETT:

02:54:25  17   Q.  Mr. Rice, please tell the jury what your position is

02:54:29  18   with Lone Star.

02:54:29  19   A.  I'm the managing director of Lone Star.

02:54:32  20   Q.  Could you adjust the mic, sir.  Say that again, please.

02:54:36  21   A.  I'm the managing director of Lone Star.

02:54:38  22   Q.  What does it mean to be managing director at Lone Star?

02:54:42  23   A.  Essentially means I'm in charge of making decisions for

02:54:45  24   the company.

02:54:46  25   Q.  Okay.  Does Lone Star have any employees?

```
02:54:48   1   A.  It does not.
02:54:49   2   Q.  Does it have any staff?
02:54:51   3   A.  It does not.
02:54:52   4   Q.  Does it have any offices?
02:54:54   5   A.  It does not.
02:54:55   6   Q.  What does Lone Star have?
02:54:57   7   A.  Lone Star owns some intellectual property.
02:55:00   8   Q.  And what is it that Lone Star does?
02:55:02   9   A.  Lone Star does intellectual property development,
02:55:09  10   licensing, patented technology.
02:55:11  11   Q.  Okay.  When you're not at Lone Star or not working with
02:55:15  12   Lone Star, what are you doing?
02:55:16  13   A.  My regular day job is I am a software engineer.
02:55:20  14   Q.  Okay.  Other than being a software engineer, what do
02:55:27  15   you do?
02:55:27  16   A.  I enjoy hiking, vacationing, traveling with my wife.
02:55:31  17   Q.  Tell the jury a little bit about your family.
02:55:36  18   A.  Sure.  I live with my wife up in Redmond, Washington.
02:55:39  19   Been married for about 10 years now.  My wife is originally
02:55:42  20   from India, and the rest of her family lives here in Texas.
02:55:46  21   Q.  Okay.  So you -- I'm sorry, did you -- where do you
02:55:50  22   live, did you say?  I wasn't sure what you said.
02:56:00  23   A.  My wife and I live up in Redmond, Washington.
02:56:03  24   Q.  Okay.  In terms of the '435 patent that's at issue, how
02:56:05  25   is it that Lone Star acquired it?
```

02:56:07   1   A.   Originally, in about 2009, during the financial crisis,

02:56:11   2   I was looking for some additional investment or financial

02:56:20   3   security opportunities as, you know, the threat of layoffs,

02:56:24   4   et cetera, became more real.   And real estate was not

02:56:28   5   necessarily the best investment opportunity at that time.

02:56:31   6   I had some -- one small piece of real estate prior to that

02:56:35   7   going down in value at that time.   And so intellectual

02:56:40   8   property was another investment possibility that I decided

02:56:43   9   to explore in 2009.

02:56:50  10         I heard through some acquaintances that Intel had

02:56:54  11   a patent portfolio available for sale and decided to

02:56:59  12   explore that, was able to do some research on the portfolio

02:57:03  13   that they had available and was able to do some negotiation

02:57:08  14   with them and acquire the portfolio from them.

02:57:10  15   Q.   Okay.   So just so we're clear, did you invent the

02:57:13  16   patent, the invention that's at issue in the patent,

02:57:17  17   the '435?

02:57:17  18   A.   I did not.

02:57:18  19   Q.   Okay.   And when you acquired it, did you buy it

02:57:20  20   personally, or did some -- was it by some other means?

02:57:23  21   A.   A -- I formed an LLC in Washington State, and that LLC

02:57:31  22   purchased the portfolio.

02:57:34  23   Q.   All right.   Was it the same LLC as Lone Star?

02:57:36  24   A.   It was not.

02:57:37  25   Q.   Okay.   How did Lone Star get it, then?

02:57:39   1   A.   In 2011, Lone Star was formed, and in 2013, the patents

02:57:48   2   were transferred from the original entity to Lone Star.

02:57:53   3   Q.   Okay.   We have seen those.   There's some binders to

02:57:57   4   your right there.   We've seen it enough times.   Plaintiff's

02:58:00   5   Exhibit No. 1 is the patent.

02:58:01   6        MR. BENNETT:   Your Honor, we move for its

02:58:03   7   admission.

02:58:03   8        THE COURT:   Any objection?   Subject to the

02:58:08   9   previous objection.

02:58:10   10        MR. JOSHI:   Yes.   No further --

02:58:11   11        THE COURT:   Very well.   It'll be received.

02:58:13   12        MR. BENNETT:   Thank you.

02:58:13   13        Denver, thank you.

02:58:13   14   BY MR. BENNETT:

02:58:15   15   Q.   All right.   It should be on your monitor there in front

02:58:18   16   of you.   Is that what -- is that what Lone Star acquired?

02:58:20   17   A.   Yes.

02:58:21   18   Q.   All right.   Now, you mentioned you purchased or

02:58:27   19   acquired the patent with intent to make a return on it.

02:58:34   20   Explain that.   How would -- how would you make a return off

02:58:36   21   of a patent?

02:58:37   22   A.   Typically, with -- the main monetization of a patent is

02:58:44   23   around licensing the patented technology to other

02:58:46   24   companies.

02:58:47   25   Q.   Okay.   When you say "licensing," we've heard that word

02:58:50  1   a few times.  In your own words, how would you describe the

02:58:55  2   licensing?  What does that mean?

02:58:57  3   A.  Sure.  It essentially means creating a contract that

02:59:03  4   authorizes another company to use the patented technology,

02:59:07  5   typically in exchange for some amount of money or some

02:59:11  6   other financial consideration.

02:59:13  7   Q.  Okay.  Has Lone Star licensed the '435 patent?

02:59:18  8   A.  Yes.

02:59:18  9   Q.  And to your right, there should be a collection of

02:59:23  10  binders, Volume I.  In that first volume, please turn to

02:59:40  11  Exhibit 32.

02:59:47  12  A.  Yes.

02:59:47  13  Q.  Are you there?

02:59:48  14  A.  Yes.

02:59:48  15  Q.  All right.  If you would, please, just for the sake of

02:59:50  16  time, review 32 -- Exhibits -- Plaintiff's Exhibits 32, 33,

02:59:59  17  and 34.

03:00:14  18  A.  Yes.

03:00:14  19  Q.  As Lone Star's director, you've seen these documents

03:00:18  20  before, right?

03:00:18  21  A.  Yes, I have.

03:00:19  22  Q.  What are they?

03:00:20  23  A.  These are licensing agreements between Lone Star and

03:00:23  24  Acer, NEC, and Sharp.

03:00:30  25  Q.  Okay.  So that would be for Plaintiff's Exhibits 32,

| | | |
|---|---|---|
| 03:00:34 | 1 | 33, and 34 respectively? |
| 03:00:36 | 2 | A.  Yes. |
| 03:00:37 | 3 | Q.  All right. |
| 03:00:37 | 4 | MR. BENNETT:  Your Honor, we move for the |
| 03:00:38 | 5 | admission of Plaintiff's Exhibit 32, 33, and 34. |
| 03:00:42 | 6 | THE COURT:  Any objection? |
| 03:00:43 | 7 | MR. JOSHI:  No objection. |
| 03:00:44 | 8 | THE COURT:  Very well.  They will be received. |
| 03:00:44 | 9 | BY MR. BENNETT: |
| 03:00:46 | 10 | Q.  All right.  And you'll need another binder for this |
| 03:00:49 | 11 | one.  Exhibit -- Plaintiff's Exhibit 91. |
| 03:01:18 | 12 | A.  Yes, I have it. |
| 03:01:19 | 13 | Q.  Okay.  You recognize that document? |
| 03:01:21 | 14 | A.  Yes, I do. |
| 03:01:22 | 15 | Q.  What is it? |
| 03:01:23 | 16 | A.  This is a licensing agreement between Lone Star and |
| 03:01:26 | 17 | Barco. |
| 03:01:27 | 18 | Q.  And who is Barco? |
| 03:01:29 | 19 | A.  Barco is a company that manufactures mainly projectors. |
| 03:01:43 | 20 | Q.  Okay. |
| 03:01:43 | 21 | MR. BENNETT:  Your Honor, Plaintiffs move for the |
| 03:01:46 | 22 | admission of Plaintiff's Exhibit 91. |
| 03:01:48 | 23 | THE COURT:  Any objection? |
| 03:01:50 | 24 | MR. JOSHI:  No objection. |
| 03:01:51 | 25 | THE COURT:  It'll be received. |

03:01:52  1          MR. BENNETT:  Could you go ahead and put up 32,

03:01:54  2  please -- or, actually, no, put up Exhibit 34.

03:01:54  3  BY MR. BENNETT:

03:01:57  4  Q.  All right.  Using this one as an example -- and we'll

03:02:00  5  just talk about all four generally -- how is it that Lone

03:02:03  6  Star came by these four licenses?

03:02:05  7  A.  So Lone Star did a lot of homework with advisers and

03:02:12  8  experts to identify companies that it believed used its

03:02:19  9  patented technology and had filed lawsuits against these

03:02:24  10  companies claiming that its technology was used.

03:02:28  11          And eventually as a result of filing lawsuits with

03:02:35  12  these companies, there were negotiations that took place

03:02:37  13  between Lone Star and these companies to come to these

03:02:40  14  license agreements.

03:02:41  15  Q.  And how much -- what's the top end of these four

03:02:48  16  licenses?  Which one was at the highest end?

03:02:51  17  A.  I believe Sharp was at the high end at 435,000.

03:02:56  18  Q.  Okay.  And what's the lowest one?

03:02:58  19  A.  And I believe Barco was at the lower end, around

03:03:01  20  135,000.

03:03:02  21  Q.  Where do the other two fall?

03:03:04  22  A.  In the 250- to 280,000 range.

03:03:09  23  Q.  Okay.  And those companies paid those sums to Lone Star

03:03:12  24  in exchange for a license?

03:03:15  25  A.  That's correct.

03:03:15  1  Q.  Now, during the opening, Mr. Oliver criticized Lone

03:03:20  2  Star a little bit for not sending a letter, for example.

03:03:26  3       Why didn't you send a letter to these companies

03:03:28  4  before suing them?

03:03:30  5  A.  In my experience and opinion, it -- sending a letter to

03:03:37  6  large companies rarely gets any response.  So filing a

03:03:42  7  lawsuit is the main mechanism where you're sure to get a

03:03:47  8  response to your concerns.

03:03:49  9  Q.  Let's talk about this lawsuit.  Obviously, we're here.

03:03:58  10  You've sued ASUS.  Who made the decision to sue ASUS?

03:04:03  11  A.  Well, again, our experts and advisers did a lot of

03:04:10  12  homework to determine that we believed that ASUS infringed

03:04:15  13  on the patented technology, and, ultimately, I'm the

03:04:20  14  decision maker that makes that call based on that advice of

03:04:24  15  our experts.

03:04:25  16  Q.  Okay.  In that first binder, will you please open to

03:04:32  17  Plaintiff's Exhibit 14A?  Specifically, Page 19 in the

03:04:51  18  bottom right-hand corner of Exhibit 14A.

03:04:55  19  A.  Yes, I have it.

03:04:56  20  Q.  What is this document?

03:04:57  21  A.  This appears to be something from ASUS's website

03:05:08  22  describing 6-axis color control.

03:05:12  23       MR. BENNETT:  Your Honor, Plaintiffs move for

03:05:14  24  admission of Plaintiff's Exhibit 114A.

03:05:17  25       THE COURT:  Any objection?

```
03:05:18   1              MR. JOSHI:  No.
03:05:18   2              THE COURT:  It'll be received.
03:05:19   3              MR. BENNETT:  Put up Page 19.  Scroll -- yeah.
03:05:32   4    Maybe -- it's Page 19, bottom right corner.
03:05:32   5    BY MR. BENNETT:
03:06:19   6    Q.  All right.  What is it that the jury is looking at?
03:06:23   7    A.  This is a snippet from ASUS's FAQ on their website
03:06:32   8    describing 6-axis color control.
03:06:35   9    Q.  All right.  Is this some of the information you
03:06:37  10    referred to earlier about what you relied on in pursuing
03:06:41  11    claims against ASUS?
03:06:42  12    A.  Yes.  Most definitely.  I mean, ultimately, we defer to
03:06:47  13    our experts as far as making -- giving advice, but, yes,
03:06:55  14    this is a fairly easy to understand description that very
03:06:58  15    closely matches some of the language in the patent.
03:07:01  16    Q.  For the jury's benefit, can you point to the language
03:07:05  17    here that closely, in your view, speaks of the patent and
03:07:10  18    its claims?
03:07:10  19    A.  I think perhaps the last sentence there is what -- some
03:07:13  20    of the most important part where it indicates adjusting
03:07:17  21    different colors without affecting the output of the other
03:07:21  22    colors.
03:07:21  23    Q.  Okay.  Now, earlier, also during opening, Mr. Oliver
03:07:33  24    said or alluded to the fact that you -- that Lone Star
03:07:37  25    waited some time before it brought suit against ASUS.  Why
```

03:07:41  1  did Lone Star wait?  If its rights were being infringed, as

03:07:45  2  you say, why did Lone Star wait?

03:07:49  3  A.  So it's the first time that I've been involved in

03:07:55  4  patent licensing, and it takes a while to understand the

03:07:59  5  process, to assemble a team of experts that I'm able to

03:08:04  6  work with.  And so that was an extended process that, you

03:08:08  7  know, I went through as I learned of this area.  So that

03:08:14  8  took some time, and then eventually, we did file suit

03:08:18  9  against ASUS.

03:08:20  10  Q.  You said the first time, you mean as Lone Star?

03:08:23  11  A.  Correct.

03:08:24  12  Q.  All right.  In terms of pursuing ASUS in this case, you

03:08:32  13  heard during opening, 2.8 million, we just heard your

03:08:36  14  testimony about the licenses, 435,000 top end.  That's a

03:08:42  15  pretty big gap.  Why does that gap exist?

03:08:45  16  A.  Certainly.  And all of those companies, first of all,

03:08:51  17  engaged in licensing and agreement negotiations fairly

03:09:00  18  early in the process, and they have different product

03:09:05  19  lines, different sales volumes, et cetera, from ASUS.

03:09:10  20        And so in this particular case, we moved quite far

03:09:14  21  along in the process.  And so based on the recommendations

03:09:20  22  of our damages experts, we feel that that's a reasonable

03:09:22  23  and fair royalty in exchange for, you know, the

03:09:29  24  unauthorized use of our intellectual property.

03:09:31  25  Q.  In opening, they talked a little bit about what they

03:09:36  1  said Lone Star is trying to do.  Somehow we're trying to

03:09:40  2  take guns away or something.

03:09:42  3       What's your reaction to what you heard?

03:09:45  4  A.  Yeah.  I mean, the multiple references to murder were a

03:09:52  5  little concerning and confusing, certainly.  And I don't

03:09:57  6  think Lone Star is trying to take anything away.  Lone Star

03:10:01  7  feels as though it has, you know, a valuable asset that it

03:10:06  8  owns, and it just wants to protect that property right and

03:10:10  9  get what it feels is fair and reasonable in exchange.

03:10:13  10  Q.  Is Lone Star trying to murder anyone's technology?

03:10:16  11  A.  Certainly not.

03:10:17  12  Q.  What is it that Lone Star wants?

03:10:19  13  A.  Lone Star just wants a fair and reasonable compensation

03:10:24  14  for the unauthorized use of its valuable patented

03:10:24  15  technology.

03:10:32  16  Q.  Thank you, Mr. Rice.

03:10:32  17       MR. BENNETT:  I pass, Your Honor.

03:10:41  18       THE COURT:  Cross-examination?

03:10:45  19       MR. JOSHI:  Thank you, Your Honor.

03:10:48  20                    CROSS-EXAMINATION

03:10:48  21  BY MR. JOSHI:

03:10:49  22  Q.  Good afternoon, Mr. Rice.  My name is Vinay Joshi.  I

03:10:52  23  am a lawyer for ASUS, and I want to just ask you just a few

03:10:56  24  questions.

03:10:56  25       So I was listening to your examination by

03:11:00  1   Mr. Bennett.  As I understand, it you're the only employee

03:11:02  2   of Lone Star; is that right?

03:11:03  3   A.  That's correct.

03:11:04  4   Q.  Okay.  So you are Lone Star?

03:11:06  5   A.  Yes.

03:11:06  6   Q.  And you live in Redmond, Washington?

03:11:12  7   A.  Yes, that's correct.

03:11:14  8   Q.  So why did you name your company Lone Star?

03:11:17  9   A.  I created the company in Texas.  I have connections to

03:11:22  10  Texas through my wife's family.  We visit here quite

03:11:26  11  frequently.  Also, Texas respects property rights a great

03:11:33  12  deal, and so the formation of the company here made sense

03:11:37  13  from that standpoint, as well.

03:11:41  14  Q.  So did you name your company Lone Star so you could

03:11:44  15  bring lawsuits in Texas?

03:11:51  16  A.  Not -- no, not specifically so I could bring lawsuits

03:11:55  17  in Texas.  It is a Texas company.

03:11:57  18  Q.  How does your company make money?

03:12:04  19  A.  The company makes money by offering a license to its

03:12:11  20  intellectual property.

03:12:13  21  Q.  Do you make any product?

03:12:15  22  A.  No.

03:12:16  23  Q.  And you don't make monitors either, I assume?

03:12:19  24  A.  That's correct.

03:12:20  25  Q.  Now, the owner -- I'm sorry -- the inventor of the

03:12:32  1   patent, Mr. Segman, did he ever work for you at any point

03:12:36  2   in time?

03:12:37  3   A.  No.

03:12:38  4   Q.  Have you ever met him?

03:12:39  5   A.  I have not.

03:12:40  6   Q.  Were you here when Mr. Oliver did the opening for ASUS?

03:12:44  7   A.  Yes.

03:12:44  8   Q.  And he said that Mr. Segman filed two patents -- patent

03:12:53  9   applications in a two-year span, and Mr. Oliver talked

03:12:58  10  about double-patenting.  Were you here when he did that?

03:13:01  11  A.  I was.

03:13:04  12  Q.  Do you know why Mr. Segman filed two patents in two

03:13:09  13  years -- two years apart?

03:13:12  14  A.  I do not.

03:13:21  15  Q.  So let's talk about this lawsuit.  Mr. Bennett asked

03:13:24  16  you some questions about this lawsuit.  Are you aware that

03:13:30  17  there was another Defendant in this lawsuit at one time?

03:13:36  18  A.  Another Defendant in this lawsuit?

03:13:37  19  Q.  Are you aware that Barco was also sued in this lawsuit?

03:13:41  20  A.  Yes.

03:13:41  21  Q.  Okay.  So you sued Barco, and you sued ASUS?

03:13:45  22  A.  Yes.

03:13:45  23  Q.  And Barco paid you $135,000 for a license to the '435

03:13:52  24  patent?

03:13:52  25  A.  Yes, that's correct.

03:13:53   1   Q.   And that was just a few weeks ago; is that right?

03:13:58   2   A.   I would have to look at the dates, but I believe it was

03:14:06   3   last year.

03:14:07   4   Q.   Okay.  Last year, meaning 2020?

03:14:11   5   A.   Correct.

03:14:11   6   Q.   And was that towards the end of 2020?

03:14:12   7   A.   I believe that's correct.

03:14:13   8   Q.   Okay.  Is Barco a large company?

03:14:22   9   A.   Barco is a fairly large company.

03:14:23   10   Q.   And they sell monitors, projectors, just like ASUS?

03:14:27   11   A.   I believe they sell primarily projectors.

03:14:32   12   Q.   Okay.  And you said that you're now asking ASUS

03:14:38   13   for 2.8 million because we didn't settle early in the

03:14:42   14   process and proceeded to fight; is that -- is that correct?

03:14:46   15   A.   Partially, as well as differences in volume of

03:14:52   16   products, sales volume, that sort of thing.  Damages expert

03:14:58   17   takes all those into account when he does the calculations.

03:15:01   18   Q.   Okay.  So just to reconfirm, Barco paid $135,000 for

03:15:07   19   the license?

03:15:08   20   A.   Yes.

03:15:09   21   Q.   Is Sharp a big company?

03:15:12   22   A.   Yes.

03:15:13   23   Q.   In fact, it's a big multi-national company, correct?

03:15:19   24   A.   Yes.

03:15:20   25   Q.   And they paid you $435,000 for a license to this

| | | |
|---|---|---|
| 03:15:24 | 1 | patent? |
| 03:15:24 | 2 | A.  That's correct. |
| 03:15:25 | 3 | Q.  And then you said two other people paid you between |
| 03:15:29 | 4 | 250,000 and $280,000? |
| 03:15:31 | 5 | A.  Correct. |
| 03:15:32 | 6 | Q.  Were those big companies? |
| 03:15:35 | 7 | A.  They were relatively large companies. |
| 03:15:37 | 8 | Q.  Okay. |
| 03:15:50 | 9 | MR. JOSHI:  May I please have Plaintiff's 14A |
| 03:15:54 | 10 | pulled up for me, please?  And go to page 19. |
| 03:15:54 | 11 | BY MR. JOSHI: |
| 03:16:15 | 12 | Q.  Mr. Rice, you recall Mr. Bennett asked you some |
| 03:16:19 | 13 | questions about this page? |
| 03:16:20 | 14 | A.  Yes. |
| 03:16:20 | 15 | Q.  Okay.  Now, it says on the document:  What is 6-axis |
| 03:16:27 | 16 | color independent control? |
| 03:16:32 | 17 | A.  Yes. |
| 03:16:32 | 18 | Q.  Okay.  And are you aware that ASUS has 6-axis products |
| 03:16:44 | 19 | and then there are products that are not 6-axis? |
| 03:16:49 | 20 | A.  I don't have familiarity with every individual product. |
| 03:16:54 | 21 | I know our experts look at all the products. |
| 03:16:56 | 22 | Q.  Okay.  But you specifically talked about 6-axis during |
| 03:17:00 | 23 | your direct exam, and you pointed this marketing material |
| 03:17:04 | 24 | of ASUS as the reason why you believe there's infringement, |
| 03:17:07 | 25 | correct? |

03:17:08  1   A.  This is one example, yes.

03:17:09  2   Q.  Okay.  And you realize that the 6-axis products are

03:17:14  3   ASUS's high end products?  Were you aware of that?

03:17:19  4   A.  I'm aware that at least some of the products are

03:17:23  5   covered by this particular language, yes.

03:17:26  6   Q.  Are you aware that less than 2 percent of ASUS's sales

03:17:30  7   are of 6-axis products?

03:17:32  8   A.  I'm not aware of that specific figure.

03:17:35  9   Q.  But at least on -- on your direct exam, you didn't show

03:17:44  10  any documentation for any other product, correct, just the

03:17:47  11  6-axis product?

03:17:48  12  A.  Only this particular slide, yes.

03:17:52  13  Q.  Okay.

03:17:53  14        MR. JOSHI:  Could you scroll up to where it shows

03:17:57  15  the user interface?  I think you have to go down actually.

03:18:12  16  My apologies, Andrew.  It's after 19.  I believe it's 20.

03:18:33  17        THE COURT:  You can remove that, Mr. Richardson,

03:18:36  18  if you want to.

03:18:38  19        COURT SECURITY OFFICER:  Thank you, Your Honor.

03:18:38  20  BY MR. JOSHI:

03:18:41  21  Q.  Mr. Rice, you see this menu?

03:18:43  22  A.  Yes.

03:18:44  23  Q.  Okay.  And then do you see that what this user

03:18:47  24  interface allows a user to do is first select either a

03:18:56  25  6-axis hue or a 6-axis saturation?  You see that?

03:18:59   1    A.  I can see that.

03:19:01   2    Q.  Okay.  And then once the user selects one of those,

03:19:04   3    then it allows it to select a color, R for red, G for

03:19:11   4    green, B for blue, C for cyan, M for magenta, Y for yellow.

03:19:17   5    It allows the user to choose one of those six colors,

03:19:21   6    correct?

03:19:21   7    A.  I have not used this particular interface.  I would

03:19:24   8    rely on our experts as far as the particular functionality.

03:19:28   9    Q.  Okay.  But yet -- okay, so if that's true --

03:19:32  10         MR. JOSHI:  Then we go back up one page.

03:19:32  11    BY MR. JOSHI:

03:19:43  12    Q.  If that's true and you haven't used it and you're

03:19:46  13    relying on experts, how do you reconcile that with saying:

03:19:49  14    I read this on ASUS's webpage, and that's why I believe

03:19:53  15    there was infringement or something to that effect?

03:19:56  16         MR. BENNETT:  Objection, misstates prior

03:19:59  17    testimony, Your Honor.

03:20:00  18         MR. JOSHI:  I'll reask the question.

03:20:00  19    BY MR. JOSHI:

03:20:03  20    Q.  What was your testimony about this page, could you tell

03:20:05  21    me?

03:20:05  22    A.  I believe that I indicated that the language on this

03:20:07  23    page is very similar to language in the patent.

03:20:12  24    Q.  Okay.  So you're someone who understands how to read a

03:20:19  25    patent, then?

03:20:20  1  A.  I would not say that I understand the detailed language

03:20:24  2  of the patent, but at a high level, this is fairly

03:20:27  3  straightforward language that does match very closely the

03:20:30  4  wording in the patent.

03:20:31  5  Q.  Okay.  So then -- so if we go to the next page, the

03:20:36  6  next page relates to this.

03:20:36  7  A.  Yeah.

03:20:45  8  Q.  So you understand that the 6-axis that's referenced on

03:20:48  9  the previous page references to these six colors, correct?

03:20:52  10  A.  Yes.

03:20:52  11  Q.  Okay.  So in this product of ASUS, a user is able to

03:20:59  12  choose either hue or saturation, and then after selecting

03:21:04  13  one, then he or she can select from one of those six

03:21:07  14  colors, correct?

03:21:08  15  A.  Again, I'm not familiar with this particular interface

03:21:13  16  so I would have to defer to our experts on that.

03:21:17  17  Q.  Okay.  So to be clear, then, the sentence on the

03:21:21  18  previous page that you testified about on your direct and

03:21:26  19  then this very next page that shows the menu, you yourself

03:21:30  20  are not in a position to tie them together, correct?

03:21:34  21  A.  I'm not an expert in the color control, so it would be

03:21:40  22  our technical experts that I would defer to.

03:21:43  23  Q.  Okay.  And, Mr. Rice, you testified that you are the

03:21:46  24  owner of the '435 -- let me strike that question.

03:21:53  25          Mr. Rice, you testified that Lone Star is the

03:21:55  1    owner of the '435 patent?

03:21:56  2    A.  Yes.

03:21:56  3    Q.  And in your direct exam you didn't present any document

03:22:00  4    or show any document that proves that, correct?

03:22:03  5    A.  Correct.

03:22:03  6    Q.  Okay.  Thank you.

03:22:06  7            MR. JOSHI:  No further questions, Your Honor.

03:22:07  8            THE COURT:  Redirect?

03:22:08  9            MR. BENNETT:  Yes.  Thank you, Your Honor.

03:22:15  10                     REDIRECT EXAMINATION

03:22:15  11   BY MR. BENNETT:

03:22:18  12   Q.  Mr. Rice, does Lone Star own the patent?

03:22:20  13   A.  Yes, it does.

03:22:21  14   Q.  And why does it own the patent?

03:22:23  15   A.  It owns the patent because I am aware that I

03:22:26  16   transferred the patent to Lone Star.

03:22:28  17   Q.  Okay.

03:22:34  18           MR. BENNETT:  Denver, will you please pull up

03:22:38  19   Plaintiff's Exhibit No. 1?  Zoom in there on the first

03:22:43  20   sentence of the abstract, please, and highlight that.

03:22:43  21   BY MR. BENNETT:

03:22:51  22   Q.  Now, earlier you had said that the language from 14A

03:22:58  23   closely resembled language from the patent.  Now, this

03:23:02  24   isn't claim language, but is this the language you referred

03:23:06  25   to?

03:23:06  1   A.   This is the language that I was referring to.

03:23:09  2   Q.   Okay.  Mr. Joshi asked you about -- well, are you

03:23:17  3   punishing or -- because ASUS is fighting, you're asking for

03:23:21  4   more.  I wanted to talk to you about that some.

03:23:25  5          For every sale of an ASUS product that infringes

03:23:30  6   on this patent, what happens to Lone Star?

03:23:33  7   A.   Lone Star is essentially prevented from getting

03:23:41  8   compensation for the use of its patented technology every

03:23:44  9   time one of those products is sold.

03:23:46  10  Q.   And as more time passes, what happens to products sold?

03:23:51  11  A.   Sales continue, and those numbers increase.

03:23:55  12  Q.   And as numbers increase, what happens to Lone Star's

03:24:00  13  losses?

03:24:00  14  A.   Lone Star is further impacted by not getting fair

03:24:05  15  compensation for its technology.

03:24:07  16  Q.   All right.  Mr. Joshi asked you about 2 percent of

03:24:12  17  sales.  Do you remember that?

03:24:12  18  A.   Yes.

03:24:13  19  Q.   He -- I didn't hear it.  Did you hear him say anything

03:24:17  20  about how much 2 percent is?

03:24:19  21  A.   No.

03:24:20  22  Q.   I didn't, either.

03:24:22  23          Do you know that?  How much 2 percent of what is?

03:24:27  24  A.   I don't.

03:24:28  25  Q.   All right.  And why not?

03:24:33  1   A.  I don't -- I'm not privy to the detailed sales

03:24:37  2   information.  Our damages expert does those calculations

03:24:41  3   and understands the sales volumes and is able to make those

03:24:46  4   calculations.

03:24:51  5   Q.  Okay.  And why are you not privy to that?

03:24:54  6   A.  I am not allowed to see that information.  That

03:24:57  7   information is confidential, and it's restricted to only

03:25:00  8   certain parties in the case.  And I am not one of those

03:25:04  9   parties.

03:25:08  10  Q.  Mr. Joshi also asked you about the Segman invalidity

03:25:14  11  that you heard about somewhat in the opening.  Remember

03:25:17  12  that?

03:25:17  13  A.  Yes.

03:25:17  14  Q.  Are you an expert in patent law?

03:25:20  15  A.  I am not.

03:25:21  16  Q.  Does Lone Star have an expert that it will call to

03:25:27  17  testify on that issue?

03:25:28  18  A.  It does have a technical expert, yes.

03:25:31  19  Q.  And that's not you?

03:25:32  20  A.  Correct.

03:25:32  21  Q.  All right.  Going back to the conversation about ASUS

03:25:38  22  and what Lone Star's intentions are, just so we're all

03:25:42  23  clear in light of Mr. Joshi's questioning, what are Lone

03:25:45  24  Star's intentions in this lawsuit?

03:25:48  25  A.  Lone Star's intentions are just to simply get fair and

03:25:54  1   reasonable compensation for the unauthorized use of its

03:25:57  2   patented technology.

03:25:58  3            MR. BENNETT:  That's all I have, Your Honor.

03:26:00  4            THE COURT:  Recross?

03:26:07  5            MR. JOSHI:  Very briefly.

03:26:12  6                      RECROSS-EXAMINATION

03:26:12  7   BY MR. JOSHI:

03:26:16  8   Q.  I just want to clarify something very quickly,

03:26:19  9   Mr. Rice.  This shouldn't take very long at all.  Just a

03:26:23 10   second ago you read -- you read the top line of Claim 1.

03:26:27 11   Do you recall that?  It was just a couple of minutes ago.

03:26:32 12   A.  I believe it was the abstract.

03:26:36 13   Q.  Okay.

03:26:38 14   A.  It was the abstract.

03:26:39 15   Q.  Let me ask you a question about the claims.  You

03:26:42 16   realize what your company is asserting in this lawsuit is a

03:26:46 17   method claim, correct?

03:26:48 18   A.  As Mr. Bennett mentioned, I'm not a patent expert and

03:26:55 19   so I rely on our technical expert to assert that.

03:26:59 20   Q.  But as a -- as the owner of the company and someone who

03:27:04 21   brought this lawsuit, you realize that infringement of a

03:27:09 22   method claim occurs when a person practices that method,

03:27:14 23   not when the product is sold.  You understand that?

03:27:17 24   A.  Again, I would defer to our expert, technical expert on

03:27:21 25   that.

03:27:21   1   Q.   Okay.  Sir, just one last question.  You understand

03:27:24   2   that if ten people buy a product but only one of them

03:27:30   3   practices a method claim, then the other nine don't

03:27:37   4   infringe, you understand that, right?

03:27:38   5   A.   Again, I'm not an expert on the details of patent

03:27:41   6   usage, so I would defer to our expert on that.

03:27:46   7   Q.   Okay.  Thank you.

03:27:47   8          MR. JOSHI:  Thank you, Mr. Rice.

03:27:49   9          THE COURT:  Anything further?

03:27:50  10          MR. BENNETT:  No further questions, Your Honor.

03:27:52  11          THE COURT:  Okay.

03:27:54  12          You may step down.

03:27:55  13          Call your next witness.

03:27:57  14          MR. BENNETT:  Your Honor, we would call Mr. Alvin

03:27:59  15   Lin, except he's a remote witness.  Is he available?

03:28:06  16          MR. JOSHI:  He is available.  He's ready.  I just

03:28:10  17   have to let my colleague know for him to -- I'll step out

03:28:14  18   and do that.

03:28:14  19          THE COURT:  Okay.  Ladies and gentlemen, we're

03:28:16  20   going to take a short recess while we make the technical

03:28:22  21   arrangements that are necessary for the next witness.

03:28:24  22          As a reminder, don't discuss the case among

03:28:27  23   yourselves until all of the evidence has been presented and

03:28:31  24   I've instructed you on the law.  We'll get you back in the

03:28:35  25   courtroom just as quickly as we can.

03:28:39  1              (Jury out.)

03:29:08  2              THE COURT:  Okay.

03:29:09  3              MR. JOSHI:  Your Honor, I have been informed that

03:29:14  4  we are ready, that there are three people who have joined

03:29:17  5  the link.

03:29:20  6              THE COURT:  You're close enough right now,

03:29:21  7  Mr. Joshi, I can hear you.

03:29:23  8              MR. JOSHI:  We have three people on.  One is the

03:29:26  9  interpreter, one is the witness, Mr. Alvin Lin, and ASUS's

03:29:30  10 in-house counsel in Taiwan, Mr. Allen Chen, is also on the

03:29:35  11 same link.  So there are three people, but they're in

03:29:39  12 different rooms, and Mr. -- the witness is all by himself.

03:29:42  13             THE COURT:  Okay.  Mr. Bennett, any concerns about

03:29:47  14 that?

03:29:47  15             MR. BENNETT:  They're in separate rooms, that's --

03:29:51  16             THE COURT:  Very well.

03:29:56  17             MR. JOSHI:  And the Court's IT needs to connect

03:30:00  18 the link.

03:30:00  19             THE COURT:  Okay.  All right.  You all can just

03:30:00  20 stand down.  As soon as that gets done, we'll get the jury

03:30:26  21 back in.

03:30:26  22             MR. BENNETT:  Your Honor, Ms. Litle has reminded

03:30:28  23 me of an issue we needed to raise as to Mr. Lin.

03:30:35  24             THE COURT:  Okay.

03:30:35  25             MR. BENNETT:  And the issue deals with testing.

03:30:44  1   There were a number of exhibits, Defense Exhibits 140

03:30:48  2   through 142.  It's not going to come in on my direct, I'm

03:30:51  3   not going to ask him a word about that testing, but I

03:30:56  4   imagine that they will on their -- well, their direct --

03:30:58  5   cross for all intents and purposes now.

03:31:02  6        We objected to it on several grounds.  It's

03:31:05  7   improper lay testimony.  It's hearsay because Mr. Lin is

03:31:08  8   shown a depo transcript where he admits he didn't do it

03:31:12  9   himself.  He had somebody else do it.  It's not a business

03:31:15  10  record that they keep in the ordinary course.  It's just

03:31:18  11  hearsay all over the place.

03:31:19  12       So under 701, under 802, under -- it doesn't meet

03:31:24  13  any exceptions under 803, it's also prejudicial, and for

03:31:29  14  all of those reasons, we'd move for its seclusion and that

03:31:32  15  they not be allowed to ask about it on their examination.

03:31:36  16       MR. JOSHI:  So a few responses, Your Honor.

03:31:39  17       So, firstly, we should remember for context, you

03:31:41  18  just allowed 139 documents to come in.  This test result

03:31:46  19  was given to them before Mr. Lin's deposition.  They

03:31:49  20  deposed him.  He is not going to testify about

03:31:51  21  infringement.  He is going to testify about a test that

03:31:53  22  happened under his supervision.  Mr. David Lin worked for

03:31:58  23  Mr. Alvin Lin.  Mr. Alvin Lin asked him to do the test.

03:32:03  24  Mr. Alvin Lin designed the test.  And this test shows

03:32:06  25  essentially what happens to colors on a monitor, that --

03:32:08    1    it's just one Microsoft Excel file.  It's got a bunch of

03:32:14    2    data in it, and he has been deposed about it already.

03:32:17    3         MR. BENNETT:  The extent of the deposition was did

03:32:20    4    you conduct this test?  No, David Lin did.  And that's

03:32:24    5    about it.

03:32:25    6         It's -- their expert did not rely on it.  They

03:32:29    7    have not designated Mr. Alvin Lin as a nonretained expert.

03:32:35    8    He is a lay witness who is trying to get in expert

03:32:37    9    testimony.

03:32:38   10         THE COURT:  Why is it not expert testimony?

03:32:41   11         MR. JOSHI:  It is not expert testimony because he

03:32:45   12    is not going to testify about infringement.  He is not

03:32:48   13    going to give any opinions.  He is just going to say, I

03:32:53   14    adjusted the color, and this is what happened to other

03:32:55   15    colors when I did that test.  It's purely factual.

03:33:00   16         THE COURT:  Okay.  And so -- and that's --

03:33:02   17    what's -- I guess my question is, what was the purpose of

03:33:04   18    the test?

03:33:05   19         MR. JOSHI:  The test -- he did the test because he

03:33:10   20    found out from legal that ASUS was being sued for a patent

03:33:16   21    in which a change of one color doesn't change other colors.

03:33:21   22    He didn't do the test.  He submitted an affidavit to that

03:33:26   23    effect to this Court.  He didn't do it under the

03:33:29   24    supervision of legal, but he nonetheless did it in the

03:33:32   25    context of the patent to see if the products are anything

03:33:36   1   like the patent.

03:33:38   2           THE COURT:  So is someone going to compare it to

03:33:41   3   the claim language?

03:33:44   4           MR. JOSHI:  Our expert is not, no.

03:33:46   5           THE COURT:  Is anyone going to compare it to the

03:33:49   6   claim language?

03:33:50   7           MR. JOSHI:  No.

03:33:50   8           THE COURT:  So how is it relevant?

03:33:54   9           MR. JOSHI:  It is -- so counsel will talk about

03:34:02  10   the test in the closing argument.

03:34:03  11           THE COURT:  But counsel is not an expert witness.

03:34:06  12           MR. JOSHI:  I understand, Your Honor.  But that's

03:34:09  13   information for the jury, we believe, and their expert may

03:34:11  14   wish to comment on it.

03:34:14  15           THE COURT:  I'm going to sustain the objection.

03:34:16  16           MR. BENNETT:  Thank you, Your Honor.

03:34:16  17           THE COURT:  I don't see how it becomes relevant

03:34:20  18   based on -- I mean, if you're aware of some law out there

03:34:24  19   that says an attorney can, you know, compare this test to

03:34:28  20   what the claim language is in closing argument and let the

03:34:32  21   jury reach that decision, I'd sure like to review that case

03:34:36  22   law, but I don't think that's what the authority is.

03:34:40  23           Are you aware of anything like that?

03:34:42  24           MR. JOSHI:  I am not.  I understand it's a bit

03:34:46  25   unusual, Your Honor, but this is a situation where the

```
03:34:50   1   technology is really not that complicated.  The jury can
03:34:54   2   probably listen to the fact witness and make some
03:34:57   3   conclusions on their own.  This is just about what happens
03:35:00   4   to one color when another color is changed.
03:35:03   5          THE COURT:  I do think it's unusual, and the
03:35:05   6   authority I'm familiar with doesn't allow it.
03:35:08   7          MR. JOSHI:  All right.  Thank you.
03:35:10   8          THE COURT:  So I'll sustain the objection.
03:35:11   9          MR. BENNETT:  Thank you, Your Honor.
03:35:12  10          THE COURT:  Okay.  If you would, please have the
03:35:14  11   jury brought in.
04:00:54  12          COURT SECURITY OFFICER:  All rise for the jury.
04:01:08  13          (Jury in.)
04:01:19  14          THE COURT:  Please be seated.
04:01:23  15          Okay.  Ladies and gentlemen of the jury, I
04:01:25  16   apologize for the delay.  We had some technical
04:01:29  17   difficulties that needed to be resolved, and hopefully this
04:01:34  18   will work as we anticipate.
04:01:37  19          The next witness for the Plaintiff's behalf is
04:01:40  20   testifying remotely, that is, he -- you see him on the
04:01:44  21   screen there.  He is located in Taipei, Taiwan.
04:01:50  22          And our translator is Vivan Josh.
04:01:56  23          Ms. Josh, where are you located, ma'am?
04:02:03  24          THE INTERPRETER:  Plano, Texas.
04:02:05  25          THE COURT:  All right.  At this time, I'm going to
```

| | | |
|---|---|---|
| 04:02:07 | 1 | ask Mrs. Schroeder to approach the lectern, and she will |
| 04:02:11 | 2 | swear in Ms. Josh as the translator. |
| 04:02:15 | 3 | Mr. Bennett, if you will move here. |
| 04:02:16 | 4 | MR. BENNETT:  Oh, I'm sorry.  Yes, of course. |
| 04:02:17 | 5 | THE COURT:  Mrs. Schroeder, if you would swear in |
| 04:02:19 | 6 | the interpreter. |
| 04:02:25 | 7 | (Interpreter sworn.) |
| 04:02:31 | 8 | THE COURT:  Okay.  And at this time, Ms. Josh, the |
| 04:02:37 | 9 | courtroom deputy will swear in the witness, and you can |
| 04:02:40 | 10 | translate that for us. |
| 04:02:43 | 11 | (Witness sworn.) |
| 04:03:17 | 12 | THE COURT:  Okay.  Mr. Bennett, you may proceed. |
| 04:03:20 | 13 | MR. BENNETT:  Thank you, Your Honor. |
| 04:03:21 | 14 | ALVIN LIN, PLAINTIFF'S WITNESS, SWORN |
| 04:03:21 | 15 | DIRECT EXAMINATION |
| 04:03:21 | 16 | BY MR. BENNETT: |
| 04:03:28 | 17 | Q.  Mr. Lin, can you see me okay? |
| 04:03:35 | 18 | A.  Right now, I can only see myself. |
| 04:03:38 | 19 | Q.  Okay.  You can hear me, though? |
| 04:03:44 | 20 | A.  Yes. |
| 04:03:45 | 21 | Q.  Well, we'll proceed with hearing me, and maybe at some |
| 04:03:53 | 22 | point you can see me, too, okay? |
| 04:04:06 | 23 | A.  Okay. |
| 04:04:07 | 24 | Q.  Mr. Lin, you are an ASUS employee, correct? |
| 04:04:12 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 04:04:16 | 1 | Q.  You have worked at ASUS since 1997, right? |
| 04:04:21 | 2 | A.  I have to make a correction here.  It should be since |
| 04:04:37 | 3 | 1996. |
| 04:04:43 | 4 | Q.  Okay.  Thank you for that. |
| 04:04:45 | 5 | You are an ASUS division director, right? |
| 04:04:59 | 6 | A.  Yes. |
| 04:05:00 | 7 | Q.  You are responsible for technical support and providing |
| 04:05:05 | 8 | solutions for technical issues? |
| 04:05:16 | 9 | A.  Yes. |
| 04:05:17 | 10 | Q.  I want to show you, I hope, a document, Plaintiff's 13, |
| 04:05:39 | 11 | P3 I think it's been known to you as. |
| 04:06:01 | 12 | Can you see that document, Mr. Lin? |
| 04:06:03 | 13 | A.  Yes. |
| 04:06:07 | 14 | Q.  All right.  This is an email from Nicky Lin. |
| 04:06:12 | 15 | Do you see that? |
| 04:06:21 | 16 | A.  Yes. |
| 04:06:21 | 17 | Q.  And you are one of the recipients of this email, |
| 04:06:33 | 18 | correct? |
| 04:06:34 | 19 | A.  Correct. |
| 04:06:35 | 20 | Q.  Who is Nicky Lin, Mr. Lin? |
| 04:06:43 | 21 | A.  PM, project manager. |
| 04:06:59 | 22 | Q.  She's an ASUS project manager? |
| 04:07:02 | 23 | A.  Yes. |
| 04:07:03 | 24 | Q.  This email is dated September 18, 2017. |
| 04:07:10 | 25 | Do you see that? |

04:07:12  1   A.  Yes.

04:07:19  2   Q.  And the subject of this email is 21.6 4K OLED Panel

04:07:30  3   Open Issue Discussion.

04:07:31  4         Do you see that?

04:07:46  5   A.  Yes.

04:07:48  6   Q.  And the purpose of this email is to discuss features of

04:07:55  7   an ASUS display product, correct?

04:08:17  8   A.  Yes.

04:08:18  9   Q.  You weren't here in the courtroom earlier today, but

04:08:24  10  the jury has heard a little bit about how ASUS uses other

04:08:27  11  companies to supply components to its displays.

04:09:01  12  A.  In fact, the subject matter for this email, the

04:09:06  13  components we discussed in here, are also from one of the

04:09:11  14  suppliers.

04:09:14  15  Q.  Thank you, Mr. Lin.

04:09:19  16        And if I could just say one clarifying thing

04:09:22  17  really quickly.  Because this is being translated,

04:09:42  18  sometimes I'm going to have to explain something before I

04:09:45  19  ask my question, okay?

04:09:56  20  A.  Okay.

04:09:57  21  Q.  So if you can do your best to wait until the question

04:10:00  22  is asked before you start in on your answer, that will help

04:10:05  23  things go more smoothly, all right?

04:10:20  24  A.  Okay.

04:10:20  25  Q.  But nobody is expecting perfection, all right?  We'll

| | | |
|---|---|---|
| 04:10:35 | 1 | work together as best we can. |
| 04:10:38 | 2 | A.  Okay. |
| 04:10:38 | 3 | Q.  All right.  Getting back to Plaintiff's Exhibit 13, the |
| 04:10:44 | 4 | discussion here is about requests that ASUS is making of |
| 04:10:50 | 5 | its supplier about features ASUS wants in its display |
| 04:10:56 | 6 | products, correct? |
| 04:11:06 | 7 | A.  Yes. |
| 04:11:13 | 8 | Q.  And, in fact, in this particular email -- |
| 04:11:19 | 9 | MR. BENNETT:  Denver, will you -- will you please |
| 04:11:24 | 10 | blow up the bolded part, if you can, please? |
| 04:11:30 | 11 | Go ahead, Ms. Josh. |
| 04:11:30 | 12 | BY MR. BENNETT: |
| 04:11:43 | 13 | Q.  And I want to focus your attention on this particular |
| 04:11:46 | 14 | piece of the email that's bolded from the rest of the text, |
| 04:11:49 | 15 | okay? |
| 04:12:01 | 16 | A.  Okay. |
| 04:12:02 | 17 | Q.  Before I do that, though, I want to ask a more general |
| 04:12:06 | 18 | or broad question, and it's this -- |
| 04:12:11 | 19 | MR. BENNETT:  Go ahead, Ms. Josh. |
| 04:12:24 | 20 | A.  Okay. |
| 04:12:24 | 21 | BY MR. BENNETT: |
| 04:12:27 | 22 | Q.  And here is my question:  ASUS has in Taiwan a research |
| 04:12:33 | 23 | and development department that finds new features for |
| 04:12:38 | 24 | products that it thinks consumers will like, correct? |
| 04:13:02 | 25 | A.  Yes. |

04:13:03  1   Q.  All right.  And in this email, the three features

04:13:07  2   bolded here are some of the features that ASUS wants to add

04:13:12  3   as a result of that kind of research, correct?

04:13:16  4   A.  Yes.

04:13:35  5   Q.  And, in particular, these three features, I want to

04:13:42  6   focus your attention to Number 7.  One of the features ASUS

04:13:47  7   specifically asked for is color accuracy control to meet

04:13:53  8   delta E greater than equals 2.

04:14:22  9   A.  It should be less than or equal to 2.

04:14:28  10  Q.  Okay.  It should be that, but my question is, that is a

04:14:31  11  specific feature, Number 7.  What's provided there is a

04:14:40  12  specific feature that ASUS is asking its suppliers to

04:14:46  13  supply in its display devices?

04:14:53  14  A.  That's right.  For this series of products, we do need

04:15:10  15  this specification.

04:15:12  16  Q.  And ASUS also asked its suppliers to find a way to

04:15:17  17  incorporate the feature listed in Number 9 about color

04:15:22  18  temperature, right?

04:15:24  19  A.  That is right.  That is one of the features required by

04:15:45  20  these series of products.

04:15:48  21  Q.  And I want to draw attention to the word "scaler"

04:15:52  22  there.

04:15:53  23          Do you see that?

04:16:06  24  A.  I can see that.

04:16:07  25  Q.  Okay.  And the scaler is a chip inside the display

04:16:13  1  product, right?

04:16:14  2  A.  That is correct.  It is a chip inside our product.

04:16:25  3  Q.  And that chip runs source code, right?

04:16:36  4  A.  Well, I want to clarify here.  Source codes need to be

04:17:03  5  compiled into a binary code in order to be used or run in

04:17:14  6  this product.

04:17:15  7  Q.  Okay.  But my question was, a scaler chip executes

04:17:19  8  source code, correct?

04:17:34  9  A.  That's right.  It needs to execute that source codes.

04:17:42  10 You're right.

04:17:43  11 Q.  Thank you.

04:17:46  12       You personally have not looked at the source code

04:17:49  13 run in the any of these scaler chips, have you?

04:17:55  14 A.  That's right.  I have not.

04:18:07  15 Q.  Okay.  But in any event, when ASUS requests the

04:18:12  16 features to be incorporated into the display, ASUS makes

04:18:17  17 sure that the suppliers follow through and provide that

04:18:21  18 feature in the desired product, right?

04:18:54  19 A.  You should say that we would like to have feedback from

04:18:56  20 our suppliers whether they can provide such functionality.

04:19:03  21 Q.  Well, that wasn't really my question.  Let me reask it.

04:19:07  22       My question was:  When ASUS has determined that it

04:19:14  23 wants a particular feature in a product and the supplier

04:19:17  24 can supply that feature, ASUS then follows up to make sure

04:19:22  25 that the supplier places that feature in the display

04:19:27  1  product?

04:19:57  2  A.  Yes.

04:19:57  3  Q.  And the reason ASUS follows up to make sure that the

04:20:03  4  feature is incorporated into the product is because it

04:20:08  5  hopes that feature will attract more buyers for the

04:20:19  6  product, at least in part, right?

04:20:34  7  A.  Right.

04:20:34  8  Q.  I'm going to show you what has been marked already as

04:20:43  9  Plaintiff Exhibit 14A.

04:21:00  10        MR. BENNETT:  We're going to go to Page 19 of

04:21:06  11  Plaintiff's Exhibit 14A.  Could you scroll up just a little

04:21:19  12  bit?

04:21:19  13  BY MR. BENNETT:

04:21:21  14  Q.  All right.  I want to highlight for a moment the date

04:21:24  15  under this headline.  Last update, July 16, 2019.

04:21:30  16        Do you see that?

04:21:43  17  A.  Yes.

04:21:43  18  Q.  This is about two years -- a little less than two years

04:21:47  19  after that email we just looked at, right?

04:21:51  20  A.  That's right.  The one we just saw was 2017.  This one

04:22:07  21  is 2019.

04:22:10  22  Q.  All right.  And this is an ASUS website, right?

04:22:16  23  A.  It appears so.  However, I have no way to verify.

04:22:32  24  Q.  Okay.

04:22:33  25        MR. BENNETT:  Let's scroll down -- yeah, thank

04:22:36    1    you, Denver.  Can you blow that up, please?

04:22:39    2    BY MR. BENNETT:

04:22:39    3    Q.  If you squint really hard, maybe you can see at the

04:22:48    4    bottom, it says:  www.ASUS.com/support/FAQ/1040567.

04:23:08    5            Do you see that?

04:23:09    6    A.  Yes, I can see it.

04:23:32    7            MR. BENNETT:  Okay.  So scroll back up for me,

04:23:35    8    please, Denver.

04:23:35    9    BY MR. BENNETT:

04:23:36   10    Q.  And this particular posting, I want to focus on three

04:23:42   11    products that are listed there after the word "product":

04:23:49   12    PA248Q, PA328Q, and PA329C.

04:24:29   13    A.  Yes, I can see those.

04:24:30   14    Q.  And the purpose of this particular webpage is to serve

04:24:33   15    as a frequently asked question site for potential or actual

04:24:40   16    ASUS customers, right?

04:25:01   17    A.  Well, the information I just saw on the bottom of the

04:25:25   18    screen starting from www.ASUS.com, I can verify that part

04:25:32   19    is correct.  However, anything after that, I have no way to

04:25:35   20    verify its accuracy.

04:25:38   21    Q.  Well --

04:25:40   22            MR. BENNETT:  Denver, scroll up for me again,

04:25:43   23    please.

04:25:43   24    BY MR. BENNETT:

04:25:44   25    Q.  Let's try a different way then.  ASUS has a website,

04:25:52    1   right?

04:25:56    2   A.   Right.

04:25:57    3   Q.   And it maintains a support page on that website?

04:26:13    4   A.   That's right.  We do have a support page on our

04:26:17    5   website.

04:26:18    6   Q.   And on that support page, it has an FAQ section or a

04:26:25    7   frequently asked questions section, right?

04:26:50    8   A.   We do have such section on our website.  What I wanted

04:26:57    9   to say just now was I was not sure whether that is from the

04:27:05   10   website.

04:27:08   11   Q.   Okay.  Looking at it now, Mr. Lin, do you have any

04:27:13   12   reason to think that this is not from an ASUS website?

04:27:16   13   A.   It appears so.  That's why I told you that I cannot

04:27:37   14   tell.

04:27:38   15   Q.   Well, this isn't the first time you have seen this

04:27:43   16   document, is it, Mr. Lin?

04:27:45   17   A.   I have seen something similar before.  I do have a

04:28:01   18   recollection of that.

04:28:01   19   Q.   Right.  Where you saw it was in a deposition that we

04:28:06   20   took of you, and we showed it to you there, right?

04:28:11   21   A.   It has been awhile from that deposition you took.  I

04:28:34   22   don't remember whether that is the occasion I have seen

04:28:45   23   such document.

04:28:45   24   Q.   You're right.  It has been awhile.  Your deposition was

04:28:49   25   taken on November 30, 2020, right?

04:29:00  1   A.  I'm sorry.  I kind of forgot the date.

04:29:04  2   Q.  Well, do you have any reason to disagree with me that

04:29:08  3   it was November 30, 2020?

04:29:19  4          MR. JOSHI:  Argumentative.

04:29:22  5          THE COURT:  Overruled.

04:29:24  6   A.  I really can't answer to that question because I really

04:29:27  7   forgot.

04:29:33  8          MR. BENNETT:  Okay.

04:29:33  9          Denver, can you bring up his deposition, please.

04:29:33  10  BY MR. BENNETT:

04:29:40  11  Q.  Let's refresh your recollection.

04:30:01  12          All right.  Your name is Alvin Lin, correct?

04:30:10  13  A.  Yes.

04:30:11  14  Q.  And your deposition was taken in the case of Lone Star

04:30:18  15  Technological Innovations v. ASUSTeK Computer, Inc., right?

04:30:22  16  A.  There was a deposition taken on me and for a case, but

04:31:08  17  the document you are showing me right now is very

04:31:12  18  complicated.  I really can't tell whether that is the case.

04:31:19  19  Q.  My question was pretty simple, Mr. Lin.  Your

04:31:23  20  deposition was taken in this case, yes or no?

04:31:27  21  A.  That's correct.  There was a deposition done on me for

04:31:41  22  this case.

04:31:42  23  Q.  All right.  Now, seeing your deposition here on this

04:31:46  24  video feed, does it refresh your recollection that that

04:31:50  25  deposition occurred on November 30, 2020?

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
| 04:31:53 | 1  | A.  Well, it says November.                                            |
| 04:32:25 | 2  | Q.  Because that's the day it happened, right?                         |
| 04:32:28 | 3  | A.  Well, if that's the month on the document, then that              |
| 04:32:51 | 4  | must be the date then, because if you ask me, I really               |
| 04:32:55 | 5  | forgot the exact date.                                                |
| 04:32:57 | 6  | Q.  Okay.  In any event, from that date until now, you have           |
| 04:33:04 | 7  | had a chance to review your deposition, right?                        |
| 04:33:07 | 8  | A.  I did not have any way to obtain the records for that             |
| 04:33:40 | 9  | deposition of me, though.                                             |
| 04:33:44 | 10 | Q.  No one at ASUS gave you a copy of your deposition?                |
| 04:33:50 | 11 |        MR. JOSHI:  Objection, seeks privileged                        |
| 04:33:53 | 12 | information.                                                          |
| 04:33:57 | 13 |        THE COURT:  I'm going to -- Mr. Bennett, there's               |
| 04:34:01 | 14 | been an objection that the question called for privileged            |
| 04:34:04 | 15 | information.                                                          |
| 04:34:05 | 16 |        MR. BENNETT:  I asked for no privileged                        |
| 04:34:07 | 17 | information, just whether a copy of the deposition had been          |
| 04:34:11 | 18 | provided to him, Your Honor.                                          |
| 04:34:12 | 19 |        THE COURT:  I'll overrule the objection.                       |
| 04:34:45 | 20 | A.  No.                                                               |
| 04:34:45 | 21 | BY MR. BENNETT:                                                       |
| 04:34:53 | 22 | Q.  Okay.  In any event, between November 30th and today,            |
| 04:34:57 | 23 | have you had any occasion to find any fault with, any error          |
| 04:35:04 | 24 | in the document we just looked at, Plaintiff's Exhibit 14A?          |
| 04:35:28 | 25 | A.  Upon the conclusion of that deposition, I don't believe          |

04:35:51  1  that I have received anything to do with the deposition for

04:35:53  2  me to find out the information during that deposition.

04:35:56  3  Q.  Well, you have access to the Internet, don't you,

04:36:00  4  Mr. Lin?

04:36:08  5  A.  Yes, I do have Internet.

04:36:10  6  Q.  In the almost six months since your deposition, have

04:36:15  7  you tried to find out if the version on ASUS's website is

04:36:18  8  any different than the version I'm showing you in open

04:36:21  9  court right now?

04:36:42  10  A.  Well, I did not have any motive to go check any

04:37:02  11  difference for the versions of the website because I was

04:37:08  12  not the person to maintain the website.

04:37:13  13  Q.  But your company maintains it, right?

04:37:17  14  A.  That is right.  The FAQ portion of the website was

04:37:38  15  maintained by the company's staff.

04:37:41  16  Q.  Okay.  So going back to the document from the company

04:37:47  17  website and looking at the language -- well, let me back up

04:37:53  18  one step real quick.

04:37:55  19        MR. BENNETT:  Go ahead, Ms. Josh.

04:37:55  20  BY MR. BENNETT:

04:38:06  21  Q.  The purpose of an FAQ, whether it's this one or any

04:38:11  22  other one on ASUS's website, is to answer for customers or

04:38:15  23  potential customers questions they may have about products

04:38:18  24  or product features, right?

04:38:23  25  A.  That's right.  We do have some type of function like

04:38:46  1   that.

04:38:46  2   Q.  I know you had some function like that.  My -- my

04:38:52  3   question is different.  Let me try it again.

04:38:55  4        The purpose of an FAQ page on ASUS's website is to

04:38:59  5   answer for customers who want to know about a feature

04:39:07  6   certain questions that they have about that feature, right?

04:39:48  7   A.  Well, just as I previously said, that it does have that

04:39:54  8   function.  However, more to that function, it also serves

04:39:59  9   as a database of knowledge.

04:40:02  10  Q.  Knowledge that ASUS wants to share with customers and

04:40:05  11  potential customers, right?

04:40:10  12  A.  Well, that's right.  That's what we wanted to educate

04:40:28  13  the users on, the knowledge in that matter.

04:40:33  14  Q.  And, again, speaking generally, ASUS chooses the

04:40:37  15  features that it thinks customers will want to know about

04:40:41  16  and use to explain on its FAQ page, right?

04:40:49  17  A.  That's right.  We would put something there for them to

04:41:21  18  know for something they desire to know.

04:41:27  19  Q.  In this particular instance, the feature that ASUS

04:41:30  20  wants to answer questions about so that customers may use

04:41:34  21  is the feature of an advanced color adjustment so that

04:41:37  22  users can individually customize hue and saturation for

04:41:46  23  each axis color, right?

04:42:29  24  A.  We provide options like that for the users to make the

04:42:36  25  adjustments.

04:42:38   1   Q.  Well, you more than provide options.  In fact, in this
04:42:43   2   particular document you teach users how to adjust the six
04:42:47   3   colors, red, green, blue, cyan, magenta, and yellow,
04:42:57   4   without affecting the output of other colors, right?
04:43:55   5   A.  What that means was that we do provide six options to
04:44:00   6   adjust the six colors.  Say, for instance, if I wanted to
04:44:05   7   adjust the color red and when I do that adjustment, the
04:44:07   8   other settings will remain unchanged.  That's what I meant.
04:44:14   9   Q.  Correct.  We know that if you -- let me ask it this way
04:44:18  10   then, and I think we can get on the same page.
04:44:22  11        If a user were to find this page and follow what
04:44:29  12   ASUS teaches the user on this page, it would adjust a
04:44:34  13   single color without adjusting another, right?
04:44:37  14   A.  That's not what I meant exactly.  What I meant is that
04:45:22  15   here, we would provide six options to do a color
04:45:30  16   adjustment.  I can adjust any individual color here like
04:45:33  17   red -- red, green, blue, or other colors.  And then while I
04:45:42  18   do that color adjustment, I will not affect any other five
04:45:49  19   colors.
04:45:53  20   Q.  Okay.  I think --
04:45:59  21   A.  What I meant was that will not affect the settings of
04:46:04  22   the other five colors.
04:46:06  23   Q.  Okay.  But you can adjust one color without affecting
04:46:13  24   another color?  That's what this shows users, right?
04:46:18  25   A.  That's not correct.  Just like I said, when you are

| | | |
|---|---|---|
| 04:46:45 | 1 | adjusting settings for one individual color, that the |
| 04:46:49 | 2 | settings for the other five individual colors will not be |
| 04:46:59 | 3 | affected. |
| 04:47:00 | 4 | Q.  So your test -- your testimony is that this is strictly |
| 04:47:07 | 5 | about changing settings and nothing else? |
| 04:47:11 | 6 | A.  Well, that's right, because we only provided six |
| 04:47:28 | 7 | options for the users to make adjustments as they desire. |
| 04:47:35 | 8 | Q.  Right.  And you provide that functionality so that they |
| 04:47:41 | 9 | can individually customize hue and saturation for each axis |
| 04:47:48 | 10 | color according to this document, right? |
| 04:47:51 | 11 | A.  We provided options for the users to make adjustments |
| 04:48:31 | 12 | on the six colors independently. |
| 04:48:41 | 13 | MR. BENNETT:  At this point, Your Honor, I'm -- |
| 04:48:42 | 14 | A.  Hues and -- hues and saturations -- |
| 04:48:44 | 15 | MR. BENNETT:  -- I'm going to object as |
| 04:48:48 | 16 | nonresponsive and move to strike it. |
| 04:48:51 | 17 | THE COURT:  I'll sustain it.  Ask your next |
| 04:48:54 | 18 | question. |
| 04:48:54 | 19 | BY MR. BENNETT: |
| 04:49:08 | 20 | Q.  Mr. Lin, there's no question pending, sir.  Let me just |
| 04:49:11 | 21 | really quickly -- |
| 04:49:13 | 22 | MR. BENNETT:  If I may, Your Honor, I'm not -- |
| 04:49:13 | 23 | THE COURT:  Please proceed. |
| 04:49:15 | 24 | MR. BENNETT:  -- okay, usually in the habit of |
| 04:49:17 | 25 | explaining things like that. |

04:49:17  1  BY MR. BENNETT:

04:49:19  2  Q.  You have to wait for a question before you can answer

04:49:21  3  anything, okay?

04:49:22  4       Here in a second, your lawyers can ask you

04:49:25  5  questions if they want to, but you have to answer the

04:49:32  6  questions I ask, all right?

04:49:36  7  A.  Okay.

04:49:50  8  Q.  Thank you.

04:49:52  9       Let's look at the product manual for the first

04:49:58  10  product listed in Exhibits 14A, which is the PA248 series

04:50:07  11  LCD monitor.  That's Plaintiff's Exhibit 26-30.

04:50:27  12       Can you see Plaintiff's Exhibit 26-30, Mr. Lin?

04:50:41  13  A.  Yes, I can see something on the screen.

04:50:48  14  Q.  Okay.  Can you read -- well, can you see the words on

04:50:52  15  the screen?

04:50:54  16  A.  Yes, I can, because the font is pretty big.

04:51:07  17  Q.  Okay.

04:51:09  18       MR. BENNETT:  And, Ms. Josh, if you need to

04:51:11  19  translate those few words on the page to help him out,

04:51:14  20  please feel free.

04:51:32  21  A.  That's right.  That is the translation.

04:51:32  22  BY MR. BENNETT:

04:51:41  23  Q.  When you say, "that's right, that is the translation,"

04:51:45  24  do you understand that page as you read it, Mr. Lin?

04:51:56  25  A.  I can only the -- recognize these simple English words,

04:52:07  1   because they are quite simple words.

04:52:09  2   Q.  All right.  I want to direct your attention to a

04:52:13  3   particular part of this particular manual.

04:52:19  4         MR. BENNETT:  Denver, if you'll go to Page 2283.

04:52:37  5   A.  Okay.

04:52:37  6   BY MR. BENNETT:

04:52:39  7   Q.  And before I ask any specific questions about this --

04:52:42  8   these sections of the manual, I want to ask a more general

04:52:46  9   question, which is this:  We heard earlier from ASUS's

04:52:50  10  lawyers about the ProArtist Series.  Are you familiar with

04:52:56  11  that series of displays?

04:53:22  12  A.  Well, I kind of know some.  I will try my best to

04:53:26  13  answer your questions.

04:53:27  14  Q.  My question simply, Mr. Lin, is whether you know about

04:53:33  15  ProArtist displays, like the fact that they exist and ASUS

04:53:38  16  sells them?

04:53:41  17  A.  I do know that we have these series of displays.

04:53:58  18  Q.  Okay.  And ASUS sells these displays to more than just

04:54:05  19  artists, right?

04:54:13  20  A.  Because I am engineer -- so if you're asking me

04:54:34  21  something to do with the sales, I may not be able to give

04:54:38  22  you a very confirmed answer in that matter.

04:54:49  23  Q.  Fair enough.  Let's go back to Page 2283.

04:54:56  24         Under Section 2, on Page 2283, there are two

04:55:00  25  bullets kind of midway down the page there:  Saturation and

04:55:04    1    Hue.

04:55:04    2            Do you see those?

04:55:32    3    A.  I do see "Saturation" and "Hue" on the screen now.

04:55:38    4    Q.  Okay.  And this is part of the user manual for this

04:55:43    5    product that is teaching a user how to set the desired

04:55:49    6    color on the monitor, right?

04:55:55    7    A.  From what I can see right now, it appears so.

04:56:19    8    Q.  Okay.  And then at the very bottom, there's one last

04:56:26    9    bullet point that says:  Advanced Setting.

04:56:41   10            Do you see that bottom bullet point where it says:

04:56:47   11    Advanced Setting?

04:56:54   12    A.  Yes, I can see that.

04:56:55   13    Q.  Okay.  And on the next page, it shows -- it shows what

04:57:04   14    those advanced settings are, right?

04:57:07   15    A.  From what I can see, yes.

04:57:32   16    Q.  Okay.  And that first bullet point under Advanced

04:57:39   17    Setting is how to adjust the 6-axis hue, right?

04:57:47   18    A.  From the picture I can see, yes.

04:57:56   19    Q.  And the second bullet point teaches users how to adjust

04:58:02   20    the 6-axis saturation adjustment, right?

04:58:10   21    A.  From the picture I see, yes.

04:58:18   22    Q.  All right.  And accessing either of these settings

04:58:23   23    under Advanced Settings will allow a user to change only

04:58:28   24    the red hue, right?

04:58:40   25    A.  Yes.

04:58:49  1   Q.  Or only the yellow saturation adjustment, right?

04:58:55  2   A.  Yes.  We allow them to make adjustment on one of the

04:59:13  3   six options provided.

04:59:16  4   Q.  Well, Mr. Lin, you don't just allow them, you show

04:59:20  5   them, right?

04:59:22  6   A.  Well, I am an engineer, and I provided the six options.

04:59:49  7   However -- and how to customize again these technical

04:59:56  8   documents is really not my job.

04:59:57  9   Q.  Well, regardless of whether it's your job, Mr. Lin, can

05:00:02  10  you just agree with me, looking at your -- ASUS's own user

05:00:08  11  manual, that if a user follows the steps in this user

05:00:12  12  manual, if they follow the top one, they can adjust only

05:00:15  13  the red hue adjustment, right?

05:00:29  14  A.  If I were the user, then I would know that I do have

05:00:56  15  six options to make adjustment like that.

05:01:04  16  Q.  You -- right.  And if you follow the manual, you will

05:01:08  17  make those adjustments, right?

05:01:37  18  A.  I don't understand why you ask this question.

05:01:45  19       Yes, the users, they do have the six options that

05:01:51  20  you made the six-color adjustment like that.

05:01:54  21  Q.  Okay.  So if someone followed the directions from

05:02:01  22  ASUS's PA248 series manual, they would have adjusted the

05:02:10  23  hue of the display for one color?

05:02:39  24  A.  Yes, he would be able to adjust one of the six color

05:02:53  25  options --

05:02:54  1   Q.  Okay.

05:02:57  2   A.  -- independently, yes.

05:02:58  3   Q.  Let's turn to a different part of the manual.

05:03:03  4        MR. BENNETT:  Let's go, Denver, please, to 2411.

05:03:46  5        Are you still in 2630?

05:04:17  6        That's it.  If you scroll up from the bottom, it

05:04:24  7   should read, screen image has color defects.

05:04:28  8        Actually, before you go there, sorry.

05:04:28  9   BY MR. BENNETT:

05:04:31  10  Q.  Okay.  Mr. Lin, before we get into the particulars of

05:04:35  11  this particular page, I want to ask you one question about

05:04:39  12  the title of the document so we can all understand what its

05:04:48  13  purpose is.

05:04:49  14        3.3, Troubleshooting FAQ, F-A-Q.  Do you see that?

05:05:08  15  A.  I can see that.

05:05:11  16  Q.  Okay.  And the purpose of a troubleshooting FAQ in a

05:05:18  17  user manual -- and you know this as a technical person --

05:05:21  18  is to coach and help users solve their own technological

05:05:28  19  problems with their monitor, right?

05:05:48  20  A.  Well, if they encounter some problems -- and they can

05:06:03  21  come here to find information they need for the

05:06:06  22  troubleshooting purpose.

05:06:09  23  Q.  Okay.  Good.  Right.  So the very first one, if a user

05:06:13  24  is having problems with their monitor powering on, they

05:06:18  25  look at the very first one, and it gives them tips on how

05:06:23  1  to solve that problem, right?

05:06:24  2  A.  From what is showing on the screen, yes.

05:06:46  3  Q.  Okay.  And then a little farther down, there's an

05:06:49  4  identified problem.  Screen image has color defects.  White

05:06:55  5  does not look white.

05:06:56  6       Do you see that?

05:06:58  7  A.  Yes, I can see it.

05:07:13  8  Q.  Okay.  And there are three possible solutions that ASUS

05:07:18  9  gives the user, and one of them is adjust the RGB color

05:07:24  10 settings or select the color temperature via OSD, right?

05:07:31  11 A.  I can see that.

05:07:50  12 Q.  Okay.  And ASUS suggests this solution so that users

05:07:56  13 can solve their own color defects or adjust the colors to

05:08:02  14 solve color defects on their monitors, right?

05:08:07  15 A.  Ms. Interpreter, would you help me to ask them to

05:08:39  16 verify?

05:08:40  17      And this specific document is for which model,

05:08:43  18 please?

05:08:47  19      MR. BENNETT:  Denver, go to the very first page.

05:08:47  20 BY MR. BENNETT:

05:09:09  21 Q.  That's the model, Mr. Lin.

05:09:17  22 A.  I can see that.  Thank you.

05:09:18  23 Q.  Okay.  So can you answer my question now, please?

05:09:31  24 A.  Sorry, I interrupted you before you finished asking me

05:09:36  25 questions.

| | | |
|---|---|---|
| 05:09:37 | 1 | Would you please repeat your question? |
| 05:09:43 | 2 | Q.  If I remember it, I will, yes, sir. |
| 05:09:45 | 3 | I think my question was, what ASUS does here is it |
| 05:09:51 | 4 | tells users and teaches them how to solve their own color |
| 05:09:59 | 5 | defect problem in this Troubleshooting FAQ, and that |
| 05:10:03 | 6 | particular teaching is adjust the RGB color settings. |
| 05:10:13 | 7 | A.  Well, because this specific document was not written by |
| 05:11:06 | 8 | me, I. |
| 05:11:08 | 9 | Can only tell you from an engineer perspective, |
| 05:11:14 | 10 | you can achieve the RGB adjustment through color |
| 05:11:21 | 11 | temperature selection.  It's actually just the opposite, |
| 05:11:37 | 12 | and may I reverse order. |
| 05:11:40 | 13 | What I meant is that you can adjust RGB in order |
| 05:11:44 | 14 | to achieve the color temperature. |
| 05:11:51 | 15 | MR. BENNETT:  I'm sorry.  This is just off the |
| 05:12:05 | 16 | record. |
| 05:12:05 | 17 | (Discussion off the record.) |
| 05:12:09 | 18 | MR. BENNETT:  Okay.  Your Honor, I'm about to |
| 05:12:13 | 19 | change a different document, but I do see it's past 5:00. |
| 05:12:18 | 20 | I can keep going if you want me to or -- |
| 05:12:19 | 21 | THE COURT:  It is now, Mr. Bennett.  I think we |
| 05:12:21 | 22 | should break for the day. |
| 05:12:23 | 23 | MR. BENNETT:  Okay. |
| 05:12:25 | 24 | THE COURT:  All right.  So ladies and gentlemen of |
| 05:12:25 | 25 | the jury, it's been a long day.  I appreciate your focus |

05:12:28  1  and attention throughout the afternoon.

05:12:30  2       I'll ask you to be back about 8:45 in the morning.

05:12:34  3  When you come in in the morning, if you will identify

05:12:37  4  yourself to the court security officers, they will direct

05:12:40  5  you up here, if not escort you.  And so we will hope to see

05:12:44  6  you then, and we'll plan to start here in the courtroom at

05:12:47  7  9:00 a.m.

05:12:47  8       As a reminder, you should not talk about the case

05:12:50  9  with anyone until all of the evidence has been presented,

05:12:55  10  and I have instructed you on the law.  Likewise, don't do

05:12:59  11  any independent investigation or research into the matter

05:13:02  12  involved here or the attorneys or the parties.  And,

05:13:06  13  likewise, don't post anything about any of your

05:13:10  14  observations throughout the day.

05:13:13  15       So I'll look forward to seeing you in the morning,

05:13:17  16  and I hope you all have a pleasant evening.

05:13:20  17       COURT SECURITY OFFICER:  All rise for the jury.

05:13:20  18       (Jury out.)

05:13:52  19       THE COURT:  Okay.  Please be seated.

05:13:54  20       Ms. Josh and Mr. Lee [sic], let me ask you all to

05:13:59  21  be back online no later than 8:45 Texas time tomorrow so

05:14:04  22  that we can start promptly at 9:00 a.m. Texas time with the

05:14:10  23  continued examination of the witness.

05:14:14  24       Do either of you have any questions about that?

05:14:56  25       THE WITNESS:  So, Your Honor, you said a lot of

05:14:57  1  things here, and I just want to make sure that I did not

05:15:00  2  miss anything, I did not do anything that I'm not supposed

05:15:04  3  to do.  I need to follow all the rules here.

05:15:07  4      THE COURT:  Certainly.  I'm just asking that you

05:15:12  5  all be back online at 8:45 ready to go.

05:15:16  6      I will suggest this, for purposes of maybe

05:15:21  7  speeding things up a little bit, I'll just tell you,

05:15:27  8  Mr. Lee [sic], that, you know, if you can answer the

05:15:31  9  question more succinctly with a yes or no, that's all the

05:15:38  10  better.

05:15:39  11      When you have completed your direct examination,

05:15:44  12  counsel for your employer will be able to ask any questions

05:15:50  13  they want to, and you will be able to provide a fuller

05:16:00  14  explanation.  But for purposes of the examination by the

05:16:03  15  Plaintiff, if you can give yes-or-no answers, that's fine.

05:16:06  16  If you can't give yes-or-no answers to any that are asked,

05:16:10  17  if you'll just explain that, and then Mr. Bennett can ask a

05:16:15  18  different question if he wishes to do so.

05:17:35  19      THE WITNESS:  Okay.  I got it.

05:17:37  20      THE COURT:  Okay.  Anything further for the

05:17:39  21  witness and the translator before we disconnect them?

05:17:43  22      MR. JOSHI:  Yes.

05:17:55  23      THE WITNESS:  I do not have any other questions.

05:17:57  24  Thank you, though.

05:17:58  25      THE COURT:  Okay.  Hold on just a moment,

05:18:01  1    Ms. Josh.

05:18:02  2             MR. JOSHI:  Your Honor, do you have any -- do you

05:18:05  3    have any instructions for interactions between counsel --

05:18:08  4             THE COURT:  Yes.  No interaction whatsoever.

05:18:11  5             MR. JOSHI:  Would you please make that clear?

05:18:13  6             THE COURT:  Yes, I will.  So I don't know who the

05:18:16  7    in-house counsel is, but, Mr. Lee, let me make this clear

05:18:20  8    to you.

05:18:22  9             The rules on what a witness may say in a situation

05:18:25  10   like this or discussions that may be had with a -- an

05:18:30  11   attorney is, given the fact that you're there and we're

05:18:34  12   here, I think under the specific circumstances of this

05:18:39  13   case, you should not have any correct -- any communications

05:18:46  14   at all with any of the attorneys overnight about the

05:18:49  15   subject of your testimony or the testimony you have given

05:18:55  16   today, your expected testimony tomorrow, or any knowledge

05:19:00  17   about this case.  Do you understand all of that?

05:19:03  18             THE WITNESS:  So I wanted to clarify.  You said do

05:19:52  19   not communicate with anyone or only my attorneys?

05:19:57  20             THE COURT:  No, sir.  You may not communicate with

05:20:01  21   your attorney about the substance of the testimony.  So

05:20:05  22   thank you for asking that clarification.

05:20:08  23             And if you need to have some discussions about the

05:20:13  24   technical arrangements that we have made about your

05:20:17  25   testimony, that is fine.  But what I'm instructing you,

05:20:21  1  sir, is not to have any substantive conversations about

05:20:26  2  your knowledge about the case, your testimony this

05:20:30  3  afternoon, or your expected testimony tomorrow.

05:21:12  4          THE WITNESS:  I got it.

05:21:14  5          MR. JOSHI:  Thank you, Your Honor.

05:21:15  6          THE COURT:  Okay.  All right.

05:21:17  7          All right.  We will see you all in the morning.

05:21:21  8          What else do we need to address before we adjourn?

05:21:26  9          MR. BENNETT:  Just -- I didn't object to

05:21:30  10  responsiveness that much today.  I tried.  But tomorrow I'm

05:21:34  11  going to have to do more to get -- if it doesn't change.

05:21:36  12          THE COURT:  You know, Mr. Bennett, you try your

05:21:38  13  case like you want to.  If you make the objection, if I

05:21:42  14  think, you know, an order striking the testimony is

05:21:46  15  appropriate, that's what I'll do.

05:21:50  16          So, you know, to the extent you can ask yes or no

05:21:54  17  questions, I mean, I would encourage you to do that.  If

05:22:01  18  you don't get -- if you don't get, you know, narrow

05:22:04  19  answers, I will strike the -- I will strike the testimony.

05:22:08  20          Obviously, Mr. Joshi, you'll have an opportunity

05:22:10  21  to ask whatever you want of this witness on cross-examine.

05:22:14  22          So to the extent we can move it along, I think

05:22:18  23  that's certainly helpful.

05:22:20  24          Anything else we need to discuss from --

05:22:22  25          MR. OLIVER:  One logistical question, and I am

05:22:25   1   going to apologize in advance in case you've already

05:22:29   2   addressed it in one of the many orders that I may have

05:22:31   3   missed.

05:22:31   4            THE COURT:  Certainly.

05:22:32   5            MR. OLIVER:  If you want to tell me, just go look

05:22:34   6   through the orders, I will.

05:22:35   7            THE COURT:  I might do that.

05:22:37   8            MR. OLIVER:  Does the Court provide a running

05:22:40   9   total of how much time each party has used?

05:22:41  10            THE COURT:  We will.

05:22:41  11            MR. OLIVER:  Okay.

05:22:42  12            THE COURT:  We will provide you, and we can

05:22:43  13   provide you today that number.  You will have to ask for

05:22:46  14   it.  We won't do it as a matter of routine, so you're

05:22:50  15   welcome to ask Mrs. Schroeder at the end of the day.

05:22:53  16            MR. OLIVER:  Okay.  Thank you.

05:22:54  17            THE COURT:  To the extent there are any problems

05:22:57  18   that crop up over the night, and I'm very serious about

05:23:02  19   this, I do expect the parties to try to resolve them.  I

05:23:07  20   have seen a lot of things today that basically amounted to

05:23:11  21   the other side hearing what the other side was saying for

05:23:15  22   the first time in the room.  And I expect more of you all

05:23:19  23   as professionals.

05:23:21  24            So if there are issues that -- and I'm not fussing

05:23:26  25   at you.  I'm just saying if there are issues that crop up,

05:23:31  1   that you all have with one or the other, start with trying

05:23:35  2   to resolve it by agreement, working through some sort of a

05:23:38  3   compromise.  And if you can't, bring it to me, and I'll be

05:23:42  4   more than happy to get it resolved.  But I do want you to

05:23:46  5   at least have made a serious attempt to resolve it and at

05:23:50  6   least to substantively discuss it.

05:23:53  7            Any questions about that?

05:23:55  8            MR. BENNETT:  No, Your Honor.  We understand.

05:23:59  9            THE COURT:  Okay.  Good.  See you in the morning.

05:24:02  10           COURT SECURITY OFFICER:  All rise.

05:24:06  11           (WHEREUPON, these proceedings were adjourned,

         12                 5:24 p.m.)

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

<u>COURT REPORTER'S CERTIFICATION</u>

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter held on May 17, 2021, to the best of my ability.


<u>May 17, 2021</u>        <u>s/ KATHRYN McALPINE/</u>_____
Date                   KATHRYN McALPINE, RPR, CSR, CCR