```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                       TYLER DIVISION

 3   LONE STAR TECHNOLOGICAL       )(
     INNOVATIONS, LLC,             )(
 4        PLAINTIFF,               )(     CIVIL ACTION NO.
                                   )(     6:19-CV-59-RWS
 5                                 )(
     VS.                           )(
 6                                 )(
                                   )(     TYLER, TEXAS
 7                                 )(
     ASUSTEK COMPUTER, INC.,       )(     MAY 19, 2021
 8        DEFENDANT.               )(     9:00 A.M.

 9                   TRANSCRIPT OF JURY TRIAL

10         BEFORE THE HONORABLE ROBERT W. SCHROEDER, III

11                 UNITED STATES DISTRICT JUDGE

12
     FOR THE PLAINTIFF:      Mr. Joshua J. Bennett
13                           Mr. Bradley D. Liddle
                             Ms. Monica Litle
14                           CARTER ARNETT, PLLC
                             8150 N. Central Expressway
15                           5th Floor
                             Dallas, Texas 75206
16
                             Mr. John D. Saba, Jr.
17                           WITTLIFF & CUTTER, PLLC
                             1209 Nueces Street
18                           Austin, Texas 78701

19                           Mr. John Lee
                             BANIE & ISHIMOTO, LLP
20                           2100 Geng Road
                             Suite 210
21                           Palo Alto, California 94303

22   COURT REPORTER:         Ms. Kate McAlpine, RPR, CSR, CCR
                             Federal Official Court Reporter
23                           Texarkana Division
                             500 N. State Line Avenue
24                           Texarkana, Texas 75501

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

```
 1   FOR THE DEFENDANT:        Mr. Vinay V. Joshi
                               Mr. Andrew T. Oliver
 2                             AMIN, TUROCY, & WATSON
                               160 W. Santa Clara Street
 3                             Suite 975
                               San Jose, California 95113
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

08:46:45    1

08:46:46    2          (Jury out.)

09:00:23    3          THE COURT:  Good morning, everyone.

09:00:27    4          Is there anything we need to discuss before the

09:00:31    5   jury comes in?

09:00:32    6          MR. BENNETT:  Two quick things, Your Honor.  Well,

09:00:35    7   one of them may not be so quick, but one is, I think.  The

09:00:38    8   parties are working on the charge.  We know it's due by

09:00:42    9   noon.  If we get through the lunch break, so at 1:00 --

09:00:46   10          THE COURT:  Yes.

09:00:47   11          MR. BENNETT:  Thank you, Your Honor.  We just

09:00:48   12   wanted to highlight -- we discussed this some already.

09:00:51   13   They're going to use the patent as we discussed last night.

09:00:55   14   This may be an area where a sidebar may be required,

09:00:59   15   depending on the question, and we'll just have to wait and

09:01:03   16   see what it is.

09:01:03   17          THE COURT:  Sure.

09:01:04   18          MR. BENNETT:  But there's some competing theories

09:01:08   19   about what the claim construction is that are going to try

09:01:11   20   to come in through Dr. Ducharme, and we may need to talk

09:01:15   21   about those questions before the question is asked or an

09:01:15   22   answer may be provided.  So this may be an area where we

09:01:24   23   may need to request a sidebar.

09:01:24   24          THE COURT:  That's fine.  That's fine.  We'll see

09:01:26   25   where we are breakwise.  If we can send the jury on a break

| | | |
|---|---|---|
| 09:01:31 | 1 | at that point, we'll do that.  Otherwise, we may just go |
| 09:01:35 | 2 | back in chambers in the conference room. |
| 09:01:37 | 3 | MR. BENNETT:  Okay.  And I think the way we -- we |
| 09:01:41 | 4 | would just invoke it, it will be sustained and you'll |
| 09:01:41 | 5 | enforce it.  The way that we'll bring it up with Your Honor |
| 09:01:43 | 6 | is we'll object and request that to Your Honor if we can |
| 09:01:45 | 7 | approach?  Is that -- |
| 09:01:47 | 8 | THE COURT:  Sure.  Yeah. |
| 09:01:47 | 9 | MR. BENNETT:  Okay. |
| 09:01:49 | 10 | THE COURT:  Absolutely. |
| 09:01:51 | 11 | Anything else? |
| 09:01:51 | 12 | MR. JOSHI:  Nothing from us, Your Honor. |
| 09:01:53 | 13 | THE COURT:  Okay.  Good. |
| 09:01:55 | 14 | Is our jury here? |
| 09:01:57 | 15 | COURT SECURITY OFFICER:  Yes, sir. |
| 09:01:58 | 16 | THE COURT:  Let's have them brought in, please. |
| 09:02:01 | 17 | COURT SECURITY OFFICER:  Yes, sir. |
| 09:02:02 | 18 | All rise for the jury. |
| 09:02:10 | 19 | (Jury in.) |
| 09:02:41 | 20 | THE COURT:  Please be seated. |
| 09:02:44 | 21 | Good morning, ladies and gentlemen of the jury and |
| 09:02:46 | 22 | welcome back.  I hope you all had a nice evening last |
| 09:02:50 | 23 | evening.  Thanks for being here on time so that we could |
| 09:02:54 | 24 | again start promptly this morning. |
| 09:02:56 | 25 | When we concluded the day yesterday, Mr. Saba was |

09:03:01   1   in his direct examination of the witness.

09:03:04   2           Mr. Saba, at this time, you may continue.

09:03:07   3           MR. SABA:  Thank you, Your Honor.

09:03:07   4       ALFRED D. DUCHARME, PH.D., PLAINTIFF'S WITNESS,

09:03:07   5                   PREVIOUSLY SWORN

09:03:10   6           CONTINUED DIRECT EXAMINATION

09:03:10   7   BY MR. SABA:

09:03:11   8   Q.  Dr. Ducharme, we were talking about -- we had a long

09:03:14   9   afternoon yesterday, and when we concluded, we were talking

09:03:18  10   about your opinions of validity with regard to the '435

09:03:21  11   patent.  Do you remember that?

09:03:21  12   A.  Yes.

09:03:22  13   Q.  Okay.  Can you give -- so one of the things that you

09:03:28  14   were explaining yesterday afternoon before we broke, we

09:03:31  15   were discussing this Brett prior art reference.  You

09:03:35  16   remember that?

09:03:36  17   A.  Yes.

09:03:36  18   Q.  All right.  And your opinions regarding Brett don't

09:03:39  19   change the validity of the patent?

09:03:42  20   A.  No.

09:03:42  21   Q.  Okay.  Why don't you -- I'm sorry, was that a yes or a

09:03:47  22   no?

09:03:47  23   A.  No.

09:03:47  24   Q.  All right.  Let me ask that question again.

09:03:50  25           In summary, is it your opinion that Brett does not

| | | |
|---|---|---|
| 09:03:59 | 1 | invalidate the '435 patent? |
| 09:04:01 | 2 | A.  Yes. |
| 09:04:02 | 3 | Q.  All right.  Can you give us -- the ladies and |
| 09:04:39 | 4 | gentlemen -- can you give the ladies and gentlemen of the |
| 09:04:41 | 5 | jury just a quick summary of why you do not believe Brett |
| 09:04:48 | 6 | somehow invalidates the '435 patent? |
| 09:04:50 | 7 | A.  The Brett patent is concerned with essentially |
| 09:04:55 | 8 | post-editing of film, so 35-millimeter film, old films, and |
| 09:05:00 | 9 | then converting those to digital video.  And it's really |
| 09:05:04 | 10 | not related to the '435 patent at all. |
| 09:05:07 | 11 | Q.  Does the Brett reference even concern digital video? |
| 09:05:14 | 12 | A.  No.  There is -- |
| 09:05:19 | 13 | Q.  And would it have been obvious for someone to have -- |
| 09:05:36 | 14 | someone of skill in the art to have modified the invention |
| 09:05:41 | 15 | disclosed in Brett? |
| 09:05:43 | 16 | A.  No. |
| 09:05:44 | 17 | Q.  Let me ask the question again. |
| 09:05:47 | 18 |      Would it have been obvious for someone of skill in |
| 09:05:51 | 19 | the art to have modified Brett to cover the claims of the |
| 09:05:54 | 20 | '435 patent? |
| 09:05:54 | 21 | A.  No. |
| 09:05:55 | 22 | Q.  And to the clear, the '435 patent is discussing real |
| 09:06:08 | 23 | time digital video, correct? |
| 09:06:10 | 24 | A.  Yes. |
| 09:06:10 | 25 | Q.  And for the record, does Brett discuss real time |

```
09:06:15   1   digital video?
09:06:15   2   A.  No.
09:06:16   3   Q.  All right.  I want to talk to you about double
09:06:19   4   patenting, okay?
09:06:20   5   A.  Okay.
09:06:20   6   Q.  All right.  What is double patenting?
09:06:23   7   A.  It's when a patentee has multiple patents.
09:06:27   8   Q.  And do you -- do you have multiple patents?
09:06:34   9   A.  I do.
09:06:37  10   Q.  And what is the significance of having more than one
09:06:42  11   patent?
09:06:42  12   A.  I don't understand the question.
09:06:45  13   Q.  All right.  Do you understand that ASUS's -- or
09:06:55  14   Dr. Stevenson on behalf of ASUS is arguing that the '435 is
09:07:01  15   invalid because of double patenting?
09:07:05  16   A.  I am aware of that.
09:07:06  17   Q.  And do you agree with that?
09:07:08  18   A.  No.
09:07:08  19   Q.  Tell the ladies and gentlemen of the jury why.
09:07:13  20   A.  The patentee has multiple patents.  The '012 patent and
09:07:24  21   the '435 patent, those two patents are very different.
09:07:30  22   They're -- the function, the way it affects the pixels is
09:07:35  23   different.
09:07:35  24         The '012 uses look-up tables, and the '435 uses
09:07:41  25   arithmetic and logical operations.  And it's just a
```

09:07:45  1   different way to code.  They're different means of

09:07:49  2   achieving a color change.

09:07:51  3   Q.  Let me unpack that a bit.

09:07:54  4        Lone Star has -- owns the '012 patent.  Is that

09:08:00  5   what you said?

09:08:01  6   A.  Yes.

09:08:01  7   Q.  All right.  Will you tell the ladies and gentlemen of

09:08:04  8   the jury generally what the '012 patent is?

09:08:06  9   A.  It's a way of affecting color change in a display

09:08:12  10  device where you use this -- it's a coding terminology,

09:08:16  11  look-up tables.  I called it a decoder ring yesterday.

09:08:21  12  It's a way of programming, but you affect all of the pixels

09:08:27  13  -- rather -- well, you affect all of the pixels to effect

09:08:32  14  the change.

09:08:33  15  Q.  And with regard to this concept of double patenting, do

09:08:36  16  you understand that ASUS is taking the position that the

09:08:40  17  '012 somehow invalidates the '435?

09:08:48  18  A.  Yes.

09:08:48  19  Q.  But they were both -- the '012 patent and the '435

09:08:52  20  patent were both issued by the United States government,

09:08:54  21  right?

09:08:54  22  A.  Yes.

09:08:55  23  Q.  Do you have an opinion as to why the '012 does not

09:09:01  24  render obvious the '435 patent?

09:09:02  25  A.  They are separate inventions and that was -- that's --

09:09:12   1   the fact that the U.S. Patent Office granted both patents

09:09:17   2   means that they're both novel inventions of their own.

09:09:21   3   They're separate and independent.

09:09:34   4   Q.  Can you give us a brief explanation of how the '012

09:09:38   5   differs from the '435 patent?

09:09:40   6   A.  The '012 uses look-up tables, and the '435 uses this

09:09:44   7   arithmetic and logical operations.  They are different

09:09:49   8   programming means.

09:09:50   9   Q.  All right.  Dr. Ducharme, I want to switch topics for a

09:09:53  10   second, and I want to ask you about a document that was

09:09:58  11   referenced in your report.  And it's been offered and

09:10:00  12   admitted already.

09:10:03  13          MR. SABA:  Denver, if you could kindly put on 814.

09:10:03  14   BY MR. SABA:

09:10:03  15   Q.  And I'll direct your attention to the screen.

09:10:15  16          Now, this is a webpage from ASUS, correct?

09:10:18  17   A.  Yes.

09:10:19  18   Q.  Okay.  And can you -- can you tell us a little bit

09:10:23  19   about this?  We've seen this exhibit before so I don't want

09:10:23  20   to go -- I don't want to talk too much about this, but can

09:10:30  21   you tell us what your -- oh, pardon me.  We need to get the

09:10:33  22   monitor on.

09:11:09  23          Okay.  Dr. Ducharme, can you tell the ladies and

09:11:25  24   gentlemen of the jury a little bit about this briefly?  You

09:11:29  25   need some more context?

09:11:31   1   A.  Yes, it appears to be a website.  The title of this

09:11:36   2   particular page is:  What is 6-axis Color Independent

09:11:39   3   Control.

09:11:40   4   Q.  All right.  And are you -- did you go to this website?

09:11:42   5   A.  Yes.

09:11:42   6   Q.  Okay.

09:11:44   7          MR. SABA:  Denver, if you would, go to -- I

09:11:47   8   believe it's Page 3, although don't quote me on that.  I

09:12:11   9   think it's all the way down on the bottom.

09:12:11  10   BY MR. SABA:

09:12:14  11   Q.  All right.  Dr. Ducharme, what are we looking at here?

09:12:17  12   A.  This is on the ASUS website under Support, and it's an

09:12:20  13   FAQ, a Frequently Asked Questions page.

09:12:23  14   Q.  Okay.  And so it says:  What is 6-axis color

09:12:26  15   independent control, correct?

09:12:27  16   A.  Yes.

09:12:28  17   Q.  And then it says:  FAQ.  I assume that means Frequently

09:12:32  18   Asked Questions?

09:12:32  19   A.  Yes.

09:12:33  20   Q.  Why might a consumer go to this website?

09:12:37  21   A.  They would go to this website for support.  Apparently,

09:12:51  22   they would refer to the FAQ for answers to questions they

09:12:51  23   might have --

09:12:51  24          MR. SABA:  Okay.  And if you could scroll --

09:12:54  25   A.  -- about the use of their products.

09:12:55  1  BY MR. SABA:

09:12:55  2  Q.  Pardon me, Dr. Ducharme.

09:13:00  3        MR. SABA:  If you could scroll down.  Excuse me,

09:13:02  4  Austin [sic].  It was the -- could you blow up the answer

09:13:04  5  to the FAQ?  Thank you.

09:13:06  6  BY MR. SABA:

09:13:07  7  Q.  All right.  Dr. Ducharme, so it says:  ASUS features

09:13:12  8  and advanced color adjustment so you can individually

09:13:17  9  customize hue or saturation for each access color under the

09:13:26  10  scenery mode and dark mode.  For example, you can adjust

09:13:29  11  six colors, red, green, blue, cyan, magenta, and yellow

09:13:30  12  without affecting the output of other colors, correct?

09:13:33  13  A.  Yes.

09:13:33  14  Q.  And that's what you were demonstrating yesterday after

09:13:37  15  lunch; is that accurate?

09:13:38  16  A.  That's correct.

09:13:39  17  Q.  Do you know why -- excuse me.

09:13:42  18        Does this summarize, in your opinion, the

09:13:44  19  invention of the '435 patent?

09:13:45  20  A.  Yes.

09:13:45  21  Q.  Do you know why ASUS would include this color

09:13:51  22  adjustment in their product?

09:13:53  23  A.  I believe it's because it's a valuable feature that

09:14:01  24  their users desire.

09:14:04  25  Q.  Another question I wanted to ask you with regard to the

| | | |
|---|---|---|
| 09:14:08 | 1 | manuals is this.  Is it relatively easy for an individual |
| 09:14:12 | 2 | to pull a product manual from a manufacturer's website? |
| 09:14:17 | 3 | A.  Yes. |
| 09:14:18 | 4 | Q.  And were you able to pull manuals directly from the |
| 09:14:31 | 5 | ASUS website? |
| 09:14:32 | 6 | A.  Yes. |
| 09:14:33 | 7 | Q.  All right.  Dr. Ducharme, are you being compensated for |
| 09:14:45 | 8 | your time -- for the time you spent working on this case? |
| 09:14:47 | 9 | A.  Yes. |
| 09:14:47 | 10 | Q.  At what hourly rate? |
| 09:14:49 | 11 | A.  It's $350 per hour. |
| 09:14:51 | 12 | Q.  Does your compensation depend in any way on the outcome |
| 09:14:56 | 13 | of the case? |
| 09:14:58 | 14 | A.  No. |
| 09:14:59 | 15 |       MR. SABA:  No further questions -- or pass the |
| 09:15:01 | 16 | witness, Your Honor. |
| 09:15:02 | 17 |       THE COURT:  Thank you. |
| 09:15:02 | 18 |       Cross-examination? |
| 09:15:21 | 19 |       MR. JOSHI:  Your Honor, if we were going to use |
| 09:15:24 | 20 | the display, should we set up now, or wait until the |
| 09:15:28 | 21 | time when -- are you -- can someone -- |
| 09:15:28 | 22 |       THE COURT:  Are you ready to -- are you ready to |
| 09:15:29 | 23 | use it now? |
| 09:15:30 | 24 |       MR. JOSHI:  We're not ready to use it right away, |
| 09:15:32 | 25 | no.  But we can wait until the break, maybe. |

09:15:35   1          THE COURT:  That's fine.

09:15:36   2          MR. JOSHI:  Okay.  Can we please have the monitor

09:15:55   3   switched over?  Yes.

09:16:19   4          May I begin, Your Honor?

09:16:21   5          THE COURT:  You may, yes.

09:16:23   6                    <u>CROSS-EXAMINATION</u>

09:16:23   7   BY MR. JOSHI:

09:16:26   8   Q.  Good morning, Dr. Ducharme.

09:16:26   9   A.  Good morning.

09:16:27  10   Q.  Nice meeting you finally.

09:16:28  11   A.  Pleased to meet you.

09:16:30  12   Q.  I've seen your expert reports.  Heard about you.

09:16:33  13          My name is Vinay Joshi.  It's spelled V-i-n-a-y,

09:16:36  14   J-o-s-h-i.  I have some questions for you today.

09:16:38  15   A.  Okay.

09:16:38  16   Q.  So what we have up here is Defense Exhibit 1, which is

09:16:54  17   a copy of the United States Patent '435.  Is this the

09:17:02  18   patent that Lone Star is asserting against ASUS in this

09:17:05  19   case, sir?

09:17:06  20   A.  Yes.

09:17:06  21   Q.  And this patent issued on April 20th, 2004; is that

09:17:14  22   right?

09:17:14  23   A.  That's correct.

09:17:15  24   Q.  And when was it filed?

09:17:17  25   A.  August 6, 2001.

| | | |
|---|---|---|
| 09:17:20 | 1 | Q.  Okay.  It was filed in 2001.  It was in prosecution |
| 09:17:23 | 2 | before the Patent Office for about two years or a little |
| 09:17:26 | 3 | bit more, and then issued in 2004, correct? |
| 09:17:30 | 4 | A.  Yes. |
| 09:17:31 | 5 | Q.  And how many inventors are on this patent? |
| 09:17:39 | 6 | A.  There's one -- two inventors, Segman and Yaacov. |
| 09:17:53 | 7 | Q.  Have you spoken with either of those inventors? |
| 09:17:56 | 8 | A.  No. |
| 09:17:57 | 9 | Q.  Now, let's go to the claims of the patent, Mr. Oliver. |
| 09:18:13 | 10 | So now, what you are here to testify about are the |
| 09:18:18 | 11 | following claims, as I understand it, Claim 1? |
| 09:18:21 | 12 | A.  Yes. |
| 09:18:22 | 13 | Q.  Claim 2? |
| 09:18:26 | 14 | A.  Yes. |
| 09:18:28 | 15 | MR. JOSHI:  So we can -- just scrolling down the |
| 09:18:28 | 16 | claims. |
| 09:18:28 | 17 | BY MR. JOSHI: |
| 09:18:36 | 18 | Q.  Claim 3? |
| 09:18:36 | 19 | A.  Yes. |
| 09:18:37 | 20 | Q.  Claim 5? |
| 09:18:40 | 21 | A.  Yes. |
| 09:18:40 | 22 | Q.  Claim 6? |
| 09:18:42 | 23 | A.  Yes. |
| 09:18:43 | 24 | Q.  Claim 13? |
| 09:18:45 | 25 | A.  Yes. |

09:18:46  1   Q.   Claim 14?

09:18:48  2   A.   Yes.

09:18:48  3   Q.   And Claim 15?

09:18:51  4   A.   Yes.

09:18:52  5   Q.   And all of those claims, other than one, begin with a

09:18:58  6   phrase "the method of Claim 1," correct?

09:19:02  7   A.   Yes.

09:19:03  8   Q.   So Claim 1 is the only independent claim, and all the

09:19:08  9   other claims I just mentioned depend on Claim 1?

09:19:11  10  A.   That's correct.

09:19:12  11  Q.   So if the members of the jury decide that ASUS does not

09:19:20  12  infringe Claim 1, would that automatically mean that ASUS

09:19:26  13  does not infringe any other claim?

09:19:30  14  A.   I -- that's a legal issue.  I don't -- I'm not sure I

09:19:36  15  have an opinion on that.

09:19:37  16  Q.   Okay.  So just to clarify, should the members of the

09:19:44  17  jury beside that ASUSTeK does not infringe Claim 1, you're

09:19:47  18  unsure as to what happens with the rest of the claims?

09:19:54  19  A.   Well, because they're dependent, I believe that -- I

09:20:08  20  don't know.

09:20:08  21  Q.   Okay.  Okay.  And then we begin with Claim 1.

09:20:18  22       MR. JOSHI:  So, Mr. Oliver, would you zoom out

09:20:21  23  just a little bit so we can see all the sections of

09:20:24  24  Claim 1?  Let me just -- I'm just going to pull up my hard

09:20:29  25  copy for a second.

09:20:29   1   BY MR. JOSHI:

09:20:34   2   Q.  You see that Claim 1 has a preamble at the top that

09:20:42   3   begins with "a method for independently controlling."  Do

09:20:46   4   you see that?

09:20:46   5   A.  Yes.

09:20:46   6   Q.  And then there's a Limitation (a), there's a

09:20:48   7   Limitation (b), there's a Limitation (c), Limitation (d),

09:20:58   8   and Limitation (e).

09:20:59   9   A.  Yes, I see that.

09:21:01  10   Q.  Okay.  Now, Dr. Ducharme, if these members of the jury

09:21:05  11   start comparing this claim with ASUS's products and they

09:21:10  12   start reading from the top of the claim and make their way

09:21:16  13   downwards, the very first time they notice a meaningful

09:21:22  14   difference between Claim 1 and ASUS products, would ASUS

09:21:32  15   products not infringe Claim 1?

09:21:37  16   A.  I'm -- can you clarify the question?

09:21:39  17   Q.  Sure.  ASUS products have to be different from Claim 1

09:21:45  18   in just one way, correct?  They don't have to be different

09:21:49  19   from (a), they don't have to be different from (b), they

09:21:52  20   don't have to be different from (c), (d) and (e), they just

09:21:56  21   have to be different from one of those?

09:22:00  22   A.  For -- for what result?

09:22:03  23   Q.  For there to be non-infringement.

09:22:13  24   A.  I don't know.

09:22:14  25   Q.  Okay.  You don't know?  So you don't know whether there

```
09:22:18   1   has to be just one difference, two difference, or

09:22:21   2   everything has to be different?

09:22:22   3   A.   If any one of these limitations is found to be invalid,

09:22:37   4   then the accused product would not infringe is my

09:22:43   5   understanding.

09:22:44   6   Q.   Okay.  Did you look that up when you prepared your

09:22:47   7   expert report?

09:22:48   8   A.   I -- I don't recall.  I -- I may have known it before

09:22:54   9   that.

09:22:54  10   Q.   Do you know how to compare a patent claim with a

09:22:57  11   product?  Do you know how to do that?

09:22:59  12   A.   Yes.

09:23:00  13   Q.   Okay.  And when you -- when you did your comparison

09:23:06  14   between the claim and the ASUS product, did you ask

09:23:09  15   yourself if (a) is in the product, if (b) is in the

09:23:15  16   product, if (c) is in the product, and so on?

09:23:18  17   A.   I looked to see if the product practices each one of

09:23:23  18   those claim limitations.

09:23:26  19   Q.   Okay.  And by practice, this means the product is used

09:23:28  20   for this method, correct?

09:23:30  21   A.   Yes.

09:23:31  22   Q.   And the product has to be able to perform all the steps

09:23:34  23   of the method?

09:23:35  24   A.   Yes.

09:23:36  25   Q.   And if the product does not perform one step of the
```

09:23:41   1   method but performs all the other steps of the method, it

09:23:46   2   still does not infringe, correct?

09:23:49   3   A.  I'm not sure I kept that straight in my mind.  Can

09:23:54   4   you -- can you repeat the question?

09:23:56   5   Q.  Sure.  So let's say metaphorically speaking I have the

09:24:01   6   patent claim in my one hand, and I have the product in my

09:24:04   7   other hand.

09:24:05   8   A.  Mm-hmm.

09:24:05   9   Q.  I read 1(a), and I said:  This product, the -- it

09:24:11   10  cannot do the method of 1(a).  Can I stop right there and

09:24:18   11  say this product doesn't infringe, or do I need to keep

09:24:22   12  reading 1(b), 1(c), 1(d)?

09:24:26   13  A.  Yes.  I believe, you know, if any one claim limitation

09:24:34   14  isn't practiced, then it doesn't infringe is my

09:24:37   15  understanding.

09:24:37   16  Q.  Okay.  Thank you.

09:24:41   17       Now, I listened to you very carefully.  I had to

09:24:46   18  so I could prepare my questions.  So I listened to you very

09:24:49   19  carefully yesterday and today, and as far as I know, you

09:24:55   20  did not present any evidence that ASUSTeK or anyone that

09:25:03   21  works at ASUSTeK infringes any of these claims in the

09:25:07   22  United States?

09:25:10   23       MR. SABA:  Your Honor, I'm going to object to

09:25:12   24  mischaracterization and argumentative.

09:25:17   25       THE COURT:  Can you rephrase the question?

```
09:25:19   1              MR. JOSHI:   Sure.
09:25:20   2    BY MR. JOSHI:
09:25:20   3    Q.  You didn't present any evidence -- let me take a step
09:25:23   4    back.
09:25:24   5              Do you know what direct infringement is?
09:25:30   6    A.  Yes.
09:25:30   7    Q.  How does one directly infringe Claim 1?
09:25:34   8    A.  They practice the method.  They use -- they use the
09:25:39   9    claim.
09:25:39  10    Q.  My understanding is that you did not present any
09:25:49  11    evidence that anyone from ASUSTeK directly infringes
09:25:55  12    Claim 1 of this patent.
09:25:57  13              MR. SABA:   Same objection, Your Honor.
09:25:58  14              MR. JOSHI:   I think that's a fair question,
09:26:00  15    Your Honor.
09:26:00  16              THE COURT:   I think it is a fair question.
09:26:02  17              MR. SABA:   Thank you.
09:26:09  18    A.  I don't believe I presented evidence about how ASUSTeK
09:26:18  19    uses this claim.
09:26:19  20    BY MR. JOSHI:
09:26:19  21    Q.  Okay.  Now let's talk about other human beings in the
09:26:25  22    United States that may not work for ASUSTeK.  Let's assume
09:26:30  23    they don't work for ASUSTeK.  I also don't believe you
09:26:33  24    presented any evidence that any human being has directly
09:26:37  25    infringed Claim 1 of the '435 patent; is that correct?
```

| | | |
|---|---|---|
| 09:26:42 | 1 | MR. SABA:  Objection, Your Honor.  Argumentative, |
| 09:26:47 | 2 | misleading, mischaracterizes the previous testimony. |
| 09:26:50 | 3 | THE COURT:  Overruled. |
| 09:26:51 | 4 | MR. SABA:  Thank you. |
| 09:26:52 | 5 | A.  I believe yesterday I said in my personal experience, |
| 09:26:55 | 6 | I've used this feature. |
| 09:26:57 | 7 | BY MR. JOSHI: |
| 09:26:58 | 8 | Q.  How about other than yourself?  Anyone that you |
| 09:27:00 | 9 | mentioned yesterday? |
| 09:27:04 | 10 | A.  I think everyone I know uses this feature. |
| 09:27:07 | 11 | Q.  But you did not identify any human being yesterday or |
| 09:27:10 | 12 | this morning, correct? |
| 09:27:16 | 13 | A.  Other than myself?  No. |
| 09:27:17 | 14 | Q.  Yes. |
| 09:27:34 | 15 | Okay.  So now, Dr. Ducharme, I would like to go to |
| 09:27:37 | 16 | the selecting limitation of Claim 1. |
| 09:27:42 | 17 | MR. JOSHI:  Andrew, would you please zoom in on |
| 09:27:45 | 18 | the selecting limitation? |
| 09:27:47 | 19 | BY MR. JOSHI: |
| 09:27:57 | 20 | Q.  As I understand it, Dr. Ducharme, it is your opinion |
| 09:28:01 | 21 | that ASUSTeK's products infringe Limitation (b); is that |
| 09:28:06 | 22 | correct? |
| 09:28:06 | 23 | A.  Yes. |
| 09:28:06 | 24 | Q.  And I'll refer to this as the selecting step, is that |
| 09:28:15 | 25 | fair, because it begins with selecting? |

09:28:17   1   A.  Yes, that's fine.

09:28:18   2   Q.  So let's read this:  Selecting to independently change

09:28:23   3   the hue.  Let's stop there.

09:28:27   4       Are you aware that the Court has given us a

09:28:30   5   definition for hue?

09:28:33   6   A.  Yes.

09:28:33   7   Q.  Does the definition of hue include brightness,

09:28:41   8   literally?  Let me -- let me withdraw that question and

09:28:46   9   start again.

09:28:48  10       The definition of hue that the Court has given us,

09:28:52  11   does it include the word "brightness" in it?

09:28:59  12   A.  I don't believe so, no.

09:29:04  13   Q.  You have a binder, I believe, your counsel had given

09:29:11  14   you.  Are there definitions in that binder?  I don't want

09:29:14  15   you to guess.  Feel free to ask for a copy if you like.

09:29:28  16   A.  I -- I don't believe I have a copy of the Court's

09:29:31  17   constructions.  I may refer to them in my report, but it

09:29:36  18   might take me a minute.

09:29:39  19   Q.  By all means, whatever you like.  If you want your

09:29:42  20   counsel to give you a copy, I'm fine with that.  If you

09:29:44  21   want to look at your report, but I don't want you to speak

09:29:48  22   from memory.

09:29:49  23       MR. SABA:  Your Honor, if Mr. Joshi wants to

09:29:51  24   examine the witness, he can provide the documents he's

09:29:54  25   referring to.

| | | |
|---|---|---|
| 09:29:55 | 1 | THE COURT:  Do you have a copy, Mr. Joshi? |
| 09:29:59 | 2 | MR. JOSHI:  I do, Your Honor. |
| 09:30:15 | 3 | MR. BENNETT:  I've got one here, Your Honor, just |
| 09:30:19 | 4 | for sake of time. |
| 09:30:19 | 5 | THE COURT:  That's fine. |
| 09:30:23 | 6 | MR. BENNETT:  May I approach? |
| 09:30:24 | 7 | THE COURT:  Yes, you may. |
| 09:30:29 | 8 | THE WITNESS:  Thanks. |
| 09:30:31 | 9 | BY MR. JOSHI: |
| 09:30:46 | 10 | Q.  If it helps, I'll refer you to -- |
| 09:30:48 | 11 | A.  That would be great. |
| 09:30:51 | 12 | Q.  -- to Page 10 of 44 of the order.  Ready? |
| 09:31:22 | 13 | A.  I'm on Page 10. |
| 09:31:23 | 14 | Q.  Okay.  And there's a definition of hue provided to us |
| 09:31:27 | 15 | by the Court? |
| 09:31:28 | 16 | A.  Yes. |
| 09:31:28 | 17 | Q.  Do you see the word "brightness" there anywhere? |
| 09:31:32 | 18 | A.  No. |
| 09:31:32 | 19 | Q.  Do you see the word "gain" there anywhere? |
| 09:31:37 | 20 | A.  No. |
| 09:31:38 | 21 | Q.  Below the definition of hue, there's a definition of |
| 09:31:45 | 22 | saturation, correct? |
| 09:31:46 | 23 | A.  Yes. |
| 09:31:46 | 24 | Q.  Do you see the word "brightness" in that definition |
| 09:31:50 | 25 | anywhere? |

09:31:50  1   A.  The word "brightness" does not appear in this.

09:31:54  2   Q.  Does the word "gain" appear in that definition

09:31:58  3   anywhere?

09:31:58  4   A.  No.

09:31:59  5   Q.  In compare -- so you can put that away for the moment.

09:32:02  6        In comparing ASUS's products with Claim 1, are you

09:32:06  7   relying on either brightness or gain for your infringement

09:32:12  8   argument?

09:32:12  9   A.  Can you define the word "gain"?

09:32:21  10  Q.  I cannot.  And it doesn't matter what I think gain is.

09:32:28  11       But I'm asking you if you have relied on gain --

09:32:32  12  let's me -- let's take a step back.

09:32:33  13       You're familiar with what gain is, correct?

09:32:37  14  A.  Yes.

09:32:37  15  Q.  Okay.  And you know what gain is in the context of the

09:32:42  16  technology we're talking about in this case?

09:32:44  17  A.  It's not a very specific term.

09:32:48  18  Q.  Okay.  Have you relied on gain for making your

09:32:54  19  infringement position in this case?

09:32:56  20  A.  I can't answer that question unless I know specifically

09:33:15  21  with what you're referring gain to be.

09:33:18  22  Q.  All right.

09:33:20  23  A.  Because "gain" is a very general word.

09:33:22  24  Q.  But gain doesn't appear in the Court's definition of

09:33:32  25  either hue or saturation, correct?

09:33:34   1   A.   That's correct.

09:33:34   2   Q.   To form your infringement opinions about ASUS's

09:33:43   3   products, have you relied on the brightness feature of

09:33:48   4   ASUS's products?

09:33:51   5   A.   The -- can you clarify the brightness function?

09:34:00   6   Q.   Well, what I'm trying to clarify is whether or not you

09:34:06   7   have followed the claim -- the Court's definitions.  Have

09:34:11   8   you followed the Court's definition of hue?

09:34:14   9   A.   Yes.

09:34:14   10  Q.   Have you followed the Court's definition of saturation?

09:34:17   11  A.   Yes.

09:34:17   12  Q.   And those definitions do not recite the words "gain" or

09:34:22   13  "brightness," correct?

09:34:24   14  A.   I believe I've answered that already, but, yes, they...

09:34:29   15  Q.   Okay.  All right.  We may come back to that, but let's

09:34:41   16  proceed for now.

09:34:46   17           MR. JOSHI:  Andrew, may I please have

09:34:53   18  Plaintiff's 14A brought up?  And please go to the very last

09:34:56   19  page where they have the user interface.

09:35:05   20  BY MR. JOSHI:

09:35:16   21  Q.   Okay.  Now, Dr. Ducharme, the selecting limitation that

09:35:22   22  we looked at, it calls for selecting an individual color,

09:35:26   23  correct?

09:35:26   24  A.   Yes.

09:35:28   25  Q.   And the Court has given us a definition for individual

09:35:31   1   color, correct?

09:35:32   2   A.   Yes.

09:35:32   3   Q.   And that definition -- the definition of individual

09:36:04   4   color is linear combination of colors or color components;

09:36:10   5   is that right?

09:36:11   6   A.   Yes.

09:36:11   7   Q.   And have you followed that definition in forming your

09:36:16   8   infringement opinions?

09:36:17   9   A.   Yes.

09:36:17   10   Q.   Okay.   Now, take a look at this user interface.   This

09:36:25   11   should be real familiar to everybody by now, right?

09:36:28   12   A.   Yes.

09:36:29   13   Q.   Okay.   And this is a user interface for an ASUS 6-axis

09:36:33   14   product?

09:36:33   15   A.   Yes.

09:36:34   16   Q.   Okay.   So the way this user interface is used is the

09:36:39   17   user would first select advanced setting, correct?

09:36:43   18   A.   Yes.

09:36:44   19   Q.   Then the user would select either 6-axis hue or 6-axis

09:36:50   20   saturation or gain or offset, correct?

09:36:55   21   A.   That's correct.

09:36:55   22   Q.   Now, at least in this menu, gain -- gain, g-a-i-n, is

09:37:02   23   shown as something separate from hue and saturation,

09:37:06   24   correct?

09:37:06   25   A.   Yes.

09:37:06  1   Q.  Okay.  And once the user selects hue, then the user

09:37:10  2   selects a color, RGBCMY, correct?

09:37:15  3   A.  Yes.

09:37:16  4   Q.  And once that color is selected, then the user selects

09:37:19  5   a value, which you testified yesterday ranges from 0 to

09:37:29  6   100, correct?

09:37:30  7   A.  Yes.

09:37:31  8   Q.  Okay.  So now let's talk about the Court's definition

09:37:34  9   of individual color, linear combination of colors and color

09:37:38  10  components.

09:37:39  11       Would you agree that red is a color component?

09:37:46  12  A.  Yes.

09:37:46  13  Q.  And green is a color component?

09:37:49  14  A.  Yes.

09:37:49  15  Q.  And blue is a color component?

09:37:51  16  A.  Yes.

09:37:52  17  Q.  And those colors can be -- those color components can

09:37:56  18  be combined in different quantities to form a color?

09:37:59  19  A.  Yes.

09:38:00  20  Q.  Okay.  So when a user selects red in this menu, the

09:38:12  21  user hasn't simply selected just red as an individual color

09:38:18  22  but various colors in which red is a component, correct?

09:38:21  23       MR. SABA:  Your Honor, I'm going to object.  I

09:38:23  24  believe that -- this is misleading against the Court's

09:38:28  25  claim construction order.

09:38:29   1          MR. JOSHI:  I don't believe so.

09:38:30   2          THE COURT:  Overruled.

09:38:34   3   A.  I'm sorry, can you repeat the question?

09:38:36   4   BY MR. JOSHI:

09:38:37   5   Q.  Yes.  So in this user interface, when a user selects

09:38:43   6   the color red, the user has selected a red component,

09:38:49   7   correct?

09:38:51   8   A.  The user has selected the red component to adjust.

09:38:57   9   Q.  Correct.  And on the display screen -- how many pixels

09:39:03  10   are on a display screen?

09:39:05  11   A.  Depends on the resolution.  In the millions.

09:39:07  12   Q.  Millions?

09:39:08  13   A.  Sure.

09:39:08  14   Q.  Okay.  And each one of those pixels is formed by three

09:39:17  15   components, a red, a green, and a blue, correct?

09:39:21  16   A.  Generally.

09:39:22  17   Q.  Okay.  Generally.  These ones are?

09:39:24  18   A.  Yes.

09:39:24  19   Q.  Okay.  So when a -- when a user selects red, he is

09:39:31  20   selecting red for all of those pixels, correct?

09:39:37  21   A.  In this menu when the user selects red, they're

09:39:48  22   selecting the color to adjust.

09:39:49  23   Q.  Yes.  Wherever that color may be on the display?

09:40:01  24   A.  I think that's fair to say.

09:40:06  25   Q.  Okay.

| | | |
|---|---|---|
| 09:40:07 | 1 | A.  That it's on the display. |
| 09:40:08 | 2 | Q.  Okay. |
| 09:40:09 | 3 | A.  The color that they're selecting to adjust is on the |
| 09:40:12 | 4 | display. |
| 09:40:12 | 5 | Q.  Okay. |
| 09:40:14 | 6 | A.  I believe that's correct. |
| 09:40:14 | 7 | Q.  Okay.  So there are millions of displays, but for the |
| 09:40:19 | 8 | sake of this conversation, let's just say there are a |
| 09:40:19 | 9 | hundred. |
| 09:40:23 | 10 |         So if -- |
| 09:40:23 | 11 | A.  I'm sorry.  A hundred what? |
| 09:40:25 | 12 | Q.  Hundred pixels. |
| 09:40:25 | 13 | A.  Okay.  Thank you. |
| 09:40:25 | 14 | Q.  Okay. |
| 09:40:25 | 15 | A.  Yeah. |
| 09:40:28 | 16 | Q.  So there's Pixel 1, which has some combination of red, |
| 09:40:32 | 17 | blue, and green, and there's Pixel 2 with some combination |
| 09:40:34 | 18 | of red, blue, and green, correct? |
| 09:40:36 | 19 | A.  Yes. |
| 09:40:36 | 20 | Q.  And then one red could be the highest amount |
| 09:40:41 | 21 | compared -- higher than green, higher than blue, and |
| 09:40:44 | 22 | another one, green could be higher, red could be in |
| 09:40:49 | 23 | between, blue could be less than that, right? |
| 09:40:52 | 24 | A.  I believe I'm following, yes. |
| 09:40:54 | 25 | Q.  Okay.  And both of those pixels got selected by the |

| | | |
|---|---|---|
| 09:40:58 | 1 | selection of this red? |
| 09:40:59 | 2 | A.   No. |
| 09:41:00 | 3 | Q.   Why not? |
| 09:41:01 | 4 | A.   We're referring to Step (b) in Claim 1, correct? |
| 09:41:10 | 5 | Q.   I'm referring to the product. |
| 09:41:12 | 6 | A.   So in the product -- can you -- can you maybe not |
| 09:41:19 | 7 | rephrase but clarify your question? |
| 09:41:20 | 8 | Q.   Yeah.  Actually, let's start all over again.  Now that |
| 09:41:25 | 9 | you know where I'm going with this, let's start again. |
| 09:41:28 | 10 | A.   Okay. |
| 09:41:28 | 11 | Q.   We agreed that on a display, there are millions of |
| 09:41:33 | 12 | pixels, and we say -- we also agree that each pixel |
| 09:41:37 | 13 | contains a red component, a green component, and a blue |
| 09:41:42 | 14 | component, correct? |
| 09:41:43 | 15 | A.   Yes. |
| 09:41:43 | 16 | Q.   And the way different colors are created is by |
| 09:41:47 | 17 | adjusting the amounts of those three for each pixel, |
| 09:41:51 | 18 | correct? |
| 09:41:51 | 19 | A.   Yes. |
| 09:41:52 | 20 | Q.   Okay.  When a user selects red, he or she has selected |
| 09:42:01 | 21 | red for all the pixels on the display, correct? |
| 09:42:05 | 22 | A.   I reject the premise of the question because the user |
| 09:42:20 | 23 | isn't selecting pixels here. |
| 09:42:20 | 24 | Q.   Uh-huh. |
| 09:42:23 | 25 | A.   They're selecting colors to adjust. |

09:42:25  1  Q.  That's fair.  Okay.

09:42:27  2  A.  And -- yeah, okay.

09:42:28  3  Q.  So now let's say here a user has selected R and

09:42:33  4  selected the value 50.

09:42:36  5  A.  Okay.

09:42:36  6  Q.  So let's go to one pixel where -- yesterday you used

09:42:44  7  the demonstrative where the values range from 0 to 100.  Do

09:42:49  8  you recall that?

09:42:49  9  A.  Yep, I do.

09:42:50  10  Q.  Okay.  So let's say there's a pixel where red is 100

09:42:54  11  and green is a smaller amount and then blue is a smaller

09:42:57  12  amount.  This change is going to affect that -- will affect

09:43:00  13  that pixel, correct?

09:43:01  14  A.  Yes.

09:43:01  15  Q.  Okay.  And let's say there's another pixel -- we're not

09:43:07  16  talking about the claim.  We're talking the product.  And

09:43:11  17  there's another pixel where red is not a hundred, it's some

09:43:15  18  other number, and then there's blue and then there's green

09:43:17  19  of whatever numbers, this will affect that pixel also,

09:43:21  20  correct?

09:43:22  21  A.  Yes.

09:43:22  22  Q.  Okay.

09:43:24  23  A.  Yes.

09:43:25  24  Q.  Okay.  So now we agree that when a red is selected in

09:43:32  25  this menu, red -- multiple pixel -- multiple pixels with

09:43:41  1  red are affected by the change?

09:43:49  2  A.  Multiple -- multiple pixels containing red are affected

09:43:56  3  by this change, yes, I agree.

09:43:58  4  Q.  Okay.  All right.  And the purpose of a pixel -- of any

09:44:11  5  pixel is to create an individual color by using red, green,

09:44:19  6  and blue values; is that correct?

09:44:20  7  A.  Yes.

09:44:22  8  Q.  Okay.  So if there is one amount of red in Pixel A and

09:44:31  9  a different amount of red in Pixel B, those two pixels are

09:44:36  10 going to create different individual colors, correct?

09:44:40  11 A.  Yes.

09:44:40  12 Q.  Okay.  So now with that in mind, let's go back to --

09:44:47  13      MR. JOSHI:  Claim 1, please.

09:44:50  14 BY MR. JOSHI:

09:45:00  15 Q.  Okay.  We'll stay at 1(b).

09:45:03  16      Now, this limitation says:  Selecting to

09:45:06  17 independently change the hue or the saturation of an

09:45:09  18 individual color.

09:45:13  19      Has the Court given us a definition of "individual

09:45:16  20 color" for the selecting step?

09:45:18  21 A.  I'm sorry, can you --

09:45:22  22 Q.  Yes.

09:45:23  23 A.  Just I wasn't -- I didn't quite follow it.

09:45:25  24 Q.  Oh, that's fine.  This is a dense matter, and I'm

09:45:28  25 willing to restart if you want.

09:45:30  1            But has the Court -- strike that.

09:45:34  2            With respect to Limitation 1(b) of Claim 1, has

09:45:38  3    the Court given us a definition of individual color?

09:45:44  4    A.  Yes.

09:45:45  5    Q.  What is that definition?

09:45:47  6    A.  A linear combination of colors or color components.

09:45:50  7    Q.  Has the Court given us an additional definition just

09:45:54  8    for Section B?  I can refer you to the document if you

09:45:59  9    like.

09:46:00  10   A.  Yep, sure.

09:46:00  11   Q.  Okay.  So in the document your counsel handed you, I

09:46:07  12   would like you to go to the bottom of Page 13 of 44.

09:46:24  13   A.  I'm at the bottom of Page 13.

09:46:30  14   Q.  Okay.  And tell me what the Court says there about --

09:46:39  15   well, no, don't tell me what the Court says.  But what is

09:46:43  16   that additional definition of individual color for the

09:46:48  17   selecting step?  It needs to be what?  It needs to be an

09:47:11  18   exact individual color, doesn't it?

09:47:13  19            MR. SABA:  Your Honor, I'm going to object to the

09:47:19  20   sidebar.

09:47:19  21            MR. JOSHI:  That will interrupt my flow, Your

09:47:20  22   Honor.

09:47:20  23            THE COURT:  Is that a question?

09:47:21  24            MR. JOSHI:  Yes.

09:47:22  25            THE COURT:  What is the question?

09:47:25   1           MR. JOSHI:  The individual color needs to be an

09:47:29   2    exact individual color, correct?

09:47:32   3           MR. SABA:  Your Honor, may we approach?

09:47:34   4           MR. JOSHI:  Your Honor, that interrupts my exam.

09:47:39   5           THE COURT:  Well, sidebars interrupt the -- your

09:47:47   6    exam.  I mean, that's just a function of it.

09:47:50   7           Mr. Saba, is it necessary?

09:47:52   8           MR. SABA:  I just want to make sure that we're not

09:47:55   9    going to get into a line of questioning that contradicts

09:47:59  10    the Court's claim construction.

09:48:00  11           MR. JOSHI:  That might be my only question about

09:48:01  12    this, Your Honor.

09:48:02  13           THE COURT:  All right.  Let's move along.

09:48:07  14           Mr. Saba, if you think we are, you can object.

09:48:11  15           MR. SABA:  Thank you, Your Honor.

09:48:17  16    BY MR. JOSHI:

09:48:18  17    Q.  Do you understand my question, Dr. Ducharme?

09:48:22  18    A.  Does the -- I'm not sure.  Can you repeat just the

09:48:45  19    question?

09:48:45  20    Q.  Yes.

09:48:46  21    A.  I think I've lost it.

09:48:48  22    Q.  Yes, no problem.  That's very understandable.

09:48:51  23           Look at the bottom of Page 13 of 44 of the Court's

09:48:56  24    claim construction order.

09:48:57  25    A.  Yes.

09:48:58  1  Q.  Do you understand that in this selecting step that

09:48:59  2  we're looking at, the individual color must be an exact

09:49:05  3  individual color?

09:49:13  4  A.  On the bottom of Page 13 in this construction order, it

09:49:17  5  recites that the Defendants suggested that it be limited to

09:49:20  6  an exact individual color.  That's what I see on the bottom

09:49:21  7  of the page.

09:49:21  8  Q.  What's the last phrase of that sentence?

09:49:24  9  A.  And they are correct.

09:49:26  10  Q.  So now, based on what we just discussed, the menu where

09:49:36  11  the selection of R affected multiple pixels and multiple

09:49:41  12  individual colors and this definition of exact, do you

09:49:47  13  agree that ASUSTeK does not infringe Claim 1?

09:49:51  14  A.  No.

09:49:51  15  Q.  Why not?

09:49:52  16  A.  The step requires that you select an independent color

09:50:14  17  to change a red value of the highest -- you described it as

09:50:19  18  having the highest amount red, 100 percent, and blue and

09:50:24  19  green would be 0 percent.  On that menu that you showed,

09:50:28  20  those are the exact colors that you're able to choose.

09:50:32  21  You're able to choose, you know, red of 100 percent, blue

09:50:37  22  and green, 0 percent.

09:50:39  23  Q.  Okay.  But what we're talking about there is the red

09:50:43  24  component and a green component and a blue component.

09:50:46  25  Those are not individual colors, correct?  Individual

| | | |
|---|---|---|
| 09:50:49 | 1 | colors are created from those components. |
| 09:50:53 | 2 | A.  My understanding of what you asked was does Step (b) |
| 09:51:02 | 3 | require that the user is able to select an exact color. |
| 09:51:06 | 4 | Q.  What's -- |
| 09:51:07 | 5 | A.  Red of 100 percent, green and blue of 0 percent is an |
| 09:51:12 | 6 | exact color by your previous definition, and that's -- that |
| 09:51:17 | 7 | is what ASUS is able to select in this step.  And so I |
| 09:51:22 | 8 | believe it still infringes. |
| 09:51:23 | 9 | Q.  Let's break that down a bit.  Let's start with where we |
| 09:51:27 | 10 | agree.  We agree that the selecting step requires selection |
| 09:51:31 | 11 | of an exact individual color.  We agree on that? |
| 09:51:34 | 12 | A.  Yes. |
| 09:51:35 | 13 | Q.  Okay.  And we also agree that an individual color is |
| 09:51:40 | 14 | made from a combination of red, blue, and green, correct? |
| 09:51:53 | 15 | A.  Yes. |
| 09:51:53 | 16 | Q.  Okay. |
| 09:51:53 | 17 |         MR. JOSHI:  With that, let's go back to the user |
| 09:51:57 | 18 | interface.  It's Exhibit 14, at the bottom. |
| 09:51:59 | 19 | BY MR. JOSHI: |
| 09:52:04 | 20 | Q.  Okay.  So we come here, and the -- this user has |
| 09:52:10 | 21 | selected the color red.  Do you see that? |
| 09:52:11 | 22 | A.  Yes. |
| 09:52:12 | 23 | Q.  And they have selected it at a value of 50? |
| 09:52:15 | 24 | A.  Yes. |
| 09:52:15 | 25 | Q.  But that value is for the hue.  It's not how much |

09:52:24   1   amount goes into each pixel, correct?

09:52:30   2   A.   Yes.

09:52:30   3   Q.   Okay.  So let's say there are two different pixels.

09:52:35   4   The hue value of red for each of those pixels will be 50,

09:52:41   5   correct?

09:52:42   6   A.   Can you clarify that?  I'm sorry.  I don't follow.

09:52:48   7   Q.   So there are two -- let's pick two pixels from the

09:52:52   8   display.

09:52:53   9   A.   Em-hmm.

09:52:53   10   Q.   We both agree each has a red component in it, correct?

09:52:57   11   A.   Yes.

09:52:57   12   Q.   And this user has said that I want the hue value of red

09:53:01   13   across the screen to be 50, meaning both of those pixels

09:53:04   14   have a hue value of 50 for red, correct?

09:53:07   15   A.   Yes.

09:53:07   16   Q.   Okay.  But that doesn't mean the quantity of red is the

09:53:12   17   same?  You could have 255 in one and 200 in another?

09:53:19   18   A.   Yes.

09:53:20   19   Q.   So the quantities are different, but the hue amount is

09:53:23   20   the same?

09:53:23   21   A.   Yes.

09:53:24   22   Q.   But the difference in the quantities is going to cause

09:53:27   23   each pixel to create a different individual color, correct?

09:53:31   24   A.   When is it going to?

09:53:38   25   Q.   When the display is used.

09:53:43    1   A.   I'm sorry.   I don't understand the question.

09:53:45    2   Q.   Let's start again.   That's fine.   We can start as many

09:53:49    3   times as you want.   The user one here selected the color

09:53:53    4   red and selected the value of 50 for hue for red, correct?

09:53:57    5   A.   Mm-hmm.

09:53:57    6   Q.   So now all across the display, millions of pixels where

09:54:02    7   there is a red component, that hue is 50?

09:54:05    8   A.   Yes.

09:54:09    9   Q.   Okay.   So that's uniform.   But the quantity -- the

09:54:13   10   quantity of red is different in different pixels, correct?

09:54:16   11   A.   Yes.

09:54:17   12   Q.   And that quantity is what decides what individual color

09:54:22   13   is generated by each pixel, correct?

09:54:25   14   A.   Yes.

09:54:25   15   Q.   And if the quantity is different, then the individual

09:54:29   16   color is different?

09:54:34   17   A.   Yes.

09:54:35   18   Q.   Okay.   So now do you agree with me that ASUS does not

09:54:39   19   infringe because it does not practice Limitation 1(b) of

09:54:45   20   Claim 1?

09:54:47   21   A.   What you described, the different colors and hue and --

09:54:54   22   all of that was correct.   But it's not what's described in

09:54:59   23   Claim 1 of this patent.   That's not the process by which

09:55:05   24   the video is received, the colors are selected and allowed

09:55:14   25   to be adjusted, how those pixels are then chosen and

| 09:55:18 | 1 | adjusted and then redisplayed.  That's -- you're -- you're |
| 09:55:24 | 2 | not describing this claim in your example, to the best of |
| 09:55:28 | 3 | my ability to understand your question. |
| 09:55:31 | 4 | Q.  Okay.  Well, let's take it a little bit slower.  We had |
| 09:55:35 | 5 | a discussion earlier that the claim is divided into |
| 09:55:39 | 6 | Limitations (a), (b), (c), (d), and (e)? |
| 09:55:42 | 7 | A.  Yes. |
| 09:55:42 | 8 | Q.  Right.  And I believe you agree -- and you correct me |
| 09:55:45 | 9 | if I'm wrong, you agreed that if ASUS does not infringe any |
| 09:55:51 | 10 | one of them, like 1(a) or 1(b), then it does not infringe |
| 09:55:56 | 11 | the whole claim?  We agreed on that, correct? |
| 09:55:58 | 12 | A.  Yes. |
| 09:55:58 | 13 | Q.  All right.  So now -- and do you also agree that two |
| 09:56:02 | 14 | individual colors are not exact individual color, singular? |
| 09:56:11 | 15 | MR. SABA:  Your Honor, I'm going to object to |
| 09:56:14 | 16 | misleading. |
| 09:56:15 | 17 | THE COURT:  Can you rephrase the question? |
| 09:56:17 | 18 | MR. JOSHI:  Sure. |
| 09:56:26 | 19 | BY MR. JOSHI: |
| 09:56:26 | 20 | Q.  So we agree that -- |
| 09:56:27 | 21 | MR. JOSHI:  Go back to that limitation, Andrew. |
| 09:56:31 | 22 | I'm sorry, I can't -- I can't remember the limitation. |
| 09:56:33 | 23 | BY MR. JOSHI: |
| 09:56:33 | 24 | Q.  Okay.  So I believe we agree that in this limitation, |
| 09:56:36 | 25 | an individual color refers to an exact individual color? |

09:56:41  1   You recall we had that discussion?

09:56:42  2   A.   Yes.

09:56:45  3   Q.   Okay.  And would you agree with me that an exact

09:56:47  4   individual color is not two, three, four, or five

09:56:51  5   individual colors?

09:56:55  6   A.   That an exact color is not?

09:56:57  7   Q.   Yes.

09:56:58  8   A.   Yes, I would agree with that.

09:57:00  9   Q.   Okay.  So if ASUS's display is producing multiple

09:57:07  10  individual colors and this claim calls for an exact

09:57:10  11  individual colors, why is ASUS infringing the patent?

09:57:13  12  A.   The selecting here is -- refers to the slider on the

09:57:25  13  screen.  It's not refer -- referring to the operation of

09:57:29  14  selecting these pixels in the monitor.  They're -- they're

09:57:35  15  different concepts.

09:57:37  16        This claim limitation -- the ASUS -- the accused

09:57:45  17  ASUS products infringe on this limitation because very

09:57:48  18  plainly they offer you an On-Screen-Display with a slider.

09:57:52  19  And when you move that slider, that's the delta value

09:57:56  20  that -- that the user has chosen to -- you know, that --

09:58:00  21  that color, red, green, blue, cyan, yellow, magenta, they

09:58:06  22  have chosen to adjust that color.

09:58:08  23        So all of the ASUS -- accused ASUS products allow

09:58:12  24  the user to select a color to change.  In my opinion, ASUS

09:58:19  25  products infringe this claim because they offer that

09:58:22    1    opportunity to make this adjustment.

09:58:27    2    Q.  Okay.  I don't understand what you're saying.  But when

09:58:31    3    a user goes and makes a user interface selection -- and

09:58:35    4    that has a purpose, not selecting just for the heck of it,

09:58:38    5    you want to adjust something, correct?

09:58:42    6    A.  Yes.

09:58:42    7    Q.  Okay.  And in this case what we are trying to adjust

09:58:46    8    are individual colors, correct?

09:58:47    9    A.  Yes.

09:58:48   10    Q.  Okay.  But to adjust an individual color, you first

09:58:51   11    have to select an individual color.  You can't adjust it

09:58:53   12    without selecting it first, correct?

09:58:55   13    A.  The selection --

09:59:00   14    Q.  Yeah.

09:59:01   15    A.  -- is the choice you make with the slider that you

09:59:05   16    choose.

09:59:05   17    Q.  Yes, sir.  Yes.  But the slider is selecting a hue or a

09:59:11   18    saturation for a color wherever it might be on a display,

09:59:16   19    correct?

09:59:17   20    A.  Slider -- the only purpose of the slider is to record

09:59:22   21    the user's desired delta value, how much they want to

09:59:26   22    change the color.  That's all the slider does.

09:59:29   23    Q.  Right.  And it doesn't do it for one individual color.

09:59:34   24    It does it for all the individual colors on the display?

09:59:37   25    A.  The slider doesn't have any part of that in the method.

09:59:43   1   Q.   Okay.   Let me -- let me test that a little bit.   Do you

09:59:48   2   see the verbiage there:   By selecting an independent color

09:59:48   3   hue control delta value.

10:00:00   4         Do you see that?

10:00:01   5   A.   Yes.

10:00:02   6   Q.   And in our example that we looked at on that user

10:00:06   7   interface, that delta value would be 50, correct?

10:00:09   8   A.   Yes.

10:00:10   9   Q.   So why do you say that has nothing to do with this

10:00:13   10   claim?

10:00:14   11   A.   I don't understand your question.   I think that's

10:00:18   12   exactly what I was saying happens.

10:00:20   13   Q.   Okay.   All right.   So the user selected 50, so they

10:00:29   14   selected the delta value and they selected it for the color

10:00:32   15   red -- the color component red, correct?

10:00:35   16   A.   Yes.

10:00:35   17   Q.   And that color component red is all over the display in

10:00:40   18   various pixels creating individual colors, correct?

10:00:44   19   A.   Absolutely.

10:00:45   20   Q.   And that color component is all over the display,

10:00:49   21   creating different individual colors, correct?

10:00:52   22   A.   Correct.

10:00:52   23   Q.   And different individual colors is not an exact

10:00:57   24   individual color, correct?

10:01:01   25   A.   Just that last part, can you just state that again?

10:01:06    1    Q.  Okay.  So let's -- let's use your terms, okay?  What

10:01:10    2    you did yesterday is you gave each individual color three

10:01:17    3    digits, R, G, and B.  So, for example, you said one

10:01:23    4    individual color would be 100, 50, 25.  I'm just making

10:01:27    5    that up, red, green and blue.  Would that define an exact

10:01:31    6    color?

10:01:32    7    A.  What were the numbers again?

10:01:33    8    Q.  Okay.  Let me -- let me put up your slide on the Elmo.

10:01:40    9            MR. JOSHI:  May I please switch to the Elmo?

10:01:43   10    BY MR. JOSHI:

10:01:58   11    Q.  All right.  And now --

10:02:02   12            THE COURT:  Mr. Joshi, you have to have a

10:02:03   13    microphone if you're away.

10:02:05   14            MR. JOSHI:  Sorry, Your Honor.

10:02:09   15    BY MR. JOSHI:

10:02:10   16    Q.  Okay.  So this is your slide.  You used it yesterday?

10:02:14   17    A.  Yeah, it's a -- it's a printed version, but, yes.

10:02:18   18    Q.  Okay.  Look at the very first color you're showing.

10:02:21   19    You say a combination of red, 100; green, 0; and blue, 0,

10:02:27   20    makes for an individual color.

10:02:28   21            Correct?

10:02:29   22    A.  Yes.

10:02:29   23    Q.  Okay.  And on the other side, a combination of

10:02:35   24    red, 100; green, 0; blue, 100, makes for a different

10:02:40   25    individual color, correct?

10:02:41   1   A.   That's correct.

10:02:41   2   Q.   All right.   And now in the middle, a combination of

10:02:47   3   red, 0; green, 0; and blue, 100, makes for yet another

10:02:52   4   individual color, correct?

10:02:53   5   A.   Yes.

10:02:54   6   Q.   Okay.   So now the -- the value of red you have shown

10:02:58   7   is 0, but you could have just as easily said 50 or 25

10:03:02   8   or 35, correct?

10:03:04   9   A.   I agree.

10:03:05  10   Q.   And that would -- and that would have created yet

10:03:08  11   another individual color, correct?

10:03:09  12   A.   Yes.

10:03:09  13   Q.   Okay.   So now let's get back to the conversation.   So

10:03:13  14   we -- the user selected red, selected hue or saturation,

10:03:25  15   and selected 50, okay?   That has nothing to do with these

10:03:29  16   numbers.   These are quantities, correct?

10:03:31  17   A.   Yes.

10:03:31  18   Q.   Okay.   So -- so she went in, she selected that number.

10:03:35  19   Now every red pixel on that entire screen has a hue at --

10:03:39  20   value of 50, correct?

10:03:41  21   A.   A hue what value?   I didn't hear the word.

10:03:44  22   Q.   In the ASUS user interface for the 6-axis products --

10:03:48  23   A.   Yes.

10:03:48  24   Q.   -- when the user selected red and 50, now every single

10:03:53  25   pixel on that screen will have a hue value of 50 for the

10:03:58   1   red component, correct?

10:04:02   2   A.  Yes, because that's the current setting.  So we can

10:04:10   3   assume previously that that slider has been moved --

10:04:10   4   Q.  Yes.

10:04:13   5   A.  -- and all of the colors have been adjusted and so

10:04:16   6   right now, yes, they all have that corresponding hue value.

10:04:21   7   Q.  Okay.  So, for example, at the bottom, that one pixel

10:04:25   8   which has an R of 100, green of 0, and blue of 100 --

10:04:30   9   A.  Yes.

10:04:30   10   Q.  -- that would have a hue value of 50 for red?

10:04:56   11   A.  I don't know if you can think of it that way.  When you

10:05:00   12   have a test pattern like this, it's created on some kind of

10:05:04   13   calibrated machine or its digitally created, right, so

10:05:08   14   we're going to display it on a computer.  And you're --

10:05:11   15   you're choosing that the formatting of the digital

10:05:15   16   information has these values.

10:05:17   17          And so now when it's displayed on a monitor, as

10:05:20   18   you suggest with a hue value of 50, that's a different --

10:05:24   19   that's a different thing.  The -- these numbers don't

10:05:29   20   necessarily relate to that anymore.

10:05:31   21   Q.  Let's forget about these numbers.  I was just using

10:05:34   22   them as a way of example.

10:05:36   23   A.  Sure.

10:05:37   24   Q.  But what I'm saying is when -- when the user, when she

10:05:40   25   selected a hue value of 50, anywhere red appears on that

| | | |
|---|---|---|
| 10:05:46 | 1 | screen is going to have a hue value of 50, correct? |
| 10:05:49 | 2 | A.  I don't know.  It doesn't -- I'm not sure how to answer |
| 10:05:58 | 3 | that question.  It's -- |
| 10:06:00 | 4 | Q.  You don't know?  So let me start again. |
| 10:06:04 | 5 | MR. JOSHI:  Can we go back to that user interface |
| 10:06:09 | 6 | again? |
| 10:06:16 | 7 | MR. OLIVER:  It's on the -- |
| 10:06:17 | 8 | MR. JOSHI:  Oh.  May we please switch back?  Thank |
| 10:06:20 | 9 | you.  Thanks. |
| 10:06:21 | 10 | BY MR. JOSHI: |
| 10:06:21 | 11 | Q.  Okay.  So when you gave your infringement opinion |
| 10:06:25 | 12 | yesterday, this user interface was a part of your analysis, |
| 10:06:29 | 13 | correct? |
| 10:06:30 | 14 | A.  Absolutely. |
| 10:06:31 | 15 | Q.  Okay.  And so now in the selecting -- in the selecting |
| 10:06:35 | 16 | phase, the user has selected 6-axis hue, she has selected |
| 10:06:43 | 17 | the color red, and she has selected the value of 50 for the |
| 10:06:47 | 18 | hue, correct? |
| 10:06:48 | 19 | A.  Yes. |
| 10:06:49 | 20 | Q.  Okay.  And that selection is not for some pixels, it's |
| 10:06:54 | 21 | for all the pixels on the display, correct? |
| 10:06:56 | 22 | A.  Yes. |
| 10:06:57 | 23 | Q.  Okay.  And we talked about millions of pixels on a |
| 10:07:04 | 24 | display, each having a red component. |
| 10:07:05 | 25 | A.  Yes. |

10:07:06  1  Q.  Okay.  So this value is for wherever that red component

10:07:09  2  is on the display, correct?

10:07:10  3  A.  I believe that's correct.

10:07:18  4  Q.  Okay.

10:07:19  5  A.  It's -- I'll leave it at that.

10:07:25  6  Q.  Okay.  And so then this -- this 50 value has nothing to

10:07:29  7  do with the quantity of red in each pixel, correct?  That's

10:07:36  8  a different thing?

10:07:38  9  A.  Yeah, the quantity of the red, green, and blue in a

10:07:42  10  pixel is defined by whatever it is you're displaying on it.

10:07:46  11  I think that's where I'm having trouble with your saying

10:07:51  12  it's all 50 or it's all --

10:07:54  13  Q.  Point very well taken.  I think this is just a little

10:07:56  14  bit -- I don't think you're trying to dodge the question.

10:07:59  15  I think you're --

10:08:01  16  A.  I'm trying to very hard to answer your question.

10:08:04  17  Q.  I understand that.  Okay.  And we'll get there.  It's

10:08:07  18  just that these different slides have different numbers,

10:08:09  19  and then we have to harmonize them.

10:08:12  20        But anyway -- so now what we agree on is we have

10:08:14  21  multiple pixels on a display where the hue value of red is

10:08:20  22  the same, correct?  That's what this setting does, makes

10:08:23  23  it 50?

10:08:31  24  A.  I think I can agree if -- if we think -- yes, if we

10:08:35  25  think of it -- that this is how the monitor is currently

10:08:39  1  set, so now whatever we display on it will display with

10:08:44  2  those settings.

10:08:45  3  Q.  Okay.

10:08:46  4  A.  I think that's the way to think of it.

10:08:48  5  Q.  Sure.  She hasn't finished it, but let's say she

10:08:52  6  finished, okay?  So now the red component can be

10:09:05  7  combined -- let me restart again.

10:09:07  8       The exact same red component can be combined with

10:09:10  9  different values of greens and blues to create different

10:09:14  10  individual colors.  Would you agree with that?

10:09:16  11  A.  Yes.

10:09:16  12  Q.  All right.  Let's -- we may come back to this, but I

10:09:28  13  believe we don't infringe because of this.  But let's move

10:09:31  14  on.

10:09:31  15       MR. SABA:  Your Honor, I'm going to object to the

10:09:33  16  sidebar again.

10:09:34  17       THE COURT:  Sustained.

10:09:35  18       MR. SABA:  Your Honor, could we get an instruction

10:09:38  19  for the jury?

10:09:38  20       THE COURT:  The jury will ignore the last comment.

10:09:41  21       MR. SABA:  Thank you, Your Honor.

10:09:42  22       THE WITNESS:  Can I inquire about time to the

10:09:45  23  break?

10:09:47  24       THE COURT:  Mr. Joshi --

10:09:50  25       MR. JOSHI:  Yeah, we can take a break.

| | | |
|---|---|---|
| 10:09:52 | 1 | THE COURT:  That would be fine. |
| 10:09:53 | 2 | THE WITNESS:  Thank you, Your Honor. |
| 10:09:54 | 3 | THE COURT:  All right.  Ladies and gentlemen of |
| 10:09:55 | 4 | the jury, we'll take a slightly early morning break at this |
| 10:09:58 | 5 | time.  We'll be in recess about 15 minutes. |
| 10:10:01 | 6 | COURT SECURITY OFFICER:  All rise for the jury. |
| 10:10:03 | 7 | (Jury out.) |
| 10:10:03 | 8 | (Recess.) |
| 10:28:30 | 9 | THE COURT:  Okay.  Is everyone ready? |
| 10:28:32 | 10 | MR. JOSHI:  Your Honor, just -- I would like to do |
| 10:28:35 | 11 | source code in the next session. |
| 10:28:36 | 12 | THE COURT:  Okay.  So you'll move to seal the |
| 10:28:39 | 13 | courtroom when that happens.  Anybody -- |
| 10:28:41 | 14 | MR. JOSHI:  I only have a couple of questions |
| 10:28:43 | 15 | before I do that, so we could do it now if you like. |
| 10:28:46 | 16 | THE COURT:  We can just -- I mean, get through |
| 10:28:48 | 17 | your questions, move to seal the courtroom.  We'll seal the |
| 10:28:48 | 18 | courtroom. |
| 10:28:48 | 19 | MR. JOSHI:  Okay. |
| 10:28:51 | 20 | THE COURT:  Anyone not subject to the protective |
| 10:28:53 | 21 | order can excuse themselves.  And then when you get |
| 10:29:02 | 22 | finished with that section, move to unseal the courtroom |
| 10:29:06 | 23 | and I'll do that and we'll let anyone else back in. |
| 10:29:10 | 24 | MR. JOSHI:  Thank you, Your Honor. |
| 10:29:10 | 25 | THE COURT:  Any questions about that? |

10:29:13    1                MR. JOSHI:  No.

10:29:14    2                MR. OLIVER:  Do the corporate representatives get

10:29:18    3    to stay if they haven't signed the protective order?

10:29:19    4                THE COURT:  Did the parties discuss that?

10:29:21    5                MR. BENNETT:  It's not our source code,

10:29:23    6    Your Honor, so I don't have a real interest in that.  I

10:29:26    7    can't give them advice about how to comply with the order.

10:29:31    8    I mean, we're going to excuse our corporate rep because --

10:29:36    9                THE COURT:  The safest thing to do is just to

10:29:38   10    excuse him.  That's fine.

10:29:40   11                Let's have the jury brought in.

10:29:45   12                MR. BENNETT:  Your Honor, we have an issue that

10:29:47   13    needs raising.  We can wait until a break, but it's a

10:29:49   14    mistrial problem.

10:29:49   15                THE COURT:  Okay.  Well, let's hear it now if it

10:29:53   16    relates to this witness's testimony.

10:29:54   17                MR. BENNETT:  It does.  We have obligations to

10:29:56   18    object.  I understand that.  But as lawyers in the court,

10:29:57   19    we also have, as officers of the court, an obligation to

10:30:01   20    follow Court orders.

10:30:01   21                THE COURT:  Sure.

10:30:02   22                MR. BENNETT:  Mr. Joshi had my witness read

10:30:04   23    directly from the claim construction order and bolster his

10:30:10   24    side after he told the Court he had only the pending

10:30:13   25    question to ask about that.  We objected.  He said:  I have

10:30:17   1   one question.  And he asked two.  And the question that he

10:30:20   2   asked was:  What does it say?  Defendants, they are

10:30:22   3   correct.  He had my expert read that directly in violation

10:30:26   4   of the claim construction order.

10:30:28   5          So, once again, ASUS seems like they've won this

10:30:31   6   trial.  They've violated the claim construction order by

10:30:34   7   reading directly from it in front of the jury in violation

10:30:38   8   of the Court's order on page 44.

10:30:41   9          So the jury is left with the misimpression that

10:30:43  10   the Court has endorsed the theory without the full rest of

10:30:47  11   the page.  If you continue on to the next part of the page:

10:30:50  12   To the extent Defendants argue Claim 1's identifying step

10:30:54  13   is limited to identifying input image pixels -- they have

10:30:59  14   the exact -- this is the language Mr. Joshi focused on --

10:31:01  15   the exact individual color previously selected -- they are

10:31:05  16   incorrect is what the Court said.  Of course, he didn't

10:31:08  17   have my witness read that part.  The jury has been

10:31:12  18   misinformed by an officer of the Court at his behest after

10:31:17  19   he told the Court he was going to ask the pending question.

10:31:21  20          We were all misled, and that is severely

10:31:23  21   prejudicial.  So we ask for a mistrial to preserve that

10:31:27  22   error.  If the Court denies that, we ask for a curative

10:31:30  23   instruction when we get up on redirect for the Court to

10:31:31  24   tell the jury it was a violation and that to cure that

10:31:35  25   violation, we are going to get to explore the other parts

10:31:38  1    where the Court says the Defendants were incorrect and that

10:31:42  2    bears directly on the testimony elicited from our expert.

10:31:44  3    It is severely prejudicial because of its source, as well.

10:31:47  4    All he did was read words on a page.

10:31:50  5          So for all of those reasons, we move for a

10:31:54  6    mistrial, and in the alternative, for a curative

10:31:57  7    instruction on redirect.

10:31:58  8          MR. JOSHI:  Your Honor, that -- I don't believe

10:32:00  9    that happened.  I was very, very careful.  I been thinking

10:32:04  10   about this since yesterday.  I don't want to violate this

10:32:07  11   order.  So after Mr. Saba agreed to give him the order, all

10:32:12  12   I wanted him -- was for him to have it.  And then --

10:32:16  13         THE COURT:  Well, you could have taken the terms

10:32:18  14   yourself, Mr. Joshi.  So, you know, I don't know why you

10:32:22  15   didn't do that.  You had to rely on them to provide, you

10:32:25  16   know, a copy of it.  I did -- I was completely perplexed by

10:32:31  17   what you were doing.

10:32:32  18         MR. JOSHI:  Well, Your Honor, I didn't ask him to

10:32:34  19   read it.  He actually read it, but then he didn't complete

10:32:37  20   the sentence.  He just said it looks like just the

10:32:41  21   Defendants offered it.  I didn't want him to read that.  I

10:32:43  22   just wanted him to understand that --

10:32:45  23         THE COURT:  He did read the part where it says --

10:32:47  24   where the order says Defendants are correct.  That did come

10:32:51  25   in, and I heard that.

10:32:52  1            I'm going to deny the mistrial request.

10:32:55  2            Let me say this.  I'll give you your choice,

10:32:58  3  Mr. Bennett.  I can either instruct the jury to disregard

10:33:01  4  that testimony, or I will allow you to read the other part

10:33:06  5  of the order on your redirect.  Mr. Saba can do that on

10:33:13  6  redirect, if you want to do that, but it's an either/or,

10:33:18  7  one or the other.

10:33:19  8            MR. BENNETT:  Understood.  We will take a curative

10:33:21  9  instruction because the order will have not near enough

10:33:23 10  context.  But we would ask that the curative instruction go

10:33:28 11  far enough to inform the jury about the misconduct, that

10:33:35 12  they've been ordered not to read from or ask witnesses to

10:33:39 13  read from and they did, and so I'm telling you to disregard

10:33:39 14  that.

10:33:42 15            If I could make a representation, and we've got a

10:33:45 16  real time transcript, and I will look through and see if I

10:33:49 17  can find it.  It wasn't that my witness volunteered it.

10:33:52 18  Mr. Joshi followed up with a question, and said, and how

10:33:55 19  does it finish or what did the rest of it say?  It is

10:33:57 20  something along those lines because Dr. Ducharme had no

10:34:03 21  interest in reading that phrase on his own.

10:34:06 22            THE COURT:  All right.  So --

10:34:06 23            MR. JOSHI:  Your Honor, I just asked him if he

10:34:08 24  understood what the Court construction was.  He read it.  I

10:34:10 25  did not ask him to read it.

```
10:34:12   1          THE COURT:  Well, the transcript will be what it
10:34:14   2   will be.  I mean, I am -- again, I'm going to leave it up
10:34:18   3   to the Plaintiffs which alternative you choose.  I can
10:34:26   4   assure you, the instruction will not be worded like you've
10:34:28   5   asked me to word it.  So you may want to consider that.  It
10:34:32   6   will be much more measured in tone, but it will have the
10:34:39   7   effect, I think, of what you're seeking, which is for the
10:34:43   8   jury to understand that that testimony was improper.
10:34:47   9          So as I said, I'm going to let you decide what you
10:34:50  10   want to do.  It will take us awhile to -- to sort of come
10:34:54  11   up with something that is appropriate after having reviewed
10:35:01  12   the transcript, but I certainly will do that.
10:35:06  13          Like I said, I'm not going to let you do it both
10:35:09  14   ways.  So you'll either get the instruction or Mr. Saba can
10:35:12  15   read the rest of the -- read the rest the order, that
10:35:17  16   section, the part that you said was not read, and -- but
10:35:20  17   not both.  It'll be your choice.
10:35:22  18          MR. BENNETT:  We elect the curative instruction,
10:35:25  19   Your Honor.
10:35:25  20          THE COURT:  Okay.  All right.  Let's have the jury
10:35:27  21   brought in.
10:35:28  22          COURT SECURITY OFFICER:  Yes, Your Honor.
10:35:29  23          All rise for the jury.
10:35:36  24          (Jury in.)
10:36:02  25          THE COURT:  Please be seated.
```

435

| | | |
|---|---|---|
| 10:36:03 | 1 | You may continue. |
| 10:36:05 | 2 | MR. JOSHI:  Thank you, Your Honor. |
| 10:36:06 | 3 | BY MR. JOSHI: |
| 10:36:07 | 4 | Q.  Welcome back, Mr. -- Dr. Ducharme. |
| 10:36:10 | 5 | A.  Thank you. |
| 10:36:10 | 6 | MR. JOSHI:  Andrew, may I have DX-1, the patent, |
| 10:36:15 | 7 | brought back up, the Claim 1 language? |
| 10:36:18 | 8 | BY MR. JOSHI: |
| 10:36:19 | 9 | Q.  I just have just a couple more questions on this, |
| 10:36:22 | 10 | Dr. Ducharme, and then we'll move on to something else, but |
| 10:36:27 | 11 | I just want to give this claim some context. |
| 10:36:32 | 12 | MR. JOSHI:  Could you scroll up a little bit so we |
| 10:36:34 | 13 | can also see 1(a), Andrew?  Thank you. |
| 10:36:48 | 14 | BY MR. JOSHI: |
| 10:36:48 | 15 | Q.  So what that -- 1(a) says is:  Receiving and |
| 10:36:51 | 16 | characterizing the real time digital video input image |
| 10:36:56 | 17 | featuring input image pixels. |
| 10:37:00 | 18 | I would just like to jury to understand what is |
| 10:37:03 | 19 | happening here.  So input image pixels, could they, for |
| 10:37:10 | 20 | example, be coming in from a baseball game or some event |
| 10:37:14 | 21 | where an event is being videotaped?  Would that refer to |
| 10:37:18 | 22 | input pixels coming into a system or your method here? |
| 10:37:23 | 23 | A.  That would be an example of real time digital video. |
| 10:37:28 | 24 | Q.  Yeah. |
| 10:37:29 | 25 | A.  I agree. |

10:37:29   1   Q.   Okay.   So what your method does here in Claim 1 is that

10:37:32   2   these pixels have come in, work is going to be done on

10:37:38   3   them, processing -- the words you used, arithmetic, I

10:37:42   4   believe you said, logic, things will be done to them, and

10:37:46   5   then the ultimate goal being then to display them on a

10:37:49   6   screen, correct?

10:37:49   7   A.   Yes.

10:37:50   8   Q.   And that -- that's what this claim does, it takes --

10:37:52   9   takes in input pixels, does something to them, that's the

10:37:55   10  meat of the claim, in between, and at the end, then it

10:37:58   11  displays it to a person watching the monitor, correct?

10:38:01   12  A.   Yes.

10:38:01   13  Q.   Okay.   So in 1(a), input image pixels have come in, and

10:38:14   14  would you agree that all of these pixels that come in have

10:38:16   15  a red component, a blue component, and a green component,

10:38:20   16  correct?

10:38:20   17  A.   Are you asking about the format of the video stream?

10:38:25   18  Q.   Yes, yes.

10:38:28   19  A.   Yes.

10:38:29   20  Q.   Okay.   So we have these pixels that have come in, and

10:38:37   21  when the pixels came in, the colors in them had some hue or

10:38:45   22  some saturation value when they came in, correct?

10:38:48   23          MR. SABA:   Your Honor, I'm going to object to this

10:38:51   24  as a -- I guess on foundation.   It's an improper

10:38:56   25  hypothetical.   We have no idea -- we're just supposed to

```
10:38:59   1   assume the scenario, and that -- and I think that's unfair
10:39:02   2   and prejudicial to the witness.
10:39:03   3           MR. JOSHI:  Your Honor, I'm allowed to ask
10:39:05   4   hypothetical questions to an expert witness.
10:39:07   5           MR. SABA:  I -- can I respond to that, Your Honor?
10:39:09   6           THE COURT:  You may.
10:39:09   7           MR. SABA:  I understand that, but it's just -- the
10:39:12   8   foundation of the hypothetical doesn't even make sense.
10:39:15   9           THE COURT:  Well, I'm going to let you go through
10:39:17  10   it, Mr. Saba, in redirect, and you can explain to the jury
10:39:21  11   through your questioning of the witness why you believe it
10:39:23  12   does.  And I'll give Mr. Joshi some leeway here.
10:39:27  13           MR. SABA:  Thank you, Your Honor.
10:39:28  14           THE COURT:  This is cross-examination.
10:39:35  15           MR. JOSHI:  Thank you, Your Honor.
10:39:36  16   BY MR. JOSHI:
10:39:36  17   Q.  And so in the user interface that we saw before, the
10:39:39  18   user then makes an adjustment to a hue or saturation level?
10:39:46  19   We saw that, remember, in the --
10:39:48  20   A.  Yes, it allows for the hue or saturation --
10:39:53  21   Q.  Okay.
10:39:55  22   A.  -- adjustment of an individual color.
10:39:56  23   Q.  Correct.  And that adjustment is meant for these input
10:40:00  24   pixels that have come in that now need to be processed,
10:40:03  25   correct?
```

10:40:03   1   A.   Yes.

10:40:04   2   Q.   Okay.  And so when the -- when the user makes that

10:40:10   3   selection, that selection is going to apply to multiple of

10:40:16   4   these input image pixels, correct?

10:40:23   5   A.   Can you tell me what -- what you mean by -- what you

10:40:25   6   mean by apply?

10:40:26   7   Q.   It would -- later on when the processing is done of

10:40:37   8   these input image pixels, the adjustment that the user made

10:40:41   9   would affect multiple input pixels.

10:40:47  10   A.   I'm going to assume that that's correct if it's a

10:40:52  11   picture of something colorful, sure.

10:40:55  12   Q.   Correct.  And taking that one step forward, then

10:40:58  13   multiple individual colors were selected, correct?

10:41:07  14   A.   It may -- I don't believe that on that ASUS interface,

10:41:15  15   you can select more than one individual color to adjust.  I

10:41:18  16   mean, when you go into that menu and you go into

10:41:21  17   advanced --

10:41:22  18   Q.   Yes.

10:41:23  19   A.   -- and then you can choose either a hue adjustment --

10:41:23  20   Q.   Yes.

10:41:25  21   A.   -- or a saturation adjustment.

10:41:26  22   Q.   Yes.

10:41:27  23   A.   Let's say you go into the saturation adjustment --

10:41:29  24   Q.   Yes.

10:41:29  25   A.   -- it then gives you the individual colors as the -- as

439

10:41:33  1  described in Step B for, say, red, green, blue, cyan,

10:41:39  2  yellow, magenta, and those are the individual colors that

10:41:42  3  you're allowed to select.  And it gives you a slider, and

10:41:45  4  that slider is then -- this Part B that we've selected an

10:41:49  5  adjustment to be made and where now the slider is giving

10:41:54  6  you a delta value, that's the --

10:41:54  7  Q.  Sure.

10:41:55  8  A.  -- amount of the change that you want.

10:41:56  9  Q.  You said something very interesting.

10:41:58  10        By the way, are you finished, or did I interrupt

10:42:01  11  you?  Are you finished?

10:42:09  12  A.  I'm finished.

10:42:09  13  Q.  Okay.  So you said something very interest.  You said

10:42:11  14  those red, green, blue that showed up on that menu, those

10:42:14  15  are the individual colors.  Did I hear you correctly?

10:42:17  16  A.  Those are the individual color selections that you can

10:42:19  17  make on that menu, yes.

10:42:20  18  Q.  Okay.  So you see those as individual colors and not as

10:42:25  19  color components?

10:42:35  20  A.  Well, red, green, and blue could be either, and then

10:42:41  21  cyan, yellow, magenta are individual colors.

10:42:44  22  Q.  So red is a color component, correct?

10:42:47  23  A.  Yes.

10:42:47  24  Q.  Okay.  And so when the user selected the hue value, she

10:42:51  25  selected hue value, if there is a pixel where red is at

10:42:57  1  100 percent, she selected red for a pixel in which red is

10:43:04  2  only 90 percent, and she selected red for a pixel in which

10:43:08  3  red is only 80 percent, correct?

10:43:10  4  A.  I think it -- I think how you're describing it, as you

10:43:14  5  were before, is misrepresenting what happens when you move

10:43:19  6  that slider.

10:43:20  7  Q.  Okay.

10:43:21  8  A.  When you move the slider, remember, you're just

10:43:24  9  selecting, choosing an amount that you want to change that

10:43:30  10  feature.  So it's just a digital number for -- for the

10:43:33  11  amount of change.

10:43:35  12  Q.  But that change applies to multiple individual colors

10:43:39  13  that have red as a component, correct?

10:43:41  14  A.  Not in this step.

10:43:44  15  Q.  Not in -- okay.  But it will eventually, correct?

10:43:54  16  A.  Yes, according to this method --

10:43:56  17  Q.  Okay.

10:43:58  18  A.  -- pixels -- pixels will be selected.

10:44:00  19  Q.  Okay.  All right.

10:44:02  20        MR. JOSHI:  Your Honor, I would move to seal the

10:44:04  21  courtroom.

10:44:05  22        THE COURT:  Okay.  The courtroom will need to be

10:44:07  23  sealed at this time.  Anyone not subject to the protective

10:44:12  24  order will need to excuse themselves.  And we'll unseal it

10:44:16  25  as quickly as we can.

| | | |
|---|---|---|
| 10:44:19 | 1 | (Courtroom sealed.) |
| 10:44:47 | 2 | |
| 10:44:47 | 3 | (This portion of the transcript is sealed and |
| 10:44:47 | 4 | filed under a separate cover as Sealed Portion No. 1.) |
| 11:22:54 | 5 | |
| 11:22:55 | 6 | (Courtroom unsealed.) |
| 11:23:20 | 7 | MR. JOSHI:  Could we please go back to DX-1 at |
| 11:23:28 | 8 | Column 10.  Column 10.  Okay.  Please scroll down.  And if |
| 11:23:52 | 9 | you don't mind, Andrew, please zoom in on where it says: |
| 11:23:57 | 10 | "In Case 1," and a little bit above that.  Okay. |
| 11:24:03 | 11 | BY MR. JOSHI: |
| 11:24:05 | 12 | Q.  Dr. Ducharme, you read this patent? |
| 11:24:08 | 13 | A.  Yes. |
| 11:24:08 | 14 | Q.  Okay.  And do you understand what I am showing now -- |
| 11:24:14 | 15 | showing you now is a preferred embodiment of the patent? |
| 11:24:18 | 16 | A.  Yes. |
| 11:24:18 | 17 | Q.  Could you tell the members of the jury what a preferred |
| 11:24:21 | 18 | embodiment of a patent is? |
| 11:24:24 | 19 | A.  It's -- in some ways, it's an example of how the patent |
| 11:24:28 | 20 | could be used. |
| 11:24:34 | 21 | Q.  Okay.  And the claims cover preferred embodiments, do |
| 11:24:42 | 22 | they? |
| 11:24:44 | 23 | You want me to rephrase that question? |
| 11:24:50 | 24 | A.  Yeah.  I don't know how to answer that. |
| 11:24:53 | 25 | Q.  Can a claim be read in a manner that excludes the |

11:24:57   1   preferred embodiment?

11:24:59   2          MR. SABA:  Your Honor, I'm going to -- I'd like to

11:25:01   3   object to this line of questioning.  We're back into the

11:25:04   4   claim construction order again, and this is an

11:25:06   5   inappropriate line of questioning.

11:25:07   6          MR. JOSHI:  I would -- I would ask this question

11:25:09   7   of any expert, Your Honor, this is a normal expert

11:25:12   8   question.

11:25:12   9          THE COURT:  Okay.  We're not going to talk about

11:25:15   10  the claim construction order, correct?

11:25:16   11         MR. JOSHI:  Correct.

11:25:17   12         MR. SABA:  Thank you, Your Honor.

11:25:19   13  BY MR. JOSHI:

11:25:20   14  Q.  And you see at the bottom of what's shown up there, do

11:25:23   15  you see an equation?

11:25:25   16  A.  Yes.

11:25:25   17  Q.  Okay.  The R there refers the color red?

11:25:31   18  A.  Yes.

11:25:34   19  Q.  Okay.  So now what this inequality shows is that --

11:25:41   20  well, let me read it, okay?

11:25:43   21         In Case 1, where the independent red hue control

11:25:48   22  delta value, Hr, or the independent red saturation delta

11:25:55   23  value, Sr, of Step B is not equal to zero, there is

11:26:02   24  identifying each input image pixel having red, R, as the

11:26:08   25  individual color whose hue or saturation was selected to be

| | | |
|---|---|---|
| 11:26:11 | 1 | independently changed, according to the following logical |
| 11:26:16 | 2 | conditions. |
| 11:26:20 | 3 | And what this says is that in this logical |
| 11:26:26 | 4 | condition, the red is greater than green plus a constant |
| 11:26:30 | 5 | and red is greater than blue plus a constant, and the |
| 11:26:37 | 6 | constants are positive constants.  Do you see that? |
| 11:26:39 | 7 | A.  Yes. |
| 11:26:40 | 8 | Q.  Okay.  So what this preferred embodiment says is:  For |
| 11:27:02 | 9 | identifying an input image pixel as having red, you want |
| 11:27:07 | 10 | to identify pixels, and you want to identify a certain |
| 11:27:10 | 11 | pixel's -- we have pixels, and you want to identify a |
| 11:27:14 | 12 | certain pixel as having red. |
| 11:27:15 | 13 | To do that, we have to see if red is greater than |
| 11:27:19 | 14 | green plus a constant and if red is greater than blue plus |
| 11:27:23 | 15 | a constant, correct? |
| 11:27:25 | 16 | MR. SABA:  Your Honor, I'd like to object on -- |
| 11:27:29 | 17 | that this line of questioning is misleading, and it -- and, |
| 11:27:35 | 18 | again, I'd like to renew that we're getting into -- sounds |
| 11:27:39 | 19 | like claim construction arguments. |
| 11:27:41 | 20 | THE COURT:  Overruled.  You can go into this on |
| 11:27:45 | 21 | redirect. |
| 11:27:45 | 22 | MR. SABA:  Thank you, Your Honor. |
| 11:27:47 | 23 | BY MR. JOSHI: |
| 11:27:49 | 24 | Q.  Do you understand this, sir?  Do you understand this |
| 11:27:51 | 25 | inequality? |

| | | |
|---|---|---|
| 11:27:52 | 1 | A.  I understand this inequality. |
| 11:27:54 | 2 | Q.  Please tell us what it means. |
| 11:27:57 | 3 | A.  So Case 1 is an example of how pixels could be |
| 11:28:01 | 4 | identified. |
| 11:28:01 | 5 | Q.  Okay. |
| 11:28:02 | 6 | A.  And so using this preferred embodiment, this example |
| 11:28:07 | 7 | that's given in the -- in the specification of the patent, |
| 11:28:12 | 8 | red would be -- for a pixel to be selected as a -- for a |
| 11:28:18 | 9 | pixel to be selected, the -- and that's the red input |
| 11:28:23 | 10 | pixel, it would need to be greater than green by some |
| 11:28:27 | 11 | argument, and red would also have to be greater than blue |
| 11:28:31 | 12 | by some argument.  I mean, I'm just repeating what you |
| 11:28:36 | 13 | said. |
| 11:28:36 | 14 | Q.  Okay. |
| 11:28:36 | 15 | A.  That's about as much as I can explain of the |
| 11:28:36 | 16 | inequality. |
| 11:28:37 | 17 | Q.  I think they feel better hearing from you because you |
| 11:28:37 | 18 | have a Ph.D., I don't.  So that's why -- |
| 11:28:37 | 19 | A.  Okay. |
| 11:28:43 | 20 | Q.  Thanks for explaining that.  Okay.  So... |
| 11:28:45 | 21 |         MR. JOSHI:  May I please have the Elmo again? |
| 11:29:12 | 22 | BY MR. JOSHI: |
| 11:29:34 | 23 | Q.  You did a demonstration yesterday, sir, remember? |
| 11:29:39 | 24 | A.  Yes. |
| 11:29:40 | 25 | Q.  And this slide is from that demonstration? |

11:29:47  1   A.  Yes.

11:29:48  2   Q.  Okay.  And as I recall, in that demonstration you said

11:29:50  3   that -- that color on the very left is red, correct?

11:29:52  4   A.  Yes.

11:29:53  5   Q.  And you also said that the two colors on the very right

11:29:56  6   are also red?

11:29:57  7   A.  Yes.

11:29:58  8   Q.  Okay.  Now, if you look at the color shown very much to

11:30:06  9   the right, the yellow one, their red and green are equal,

11:30:09  10  correct?

11:30:10  11  A.  I'm sorry.  I -- which -- which two -- which two are

11:30:19  12  green is equal and which two?

11:30:22  13  Q.  All the way to the right, the yellow.  R is 100, and

11:30:26  14  green is 100.

11:30:27  15  A.  Yes, I agree.

11:30:28  16  Q.  Okay.  So there, red is not greater than green,

11:30:31  17  correct?

11:30:32  18  A.  That's correct.

11:30:33  19  Q.  So under the inequality we just looked at, that color

11:30:38  20  would not be red?

11:30:41  21  A.  Using the inequality that we just went over?

11:30:46  22  Q.  Yes.

11:30:47  23  A.  You're correct.

11:30:47  24  Q.  Okay.  And the next -- the color next to it, R is 100

11:30:59  25  and blue is 100, correct?

| | | |
|---|---|---|
| 11:31:01 | 1 | A.  Yes. |
| 11:31:02 | 2 | Q.  So under the inequality we looked at, here also, this |
| 11:31:12 | 3 | color would not be red under that inequality, correct? |
| 11:31:16 | 4 | A.  That's correct. |
| 11:31:17 | 5 | Q.  Okay.  So -- so you would agree that this slide is |
| 11:31:24 | 6 | inconsistent with the inequality we just looked at in the |
| 11:31:27 | 7 | patent? |
| 11:31:27 | 8 | A.  Yes, that's correct. |
| 11:31:29 | 9 | Q.  Okay. |
| 11:32:10 | 10 | MR. JOSHI:  Andrew, would you please bring up |
| 11:32:12 | 11 | their slide?  I believe it's 54 from yesterday. |
| 11:32:26 | 12 | MR. OLIVER:  We never received -- |
| 11:32:27 | 13 | MR. JOSHI:  Okay.  Let me -- let me just put it |
| 11:32:31 | 14 | on -- I'll just put it on the Elmo. |
| 11:32:45 | 15 | I'm sorry to keep doing this to you, ma'am, back |
| 11:32:50 | 16 | and forth.  Okay. |
| 11:32:51 | 17 | BY MR. JOSHI: |
| 11:33:00 | 18 | Q.  Dr. Ducharme, you recall testifying about this slide |
| 11:33:03 | 19 | yesterday? |
| 11:33:03 | 20 | A.  Yes. |
| 11:33:03 | 21 | Q.  Okay.  And you had a conversation with Mr. Saba, I |
| 11:33:08 | 22 | think -- it might even have been this morning, but |
| 11:33:11 | 23 | yesterday, also? |
| 11:33:12 | 24 | A.  Yes. |
| 11:33:13 | 25 | Q.  Double patenting.  Okay.  So what ASUS is alleging |

11:33:18   1   here, I just want to make sure you understand, is that the

11:33:23   2   inventor of the patent, '435 patent, Mr. Segman, filed two

11:33:28   3   patents two years apart to extend the patent term which is

11:33:32   4   not allowed.  You would disagree, obviously, but you

11:33:36   5   understand our position?

11:33:38   6            MR. SABA:  Your Honor, sidebar.

11:33:39   7            THE COURT:  Mr. Joshi, I think that we're getting

11:33:52   8   pretty close here.

11:33:53   9            MR. JOSHI:  Okay.

11:33:54  10   BY MR. JOSHI:

11:33:55  11   Q.  Okay.  So can you tell us what the double patenting

11:33:57  12   issue is in this case?

11:33:58  13   A.  You just described it.  Your -- ASUS is -- sorry --

11:34:05  14   ASUS is suggesting that the patentee somehow got two

11:34:15  15   patents for the same invention --

11:34:17  16   Q.  Right.

11:34:18  17   A.  -- through the United States Patent Office.

11:34:20  18   Q.  Okay.  And that the inventor's first patent is the '435

11:34:29  19   patent -- or one of them is the '435 patent that's in this

11:34:32  20   case, correct?

11:34:32  21   A.  Yes.

11:34:33  22   Q.  And his other patent is the '012 patent that was filed

11:34:40  23   earlier; is that correct?

11:34:40  24   A.  That's my understanding.

11:34:41  25   Q.  Okay.  And what you say on this slide is that they are

11:34:45   1   different, correct?

11:34:46   2   A.   Yes.

11:34:46   3   Q.   Okay.  And you say that the difference between the two

11:35:00   4   is what's called look-up tables?

11:35:03   5   A.   Yes.  Well, that's part of the reason they're

11:35:06   6   different, but, yes.

11:35:07   7   Q.   Well, that's the only one on this slide, correct?

11:35:10   8   A.   The only one -- what are you referring to?

11:35:13   9   Q.   The only differentiator between '012 and '435 is the

11:35:21  10   look-up table on this slide?

11:35:22  11   A.   That's what's described on the slide, I agree.

11:35:28  12   Q.   Okay.  And the other -- or not the other side, but what

11:35:44  13   would be different from a look-up table would be arithmetic

11:35:49  14   and logical operations, correct?

11:35:51  15   A.   Yes.

11:35:51  16   Q.   So you contend that '435 discloses arithmetic and

11:35:59  17   logical operations, and '012 teaches look-up tables, and

11:36:05  18   that's a difference between them, correct?  That's why

11:36:08  19   they're different, in part?

11:36:09  20   A.   In part, that's why they're different.

11:36:11  21   Q.   Okay.  But it is your contention that arithmetic logic

11:36:19  22   operations are -- and I don't want to say "very," but

11:36:24  23   meaningfully different from look-up tables; is that

11:36:30  24   correct?  Significantly different?

11:36:32  25   A.   Yes.

| | | |
|---|---|---|
| 11:36:32 | 1 | Q.  Okay. |
| 11:36:33 | 2 | A.  The way that the -- the way that they're implemented in |
| 11:36:39 | 3 | the source code is. |
| 11:36:41 | 4 | Q.  Okay.  Do you recall having taken exactly an opposite |
| 11:36:49 | 5 | position in this litigation on that issue? |
| 11:36:53 | 6 | A.  Do I remember -- I'm sorry? |
| 11:36:55 | 7 | Q.  Do you remember taking a position in an expert report |
| 11:36:58 | 8 | that the difference between a look-up table on the one hand |
| 11:37:03 | 9 | and arithmetic logical operations on the other hand is |
| 11:37:12 | 10 | insignificant? |
| 11:37:12 | 11 | A.  I don't recall that. |
| 11:37:13 | 12 | MR. JOSHI:  Your Honor, may I have permission to |
| 11:37:15 | 13 | show the expert his expert report? |
| 11:37:18 | 14 | THE COURT:  Yes, you may. |
| 11:37:20 | 15 | MR. JOSHI:  Can you pull up Dr. Ducharme's -- |
| 11:37:23 | 16 | THE COURT:  Not on the screen.  You will have to |
| 11:37:28 | 17 | give him a copy. |
| 11:37:35 | 18 | MR. BENNETT:  Your Honor, for saving time, I |
| 11:37:36 | 19 | believe there's a copy of his report on -- |
| 11:37:39 | 20 | THE COURT:  That's fine.  If you can direct him to |
| 11:37:43 | 21 | it, maybe -- |
| 11:38:03 | 22 | THE WITNESS:  I have a copy of my report. |
| 11:39:06 | 23 | THE COURT:  Mr. Joshi, just to be clear, what -- |
| 11:39:09 | 24 | until you've refreshed his recollection, you can't put it |
| 11:39:13 | 25 | on the screen.  But once you've done that, it can be |

| | | |
|---|---|---|
| 11:39:16 | 1 | published. |
| 11:39:17 | 2 | MR. JOSHI:  Okay.  I apologize for the confusion |
| 11:39:20 | 3 | here.  Just take -- just take one minute to find the |
| 11:39:24 | 4 | location in his report. |
| 11:40:10 | 5 | BY MR. JOSHI: |
| 11:40:10 | 6 | Q.  Sorry about that, Dr. Ducharme. |
| 11:40:11 | 7 | So you would look at Paragraph 70 of your |
| 11:40:17 | 8 | supplemental infringement report. |
| 11:40:19 | 9 | A.  I'm sorry.  What was the -- |
| 11:40:22 | 10 | Q.  Your supplemental infringement, Paragraph 70, 7-0. |
| 11:40:30 | 11 | A.  Okay. |
| 11:40:31 | 12 | Q.  Okay.  Do you believe -- do you see what you say there? |
| 11:41:28 | 13 | Do you see that last sentence -- |
| 11:41:30 | 14 | A.  I'm almost there. |
| 11:41:34 | 15 | Q.  Okay.  Take your time. |
| 11:41:43 | 16 | A.  Yes, I see the word "insubstantially." |
| 11:41:46 | 17 | Q.  Right. |
| 11:41:47 | 18 | MR. JOSHI:  Your Honor, may I read it to the jury? |
| 11:41:50 | 19 | THE COURT:  Any objection? |
| 11:41:52 | 20 | MR. SABA:  Yes, Your Honor.  I don't believe he |
| 11:41:54 | 21 | has properly laid a predicate for a -- if he's going to for |
| 11:41:58 | 22 | a prior inconsistent statement, I don't think the |
| 11:42:01 | 23 | foundation has been established. |
| 11:42:02 | 24 | THE COURT:  I think that's right, Mr. Joshi.  I |
| 11:42:05 | 25 | think you can do it, but you haven't done it yet. |

451

11:42:07   1            MR. JOSHI:  Okay.

11:42:13   2   BY MR. JOSHI:

11:42:17   3   Q.  Dr. Ducharme, would you agree that the position you

11:42:19   4   have taken in Paragraph 70 of your supplemental expert

11:42:23   5   report on infringement is inconsistent with the position

11:42:28   6   you took in this Court yesterday on double patenting with

11:42:33   7   regards to look-up tables?

11:42:40   8   A.  Do I -- what was the question part of that?

11:42:42   9   Q.  Do you agree that the two positions are inconsistent?

11:42:45   10  A.  Before I answer that, just to make sure, can you repeat

11:42:52   11  the whole question?

11:42:54   12  Q.  Sure.  So we just had a discussion about a position you

11:43:02   13  took about -- took on double patenting in this courtroom

11:43:07   14  yesterday.  And then in conversation with me today, I

11:43:10   15  believe you said that a significant difference between the

11:43:16   16  '435 patent and the '012 patent is that the '012 patent

11:43:24   17  teaches color manipulation using look-up tables, LUTs.  And

11:43:30   18  I'm asking if that position is inconsistent with what you

11:43:32   19  said at the bottom of Paragraph 70 of your supplemental

11:43:38   20  expert report on infringement?

11:43:40   21  A.  Well, what I said today to you was that that was part

11:43:45   22  of the difference, but it wasn't the whole difference.

11:43:49   23  When you asked me if it was a significant difference, I

11:43:52   24  said it was -- it's a difference -- part -- it's only part

11:43:57   25  of the difference.  It's not the whole -- whole difference.

452

```
11:44:01   1          MR. JOSHI:  Your Honor, I believe I have now laid
11:44:04   2   the foundation to publish.
11:44:06   3          MR. SABA:  Your Honor, I do not believe he's laid
11:44:08   4   the foundation for a prior inconsistent statement.  That's
11:44:11   5   what he is trying to establish.
11:44:12   6          THE COURT:  I agree.  Can you just show him the
11:44:22   7   testimony?
11:44:23   8          MR. JOSHI:  I showed it to him.
11:44:27   9          THE COURT:  Okay.  And just lay the foundation --
11:44:27   10         MR. JOSHI:  Okay.
11:44:29   11         THE COURT:  -- for the conditions of the
11:44:31   12   deposition, when it was taken --
11:44:31   13         MR. JOSHI:  Okay.
11:44:33   14         THE COURT:  -- whether he swore to tell the
11:44:36   15   truth --
11:44:36   16         MR. JOSHI:  Yes.
11:44:36   17         THE COURT:  -- all of that.
11:44:38   18   BY MR. JOSHI:
11:44:38   19   Q.  So, Dr. Ducharme, you submitted a supplemental expert
11:44:42   20   report on infringement in this case; is that correct?
11:44:45   21   A.  Yes.
11:44:45   22   Q.  And that's dated October 29, 2020, correct?
11:44:55   23   A.  You're referring to the report that I have in my hand?
11:44:58   24   Q.  Yes, sir.
11:45:00   25   A.  I don't see a date.  I don't remember the date.
```

| | | |
|---|---|---|
| 11:45:02 | 1 | Q.  The date is on the very last page. |
| 11:45:05 | 2 | A.  Oh, of course.  Yes, October 29th, 2020. |
| 11:45:11 | 3 | Q.  Okay.  And do you see right above your signature it |
| 11:45:16 | 4 | says:  I swear under penalty of perjury that the forgoing |
| 11:45:20 | 5 | is true and correct? |
| 11:45:21 | 6 | A.  Yes. |
| 11:45:22 | 7 | Q.  Did you mean it when you signed this document? |
| 11:45:25 | 8 | A.  Of course, yes. |
| 11:45:32 | 9 | Q.  And then is there a Paragraph 70 in this document? |
| 11:45:35 | 10 | A.  Yes. |
| 11:45:36 | 11 | Q.  And is there a discussion of LUT at the bottom of this |
| 11:45:40 | 12 | paragraph? |
| 11:45:40 | 13 | A.  Yes. |
| 11:45:40 | 14 | Q.  Okay.  And you wrote this? |
| 11:45:42 | 15 | A.  Yes. |
| 11:45:42 | 16 | Q.  Okay. |
| 11:45:43 | 17 | MR. JOSHI:  Your Honor, may I publish? |
| 11:45:45 | 18 | THE COURT:  Mr. Saba? |
| 11:45:48 | 19 | MR. SABA:  Your Honor, he has not established that |
| 11:45:51 | 20 | there's some sort of prior inconsistent statement.  He just |
| 11:45:54 | 21 | wants to publish an exhibit that the witness -- |
| 11:45:57 | 22 | THE COURT:  I tell you what I'm going to do is I'm |
| 11:45:59 | 23 | going to let you read it. |
| 11:46:01 | 24 | MR. JOSHI:  Okay.  Thank you. |
| 11:46:03 | 25 | BY MR. JOSHI: |

11:46:03  1   Q.  So here's what you said:

11:46:07  2        The accused device is capable of achieving

11:46:13  3   substantially similar results using insubstantially

11:46:16  4   different operations.  For example, the accused devices are

11:46:19  5   capable and do achieve identifying the pixel values with

11:46:23  6   the individual color to be changed in applying the change

11:46:27  7   to either hue or saturation.  Those values do not change

11:46:31  8   accordingly as confirmed and explained by my testing of

11:46:35  9   accused products.  Therefore, even if the accused devices,

11:46:39  10  for example, uses a matrix or LUT transform, it still

11:46:46  11  achieves substantially similar results with insubstantially

11:46:50  12  different operations.

11:46:51  13        MR. JOSHI:  Thank you, Your Honor.

11:46:54  14        MR. SABA:  Your Honor, I don't know if there's a

11:46:56  15  question.

11:46:57  16        THE COURT:  Is there a question?  Are you

11:46:59  17  following up, Mr. Joshi?

11:47:00  18        MR. JOSHI:  Yes.

11:47:01  19  BY MR. JOSHI:

11:47:01  20  Q.  Did I read that correctly, Dr. Ducharme?

11:47:04  21  A.  Yes.

11:47:06  22  Q.  Okay.  Thank you.

11:47:38  23        MR. JOSHI:  So, Your Honor, the next thing we

11:47:41  24  wanted to do was do some -- not testing but wanted to show

11:47:45  25  something to Dr. Ducharme so we can we start -- if you

11:47:49  1   like, we could set up now and start or we could wait until

11:47:52  2   after lunch.  It's up to you.

11:47:54  3          THE COURT:  How long would it take to set it up?

11:47:57  4          MR. JOSHI:  It only takes a couple of minutes to

11:48:00  5   set it up.

11:48:04  6          THE COURT:  Go ahead and do it now.

11:48:07  7          MR. JOSHI:  Okay.  Thank you, Your Honor.

11:48:10  8          THE WITNESS:  Can I be excused for a moment to use

11:48:12  9   the restroom?

11:48:13  10         THE COURT:  Yes.

11:48:15  11         Ladies and gentlemen of the jury, we're just going

11:48:17  12  to wait for a few moments to get the equipment set up.  You

11:48:19  13  guys are welcome to stretch, if you want to, stand up for

11:48:24  14  just a moment, and we'll get back started in just a second.

11:48:27  15         MR. BENNETT:  Your Honor, there may be a few

11:48:30  16  lawyers who need to walk down the hall, as well, if that's

11:48:35  17  all right.

11:48:35  18         THE COURT:  Well, as soon as the equipment is set

11:48:37  19  up, if it really just takes a couple of minutes as

11:48:41  20  Mr. Joshi has said, we're going to start back, so they

11:48:46  21  might not want to go very far.

11:52:41  22         (Recess.)

11:52:59  23         MR. JOSHI:  Your Honor, we're ready to begin.

11:53:02  24         THE COURT:  Very well.  Please proceed.

11:53:05  25  BY MR. JOSHI:

11:53:05   1   Q.   Dr. Ducharme, this is Plaintiff's Exhibit 11, one of

11:53:10   2   the monitors that was used by you yesterday to do some --

11:53:14   3   A.   Okay.

11:53:15   4   Q.   -- demonstrations, so I'm going to ask you a few

11:53:23   5   questions.

11:53:45   6           So, Dr. Ducharme, before the break, we looked at

11:53:47   7   an inequality in the patent.  Do you recall?

11:53:50   8   A.   Yes.

11:53:51   9   Q.   Under that inequality, this color that's shown on the

11:53:55   10  display would not be red, correct?

11:53:57   11  A.   Under the inequality in the preferred embodiment of the

11:54:01   12  patent?

11:54:02   13  Q.   Yes.

11:54:02   14  A.   Yes, that would be correct.

11:54:04   15  Q.   And that's because red is lower than blue, correct,

11:54:06   16  here?

11:54:06   17  A.   Yes.

11:54:07   18  Q.   Okay.  Now, we're going to -- so when we -- when we

11:54:17   19  adjust red value on this monitor, that should not affect

11:54:21   20  this color, correct?

11:54:24   21  A.   So what specifically is the question?  When you move

11:54:30   22  the red slider?

11:54:31   23  Q.   When we -- yeah, when we move the red slider on this

11:54:37   24  monitor to practice Claim 1, this color should not change

11:54:41   25  because this color is not red, correct?

11:54:43   1   A.   This is a 3-axis monitor, and as I showed yesterday,

11:54:50   2   because it has a red component in the color that you're

11:54:54   3   displaying on the screen, when you move the red slider,

11:54:57   4   that color will change.

11:54:59   5   Q.   Let's just -- let's do it.  Can we adjust the red,

11:55:07   6   please?  What's the red value right now?  Okay.  So red's

11:55:18   7   at 50?

11:55:19   8          MR. JOSHI:  Increase the red to 100, please.

11:55:23   9   BY MR. JOSHI:

11:55:26   10  Q.   Dr. Ducharme, do you agree that the color changed?

11:55:28   11  A.   Yes.

11:55:30   12         MR. JOSHI:  Now take it back down to 50,

11:55:33   13  Mr. Oliver, and now take it down to 0.

11:55:41   14  BY MR. JOSHI:

11:55:42   15  Q.   Now that color is blue, Dr. Ducharme, so the color

11:55:45   16  changed again?

11:55:46   17  A.   Yes.

11:55:46   18  Q.   So a question for you -- my question for you is this.

11:55:51   19         MR. JOSHI:  Go back to the way it was before.

11:55:53   20  Okay.

11:55:54   21  BY MR. JOSHI:

11:55:54   22  Q.   So what we have here is under the inequality, this

11:56:07   23  color is not red, correct?

11:56:10   24  A.   That's correct.

11:56:12   25  Q.   Okay.  And are you familiar with "without affecting any

11:56:19   1   other individual color" limitation of Claim 1?

11:56:22   2   A.  Yes.

11:56:23   3   Q.  So if -- if red is the color that we are adjusting,

11:56:35   4   then -- then any other individual color would include this

11:56:39   5   color, correct?

11:56:41   6   A.  No.

11:56:41   7   Q.  Why not?

11:56:43   8   A.  The Court's interpretation of any other color is the

11:56:54   9   remaining pixels.  So it receives the digital video, you

11:57:01  10   make a selection for the color that you want to change on

11:57:03  11   the screen, you move the red slider as you've done.  It

11:57:07  12   then identifies all the pixels in the screen that have that

11:57:12  13   individual color, that component color red, and it puts all

11:57:17  14   of those pixels in a "I'm going to change you" bucket, and

11:57:21  15   then all of the other pixels go in the "I'm not going to

11:57:24  16   change you" bucket.

11:57:26  17       And so when you mentioned the other colors won't

11:57:30  18   change, the other colors are the remaining -- the remaining

11:57:35  19   pixels, the pixels that weren't selected in -- in the

11:57:40  20   monitor's brain, I guess you will.

11:57:41  21   Q.  So, sir, is it your position that any pixel that had

11:57:47  22   any red at all would be selected?

11:57:51  23   A.  That's what the ASUS products demonstrate, yes.

11:57:57  24   Q.  Okay.  But for infringement of Claim 1?

11:58:02  25   A.  Yes.

11:58:02   1   Q.  Okay.  For infringement of Claim 1, this color that you

11:58:13   2   see on the screen, would it be considered a red color or

11:58:18   3   not a red color?

11:58:21   4   A.  It's considered a color that includes the selected

11:58:26   5   color red.  That's how the monitor thinks about it.

11:58:30   6   Q.  Okay.  As somebody who is offering an infringement

11:58:34   7   opinion on Claim 1, okay, and specifically with respect to

11:58:45   8   the limitation without affecting any other individual

11:58:48   9   color --

11:58:50   10   A.  Mm-hmm.

11:58:50   11   Q.  -- okay, is this color that's demonstrated here having

11:58:56   12   an R quantity of 240, G quantity of 0, and B quantity of

11:59:02   13   255, is this red or is this not red?

11:59:08   14          MR. SABA:  Your Honor, I'm going to object to

11:59:10   15   asked and answered.

11:59:11   16          THE WITNESS:  Yeah, I believe --

11:59:12   17          THE COURT:  Sustained.  Let's move along,

11:59:15   18   Mr. Joshi.

11:59:16   19          MR. JOSHI:  Okay.

11:59:18   20   BY MR. JOSHI:

11:59:18   21   Q.  All right.  So let's do another color.

11:59:20   22          MR. JOSHI:  We have another one?

11:59:20   23   BY MR. JOSHI:

11:59:21   24   Q.  So, Dr. Ducharme, I have a color up on the screen whose

11:59:25   25   R component value is 240, the green component value is 255,

460

| | | |
|---|---|---|
| 11:59:31 | 1 | and the blue component value is 0.  Would you agree that |
| 11:59:35 | 2 | this color is not red for the purposes of infringement of |
| 11:59:43 | 3 | Claim 1? |
| 11:59:46 | 4 | A.  The first part was would I agree? |
| 11:59:48 | 5 | Q.  Would you agree? |
| 11:59:49 | 6 | A.  No, I would not agree. |
| 11:59:51 | 7 | Q.  Okay. |
| 11:59:52 | 8 | A.  I would -- this color includes the -- assuming we are |
| 11:59:55 | 9 | going to move the red slider, the selected color, the |
| 11:59:59 | 10 | change.  So it has some red in it, so it's going to change. |
| 12:00:03 | 11 | Q.  Okay.  So for the -- now, the word "slider" is not in |
| 12:00:12 | 12 | Claim 1, is it? |
| 12:00:12 | 13 | A.  No.  That's kind of my term for -- a delta term, a |
| 12:00:16 | 14 | delta value. |
| 12:00:16 | 15 | Q.  All right.  Well, let's use the terms that are in the |
| 12:00:19 | 16 | patent.  So in the patent Claim 1 -- |
| 12:00:23 | 17 | A.  Em-hmm. |
| 12:00:24 | 18 | Q.  -- okay, an adjustment is made to a color -- let's say |
| 12:00:31 | 19 | a red or a green or a blue -- and what the claim requires |
| 12:00:38 | 20 | is that the adjustment of that color should not cause any |
| 12:00:42 | 21 | other color to change, correct? |
| 12:00:56 | 22 | A.  That is what -- yeah, the -- any other color is -- |
| 12:01:02 | 23 | that's -- that is the -- the words that are used in the |
| 12:01:06 | 24 | claim.  Yes, that's correct. |
| 12:01:07 | 25 | Q.  Okay.  And then -- |

| | | |
|---|---|---|
| 12:01:09 | 1 | A.  But when I evaluate this, I have to use the Court's |
| 12:01:16 | 2 | construction.  That's how the parties and the Judge agree |
| 12:01:19 | 3 | that the words in the claims should be understood.  As long |
| 12:01:26 | 4 | as -- unless they're of plain and ordinary meaning, so "any |
| 12:01:31 | 5 | other color" had a special definition in that core |
| 12:01:35 | 6 | construction. |
| 12:01:35 | 7 | Q.  Okay.  So do you agree that for an ASUS product to |
| 12:01:43 | 8 | infringe Claim 1 -- by way of example, if an adjustment is |
| 12:01:49 | 9 | made to a -- if an adjustment is made to red, then a color |
| 12:02:00 | 10 | that is not red should not change? |
| 12:02:04 | 11 | A.  You're -- the premise of your question isn't -- I |
| 12:02:08 | 12 | disagree with it.  It -- you're saying an adjustment is |
| 12:02:12 | 13 | made to a color.  As the patent says, you will select a |
| 12:02:18 | 14 | color to adjust. |
| 12:02:19 | 15 | Q.  Right. |
| 12:02:21 | 16 | A.  It's -- they're -- they're different processes, so... |
| 12:02:23 | 17 | Q.  Very good point.  Very good point.  So let's say if we |
| 12:02:27 | 18 | select a color red to change -- |
| 12:02:31 | 19 | A.  Okay. |
| 12:02:31 | 20 | Q.  -- okay, if we select a color red to change and then |
| 12:02:36 | 21 | proceed to change that color, then a color that is not red |
| 12:02:39 | 22 | should not change, correct? |
| 12:02:41 | 23 | MR. SABA:  Your Honor, I'm going to object again |
| 12:02:44 | 24 | to asked and answered. |
| 12:02:46 | 25 | THE COURT:  Sustained. |

```
12:02:47    1           MR. JOSHI:  All right.  So, Mr. Oliver, please

12:02:51    2   bring up the menu to make adjustments to red, blue, or

12:02:57    3   green.  What's the red at?  Can you see?  Is it 50?  Can

12:03:11    4   you make the red 50, please?  Now could you take it to 100?

12:03:18    5   BY MR. JOSHI:

12:03:19    6   Q.  Dr. Ducharme, do you see that the color changed?

12:03:21    7   A.  Yes, the color changed.

12:03:23    8           MR. JOSHI:  Can you take the red back down to 30?

12:03:26    9   Could you please take it to 0 on the red?  It's not

12:03:37   10   working?  No, take it down to 0, just the red.

12:03:42   11   BY MR. JOSHI:

12:03:42   12   Q.  And you see that the color changed again?

12:03:45   13   A.  I see that the color changed.

12:03:48   14           MR. JOSHI:  And -- all right.  Let's go to the

12:03:50   15   next color.  Yeah, next.  Okay.

12:03:58   16   BY MR. JOSHI:

12:03:59   17   Q.  So I have another color for you here, Dr. Ducharme.

12:04:09   18   This has a component that is -- red is 0, green is 240, and

12:04:16   19   blue is 255.

12:04:18   20   A.  Yes.

12:04:19   21   Q.  Would you agree that in the preferred embodiment of the

12:04:24   22   patent, this color would not be green?

12:04:32   23           MR. SABA:  Your Honor, I'm going to object to

12:04:35   24   relevance.

12:04:35   25           THE COURT:  I'll sustain that objection.
```

12:04:37  1          Move along, Mr. Joshi.

12:04:40  2          MR. JOSHI:  All right.  So -- well, Your Honor,

12:04:43  3  the relevance is --

12:04:45  4          THE COURT:  Well, to the extent you're comparing

12:04:48  5  this preferred embodiment to the accused products, I'm

12:04:54  6  concerned about that.  Is that -- is that what you're

12:04:57  7  doing?

12:04:59  8          MR. JOSHI:  I also -- yeah, we would have to have

12:05:03  9  a sidebar to discuss that, Your Honor.

12:05:05  10          THE COURT:  All right.  Let's go ahead and break

12:05:07  11  for lunch at this time.

12:05:08  12          Ladies and gentlemen of the jury, your lunches

12:05:10  13  should be here, and we will be in recess until a little

12:05:16  14  after 1:00.  Don't discuss the case among yourselves until

12:05:21  15  all of the evidence has been presented and I have

12:05:25  16  instructed you on the law.

12:05:27  17          COURT SECURITY OFFICER:  All rise.

12:05:31  18          (Jury out.)

12:05:52  19          MR. BENNETT:  Before we get into this, just a

12:05:55  20  quick housekeeping matter.  We have lunch for Dr. Ducharme,

12:05:59  21  but obviously we're on cross, so I want to talk to him just

12:06:04  22  for a second in open court so everyone can hear and see and

12:06:08  23  then send him on his way so he can eat his lunch.

12:06:11  24          THE COURT:  Sure.

12:06:14  25          (Discussion held off the record.)

```
12:06:23   1            THE COURT:  You're excused.

12:06:25   2            THE WITNESS:  Thank you.

12:06:25   3            THE COURT:  Okay.  You all sit down.  Let's

12:06:28   4   address this issue.

12:06:29   5            When the discussion of the preferred embodiment

12:06:31   6   first came up, Mr. Joshi was just sort of explaining what a

12:06:36   7   preferred embodiment was.

12:06:39   8            To that, Mr. Saba, you objected, which I

12:06:43   9   overruled.  And then we -- we're in an area here I'm a

12:06:50  10   little concerned about, Mr. Joshi.  So how is what you --

12:06:54  11   you're asking the witness to do right now not amounting to

12:06:59  12   comparing the preferred embodiment to the products in a way

12:07:03  13   that is inappropriate?

12:07:05  14            MR. JOSHI:  I am doing that, and it's not

12:07:07  15   inappropriate for the following reason.  The way the

12:07:10  16   Court's claim construction order is written, when it --

12:07:12  17   when it comes down to a certain limitation, the Court says,

12:07:16  18   for the meaning of this, see preferred embodiment, and

12:07:20  19   actually cites to the inequality I just mentioned.

12:07:23  20            So the preferred -- the definition is the

12:07:26  21   preferred embodiment in the Court's claim construction

12:07:29  22   order, and I can -- I can show you the details if you like.

12:07:32  23            THE COURT:  Well, I'll be glad to look at it.

12:07:36  24            Let me hear from you, Mr. Saba.

12:07:39  25            MR. SABA:  Your Honor --
```

12:07:40  1        THE COURT:  I don't think we said the claim was

12:07:43  2   limited to the preferred embodiment.

12:07:46  3        MR. SABA:  I agree with that, Your Honor, and the

12:07:48  4   whole point of our objections from this morning and the

12:07:50  5   request for a mistrial, it just goes back to the same

12:07:52  6   thing.  The first words out of Mr. Joshi's mouth was:

12:07:56  7   They're claim construction arguments.

12:07:57  8        What they're going to try to do is ask the witness

12:08:01  9   about a preferred embodiment and then come back and close

12:08:06 10   and say, look, he doesn't do the preferred embodiment, hand

12:08:06 11   wave, and then go for non-infringement.  And that's what

12:08:10 12   we've been fighting the whole trial.

12:08:10 13        THE COURT:  Well, I mean, again, Mr. Saba, you did

12:08:11 14   not object to any of this discussion on the record today.

12:08:14 15   So when he first started using, you know, a general

12:08:18 16   explanation or asking the witness to generally explain

12:08:23 17   preferred embodiment, I mean, the record will reflect what

12:08:25 18   it will reflect, but I didn't see you object to any of

12:08:29 19   that, and I'm hesitant to interrupt.

12:08:32 20        I can assure you, Mr. Joshi, that the claim

12:08:39 21   construction order did not limit the claim to the preferred

12:08:43 22   embodiment.  And it sounds like to me that's precisely what

12:08:47 23   you're trying to do here, so I'm going to caution you

12:08:51 24   against that.

12:08:51 25        MR. JOSHI:  Okay.  So, then, Your Honor, I'll

```
12:08:53   1   just -- I'll stop referring to the preferred embodiment,
12:08:57   2   and I'll refer to the Court's claim construction, if that's
12:09:00   3   okay.
12:09:00   4          THE COURT:  To the construction of the terms.  Use
12:09:04   5   the claims themselves or the Court's claim construction
12:09:07   6   ruling on the terms.
12:09:09   7          MR. SABA:  Your Honor, I'd like to -- I'd like to
12:09:13   8   say that we would -- for purposes of preservation, we would
12:09:15   9   like to request another curative instruction, and this is
12:09:20  10   why.
12:09:21  11          We had -- we moved for a mistrial yesterday.  They
12:09:24  12   said no more.  We moved for mistrial today.  They said no
12:09:29  13   more.  And here we are right before lunch talking about
12:09:33  14   preferred embodiments.  Every time they say they're not
12:09:37  15   going to do it, they go right back --
12:09:39  16          THE COURT:  So here's what we're going to do,
12:09:40  17   Mr. Saba.  I want you-all to draft an instruction over the
12:09:45  18   lunch hour about the claims not being limited by the
12:09:48  19   preferred embodiment, and I will give that instruction
12:09:52  20   because I do think there is some prejudice here.
12:09:55  21          Mr. Joshi, I'm certainly not saying that it was
12:09:58  22   intentional, and I'm not accepting everything that Mr. Saba
12:10:01  23   said about how we got to this point.  But you have clearly
12:10:06  24   admitted that is what you were doing with this last set of
12:10:09  25   questions for the witness, and I think that's
```

```
12:10:11   1   inappropriate.  So I will give an instruction along those
12:10:15   2   lines.
12:10:15   3        I also intend to give the -- the jury an
12:10:24   4   instruction with respect to the witness's testimony earlier
12:10:31   5   regarding the claim construction order.  I -- I have gone
12:10:36   6   back and looked at that.  And if you-all will give me just
12:10:40   7   a moment, I can tell you what the question was.
12:10:50   8        All right.
12:10:58   9        (As read):  MR. JOSHI:  Yes, no problem.  That's
12:11:06  10   very understandable.  Look at the bottom of Page 13 of 44
12:11:10  11   of the Court's claim construction order.
12:11:13  12        Answer:  Yes.
12:11:14  13        Question:  Do you understand that in this
12:11:16  14   selecting step that we're looking at, the individual color
12:11:19  15   must be an exact individual color?
12:11:22  16        Answer:  On the bottom of Page 13 in this
12:11:26  17   construction order, it recites that the Defendants
12:11:29  18   suggested that it be limited to an exact individual color.
12:11:33  19   That's what I see on the bottom of the page.
12:11:37  20        Question:  What's the last phrase of that
12:11:40  21   sentence?
12:11:41  22        Answer:  And they are correct.
12:11:45  23        That was improper, Mr. Joshi.  And, again, you
12:11:51  24   know, I'm not sure how we got there.  I think the witness
12:11:55  25   may have gotten you there, but definitely your last
```

12:11:59   1   question there was inappropriate.  And I intend to instruct

12:12:02   2   the jury that you had asked the witness to read from the

12:12:09   3   Court's claim construction order and that was improper and

12:12:12   4   that they are to ignore the testimony of the witness that

12:12:16   5   quoted from the Court's claim construction order.

12:12:19   6          MR. JOSHI:  Your Honor, may I just note my

12:12:22   7   response to that?

12:12:23   8          THE COURT:  Of course.

12:12:25   9          MR. JOSHI:  I will, of course, obey whatever your

12:12:28  10   instructions are.

12:12:28  11          THE COURT:  Oh, of course.

12:12:29  12          MR. JOSHI:  But I can tell you there was no other

12:12:31  13   way to do it.  This is a very important term, the having --

12:12:34  14   having an individual color.

12:12:35  15          That's just the way the Court wrote it.  If you

12:12:38  16   just take the first part of the sentence, "Defendant says

12:12:43  17   that," well, that just says it's our position.  But when

12:12:47  18   you add to it the part "and they would be correct," that's

12:12:50  19   what makes it a Court's definition.

12:12:52  20          So the full sentence says, you know, that --

12:12:55  21   because before that it says, "they would be correct," then

12:12:57  22   later on, it says, "they would be incorrect," and we

12:13:00  23   believe that all of that is needed for proper definition of

12:13:03  24   these terms.

12:13:05  25          THE COURT:  Well, there's a better way to make

12:13:07  1   that argument than having the witness read from the claim

12:13:10  2   construction order.

12:13:11  3          MR. SABA:  Your Honor, may I add something to

12:13:11  4   that?

12:13:12  5          The last paragraph of the claim construction order

12:13:15  6   prohibits the parties from commenting on the arguments,

12:13:18  7   directly or indirectly.  That's square in the order, and to

12:13:21  8   have it out when questioning the witness is totally

12:13:25  9   inappropriate.

12:13:26  10         THE COURT:  Okay.  So I'm going to ask the

12:13:28  11  Plaintiffs to propose an instruction with respect to the

12:13:31  12  preferred embodiment issue along the lines of the claims

12:13:36  13  are not limited to the preferred embodiment, in that

12:13:39  14  nature, and I will give an instruction like that, as well

12:13:44  15  as the ones that I just read with respect to the claim

12:13:49  16  construction order.

12:13:50  17         My preference would be to give these instructions

12:13:59  18  at the conclusion of the witness's testimony.  We'll see if

12:14:04  19  we have any other issues before we get to that point.  But

12:14:07  20  I'm not inclined to give the instruction during the middle

12:14:11  21  of witness's testimony.

12:14:12  22         Does anyone disagree with that?

12:14:14  23         MR. JOSHI:  We do not, Your Honor.  And I'll just

12:14:16  24  add, I'm doing my absolute best here.  It's just the way

12:14:21  25  the claim construction order is written.  Their agreed

12:14:24  1  definition, and then there are terms where it says, term

12:14:27  2  definition, term definition, term definition.  Then there

12:14:30  3  are places where they say, you're right, or you're wrong.

12:14:30  4  And if we don't include those as part of the term -- you

12:14:35  5  know, I agree there's a better form that I could have done

12:14:37  6  this in, but my --

12:14:39  7            THE COURT:  Go ahead.

12:14:40  8            MR. JOSHI:  -- but the intent here wasn't to get

12:14:45  9  him to read something --

12:14:47  10            THE COURT:  I'm not -- Mr. Joshi, I don't -- I

12:14:49  11  don't think you did -- I don't -- I'm not accusing you of

12:14:52  12  doing anything wrong at all.  I just think there's a better

12:14:56  13  way to do it.  And read -- having the witness read from the

12:15:00  14  claim construction order is not the way to do it.

12:15:03  15            MR. JOSHI:  Thank you, Your Honor.

12:15:04  16            THE COURT:  Yeah, no, I understand.

12:15:07  17            Okay.  Anything else?

12:15:09  18            MR. BENNETT:  One housekeeping item.  We were --

12:15:14  19  we were going to use lunch for the jury charge and things.

12:15:19  20  So could we -- could we have a -- like a 6:00 extension

12:15:24  21  to -- because we're not going to close -- I don't think

12:15:27  22  there's any chance we're closing --

12:15:29  23            THE COURT:  It's not looking like it.

12:15:31  24            MR. BENNETT:  Yeah.

12:15:31  25            THE COURT:  Okay.  6:00 will be fine.

12:15:32   1            MR. BENNETT:  Okay.  Thank you, Your Honor.

12:15:33   2   Appreciate that.

12:15:34   3            THE COURT:  Thanks.

12:15:36   4            COURT SECURITY OFFICER:  All rise.

12:15:39   5            (Recess.)

01:09:24   6            COURT SECURITY OFFICER:  All rise.

01:09:25   7            THE COURT:  Please be seated.

01:09:27   8            Okay.  I have received the Plaintiff's proposed

01:09:32   9   curative instruction with the respect to the preferred

01:09:37  10   embodiment comparison.

01:09:40  11            Mr. Joshi, have you had a opportunity to review

01:09:45  12   that?

01:09:46  13            MR. JOSHI:  Yes, yes, Your Honor.  And we are fine

01:09:49  14   with all of it except the very last sentence.  I don't

01:09:55  15   think there's anything wrong with the letter, you know,

01:09:57  16   talking about accused products in reference to the

01:10:00  17   preferred embodiments.

01:10:02  18            THE COURT:  Okay.  All right.  Mr. Bennett?

01:10:03  19            MR. BENNETT:  Well, that's the purpose of the

01:10:05  20   curative instruction is to instruct the jury what the

01:10:08  21   standard is and that whatever they heard that didn't meet

01:10:11  22   that standard, they shouldn't consider it or give any

01:10:15  23   weight to it.

01:10:16  24            THE COURT:  Right.  And that -- and in my view,

01:10:18  25   the first two sentences do that adequately.  I think the

01:10:22   1   first two sentences are appropriate, especially given the

01:10:25   2   fact that there was no objection during any of that

01:10:29   3   testimony from the Plaintiff.

01:10:32   4         So I intend to give the first two sentences of the

01:10:37   5   Plaintiff's proposed instruction.

01:10:39   6         MR. BENNETT:  And may I ask about timing,

01:10:44   7   Your Honor?

01:10:44   8         THE COURT:  I intend to do it when the witness

01:10:47   9   completes all of his testimony.  I mean, I'll -- I'll hear

01:10:50  10   you all now if you think it should be now, but I -- you

01:10:55  11   know, I would prefer this witness to get off the stand

01:10:57  12   before we -- I mean, we may have something else come up,

01:11:00  13   but I'd rather do all of this at once.

01:11:02  14         MR. BENNETT:  I don't necessarily disagree.  Here

01:11:05  15   is what I would -- here's what we would like.  Here's what

01:11:08  16   we're asking for, if it be read at the end of cross before

01:11:15  17   we start in on direct.

01:11:16  18         My concern, our concern, Lone Star's concern is if

01:11:20  19   we wait until the end of redirect, maybe some recross, the

01:11:24  20   ideas, memories of what the testimony exactly was might

01:11:29  21   have faded.

01:11:29  22         So I would like the instruction -- we're asking

01:11:31  23   that the instruction be read at the close of cross, and

01:11:36  24   then we'll start in on redirect, and then we're done.

01:11:39  25         MR. JOSHI:  So my concern, Your Honor, is that it

01:11:42   1    would appear punitive if you do it after I'm done.

01:11:46   2          THE COURT:  I agree with that.  We're going to see

01:11:49   3    where it goes.  I hope this will resolve all the issues we

01:11:52   4    had with the witness's testimony.  So there is that.

01:11:54   5          There is a chance that something else may come up,

01:12:00   6    and I would prefer to do this at once.  And I think

01:12:03   7    Mr. Joshi's got a fair point here.

01:12:06   8          So let me just do it at the very end, and I'll do

01:12:10   9    it in a very neutral kind of way, and that will solve it.

01:12:13  10          MR. BENNETT:  Thank you, Your Honor.

01:12:13  11          THE COURT:  Okay.  Anything else before we have

01:12:16  12    the jury brought back in?

01:12:19  13          MR. OLIVER:  Should we set up the demonstration

01:12:21  14    right now and --

01:12:21  15          THE COURT:  Yes.

01:12:22  16          MR. OLIVER:  Okay.

01:12:22  17          THE COURT:  If it's --

01:12:25  18          MR. OLIVER:  That would be -- it'll just take a

01:12:27  19    couple seconds.

01:12:28  20          MR. BENNETT:  There is a -- it's a housekeeping

01:12:30  21    item that's getting prejudicial, which is when they switch

01:12:36  22    between PDFs, they need to have all of the PDF files that

01:12:40  23    they intend to use open, because what's happening is they

01:12:44  24    open their document folder, and all of the exhibits with

01:12:47  25    the full names of what this -- of what's in them, whether

01:12:48    1    admissible or not --

01:12:48    2           THE COURT:  Can we keep that from happening

01:12:52    3    somehow?

01:12:52    4           MR. OLIVER:  Yes.  That's easy.

01:12:52    5           MR. JOSHI:  We can --

01:12:52    6           MR. OLIVER:  We'll just unplug the cable.

01:12:53    7           MR. JOSHI:  No, don't unplug it.  We'll just have

01:12:53    8    him turn off the screen, we'll get the document, then we'll

01:12:57    9    turn the screen back on.

01:12:58   10           MR. BENNETT:  That's fine.  However we do it,

01:13:00   11    that's fine.

01:13:01   12           MR. OLIVER:  One final thing to note, Your Honor,

01:13:04   13    because I don't think that Dr. Ducharme will be on the

01:13:06   14    stand for the rest of the afternoon, there's still a live

01:13:11   15    objection to the demonstratives that Plaintiff wants to use

01:13:14   16    with their next witness that has not been ruled upon by the

01:13:18   17    Court.

01:13:18   18           THE COURT:  Let's don't deal with that right now.

01:13:21   19           MR. OLIVER:  Okay.  Just wanted to make sure it

01:13:25   20    was on your radar.

01:13:25   21           THE COURT:  Let's get the demonstration set up and

01:13:28   22    bring the jury in.  But thank you for bringing it to my

01:13:33   23    attention.

01:15:04   24           Are we ready?

01:15:06   25           MR. BENNETT:  Just one last question, Your Honor,

01:15:08  1    or raise this and deal with it later, perhaps.

01:15:10  2         But in connection with the curative instructions,

01:15:13  3    we did ask for one with the first mistrial motion that we

01:15:19  4    filed that deals exactly with demonstrations and this

01:15:20  5    witness's testimony --

01:15:20  6         THE COURT:  So let me tell you what my thoughts

01:15:23  7    about that are, Mr. Bennett.  I know that was made.  I

01:15:27  8    think that -- I think that the questioning that the

01:15:31  9    Plaintiffs had, frankly dealt with all of that.  And if it

01:15:39  10   didn't, I think this instruction I'm getting ready to give

01:15:43  11   essentially does that, as well.

01:15:45  12        MR. BENNETT:  Fair enough.

01:15:47  13        THE COURT:  And I do think any prejudice that

01:15:49  14   occurred has been alleviated.

01:15:51  15        MR. BENNETT:  Okay.  Thank you, Your Honor.

01:16:00  16        THE COURT:  All right.  Are we ready, Mr. Joshi?

01:16:03  17        MR. JOSHI:  Yes, Your Honor.

01:16:04  18        THE COURT:  Can I ask the witness, if you would

01:16:09  19   please move the mic over toward you.

01:16:16  20        And let's have the jury brought in.

09:02:02  21        COURT SECURITY OFFICER:  All rise for the jury.

01:16:23  22        (Jury in.)

01:16:35  23        THE COURT:  Please be seated.

01:16:39  24        Okay.  Mr. Joshi, you may continue.

01:16:43  25   BY MR. JOSHI:

| | | |
|---|---|---|
| 01:16:43 | 1 | Q.  Welcome back, Dr. Ducharme. |
| 01:16:45 | 2 | A.  Thank you. |
| 01:16:45 | 3 | Q.  What I have here is Exhibit P-11 which is this monitor. |
| 01:16:53 | 4 | A.  Yes. |
| 01:16:54 | 5 | Q.  What is presently showing now is a color whose R |
| 01:16:59 | 6 | component value is 0, green component value is 240, and |
| 01:17:08 | 7 | blue component value is 255.  If I change the color |
| 01:17:18 | 8 | component adjustment for the green color, will this change |
| 01:17:22 | 9 | the screen? |
| 01:17:23 | 10 | A.  Yes. |
| 01:17:24 | 11 | Q.  Will this color change on the screen?  Same answer? |
| 01:17:29 | 12 | A.  Yes. |
| 01:17:29 | 13 | Q.  Okay.  Thank you. |
| 01:17:31 | 14 | MR. JOSHI:  Mr. Oliver, could you adjust -- in the |
| 01:17:38 | 15 | menu bring up the -- okay.  So we'll just go to the next |
| 01:17:44 | 16 | slide. |
| 01:17:46 | 17 | BY MR. JOSHI: |
| 01:17:51 | 18 | Q.  Again, with reference to Exhibit 11, I'm showing you a |
| 01:17:57 | 19 | color with a red component of 255, green component of 240, |
| 01:18:02 | 20 | and blue component of 0.  If I change the color component |
| 01:18:11 | 21 | adjustment for the color green, will this color change on |
| 01:18:17 | 22 | the screen? |
| 01:18:18 | 23 | A.  Yes. |
| 01:18:20 | 24 | MR. JOSHI:  Next slide, please. |
| 01:18:22 | 25 | BY MR. JOSHI: |

01:18:23    1    Q.  Dr. Ducharme, with reference to Exhibit 11, I'm showing

01:18:28    2    you a color which has the following color components:

01:18:33    3    red, 255; green, 0; blue 240.  If I were to change the

01:18:42    4    color component adjustment for blue, will this color change

01:18:50    5    on the screen?

01:18:51    6    A.  Yes.

01:18:51    7            MR. JOSHI:  Next slide.

01:18:53    8    BY MR. JOSHI:

01:18:55    9    Q.  Dr. Ducharme, I'm showing you a color which has the

01:18:59   10    following color components:  red, 0; green, 255; blue 240.

01:19:07   11    If I change the color component adjustment for the color

01:19:11   12    blue, will this color change on the screen?

01:19:14   13    A.  Yes.

01:19:21   14            MR. JOSHI:  Next slide, please.

01:19:25   15    BY MR. JOSHI:

01:19:33   16    Q.  Dr. Ducharme, can white be an individual color under

01:19:39   17    the Court's construction of the term "individual color"?

01:19:44   18    A.  Yes.

01:19:45   19    Q.  There are several different colors shown on there.  At

01:20:03   20    the top left is a color having the components R, 255;

01:20:10   21    green, 255; blue, 255.  If I change the color -- and then

01:20:27   22    the next color, next to it, has a red component of 228,

01:20:33   23    green component of 228, blue component of 228.

01:20:39   24            The color next to it has a red component of 200,

01:20:44   25    green component of 200, and blue component of 200.

01:20:48   1            Next to that, the color has a red component

01:20:52   2   of 160, green component of 160, and blue component of 160.

01:20:58   3            At the bottom, the first color has a red component

01:21:03   4   of 128, a green component of 128, and a blue component

01:21:10   5   of 128.

01:21:11   6            Next to it, the red component is 100, the green

01:21:21   7   component is 100, and the blue component is 100.

01:21:25   8            And the bottom last from the right, there is a

01:21:28   9   color with components of red at 64, green at 64, and blue

01:21:33  10   at 64.

01:21:34  11            And finally, at the bottom right of the screen,

01:21:37  12   there is a color with red component of 32, green component

01:21:42  13   of 32, and blue component of 32.

01:21:46  14            Dr. Ducharme, are all of these white colors?

01:21:51  15   A.  Yes.

01:21:54  16   Q.  Okay.  And for any of these colors that are shown

01:22:03  17   there, if I were to change the color component adjustment

01:22:08  18   for red, will that change -- will the color change on the

01:22:18  19   screen?

01:22:19  20   A.  Will you just repeat your question?

01:22:31  21   Q.  Sure.  Please.  Yeah, please go ahead.

01:22:35  22   A.  Repeat the question for me.

01:22:36  23   Q.  Oh, you want me to repeat the question?

01:22:39  24   A.  Yes, please.

01:22:40  25   Q.  I'll be happy to.

| | | |
|---|---|---|
| 01:22:43 | 1 | A.  Just the last part. |
| 01:22:44 | 2 | Q.  For any one of these colors on the screen, if I were to |
| 01:22:47 | 3 | change color component adjustment on an accused product for |
| 01:22:55 | 4 | the color red, will the color change on the screen? |
| 01:22:59 | 5 | A.  Yes, the color of each one of these will change. |
| 01:23:06 | 6 | Q.  Okay. |
| 01:23:15 | 7 | A.  It may be a little hard to see with your setup on the |
| 01:23:19 | 8 | one on the bottom right, but... |
| 01:23:21 | 9 | Q.  Would you answer me the same if I asked you the same |
| 01:23:25 | 10 | question about color component adjustment for green? |
| 01:23:27 | 11 | A.  Yes. |
| 01:23:28 | 12 | Q.  Will you answer me the same if I were to ask you the |
| 01:23:31 | 13 | same question about color component adjustment for blue? |
| 01:23:35 | 14 | A.  Yes. |
| 01:23:37 | 15 | MR. JOSHI:  We're done with this demonstrative, |
| 01:23:40 | 16 | Your Honor. |
| 01:23:41 | 17 | THE COURT:  Okay. |
| 01:23:49 | 18 | MR. JOSHI:  Thank you, Mr. Oliver. |
| 01:23:52 | 19 | BY MR. JOSHI: |
| 01:24:26 | 20 | Q.  Dr. Ducharme, yesterday you discussed this slide with |
| 01:24:32 | 21 | the jury. |
| 01:24:33 | 22 | A.  Yes. |
| 01:24:34 | 23 | THE COURT:  Mr. Joshi? |
| 01:24:35 | 24 | MR. JOSHI:  Thank you, Your Honor. |
| 01:24:38 | 25 | BY MR. JOSHI: |

480

| | | |
|---|---|---|
| 01:24:41 | 1 | Q.  It says "pass" at the end of that slide there, the two |
| 01:24:46 | 2 | columns which say:  Pass, pass, pass, pass, up to down. |
| 01:24:51 | 3 | Did you write that or did the machine write it? |
| 01:24:55 | 4 | A.  Did what machine -- |
| 01:24:57 | 5 | Q.  The word "pass" in that slide.  Who -- who -- who added |
| 01:25:01 | 6 | "pass" to that slide, the word? |
| 01:25:04 | 7 | A.  It's -- this is an Excel spreadsheet.  So when you say |
| 01:25:15 | 8 | machine, I'm not sure what you mean.  Do you mean the |
| 01:25:17 | 9 | computer or what -- |
| 01:25:17 | 10 | Q.  Let me clarify.  You did testing, this slide shows test |
| 01:25:22 | 11 | results? |
| 01:25:23 | 12 | A.  Yes. |
| 01:25:23 | 13 | Q.  Okay.  To -- to do the test, you used a machine, I |
| 01:25:29 | 14 | assume? |
| 01:25:29 | 15 | A.  What kind of machine?  I mean -- |
| 01:25:31 | 16 | Q.  A device, a sensor? |
| 01:25:33 | 17 | A.  Okay.  To -- to generate -- I'm not exactly sure |
| 01:25:45 | 18 | what -- which part of the -- of the -- you know -- |
| 01:25:45 | 19 | Q.  All right. |
| 01:25:50 | 20 | A.  -- can you be more clear? |
| 01:25:51 | 21 | Q.  Yes, yes, I'll try.  Do you see there are columns x |
| 01:25:55 | 22 | and y on -- |
| 01:25:55 | 23 | A.  I see the columns. |
| 01:25:56 | 24 | Q.  Okay.  And there's data in there, correct? |
| 01:25:59 | 25 | A.  Yes. |

01:25:59   1   Q.   Where did that data come from?

01:26:01   2   A.   So the color analyzer that I used, that I described

01:26:05   3   yesterday, outputs the x and y values for whatever light

01:26:09   4   you're pointing it at.

01:26:10   5   Q.   Okay.   Okay.   And then the color analyzer data you took

01:26:16   6   and you put it in an Excel spreadsheet?

01:26:21   7   A.   Yes.

01:26:22   8   Q.   Okay.   And the words "pass," you entered those?

01:26:25   9   A.   No -- well, I allowed Excel -- I used a conditional

01:26:29  10   statement in Excel --

01:26:29  11   Q.   Right.

01:26:30  12   A.   -- to evaluate the difference between the row that's

01:26:35  13   marked white --

01:26:36  14   Q.   Yes.

01:26:37  15   A.   -- I compared -- I'm sorry.   It's actually the row that

01:26:41  16   is marked Row 2 -- I guess it's No. 2 --

01:26:41  17   Q.   Right.

01:26:49  18   A.   Row 2 is what I call my control color.   So Rows 3

01:26:54  19   through 12 in x were all compared -- and by compared, I

01:26:59  20   mean subtracted from that control value to get a

01:27:03  21   difference.

01:27:03  22   Q.   Okay.

01:27:04  23   A.   And if that difference was smaller than .002, then I

01:27:14  24   had Excel provide the word "pass."

01:27:18  25   Q.   Yes.

01:27:19  1   A.   If it didn't, it provides the word "fail."

01:27:22  2   Q.   Okay.  So if I understand correctly, the data came from

01:27:26  3   the analyzer, and the pass came from the standard that you

01:27:32  4   set on Excel; is that fair?

01:27:35  5   A.   Yes.

01:27:36  6   Q.   Okay.  And if I were to take a --

01:27:40  7        MR. JOSHI:  Would it be possible to zoom in a bit

01:27:42  8   on the (x,y)?  No, I'm sorry.  We're here, so...

01:28:04  9   BY MR. JOSHI:

01:28:04  10  Q.   So if we look at just a few values of (x,y), what I'm

01:28:10  11  noticing is let's say between the row that has a number

01:28:13  12  that ends with 67, correct -- x value ends with 67?

01:28:18  13  A.   Yes.

01:28:18  14  Q.   And the y ends with, I believe, 6 -- is it 8?

01:28:24  15  A.   66.

01:28:26  16  Q.   66.  And then below the numbers are slightly different.

01:28:31  17  The first one, the x ends in 69, and then the y ends in 65.

01:28:36  18  Do you see that?

01:28:37  19  A.   Yes.

01:28:37  20  Q.   Okay.  And the reason why you -- you believe those

01:28:46  21  differences are insignificant is because human beings

01:28:51  22  cannot perceive a difference that small; is that correct?

01:28:54  23  A.   No.

01:28:55  24  Q.   What is the reason why you said pass even though the

01:28:59  25  numbers are different?

01:29:01    1    A.  With any scientific measurement, if it's based on data

01:29:08    2    that you get from a sensor, some kind of measurement

01:29:14    3    device, there is -- the limit of the measurement, the

01:29:19    4    smallest change, we'll say, that you can measure is

01:29:26    5    determined by what's called the tolerance.

01:29:29    6             So this color analyzer has a color -- it's

01:29:34    7    actually a chromaticity difference.  Chromaticity is just a

01:29:41    8    bench word for color -- chromaticity difference of plus or

01:29:43    9    minus .002.

01:29:43   10    Q.  Okay.

01:29:45   11    A.  So what that means is that if we didn't put any light

01:29:49   12    into the sensor, it might give us values that are that

01:29:53   13    small, and they would randomly fluctuate because electronic

01:29:59   14    signals have what's called a noise floor.  So they would

01:30:04   15    randomly fluctuate.  So the lowest point that you can trust

01:30:08   16    the numbers that an instrument gives you in a scientific

01:30:14   17    experiment is the tolerance of the device.  So numbers may

01:30:19   18    change below that, but they can't be trusted.  It could

01:30:22   19    just be random fluctuations in the instrument.

01:30:26   20    Q.  Okay.  But when there's so much change -- where you can

01:30:30   21    see they're changing row after row after row after row

01:30:34   22    after row, it's not as if the change is only for one or two

01:30:38   23    rows.  Do you see that?

01:30:46   24    A.  You're talking about down the column, right?

01:30:49   25    Q.  Correct.

01:30:50  1   A.   I mean, down the column, I would expect those numbers

01:30:53  2   to change.   If they change greater than the tolerance

01:30:56  3   value, a bigger number, then that column on the right would

01:31:01  4   say fail.   And I have no control other that, other than I

01:31:04  5   created the condition.   But the numbers, they fluctuate but

01:31:09  6   I would expect them to, as I would with any scientific

01:31:12  7   measurement.

01:31:13  8   Q.   Did you do any testing to see what change occurred to

01:31:20  9   the drive signal of the display as these numbers change?

01:31:25  10  A.   What did you say again?

01:31:26  11  Q.   The drive signal of the display.

01:31:29  12  A.   No.

01:31:30  13  Q.   Did you do any testing to check if the crystal angle of

01:31:38  14  the display changed because of these changes in the

01:31:42  15  numbers?

01:31:42  16  A.   If the crystal changed?

01:31:44  17  Q.   The angle, yes.

01:31:46  18  A.   The crystal angle of --

01:31:48  19  Q.   The display.

01:31:53  20  A.   No.

01:31:53  21  Q.   Okay.   Do you know who Mr. Perdue is?

01:32:10  22  A.   I recognize the name.   I believe he's a witness in this

01:32:10  23  case, but I --

01:32:18  24  Q.   He is Lone Star's damages expert.

01:32:22  25        Have you spoken to him in the course of this

01:32:25  1  litigation?

01:32:25  2  A.  Oh, yeah.  Yes, I have.

01:32:27  3  Q.  Did you talk to Mr. Perdue about whether patents and

01:32:32  4  license agreements were comparable to the '435 patent prior

01:32:39  5  to submitting your infringement report in this case?

01:32:42  6  A.  I don't recall when I talked to him and when I

01:32:49  7  submitted this, no.

01:32:50  8  Q.  And then if you don't recall that, then I'll still ask

01:32:54  9  the next question anyway.

01:32:56  10        For which licenses did you analyze the patents and

01:33:02  11  inform Mr. Perdue of technical comparability to the '435

01:33:07  12  patent?

01:33:07  13        MR. SABA:  Your Honor, objection, foundation.

01:33:10  14        THE COURT:  Can you lay a foundation?

01:33:11  15        MR. JOSHI:  Sure.

01:33:13  16  BY MR. JOSHI:

01:33:18  17  Q.  Now that I have brought up Mr. Perdue, do you recall

01:33:22  18  having a conversation with him?

01:33:23  19  A.  I remember having a conversation with him.  I don't

01:33:32  20  remember if it was about ASUS.  I was -- it was probably

01:33:37  21  several -- it was several years ago.  So --

01:33:41  22  Q.  But you didn't have any conversation with Mr. Perdue in

01:33:42  23  the context of this litigation; is that correct?

01:33:46  24  A.  I -- I honestly, I don't recall.  I can't -- I don't

01:33:52  25  remember the specifics of a conversation with him about

01:33:54   1   this case.

01:33:55   2   Q.  But to the best of your recollection, the conversation

01:33:59   3   was many years ago?

01:34:00   4   A.  It was -- it was over a year ago to the best of my

01:34:04   5   recollection.

01:34:04   6   Q.  Okay.  Do you recall if the conversation was about

01:34:07   7   license agreements?

01:34:09   8   A.  I don't recall any discussions with anyone about

01:34:16   9   licensing.

01:34:16  10   Q.  Okay.  Thank you.

01:34:19  11         Yesterday, Dr. Ducharme, you said that calibration

01:34:57  12   of a monitor is recommended every 200 to 300 hours.  Do you

01:35:11  13   recall saying that?

01:35:12  14   A.  I don't know if I used the word "calibration."  I

01:35:16  15   believe I said -- well, can you -- can we read the

01:35:21  16   transcript back?  I can't remember my exact phrasing.

01:35:24  17   Q.  Well, let me ask you another question.  You didn't

01:35:30  18   present any evidence today or yesterday that ASUS

01:35:34  19   recommends its users to calibrate the monitor every 200 to

01:35:42  20   300 hours?

01:35:45  21   A.  I -- no, I don't believe I did.

01:35:47  22   Q.  Okay.  Earlier today, I showed you a slide on double

01:36:21  23   patenting that you used yesterday.  Do you recall that?

01:36:24  24   A.  Yes.

01:36:24  25   Q.  Okay.  And on that slide, there was a mention of

487

```
01:36:43   1   look-up table.  Do you recall?
01:36:46   2   A.  Yes.
01:36:50   3   Q.  In your testimony today and yesterday, the only reason
01:36:53   4   that you gave for the difference between the '012 and the
01:37:00   5   '435 patent was the look-up table; is that correct?
01:37:02   6         MR. SABA:  Your Honor, I'm going to object to
01:37:04   7   asked and answered.  We went into this this morning.
01:37:07   8         MR. JOSHI:  That was a different question I asked.
01:37:10   9   I asked about the slide.  Now I'm asking about the
01:37:13  10   testimony.
01:37:14  11         THE COURT:  All right.  Overruled.
01:37:14  12         MR. SABA:  Thank you, Your Honor.
01:37:18  13   A.  Can you ask the question again?
01:37:20  14   BY MR. JOSHI:
01:37:21  15   Q.  Yes.  In your testimony today and yesterday, the only
01:37:25  16   reason that you have presented for there being a difference
01:37:28  17   between the '012 patent and the '435 patent is the look-up
01:37:33  18   table?
01:37:34  19   A.  I don't believe that was my testimony.  I said that's
01:37:36  20   one of the reasons.
01:37:37  21   Q.  But you didn't give any other reasons, did you?
01:37:41  22   A.  I believe I said that in the '012 patent, with the
01:37:49  23   look-up tables, you're adjusting this look-up table.  And
01:37:54  24   in the '435, you're affecting each single pixel.
01:38:00  25         I -- there was some phrasing where I said that,
```

01:38:02    1   you know, they were affecting all the pixels in the '012

01:38:06    2   and going through each pixel in the '435.  I don't remember

01:38:10    3   exactly what I said, but that's what I know.  So I assume

01:38:13    4   that's what I said.

01:38:14    5   Q.  Okay.  But all of that discussion was about look-up

01:38:23    6   tables, correct, versus arithmetic and logical operations?

01:38:32    7   A.  I'm a little unclear as to what you're asking.  All of

01:38:36    8   what discussions was about look-up -- I don't --

01:38:39    9   Q.  Yesterday, and maybe even today in your discussion with

01:38:41   10   Mr. Saba, you differentiated the '012 patent from the '435

01:38:47   11   patent, correct?

01:38:48   12   A.  Yes.

01:38:49   13   Q.  And any and all the differences that you pointed

01:38:56   14   between the two patents related to the look-up table,

01:38:59   15   correct?

01:38:59   16   A.  Yes.

01:38:59   17   Q.  Okay.  Just a couple more questions.

01:39:35   18          MR. JOSHI:  Andrew, I'm sorry to disturb you, but

01:39:40   19   could you please pull up DX-1 for me?  It's the patent, the

01:39:45   20   '435 patent.  Would you please pull up Claim 1?  Could you

01:40:22   21   please high -- blow up the identifying limitation of

01:40:24   22   Claim 1?

01:40:55   23   BY MR. JOSHI:

01:40:56   24   Q.  Dr. Ducharme, is it your position that with respect to

01:40:59   25   the identifying limitation, when a red slider in an accused

01:41:10  1  ASUS device is adjusted, then every input pixel having a

01:41:21  2  value of red greater than 0 is identified?

01:41:25  3  A.  No.

01:41:37  4  Q.  Could you -- could you tell me what your position is in

01:41:41  5  that regard?

01:41:42  6  A.  This -- this limitation discusses identifying pixels

01:41:49  7  that meet certain arithmetic and logical operations.

01:41:56  8       And earlier we talked about when the red pixel N

01:42:01  9  needs to be greater than an argument plus green and plus

01:42:05  10  blue, and we talked about that, then that is, I mean, a

01:42:08  11  very good example of how you could use arithmetic and

01:42:12  12  logical operations.

01:42:13  13       Just remember, arithmetic operations are plus,

01:42:18  14  minus, multiplication, and divide; and then logical

01:42:22  15  operations are equals, less than, greater than.

01:42:25  16       But in the same patent, Column 9, it teaches that

01:42:31  17  the designer or whoever is using this method can combine

01:42:38  18  these logical operations.

01:42:40  19       So, I mean, I could imagine a scenario where, I

01:42:46  20  don't know for what purpose, you could design an

01:42:51  21  identifying -- or arithmetic and logical operation using a

01:42:53  22  combination of logical operators that would select the

01:42:57  23  pixels of 0.  It doesn't make any sense to me to do that,

01:43:02  24  but the patent teaches that the designer has the ability to

01:43:07  25  combine these operators and still meet this limitation.

01:43:10  1  Q.  So in your infringement analysis of the accused

01:43:19  2  products, which input pixels in the accused products did

01:43:31  3  you identify and which input pixels -- let me start that

01:43:35  4  again.

01:43:35  5         And I'm only talking about input pixels having

01:43:38  6  red.

01:43:38  7         And my question is:  For the accused products,

01:43:44  8  what was the value of red that determined whether you

01:43:50  9  selected certain input pixels and didn't select certain

01:43:57  10  input pixels?

01:43:58  11  A.  In the accused products, it was a value greater than 0.

01:44:03  12  Q.  Okay.  And because of that manner of selecting the

01:44:14  13  input pixels in the accused products, do you believe that

01:44:19  14  ASUS products infringe the Limitation (e) of Claim 1?

01:44:34  15  A.  Yes.

01:44:42  16  Q.  Okay.  Thank you, Dr. Ducharme.

01:44:44  17         MR. JOSHI:  We're done, Your Honor.  Thank you.

01:44:46  18         THE COURT:  Redirect?

01:44:47  19         MR. SABA:  Yes, Your Honor.  A few questions

01:44:48  20  briefly.

01:44:51  21                REDIRECT EXAMINATION

01:45:03  22  BY MR. SABA:

01:45:27  23  Q.  Thank you, Dr. Ducharme.

01:45:28  24         I just wanted to ask a few brief questions based

01:45:31  25  on some of the questions that Mr. Joshi was asking you

01:45:35  1   about.

01:45:35  2          You still have your reports in front of you,

01:45:37  3   correct?

01:45:38  4   A.  Yes, I do.

01:45:38  5   Q.  Let me start talking -- let me ask you some questions

01:45:43  6   here about the color-changing technology.

01:45:53  7          Before lunch and shortly thereafter, Mr. Joshi had

01:45:56  8   asked you a lot of questions about the color-changing

01:46:00  9   technology and implying that the ASUS products didn't

01:46:03  10  infringe.  You remember that?

01:46:04  11  A.  Yes.

01:46:05  12  Q.  All right.  And I don't really believe that he gave you

01:46:12  13  a fair chance to explain, and so I want to be -- I want to

01:46:16  14  give you a chance to explain briefly.

01:46:22  15         MR. SABA:  And, Denver, can you put on the screen

01:46:24  16  the six bars, please?

01:46:28  17  BY MR. SABA:

01:46:28  18  Q.  We talked about this yesterday.  We're not pulling out

01:46:31  19  any displays.

01:46:32  20         I want you -- you see the color chart in front of

01:46:34  21  you, right?

01:46:35  22  A.  Yes.

01:46:37  23  Q.  Now, assuming that this color array is being displayed

01:46:42  24  on the 3-axis ASUS display?

01:46:44  25  A.  Yes.

01:46:44  1   Q.  I change red, hue or saturation, which colors will

01:46:50  2   change?

01:46:50  3   A.  The red color on the left, denoted red 100, green --

01:46:59  4   I'm sorry, green 0, blue 0, and then I'm going to look

01:47:02  5   down, any one of those that contains red is going to

01:47:05  6   change.

01:47:05  7         So on the far right, with magenta and yellow, red

01:47:08  8   is 100 -- I'm speaking about magenta.  Red is 100, green

01:47:13  9   is 0, blue is 100.  That will change.  And then yellow, red

01:47:20  10  is 100, green is 100, and blue is 0.  It's on the right.

01:47:24  11  That will change, as well.

01:47:27  12  Q.  So the colors that will change are red?

01:47:29  13  A.  Yes.

01:47:29  14  Q.  Purple?

01:47:30  15  A.  Yes.

01:47:30  16  Q.  And yellow?

01:47:32  17  A.  Yes.

01:47:32  18  Q.  Okay.  Now, if we're on a 6-axis ASUS display and I

01:47:36  19  change red, which colors will change?

01:47:39  20  A.  Red.

01:47:39  21  Q.  Just red?

01:47:40  22  A.  Yes.

01:47:40  23  Q.  Not purple?

01:47:43  24  A.  No.

01:47:44  25  Q.  Why?

01:47:47  1  A.  The selection of these received input pixels is based

01:47:56  2  on arithmetic and logical operations, so pluses and

01:48:03  3  minuses, greater thans and equal tos.  The 3-axis monitor

01:48:09  4  looks for just those three colors, red, green, blue, and

01:48:15  5  applies a set of arithmetic and logical operations to

01:48:17  6  determine which of the pixels in the rest of the screen

01:48:20  7  have one of those colors that you selected.

01:48:23  8          When you display the same pattern on a 6-axis

01:48:26  9  monitor, it's a different set of arithmetic and logical

01:48:31  10  operators.  They have different code -- different source

01:48:36  11  code or different -- different functions running in their

01:48:40  12  brains, as I called it yesterday.

01:48:42  13          So as the patent is -- teaches -- and by teaches,

01:48:47  14  we mean it's in the specification, it explains that the

01:48:51  15  designer of someone that's going to use this method can use

01:48:57  16  logical operators, arithmetic operators, and you can use

01:49:02  17  them in different ways and in combinations, and it's very

01:49:05  18  important.

01:49:06  19          So does that answer your question?

01:49:08  20  Q.  Yes, sir.

01:49:09  21          We've been talking about -- well, let me ask you

01:49:12  22  this question.  Is all of that with your -- consistent with

01:49:16  23  your opinion of infringement?

01:49:18  24  A.  Yes.

01:49:18  25  Q.  We've been talking about 3-axis, and we are -- we've

01:49:21   1   been talking about 6-axis, right?

01:49:23   2   A.   Yes.

01:49:23   3   Q.   But is 3 or 6 or 25 necessary to infringe the claims of

01:49:29   4   the '435?

01:49:33   5   A.   No.

01:49:34   6   Q.   So could I have a 20-axis control monitor that would

01:49:38   7   still infringe upon the '435?

01:49:41   8   A.   Yes.

01:49:42   9   Q.   If I had -- excuse me.

01:49:45   10        Mr. Joshi was asking you about the -- it was the

01:49:47   11   black and white slide; do you remember that?

01:49:48   12   A.   Yes.

01:49:49   13   Q.   Does white change the opinions of your analysis?

01:49:52   14   A.   No.

01:49:53   15   Q.   And do the ASUS monitors that you looked at and you

01:49:56   16   rendered an opinion on, is all of the things we talked

01:49:59   17   about consistent with your opin -- opinion of infringement?

01:50:05   18   A.   Yes.

01:50:05   19   Q.   All right.  Thank you, sir.

01:50:06   20        MR. JOSHI:  Nothing from us, Your Honor.

01:50:09   21        MR. SABA:  I'm not done yet, Mr. Joshi.  Thank

01:50:12   22   you.

01:50:12   23        MR. JOSHI:  I'm sorry.

01:50:15   24   BY MR. SABA:

01:50:15   25   Q.   Mr. Joshi was also talking to you about brightness and

01:50:19   1   gain.  Do you remember that?

01:50:19   2   A.  Yes.

01:50:20   3   Q.  All right.  And he asked you whether or not gain,

01:50:23   4   brightness, were actually included in the Court's

01:50:27   5   construction.  Do you remember that?

01:50:28   6   A.  Yes.

01:50:29   7   Q.  I don't believe he gave you an opportunity to --

01:50:33   8        MR. SABA:  May I approach, Your Honor?

01:50:35   9        THE COURT:  You may.

01:50:36   10  BY MR. SABA:

01:50:37   11  Q.  I don't believe he gave you an opportunity to state the

01:50:41   12  definition of hue and saturation, so I'm going to ask you,

01:50:45   13  what's the construction of hue?

01:50:46   14  A.  It is one, tint -- sorry -- two, graduation [sic] or

01:50:55   15  shade of a color or color component; or three, the angle

01:50:59   16  between one color or color component and the other

01:51:03   17  colors -- colors or color components characterized in a

01:51:06   18  particular color space.

01:51:08   19  Q.  Did you say -- I'm sorry.  Did you say shade or color?

01:51:12   20  A.  Yes.

01:51:12   21  Q.  Tint?

01:51:14   22  A.  Yes.

01:51:14   23  Q.  What is the definition of saturation?

01:51:22   24  A.  The Court's construction order states that saturation

01:51:26   25  is, one, the intensity of a color or color component

01:51:31  1  characterized in a particular color space or, two,

01:51:34  2  vividness of hue.

01:51:35  3  Q.  So does it matter what Mr. Joshi is contending is gain

01:51:41  4  or brightness if it fits the definition of the

01:51:46  5  construction?

01:51:46  6           MR. JOSHI:  Objection.

01:51:49  7           THE COURT:  What's the objection?

01:51:50  8           MR. JOSHI:  He's -- he's asking what is and isn't

01:51:54  9  included in the claim construction.

01:51:58  10          MR. SABA:  Your Honor, I'm just responding to

01:52:00  11  Mr. Joshi's cross where we went into this, and he said that

01:52:04  12  brightness and gain were not.  And I'm just asking the

01:52:07  13  witness of the Court's proper construction of the terms.

01:52:10  14          THE COURT:  Can you --

01:52:10  15          MR. JOSHI:  The construction is what it is,

01:52:12  16  Your Honor.

01:52:12  17          THE COURT:  Overruled.

01:52:17  18  BY MR. SABA:

01:52:17  19  Q.  Let me rephrase the question, just to be clear.  If

01:52:20  20  there is any sort of color change that meets one of the

01:52:24  21  definitions of hue or saturation, does that infringe upon

01:52:27  22  the claim?

01:52:28  23  A.  Yes.

01:52:43  24  Q.  We talked a little bit -- Mr. Joshi was asking you a

01:52:47  25  little bit about the MediaTek source code.  Do you remember

01:52:49   1   that?

01:52:49   2   A.  Yes.

01:52:49   3   Q.  All right.  First, how did Lone Star get the source

01:52:54   4   code from MediaTek?

01:52:57   5   A.  It was -- a request was made as part of what's called

01:53:02   6   the interrogatories where certain things were requested,

01:53:06   7   and it was a response to that.

01:53:15   8   Q.  Through the litigation, correct?

01:53:17   9   A.  Through the litigation.

01:53:19   10  Q.  All right.  Do you recall -- in rendering your

01:53:29   11  opinions, you relied upon some --

01:53:31   12          MR. SABA:  Thank you, Denver.

01:53:33   13  BY MR. SABA:

01:53:34   14  Q.  -- some information called responses to

01:53:35   15  interrogatories.  Do you remember that?

01:53:36   16  A.  Yes.

01:53:37   17  Q.  All right.  And ASUS provided some responses to

01:53:39   18  interrogatories in this case?

01:53:40   19  A.  Yes.

01:53:41   20  Q.  Do you remember what they said about the information

01:53:43   21  regarding the specific MediaTek chips in at least some of

01:53:48   22  their devices?

01:53:49   23  A.  That the responses of what was produced is

01:53:55   24  representative of the code used for the color adjustment

01:53:58   25  functions.

01:53:58   1   Q.   Okay.   Let me be more specific.

01:54:00   2           MR. SABA:   Can I approach, Your Honor?

01:54:01   3           THE COURT:   You may.

01:54:03   4   BY MR. SABA:

01:54:04   5   Q.   I want to refresh your recollection.

01:54:13   6           MR. JOSHI:   Objection.   Mischaracterization,

01:54:15   7   Your Honor.

01:54:16   8           THE COURT:   Overruled.

01:54:17   9           MR. SABA:   Thank you, Your Honor.

01:54:19   10   BY MR. SABA:

01:54:20   11   Q.   Dr. Ducharme, do you remember what -- what ASUS said

01:54:23   12   with regard to what information do you have in your --

01:54:32   13   across the accused devices with regard to MediaTek?

01:55:34   14   A.   So the -- just -- it says that the information is

01:55:36   15   representative data for the products identified.

01:55:39   16   Q.   Yeah.   And how many products did they identify?

01:55:41   17   A.   How many what?

01:55:42   18   Q.   How many products were -- how many MediaTek scaler

01:55:45   19   chips were identified by ASUS?

01:55:49   20   A.   Well, it looks like there's one, two, three, four,

01:55:53   21   five, six.

01:55:55   22   Q.   Right.   And I believe one is for a projector, right?

01:56:00   23   A.   Yes.

01:56:00   24   Q.   All right.   So four -- four or five, I can't

01:56:00   25   remember --

01:56:05  1  A.  One, two, three, four, five.

01:56:05  2  Q.  Right.  So did they provide all of the -- anyway, so

01:56:11  3  you had said that then --

01:56:16  4       MR. SABA:  Your Honor, may we publish Exhibit 29,

01:56:20  5  Plaintiff's 29, which is the interrogatory responses?

01:56:22  6       MR. JOSHI:  No objection.

01:56:24  7       MR. SABA:  Thank you.

01:56:26  8       THE COURT:  Yes.

01:56:29  9       MR. SABA:  May I approach, Your Honor?

01:56:32  10       THE COURT:  You may.

01:56:33  11  BY MR. SABA:

01:56:54  12  Q.  Dr. Ducharme, if you could look at your screen.  Thank

01:56:57  13  you very much.  It says:  The following table sets forth

01:57:00  14  the representative data for the products identified in the

01:57:03  15  complaint as agreed by the parties.

01:57:04  16       Okay.  Is this what you were talking about a

01:57:07  17  second ago?

01:57:07  18  A.  Yes.

01:57:08  19  Q.  And then tell me where -- well, you've got -- you know,

01:57:09  20  the first product here, PA27AC -- there we go -- the second

01:57:14  21  one under there, those are media -- have been identified as

01:57:19  22  having MediaTek chips, correct?

01:57:21  23  A.  Yes.

01:57:21  24  Q.  And then you've got two more at the bottom.

01:57:30  25       MR. SABA:  And then the one above that, Denver.

01:57:35  1  BY MR. SABA:

01:57:40  2  Q.  And then they provided -- excuse me.

01:57:43  3        Did ASUS provide the scaler model number?

01:57:47  4  A.  In the table it's identified, yes.

01:57:50  5  Q.  Right.  And so that information was included in, I

01:57:54  6  believe you said, the interrogatories?

01:57:56  7  A.  Yes.

01:57:57  8  Q.  Right.  And MediaTek provided information back,

01:58:01  9  correct?

01:58:03  10  A.  Yes.

01:58:04  11  Q.  All right.  Do you believe that what MediaTek provided

01:58:14  12  back was relevant or related to the ASUS products?

01:58:19  13  A.  Yes.

01:58:19  14  Q.  Do you have any reason to dispute that whatever they

01:58:24  15  produced in source code was not what it actually appeared

01:58:27  16  to be?

01:58:28  17  A.  No.

01:58:28  18  Q.  And you reviewed the code, correct?

01:58:30  19  A.  Yes.

01:58:31  20  Q.  Yeah.  Do you have your copy of your report handy?

01:58:35  21  A.  Yes.

01:58:36  22  Q.  Could you grab it really quick?  I'm not going to go

01:58:40  23  deep on this, but I want to ask you a question.  Can you

01:58:42  24  give the ladies and gentlemen of the jury just one example

01:58:45  25  of how you used the source code to formulate your opinions?

01:58:49  1   Nothing detailed.

01:58:53  2   A.  I pointed to some of the functions indicating

01:59:02  3   arithmetic and logical operations.

01:59:03  4   Q.  Very good.  And that is cited throughout your report,

01:59:08  5   correct?

01:59:09  6   A.  Yes.

01:59:10  7   Q.  All right.  You were asked some questions on -- let's

01:59:20  8   go over to the validity side of your opinions, right?  Your

01:59:25  9   opinions earlier were that the patent -- the '435 patent is

01:59:29  10  valid, and you were asked to render some opinions on that.

01:59:34  11  A.  Yes.

01:59:35  12  Q.  Mr. Joshi was -- Joshi, pardon me, was asking you

01:59:40  13  questions about the Brett reference?

01:59:43  14  A.  Yes.

01:59:44  15  Q.  All right.  What is described and disclosed in the

01:59:49  16  Brett reference?

01:59:53  17  A.  The Brett reference is a patented invention for

02:00:01  18  post-editing of film.  So it takes film -- old-style movie

02:00:06  19  film and converts it to digital video.  And the patent is a

02:00:15  20  way to -- they call it post-processing editing of the color

02:00:20  21  information and what's translated to digital.

02:00:24  22  Q.  So -- was it -- did you refer to it as post-processing

02:00:31  23  yesterday?  Yesterday.

02:00:32  24  A.  I may have.

02:00:33  25  Q.  Yeah.  Is there any real time video component to Brett?

02:00:40  1   A.  There's no real time digital video component in Brett.

02:00:47  2   Q.  Does Brett affect the hue or saturation of any

02:00:51  3   individual color?

02:00:52  4   A.  No.

02:00:52  5   Q.  We are talking about -- Mr. Joshi was asking you

02:00:58  6   questions about this double patenting.  Do you remember

02:01:00  7   that?

02:01:00  8   A.  Yes.

02:01:01  9   Q.  All right.  The patent office had issued the -- Lone

02:01:08  10  Star's '012 patent prior to the '435, right?

02:01:13  11  A.  Yes.

02:01:14  12  Q.  And they didn't have a problem with ultimately issuing

02:01:18  13  the '435, did they?

02:01:21  14  A.  No.

02:01:21  15  Q.  Do you think the Patent Office would have issued the

02:01:25  16  '435 patent if the '012 somehow invalidated it?

02:01:30  17  A.  No.

02:01:30  18  Q.  One last topic here.  We talked a little bit about

02:01:37  19  these look-up tables.  And you were asked in your report --

02:01:46  20  I think it was 70.  My question is, is there anything

02:01:51  21  inconsistent about what you said on the matrix and look-up

02:01:57  22  tables and your position on the validity of the '435

02:02:01  23  patent?

02:02:01  24  A.  No.

02:02:06  25  Q.  Dr. Ducharme, thank you for your time this afternoon.

| | | |
|---|---|---|
| 02:02:24 | 1 | MR. JOSHI:  Mr. Oliver, may I please have |
| 02:02:27 | 2 | Plaintiff's 29? |
| 02:02:27 | 3 | May I proceed, Your Honor? |
| 02:02:29 | 4 | THE COURT:  You may. |
| 02:02:29 | 5 | RECROSS-EXAMINATION |
| 02:02:35 | 6 | BY MR. JOSHI: |
| 02:02:48 | 7 | Q.  Dr. Ducharme, Mr. Saba asked you some questions about |
| 02:02:53 | 8 | this interrogatory response from us.  Do you recall? |
| 02:02:55 | 9 | A.  Yes. |
| 02:02:56 | 10 | Q.  Now, at the top, tell me if it says representative data |
| 02:03:01 | 11 | or does it say representative products? |
| 02:03:04 | 12 | A.  It says representative data for the products identified |
| 02:03:08 | 13 | on the complaint, and that's what -- |
| 02:03:11 | 14 | Q.  It says representative data for the products |
| 02:03:14 | 15 | identified, right? |
| 02:03:15 | 16 | A.  Yes. |
| 02:03:15 | 17 | Q.  Okay.  The first product that's listed, PA27AC, are you |
| 02:03:24 | 18 | aware that that's a 6-axis product? |
| 02:03:36 | 19 | A.  I believe it is.  It starts with PA. |
| 02:03:39 | 20 | Q.  Okay.  And so is the second product, correct? |
| 02:03:41 | 21 | A.  I would assume so, yes. |
| 02:03:43 | 22 | Q.  And then the third product is a RealTek chip and not a |
| 02:03:48 | 23 | MediaTek chip, correct? |
| 02:03:49 | 24 | A.  That's correct. |
| 02:03:49 | 25 | Q.  And you never got the RealTek chip? |

02:03:52   1    A.  No.

02:03:53   2    Q.  I'm sorry.  You never got the RealTek source code,

02:03:56   3    correct?

02:03:57   4    A.  Yeah, that's correct.

02:03:59   5    Q.  Then the next two products are also ProArt or PA,

02:04:07   6    correct?

02:04:07   7    A.  Yes.

02:04:07   8    Q.  Also 6-axis?

02:04:09   9    A.  Yes, that's correct.

02:04:11  10    Q.  And then the bottom product is projectors, correct?

02:04:14  11    A.  Yes.

02:04:14  12    Q.  Okay.  So, essentially -- and then the projector is

02:04:21  13    neither 3-axis nor 6-axis, correct?

02:04:25  14    A.  You're asking me a question about the projector?

02:04:31  15    Q.  Yes.

02:04:32  16    A.  I don't -- my understanding was that projectors were no

02:04:35  17    longer at issue.

02:04:36  18    Q.  Okay.  So the only source code that was requested by

02:04:43  19    Lone Star from MediaTek was for 6-axis products, correct?

02:04:51  20    A.  According to this list, yes.

02:04:53  21    Q.  And Lone Star went by this list to the best of your

02:04:57  22    knowledge?

02:04:57  23    A.  Yes.

02:04:58  24    Q.  So Lone Star never requested their source code for a

02:05:01  25    3-axis product from MediaTek, correct?

02:05:04  1  A.  I don't -- I wouldn't know that.  I see a list.

02:05:16  2  Q.  Okay.  So, now, you -- you have these scaler model

02:05:22  3  numbers in the medium -- in the middle column.  Do you see

02:05:25  4  that?

02:05:25  5  A.  Yes.

02:05:26  6  Q.  Did you compare those numbers with identifiers on the

02:05:33  7  source code to see if MediaTek produced source code for any

02:05:36  8  of those chips?

02:05:41  9  A.  To -- my understanding is that the code isn't from

02:05:51  10  particular chips.  It's representative of what's used in

02:05:54  11  their chips.

02:05:56  12  Q.  Why do you -- why do you believe that?

02:05:59  13  A.  I guess it was an assumption I made as an engineer that

02:06:06  14  these functions would be used in all their different chips.

02:06:11  15  Q.  Is it possible that the whole time you were reading the

02:06:15  16  source code, you were reading the source code for a product

02:06:17  17  that's not at issue in this case?

02:06:22  18  A.  I wouldn't have -- I would have no reason to believe

02:06:26  19  that that was the case.

02:06:27  20  Q.  Okay.

02:06:41  21       MR. JOSHI:  Mr. Oliver, may I have -- I believe

02:06:43  22  it's DX-139.

02:07:29  23  BY MR. JOSHI:

02:07:29  24  Q.  So, Dr. Ducharme, this is Exhibit DX-139.

02:07:33  25       MR. JOSHI:  Could you scroll down, Andrew?

| | | |
|---|---|---|
| 02:07:35 | 1 | BY MR. JOSHI: |
| 02:07:36 | 2 | Q.  This is a list of all the ODMs that do manufacturing |
| 02:07:39 | 3 | for ASUS. |
| 02:07:43 | 4 | Have you reviewed this list, Dr. Ducharme? |
| 02:07:49 | 5 | A.  I don't recall seeing this before. |
| 02:07:51 | 6 | Q.  Do you know if Lone Star asked for technical documents |
| 02:07:55 | 7 | and/or source code from these companies? |
| 02:07:59 | 8 | A.  I don't know. |
| 02:08:00 | 9 | Q.  Okay.  Dr. Ducharme, have you ever testified as an |
| 02:08:06 | 10 | expert for a Defendant in a patent case? |
| 02:08:14 | 11 | A.  In court? |
| 02:08:14 | 12 | Q.  Yes. |
| 02:08:16 | 13 | A.  No. |
| 02:08:16 | 14 | Q.  How about in a deposition? |
| 02:08:18 | 15 | A.  Yes. |
| 02:08:21 | 16 | Q.  Okay.  Have you ever been involved in a case in which a |
| 02:08:25 | 17 | patent was invalidated? |
| 02:08:28 | 18 | A.  Not to my knowledge.  I don't think so.  I don't always |
| 02:08:43 | 19 | know the outcome of cases I work on. |
| 02:08:45 | 20 | Q.  Okay. |
| 02:08:46 | 21 | A.  Sometimes it ends at my deposition, so... |
| 02:08:49 | 22 | Q.  Okay. |
| 02:08:50 | 23 | A.  I mean -- |
| 02:08:51 | 24 | Q.  And you know of cases in which patents have been |
| 02:08:57 | 25 | invalidated? |

| | | |
|---|---|---|
| 02:08:59 | 1 | A.  Yes. |
| 02:09:00 | 2 | Q.  Thank you, Dr. Ducharme. |
| 02:09:03 | 3 | MR. SABA:  Just very briefly, Your Honor. |
| 02:09:09 | 4 | FURTHER REDIRECT EXAMINATION |
| 02:09:11 | 5 | BY MR. SABA: |
| 02:09:44 | 6 | Q.  Dr. Ducharme, when Lone Star requested the source code |
| 02:09:49 | 7 | for the accused products from MediaTek, what did MediaTek |
| 02:09:54 | 8 | give Lone Star subject to that subpoena? |
| 02:10:02 | 9 | MR. JOSHI:  He said he doesn't know, Your Honor. |
| 02:10:07 | 10 | THE COURT:  Can you rephrase the question? |
| 02:10:11 | 11 | MR. SABA:  Sure. |
| 02:10:13 | 12 | BY MR. SABA: |
| 02:10:13 | 13 | Q.  When MediaTek was subpoenaed for the information based |
| 02:10:17 | 14 | on ASUS had provided, what did they provide subject to the |
| 02:10:21 | 15 | subpoena? |
| 02:10:22 | 16 | A.  The code. |
| 02:10:22 | 17 | MR. JOSHI:  Asked and answered.  He said he |
| 02:10:24 | 18 | doesn't know. |
| 02:10:25 | 19 | THE COURT:  Overruled. |
| 02:10:27 | 20 | BY MR. SABA: |
| 02:10:27 | 21 | Q.  I'm sorry? |
| 02:10:28 | 22 | A.  They provided a listing of all the code, the hard copy |
| 02:10:37 | 23 | of the code. |
| 02:10:39 | 24 | Q.  And what -- what -- generally, what's a subpoena? |
| 02:10:44 | 25 | A.  It's a -- |

02:10:45   1          MR. JOSHI:  Objection.  He is not an expert on

02:10:47   2   this kind of stuff.

02:10:48   3          THE COURT:  Can you lay a foundation for it?

02:10:51   4          MR. SABA:  Sure.

02:10:52   5   BY MR. SABA:

02:10:53   6   Q.  You understand that there's legal mechanisms in order

02:10:55   7   to obtain information from third --

02:10:58   8   A.  Yes.

02:10:58   9   Q.  And in that regard, would you categorize a subpoena to

02:11:03  10   that effect?

02:11:04  11   A.  Yes.

02:11:04  12   Q.  And does that come with, you know, authority that you

02:11:07  13   got to answer it, or you'll be in violation of a court

02:11:11  14   order?

02:11:11  15   A.  Yes.

02:11:12  16   Q.  All right.  And what happens if you violate that

02:11:15  17   subpoena?

02:11:16  18          MR. JOSHI:  Objection.  Outside the scope of his

02:11:19  19   expertise.

02:11:20  20          MR. SABA:  I'll rephrase the question, Your Honor.

02:11:23  21   BY MR. SABA:

02:11:24  22   Q.  Are there ramifications for not complying with a

02:11:27  23   subpoena?

02:11:28  24   A.  Yes.

02:11:28  25          MR. JOSHI:  Same objection.

| | | |
|---|---|---|
| 02:11:30 | 1 | THE COURT:  Overruled. |
| 02:11:33 | 2 | BY MR. SABA: |
| 02:11:33 | 3 | Q.  And so in response to the subpoena, MediaTek produced |
| 02:11:37 | 4 | the source code? |
| 02:11:37 | 5 | A.  That's correct. |
| 02:11:38 | 6 | Q.  All right.  And to be clear, MediaTek knows -- do you |
| 02:11:46 | 7 | believe that MediaTek knows the source code -- which source |
| 02:11:49 | 8 | code is relevant to the ASUS products? |
| 02:11:51 | 9 | A.  Yes. |
| 02:11:52 | 10 | Q.  Was there any substantial difference among the, I don't |
| 02:11:56 | 11 | know, Mr. Joshi said three chunks of code that was |
| 02:12:00 | 12 | produced? |
| 02:12:01 | 13 | MR. JOSHI:  Objection, foundation. |
| 02:12:06 | 14 | THE COURT:  Can you lay a foundation? |
| 02:12:08 | 15 | MR. SABA:  Yes, Your Honor. |
| 02:12:09 | 16 | BY MR. SABA: |
| 02:12:09 | 17 | Q.  In your report, Dr. Ducharme, you discuss the |
| 02:12:12 | 18 | similarities among the functionality of the code.  Do you |
| 02:12:14 | 19 | remember that? |
| 02:12:14 | 20 | A.  Yes. |
| 02:12:15 | 21 | Q.  Was there any substantial similar -- dissimilarities in |
| 02:12:18 | 22 | the code base that you reviewed? |
| 02:12:20 | 23 | A.  No. |
| 02:12:21 | 24 | Q.  Do you know whether or not ASUS's expert even bothered |
| 02:12:29 | 25 | to review the code? |

02:12:31    1   A.  I don't believe he did.

02:12:32    2   Q.  I want to ask one last question.

02:12:37    3           MR. SABA:  Denver, could you please publish

02:12:41    4   Plaintiff's 29.  This is what -- the interrogatory

02:12:43    5   responses we're talking to -- about just a moment ago.  And

02:12:49    6   if you could go to Page 8, please.

02:12:55    7   BY MR. SABA:

02:12:55    8   Q.  Okay.  Dr. Ducharme, you see the P -- there are two --

02:13:09    9   there are two devices -- accused devices or representative

02:13:12   10   products, whatever you want to call them, on this that

02:13:16   11   have -- one has a MediaTek chip, and one has a RealTek

02:13:20   12   semiconductor chip.  Do you see that?

02:13:23   13   A.  Yes.

02:13:23   14   Q.  And one of them is like a PB328Q, and the other is a

02:13:31   15   PA328Q.  Do you see that?

02:13:32   16   A.  Yes.

02:13:34   17   Q.  All right.  In your analysis, is there any

02:13:37   18   difference -- significant difference in the

02:13:42   19   color-functionality among the 6-axis devices?

02:13:45   20   A.  No.

02:13:45   21   Q.  So did it matter whether it was a RealTek chip or a

02:13:53   22   MediaTek chip?

02:13:53   23   A.  It shouldn't matter.

02:13:54   24   Q.  Why?

02:13:55   25   A.  Well, I mean, this ability to individually select and

02:14:04    1    adjust a color the way a user likes it is a valuable

02:14:08    2    feature.  And you have to assume that whoever makes the

02:14:15    3    chip that performs that function, the little brain, is

02:14:19    4    going to have the same result.  You move the slider, and

02:14:23    5    the colors move in a standard way or way you -- you'd

02:14:28    6    assume that they would move.

02:14:30    7         So I would -- no matter who makes the chip, I

02:14:33    8    would assume that the function would be the same because

02:14:35    9    it's what we want.  It's what the users -- and what ASUS

02:14:39   10    would -- sorry -- would require from the vendor of the

02:14:44   11    chips.

02:14:46   12    Q.  Thank you very much for your time this afternoon,

02:14:50   13    Dr. Ducharme.

02:14:50   14         MR. JOSHI:  Just two questions, Your Honor.

02:14:53   15                 FURTHER RECROSS-EXAMINATION

02:14:55   16    BY MR. JOSHI:

02:14:56   17    Q.  Dr. Ducharme?

02:14:57   18    A.  Yes.

02:14:57   19    Q.  From time to time, you have referred to these chips as

02:15:00   20    the brains of the product; is that correct?

02:15:02   21    A.  Yes.

02:15:06   22    Q.  Okay.  Now, you said it makes no difference whether

02:15:09   23    RealTek makes it or MediaTek makes it or something to that

02:15:13   24    effect.  Do you recall saying that to Mr. Saba right now?

02:15:16   25    A.  Yes.

02:15:17   1    Q.  Okay.

02:15:19   2    A.  And I don't know if those are the exact words I used

02:15:22   3    but --

02:15:22   4    Q.  Okay.

02:15:22   5    A.  -- close.

02:15:23   6    Q.  Because the gist of what I got was because they

02:15:27   7    accomplish the same goal, correct?

02:15:28   8    A.  They provide a feature that behaves similarly, yes.

02:15:33   9    Q.  Now, whether a chip uses look-up tables or whether

02:15:41  10    you -- it uses some other kind of arithmetic logic, you

02:15:46  11    wouldn't know that until you look at the source code,

02:15:50  12    correct?

02:15:53  13    A.  That's correct.

02:15:54  14    Q.  Okay.  And you looked at least one instance, namely the

02:16:06  15    double-patenting case, whether -- where a look-up table

02:16:09  16    versus arithmetic logic made a difference, correct?

02:16:15  17    A.  I'm sorry.  Can you ask the question again?  I'm

02:16:18  18    just --

02:16:20  19    Q.  In -- in your opinions on double patenting, you

02:16:23  20    differentiated between two patents based on one using a

02:16:29  21    look-up table and one using arithmetic logic, correct?

02:16:33  22    A.  That was not the only difference.

02:16:35  23    Q.  I agree.  Okay.  But whether I agree or don't agree

02:16:41  24    doesn't matter for this conversation.

02:16:43  25         What matters is you differentiated between two

02:16:47  1  patents based on look-up table.

02:16:55  2  A.   Yes.

02:16:55  3  Q.   Okay.   And the RealTek chip and the MediaTek chip may

02:17:00  4  serve the same ASUS product, but one may do a look-up table

02:17:04  5  and one may do a different form of logic, correct?

02:17:09  6  A.   It's possible.

02:17:10  7  Q.   Okay.   So just because they meet the same purpose in

02:17:16  8  the end doesn't mean they do it the same way, correct?

02:17:19  9  A.   Correct.

02:17:20  10  Q.   And if -- and by doing things differently, one could

02:17:23  11  infringe and one could not infringe, correct?

02:17:28  12  A.   Correct.

02:17:29  13  Q.   Okay.   Thank you, Dr. Ducharme.

02:17:33  14          MR. SABA:   Nothing further, Your Honor.

02:17:36  15          THE COURT:   Okay.   You may step down.

02:17:44  16          Ladies and gentlemen of the jury, I want to give

02:17:46  17  you a couple of instructions about Dr. Ducharme's

02:17:49  18  testimony, and then we're going to take a short break

02:17:55  19  because the attorneys and I have some matters we need to

02:17:58  20  discuss before the next witness testifies.

02:18:03  21          With respect to Dr. Ducharme's testimony, ASUS's

02:18:07  22  counsel asked Dr. Ducharme to read from the Court's claim

02:18:13  23  construction order.   That was improper.   And you are

02:18:17  24  instructed to ignore the testimony provided by Dr. Ducharme

02:18:22  25  that quoted from the Court's claim construction order.

02:18:27  1        You also heard an exchange with the witness where

02:18:31  2   an accused product was compared to what is known in patent

02:18:35  3   law as a preferred embodiment.  And the Court is

02:18:40  4   instructing you and I will instruct you further at the

02:18:44  5   close of the evidence that for purposes of finding

02:18:49  6   infringement, the claim limitations are not restricted by

02:18:53  7   or limited to the preferred embodiment.

02:18:59  8        So with those instructions, we are going to take a

02:19:04  9   recess now hopefully of about 15 minutes.

02:19:09  10        COURT SECURITY OFFICER:  All rise for the jury.

02:19:12  11        (Jury out.)

02:19:45  12        THE COURT:  Okay.  Please be seated.

02:19:48  13        Mr. Oliver, you reminded me before we began this

02:19:52  14   afternoon's session that ASUS had filed some objections to

02:19:56  15   the demonstratives or the slides to be used with the next

02:20:00  16   witness.

02:20:01  17        I've taken a look at those, and I have numbered

02:20:04  18   them in a way that corresponds with essentially the way you

02:20:10  19   set them out in your -- in your -- in your filing.

02:20:19  20        I've also had a opportunity to review the

02:20:22  21   Plaintiff's response to that.

02:20:23  22        I will be happy to hear anything you wish to say,

02:20:27  23   Mr. Oliver, and I'll be glad to hear anything Lone Star

02:20:31  24   wishes to say about that -- about this issue.  There are --

02:20:36  25   I'll tell you, there are only three that I think are

02:20:41  1   essentially not waived and that do concern me.  And I'd

02:20:46  2   like to hear whatever you want to say about that, as well

02:20:48  3   as any response.

02:20:49  4        And they are as follows:  No. 2 -- again,

02:20:53  5   according to your numbering -- which relates to an

02:20:58  6   objection or a concern about some request for post-trial

02:21:01  7   damages when the parties had agreed that the case would be

02:21:07  8   through damages through trial.  That's your No. 2.

02:21:10  9        No. 6, which is an objection to an increase in the

02:21:17 10   damages sought by the Plaintiff with respect to the

02:21:28 11   difference, I gather, between March 17th and May 17 and --

02:21:33 12   which resulted apparently in an increase of $1.58 million

02:21:40 13   to $1.72 million.

02:21:43 14        And then what you, I think, numbered 10, which is

02:21:46 15   a demonstrative or a slide that relates to licenses that

02:21:50 16   are labeled as having not been produced.

02:21:53 17        So, again, you're welcome to make whatever

02:21:57 18   argument you wish to make about these, but those are the

02:22:03 19   three that I find concerning.

02:22:07 20        MR. OLIVER:  Your Honor, with -- are you able to

02:22:17 21   hear me?

02:22:18 22        THE COURT:  I can hear you, yes.

02:22:19 23        MR. OLIVER:  Okay.  I wasn't sure whether the

02:22:22 24   microphone was picking me up.

02:22:24 25        With respect to the waiver issue that was raised

02:22:27   1   by Plaintiff, I believe the waiver argument was that these

02:22:31   2   should have been raised in a motion.  I'm looking at

02:22:34   3   Federal Rule of Evidence 103(e) on observing claims of

02:22:40   4   error, and I don't want to quibble too much, but just want

02:22:44   5   to note that in 103(a)(1)(a), it provides two different

02:22:52   6   opportunities to raise a claim of error.  One is an

02:22:54   7   objection, and one is a motion, two different types of

02:22:57   8   things.  The Court's scheduling order dealt with motions.

02:23:04   9   This is an objection.

02:23:05   10          Second --

02:23:05   11          THE COURT:  How is this different from a motion to

02:23:07   12   strike or a Daubert motion or something like that?  Because

02:23:12   13   most of these feel like Daubert motions to me.

02:23:16   14          MR. OLIVER:  Most of them are not Daubert motions

02:23:20   15   because most of them are based on relevance and things

02:23:29   16   being more prejudicial than probative of any value.  So

02:23:32   17   they're not based upon the scientific methodology, they're

02:23:37   18   based on whether they're relevant to the question presented

02:23:38   19   to the jury and whether they're more prejudicial than

02:23:41   20   probative.

02:23:41   21          THE COURT:  Right.

02:23:42   22          MR. OLIVER:  So that's why I believe -- I just

02:23:44   23   wanted to make sure that statement was clear on the record

02:23:47   24   in response to the arguments about waiver.  And the rules

02:23:52   25   do clearly denote two different things -- two different,

02:23:56  1   you know, objections or motions.

02:23:58  2          So I don't believe that the order that was --

02:24:02  3   scheduling order that was restricted just to motions

02:24:05  4   applies to objections.

02:24:07  5          THE COURT:  So as I understand what you're

02:24:10  6   objecting to now, it's not the testimony, it's the

02:24:12  7   demonstrative; is that correct?

02:24:14  8          MR. OLIVER:  It is.  And then we'll make similar

02:24:16  9   objections to the testimony that it tried to shoehorn in

02:24:21 10   the -- the evidence that's also not relevant and more

02:24:26 11   prejudicial than probative.

02:24:28 12          Sorry.  Did I interrupt Your Honor?

02:24:30 13          THE COURT:  No.  You answered my question.  I

02:24:32 14   mean, I guess my point is you wouldn't have filed this

02:24:35 15   brief if you hadn't been provided with a copy of the

02:24:38 16   demonstrative.

02:24:39 17          So really all we're talking about now is the

02:24:41 18   demonstratives.  You can make whatever objections during

02:24:45 19   the testimony you think are appropriate.

02:24:47 20          MR. OLIVER:  Okay.  Thank you.

02:24:48 21          On -- moving on to the three that Your Honor has

02:24:57 22   said you did not consider waived and wanted to consider,

02:25:04 23   this morning for the first time, while we were meeting and

02:25:09 24   conferring about the jury verdict form, Plaintiff said they

02:25:13 25   wanted to revise it to claim post-trial damages in, you

02:25:19  1  know, essentially a lump-sum damages amount that covers a

02:25:23  2  post-trial period.

02:25:24  3       And so this is the first time we've heard of that

02:25:27  4  request.  We've already put on exhibits that have testified

02:25:33  5  and left.  Mr. Rice has testified and left.  Dr. Ducharme

02:25:37  6  has testified and left.  And it's -- it's too late.

02:25:42  7       THE COURT:  Is it disclosed in an expert report?

02:25:46  8  It was?

02:25:46  9       MR. OLIVER:  The number was disclosed, but when

02:25:55  10  the Plaintiff put in its pre-trial papers, including the

02:25:57  11  jury verdict form, they asked for damages up to trial.  So

02:26:01  12  if there's an amount after trial, that's something that

02:26:04  13  should be --

02:26:04  14       THE COURT:  Well, I think in openings they said

02:26:07  15  they were asking for $2.8 million, right?  Did that number

02:26:11  16  not include post-trial damages?

02:26:12  17       MR. OLIVER:  That number includes what their

02:26:14  18  expert put in the post-trial damages, but we didn't know at

02:26:16  19  the time that --

02:26:17  20       THE COURT:  Overruled.  Move on to your next one.

02:26:22  21       MR. OLIVER:  Okay.  So on No. 6, Mr. Rice -- the

02:26:30  22  point I wanted to make here is the revised calculations

02:26:34  23  were received again after trial had started, and these are

02:26:39  24  not based on information that came from ASUS late or like a

02:26:46  25  revised spreadsheet of sales.  This is just his projection

| | | |
|---|---|---|
| 02:26:51 | 1 | based on the data that he has had for more than seven |
| 02:26:57 | 2 | months. |
| 02:26:57 | 3 | THE COURT:  So I want to ask you very clearly. |
| 02:27:00 | 4 | Was the first time you learned of this number on Monday? |
| 02:27:05 | 5 | MR. OLIVER:  Yes. |
| 02:27:06 | 6 | THE COURT:  Okay.  And how did you learn it? |
| 02:27:09 | 7 | MR. OLIVER:  It -- well, I believe we learned of |
| 02:27:12 | 8 | it through the -- the documents that we're objecting to -- |
| 02:27:17 | 9 | the demonstratives that we're objecting to. |
| 02:27:19 | 10 | THE COURT:  When that was first provided to you? |
| 02:27:22 | 11 | MR. OLIVER:  Right.  In connection with the |
| 02:27:23 | 12 | Court's deadlines for providing demonstratives in advance |
| 02:27:27 | 13 | of testimony. |
| 02:27:27 | 14 | THE COURT:  Okay.  And was a supplemental report |
| 02:27:30 | 15 | provided to you? |
| 02:27:30 | 16 | MR. OLIVER:  I don't believe so.  No, Your Honor. |
| 02:27:33 | 17 | THE COURT:  Okay.  All right. |
| 02:27:34 | 18 | MR. OLIVER:  And then the final point, I believe |
| 02:27:40 | 19 | our issue on No. 10 is -- is adequately briefed.  The fact |
| 02:27:44 | 20 | that something was not produced and that the witness found |
| 02:27:47 | 21 | some listing somewhere that they believe is probative is -- |
| 02:27:51 | 22 | is not relevant here.  He hasn't analyzed the licenses. |
| 02:27:55 | 23 | THE COURT:  Could I -- do you have a copy of this |
| 02:27:58 | 24 | slide?  Could you put the slide on the Elmo maybe? |
| 02:28:08 | 25 | MR. BENNETT:  Your Honor, if it's easier, our |

02:28:10   1    technical guy can put it up.

02:28:13   2            THE COURT:  That will be helpful.  Yes, please.

02:28:19   3            MR. OLIVER:  11.  At the top, it says:  ASUS

02:28:24   4    Licenses.

02:28:46   5            THE COURT:  Okay.  I don't need to hear any more

02:28:49   6    argument on this.  I'll hear from the Plaintiff.

02:28:58   7            MR. LEE:  Your Honor, regarding Point No. 6, the

02:29:03   8    damages, although there was -- adjusted because the table

02:29:07   9    had an incorrect date of March 15th, the overall trial

02:29:12   10   number is still $2.8 million that's being sought.  There's

02:29:15   11   no change in the ask amount by Plaintiff.

02:29:18   12           THE COURT:  But the -- the number increased from

02:29:22   13   $1.58 million to $1.72 million, correct?

02:29:28   14           MR. LEE:  That's correct, because the --

02:29:30   15   Mr. Perdue's determination of the one-time royalty payment

02:29:34   16   of $2.8 million looks at it from the period of filing of

02:29:40   17   the complaint through the patent expiration.  So the

02:29:46   18   overall sales numbers and data that he's using, it's the

02:29:49   19   same data number but it's just --

02:29:50   20           THE COURT:  So wait a minute.  Maybe I'm

02:29:53   21   misunderstanding.  What you're saying is because the trial

02:29:56   22   date moved from March 17th to May 17th, that these damages

02:30:01   23   changed from being pre-trial to post-trial or post-trial to

02:30:06   24   pre-trial?

02:30:07   25           MR. LEE:  That's how he split it up in his

02:30:11  1  calculations just to look at what the damages would be for

02:30:13  2  the payment.

02:30:13  3          THE COURT:  Okay.  And so why did we wait until

02:30:15  4  Monday to disclose that number?

02:30:18  5          MR. LEE:  We just noticed it and corrected it when

02:30:21  6  we were going through the slides -- when we were putting up

02:30:22  7  the --

02:30:22  8          THE COURT:  Yeah, but the trial -- the trial date

02:30:25  9  was moved a long time ago.

02:30:27  10          MR. LEE:  We just noticed it on the report,

02:30:30  11  Your Honor, but the overall damages number that Mr. Perdue

02:30:36  12  assesses, it's through the end of the trial -- through the

02:30:39  13  end of patent expiration.

02:30:42  14          THE COURT:  All right.  You've convinced me on

02:30:43  15  that.

02:30:43  16          Mr. Oliver, I'm going to overrule your objection

02:30:46  17  on that.  I think there was -- there should not be any

02:30:48  18  surprise about it.  It's just a question of where it lies

02:30:51  19  on the timeline.  The number -- the overall number

02:30:53  20  shouldn't -- should not have been a surprise to you.

02:30:57  21          MR. LEE:  Regarding Point No. 10, that's the only

02:31:01  22  objection to slides that were made.  We won't use it.

02:31:03  23          THE COURT:  Yeah, I think that slide is not

02:31:05  24  appropriate.  Okay.

02:31:06  25          All right.  Let's -- it's 2:30.  To avoid having

02:31:13  1   another break, let's take a short break right now, and

02:31:17  2   we'll resume.

02:31:17  3           MR. OLIVER:  Did Your Honor rule on the --

02:31:19  4           COURT SECURITY OFFICER:  All rise.

02:31:20  5           THE COURT:  Yes, I did.  I overruled your

02:31:23  6   objection.

02:31:25  7           (Recess.)

02:47:32  8           (Jury in.)

02:47:32  9           COURT SECURITY OFFICER:  All rise.

02:47:35  10           THE COURT:  Please be seated.  All right.

02:47:37  11   Plaintiffs may call its next witness.

02:47:40  12           MR. BENNETT:  Your Honor, Plaintiffs call Glenn

02:47:46  13   Perdue.

02:47:46  14           THE COURT:  Mr. Perdue, if you would raise your

02:47:48  15   right hand to be sworn, please.

02:47:51  16           (Witness sworn.)

02:48:02  17           THE COURT:  You may be seated.

02:48:20  18        GLENN PERDUE, PLAINTIFF'S WITNESS, SWORN

02:48:23  19                 DIRECT EXAMINATION

02:48:23  20   BY MR. LEE:

02:48:25  21   Q.  Good afternoon, Mr. Perdue.  How are you today?

02:48:27  22   A.  Good.

02:48:27  23   Q.  Why are you here today?

02:48:29  24   A.  To testify as to damages in this patent infringement

02:48:32  25   case.

02:48:32  1  Q.  Can you tell us a little bit about your background in
02:48:36  2  terms of your educational history?
02:48:39  3  A.  Sure.  I do know where I went to school.  I didn't need
02:48:49  4  the screen for that, but it is helpful.  Yeah.  So I
02:48:53  5  attended -- I started out in engineering school.  I
02:49:00  6  finished up with a degree in business at Middle Tennessee
02:49:04  7  State University, just outside of Nashville.  And then I
02:49:09  8  did my MBA at Vanderbilt in Nashville.
02:49:15  9  Q.  And what's the focus of your bachelor's degree?
02:49:17 10  A.  Concentration in finance.
02:49:18 11  Q.  What about your MBA degree, what was the focus on that?
02:49:20 12  A.  It was a general MBA.
02:49:22 13  Q.  What did you do after you graduated from Vanderbilt?
02:49:26 14  A.  I continued doing consulting work.  I had started a
02:49:29 15  technology company with a partner earlier in my career, in
02:49:33 16  between MTSU and Vanderbilt, and I continued doing
02:49:37 17  technology-related consulting work.
02:49:39 18  Q.  At the technology company that you started with your
02:49:42 19  partner, what type of business was that in?
02:49:45 20  A.  A software development company.
02:49:47 21  Q.  And what sort of experience did you gain while working
02:49:58 22  at that technology company?
02:49:58 23  A.  Well, we built accounting systems for businesses, so I
02:49:58 24  tell people that was my first MBA was starting and running
02:49:58 25  your own business.

02:50:08    1              THE COURT:  Mr. Lee, could I ask you to speak up,

02:50:11    2     and let me ask the witness to speak up, as well, please.

02:50:15    3              THE WITNESS:  Yes, Your Honor.

02:50:16    4              MR. LEE:  Yes, Your Honor.

02:50:18    5     BY MR. LEE:

02:50:23    6     Q.  Did you have experience with licensing at this

02:50:25    7     technology company?

02:50:25    8     A.  I did.

02:50:26    9     Q.  What sort of licensing experience did you acquire?

02:50:30   10     A.  We licensed our products out to people that were using

02:50:32   11     our products, and we in-licensed technology from companies

02:50:36   12     where we were using their software.

02:50:38   13     Q.  Now, why did you license in technology from other

02:50:41   14     companies?

02:50:42   15     A.  Well, we needed that technology, and to be able to gain

02:50:44   16     access to it legally, we had to license it from them.

02:50:47   17     Q.  And what about licensing out your technology, why did

02:50:49   18     you do that?

02:50:50   19     A.  That was the way we sold and conveyed our products, and

02:50:54   20     that's the way those transactions are.

02:50:56   21     Q.  And how long were you at this technology company?

02:50:58   22     A.  About six years.

02:51:00   23     Q.  What did you do after that?

02:51:01   24     A.  So after that -- so I sold my interest in that company,

02:51:05   25     and that's when I went to Vanderbilt to do the MBA, and

02:51:09   1   then I continued doing consulting for technology-related

02:51:12   2   companies.

02:51:13   3   Q.  And I see that you have listed as your work experience

02:51:17   4   two companies on this slide.  Can you explain to us a

02:51:20   5   little bit about both?

02:51:21   6   A.  Sure.  So Crowe Chizek & Company was a top 10 -- is a

02:51:31   7   top 10 accounting and consulting firm.  That's why I was

02:51:33   8   there for about four years.  Before that, I was with a

02:51:36   9   company called LECG.  That's where I started doing the type

02:51:41   10   of work that I do now.  And then after that, it was Kraft

02:51:48   11   Analytics where I started the subsidiary of Kraft CPAs in

02:51:50   12   Nashville, which is a large local accounting and consulting

02:51:52   13   firm.

02:51:54   14   Q.  This next slide, some of your representative clients,

02:52:00   15   can you walk us through some of the -- why you prepared a

02:52:07   16   slide?

02:52:08   17   A.  Sure.  Well, the -- on the left, the corporate clients,

02:52:09   18   those are some -- some known corporations, some known

02:52:11   19   names, DuPont, Pfizer, Nissan, Xerox, so some large

02:52:24   20   corporations that people would be familiar with.

02:52:24   21   Q.  And what type of work did you do for these clients?

02:52:28   22   A.  Work that I was doing for these clients and still do

02:52:31   23   for some of these clients is generally related to damages.

02:52:32   24   Q.  And you've also listed musical acts.  Why did you

02:52:36   25   include this on your slide?

02:52:37  1  A.  Well, it's a lot less boring than the stuff on the

02:52:41  2  left-hand side of the slide, first of all, but being in

02:52:43  3  Nashville, we do a lot of work with intellectual property

02:52:49  4  related to musical acts.

02:52:50  5         And there's a couple of famous Texans on that

02:52:54  6  slide, too.

02:52:54  7         MR. LEE:  Slide No. 2.

02:52:57  8  BY MR. LEE:

02:52:58  9  Q.  What type of credentials do you have in terms of

02:53:01  10  certifications?

02:53:02  11         THE COURT:  Mr. Lee, I hate to fuss at you --

02:53:02  12         MR. LEE:  Okay.

02:53:05  13         THE COURT:  -- but I'm struggling myself, and I

02:53:07  14  think the witness needs to speak up.

02:53:10  15  BY MR. LEE:

02:53:10  16  Q.  What type of certifications do you have?

02:53:12  17  A.  So the first one is a CVA, which stands for Certified

02:53:19  18  Valuation Analyst.

02:53:20  19  Q.  And what type of skills do you acquire being certified

02:53:24  20  as a CVA?

02:53:26  21  A.  So that's primarily related to business and intangible

02:53:28  22  asset valuation work.

02:53:29  23  Q.  The MAFF, what qualifications do you acquire for that?

02:53:38  24  A.  So that's more of a -- that's a Master Analyst in

02:53:40  25  Financial Forensics, and that's kind of what we're here --

02:53:41  1   that's what I'm doing here today.  This is financial

02:53:43  2   forensics.  It's financial analysis to assist the Court.

02:53:49  3   So that was mostly about damage calculations.

02:53:53  4   Q.  Do you have any other certifications, sir?

02:53:57  5   A.  Yes.  So the one at the bottom there, that's Certified

02:54:00  6   Licensing Professional, and that deals directly with the

02:54:02  7   issue of intellectual property licensing.

02:54:05  8   Q.  You have listed some papers there.  Can you explain why

02:54:10  9   those are there?

02:54:11  10  A.  Yes.  So these are the last three peer-reviewed papers

02:54:17  11  that were published that I authored.  And they deal with

02:54:22  12  intellectual property issues.  And I've had about six or

02:54:26  13  seven peer-reviewed papers, and I've written about 25, I

02:54:31  14  think, overall that have been published.

02:54:33  15  Q.  What about presentations, have you provided any related

02:54:38  16  to damages?

02:54:38  17  A.  I do.  I present on valuation and damages regularly for

02:54:43  18  State Bar associations, for industry groups.  I've

02:54:52  19  presented for LES, the Association of University Technology

02:54:54  20  Managers, and other groups.  And I actually present at

02:54:57  21  Vanderbilt, too, at the law school and other places.

02:55:00  22  Q.  How long have you been serving as an expert on patent

02:55:04  23  damages?

02:55:05  24  A.  So my first case was with LECG, and that was about

02:55:10  25  18 years ago, I believe.  That was my first patent

02:55:13   1   infringement case that I was retained on and wrote a report

02:55:16   2   for.

02:55:19   3   Q.  How many back patent damages cases have you worked on?

02:55:24   4   A.  Probably about 20.  Obviously, a lot of those settle

02:55:28   5   and don't see the light of day, but it's probably about 20

02:55:32   6   patent infringement cases.

02:55:33   7          MR. LEE:  Your Honor, Plaintiff moves for

02:55:35   8   Mr. Perdue to be tendered as an expert in damages.

02:55:38   9          THE COURT:  Any objection?

02:55:39  10          MR. OLIVER:  No objection.

02:55:41  11          THE COURT:  Very well.

02:55:43  12   BY MR. LEE:

02:55:46  13   Q.  Mr. Perdue, what was your homework assignment for this

02:55:51  14   case?

02:55:53  15   A.  Well, to read -- you mean for -- oh, for this case

02:55:57  16   overall?

02:56:03  17   Q.  Yes, this case overall.

02:56:05  18   A.  Yeah.  Well, it was to come up with a report that

02:56:13  19   addressed the damages using the -- based on reasonable

02:56:15  20   royalties.

02:56:15  21   Q.  And what type of information did you review in

02:56:20  22   evaluating the damages?

02:56:21  23   A.  Well, so on this slide, it's in three -- three big

02:56:23  24   buckets.  There was Lone Star information that I reviewed,

02:56:26  25   which is -- was primarily the licensing agreement,

02:56:28  1  obviously the patent, and then there were some other

02:56:31  2  miscellaneous documents.

02:56:32  3  Q.  What about Defendant, what sort of information did you

02:56:38  4  review on them?

02:56:39  5  A.  Well, at the top of that list is the financial

02:56:42  6  information.  I was dependent upon the financial

02:56:45  7  information that the Defendant provided to be able to do my

02:56:48  8  calculations of damages in terms of sales.

02:56:51  9       And then there were some license agreements, I

02:56:54  10  reviewed their website, looked at some discovery responses,

02:56:57  11  and there were some other miscellaneous information.

02:57:00  12  Q.  You know, besides Defendant's information, what other

02:57:04  13  information did you review?

02:57:05  14  A.  So the Defendant's expert, Mr. Reed, published a

02:57:10  15  report, submitted a report in this case.  I reviewed that.

02:57:14  16  I had a discussion with Dr. Ducharme that we just heard

02:57:17  17  from a moment ago.  I looked at industry articles and

02:57:20  18  license agreements, industry license agreements, and then I

02:57:24  19  reviewed some of the trial testimony.

02:57:31  20  Q.  What's your opinion on the damages for this case that's

02:57:38  21  owed to Lone Star by ASUS?

02:57:40  22  A.  The lump sum amount for the entire period that was

02:57:43  23  considered is $2.8 million.

02:57:45  24  Q.  Is $2.8 million a reasonable amount in your opinion?

02:57:49  25  A.  It is.

02:57:49  1   Q.  And why is that?

02:57:50  2   A.  Well, if you can -- you look over to the right there,

02:57:55  3   this is the -- kind of the first indicator.  There's a lot

02:57:57  4   of indicators of reasonableness here, but the very first

02:58:00  5   one is --

02:58:00  6           MR. OLIVER:  Objection.  Your Honor, I believe the

02:58:05  7   witness is about to testify about a large number, and we

02:58:08  8   object to that testimony on the basis of relevance and more

02:58:16  9   prejudicial than probative.

02:58:19 10           MR. LEE:  Your Honor, that's a number that's used

02:58:21 11   by Mr. Perdue.  It's disclosed in his expert report.  It

02:58:24 12   forms the damages base where he uses to go and calculate

02:58:28 13   the damage -- the ending damages amount of $2.8 million.

02:58:34 14           MR. OLIVER:  And this type of number, this large

02:58:36 15   number has been explicitly rejected by the Federal Circuit,

02:58:40 16   Your Honor, the use of it.

02:58:41 17           THE COURT:  What do you mean?

02:58:43 18           MR. OLIVER:  The Federal Circuit has said you

02:58:45 19   cannot -- you have to apportion, and the apportionment

02:58:48 20   number, and showing that -- the small slice out of a large

02:58:48 21   number is not the -- (indecipherable) -- that was cited in

02:58:51 22   their motion.

02:58:51 23           THE COURT:  Did you file a Daubert motion on this?

02:58:54 24           MR. OLIVER:  No, Your Honor.  I'm making an

02:58:56 25   objection.

02:58:57  1           THE COURT:  Overruled.

02:58:59  2  BY MR. LEE:

02:59:00  3  Q.  Please continue, Mr. Perdue.

02:59:02  4           Can you explain to us why the royalty payment of

02:59:05  5  $2.8 million is reasonable?

02:59:07  6  A.  Yeah.  So, again, this is kind of just one of the first

02:59:10  7  indicators of reasonableness here.

02:59:12  8           You can see that that $2.8 million number, if you

02:59:16  9  divide it by the $882 million in revenue that it was

02:59:22  10 derived from represents a fraction of 1 percent,

02:59:25  11 three-tenths of 1 percent of those revenues, and that's

02:59:30  12 the -- what we call the effective royalty rate.

02:59:38  13 Q.  Mr. Perdue, you prepared a slide.

03:00:02  14          Can you explain to us -- can you explain to us why

03:00:07  15 did you -- why did you prepare this slide?

03:00:08  16 A.  Sure.  This is a slide that I have used for years in

03:00:13  17 valuation presentations when I'm teaching, and it gets to

03:00:19  18 the heart of the idea of how we use market-based

03:00:24  19 information in valuation or in damages settings, and it's

03:00:27  20 the idea of comparable houses.

03:00:29  21          And if you're trying to figure out what you should

03:00:32  22 offer, for instance, for the yellow house, the third one

03:00:36  23 from the left with the question mark above it, and you know

03:00:39  24 that those houses around it sold for between 1.1 and

03:00:44  25 $1.3 million, that would inform you as to what might be a

03:00:49   1   reasonable offer on the yellow house that you're looking

03:00:52   2   at.

03:00:54   3          That represents a purchase price, if you transact

03:01:00   4   at that amount, these 1.1 to $1.3 million.  Those represent

03:01:07   5   purchase prices.  That's a price to own.

03:01:10   6          There's also a price to use.  For a house, it's a

03:01:13   7   rental rate.  What we're talking about here is more like

03:01:20   8   that.  It's more of a rental rate.  It's more of a price to

03:01:24   9   use, and that's what a royalty rate is.  It's a price to

03:01:27   10  use someone else's information technology.

03:01:29   11  Q.  Now, in the context of a hypothetical negotiation, what

03:01:36   12  would be the royalty -- relevant data or metrics that one

03:01:41   13  would want to look at for that licensing arrangement?

03:01:45   14  A.  Yeah.  So if you're looking at a house, you get on

03:01:47   15  Zillow, you look for comparable houses in neighborhood that

03:01:50   16  you're interested in.

03:01:51   17         With this, you try to find the most comparable or

03:01:55   18  analogous licenses you can to the technology in question to

03:01:58   19  help you understand what royalty rates for the technology

03:02:01   20  at issue would be.

03:02:02   21  Q.  And how did you determine the damages amount in this

03:02:14   22  case?

03:02:14   23  A.  Based on a reasonable royalty.

03:02:17   24         MR. LEE:  Denver, Slide 6.

03:02:20   25  BY MR. LEE:

03:02:22   1    Q.  Mr. Perdue, can you explain this slide for us?

03:02:25   2    A.  Sure.  This is the idea of a hypothetical negotiation.

03:02:28   3    So I don't know how much you've heard about the

03:02:31   4    Georgia-Pacific factors or the Georgia-Pacific case, but it

03:02:34   5    basically sets forth 15 factors that should be considered

03:02:45   6    when you're trying to go through that assessment that I

03:02:46   7    talked about earlier, trying to find a reasonable royalty

03:02:51   8    rate that's applicable to the patent-in-suit and the

03:02:56   9    infringement action, and it's based upon some of these

03:02:59   10   ideas here.

03:03:00   11   Q.  And what are some of the assumptions that are assumed

03:03:04   12   in those negotiations?

03:03:07   13   A.  Well, the first assumption is you assume -- and this is

03:03:10   14   always the case with the damages expert.  In this case, you

03:03:13   15   assume that the patent is valid, it's enforceable, and it's

03:03:18   16   infringed, or it would be infringed if you got to the point

03:03:22   17   of use.

03:03:22   18        So that basically says you're assuming that it's

03:03:27   19   a -- that it's a good patent and that it's valid.  That's

03:03:31   20   the first assumption.

03:03:32   21        And then this next bullet point and the last one

03:03:35   22   are kind of similar.  This idea of this willingness to

03:03:39   23   negotiate and the ideas that the parties have got to come

03:03:43   24   up with a deal.

03:03:45   25        In the real world, people can walk away from the

03:03:50   1   negotiating table, but in the context of this hypothetical

03:03:53   2   negotiation, we assume that they reach agreement.  They

03:03:55   3   stayed there, and they reach agreement.  So that's one of

03:04:02   4   the things.

03:04:02   5           And we assume that they are there voluntarily.  So

03:04:06   6   unlike this setting, where you're in a court setting and

03:04:09   7   you're compelled to be here, this is assumed to be

03:04:12   8   voluntary.

03:04:13   9           Think back to the idea of the house.  If some of

03:04:16   10  those house price were really, really high or really,

03:04:19   11  really low and then you learned that it was because someone

03:04:22   12  was forced to sell the house or forced to buy the house,

03:04:26   13  then the evidence wouldn't be that good.  So what we want

03:04:31   14  here is market-based evidence, arm's-length transaction, no

03:04:37   15  compulsion.

03:04:38   16  Q.  In this hypothetical negotiation, can the parties walk

03:04:43   17  away from the table and not reach a deal?

03:04:46   18  A.  No, they've got to come up with a deal.

03:04:48   19  Q.  What is the hypothetical negotiation date for this

03:04:52   20  case?

03:04:52   21  A.  2013 is when it starts.

03:04:55   22  Q.  And who are the parties doing the negotiation?

03:04:58   23  A.  It's Lone Star and ASUS.

03:05:02   24  Q.  Why would ASUS want to negotiate with Lone Star?

03:05:07   25  A.  Because under the construct of this hypothetical

535

03:05:10  1  negotiation, it's about to start using what's taught in the

03:05:16  2  '435 patent.

03:05:22  3  Q.  What is the duration of this licensing arrangement?

03:05:28  4  A.  Well, there's -- there's two buckets that -- I mean, it

03:05:35  5  can go no further than the expiration of the patent,

03:05:41  6  obviously.

03:05:41  7  Q.  And what type of license would these two parties be

03:05:46  8  negotiating between?

03:05:48  9  A.  Typically it would be a lump sum.

03:05:52  10  Q.  And what is Lone Star's licensing policy?

03:05:55  11  A.  Well, thus far, it's two primary things that I have

03:05:57  12  observed from the deals that they've done in the past.

03:06:00  13  They're non-exclusive licenses, and they tend to be

03:06:05  14  lump-sum payments.

03:06:06  15  Q.  What are the advantages of Lone Star's '435 patent?

03:06:11  16  A.  That's more for the technical expert, I think, in terms

03:06:18  17  of the technical advantages.

03:06:22  18  Q.  But they are there to negotiate the '435 patent?

03:06:27  19  A.  Yes.  Both parties are there and -- yeah, presumably

03:06:32  20  there's benefits in the patent.

03:06:51  21  Q.  If I could turn your attention to -- there's a binder

03:06:58  22  next to you, Mr. Perdue.  I believe it's the second

03:07:01  23  volume -- first volume, P-34.  If you could take your time

03:07:07  24  and take a look at that?

03:07:09  25  A.  P-34?

| | | |
|---|---|---|
| 03:07:10 | 1 | Q.  Yes, sir. |
| 03:07:12 | 2 | A.  Okay. |
| 03:07:26 | 3 | Q.  Have you seen this document before? |
| 03:07:28 | 4 | A.  I have. |
| 03:07:28 | 5 | Q.  What is this document? |
| 03:07:29 | 6 | A.  This is a patent license and settlement agreement |
| 03:07:34 | 7 | between Lone Star and Sharp Electronics. |
| 03:07:36 | 8 | Q.  Now, earlier you testified you reviewed Lone Star's |
| 03:07:39 | 9 | licenses; is that correct? |
| 03:07:40 | 10 | A.  Yes. |
| 03:07:41 | 11 | Q.  Is this one of the licenses? |
| 03:07:42 | 12 | A.  Yes. |
| 03:07:49 | 13 | MR. LEE:  Denver, can you blow up the first |
| 03:07:56 | 14 | paragraph. |
| 03:07:57 | 15 | BY MR. LEE: |
| 03:08:01 | 16 | Q.  Who is this license agreement with? |
| 03:08:03 | 17 | A.  Sharp Electronics. |
| 03:08:10 | 18 | Q.  And who is Sharp Electronics? |
| 03:08:13 | 19 | A.  Sharp Electronics, it says, is a Japanese |
| 03:08:16 | 20 | corporation -- well, Sharp Electronics is the |
| 03:08:20 | 21 | U.S. subsidiary, and Sharp Corporation is the Japanese |
| 03:08:30 | 22 | parent, it looks like. |
| 03:08:30 | 23 | Q.  What type of licensing agreement is this? |
| 03:08:32 | 24 | A.  A patent license and settlement agreement. |
| 03:08:34 | 25 | Q.  Is this a voluntary agreement for the purposes of a |

537

03:08:38  1  hypothetical negotiation?

03:08:38  2  A.  No.  This is one of those situations that we talked

03:08:40  3  about a moment ago where there's compulsion.  These parties

03:08:46  4  were compelled to come up with this agreement due to

03:08:49  5  litigation or the threat of litigation.

03:08:51  6  Q.  If I could turn your attention back to the first page

03:08:53  7  without the blowup.  Okay.  It's the third paragraph from

03:09:03  8  the recitals.

03:09:05  9  A.  Yes.

03:09:11  10         MR. LEE:  If that could be blown up.  Sorry, the

03:09:14  11  paragraph before that.

03:09:16  12  BY MR. LEE:

03:09:20  13  Q.  Can you take a moment to read this paragraph to

03:09:23  14  yourself?

03:09:37  15  A.  Okay.

03:09:38  16  Q.  What is this paragraph, in a nutshell, telling us?

03:09:50  17  A.  This tells us that Sharp has said that it's basically

03:09:54  18  going to exit the market.

03:09:58  19  Q.  And, in fact, doesn't it state that Defendant

03:10:03  20  represented that it discontinued selling or manufacturing

03:10:07  21  certain accused products in the United States?

03:10:10  22  A.  Yes.

03:10:10  23  Q.  Does that mean at the time this agreement was signed,

03:10:16  24  Sharp no longer was in the U.S. market?

03:10:19  25  A.  They were either exited or in the process of exiting

| | | |
|---|---|---|
| 03:10:22 | 1 | the U.S. market with these products. |
| 03:10:25 | 2 | Q.  Then what was the license amount for this agreement? |
| 03:10:29 | 3 | A.  4 -- I think it was over $400,000. |
| 03:10:42 | 4 | MR. LEE:  Paragraph 3, Denver.  One more. |
| 03:11:02 | 5 | BY MR. LEE: |
| 03:11:04 | 6 | Q.  Do you see that there, Mr. Perdue? |
| 03:11:05 | 7 | A.  I do.  $435,000. |
| 03:11:19 | 8 | MR. LEE:  Denver, can you publish Slide 10. |
| 03:11:23 | 9 | BY MR. LEE: |
| 03:11:30 | 10 | Q.  Now, you've also reviewed Lone Star's other license |
| 03:11:35 | 11 | agreements at the time you wrote your expert report; is |
| 03:11:38 | 12 | that -- is that right? |
| 03:11:39 | 13 | A.  Yes.  During that period of time, I reviewed these |
| 03:11:42 | 14 | agreements. |
| 03:11:42 | 15 | Q.  And what other license agreements did you review? |
| 03:11:45 | 16 | A.  Well, these are the other two.  It's the Acer and the |
| 03:11:51 | 17 | NEC agreement. |
| 03:11:52 | 18 | Q.  And the Acer agreement, you have some -- you have a |
| 03:11:56 | 19 | note there right behind a dollar amount.  Can you explain |
| 03:12:00 | 20 | that to us? |
| 03:12:01 | 21 | A.  Yes.  That says:  Equates to implied royalty rate of |
| 03:12:05 | 22 | $0.61 compared to our rate of $0.57. |
| 03:12:11 | 23 | Q.  And why did you put that note there? |
| 03:12:15 | 24 | A.  So it's this idea of an implied royalty rate again. |
| 03:12:18 | 25 | There was a certain number of units that were disclosed |

03:12:21  1   on -- that related to this Acer agreement.  And I knew what

03:12:26  2   the amount of money was, so I took the amount of money,

03:12:29  3   divided it by the amount of stated units disclosed, and

03:12:33  4   came up with that $0.61 number.

03:12:35  5   Q.  Okay.  And you -- what was the -- based on your review

03:12:39  6   of these three license agreements, how did that impact your

03:12:46  7   assessment of the hypothetical negotiations?

03:12:48  8   A.  I didn't give these license agreements much weight at

03:12:53  9   all because it's that idea of compulsion.  They -- the

03:12:59  10  parties were compelled in this situation to come up with an

03:13:02  11  agreement, and it wasn't like a -- a normal market

03:13:09  12  transaction, so I discounted these agreements and similar

03:13:15  13  agreements from ASUS.

03:13:17  14  Q.  And that's because in a hypothetical negotiation, the

03:13:20  15  parties are coming to the table voluntarily?

03:13:22  16  A.  That's right.  That's right.

03:13:24  17  Q.  Earlier you also mentioned you reviewed ASUS's

03:13:27  18  licenses; is that correct, Mr. Perdue?

03:13:29  19  A.  Yes.

03:13:29  20  Q.  What type of licenses did you review?

03:13:34  21  A.  I recall four, and they, too, were granted in the

03:13:39  22  process of some kind of a litigation or threat of

03:13:42  23  litigation.

03:13:48  24  Q.  What is your analysis of those four licenses and how it

03:13:53  25  impacts the hypothetical negotiations?

03:13:55  1  A.  Similar answer.  I didn't really give it any weight

03:13:58  2  because of this element of compulsion associated with it.

03:14:08  3  Q.  Those four licenses that you reviewed, where did they

03:14:11  4  come from?

03:14:12  5  A.  Those were produced by ASUS.

03:14:15  6  Q.  Did you review any other materials concerning ASUS's

03:14:19  7  licenses aside from -- I'm sorry, go ahead.

03:14:21  8  A.  Yes, I did.  I found some licenses online.

03:14:24  9  Q.  Why did you search online?

03:14:26  10  A.  I was trying to be thorough, so I was looking for

03:14:30  11  licenses that ASUS engaged in with others through my own

03:14:34  12  independent research.

03:14:36  13  Q.  Can you briefly describe what type of licenses those

03:14:39  14  were?

03:14:40  15  A.  I identified four other licenses through my online

03:14:43  16  research.

03:14:43  17  Q.  How did the review of those licenses, the ones that

03:14:59  18  ASUS produced, in addition to the ones that you searched

03:15:02  19  online, impact your hypothetical negotiations analysis?

03:15:07  20  A.  Again, it really just didn't carry much weight because

03:15:10  21  the ones that I found online, they, too, looked like they

03:15:15  22  were the result of some kind of litigation or settlement or

03:15:16  23  threat of litigation, so I didn't give them really any

03:15:21  24  weight.

03:15:45  25          MR. LEE:  Denver, can you put up P-35?

| | | |
|---|---|---|
| 03:15:48 | 1 | BY MR. LEE: |
| 03:16:15 | 2 | Q.  Mr. Perdue, what is this document -- |
| 03:16:19 | 3 | MR. OLIVER:  Sorry.  I apologize. |
| 03:16:22 | 4 | THE COURT:  Continue. |
| 03:16:25 | 5 | BY MR. LEE: |
| 03:16:25 | 6 | Q.  Mr. Perdue, what is this document on the screen? |
| 03:16:28 | 7 | A.  This is the 3 -- what I refer to as the 313 -- the 313 |
| 03:16:35 | 8 | spreadsheet. |
| 03:16:35 | 9 | Q.  And whose data is on -- is this on the spreadsheet? |
| 03:16:43 | 10 | A.  If you look at the bottom left-hand side, the tab there |
| 03:16:46 | 11 | says, ACI, which is ASUS's U.S. subsidiary, as I understand |
| 03:16:54 | 12 | it. |
| 03:16:55 | 13 | Q.  So this spreadsheet contains Defendant ASUS over in |
| 03:17:02 | 14 | Taiwan's -- their subsidiary's sales data; is that correct? |
| 03:17:05 | 15 | MR. OLIVER:  Objection.  Leading. |
| 03:17:07 | 16 | THE COURT:  Can you rephrase the question? |
| 03:17:10 | 17 | BY MR. LEE: |
| 03:17:16 | 18 | Q.  Whose information is on the spreadsheet? |
| 03:17:18 | 19 | A.  My understanding, that this is ASUS's U.S. subsidiary's |
| 03:17:22 | 20 | information. |
| 03:17:23 | 21 | Q.  From what period to what period? |
| 03:17:31 | 22 | A.  This spreadsheet starts in 2013.  It was a partial year |
| 03:17:36 | 23 | for 2013, and -- |
| 03:17:40 | 24 | THE WITNESS:  Dallas [sic], if you could go to the |
| 03:17:42 | 25 | right -- |

03:17:42  1   A.   I think it stops -- yeah, it stops in 2019.

03:17:49  2   BY MR. LEE:

03:17:49  3   Q.   And lists year by year; is that correct?

03:17:52  4   A.   Yes.  And I believe this 2019 was also a partial year,

03:17:57  5   and then there was another spreadsheet that I think gave us

03:18:01  6   the full year of 2019.

03:18:05  7         MR. LEE:  Denver, can you move the spreadsheet to

03:18:13  8   Column A1?

03:18:15  9   BY MR. LEE:

03:18:17 10   Q.   What does that column -- the product model name, what's

03:18:21 11   listed here?  What type of information?

03:18:22 12   A.   Yeah, so there's a product type in that first column,

03:18:25 13   and then there's a model name in Column B.

03:18:28 14   Q.   Is this listing ASUS's model numbers?

03:18:38 15   A.   That's my understanding.

03:18:42 16         MR. LEE:  Denver, can you scroll from Row 4

03:18:48 17   through about 265?  If we go back to Column A1.

03:19:22 18   BY MR. LEE:

03:19:23 19   Q.   There's a description of net QTY.  What does that mean,

03:19:28 20   Mr. Perdue?

03:19:29 21   A.   Net quantities.

03:19:30 22   Q.   And what does that signify on the spreadsheet?

03:19:34 23   A.   That's basically the net amount of quantities that you

03:19:38 24   sold, less returns and other adjustments where someone

03:19:42 25   might have returned the unit.  That's the net number.

03:19:45   1   Q.  And what about net revenue, what does that signify?

03:19:52   2   A.  Same idea, but it's the revenue associated with those

03:19:56   3   units, so it's gross revenue less returns and allowances,

03:20:01   4   any chargebacks or anything like that.  It's basically the

03:20:02   5   portion of the revenue that you get to keep.

03:20:04   6   Q.  And about the net cost?  What does that signify?

03:20:07   7   A.  Same -- same exact idea, but on the cost side of the

03:20:11   8   equation.  It's the net number.

03:20:12   9   Q.  How did you use this information in your analysis of

03:20:17  10   damages?

03:20:21  11   A.  So the revenue number is used as the basis for the

03:20:28  12   royalty base.  I also took the difference between the net

03:20:31  13   revenue and the net cost to calculate a profitability

03:20:35  14   number.  And then I also did some math involving the

03:20:39  15   quantities to get some averages, profitability per unit,

03:20:44  16   that kind of thing.  So I used all of these numbers in one

03:20:47  17   way or another.

03:21:01  18           MR. LEE:  Denver, can you publish P-94?

03:21:06  19   BY MR. LEE:

03:21:23  20   Q.  Mr. Perdue, do you recognize this document?

03:21:25  21   A.  Scroll up to the very top of it.  Are we at the top?

03:21:40  22   Q.  Yes.  That says:  Period March '13 through March '20.

03:21:47  23   A.  Yes.  Yes, I do.

03:21:48  24   Q.  What document is this?

03:21:49  25   A.  This was the document that I was referring to earlier

03:21:57  1  that had some extended periods on the end of it.  So this

03:22:00  2  went through March of 2020.

03:22:02  3  Q.  And who provided the document?

03:22:04  4  A.  ASUS.

03:22:10  5  Q.  Whose data is on the document?

03:22:12  6  A.  It's the U.S. subsidiary data again.

03:22:16  7  Q.  How did you use this document, P-94 and P-93 [sic], in

03:22:31  8  evaluating damages in this case?

03:22:32  9  A.  Yeah, so it's the same thing.  This was the most

03:22:34  10  current data because it went through March of 2020, so I

03:22:37  11  actually used this more than I did the other one because

03:22:41  12  this was basically a restatement of the earlier one, plus

03:22:45  13  the new data.  So I used it to look at sales overall.  I

03:22:51  14  used it -- what the sales trend was, the profitability.  I

03:22:59  15  looked at all those different financial metrics.

03:23:02  16  Q.  And this is the data that you reviewed coming from

03:23:05  17  Defendant's U.S. subsidiary?

03:23:07  18  A.  Yes.

03:23:08  19  Q.  Did you review any financial data from Defendant

03:23:11  20  itself?

03:23:11  21  A.  From the Taiwanese parent, I did not see any data from

03:23:18  22  the Taiwanese parent, no.

03:23:22  23  Q.  Would you have -- if that information was available,

03:23:27  24  would you have reviewed it?

03:23:29  25  A.  Yes.

03:23:30   1          MR. LEE:  Your Honor, I would like to move for the

03:23:34   2   admission of P-35 and P-94.

03:23:37   3          THE COURT:  Any objections?

03:23:38   4          MR. OLIVER:  Your Honor, do we have to follow any

03:23:40   5   special procedures for confidential exhibits or --

03:23:44   6          THE COURT:  Is there some reason the document -- I

03:23:48   7   mean, the courtroom needs to be sealed for purposes of

03:23:51   8   discussing --

03:23:52   9          MR. OLIVER:  If he had started to get into the

03:23:54  10   numbers, I would have asked to have the courtroom sealed,

03:23:57  11   but he hasn't asked about the numbers.  So it's just

03:24:02  12   exhibits at this point.

03:24:04  13          THE COURT:  But no objection to its admission; is

03:24:06  14   that correct?

03:24:06  15          MR. OLIVER:  No objection to admission.

03:24:07  16          THE COURT:  Very well.  It'll be received.

03:24:09  17          MR. LEE:  Thank you, Your Honor.

03:24:11  18   BY MR. LEE:

03:24:15  19   Q.  Did P -- did the data in P-35 and P-94, did you use

03:24:22  20   that to perform an analysis on the financial performance

03:24:29  21   and profitability of ASUS?

03:24:32  22   A.  I did.

03:24:34  23          MR. LEE:  Denver, Slide 12.

03:24:37  24   BY MR. LEE:

03:24:46  25   Q.  You analyzed the financial performance of ASUS.  How

03:24:51   1   was it?

03:24:52   2   A.   Yeah.   So the data -- the data at the bottom is the

03:24:56   3   data that I obtained from the spreadsheets that we talked

03:25:00   4   about earlier.   And it's basically saying for the full

03:25:03   5   years of 2014 through 2019, net revenues were consistently

03:25:10   6   in the two to $300 million range and profits -- you know,

03:25:17   7   the difference between the revenue minus the cost that was

03:25:20   8   presented on the spreadsheets were consistently in the 40

03:25:23   9   to $50 million range.

03:25:25   10          The first bullet point, though, I got that out of

03:25:28   11   their annual report.

03:25:31   12   Q.   Why did you look at the financial performance of ASUS

03:25:34   13   in evaluating damages?

03:25:36   14   A.   That's one of the factors that we're instructed to

03:25:39   15   consider in the Georgia-Pacific factors.

03:25:42   16   Q.   When you looked at ASUS's numbers, how did that -- how

03:25:46   17   did that impact your assessment?

03:25:48   18   A.   Well, it tells you that it's a commercially successful

03:25:51   19   product and that it's profitable and that's -- those are

03:25:55   20   some of the considerations in these Georgia-Pacific

03:25:57   21   factors.

03:25:58   22   Q.   Did you evaluate industry licenses in assessing what

03:26:29   23   the damages should be in this case?

03:26:31   24   A.   I did.

03:26:32   25   Q.   And why did you do that?

03:26:33   1   A.  Because, again, that's one of the things that the

03:26:37   2   factors instructs us to do.  And it's like the house slide

03:26:40   3   that we looked at earlier.  If you -- if you're interested

03:26:44   4   in buying a house, you're going to go out and you're going

03:26:46   5   to pull some comparable information about houses in that

03:26:49   6   area to give your sense of self -- give yourself a sense of

03:26:52   7   what the -- what the right price might be.  So it's the

03:26:55   8   same idea here.

03:26:56   9   Q.  So how did you go about looking for what licenses were

03:27:00   10  out there in the industry?

03:27:01   11  A.  So I searched for -- tried to initiate a search in

03:27:13   12  three places, and I also looked at industry data from LES

03:27:18   13  to give me just a general sense of what the neighborhood

03:27:27   14  looked like, if you will.

03:27:28   15  Q.  You mentioned you searched for -- searched on -- for

03:27:30   16  two places?

03:27:31   17  A.  There were two proprietary databases that I -- that I

03:27:39   18  searched.  I did online searching, and then I consulted LES

03:27:45   19  survey data.

03:27:51   20  Q.  The two proprietary databases that you searched, why

03:27:56   21  did you search those databases?

03:27:56   22  A.  So these are proprietary databases that you have to pay

03:27:57   23  to access, and it's two companies that compile lots of

03:28:01   24  license agreements, and then you pay a subscription to get

03:28:01   25  in to search those databases.

03:28:02  1          One is RoyaltySource, and the other is called

03:28:06  2   ktMINE.  But I was only successful with one of them.

03:28:09  3   Q.  Which one were you not successful with?

03:28:14  4   A.  RoyaltySource didn't have anything.

03:28:17  5   Q.  And what about the other one?

03:28:18  6   A.  ktMINE, I was able to find some license agreements.

03:28:22  7   Q.  How long did you search on ktMINE?

03:28:26  8   A.  I spent the good part of about two days looking for

03:28:30  9   license agreements, and I started out at a very, very

03:28:34  10  detailed level where I was using terms in the patent.  You

03:28:38  11  know, you've heard hue and saturation.  And so I was

03:28:43  12  pulling out some technical terminology from the patents to

03:28:49  13  look for license agreements and was coming up with nothing.

03:28:51  14          So I started to broaden that search more broadly

03:28:55  15  to video and other analogous technologies after I came up

03:29:01  16  dry with some of the really technical stuff that directly

03:29:04  17  went into the patent.

03:29:05  18  Q.  And -- so did that come up with some agreements, this

03:29:13  19  search?

03:29:14  20  A.  I did.  I came up with some agreements, that's right.

03:29:18  21  Q.  How many?

03:29:18  22  A.  14 -- there's a total of 18 on the list that I

03:29:22  23  summarized that's in my report.  And of those, I ultimately

03:29:26  24  used about ten to come up with a percentage royalty rate

03:29:30  25  that I used.

03:29:31   1   Q.  Aside from the RoyaltySource, which yielded no results,

03:29:41   2   you had great search results from ktMINE, what other

03:29:44   3   agreements came up -- came out through your search?

03:29:48   4   A.  Well, I did some online searching, and so ktMINE

03:29:53   5   yielded 14 of the license agreements, and my own online

03:29:57   6   searching revealed four more.

03:30:05   7   Q.  If I could have you turn to the binder, Volume II.

03:30:12   8          Do you have the binder, Mr. Perdue?

03:30:25   9   A.  Volume II?  That's Volume I.  There's Volume II.  Okay.

03:30:50   10  Q.  Tab P-95, please.

03:31:14   11  A.  Okay.  Ready.

03:31:15   12  Q.  What are these documents?

03:31:16   13  A.  These are the 18 license agreements that we -- that we

03:31:22   14  talked about just a moment ago, or licensing information.

03:31:27   15          MR. LEE:  Your Honor, we move for the admission of

03:31:29   16  Exhibit P-95.

03:31:31   17          THE COURT:  Any objection?

03:31:33   18          MR. OLIVER:  No objection.

03:31:34   19          THE COURT:  Very well.  It'll be received.

03:31:38   20  BY MR. LEE:

03:31:41   21  Q.  That's the first page of these license agreements.  Can

03:31:45   22  you identify this document?

03:31:46   23  A.  Yeah.  And let's -- and let's clarify.  This is from

03:31:51   24  Philips, the Dutch electronics consumer products company,

03:31:57   25  and this is them talking about their licensing program

03:32:00  1   where they license various families of patents to others.

03:32:04  2        So this isn't a licensing agreement, but it is

03:32:06  3   licensing information and pricing.

03:32:12  4        MR. LEE:  Denver, can you scroll down to the next

03:32:15  5   two pages?

03:32:18  6   BY MR. LEE:

03:32:18  7   Q.  And what's that on the bottom of the page, Mr. Perdue,

03:32:24  8   on the screen?

03:32:25  9   A.  Are you talking about the 15 things that I've listed

03:32:28  10  out -- that are listed out there?

03:32:30  11  Q.  Correct.

03:32:31  12  A.  Yeah, so that's 15 of the 16 clusters of technology

03:32:35  13  that Philips identified.  There's another one that bleeds

03:32:39  14  over to the next page, but there's 16 in total.

03:32:50  15       MR. LEE:  Denver, Page 5.

03:32:57  16  BY MR. LEE:

03:32:59  17  Q.  What about this document here?  Is this one of the

03:33:02  18  documents from your search?

03:33:04  19  A.  Yes.  And the first one, the Philips one, and this one

03:33:08  20  both were a result of online searching that I did on my

03:33:12  21  own.

03:33:14  22       And this is HEVC.  This relates to video

03:33:17  23  compression technology.

03:33:17  24  Q.  And these are the 18 documents from your search?

03:33:22  25  A.  Yes.

03:33:22  1  Q.  And what did you do after acquiring these documents?

03:33:29  2  Did you analyze them?

03:33:30  3  A.  I did.

03:33:31  4  Q.  Did you -- did you review them?

03:33:33  5  A.  I did.

03:33:34  6  Q.  Did you study them?

03:33:35  7  A.  Yes.

03:33:35  8  Q.  How much time did you spend looking into these

03:33:39  9  agreements and documents?

03:33:40  10  A.  All in all, days.

03:34:08  11       MR. LEE:  Denver, can you turn to Page 248.

03:34:17  12  BY MR. LEE:

03:34:20  13  Q.  This must be the 11th document.  You circled it

03:34:26  14  with 11?

03:34:27  15  A.  Yes.

03:34:27  16  Q.  Who is this document between?

03:34:33  17  A.  The parties on this one are Tellurian, as the licensor,

03:34:44  18  and Voyager Graphics, as the licensee.

03:34:55  19  Q.  And you considered this document as -- and evaluated it

03:35:00  20  as part of your royalty rate analysis?

03:35:02  21  A.  Yes.

03:35:03  22  Q.  What about the document on Page 330?

03:35:08  23       MR. LEE:  Denver?

03:35:17  24  BY MR. LEE:

03:35:19  25  Q.  What is this document?

```
03:35:19   1   A.  So that was the last document in the list of 18 that I
03:35:23   2   was talking about and this relates to audio technology.
03:35:27   3        I did consider this document, but I ultimately
03:35:31   4   excluded it.  It was a bit of an outlier and didn't seem to
03:35:35   5   be as on-target, so I excluded it.
03:35:38   6   Q.  Okay.
03:35:45   7        MR. LEE:  Denver, Slide 13.
03:35:56   8   BY MR. LEE:
03:35:57   9   Q.  Mr. Perdue, did you prepare this slide?
03:35:58  10   A.  I did.
03:35:59  11   Q.  Can you explain to us what this slide tells us?
03:36:08  12   A.  Yes.  This slide is a really high level summary of
03:36:11  13   those 18 agreements that we were just talking about that
03:36:16  14   compromised 300-plus pages.
03:36:22  15   Q.  And you prepared this summary after you reviewed and
03:36:27  16   analyzed these 18 agreements?
03:36:28  17   A.  Yes.
03:36:29  18   Q.  Why are some of the rows highlighted and others not?
03:36:34  19   A.  So the highlighted agreements, those are all percentage
03:36:38  20   royalty rates.
03:36:39  21        So at the top, it's royalty rates that deal with
03:36:42  22   per-unit rates, like dollars per-unit.  And in Section B,
03:36:46  23   in the middle where you see the yellow, that's rate --
03:36:49  24   rates that deal with percentages of revenue.  And that was
03:36:54  25   the bulk of the rates.  And so the ones highlighted in
```

03:36:58  1  yellow are the ones that I ultimately used for my

03:37:02  2  calculation at the bottom.

03:37:03  3  Q.  Does the -- does the numbering system 1 through 18

03:37:09  4  track your identification on the actual exhibit itself?

03:37:15  5  A.  Yes, it does.

03:37:16  6  Q.  So No. 1, that's the first agreement that we reviewed

03:37:20  7  on the screen?

03:37:22  8  A.  Yes, that's the Philips licensing program, that's

03:37:26  9  right.

03:37:26  10  Q.  Why is that agreement not highlighted?

03:37:32  11  A.  Well, first of all, the bulk of the information that I

03:37:36  12  was able to obtain stated royalties on a percentage basis.

03:37:40  13  So it was an apples-to-oranges problem.  That's a

03:37:46  14  dollar-per-unit basis, and the bulk of the information that

03:37:49  15  I was using was a percentage basis, but I do consider it

03:37:52  16  later.

03:37:55  17          MR. LEE:  Denver, can you pull up 1 through 5?

03:38:01  18  BY MR. LEE:

03:38:03  19  Q.  But this was a -- technology on displays, right?  It

03:38:10  20  had to contain a technology cluster on TV, correct?

03:38:15  21  A.  Well, the whole thing is for televisions and set-top

03:38:21  22  boxes, all of that technology.

03:38:22  23  Q.  But you excluded it?

03:38:24  24  A.  I didn't exclude it.  I considered it, and I use it

03:38:27  25  later, but it didn't have a percentage royalty rate, which

03:38:32   1   is what I needed for my calculation for this -- for what's

03:38:35   2   highlighted in the next section.

03:38:37   3   Q.  So you considered it, but it had to do with TVs, but it

03:38:41   4   was not used to calculate the royalty rate?

03:38:43   5   A.  That's right.  That's right.

03:38:45   6        MR. LEE:  Denver, if you go back out.

03:38:52   7   BY MR. LEE:

03:38:53   8   Q.  Without having to go through each of the rows that are

03:38:55   9   not highlighted, what's the -- what's the general rationale

03:39:00   10   for not using these agreements as part of your rate

03:39:04   11   consideration calculation?

03:39:05   12   A.  Yeah, so let's focus on the middle section first,

03:39:09   13   Section B.

03:39:10   14        Again, these are all percentage rates, so that's

03:39:12   15   good because I wanted a percentage rate because that looked

03:39:17   16   like the most promising type of rate based upon this

03:39:20   17   information.

03:39:20   18        THE WITNESS:  Go -- go back out, Denver, so that

03:39:23   19   we can see the first one.  Yeah, zoom in on 5 there so that

03:39:35   20   we can see it a little bit better.  Yeah, that's good.

03:39:42   21   A.  So Mondis/Chimei Innolux, that was actually an Eastern

03:39:49   22   District of Texas case, and it dealt with video displays.

03:39:50   23   Well -- so that's great.  It was on target.  But it was the

03:39:53   24   result of litigation, so there's the compulsion issue.

03:39:56   25        So I liked that it was on target, but I didn't

03:40:01  1  like the fact that it was -- had this issue of compulsion

03:40:04  2  tied to it.  So that's why I didn't use that one.

03:40:07  3          And then when you go down --

03:40:08  4          THE WITNESS:  Denver, if you can scroll down to

03:40:11  5  like, 13, 14, down there.  Yeah, that's good.

03:40:15  6  A.  So these two were also received --

03:40:18  7          THE WITNESS:  Scroll over to the right, please.

03:40:20  8  A.  So that was patent enforcement and licensing.  So these

03:40:26  9  were settlement agreements also.  You've got the compulsion

03:40:30  10  issue, right?

03:40:31  11          And then let's go over to the left and let's look

03:40:34  12  at that last one, No. 18.

03:40:36  13          And this is something we just talked about,

03:40:40  14  Mr. Lee.  You brought up that Max Sound agreement.  This

03:40:44  15  had a 50 percent rate and --

03:40:44  16  BY MR. LEE:

03:40:48  17  Q.  That's a big rate.

03:40:49  18  A.  It is.  It's a big rate, but it was just not

03:40:53  19  applicable.  It was an outlier.  I didn't think that it

03:40:56  20  made sense to include it, so I excluded it.

03:41:00  21  Q.  Well, let's focus on the ones that are highlighted in

03:41:03  22  yellow.

03:41:04  23  A.  Okay.

03:41:04  24  Q.  Those are the ones that you used to determine the

03:41:07  25  royalty rate in this case?

03:41:09  1    A.   Yes.

03:41:21  2    Q.   For example, Row No. 6, who are the parties of the

03:41:24  3    license agreement?

03:41:25  4    A.   So it was Princeton University and two other

03:41:30  5    universities that were involved in that licensing

03:41:32  6    transaction.   They were the licensor of the technology.

03:41:35  7    Q.   What were the royalty rates in that license agreement?

03:41:37  8    A.   That was 3 percent, and I looked at the high and lows.

03:41:42  9    Some of these license agreements, you're going to have a

03:41:45 10    high number based upon some factor and a low number.   There

03:41:48 11    might be various terms related to that, but the idea here

03:41:52 12    is just to get a general spread.   And in this case, it was

03:41:55 13    just one rate, 3 percent.

03:41:56 14    Q.   Do you remember how many patents were involved in this

03:41:59 15    license agreement?

03:42:00 16    A.   It was several.   It was -- it was multiple patents.

03:42:04 17    Q.   If I could turn your attention to Row No. 15,

03:42:25 18    Mr. Perdue.

03:42:26 19    A.   Yes.

03:42:26 20    Q.   Whose agreement is that between?

03:42:29 21    A.   The licensor, the owner of the patent and the one

03:42:32 22    granting the rights is Psyko Audio Labs, and the licensee

03:42:39 23    that the rights are being granted to is Exeo Entertainment.

03:42:45 24    Q.   And what's the license rate for this particular

03:42:49 25    agreement?

03:42:49  1    A.   5 percent flat.

03:42:51  2    Q.   And what about the technology?

03:42:52  3    A.   This was -- yeah, surround sound headphone technology

03:42:55  4    for gaming.

03:42:55  5    Q.   That doesn't seem like it's -- to be video display

03:43:02  6    technology.  Why did you include this in the analysis?

03:43:04  7    A.   So we -- we talked about this a little bit earlier.

03:43:07  8    When I initiated my search, I was pulling terms out of the

03:43:13  9    patent, hue, saturation, some of the other technical terms

03:43:17  10   out of the patent.  I was coming up with nothing.

03:43:19  11        So I started to expand my search, and where I

03:43:23  12   ultimately expanded the search to was basically the area of

03:43:30  13   computer peripherals.  So a video monitor is a computer

03:43:36  14   peripheral.  A sound system is a computer peripheral.  A

03:43:44  15   navigation device, a keyboard, a mouse, those are all

03:43:47  16   computer peripherals.  And I did that because I wanted

03:43:50  17   enough data for it to be meaningful.

03:44:00  18   Q.   So the agreements in -- highlighted in yellow were 6

03:44:03  19   through 12 and 15 through 17 were either comparable or

03:44:05  20   analogous?

03:44:05  21        MR. OLIVER:  Objection.  The witness is

03:44:07  22   unqualified on the comparability of the technologies.

03:44:10  23        THE COURT:  Can you lay a foundation, Mr. Lee?

03:44:14  24        MR. LEE:  Sure.

03:44:16  25   BY MR. LEE:

03:44:16  1   Q.  Mr. Perdue, why did you -- how did you evaluate these

03:44:21  2   agreements and determine to include them in here?

03:44:24  3   A.  Well, again, I started out looking at the patent and

03:44:28  4   using terms from the patent.  I couldn't find anything that

03:44:32  5   went to that level of detail.  Had I found, let's say, 40

03:44:37  6   or 50 patents that had hue and saturation and color

03:44:41  7   adjustment and all of that in it, I would have then spoken

03:44:44  8   to Dr. Ducharme, I would have gotten his opinion on it.

03:44:47  9   But I ended up not needing to do that because there was

03:44:51  10  just a dearth of information.  So I went to this higher

03:44:58  11  level and pulled these more economically comparable and

03:45:03  12  analogous technologies related to computer peripherals.

03:45:07  13  Q.  What Georgia-Pacific factor was this analysis performed

03:45:11  14  for?

03:45:11  15  A.  Yeah.  So there are several factors that talk about

03:45:15  16  that, and I can't remember the factor right now.  We'll get

03:45:18  17  into them later, but comparable and analogous is definitely

03:45:23  18  some of the language in the Georgia-Pacific factors related

03:45:25  19  to this issue.

03:45:26  20  Q.  So this was your analysis for that factor which we'll

03:45:28  21  go into detail a little later?

03:45:32  22  A.  Yeah.  The -- and think it was the industry rate.  I

03:45:35  23  think it's Factor 12, but we'll look at that in a little

03:45:38  24  bit, I'm sure.

03:45:39  25  Q.  So how did you -- having selected these agreements

03:45:44  1  highlighted in yellow, how did you determine the royalty

03:45:50  2  rate for this case?

03:45:51  3  A.  So I started with the rates in yellow.  They were all

03:45:58  4  percentage rates.  Then I looked at this column related to

03:46:04  5  exclusivity, and I noted that some were exclusive and some

03:46:09  6  were non-exclusive.

03:46:10  7       The patent license that would result from the

03:46:13  8  hypothetical negotiation here would be a non-exclusive

03:46:16  9  license.  Non-exclusive licenses are generally understood

03:46:21  10  to be worth less than an exclusive licenses.  So I needed

03:46:24  11  to do some sort of an adjustment for those exclusive

03:46:28  12  licenses.

03:46:30  13       So what you see in the section below, in

03:46:34  14  Section C, is where I took a 35 percent discount for the

03:46:39  15  exclusive right to bring it down to account for the

03:46:44  16  non-exclusivity that we're dealing with here.

03:46:46  17          MR. LEE:  If we could move to Section 3 on the

03:46:49  18  screen.  Denver, Slide 13, Section C, please.

03:47:10  19  BY MR. LEE:

03:47:17  20  Q.  Is this the section where you do the discount for a

03:47:20  21  non-exclusive license?

03:47:21  22  A.  Yeah.  And you can see that the rates that

03:47:24  23  were 3 percent up above are now 1.95 percent.  The ones

03:47:30  24  that were already non-exclusive, I didn't adjust those, but

03:47:36  25  the ones that were exclusive, I did adjust.

```
03:47:40   1   Q.  And why did you adjust the rate down -- what was the
03:47:44   2   rate that you adjusted down?
03:47:45   3   A.  So the ones that I adjusted down were the ones that
03:47:49   4   were marked exclusive, so it would be -- the first one we
03:47:53   5   see here for 1997 --
03:47:55   6            THE WITNESS:  Denver, can you scroll over to the
03:47:57   7   left a little bit?  Yeah, that's great, right there.
03:48:01   8   A.  So the exclusive ones are 6, 7, 8, 9.  No. 10 was
03:48:06   9   already non-exclusive.  No. 11 is exclusive.  No. 12 is
03:48:14  10   non-exclusive.  15, 16 are exclusive, and then 17 was
03:48:22  11   non-exclusive.
03:48:22  12   BY MR. LEE:
03:48:22  13   Q.  What's the purpose of adjusting down the rate to
03:48:25  14   account for non-exclusivity?
03:48:26  15   A.  It was kind of an issue of comparability and fairness,
03:48:31  16   that if we're talking about a non-exclusive rate here, then
03:48:34  17   I need to take the exclusive rate and I need to do some
03:48:37  18   kind of an adjustment to account for that.
03:48:40  19   Q.  And how much did you adjust down in this -- when you
03:48:43  20   made your adjustment?
03:48:45  21   A.  On the exclusive rates, 35 percent downward.
03:48:49  22   Q.  Why did you adjust it down 35 percent?
03:48:51  23   A.  Based upon the data, I had two data points.  There was
03:48:56  24   one study that I looked at that pointed to a 50 percent
03:49:00  25   rate adjustment.  And then there was another data point
```

03:49:01  1  that I had related to a negotiation with DuPont that

03:49:07  2  pointed to a 27 percent adjustment.

03:49:08  3        I put more weight on the negotiated adjustment

03:49:11  4  with DuPont.  They were a client of mine.  They're

03:49:18  5  sophisticated.  I put a little bit more weight on that

03:49:21  6  negotiated adjustment amount and ended up with 35 percent

03:49:25  7  which is a number basically almost in the middle.

03:49:27  8  Q.  What about the other source?  What was the percentage

03:49:32  9  adjustment for the first source?

03:49:34 10  A.  So that was the Varner Study, and it was this very

03:49:42 11  structured study where Mr. Varner looked at public filings

03:49:50 12  for companies that disclosed license agreements where there

03:49:53 13  was an exclusive license but there was this additional

03:49:57 14  provision that said:  Oh, by the way, if this license

03:50:00 15  becomes non-exclusive, here is the amount of reduction that

03:50:04 16  we're going to use in the royalty rate.  So it was this

03:50:07 17  very structured search on this very unique group of

03:50:13 18  licensees and licensors.

03:50:15 19  Q.  How many agreements were part of the Varner Study?

03:50:20 20  A.  About 1,400.

03:50:23 21  Q.  Wouldn't that study be more weight in figuring out what

03:50:29 22  the -- adjust down for being non-exclusive?

03:50:33 23  A.  Yeah, I mean, I certainly considered it.  But, again,

03:50:37 24  the DuPont number, the 27 percent number, that was a real

03:50:41 25  live negotiation.  This group of exclusive licenses that

03:50:46   1    had this kind of pre-packaged discount built in, there

03:50:53   2    wasn't -- that 50 percent wasn't really kind of a direct

03:50:56   3    negotiation.  That was a part of this other agreement and

03:51:01   4    this other negotiation.  The 27 percent from DuPont is a

03:51:03   5    real live negotiation that went from 5.5 percent

03:51:07   6    to 4.0 percent which is a 27 percent discount.

03:51:10   7    Q.  Is your discount rate reasonable?

03:51:12   8    A.  I believe it is.

03:51:13   9    Q.  Would a 50 percent-plus discount rate be reasonable?

03:51:18   10   A.  No.  I think going to the extreme like that, I don't

03:51:24   11   think that reflects the reality of situations like the

03:51:27   12   DuPont situation.

03:51:27   13   Q.  So after you went through and factored in a discount of

03:51:33   14   35 percent for the non-exclusive licenses, what did you do

03:51:39   15   next?

03:51:39   16   A.  So then I did the statistical analysis that you see at

03:51:45   17   the bottom where I basically said:  Okay, what are the

03:51:49   18   percentiles associated with these licenses and these

03:51:53   19   rates -- these adjusted rates that I have developed here?

03:51:56   20           And what I came up with was a median value of --

03:52:03   21           MR. OLIVER:  Objection.  Your Honor, we object to

03:52:05   22   the use of industry average rates for the same reasons

03:52:09   23   stated in our briefing.

03:52:12   24           MR. LEE:  It's in his expert report, Your Honor.

03:52:14   25   He's just testifying to the --

```
03:52:16   1            MR. OLIVER:  We'd like to maintain the objection
03:52:19   2   to relevance, more prejudicial than probative.
03:52:23   3            THE COURT:  Overruled.  You may proceed.
03:52:25   4            MR. OLIVER:  May I have a standing objection so I
03:52:29   5   don't have to keep standing up?
03:52:30   6            THE COURT:  Any objection to a standing objection?
03:52:33   7            MR. LEE:  No.
03:52:33   8            THE COURT:  Very well.
03:52:36   9   A.  So, yeah, I need to make a correction first.  This
03:52:39  10   isn't an average.  It's a median.  I'm using a median.  I'm
03:52:42  11   not using an average, so I think that's relevant here.
03:52:46  12   BY MR. LEE:
03:52:47  13   Q.  Go ahead and explain how you arrived at the median.
03:52:51  14   A.  Yeah.  So I arrived at the median by looking -- the
03:52:53  15   median is, you know, the middle number.  So of the
03:52:58  16   observations that were identified in Section C, I find the
03:53:01  17   middle number.  And you do that because with an average,
03:53:05  18   outliers can distort the value.  I didn't use an average.
03:53:10  19   I looked at the median.  That's the middle number.  I felt
03:53:13  20   that was more reasonable.  So it's 2.0 to 2.6 percent for
03:53:18  21   the low to high.
03:53:21  22            MR. LEE:  Denver, Slide 15, please.
03:53:26  23   BY MR. LEE:
03:53:34  24   Q.  Mr. Perdue, why did you prepare this slide?
03:53:38  25   A.  Early on, you asked me about the issue of
```

03:53:40   1   reasonableness, and I think there's different ways to look
03:53:42   2   at reasonableness.  And this is one of those ways.
03:53:48   3   Q.  And how does this show whether your rate is reasonable
03:53:51   4   or not?
03:53:51   5   A.  Well, I basically stacked up on the slide some of these
03:53:55   6   rates that we've been talking about, and I've made it more
03:53:58   7   digestible for human consumption, so that we can all look
03:54:02   8   at the picture instead of looking at spreadsheets with tiny
03:54:05   9   fonts.  But you can see that the industry rates generally
03:54:09  10   are in the 3 to 6 percent range.  You can see that the
03:54:13  11   ktMINE rates span from 2 percent to 50 percent.
03:54:17  12         Now, I threw out the 50 percent observation.  When
03:54:22  13   you throw that out, it's 2 percent to 15 percent.  And then
03:54:26  14   there's this 3 percent rate with Universal Display Corp.
03:54:33  15   And what you see is that the 2.3 percent rate that I
03:54:35  16   selected is way at the left-hand side of all of those
03:54:39  17   rates, thus suggesting that it's reasonable and
03:54:45  18   conservative.
03:54:51  19         MR. LEE:  Slide 16, Denver.
03:54:53  20   BY MR. LEE:
03:54:54  21   Q.  So this is another slide you prepared.  How does this
03:54:57  22   help us determine whether your rate is reasonable or not?
03:55:01  23   A.  So this is those dollar rates that we talked about that
03:55:04  24   were in Section A.  And, again, I was looking more for
03:55:08  25   percentage rates because the bulk of what I was able to

03:55:11   1   find were percentage rates.  But I did use these dollar

03:55:14   2   rates, these per unit rates, and this is one of the ways

03:55:18   3   that I used it, was to show how the $0.57 per unit rate

03:55:26   4   that results from my royalty calculation stacks up against

03:55:30   5   these per unit rates from the information that we saw in

03:55:37   6   the summary document.  And, again, it's within the goal

03:55:40   7   posts.

03:55:46   8           MR. LEE:  Slide 17, Denver.

03:55:49   9   BY MR. LEE:

03:55:49  10   Q.  And what about this rate or this slide?

03:55:51  11   A.  So one of the Georgia-Pacific factors, Factor 15, says

03:55:55  12   that -- that this negotiation occurs and that the licensee

03:56:01  13   is going to bargain for a rate that allows them to still

03:56:06  14   make a profit basically.  You can't have the rate so high

03:56:10  15   that the licensee that's going to use the patent can't make

03:56:15  16   any money selling the product that uses the patent.  So one

03:56:18  17   of the things that we look at is this issue of

03:56:21  18   profitability.

03:56:21  19           What this slide tells us is that at $0.57 per

03:56:27  20   unit, that equates to 1.9 percent of profits which are

03:56:32  21   about $30 per monitor.  So that tells us that there's lots

03:56:39  22   of profitability left.  And if the hypothetical negotiators

03:56:45  23   had landed at the rate that I've defined, they would be

03:56:48  24   okay and the licensee would still be able to make money on

03:56:56  25   their product.

03:57:07  1   Q.  Once you determined the royalty rate, what was the next

03:57:10  2   step in your analysis for damages?

03:57:12  3   A.  Then I turned to the issue of apportionment.

03:57:15  4   Q.  And what is apportionment?

03:57:17  5   A.  The idea of apportionment is that you've got a bundle

03:57:23  6   of technology.  You know, you look at a screen like this,

03:57:27  7   and there's data communication capabilities, there's a

03:57:32  8   case, there's audio, there's video, there's a lot of

03:57:36  9   technologies that are rolled into a piece of technology

03:57:38  10  like this.

03:57:39  11       So what you're trying to do is isolate the

03:57:43  12  relevant bundle of technology to which you apply the

03:57:49  13  royalty rate.  So you want to isolate that chunk of value

03:57:53  14  that's reasonable to apply the rate to.  That's what

03:57:56  15  apportionment is.

03:58:04  16  Q.  And how did you go about determining the apportionment

03:58:08  17  factor to use in this case?

03:58:10  18  A.  The best evidence available, in my opinion, was the

03:58:22  19  Phillips data because Phillips basically said to the world:

03:58:27  20  Here's these 16 clusters of technology that we license to

03:58:33  21  companies all over the world if they want to make a

03:58:36  22  television or a set-top box.  That told me what this broad

03:58:41  23  view of that technology universe looked like.  And I

03:58:46  24  isolated one of those technology clusters that I thought

03:58:51  25  was most comparable to this --

03:58:51  1          MR. OLIVER:  Objection.

03:58:53  2  A.  -- idea of video adjustment and --

03:58:56  3          THE COURT:  Hold on one moment.

03:58:59  4          MR. OLIVER:  The answer is nonresponsive, and

03:59:02  5  he's -- the right term he's -- it's a very lengthy answer

03:59:06  6  to a --

03:59:06  7          THE COURT:  Narrative?

03:59:07  8          MR. OLIVER:  It's a narrative answer to a question

03:59:10  9  that wasn't asked, and he has now testified again and again

03:59:13  10  about technical comparability without being qualified on

03:59:18  11  technical comparability.

03:59:20  12          THE COURT:  Overruled.  You may proceed.

03:59:25  13          MR. LEE:  Denver -- Denver, Slide No. 18, please.

03:59:33  14  BY MR. LEE:

03:59:33  15  Q.  Mr. Perdue, you mentioned the Phillips table.  Are you

03:59:36  16  talking about this information on Table 1 on this slide?

03:59:40  17  A.  Yes.

03:59:41  18  Q.  Who prepared the table on this slide?

03:59:48  19  A.  Well, we actually looked at a lot of this information

03:59:51  20  that's in the first three columns earlier when we pulled up

03:59:55  21  the Philips licensing program information.  I calculated

03:59:59  22  the last column.  Everything else came from Philips.

04:00:03  23  Q.  Why did you choose TV backlight and dimming?

04:00:07  24  A.  When I looked at these 16 areas, that was the only area

04:00:16  25  that I saw that had anything to do with video adjustment

| | | |
|---|---|---|
| 04:00:19 | 1 | and control.  I looked at the rest of the categories, and I |
| 04:00:25 | 2 | just didn't see anything as good.  So I used that as a |
| 04:00:28 | 3 | proxy for this apportionment exercise. |
| 04:00:31 | 4 | Q.  Is the Philips data reliable? |
| 04:00:35 | 5 | A.  Yeah.  They -- this is what they tell the world that |
| 04:00:39 | 6 | they do their licensing at.  This is their price list, |
| 04:00:45 | 7 | basically. |
| 04:00:46 | 8 | Q.  And based on the Philips data, what was the |
| 04:00:50 | 9 | apportionment rate? |
| 04:00:51 | 10 | A.  14 percent. |
| 04:00:53 | 11 | Q.  And how does the apportionment rate -- how is the |
| 04:01:11 | 12 | apportionment rate used to determine the damages in this |
| 04:01:15 | 13 | case with the other numbers that you talked about earlier? |
| 04:01:17 | 14 | A.  Yeah.  So it's -- it's a couple of big steps. |
| 04:01:23 | 15 | You take the big number royalty base, you multiply |
| 04:01:27 | 16 | that by this 14 percent, and you get a much smaller |
| 04:01:32 | 17 | adjusted royalty base.  So you start out at eight hundred |
| 04:01:36 | 18 | and something million dollars, and then it comes down to a |
| 04:01:40 | 19 | hundred and something million dollars.  And then you apply |
| 04:01:43 | 20 | that royalty rate times that smaller number.  That's where |
| 04:01:46 | 21 | the 2.8 comes from. |
| 04:01:49 | 22 | MR. LEE:  Denver, Slide 7. |
| 04:01:56 | 23 | BY MR. LEE: |
| 04:01:57 | 24 | Q.  Is this the calculation that you were just describing? |
| 04:02:00 | 25 | A.  Yes.  This -- this follows my hand gestures from just a |

04:02:04  1   moment ago.  This is that two-step process where you start

04:02:08  2   with the big number and multiply it by the 14 percent to

04:02:11  3   isolate that technology -- that relevant technology

04:02:15  4   cluster.  Then you multiply it by the royalty rate.

04:02:19  5   Q.  The come -- the graphic on the left, the

04:02:27  6   $881.6 million, where did that number come from?

04:02:28  7   A.  That came from ASUS.

04:02:30  8   Q.  Who -- how did you calculate it?

04:02:36  9   A.  That was sales for the damage period.

04:02:38  10  Q.  And it says sales of accused products through patent

04:02:47  11  expiration, is that --

04:02:48  12  A.  That's correct.

04:02:48  13  Q.  Why is that the royalty base?

04:02:51  14  A.  Because normally those royalties are applied usually to

04:02:54  15  some kind of top -- top line number, usually some metric of

04:02:58  16  sales.

04:02:58  17  Q.  Now, you took this number and you multiplied --

04:03:05  18  multiplied it by 14 percent.  Why is that?

04:03:08  19  A.  Again, to isolate that -- that cluster of this device

04:03:14  20  that could be reasonably attributable to video adjustment

04:03:20  21  and control.  Not just color control, all types of video

04:03:25  22  adjustment and control.  That was the economic cluster that

04:03:31  23  I was after there, and that's what the 14 percent

04:03:34  24  represents.

04:03:34  25  Q.  What does it say under the box, 14 percent on that

04:03:39  1  slide?

04:03:39  2  A.  It says 86 percent reduction.

04:03:41  3  Q.  And what does that mean?

04:03:44  4  A.  So the reduction from the 881.6 to --

04:03:48  5        THE WITNESS:  Zoom back out, Denver.

04:03:50  6  A.  -- to the 123.4.  That's an 86 percent reduction.

04:03:55  7  BY MR. LEE:

04:03:55  8  Q.  And that came out to $123 million?

04:03:58  9  A.  Yes.

04:03:59  10  Q.  Why is that called the apportioned royalty base?

04:04:03  11  A.  Because we went through this apportionment step to

04:04:07  12  isolate that value.

04:04:09  13  Q.  And what is the isolated value that's -- that comes out

04:04:18  14  of this apportionment?

04:04:19  15  A.  Well, the ultimate value is the 2.8 million, but the

04:04:24  16  123 represents that apportioned royalty base that's that

04:04:29  17  isolated cluster of technology.

04:04:32  18  Q.  What did you do with the apportioned royalty base?

04:04:36  19  A.  Multiplied it times the royalty rate.

04:04:39  20  Q.  And what is the number coming out of that calculation?

04:04:43  21  A.  $2.8 million.

04:04:54  22        MR. LEE:  Denver, Slide No. 19.

04:05:02  23  BY MR. LEE:

04:05:03  24  Q.  What does this slide show, Mr. Perdue?

04:05:05  25  A.  This -- this shows really the mechanics of that

04:05:14   1   calculation.  The -- what we looked at in the last slide

04:05:17   2   was just really a high-level summary of it, but this is

04:05:22   3   actually from my report that shows the detailed calculation

04:05:25   4   mechanics.

04:05:27   5           MR. LEE:  Okay.  And can we -- Denver, Slide

04:05:31   6   No. 9.

04:05:32   7   BY MR. LEE:

04:05:36   8   Q.  Did you review Factor 1, royalties received by Lone

04:05:40   9   Star for the '435 patent?

04:05:41  10   A.  Yes, and we talked about that earlier.

04:05:43  11   Q.  And what was the result of your analysis?

04:05:46  12   A.  That Lone Star's kind of licensing approach is lump sum

04:05:54  13   settlements, and there was generally no rate specified.

04:05:57  14   Q.  What about Factor No. 2, royalty rates paid by ASUS for

04:06:02  15   comparable patents?  What did you determine?

04:06:04  16   A.  Same answer.  Lump sum amounts with really no rates

04:06:09  17   being specified.

04:06:10  18   Q.  What about Factor No. 3?

04:06:13  19   A.  So this is where the 35 percent reduction comes into

04:06:17  20   play for those exclusive licenses.  This deals with the

04:06:21  21   nature and the scope of the license, and this is where

04:06:26  22   exclusivity enters the picture.

04:06:30  23   Q.  Well -- now, when you went and analyzed these damages

04:06:35  24   in this case, did you speak with Dr. Ducharme?

04:06:37  25   A.  I did.

04:06:38   1   Q.   Why did you do that?

04:06:40   2   A.   I wanted his input on some of -- there was a couple of

04:06:45   3   these factors where I -- where I wanted his input, and I

04:06:48   4   know one of these, I think it was -- yeah, so No. 9 and

04:06:54   5   No. 11, I know I wanted his input on that.

04:06:59   6        I would have sought his input on the technical

04:07:03   7   issue if I had a lot of patents that we're going to get

04:07:06   8   into the weeds of the technology, but that ended up not

04:07:09   9   being necessary.

04:07:20   10  Q.   Based on all that analysis, what did you determine the

04:07:22   11  rate, again, to be?

04:07:24   12  A.   Yeah, so Factor 15 wraps it all up.

04:07:27   13       Factor 15 is after you've considered all of these

04:07:30   14  things -- and just a handful of these really matter in this

04:07:33   15  particular case.  Factor 15 is where it wraps it all up,

04:07:37   16  and it says what's the hypothetical negotiation result

04:07:37   17  reached voluntarily?

04:07:42   18       And my opinion on that is this 2.3 percent rate

04:07:45   19  with this 14 percent apportionment factor.

04:07:50   20  Q.   A one-time payment of $2.8 million?

04:07:54   21  A.   Yes, that's the total on a combined basis.

04:07:58   22       MR. LEE:  Pass the witness.

04:08:00   23       THE COURT:  Cross-examination?

04:08:04   24                   CROSS-EXAMINATION

04:08:08   25  BY MR. OLIVER:

04:08:46   1    Q.  Good afternoon, Mr. Perdue.

04:08:47   2         My name is Andrew Oliver.  Good to meet you.

04:08:50   3    A.  Good to meet you.

04:08:51   4    Q.  Sorry to shout over you a couple times earlier.  I

04:08:51   5    don't know how powerful the microphone was.  So hopefully

04:08:54   6    it wasn't too annoying.

04:08:54   7         MR. OLIVER:  May I have the Elmo, please?

04:09:01   8         THE COURT:  Is it on?  The light needs to be

04:09:05   9    turned on, Mr. Oliver.

04:09:46  10    BY MR. OLIVER:

04:09:47  11    Q.  Mr. Perdue, were you here when Dr. Ducharme was

04:09:49  12    testifying?

04:09:50  13    A.  The very tail end of it.

04:09:52  14    Q.  Okay.  Did you see this list of accused devices?

04:09:54  15    A.  I did not.

04:09:55  16    Q.  And I'm going to represent to you that this was shown

04:10:00  17    during Dr. Ducharme's testimony, and he said that this was

04:10:04  18    the devices that are accused in this case.

04:10:07  19    A.  Okay.

04:10:08  20    Q.  Did you, in your damages calculation, include any

04:10:13  21    devices that aren't accused in this case?

04:10:15  22    A.  Well, obviously we don't have time for me to

04:10:20  23    cross-reference this list with the list that I have used.

04:10:23  24    It was represented to me that the list of accused devices

04:10:28  25    on the information provided by ASUS, that those were all

574

04:10:31    1   accused devices.

04:10:31    2   Q.  Okay.  We do have time to cross-reference those.  We're

04:10:34    3   about to, but I'll walk you through that.

04:10:37    4   A.  Okay.

04:10:37    5   Q.  You see the first list -- the first -- does that list

04:10:43    6   appear to be alphabetical to you, except for the very last

04:10:50    7   item?

04:10:50    8   A.  Yeah, other than the last -- yes, other than the last

04:11:02    9   item, I think it does look like it's alphabetical.

04:11:06   10   Q.  So you see down at the bottom right, we see B1MR?

04:11:12   11   A.  Bottom right.  I don't see that.

04:11:18   12   Q.  135, do you see that?

04:11:20   13   A.  Oh, I do, yes, yes.

04:11:22   14   Q.  B1MR, right?

04:11:25   15   A.  Yes.

04:11:25   16   Q.  So keep that in mind, B1MR.

04:11:29   17   A.  Okay.

04:11:29   18   Q.  And then the next one alphabetically is C422, right?

04:11:35   19   A.  Yes.

04:11:36   20   Q.  Okay.  I'm going to switch exhibits, so keep those two

04:11:40   21   in mind?

04:11:41   22          MR. OLIVER:  May I have Exhibit P-94, please?

04:12:16   23   BY MR. OLIVER:

04:12:16   24   Q.  You see, is this the spreadsheet of sales that you used

04:12:26   25   to calculate your figures in this case?

04:12:28  1   A.  It appears to be, yes.  It's -- I think it's the last

04:12:32  2   one that I looked at with Mr. Lee.

04:12:34  3   Q.  Okay.  And you looked at it earlier when you were

04:12:38  4   testifying today?

04:12:39  5   A.  Yes, with Mr. Lee.

04:12:41  6   Q.  Okay.  What's the first model name there?

04:12:46  7   A.  B1M.

04:12:48  8   Q.  And that was not on the list of accused products,

04:12:52  9   right?

04:12:53  10  A.  Well, was that the bottom right, or was that B1MR?

04:12:58  11  Q.  Would you like -- it was B1MR on the bottom right.

04:13:01  12  A.  Okay.

04:13:02  13  Q.  So B1M was not on the list of accused products?

04:13:06  14  A.  I don't know -- if B1MR was bottom right, then I don't

04:13:13  15  believe B1M would have been on that list if it's

04:13:16  16  alphabetical.

04:13:17  17  Q.  Okay.  And you included those sales in your figures?

04:13:21  18  Okay.

04:13:21  19  A.  Yes.

04:13:23  20        MR. OLIVER:  Scroll down, please, and let's switch

04:13:30  21  back to the ELMO, please.

04:13:36  22  BY MR. OLIVER:

04:13:37  23  Q.  Now, this is alphabetical.  Do you see Rows 8 and 9?

04:13:41  24  A.  I do.

04:13:42  25  Q.  And you see there -- you see there's a gap between the

04:13:44  1   letter C and the letter M?

04:13:45  2   A.  I do.

04:13:48  3   Q.  Okay.

04:13:48  4        MR. OLIVER:  Can we switch back to the exhibit,

04:13:51  5   please, P-94?

04:13:52  6   BY MR. OLIVER:

04:13:53  7   Q.  So you see the E1 product there?

04:13:56  8   A.  I do.

04:13:56  9   Q.  That's not accused, right?

04:13:58  10  A.  Not if it's alphabetical, that's right.

04:14:01  11  Q.  Is the E1Z product there, you see?

04:14:05  12  A.  I do.

04:14:05  13  Q.  That's not accused?

04:14:08  14  A.  (No audible response.)

04:14:08  15        MR. OLIVER:  Next screen, please.

04:14:10  16  BY MR. OLIVER:

04:14:10  17  Q.  F1, do you see that?

04:14:13  18  A.  I do.

04:14:14  19  Q.  That's not accused, right?

04:14:16  20  A.  I know that there's disagreement about this.  So I'm

04:14:19  21  not -- I'm not the technical expert, and I'm not a legal

04:14:22  22  expert.  So I know there's disagreement in terms of what's

04:14:25  23  in and what's out.  It's not my area.

04:14:27  24  Q.  Okay.  So you accuse -- you included money for a lot of

04:14:34  25  products here that are not even accused of infringement in

```
04:14:40   1   this case?
04:14:40   2   A.  Well, I don't know that because I know there's
04:14:42   3   disagreement about that.  So, again, that's not my area.
04:14:46   4   Q.  Okay.  If you accept my representation about the image
04:14:50   5   we showed of the accused devices --
04:14:53   6   A.  Yes.
04:14:53   7   Q.  -- if that -- if my representation is true, then you
04:14:56   8   accuse -- you included money in your figures for a lot of
04:15:01   9   devices that aren't even accused in this case?
04:15:03  10   A.  Well, I don't know what a lot is, but that would be
04:15:06  11   true if what you've represented to me is true.
04:15:08  12   Q.  Okay.  Have you -- are you familiar with Mr. Brett
04:15:11  13   Reed's report?
04:15:12  14   A.  I am.
04:15:13  15   Q.  You reviewed it?
04:15:14  16   A.  I did.
04:15:15  17   Q.  Do you recall the charts in it where he mentioned that
04:15:19  18   there were products that were not accused that were
04:15:22  19   included in your calculations?
04:15:24  20   A.  That's where I became aware of the dispute about this
04:15:27  21   issue of the accused products.
04:15:29  22   Q.  Okay.  And --
04:15:29  23          MR. OLIVER:  Can we switch back to the Elmo,
04:15:35  24   please?
04:15:36  25   BY MR. OLIVER:
```

04:15:36  1   Q.  And this list of accused devices that I've represented

04:15:40  2   is the list that was testified about earlier has 135

04:15:44  3   devices on it, right?

04:15:46  4   A.  Yes.

04:15:46  5   Q.  And Mr. Reed, in his report, is it fair to state that

04:15:54  6   he identified over 40 devices that you included in your

04:15:57  7   calculations that aren't accused in this case?

04:15:59  8   A.  I don't know the count, but I am familiar with the fact

04:16:02  9   that Mr. Reed points to this issue.

04:16:05  10  Q.  Would it surprise you if Mr. Reed came up during the

04:16:11  11  defense case and testified and he said that you included

04:16:15  12  over 40 devices that weren't even accused of infringement

04:16:18  13  in your calculations?

04:16:19  14  A.  No.  Again, he state -- I know he states that in his

04:16:23  15  report.

04:16:23  16  Q.  Okay.  But you didn't revise your report to remove

04:16:26  17  those devices that aren't even accused of infringement?

04:16:29  18  A.  My understanding is that there's disagreement about

04:16:32  19  that, and I'm not in a position to assess that.

04:16:34  20  Q.  Okay.  But you want this jury to make ASUS pay

04:16:38  21  Lone Star for 40 devices that aren't even accused of

04:16:44  22  infringement?

04:16:45  23  A.  That's your contention.  I believe the other side's

04:16:49  24  contention is different.  And, again, that's not my area.

04:16:55  25  Q.  Okay.  I think we'll come back to this in a little bit

| 04:17:01 | 1 | because I'm going to want to establish all of the devices |
| 04:17:04 | 2 | you included in your report that aren't accused.  But is it |
| 04:17:07 | 3 | okay if we move to another subject for a little -- |
| 04:17:10 | 4 | A.  Sure. |
| 04:17:11 | 5 | Q.  -- while? |
| 04:17:15 | 6 | A.  Sure. |
| 04:17:15 | 7 | Q.  Okay.  Have you ever testified on behalf of a Defendant |
| 04:17:18 | 8 | in a patent case? |
| 04:17:19 | 9 | A.  You know, I'd have to look at my CV.  I know that my |
| 04:17:27 | 10 | cases tend to be pretty evenly split between Defendants and |
| 04:17:31 | 11 | Plaintiffs.  So I would have to look at my CV. |
| 04:17:35 | 12 | Q.  Okay.  But you can't think of any cases off the top of |
| 04:17:39 | 13 | your head where you've testified on behalf of a Defendant |
| 04:17:42 | 14 | in a patent case? |
| 04:17:54 | 15 | A.  Yeah, I mean, we'd have to look at the CV. |
| 04:18:02 | 16 | Q.  Okay.  Do you recognize this picture that I've put on |
| 04:18:03 | 17 | the Elmo? |
| 04:18:04 | 18 | A.  Yes. |
| 04:18:04 | 19 | Q.  That's one of the slides you presented earlier today, |
| 04:18:07 | 20 | right? |
| 04:18:07 | 21 | A.  Correct. |
| 04:18:08 | 22 | Q.  And you said here that there are required assumptions |
| 04:18:10 | 23 | for negotiations, right? |
| 04:18:13 | 24 | A.  Yes. |
| 04:18:13 | 25 | Q.  So those are assumptions that you have to make? |

04:18:18  1   A.  Those are assumptions that are understood in the
04:18:20  2   context of this hypothetical negotiation.
04:18:21  3   Q.  And those are assumptions that Mr. Reed has to also
04:18:26  4   make, as well, right?
04:18:28  5   A.  Presumably.
04:18:29  6   Q.  And so even though he's testifying on behalf of the
04:18:33  7   defense, he still has to assume the patent is valid for
04:18:38  8   this computation, right?
04:18:42  9   A.  That's correct.
04:18:43  10  Q.  Even if the defense is claiming the patent is not
04:18:46  11  valid, right?
04:18:47  12  A.  True.
04:18:47  13  Q.  And Mr. Reed still is going to have to assume that the
04:18:51  14  patent is infringed even if the defense argues that the
04:18:55  15  patent is not infringed, right?
04:18:57  16  A.  Correct.
04:18:57  17  Q.  And the jury could find the patent to be infringed or
04:19:01  18  not infringed, right?
04:19:02  19  A.  Sure.
04:19:03  20  Q.  And the jury could find the patent to be valid or
04:19:07  21  invalid, right?
04:19:08  22  A.  Yeah.
04:19:09  23  Q.  So Mr. Reed's assumptions and your assumptions don't
04:19:12  24  have any bearing on whether the patent is actually valid or
04:19:16  25  infringed, right?

04:19:18   1   A.   It's a liability issue.

04:19:20   2   Q.   Okay.   And just by making that assumption, that doesn't

04:19:27   3   mean that Mr. Reed agrees that the patent is invalid and

04:19:30   4   infringed, does it?

04:19:32   5   A.   No.

04:19:32   6   Q.   Okay.   So the date of your hypothetical negotiation,

04:19:39   7   March 13th -- and you said that's -- at the top you say

04:19:43   8   that's a negotiation between Lone Star and ASUS, right?

04:19:46   9   A.   Yes.

04:19:46   10   Q.   And why would Lone Star make the negotiation at that

04:19:53   11   date?

04:19:54   12   A.   And this is a legal issue, but my understanding is that

04:19:57   13   that was -- that's what I understand to be the date of

04:20:00   14   first infringement.

04:20:00   15   Q.   Okay.   But can Lone Star enter into a negotiation for a

04:20:05   16   patent license if it doesn't own the patent on that date?

04:20:08   17   A.   Well, when you enter into these types of hypothetical

04:20:12   18   negotiations, they're hypothetical and we have to take some

04:20:14   19   liberties with some of those facts.

04:20:17   20   Q.   Are you aware that the patent was previously owned by

04:20:21   21   another company?

04:20:21   22   A.   I am aware of that.

04:20:23   23   Q.   And that Lone Star claims to have acquired it at some

04:20:28   24   point?

04:20:28   25   A.   Yes.

04:20:29  1   Q.  Would it surprise you if that date was after the date

04:20:32  2   of your hypothetical negotiation?

04:20:34  3   A.  No.  And I don't know what that date is.

04:20:40  4   Q.  Okay.  So you're fine with assuming Lone Star -- you

04:20:45  5   know the previous owner was named Oplus?  Do you know that?

04:20:48  6   A.  No, I did not.

04:20:49  7   Q.  Okay.  Well, I'm going to bring the patent up.

04:21:05  8              I'm sorry.  I'll keep going.  I thought I had it

04:21:07  9   with me.

04:21:18  10             So this is Defense Exhibit 1.  Do you see that?

04:21:20  11  A.  I do.

04:21:21  12  Q.  Is that the patent you analyzed for this case?

04:21:26  13  A.  Yes.

04:21:27  14  Q.  Okay.  You see here that it says that the inventor was

04:21:37  15  Yosef Segman from a city named Zichron Yaacov in Israel?

04:21:50  16  A.  Yes.

04:21:51  17  Q.  And that the assignee was Oplus Technologies?

04:21:51  18  A.  Yes.

04:21:51  19  Q.  So wouldn't it be safe to assume that Oplus

04:21:51  20  Technologies would make -- do the hypothetical negotiation

04:21:51  21  if it owned the patent at the time of the hypothetical

04:22:00  22  negotiation?

04:22:00  23             MR. LEE:  Objection, Your Honor.  Relevance.

04:22:03  24             THE COURT:  What's the relevance?

04:22:04  25             MR. OLIVER:  Part of the Georgia-Pacific factors

04:22:06  1  are an assessment of the company's size and so on and --

04:22:09  2  and, you know, various aspects about the company that owns

04:22:12  3  the patent itself.

04:22:13  4         THE COURT:  I'll allow it.

04:22:18  5  BY MR. OLIVER:

04:22:19  6  Q.  So if Oplus Technologies owned the patent on

04:22:23  7  March 13th, would the hypothetical negotiation need to be

04:22:27  8  done based on their information?

04:22:29  9  A.  What I'm not sure of is how patent law deals with the

04:22:32  10  issue of successors, assignees, and all that.  I don't know

04:22:36  11  if you step into the shoes of previous owner.  That's a

04:22:39  12  legal issue that's beyond my expertise.

04:22:59  13  Q.  You recognize this?  I can put the whole slide up if

04:23:03  14  you need it, but you recognize what I'm showing you from

04:23:06  15  what you can see?

04:23:06  16  A.  No, I can see it fine.

04:23:08  17  Q.  You're prepared this slide, right?

04:23:12  18  A.  Yes.

04:23:13  19  Q.  And these are the legal factors, right, that go into

04:23:16  20  the analysis?

04:23:17  21  A.  Yes.  Well, they're economic factors and legal factors

04:23:23  22  both.

04:23:24  23  Q.  Okay.  And you said you're not aware of any legal

04:23:26  24  factors that relate to who owns the patent?

04:23:29  25  A.  Oh, no, no.  What I said was I'm not aware of how

| 04:23:32 | 1 | patent law treats successors, assignees, and all of that in |
| 04:23:37 | 2 | the context of the hypothetical negotiation.  That's a |
| 04:23:39 | 3 | legal issue. |
| 04:23:39 | 4 | Q.  But you consider that patent owner's licensing policy |
| 04:23:45 | 5 | at the time of the hypothetical negotiation, right? |
| 04:23:47 | 6 | A.  Yes.  But I don't know if Lone Star essentially stepped |
| 04:23:52 | 7 | into the shoes of Oplus.  I'm not sure of how the patent |
| 04:23:56 | 8 | law works with that. |
| 04:23:57 | 9 | Q.  So you don't even know whether it's appropriate to |
| 04:24:00 | 10 | consider Lone Star's licensing policy versus Oplus's |
| 04:24:04 | 11 | licensing policy? |
| 04:24:05 | 12 | A.  What I know is not appropriate is for me to opine on a |
| 04:24:09 | 13 | legal issue. |
| 04:24:09 | 14 | Q.  Okay.  But if we assume that Oplus owned the patent in |
| 04:24:17 | 15 | March 2013, it would have been incorrect to -- on No. 4, to |
| 04:24:25 | 16 | consider Lone Star's licensing policy, right? |
| 04:24:28 | 17 | A.  Well, I don't know.  Again, I don't know how the law |
| 04:24:31 | 18 | treats that issue. |
| 04:24:35 | 19 | Q.  What is Factor No. 4? |
| 04:24:37 | 20 | A.  It says:  Lone Star's licensing policy related to the |
| 04:24:40 | 21 | '435 patent. |
| 04:24:40 | 22 | Q.  But if you looked at the Georgia-Pacific factors that |
| 04:24:43 | 23 | relate to all cases, not just Lone Star, what would it -- |
| 04:24:47 | 24 | what would it be? |
| 04:24:48 | 25 | A.  I'm sorry.  I don't understand. |

04:24:50  1   Q.  Well, the Georgia-Pacific case from which you got these

04:24:54  2   analyses --

04:24:54  3   A.  Right.

04:24:55  4   Q.  -- it didn't talk about Lone Star.  What did it talk

04:24:58  5   about?

04:24:58  6   A.  You mean at the time -- in 2013?

04:25:02  7   Q.  I mean, the legal --

04:25:04  8   A.  I'm lost.

04:25:05  9   Q.  Divorced from this lawsuit, divorced from Lone Star and

04:25:09  10  ASUS, what does Georgia-Pacific say the factor is?

04:25:13  11  A.  It's the patent owner's licensing policy related to the

04:25:17  12  '435.

04:25:18  13  Q.  And that's the policy that exists as of the date of the

04:25:22  14  hypothetical negotiation?

04:25:23  15  A.  It is, but I don't know how law -- the law treats this

04:25:28  16  issue of the successors or the assignee --

04:25:32  17  Q.  I'm just asking you about the factors that you

04:25:33  18  purported to have analyzed.  You analyzed a factor that had

04:25:38  19  to do with a patent owner's licensing policy, right?

04:25:41  20  A.  Yeah.  And let me get the actual word for you so that

04:25:44  21  we're using the correct word here.

04:25:47  22  Q.  Thank you.

04:26:18  23  A.  So Factor 4 says:  The licensor's established policy

04:26:23  24  and marketing program to maintain his patent monopoly by

04:26:27  25  not licensing others to use the invention or by granting

04:26:31   1   licensing under special conditions designed to preserve

04:26:36   2   that monopoly.

04:26:37   3           So it says:  The licensor.

04:26:38   4   Q.  The licensor.  And just from your understanding of

04:26:42   5   licensor, not referencing one of the parties, what does the

04:26:48   6   word "licensor" mean?

04:26:50   7   A.  That's the person from whom the license is granted.  It

04:26:54   8   comes from the licensor and goes to the licensee.

04:26:58   9   Q.  Okay.  So the licensor would be the person who has the

04:27:01   10  rights in the patent, who -- is that right?

04:27:04   11  A.  Yes, that would have the rights to grant that license.

04:27:09   12  Q.  And that would be the person that -- that -- I'm sorry.

04:27:13   13  You just said -- the person who can grant the license,

04:27:16   14  right?

04:27:17   15  A.  Correct.

04:27:17   16  Q.  And if Lone Star does not own a patent, is it able to

04:27:23   17  grant a license to that patent?

04:27:25   18  A.  It stepped into those shoes later in the construct of

04:27:31   19  the hypothetical negotiation.  I don't know that that's not

04:27:33   20  okay.

04:27:33   21  Q.  So if -- if I wanted to, I could grant a license right

04:27:38   22  now to Lone Star's patent and then buy the patent later

04:27:42   23  from Lone Star and it would be okay?

04:27:44   24  A.  I don't know.  There's a lot of magic with

04:27:48   25  Georgia-Pacific because we're in this hypothetical world

04:27:50  1   where we're saying we're going to peer into the future and

04:27:53  2   we're going to look back and we're going to say here's what

04:27:57  3   would have happened under these conditions.  So I don't

04:27:59  4   know that there's not liberty to do exactly what we're

04:28:02  5   talking about here within that construct.

04:28:04  6   Q.  So to use your term, you applied a lot of magic in

04:28:08  7   coming up with your number?

04:28:10  8   A.  I'm using that term in reference to this hypothetical

04:28:13  9   idea.

04:28:13  10  Q.  Okay.  Are there any other factors that relate to

04:28:24  11  the -- the patent owner?

04:28:26  12  A.  Well, a lot of them do, obviously.  So the nature and

04:28:35  13  the scope of the license, exclusive, the territories, all

04:28:38  14  that, that's relating to the patent owner and the licensor

04:28:42  15  and the licensee.

04:28:43  16  Q.  Okay.  So, for example, the commercial relationship of

04:28:47  17  the parties?

04:28:47  18  A.  Yes.

04:28:47  19  Q.  What was the commercial relationship of Oplus and ASUS

04:28:53  20  in March of 2013?

04:28:54  21  A.  Well, at that point, Oplus would have been the patent

04:28:58  22  owner, and ASUS could have been a -- a potential and

04:29:05  23  alleged infringer.

04:29:06  24  Q.  Or they could have had a joint venture, if we're

04:29:13  25  speculating?

| | | |
|---|---|---|
| 04:29:14 | 1 | A.  I don't know. |
| 04:29:14 | 2 | Q.  You just don't know? |
| 04:29:16 | 3 | A.  Now, I mean, in this construct of the hypothetical |
| 04:29:18 | 4 | negotiation, the patent owner would be the licensor and |
| 04:29:22 | 5 | ASUS would be the licensee. |
| 04:29:23 | 6 | Q.  Okay.  So if you take my representation that Lone Star |
| 04:29:27 | 7 | did not own the patent at the date of your hypothetical |
| 04:29:32 | 8 | negotiation, it was incorrect for you to consider the |
| 04:29:35 | 9 | relationship between Oplus -- or between Lone Star and |
| 04:29:39 | 10 | ASUS, right? |
| 04:29:40 | 11 | A.  I don't know that it is. |
| 04:29:41 | 12 | Q.  You should have considered the relationship between |
| 04:29:46 | 13 | Oplus and ASUS, right? |
| 04:29:48 | 14 | A.  I don't know that that is right because I don't know |
| 04:29:50 | 15 | that Lone Star doesn't essentially get to step into the |
| 04:29:54 | 16 | shoes as a buyer or assignee of the patent. |
| 04:30:00 | 17 | THE COURT:  Hold on just a moment.  Is there an |
| 04:30:02 | 18 | objection? |
| 04:30:02 | 19 | MR. LEE:  Yes, Your Honor.  Asked and answered. |
| 04:30:04 | 20 | THE COURT:  I think we have exhausted the point |
| 04:30:08 | 21 | here, Mr. Oliver. |
| 04:30:09 | 22 | MR. OLIVER:  Okay. |
| 04:30:10 | 23 | BY MR. OLIVER: |
| 04:30:11 | 24 | Q.  What other factors relate to the owner of the patent at |
| 04:30:18 | 25 | the time of the hypothetical negotiation? |

| | | |
|---|---|---|
| 04:30:19 | 1 | A.  Factor 1 relates to the licensor. |
| 04:30:26 | 2 | Q.  Okay.  On Factor 1, did you consider any royalties |
| 04:30:32 | 3 | received by Oplus? |
| 04:30:33 | 4 | A.  No. |
| 04:30:33 | 5 | Q.  You just limited your analysis to Lone Star? |
| 04:30:36 | 6 | A.  Yes. |
| 04:30:38 | 7 | Q.  Okay.  And what other factors relate to the patent |
| 04:30:46 | 8 | owner? |
| 04:30:47 | 9 | A.  We've already talked about 4.  We've already talked |
| 04:30:50 | 10 | about 5.  I think we've touched the major ones. |
| 04:31:11 | 11 | Q.  Okay.  Thank you. |
| 04:31:13 | 12 | MR. BENNETT:  Your Honor, I'm sorry to barge in |
| 04:31:18 | 13 | like this, but our mic has gone dead. |
| 04:31:21 | 14 | THE COURT:  Okay.  Let's replace it. |
| 04:31:24 | 15 | MR. BENNETT:  Sorry for the interruption, |
| 04:31:32 | 16 | Your Honor. |
| 04:31:32 | 17 | THE COURT:  Please proceed. |
| 04:31:34 | 18 | BY MR. OLIVER: |
| 04:31:35 | 19 | Q.  Okay.  Mr. Perdue, let's move to a slightly different |
| 04:31:37 | 20 | topic, still within the realm of your report.  Who are some |
| 04:31:43 | 21 | of the large monitor suppliers in the U.S.? |
| 04:31:50 | 22 | A.  Well, we know about ASUS.  We know about Acer.  Those |
| 04:31:56 | 23 | are two that come to mind right off the top of my head. |
| 04:32:00 | 24 | Q.  Dell? |
| 04:32:01 | 25 | A.  Em-hmm.  Yep, Dell. |

04:32:05  1   Q.  What about LG?

04:32:08  2   A.  I know they sell televisions.  I would -- makes sense

04:32:12  3   that they would sell monitors, but I'm not sure.

04:32:18  4   Q.  Samsung?

04:32:21  5   A.  Yeah, probably.  And then Apple obviously sells

04:32:27  6   monitors.

04:32:28  7   Q.  Okay.  How many of those companies have licenses to

04:32:38  8   assert a patent?

04:32:39  9   A.  Well, of the ones that we just rattled off, I know Acer

04:32:44  10  does.

04:32:44  11  Q.  Okay.  And you looked at all of Lone Star's patent

04:32:47  12  licenses, right?

04:32:48  13  A.  No.  There were two licenses that were entered into

04:32:52  14  after my report was submitted, and so that -- those aren't

04:32:56  15  mentioned in my report.

04:32:58  16  Q.  Okay.  But those don't include any of the companies we

04:33:01  17  just named?

04:33:02  18  A.  No, they don't.

04:33:04  19  Q.  Okay.  And did we mention Sharp?

04:33:13  20  A.  Yes.

04:33:13  21  Q.  Okay.  And then -- and do you recognize the document

04:33:15  22  I'm putting on the screen?

04:33:16  23  A.  Yes.

04:33:17  24  Q.  And that's one of your demonstratives, right?

04:33:19  25  A.  Yes.

| 04:33:19 | 1  | Q.  And let me zoom in a little bit.  That says:  At the |
| 04:33:35 | 2  | time of the agreement, Sharp represented that it had exited |
| 04:33:40 | 3  | the market for the accused devices. |
| 04:33:42 | 4  |      Did I read that correctly? |
| 04:33:43 | 5  | A.  Yes. |
| 04:33:51 | 6  | Q.  But in your -- you did a report in this case, right? |
| 04:33:55 | 7  | A.  Yes. |
| 04:33:55 | 8  | Q.  And in that report, you just said it exited the |
| 04:34:00 | 9  | U.S. market, right? |
| 04:34:01 | 10 | A.  I'll look at my report. |
| 04:34:08 | 11 | Q.  Okay.  Try Page 8. |
| 04:34:10 | 12 | A.  Page 8? |
| 04:34:27 | 13 |      Yes. |
| 04:34:28 | 14 | Q.  So did Sharp exit the worldwide market or just the |
| 04:34:32 | 15 | U.S. market? |
| 04:34:32 | 16 | A.  What I understood was the U.S. market. |
| 04:34:39 | 17 | Q.  Okay.  And did it stop making TVs and monitors or did |
| 04:34:44 | 18 | it just stop making the accused devices? |
| 04:34:45 | 19 | A.  Not completely sure about that. |
| 04:34:48 | 20 | Q.  Okay.  Were you here when the witness testified about |
| 04:34:52 | 21 | the ODMs that supply monitors to ASUS? |
| 04:34:56 | 22 | A.  I don't believe so. |
| 04:34:57 | 23 | Q.  Would it surprise you if one of the ODMs that supplies |
| 04:35:02 | 24 | monitors to ASUS was Sharp? |
| 04:35:05 | 25 | A.  Did you say ODM? |

04:35:07   1    Q.  I'm sorry.  The -- we've been using the term through

04:35:10   2    the trial.  Original device manufacturer is abbreviated

04:35:16   3    ODM.  Are you familiar with that term?

04:35:18   4    A.  Okay.  Yes.

04:35:18   5    Q.  Okay.  So would it surprise you if the exhibit that we

04:35:22   6    saw earlier in the trial indicated that Sharp supplied

04:35:28   7    products to ASUS that are accused in this case?

04:35:31   8    A.  I don't know that it would or wouldn't.  I'm not aware

04:35:34   9    of that.

04:35:39  10    Q.  Okay.  And those products that are accused have to come

04:35:43  11    into the United States?

04:35:44  12    A.  I'm not sure.

04:35:46  13    Q.  Can accused products infringe a patent if they're not

04:35:46  14    in the United States?

04:35:46  15         MR. LEE:  Your Honor?

04:35:49  16         THE COURT:  I'm sorry?

04:35:49  17         MR. LEE:  Calls for speculation, Your Honor.

04:35:51  18         THE COURT:  I think your mic -- press the -- press

04:35:53  19    the button, hold it down until the green light comes on.

04:35:57  20    Just one simple press.  There you go.

04:35:59  21         MR. LEE:  Objection, Your Honor, calls for

04:36:01  22    speculation.

04:36:02  23         THE COURT:  Okay.  Can you rephrase the question

04:36:04  24    to avoid the objection, please?

04:36:06  25         MR. OLIVER:  Okay.

593

04:36:08   1   BY MR. OLIVER:

04:36:09   2   Q.  Can products infringe a United States patent if they

04:36:12   3   don't enter the United States market?

04:36:14   4   A.  It's a patent law question, but -- but I don't believe

04:36:19   5   so.

04:36:19   6   Q.  Okay.  And so if Sharp sells products to Acer that come

04:36:26   7   into the U.S., do you still consider that Sharp exited the

04:36:32   8   U.S. market?

04:36:33   9   A.  As a direct seller, it sounds like they exited the

04:36:37   10  market, but under your -- what you just described, they are

04:36:42   11  still -- they're in the market as a supplier to someone

04:36:45   12  else that's actually the direct seller in the market.

04:36:52   13  Q.  Okay.  So the -- is it possible that Sharp is still

04:37:02   14  supplying monitors but just not monitors that can be used

04:37:05   15  with the accused method?

04:37:07   16          MR. LEE:  Objection, Your Honor, calls for

04:37:13   17  speculation.

04:37:13   18          THE COURT:  I will sustain that objection.

04:37:15   19  BY MR. OLIVER:

04:37:15   20  Q.  Did you ask anybody before you finished your report

04:37:19   21  whether Sharp is still supplying monitors that come into

04:37:22   22  the U.S.?

04:37:24   23  A.  No.

04:37:24   24  Q.  Did you ask anybody before your report whether Sharp is

04:37:29   25  still supplying monitors that can use the method in the

04:37:32  1  '435 patent?

04:37:32  2  A.  No.

04:37:33  3  Q.  Okay.  Do you know whether Sharp is still supplying

04:37:42  4  such monitors?

04:37:43  5  A.  I do not.

04:37:44  6  Q.  Okay.  You reviewed Sharp's patent license with Lone

04:37:50  7  Star, right?

04:37:51  8  A.  Yes.

04:37:51  9  Q.  And in your understanding, is Sharp a U.S. company or

04:37:55  10  an international company or some other type of -- do you

04:37:58  11  know what type of company it is?

04:38:00  12  A.  We -- we'd have to look at the license.  I don't

04:38:03  13  remember.  I remember we looked at a couple that had

04:38:07  14  U.S. subsidiaries and foreign parents.

04:38:09  15  Q.  Okay.  Does Sharp's -- in -- according to data you have

04:38:15  16  from that license and the data you reviewed, does Sharp

04:38:18  17  sell products outside of the United States?

04:38:21  18  A.  I don't know.  I believe Sharp is a multinational

04:38:25  19  company and that they do sell product outside of the United

04:38:28  20  States.

04:38:28  21  Q.  Okay.  And the Lone Star license to Sharp didn't just

04:38:32  22  include the '435 patent, right?

04:38:34  23  A.  I believe there was another patent involved.

04:38:36  24  Q.  And at least one, if not more, foreign patents, right?

04:38:43  25  A.  The details I'm unaware of.  I believe there were more

| | | |
|---|---|---|
| 04:38:47 | 1 | patents.  That's all I really know. |
| 04:38:49 | 2 | Q.  Okay.  Would you have any reason to dispute that it |
| 04:38:55 | 3 | includes at least one foreign patent as you sit here? |
| 04:38:59 | 4 | A.  Like I said, I don't know the specifics. |
| 04:39:01 | 5 | Q.  Okay.  But in your calculations that you did with |
| 04:39:12 | 6 | respect to Sharp, did you consider the volume of products, |
| 04:39:17 | 7 | the number of products that were sold? |
| 04:39:19 | 8 | A.  I didn't -- I don't think I did a calculation with |
| 04:39:22 | 9 | respect to Sharp. |
| 04:39:24 | 10 | Q.  Okay.  So you testified earlier that -- I'm sorry.  I'm |
| 04:39:35 | 11 | sorry.  Were you here when Mr. Rice testified? |
| 04:39:38 | 12 | A.  No, but I reviewed some of the transcript. |
| 04:39:41 | 13 | Q.  Okay.  Did you see the part where he testified about |
| 04:39:44 | 14 | who Lone Star licensed? |
| 04:39:46 | 15 | A.  Yes, I vaguely remember it, and I remember him talking |
| 04:39:51 | 16 | about the three that we've talked about here today. |
| 04:39:53 | 17 | Q.  Okay.  And has Lone Star licensed NEC? |
| 04:39:59 | 18 | A.  NEC, Sharp, and Acer were the three that I identified |
| 04:40:04 | 19 | in my report. |
| 04:40:05 | 20 | Q.  Okay.  Are you familiar with company named Barco? |
| 04:40:08 | 21 | A.  Yes. |
| 04:40:09 | 22 | Q.  Has Lone Star licensed Barco? |
| 04:40:11 | 23 | A.  Yes. |
| 04:40:11 | 24 | Q.  Where is Barco's headquarters? |
| 04:40:15 | 25 | A.  I believe the Netherlands. |

596

```
04:40:19   1   Q.  I don't think that's right, but I'll represent to you
04:40:22   2   that it's Belgium.
04:40:25   3   A.  Somewhere in Europe.
04:40:27   4   Q.  Does it say in the license agreement where they are?
04:40:29   5   A.  I've not reviewed that license agreement.
04:40:32   6   Q.  Okay.  Has Lone Star licensed LG?
04:40:38   7   A.  I don't believe so.
04:40:40   8   Q.  Has Lone Star licensed Samsung?
04:40:44   9   A.  Now, their -- Lone Star owns other patents.  What I'm
04:40:48  10   familiar with is the '435 patent.  I'm unaware of some of
04:40:51  11   the other patents that they may have, that they may have
04:40:55  12   licensed to other parties.  So I have limited knowledge
04:40:57  13   here.
04:40:57  14   Q.  Okay.  Let's -- I'll just take a step back.
04:41:00  15        Has Lone Star licensed -- I'm sorry.  It's late in
04:41:05  16   the day for me.  I'm getting a little tired.
04:41:10  17        Has Lone Star licensed LG under the '435 patent?
04:41:13  18   A.  No, I don't believe so, under the '435.  I'm unaware of
04:41:18  19   that.
04:41:18  20   Q.  Has Lone Star licensed Samsung under the '435 patent?
04:41:21  21   A.  The only five I'm familiar with -- we'll make this
04:41:24  22   easy -- are the three that we talked about earlier, plus
04:41:28  23   Barco, plus Hisense.  Those are the five that I'm aware
04:41:31  24   of --
04:41:31  25   Q.  Okay.
```

| | | |
|---|---|---|
| 04:41:31 | 1 | A.  -- the '435 patent. |
| 04:41:32 | 2 | Q.  So just to summarize, not Dell, not Apple, not any of |
| 04:41:43 | 3 | the other companies we talked about? |
| 04:41:45 | 4 | A.  Yeah, I told you the five that I'm aware of. |
| 04:41:47 | 5 | Q.  Okay.  You know whether Lone Star has sent letters or |
| 04:41:51 | 6 | any other type of notice to any of those unlicensed |
| 04:41:54 | 7 | companies alleging that they infringed the patent? |
| 04:42:01 | 8 | MR. LEE:  Objection, relevance. |
| 04:42:03 | 9 | THE COURT:  I'm sorry, what is the objection? |
| 04:42:05 | 10 | MR. LEE:  Relevance, Your Honor. |
| 04:42:07 | 11 | THE COURT:  How is that relevant? |
| 04:42:08 | 12 | MR. OLIVER:  The companies' licensing policies are |
| 04:42:09 | 13 | part of the Georgia-Pacific factors.  So I'm attempting to |
| 04:42:13 | 14 | determine whether they would try to license any of these |
| 04:42:16 | 15 | companies. |
| 04:42:19 | 16 | THE COURT:  All right.  I'll allow that. |
| 04:42:22 | 17 | A.  Well, I think the answer to that is pretty simple.  I |
| 04:42:24 | 18 | stated this in my direct.  Their licensing policy is |
| 04:42:28 | 19 | basically nonexclusive licenses, and they're generally paid |
| 04:42:32 | 20 | in a lump sum.  So they're in the business of licensing. |
| 04:42:35 | 21 | BY MR. OLIVER: |
| 04:42:37 | 22 | Q.  Okay.  Do you have any knowledge whether Lone Star has |
| 04:42:41 | 23 | sent letters seeking licenses or giving notices of patent |
| 04:42:45 | 24 | infringement to any of the non-licensed companies that |
| 04:42:48 | 25 | we've mentioned? |

04:42:50   1   A.   The specific ones you've mentioned, I do not.

04:42:53   2   Q.   Okay.   Did you talk to Mr. Rice?   Do you know

04:43:04   3   Mr. Rice?

04:43:04   4   A.   I do.

04:43:05   5   Q.   He's the gentleman at the far end of the Plaintiff's

04:43:08   6   table?

04:43:08   7   A.   Yes.

04:43:09   8   Q.   Did you talk to him at all to gather information before

04:43:11   9   you prepared your expert report?

04:43:13  10   A.   Not prior to my report, no.

04:43:18  11   Q.   Okay.   I want to ask you about something that Mr. Rice

04:43:21  12   said when he testified.

04:43:22  13        He testified:   Lone Star is essentially prevented

04:43:25  14   from getting compensation for the use of its patented

04:43:31  15   technology every time one of these products is sold with

04:43:35  16   respect -- that's the end of his testimony, but he was

04:43:38  17   testifying about ASUS's sales.

04:43:44  18        With respect to that testimony, I want to ask you,

04:43:47  19   he couldn't have told you that before you wrote your

04:43:50  20   report, right?

04:43:52  21   A.   We didn't speak before I submitted my report.

04:43:55  22   Q.   And so you couldn't have given that information to him

04:43:58  23   before you wrote the report?

04:44:00  24   A.   The statement that you just read?

04:44:03  25   Q.   Right.

04:44:04  1   A.   No.

04:44:04  2   Q.   Okay.   Have you told him anything with respect to that

04:44:10  3   since you have been working for Lone Star?

04:44:12  4   A.   No.

04:44:14  5   Q.   Okay.   Now, looking -- we looked at the -- a little bit

04:44:22  6   of information about the agreement that Acer had with Lone

04:44:28  7   Star?

04:44:28  8   A.   Yes.

04:44:29  9   Q.   And Acer paid Lone Star a lump sum payment, right?

04:44:33  10  A.   Yes.

04:44:33  11  Q.   And so I want you to assume a hypothetical where

04:44:39  12  there's a store, where there's an Acer licensed product and

04:44:43  13  then an ASUS accused product next to the Acer licensed

04:44:47  14  product?

04:44:47  15  A.   Okay.

04:44:48  16  Q.   Acer and ASUS, right?

04:44:53  17  A.   Got it.

04:44:54  18  Q.   And a customer goes in to buy a monitor and makes a

04:44:58  19  choice.   Is that a fair hypothetical?

04:45:00  20  A.   Yeah, so far.

04:45:03  21  Q.   Okay.   If the customer buys the Acer monitor, Lone Star

04:45:11  22  doesn't get a penny more for that sale of the Acer monitor,

04:45:15  23  right?

04:45:16  24  A.   No, because it's all -- based on their license

04:45:19  25  agreement, you mean, it's a lump sum.

04:45:21  1  Q.  Right.

04:45:23  2  A.  Is that what you're talking about here?

04:45:26  3  Q.  Right.  You got to my next question ahead of me.  Thank

04:45:30  4  you.

04:45:30  5       So the money that Acer paid is all that they ever

04:45:35  6  had to pay, right?

04:45:36  7  A.  Yes.

04:45:37  8  Q.  And they -- if Acer keeps selling monitors from their

04:45:41  9  license in 2020 until the patent expires in 2022, they

04:45:45  10  never pay Lone Star another cent, right?

04:45:49  11  A.  That's my understanding, it's a paid-up lump sum

04:45:53  12  license.

04:45:53  13  Q.  So how does -- if a -- if a user -- do you think it's

04:45:59  14  realistic in the real world that a person -- a consumer out

04:46:04  15  in a store would choose between an Acer monitor and an ASUS

04:46:08  16  monitor?

04:46:09  17  A.  I believe they're direct competitors.

04:46:11  18  Q.  So how would the choice of an ASUS monitor versus an

04:46:15  19  Acer monitor cause Lone Star to loose money?

04:46:26  20  A.  There's not a license agreement in place.

04:46:29  21  Q.  But if they buy the Acer product, they're not getting

04:46:32  22  any more money?

04:46:34  23  A.  But they did get money.

04:46:36  24  Q.  But they're not getting any more going forward, right?

04:46:40  25  A.  They got it all at once.

04:46:42   1   Q.   Okay.   And if somebody buys a monitor from LG, Samsung,

04:46:45   2   or Dell, Lone Star is not getting any -- any money for

04:46:49   3   those sales, right?

04:46:50   4   A.   No.

04:46:50   5   Q.   Even if the product infringes the '435 patent, Lone

04:46:54   6   Star is not getting paid, right?

04:46:56   7   A.   Well, if there's infringement, there's lost revenue,

04:47:01   8   but if there's not infringement, there's nothing lost.

04:47:04   9   Q.   Okay.   But you just said that Lone Star hasn't -- to

04:47:09  10   your knowledge, Lone Star hasn't given notice to any of

04:47:12  11   those companies of infringement.   So without such notice,

04:47:15  12   Lone Star is not really losing any money because they can't

04:47:19  13   collect for damages, right?

04:47:20  14   A.   Yeah, if there's no lawsuit that's been filed, you

04:47:23  15   don't know if there's infringement.   You don't know those

04:47:25  16   things yet.

04:47:26  17   Q.   Okay.   So with that note, we've talked about several

04:47:41  18   huge companies that sell monitors.

04:47:48  19          How is it that when ASUS sells a monitor, Lone

04:47:51  20   Star is losing money if none of those other companies are

04:47:57  21   having to pay Lone Star for selling their monitors?

04:47:57  22   A.   Did you say Acer or ASUS?

04:47:59  23   Q.   I'm sorry.   ASUS.

04:48:01  24   A.   Yeah.

04:48:03  25   Q.   A-S-U-S.

04:48:03  1  A.  Well, in that case, a lawsuit has been filed, and now

04:48:07  2  there's an issue of infringement that's being decided in

04:48:09  3  this proceeding.

04:48:10  4  Q.  That's the sole basis, though, right?

04:48:13  5  A.  That is -- that is the -- that is the basis for it.

04:48:16  6  Q.  Okay.  And you said you have spoken to Mr. Rice since

04:48:23  7  you filed your -- since you signed your expert report?

04:48:28  8  A.  Following the submission of my report.

04:48:29  9  Q.  Okay.  Did the -- did you ask him why Samsung and LG

04:48:33  10  and Apple and Dell and all those other companies haven't

04:48:42  11  entered into a license agreement?

04:48:42  12  A.  I did not.

04:48:43  13  Q.  Okay.  So when you obtained the royalty rate of 2.3

04:48:57  14  that you testified about, you looked at 10 licenses to get

04:49:01  15  to that, right?

04:49:04  16  A.  Looked at 18 things first, and I narrowed it down

04:49:08  17  to 10.

04:49:09  18  Q.  Okay.  And then 7 out of those 10 licenses are

04:49:18  19  exclusive licenses, right?

04:49:20  20  A.  Yes.

04:49:31  21  Q.  Do you recognize the demonstrative -- this

04:49:32  22  demonstrative?

04:49:32  23  A.  I do.

04:49:33  24  Q.  So -- so the -- you -- the yellow highlighted licenses

04:49:40  25  are the exclusive licenses or --

```
04:49:44    1    A.   No.
04:49:44    2    Q.   No?   Okay.   Oh, I see.   The column on the far right
04:49:49    3    says whether they're exclusive, right?
04:49:51    4    A.   There you go.
04:49:51    5    Q.   Okay.   And in the demonstratives, you also showed
04:50:04    6    something about a picture of some beautiful Victorian
04:50:08    7    houses?
04:50:09    8    A.   Yes.   Full House houses.
04:50:17    9    Q.   I tell you, I bet in San Francisco if one of those
04:50:22   10    houses burned down, you could still buy the lot it was on
04:50:25   11    for a million dollars, right?
04:50:30   12    A.   Been using this -- I've been using this slide for a
04:50:32   13    long time.
04:50:32   14    Q.   And you talked about a purchase price, which is a price
04:50:35   15    to own, right?
04:50:36   16    A.   Yeah, that was the first thing we talked about was
04:50:37   17    those were basically purchase price.
04:50:37   18    Q.   And that was for an exclusive license or a purchase of
04:50:40   19    a patent, right?
04:50:41   20    A.   Well, that would be analogous to buying the patent
04:50:46   21    versus licensing the patent which is more of a price to
04:50:51   22    use.
04:50:51   23    Q.   How does the law treat exclusive licenses of patents?
04:50:57   24    Does it treat it like a purchase or not?
04:51:00   25    A.   I'm -- I'm not an attorney.   I can't answer that.
```

```
04:51:03   1   Q.  Okay.  Okay.  But in any event, are you treating a
04:51:10   2   non-exclusive license more like the rental rate than the
04:51:15   3   purchase price?
04:51:15   4   A.  They're different -- they're different -- they're
04:51:20   5   different things.  So with -- with an IP license -- here's
04:51:27   6   the difference.  A house is a tangible piece of property.
04:51:34   7   I guess you could sell the house and let multiple families
04:51:38   8   in it, but generally you want just your family in the
04:51:42   9   house.  It would be a little bit awkward having multiple
04:51:47  10   families in the house.
04:51:48  11        With the IP, it's an intangible asset.  It's not a
04:51:53  12   tangible asset.  It can be licensed to multiple people at
04:51:57  13   the same time without degrading its value.  Multiple people
04:52:00  14   can't drive a car at the same time.  Multiple families in a
04:52:04  15   house, those are all problematic.  Those are tangibles.
04:52:04  16   With intangibles, they can be licensed to multiple parties.
04:52:10  17        So that's the distinction that I'm making.  The
04:52:12  18   purchase versus the -- the price to purchase versus the
04:52:15  19   price to use, those things are still analogous.  But when
04:52:19  20   you get into the exclusivity issue, it's different with IP.
04:52:24  21   Q.  Kind of like making -- the difference between taking a
04:52:28  22   taxi from the airport to your house versus taking a public
04:52:32  23   bus from the airport to your house.  You pay more for the
04:52:36  24   exclusivity of the taxi than sitting next to everyone on
04:52:38  25   the bus?
```

```
04:52:38   1   A.  Yeah.  That's -- I mean, that's the idea here is that
04:52:40   2   the exclusive is generally considered to be worth more than
04:52:43   3   the non-exclusive, so you want to adjust for that somehow.
04:52:48   4   Q.  Okay.  And then in these exclusive licenses that you
04:52:51   5   looked at, they all included patents?
04:52:56   6   A.  They included patents, and sometimes there were some
04:53:00   7   other things included in there.
04:53:01   8   Q.  Things like know-how?
04:53:03   9   A.  Yes.
04:53:03  10   Q.  What is "know-how"?
04:53:04  11   A.  That's something that's stuck in someone's head that
04:53:07  12   you might need their help to figure something out.
04:53:11  13   Q.  And some of them include assistance, right?  Some of
04:53:13  14   these exclusive licenses include assistance?
04:53:17  15   A.  It could, yeah.
04:53:18  16   Q.  And so this know-how and assistance, would it be fair
04:53:28  17   to say that that's the licensing -- the company that's
04:53:32  18   giving the license is also agreeing to help somebody
04:53:37  19   implement the technology if they need it?
04:53:39  20   A.  That could be, yes.
04:53:41  21   Q.  And there's value to that, right?
04:53:44  22   A.  Yes.
04:53:44  23   Q.  Okay.  And how did you discount the -- that value --
04:53:51  24   how did you discount that value from the patents to get to
04:53:56  25   the -- from the licenses to get to the value of the
```

04:53:58   1   patents?

04:53:59   2   A.   I didn't.   That's just part of the messiness of this

04:54:05   3   situation where you're going to have things involved in

04:54:08   4   real-world transactions.   You don't have the perfect naked

04:54:11   5   license every time for comparables, and we certainly didn't

04:54:14   6   have it in this case.

04:54:15   7   Q.   Okay.   And -- but getting back to what you said we're

04:54:19   8   doing here, we're talking about a hypothetical negotiation,

04:54:30   9   right?

04:54:31   10   A.   Yes.

04:54:31   11   Q.   And that negotiation is just for a patent, right?

04:54:41   12   A.   That's correct.

04:54:41   13   Q.   And that doesn't include any know-how from Lone Star to

04:54:45   14   ASUS?

04:54:46   15   A.   Yeah.   This is just for the patent.

04:54:47   16   Q.   And doesn't include any assistance from Lone Star to

04:54:51   17   ASUS, right?

04:54:52   18   A.   No.   This is just a patent license.

04:54:54   19   Q.   So you're still keeping the value of know-how and

04:54:57   20   assistance in the licenses you're using as a basis for your

04:55:01   21   number, right?

04:55:02   22   A.   Just like one of those houses on that hill, the six

04:55:05   23   houses.   One might have a garage in back.   One might have

04:55:09   24   new carpet.   One might have new appliances.   That's just

04:55:13   25   part of the messiness of it.

04:55:14  1   Q.  Okay.  And ASUS -- ASUS probably doesn't need

04:55:17  2   assistance from Mr. Rice to implement its technology,

04:55:21  3   right?

04:55:21  4   A.  I don't know that it would or wouldn't.

04:55:23  5   Q.  So ASUS -- well, the claim is by Lone Star that it has

04:55:26  6   already implemented this technology, right?

04:55:28  7   A.  Yes, that's right.

04:55:29  8   Q.  So you want to include the value of know-how and

04:55:39  9   assistance in what the jury -- you want the jury to tell

04:55:44  10  ASUS to pay for something that includes the value of

04:55:47  11  know-how and assistance even though that would not be

04:55:50  12  included in the license from Lone Star?

04:55:51  13          MR. LEE:  Objection, Your Honor.  Argumentative.

04:55:55  14          THE COURT:  Overruled.

04:55:56  15  A.  Yeah, that's just the messiness of this situation that

04:55:59  16  we're in.  A perfect world, those six houses that are all

04:56:03  17  lined up those together, that's the perfect world.  In this

04:56:06  18  world where I started looking at very -- looking

04:56:09  19  specifically for hue and saturation and all that.  In a

04:56:12  20  perfect world, I would have gotten these perfect naked

04:56:16  21  patent licenses that dealt specifically with video

04:56:20  22  adjustment technology.  That's not the real world.  There

04:56:22  23  are no perfect comps.  And this is what we encounter when

04:56:26  24  we do this all the time.

04:56:27  25  BY MR. OLIVER:

04:56:28  1  Q.  But you remember you said you did a lot of magic,

04:56:31  2  right, to get to your number?

04:56:33  3  A.  I said Georgia-Pacific factor hypothetical negotiation

04:56:36  4  is magic.  I didn't say I did magic.

04:56:39  5  Q.  Okay.  And as a part of that magic, you could have

04:56:43  6  discounted the licenses to cut out the know-how since you

04:56:47  7  knew it wouldn't be something that would be part of the

04:56:54  8  hypothetical negotiation, right?

04:56:55  9  A.  When I took the 14 percent out that I isolated and

04:56:59  10  the 2.3 percent out that I isolated, think about all that

04:57:03  11  industry data that I looked at.  My stuff was to the left,

04:57:06  12  so I knew I was being reasonable and conservative in it.

04:57:10  13  Is it perfect?  No, it never is.

04:57:12  14  Q.  Okay.  So to go to your hypothetical that you gave

04:57:15  15  about the houses and so on, if I go out to rent a house and

04:57:20  16  there's one that's for rent furnished and one that's

04:57:26  17  unfurnished and I said, look, I want my own furniture in

04:57:30  18  the house, I don't want your furniture, I want you to get

04:57:34  19  rid of your furniture and discount it, you don't think that

04:57:38  20  the owner, to compete with the other person, would discount

04:57:42  21  the furniture and say, look, I'm not going to charge you

04:57:45  22  for the furniture that's included in this rental?

04:57:47  23  A.  Depends on how bad he wants the deal.

04:57:50  24  Q.  But the owner could do that, right?  They could

04:57:52  25  discount it?

04:57:52  1   A.   The owner could, and that's a real world messiness

04:57:55  2   issue that we encounter.

04:57:55  3   Q.   And you could have discounted that, but you just chose

04:57:59  4   to keep it lumped in with what you think the jury should

04:58:02  5   tell ASUS to pay?

04:58:03  6   A.   When I looked at in the context of all those reasonable

04:58:07  7   factors, it looked reasonable to me.  Is it perfect?  It's

04:58:11  8   not perfect, but it is reasonable.

04:58:13  9   Q.   How many of these licenses that you included in your --

04:58:24  10  in your analysis were considered by Dr. Ducharme?

04:58:30  11  A.   Well, I talked about that earlier.  When I started

04:58:35  12  doing the searching, I looked at some of the technical

04:58:40  13  terms in the patent, and my plan was --

04:58:43  14  Q.   Sir, can you just answer my question, please?  If you

04:58:46  15  need a chance to explain it later, I'm sure --

04:58:46  16  A.   Oh, okay.

04:58:50  17  Q.   -- Mr. Lee will ask you.

04:58:52  18           How many of the licenses that you considered were

04:58:54  19  looked at by Dr. Ducharme?

04:58:55  20  A.   None because he didn't need to because of the search

04:58:59  21  results.

04:58:59  22  Q.   Okay.  And how many of the patents that appear on those

04:59:04  23  licenses were looked at by Dr. Ducharme?

04:59:07  24  A.   We just talked about -- well, none of the licenses and

04:59:10  25  none of the patents.  He didn't look at any of that.

04:59:14  1   Q.  Okay.  So you didn't seek any technical input from a

04:59:21  2   technologist when considering whether the licenses that you

04:59:25  3   looked at were comparable to the -- the Lone Star patent,

04:59:35  4   right?

04:59:35  5   A.  Yeah, and I explained that earlier.  I was going to,

04:59:39  6   but there was just a dearth of information.  I looked at it

04:59:43  7   through the lens of economic comparability.

04:59:44  8   Q.  Okay.  But you could have asked Dr. Ducharme to tell

04:59:47  9   you whether the patents and the licenses were comparable to

04:59:49  10  Lone Star's patent?

04:59:51  11  A.  It became unnecessary because there was no --

04:59:54  12  Q.  Sir, that's not the answer to my question.  You could

04:59:58  13  have asked him, right?

04:59:59  14  A.  It would have been useless, but I could have.

05:00:02  15  Q.  Okay.  So you looked at -- you ultimately have ten

05:00:07  16  licenses in your group of licenses that are comparable,

05:00:10  17  right?

05:00:11  18  A.  Yes.

05:00:12  19  Q.  And all of the licensees in that group agreed to pay a

05:00:19  20  running percentage of their sales, right?

05:00:22  21  A.  They're all running royalty rates.  It's a percentage,

05:00:27  22  that's right.

05:00:27  23  Q.  So maybe 2 percent of the revenue or 3 percent of the

05:00:33  24  revenues or 0.5 percent of the revenue or something like

05:00:36  25  that?

| | | |
|---|---|---|
| 05:00:36 | 1 | A.  Yeah.  They ranged from 2 to 15 percent after I |
| 05:00:40 | 2 | excluded the 50 percenter. |
| 05:00:41 | 3 | Q.  And after you excluded the 0.5 percent, right? |
| 05:00:44 | 4 | A.  That was due to litigation, that's right. |
| 05:00:47 | 5 | Q.  Okay.  I want to ask you briefly about -- I think it |
| 05:01:05 | 6 | was Philips.  Let me make sure I have that name right. |
| 05:01:07 | 7 | MR. OLIVER:  Should I move to a different topic, |
| 05:01:09 | 8 | Your Honor, or would you prefer to -- |
| 05:01:10 | 9 | THE COURT:  Yes.  Do you have any idea, |
| 05:01:15 | 10 | Mr. Oliver, how much longer you have on cross? |
| 05:01:18 | 11 | MR. OLIVER:  I believe it will be a fair amount |
| 05:01:20 | 12 | longer. |
| 05:01:20 | 13 | THE COURT:  I would like to keep going.  Let me |
| 05:01:22 | 14 | ask the jury.  It's close to 5:00.  Would it create any |
| 05:01:26 | 15 | scheduling matters or arrangements you-all made if we went |
| 05:01:30 | 16 | a little bit later tonight, say to 5:30?  None?  Okay. |
| 05:01:35 | 17 | Good. |
| 05:01:36 | 18 | Mr. Oliver, you have until 5:30. |
| 05:01:38 | 19 | MR. OLIVER:  Okay.  I was going to say, |
| 05:01:40 | 20 | Your Honor, for point of reference, I'm about halfway |
| 05:01:43 | 21 | through my outline, but Mr. Joshi might beat me up tonight |
| 05:01:47 | 22 | and tell me I'm done, so we'll see. |
| 05:01:47 | 23 | BY MR. OLIVER: |
| 05:02:00 | 24 | Q.  You -- the Philips license that you discussed is in the |
| 05:02:07 | 25 | first row of your -- your chart, right, No. 1 there? |

05:02:13    1    A.  Yes.

05:02:13    2    Q.  And the rates in that -- that license were -- were --

05:02:19    3    had a decent range, right, or had a significant range?  The

05:02:30    4    numbers you put up for the jury were $0.05 to $0.85 per

05:02:36    5    unit, right?

05:02:36    6    A.  For the 16 -- that's the range for the 16 different

05:02:39    7    clusters, that's right.

05:02:40    8    Q.  Okay.  And what does that license relate to?

05:02:43    9    A.  That license relates to the 16 clusters that Philips

05:02:47   10    identifies on its webpage for TV and set-top box

05:02:53   11    technologies.

05:02:54   12    Q.  Okay.  So TV technology is one of them.  That's one

05:02:59   13    that I assume just about everybody in this room is familiar

05:03:02   14    with?

05:03:02   15    A.  That's right.

05:03:03   16    Q.  And you cut that out because you said it didn't have a

05:03:08   17    percentage, right?

05:03:09   18    A.  No, I didn't cut it out.  What I said was the bulk of

05:03:13   19    the licenses that I -- that I was able to obtain were

05:03:17   20    percentage royalties.  That was better suited, so there was

05:03:20   21    more bulk of the analysis there.  I ultimately used this

05:03:24   22    Philips data.

05:03:26   23    Q.  Okay.  You're an economist?

05:03:32   24    A.  I'm a finance and accounting professional.

05:03:34   25    Q.  Okay.  And you're generally familiar with average

613

05:03:40  1   price -- products on the market could have an average

05:03:44  2   price, there could be an average price for cars, there

05:03:47  3   could be an average price for iPhones, there could be an

05:03:54  4   average price for potato chips?

05:03:57  5   A.  There can be an average for anything that has numbers

05:04:01  6   associated with it.

05:04:02  7   Q.  Okay.  And what is the average price for a TV, would

05:04:06  8   you say?

05:04:06  9   A.  I don't know.

05:04:07  10  Q.  What's the cheapest TV you've ever seen in the store

05:04:12  11  now?

05:04:12  12  A.  I mean, a television right now seems like it could

05:04:16  13  range between 100 bucks and two or $3,000.

05:04:21  14  Q.  Okay.  So if the television that was licensed here was

05:04:27  15  $100, what percentage would those royalty rates amount to?

05:04:30  16  A.  Well, if you licensed all of it, it was $4.12.  So as a

05:04:36  17  percentage of the $100 TV, it would be 4.12 percent.

05:04:42  18  Q.  Okay.  How about if you just license the $0.05

05:04:45  19  technology?

05:04:45  20  A.  The what?

05:04:46  21  Q.  If you license the $0.05 technology in the $100 TV, how

05:04:53  22  much -- what royalty rate would that be?

05:04:55  23  A.  That would some sub .1 percent rate.

05:04:57  24  Q.  Something way, way below 1 percent up to 4 percent,

05:05:03  25  depending on which technology cluster you chose?

05:05:06  1    A.  Yes.

05:05:06  2    Q.  Okay.  And if you licensed it for the $2,000 TV you

05:05:12  3    mentioned, we're talking even if you paid the $4, that

05:05:16  4    would be .4 percent; is that right -- or, no, .2 percent;

05:05:22  5    is that right?

05:05:22  6    A.  Yeah, it would be a sub-1 percent rate.

05:05:26  7    Q.  Less than 1 percent?  Okay.  So you actually could have

05:05:30  8    gotten a royalty rate for this Philips cluster of patents

05:05:36  9    but it would have been way, way lower than the royalty

05:05:39  10   rates you're talking about, right?

05:05:40  11   A.  To do that would have been to engage in speculation

05:05:43  12   about the prices of televisions and all that.  I

05:05:47  13   wouldn't -- I would not want to do that.

05:05:50  14   Q.  Okay.  But you could have found information about

05:05:55  15   average prices of televisions, right?

05:05:56  16   A.  But that would have been a mistake.

05:05:58  17   Q.  And we just have -- we have an example here that we

05:06:02  18   just discussed where maybe they're $100, maybe they're

05:06:07  19   $2,000, somewhere in that range, you could have applied and

05:06:10  20   said there's a range of rates from way, way, way, way

05:06:13  21   below 1 percent to somewhere not quite 1 percent, right?

05:06:16  22   A.  I could have, but that would have been a mistake.

05:06:21  23   Q.  Okay.  And then ultimately you said that this Philips

05:06:24  24   license was closely related in some ways to the -- to what

05:06:30  25   we're talking about here, right?

```
05:06:32    1   A.  Televisions.  Yeah, it's closely related.
05:06:36    2   Q.  Okay.  This license -- this agreement, this licensing
05:06:38    3   that has way less than 1 percent when you look at the
05:06:41    4   actual values of the TVs?
05:06:44    5   A.  I don't know that you can say that because, again,
05:06:47    6   we're playing with this hypothetical of 100 to 2,000.
05:06:50    7   That's not very helpful.  This is helpful when you see it
05:06:55    8   at these per-unit rates.  This is helpful.
05:06:58    9   Q.  Okay.  So I'm not sure if I've asked this.  I'm sorry
05:07:10   10   if I've already asked it, but Lone Star never has gotten a
05:07:13   11   percentage running royalty in any of its licenses, right?
05:07:20   12   A.  They're all lump sum payments.
05:07:22   13   Q.  Okay.  So why were you -- but yet you were very
05:07:26   14   concerned that you wanted something with a running royalty
05:07:28   15   to analyze here?
05:07:30   16   A.  I wasn't concerned.  I followed the data, and the bulk
05:07:34   17   of the data had a percentage rate.  So I wanted to make the
05:07:37   18   best use of the data that I had.
05:07:38   19   Q.  And you didn't find any lump sum licenses in your -- in
05:07:42   20   your research?
05:07:43   21   A.  No, because these are market rates where there's an
05:07:46   22   ongoing royalty being paid.
05:07:48   23   Q.  But you actually saw some licenses from ASUS that were
05:07:52   24   lump sums, right?
05:07:53   25   A.  Both, ASUS and Lone Star had lump sum --
```

05:07:53  1   Q.  Okay.

05:07:57  2   A.  -- licenses.

05:07:58  3   Q.  And the licenses that ASUS has paid were pretty small

05:08:02  4   numbers, right?

05:08:03  5   A.  Yes.

05:08:04  6   Q.  Like extremely small numbers, right?

05:08:08  7   A.  Of the licenses that were produced, they were very

05:08:12  8   small numbers.

05:08:13  9   Q.  Okay.  And those were lump sums?

05:08:15  10  A.  I believe so.

05:08:16  11  Q.  And there were no licenses that you've seen that ASUS

05:08:18  12  has produced with a running royalty, right?

05:08:20  13  A.  No, I have not.

05:08:21  14  Q.  We've talked about a lot of elements around the 10

05:08:31  15  licenses you chose, and how the situation might be

05:08:36  16  different from what we're facing here, but yet the only

05:08:41  17  adjustment you did was to reduce the royalty rate by

05:08:45  18  35 percent?

05:08:47  19  A.  No.  I went through a selection process, first of all.

05:08:52  20  I got rid of things that didn't look like they fit, did do

05:08:57  21  a 35 percent rate, and I used a median.  Then I did all

05:09:01  22  those comparisons that I talked about with Mr. Lee to make

05:09:04  23  sure that they were reasonable.

05:09:12  24  Q.  And you said that the data that you looked at had a lot

05:09:15  25  of licenses that went from exclusive to non-exclusive that

| | | |
|---|---|---|
| 05:09:20 | 1 | had 50 percent productions? |
| 05:09:22 | 2 | A.  The Varner Study cited a 50 percent reduction in that |
| 05:09:28 | 3 | very narrow -- with that very narrow fact pattern. |
| 05:09:32 | 4 | Q.  Okay.  In fact, what -- isn't it true that about -- |
| 05:09:38 | 5 | about almost 70 percent or two-thirds of the licenses in |
| 05:09:42 | 6 | that study had a 50 percent reduction? |
| 05:09:45 | 7 | A.  Two-thirds. |
| 05:09:46 | 8 | Q.  Okay.  And we talked a little bit earlier about -- |
| 05:09:53 | 9 | where are we?  I'm going to show a different part of your |
| 05:10:02 | 10 | slide. |
| 05:10:02 | 11 | Do you recall we talked a little bit earlier about |
| 05:10:05 | 12 | this bottom where you said it was a median and not an |
| 05:10:08 | 13 | average. |
| 05:10:08 | 14 | A.  Yes. |
| 05:10:08 | 15 | Q.  What's a "median"? |
| 05:10:09 | 16 | A.  It's a middle observation. |
| 05:10:12 | 17 | Q.  Okay.  So half of the rates are higher, and half of the |
| 05:10:18 | 18 | rates are lower than the median? |
| 05:10:20 | 19 | A.  That's right. |
| 05:10:21 | 20 | Q.  And in the Varner Study, where would the median |
| 05:10:29 | 21 | reduction be?  Two-thirds of the licenses were 50 percent |
| 05:10:34 | 22 | reductions, right? |
| 05:10:35 | 23 | A.  That's right.  The median would probably be 50 percent |
| 05:10:41 | 24 | given that that many of the licenses were citing the |
| 05:10:44 | 25 | 50 percent right, that's right. |

05:10:47  1   Q.  So you want to jury to take the median here, but in the

05:10:50  2   other factor, you want the jury to take a much lower

05:10:53  3   reduction than the median?  Only reduce it a little, not

05:10:56  4   the full 50 percent?

05:10:58  5   A.  And I explained why.

05:10:59  6   Q.  But that's what you're asking, right, take two

05:11:03  7   different -- take the median in one situation and don't

05:11:05  8   take the median in the other situation?

05:11:07  9   A.  No, the number I cited was in between the two data

05:11:11  10  points.

05:11:12  11  Q.  Okay.  If the jury took the median reduction for --

05:11:14  12  from exclusive licenses to non-exclusive licenses from

05:11:19  13  Varner --

05:11:19  14  A.  Yeah.

05:11:21  15  Q.  -- they would reduce it by 50 percent, right?

05:11:23  16  A.  But then that would be ignoring the --

05:11:25  17  Q.  Sir?  Sir?  Sir, that's not my question.  If they took

05:11:28  18  the median point from the Varner Study, they would reduce

05:11:32  19  it by 50 percent, right?

05:11:34  20  A.  That's correct.

05:11:34  21  Q.  And you only reduced it by 35 percent?

05:11:37  22  A.  And I explained why in my direct, yes.

05:11:39  23  Q.  So was the information in Mr. Varner's study public or

05:12:07  24  private information?

05:12:07  25  A.  It was a paper.

05:12:08  1   Q.  But the licenses he considered, were those publicly

05:12:11  2   available or private?

05:12:12  3   A.  No, he got them from public company disclosures.

05:12:17  4   Q.  Okay.  So the licenses themselves were actually

05:12:26  5   publicly available?

05:12:27  6   A.  They were disclosed in public SEC filings.

05:12:31  7   Q.  The actual licenses?

05:12:33  8   A.  Or references to the licenses.  I'm not sure if it was

05:12:37  9   the entire license agreement or not, but there was some

05:12:40  10  reference to it at a minimum.

05:12:42  11  Q.  And there was a -- so you're sure there were at least

05:12:44  12  references to it?  You're not sure that all these licenses

05:12:47  13  were public, right?

05:12:48  14  A.  That's correct.

05:12:49  15  Q.  But there was at least one public license, right,

05:12:52  16  from -- to DuPont?

05:12:54  17  A.  Well, the DuPont thing was cited in a -- in a paper,

05:12:58  18  and it was cited in the treatise that I use in my book.  So

05:13:05  19  that's how I know about the DuPont amount.

05:13:06  20  Q.  So that's the public data we have.  That's

05:13:10  21  the 27 percent number?

05:13:10  22  A.  Yes.  And it's public in that it's published, and maybe

05:13:15  23  that's what you mean.

05:13:16  24  Q.  Publicly available.

05:13:16  25  A.  Yes.

05:13:18   1   Q.   The document is publicly available.

05:13:19   2   A.   Well, I don't know that the document is, but I know

05:13:23   3   that the paper that talks about it and the treatise that I

05:13:25   4   got it from are publicly available.

05:13:27   5   Q.   Okay.  And that study was done in 2011, right?

05:13:41   6   A.   The Varner Study?  2011, yes.

05:14:06   7   Q.   Did you have a chart with that data in your

05:14:23   8   demonstratives or not?

05:14:24   9   A.   No.

05:14:25  10   Q.   Okay.  And so the low point in that -- the lowest

05:14:32  11   reduction to an exclusive license was 27 percent, right?

05:14:37  12   A.   Yeah, two data points, 27 percent and 50 percent.

05:14:43  13   Q.   Right.  And that 27 percent was a -- the license to

05:14:48  14   DuPont?

05:14:49  15   A.   That was the DuPont renegotiated license, that's right.

05:14:52  16   Q.   Do you recall the date of that license?

05:14:54  17   A.   I don't.  You want me to look it up?

05:14:57  18   Q.   I just want to -- let's see if we can get to a

05:15:01  19   generality here.  That was a really old license, right?

05:15:05  20   A.   I don't know.  I'd have to look it up.

05:15:07  21   Q.   Okay.  You don't need to look it up right now.

05:15:10  22   A.   Okay.

05:15:15  23   Q.   You read Mr. Reed's report, though?

05:15:18  24   A.   Yes.

05:15:18  25   Q.   And in his report, he suggested that that was a really

05:15:21  1  old license, right?

05:15:23  2  A.  In his report, he expect -- he says, go to the extreme

05:15:26  3  and use 50 percent.  That's what he suggests in his report.

05:15:29  4  Q.  And by extreme, you mean the median, right, the

05:15:33  5  50-percent median?

05:15:35  6  A.  The high number.

05:15:35  7  Q.  The high number is 50 percent, right?

05:15:38  8  A.  The high number is 50 percent.  I did something in the

05:15:41  9  middle.

05:15:42  10  Q.  So if we look at what you've got here, when you're

05:15:50  11  looking at this type of thing, you kind of look at

05:15:53  12  different chunks of data and statistics, right?  You look

05:15:58  13  at -- oh, froze it, okay.

05:15:59  14          You look at a high number, right?

05:16:02  15  A.  Yes.

05:16:03  16  Q.  And then a 75th percentile, right?

05:16:08  17  A.  Yes.

05:16:08  18  Q.  And a median, right?  And then you get into the low

05:16:12  19  numbers, right?

05:16:12  20  A.  Yes.

05:16:13  21  Q.  And so the high reduction would be -- in the Varner

05:16:19  22  Study would be 50 percent, right?

05:16:20  23  A.  Yes.

05:16:21  24  Q.  The 75th percentile would be a 50-percent reduction,

05:16:25  25  right?

622

| | | |
|---|---|---|
| 05:16:26 | 1 | A.   In the Varner Study? |
| 05:16:27 | 2 | Q.   Because two-thirds of the licenses were 50 percent? |
| 05:16:30 | 3 | A.   Two-thirds is 66 percent.  So 75th percentile would be |
| 05:16:37 | 4 | above that.  If -- we don't know -- we don't know where the |
| 05:16:39 | 5 | or third is.  We don't know if they're higher or lower.  So |
| 05:16:42 | 6 | we don't understand where that two-thirds is in the |
| 05:16:45 | 7 | ranking. |
| 05:16:45 | 8 | Q.   Okay.  So there could actually even be greater |
| 05:16:50 | 9 | reductions than 50 percent? |
| 05:16:51 | 10 | A.   We don't know because in that snippet that I used, some |
| 05:16:55 | 11 | could be higher, some could be lower. |
| 05:16:58 | 12 | Q.   Okay.  And so the lowest possible reduction of |
| 05:17:02 | 13 | the 75th percentile would be a 50 percent reduction, right? |
| 05:17:05 | 14 | A.   No, because if the two-thirds were moved towards the |
| 05:17:10 | 15 | bottom, then the 75th percentile number could be -- could |
| 05:17:16 | 16 | be a different number than the 50 percent. |
| 05:17:18 | 17 | Q.   It could be higher than 50 percent? |
| 05:17:20 | 18 | A.   Could be higher. |
| 05:17:22 | 19 | Q.   So what I said was the lowest possible reduction was |
| 05:17:27 | 20 | 50 percent for the 75th percentile? |
| 05:17:27 | 21 | A.   Based on Varner. |
| 05:17:31 | 22 | Q.   Right.  And the lowest possible median number would |
| 05:17:34 | 23 | be -- actually, the only possible median number would be a |
| 05:17:37 | 24 | 50 percent reduction in the license rates, right? |
| 05:17:39 | 25 | A.   That's probably true, given the way that data would |

05:17:41   1   work, yes.

05:17:43   2   Q.  Okay.  And yet -- well, you chose the median in one

05:17:51   3   spot, you chose the lowest possible reduction rate to get

05:17:55   4   the highest possible value from the Varner Study?

05:17:57   5   A.  In both cases, I chose something in the middle, in both

05:18:02   6   cases.

05:18:02   7   Q.  The 27 per -- okay.  Okay, I'm sorry.  You didn't

05:18:05   8   choose the 27 percent.  You increased it a little bit?

05:18:08   9   A.  In both cases, I chose something in the middle.

05:18:10   10   Q.  You went pretty far away from the 50 percent that's the

05:18:13   11   median, the high of the 75th percentile, right?

05:18:13   12   A.  That's one data point.

05:18:15   13   Q.  That's what you based your reduction on?

05:18:18   14   A.  It was one data point.

05:18:38   15   Q.  You considered a bunch of ASUS monitor revenue in

05:18:43   16   reaching your final number, right?

05:18:45   17   A.  Everything that was produced in the documents we looked

05:18:48   18   at earlier.

05:18:49   19   Q.  And then you took a chunk of that value, and you called

05:18:55   20   that apportioning it, right?

05:19:00   21   A.  Yes.

05:19:00   22   Q.  And so I put your other -- your Introduction to

05:19:06   23   Apportionment slide up.

05:19:09   24          We see that you've -- PacMan plus what PacMan is

05:19:16   25   eating is the entire profit to ASUS; is that right?

05:19:25  1   A.   What this represents here is of the Philips' licenses,

05:19:29  2   that was the 14 percent, and I'm saying that that's a proxy

05:19:34  3   for this apportionment factor for ASUS.

05:19:38  4   Q.   Okay.  And that apportionment factor, that's supposed

05:19:46  5   to represent how much value the patent adds to the product,

05:19:52  6   right?

05:19:53  7   A.   No.

05:19:54  8   Q.   What -- what does it represent in your mind?

05:19:58  9   A.   It represents the appropriate bundle of technology that

05:20:01  10  you would apply the royalty rate to, and the '435 patent

05:20:06  11  would be one of several technical capabilities within that

05:20:11  12  bundle.

05:20:12  13        Imagine a hard drive.  If you've got a computer

05:20:17  14  and you've got a hard drive and you've got a motherboard,

05:20:21  15  it's the idea of this smaller unit that you would apply the

05:20:24  16  royalty rate to.  The royalty rate is what isolates the

05:20:27  17  value of the patent.

05:20:27  18  Q.   Okay.  So if I -- I look at one of the ASUS products,

05:20:37  19  there's -- some of the value is in the base and some of the

05:20:40  20  value is in this little thing that twists --

05:20:40  21  A.   Yep.

05:20:43  22  Q.   -- and some of the value might be in the technology

05:20:45  23  that allows you to screw it onto the stand.  There would be

05:20:50  24  value in the stand, right?

05:20:52  25  A.   I say all that in my report, that's right.

05:20:55  1   Q.  And there would be value in the thing that -- that you

05:20:58  2   push up and down, right?

05:20:59  3   A.  Yep.

05:21:00  4   Q.  And then, what do you think, it would be fair to

05:21:04  5   characterize that most of the value is found in the actual

05:21:08  6   screen itself, not all the accessories?

05:21:10  7   A.  I think most of the value in an electronic display

05:21:14  8   device is in the electronic display components, in general,

05:21:18  9   of which video adjustment and control would be a subset.

05:21:21  10  Q.  Okay.  But -- that's right.  Okay.  So we're saying

05:21:28  11  most of the value is probably in the screen.  Did you

05:21:32  12  consider -- did you consider how much the cost of the

05:21:35  13  different components were in reaching your apportionment?

05:21:41  14  A.  Well, first of all, I didn't say most of the value is

05:21:44  15  in the screen.  You did.

05:21:45  16          All I said was that there were these various

05:21:50  17  bundles of other sources of value and that I'm trying to

05:21:53  18  isolate out video adjustment and control --

05:21:53  19  Q.  Okay.

05:21:56  20  A.  -- from this big bundle.

05:21:57  21  Q.  So that's about one-seventh of the total value of

05:22:05  22  the -- of the technology, right?

05:22:07  23  A.  14 percent.

05:22:07  24  Q.  And you're assuming one-seventh of it to what you would

05:22:15  25  call video control?

05:22:17  1   A.  Video adjustment and control --

05:22:17  2   Q.  Video adjustment and control --

05:22:18  3   A.  -- is just a big bundle.

05:22:21  4   Q.  And that includes all of the adjustment options in the

05:22:24  5   on-screen menu on these -- in these products?

05:22:27  6   A.  It's exactly what it says.  Video adjustment and

05:22:30  7   control is the bundle that I'm saying is reasonable to

05:22:33  8   consider here, and the color-changing technology would be a

05:22:35  9   part of that bundle.

05:22:36  10  Q.  Okay.  And -- but this patent only relates to one

05:22:47  11  specific menu option in this product, right?

05:22:52  12  A.  I don't know.  That's a technical issue.

05:22:59  13  Q.  Didn't you consider that when you were considering how

05:23:02  14  much the technology was worth?

05:23:03  15  A.  No.  I understand that there was a calibration and

05:23:09  16  adjustment capability in it.  That's what the royalty rate

05:23:11  17  is there for, to isolate that piece.

05:23:12  18  Q.  Okay.  So you did not apportion the value of the

05:23:18  19  technology specifically that's accused of infringement.

05:23:22  20  Rather, you apportioned the entirety of all the video

05:23:28  21  adjustment and control technology, right?

05:23:31  22      MR. LEE:  Objection, Your Honor.  Asked and

05:23:32  23  answered.

05:23:36  24      MR. OLIVER:  I haven't asked that question.

05:23:40  25      THE COURT:  Overruled.

```
05:23:42   1   A.  Video adjustment and control technology was the bundle
05:23:44   2   I considered to be appropriate for this, and I found a rate
05:23:47   3   that I thought was a reasonable proxy.  I look at color
05:23:51   4   adjustment as one of the parts of that bundle.  The royalty
05:23:55   5   rate is what attaches to that specific value.
05:23:57   6   BY MR. OLIVER:
05:23:57   7   Q.  But could you have broken out in any way -- would there
05:24:01   8   have been any way within the magic of the Georgia-Pacific
05:24:04   9   analysis to break out the value of the specific technology
05:24:07  10   we're talking about?
05:24:08  11   A.  Not based upon what I considered to be the best
05:24:11  12   available data, which is what I have used.  This was the
05:24:16  13   best and I think a reasonable way to do it.
05:24:18  14   Q.  Okay.  And in these monitors, when somebody hits the
05:24:24  15   buttons on the bottom or the back or the side to bring up
05:24:27  16   the On-Screen-Display menu, how many menu items are there?
05:24:34  17   A.  I'm not sure.  I've actually adjusted my color, so I
05:24:34  18   have seen that.
05:24:34  19   Q.  Okay.
05:24:38  20   A.  But I don't know many menu items.
05:24:39  21   Q.  What type of monitor do you have?
05:24:42  22   A.  It's an ASUS monitor.
05:24:43  23   Q.  And you adjusted it when you were working on this case?
05:24:50  24   A.  No, before.
05:24:50  25   Q.  Okay.  How many -- just to be clear, is your monitor
```

| | | |
|---|---|---|
| 05:24:55 | 1 | one of the accused products? |
| 05:24:57 | 2 | A.  I'm not sure. |
| 05:24:58 | 3 | Q.  Okay.  When you did adjust that on that monitor, how |
| 05:25:06 | 4 | many different options were in the menu that you saw? |
| 05:25:10 | 5 | A.  That was a long time ago.  I don't remember. |
| 05:25:12 | 6 | Q.  Do you think there's more options than just the |
| 05:25:16 | 7 | technology there is available -- do you think that there |
| 05:25:19 | 8 | are more adjustment options in these monitors than the |
| 05:25:22 | 9 | technology that's at issue in this lawsuit? |
| 05:25:24 | 10 | A.  There were several things when I went to the on-screen |
| 05:25:27 | 11 | adjustment.  I don't remember what they were or how many |
| 05:25:29 | 12 | there were. |
| 05:25:30 | 13 | Q.  Okay.  So what we're talking about, then, if that holds |
| 05:25:36 | 14 | true with these monitors, is a much smaller piece of the |
| 05:25:41 | 15 | overall video adjustment and control technology, right? |
| 05:25:44 | 16 | A.  It's a subset of that video adjustment and control. |
| 05:25:48 | 17 | And the easy math is it's three-tenths of 1 percent of the |
| 05:25:53 | 18 | overall, so it's a sub-1 percent rate on an effective |
| 05:26:01 | 19 | basis. |
| 05:26:01 | 20 | Q.  Okay.  I'm not sure I understand what you just said, |
| 05:26:04 | 21 | but I think you answered my question.  Did you answer my |
| 05:26:08 | 22 | question that it was a smaller -- |
| 05:26:08 | 23 | A.  I thought I did. |
| 05:26:10 | 24 | Q.  Okay. |
| 05:26:11 | 25 | A.  I thought so. |

| | | |
|---|---|---|
| 05:26:12 | 1 | Q.  So you didn't actually look at the adjustment |
| 05:26:30 | 2 | technology in any of the accused monitors to see how many |
| 05:26:35 | 3 | different adjustments there were before apportioning |
| 05:26:38 | 4 | 14 percent of the value to the one feature we're talking |
| 05:26:41 | 5 | about, right? |
| 05:26:42 | 6 | A.  That mischaracterizes what I did.  I didn't apportion |
| 05:26:46 | 7 | 14 percent to the one feature.  I apportioned 14 percent to |
| 05:26:50 | 8 | this bigger bundle.  Then I applied the 2.3 percent rate to |
| 05:26:54 | 9 | that.  On an overall basis, it's three-tenths of 1 percent. |
| 05:27:02 | 10 | Q.  Okay.  So does that apportionment apply to -- equally |
| 05:27:11 | 11 | to different monitors, despite the usage of the monitor? |
| 05:27:15 | 12 | A.  This was done across the board. |
| 05:27:17 | 13 | Q.  So if we have a monitor that's made for a gamer -- I'm |
| 05:27:27 | 14 | going to hold up a box here.  It's a little awkward.  You |
| 05:27:31 | 15 | see this?  This is one of the accused products, right? |
| 05:27:34 | 16 | A.  Yes. |
| 05:27:35 | 17 | Q.  And that says tough -- tough gaming, right? |
| 05:27:41 | 18 | A.  Yes. |
| 05:27:41 | 19 | Q.  And did you consider whether gamers need the color -- |
| 05:27:50 | 20 | use the color adjustment technology? |
| 05:27:52 | 21 | A.  I didn't go to that level of detail.  I did this at a |
| 05:27:56 | 22 | very high level. |
| 05:27:57 | 23 | Q.  So if we have -- if we have a monitor for gamers and it |
| 05:28:01 | 24 | costs $600, you're still apportioning the same amount to |
| 05:28:12 | 25 | that $600 monitor? |

05:28:14  1    A.  This was the -- based on the best available evidence,

05:28:17  2    it had to be done at a high level like this, and I've not

05:28:21  3    seen any better evidence or approach.

05:28:23  4    Q.  But that wasn't my question.  My question is, if we've

05:28:26  5    got a monitor for gamers who are -- who may or may not ever

05:28:31  6    use adjustment technology, you're still apportioning the

05:28:35  7    same amount to that monitor?

05:28:38  8    A.  I think I said this earlier.  I did it at an overall

05:28:43  9    level.  Everything was treated equally on that.

05:28:45  10   Q.  And that holds true for the Professional Artist models,

05:28:48  11   as well, right?

05:28:49  12   A.  That is included in everything.

05:28:50  13   Q.  Okay.  And so precision color adjustment technology in

05:28:57  14   your apportionment had the exact same value to a gamer as

05:29:03  15   to a business person as to a home user as to a gamer as to

05:29:07  16   any user of this technology, right?

05:29:09  17   A.  I didn't make that leap.

05:29:10  18   Q.  But you could have, right, because you had -- you knew

05:29:14  19   the different categories of products?

05:29:17  20   A.  There's not that much precision in the data.  There's

05:29:23  21   just not.  The data is messier than that.

05:29:26  22   Q.  Okay.  Did you consider whether ASUS advertised

05:29:35  23   the 6-axis technology for any particular products when you

05:29:39  24   made your apportionment adjustment?

05:29:41  25   A.  Well, I know I considered in my Georgia-Pacific

631

05:29:44   1   factors -- I know I put a screenshot in my report of one of

05:29:48   2   the monitors, and I think it was either the ProArt or a

05:29:51   3   gaming monitor.  So I did consider that, and I did discuss

05:29:53   4   that with Dr. Ducharme.

05:29:55   5   Q.  Okay.  And was that advertising important to your

05:30:00   6   apportionment?

05:30:00   7   A.  Well, at the end of that particular Georgia-Pacific

05:30:03   8   factor, I said that it could exert upward pressure on a

05:30:07   9   rate, but I ended up not moving the rate because of that

05:30:11  10   upward pressure.

05:30:11  11   Q.  Okay.  And if a feature is not advertised, could it

05:30:20  12   exert downward pressure on a rate?

05:30:23  13   A.  Just because it's not advertised doesn't mean it's not

05:30:27  14   important.

05:30:27  15   Q.  So companies put important features in products but

05:30:32  16   don't advertise them?

05:30:32  17   A.  They might.  They might just say we're going to promote

05:30:36  18   the top three things, but ten things might be important to

05:30:41  19   a consumer.

05:30:41  20   Q.  And that would be relevant to your analysis, right?

05:30:43  21   A.  No, again, that's a level of precision that's not

05:30:46  22   applicable here.

05:30:47  23   Q.  Okay.  But you did consider it with respect to some

05:30:49  24   products where you considered whether they advertise

05:30:53  25   6-axis?

05:30:54  1   A.   Again, I said that there was those two rates that I

05:30:57  2   said could have exerted upward pressure, but I ended up not

05:31:02  3   changing my rate at all because of it, so I didn't even

05:31:05  4   apply the upward pressure to my rate.   I kept it where it

05:31:08  5   was.

05:31:08  6   Q.   Okay.   I understand that, but my question is you

05:31:13  7   considered it in one instance, right?   You considered the

05:31:16  8   advertising of a specific feature in one instance, right?

05:31:20  9   A.   I highlighted it, and then didn't use it.

05:31:22  10  Q.   Okay.   And then -- but you didn't consider the lack of

05:31:30  11  advertising on the other hand?

05:31:32  12  A.   And I wouldn't have used it either.   I would have

05:31:34  13  treated it the exact same way.   That's my point.

05:31:35  14  Q.   Isn't it pretty common that if a company has a feature

05:31:39  15  that's important in a product, they advertise it?

05:31:40  16  A.   Yeah.   But, you know, there's only so much mind space

05:31:43  17  that a consumer has.   If you give out a list of 100

05:31:48  18  attributes of a product, you're going to get lost in the

05:31:52  19  shuffle, so they tend to focus on top attributes.

05:32:10  20  Q.   We talked about the Philips licensing program that you

05:32:13  21  pulled some data from, right?

05:32:15  22  A.   Yes.

05:32:23  23  Q.   There's a couple of pen marks and highlights on this,

05:32:26  24  but absent the pen marks and absent the highlighting that's

05:32:32  25  what you displayed for us, right?

| 05:32:34 | 1 | A.  Yes. |
| 05:32:34 | 2 | Q.  And this is a table of Philips set-top licensing rates, |
| 05:32:38 | 3 | right? |
| 05:32:38 | 4 | A.  Yes. |
| 05:32:39 | 5 | Q.  And you chose the 14 percent apportionment based on the |
| 05:32:43 | 6 | highlighted line there? |
| 05:32:44 | 7 | A.  Yes. |
| 05:32:47 | 8 | Q.  And basically, other than advertising, which was at a |
| 05:32:56 | 9 | higher rate, you basically chose the second highest rate on |
| 05:33:00 | 10 | the table, right? |
| 05:33:01 | 11 | A.  Yeah.  But that wasn't the reason I selected it, but it |
| 05:33:04 | 12 | is the second highest rate on the table, yes. |
| 05:33:07 | 13 | Q.  Okay.  And you weren't here for Dr. Ducharme's |
| 05:33:09 | 14 | testimony? |
| 05:33:10 | 15 | A.  Tail end of it. |
| 05:33:11 | 16 | Q.  Did you hear any testimony about software? |
| 05:33:14 | 17 | A.  Very little, but I -- yes. |
| 05:33:17 | 18 | Q.  But you did hear that he testified about the software |
| 05:33:20 | 19 | in these products? |
| 05:33:21 | 20 | A.  I heard -- I heard a little bit about software, yes. |
| 05:33:26 | 21 | Q.  And that's software that he testified that if it's in |
| 05:33:32 | 22 | the product, it's essentially an upgrade over a product |
| 05:33:36 | 23 | without the same software, right? |
| 05:33:38 | 24 | A.  I wasn't paying that close of attention to it. |
| 05:33:41 | 25 | Q.  He didn't say that.  What I'm saying is if you upgrade |

05:33:45  1  a premium product to the patented technology by adding

05:33:47  2  software to it, that would a software upgrade, right?

05:33:53  3  A.  Can you restate the question, please?

05:33:55  4  Q.  Assume you have an ASUS product that does not

05:33:59  5  have 6-axis technology in it.

05:34:00  6  A.  Okay.

05:34:00  7  Q.  And you added -- so if you were able to add software to

05:34:04  8  add that 6-axis technology, that would be a software

05:34:09  9  upgrade, right?

05:34:11  10  A.  Potentially, but it would also have to be supported by

05:34:15  11  the hardware, too.

05:34:16  12  Q.  Right.  And so there's a rate here for software

05:34:20  13  upgrades, right?

05:34:22  14  A.  Yeah.

05:34:23  15  Q.  0 percent?

05:34:23  16  A.  Yeah.

05:34:24  17  Q.  So Philips doesn't charge anything for when there's a

05:34:27  18  software upgrade within their patent portfolio, right?

05:34:31  19  A.  Based upon this -- well, they do in the EU.

05:34:37  20  Q.  The EU is the European Union, right?

05:34:40  21  A.  That's right.  They do charge an EU rate.  Maybe that's

05:34:45  22  something specific to the EU.

05:34:46  23  Q.  Okay.  But in the United States, it's free, right?

05:34:48  24  A.  I don't know.  I don't know the distinction between how

05:34:52  25  they treat it in Europe and how they treat it here.

| 05:34:54 | 1 | Q. This is your table, isn't it? |
| 05:34:56 | 2 | A. Yeah. |
| 05:34:57 | 3 | Q. And you've looked at the data in this table? |
| 05:34:58 | 4 | A. I have. |
| 05:34:59 | 5 | Q. And you didn't just leave a number out, right? |
| 05:35:03 | 6 | A. No. |
| 05:35:03 | 7 | Q. That is where it's blank, it means 0 percent for |
| 05:35:09 | 8 | software upgrade? |
| 05:35:10 | 9 | A. Yeah, that's nothing there.  It's a 0. |
| 05:35:12 | 10 | Q. And so you -- maybe you could have chosen 0 percent, |
| 05:35:16 | 11 | but you chose 14 percent? |
| 05:35:18 | 12 | A. Because it dealt with TV backlight and dimming which |
| 05:35:23 | 13 | was more related to video adjustment and control |
| 05:35:26 | 14 | technology. |
| 05:35:26 | 15 | Q. Based on what, sir? |
| 05:35:27 | 16 | A. Based upon a high-level assessment of it. |
| 05:35:30 | 17 | Q. Is that based on your technical background? |
| 05:35:34 | 18 | A. I think that's pretty much observable fact when you |
| 05:35:37 | 19 | look at the attributes here. |
| 05:35:39 | 20 | Q. So you're just looking at a list of -- of words. |
| 05:35:42 | 21 | You're not looking at the actual patents themselves? |
| 05:35:45 | 22 | A. Well, and I know what those words mean, too. |
| 05:35:47 | 23 | Q. Okay.  But you didn't look at patents? |
| 05:35:51 | 24 | A. The underlying patents under the Philips?  No, I |
| 05:35:55 | 25 | didn't.  I looked at this at a high level to get an |

05:35:58  1   apportionment factor.

05:35:59  2   Q.  Did Mr. Reed have somebody look at the patents?

05:36:01  3   A.  He did.

05:36:01  4   Q.  Who looked at them?

05:36:03  5   A.  Mr. Stevenson.

05:36:04  6   Q.  Okay.  Dr. Stevenson, right?

05:36:05  7   A.  Dr. Stevenson.

05:36:05  8   Q.  And he -- Dr. Stevenson, who knows the technology, did

05:36:11  9   not come to the same conclusion as you did about the value

05:36:16  10  of that, right?

05:36:17  11  A.  My recollection is that Mr. Reed and Dr. Stevenson both

05:36:20  12  questioned the categories and questioned a lot of things,

05:36:26  13  whereas I take Philips at its word in terms of what its

05:36:31  14  technology is worth because this is what it promotes to the

05:36:34  15  world.

05:36:34  16  Q.  I understand that.  But you didn't actually look at the

05:36:38  17  patents behind what you chose to see if they're even -- the

05:36:43  18  patents themselves are even relevant to the technology

05:36:45  19  we're talking about, right?

05:36:46  20  A.  I didn't need to.

05:36:47  21  Q.  Sir, that wasn't my question.  You didn't look at the

05:36:51  22  patents behind the TV backlight and dimming to see if

05:36:55  23  they're even relevant to what we're talking about, correct?

05:36:57  24  A.  I didn't because I didn't need to.  That's what I just

05:37:01  25  said.

05:37:01   1   Q.  Okay.  And that one at the top there where I labeled it

05:37:04   2   Audio?

05:37:04   3   A.  Yes.

05:37:05   4   Q.  Is that -- is that described elsewhere in the Philips

05:37:09   5   documents as audio/video?

05:37:11   6   A.  Well, that was some of the stuff Dr. Stevenson and

05:37:14   7   Mr. Reed looked at, and they were questioning basically the

05:37:17   8   categories from Philips.  I don't think either of them or

05:37:23   9   me are in a position to question Philips.

05:37:27   10  Q.  Okay.  So if somebody told you they had a patent on

05:37:30   11  some technology you use, you would just accept that and pay

05:37:34   12  the royalty rate?

05:37:35   13  A.  This is what they're telling the world that they price

05:37:37   14  their technology at.  I take them at their word.

05:37:41   15  Q.  Right.  Or their word is relevant to the specific

05:37:45   16  technologies they're licensing, right?

05:37:48   17  A.  Yes, that's their --

05:37:50   18  Q.  And you didn't even dig beyond the words on this

05:37:54   19  screen, right?

05:37:54   20  A.  I didn't need to.

05:37:56   21  Q.  But you didn't?

05:37:57   22  A.  I didn't.

05:37:58   23  Q.  You didn't?  Thank you.

05:38:01   24          You see here, there's one called User Interface?

05:38:05   25  A.  I do.

05:38:06   1   Q.  And that one has a rate of less than half of what you

05:38:09   2   said for apportionment?

05:38:11   3   A.  But the user interface could deal with a lot of other

05:38:15   4   things, like you pointed out earlier when you go to that

05:38:19   5   On-Screen-Display, things unrelated to video control.  So

05:38:24   6   that wouldn't be applicable here.

05:38:26   7   Q.  And you haven't been here through this trial, but would

05:38:30   8   it surprise you to know that we've been talking an awful

05:38:32   9   lot about the user interface in this trial?

05:38:35   10  A.  That wouldn't surprise me at all, but that's a part of

05:38:37   11  it.

05:38:37   12  Q.  Okay.  But you didn't choose that rate?

05:38:39   13  A.  Because that's going to have other elements.

05:38:41   14  Q.  Because it's less than half of what you wanted to

05:38:44   15  choose, right?

05:38:44   16  A.  No.  Because it's not on point.

05:38:45   17  Q.  What about multi-angle video?  That's -- that's about

05:38:46   18  half of what you chose?

05:38:50   19  A.  Is that a question?  That's a statement.

05:38:52   20  Q.  Is it correct?

05:38:53   21  A.  It is.  It's 7.3 percent.

05:38:56   22  Q.  You didn't choose that?

05:38:57   23  A.  No.  It's not applicable.

05:38:59   24  Q.  What is multi-angle video?

05:39:02   25  A.  All I know is it doesn't have anything to do with video

| | | |
|---|---|---|
| 05:39:07 | 1 | adjustment and control technology. |
| 05:39:08 | 2 | Q.  Were you here and you heard testimony during the trial |
| 05:39:10 | 3 | about the angles of the crystals and the screen changing |
| 05:39:14 | 4 | based on the adjustment to the color? |
| 05:39:17 | 5 | A.  No, but I do -- I mean, I understand that idea, being |
| 05:39:20 | 6 | able to see it from different -- |
| 05:39:22 | 7 | Q.  No, that's not what I'm talk -- what I'm talking about, |
| 05:39:26 | 8 | sir, is one of the -- within a screen, you're aware there |
| 05:39:30 | 9 | are pixels, right? |
| 05:39:31 | 10 | A.  Yes. |
| 05:39:31 | 11 | Q.  In the screen, they are called liquid crystal diode |
| 05:39:37 | 12 | displays, right? |
| 05:39:38 | 13 | A.  Yes. |
| 05:39:38 | 14 | Q.  And are you aware that the crystals in the screen |
| 05:39:41 | 15 | change to different angles based on the colors that are |
| 05:39:44 | 16 | meant to be represented on the screen? |
| 05:39:45 | 17 | A.  No, I didn't know that. |
| 05:39:46 | 18 | Q.  You didn't -- you didn't go ask any type of |
| 05:39:49 | 19 | technologist whether multiangle video could be relevant to |
| 05:39:53 | 20 | the technology here? |
| 05:39:53 | 21 | A.  I did not. |
| 05:39:54 | 22 | Q.  Instead, you just chose the second highest rate on that |
| 05:39:59 | 23 | chart for your apportionment, right? |
| 05:40:01 | 24 | A.  That's the rate I consider to be most applicable, yes. |
| 05:40:06 | 25 | MR. OLIVER:  I'm at a good breaking point if you |

05:40:09  1   want to break, or I can keep going, Your Honor.

05:40:09  2          THE COURT:  Let's do.  No.  Thanks.

05:40:12  3          Ladies and gentlemen of the jury, we're going to

05:40:13  4   recess at this time.  I appreciate your willingness to stay

05:40:16  5   a little longer.  I will look forward to seeing you at 8:45

05:40:21  6   in the morning so that we can start promptly at 9:00.

05:40:24  7          Don't discuss the case with anyone.  Don't do any

05:40:27  8   research or investigation into the case.  Don't post

05:40:30  9   anything on any social media site about any of the

05:40:36  10  proceedings you have observed.

05:40:38  11         I hope you have a nice evening.  I'll see you back

05:40:41  12  in the morning.

05:40:42  13         COURT SECURITY OFFICER:  All rise for the jury.

05:40:42  14         (Jury out.)

05:41:19  15         THE COURT:  Okay.  Please be seated.

05:41:22  16         Mr. Perdue, you may step down.

05:41:26  17         By 10:00 a.m. in the morning, I would ask for a

05:41:29  18  new set of jury instructions.  I recognize on the

05:41:32  19  instructions that were submitted by the parties, there are

05:41:35  20  not, you know, dozens of disagreements.  So they're

05:41:40  21  actually in relatively good shape.

05:41:42  22         I would suggest that you-all have a substantive

05:41:45  23  conversation about those areas of remaining disagreement.

05:41:49  24  See if you can't work through that dispute.

05:41:53  25         If it's a question about whether they are

05:41:55  1  instructed on that or not, of course, I understand, you

05:41:58  2  know, there -- there may be disputes about that.  But in

05:42:03  3  terms of the language, if you're down to a dispute that

05:42:06  4  basically centers on, I like my language better than your

05:42:11  5  language, I'm going to ask you to try to work through that

05:42:14  6  and negotiate something.

05:42:15  7       Putting that aside, the major concern I have is

05:42:22  8  the verdict forms.  There were two submitted, and we need

05:42:24  9  one submitted, so one verdict form submitted by both

05:42:29  10  parties.

05:42:29  11       And then if you can -- all can do that by

05:42:33  12  10:00 a.m. in the morning, we'll start working on it

05:42:36  13  throughout the day tomorrow, and at the end of the day

05:42:39  14  tomorrow, we will -- we'll have a charge conference where

05:42:45  15  we will go through the party's disagreements and get that

05:42:49  16  on the record.

05:42:51  17       Overnight on Thursday, I will make decisions about

05:42:54  18  what is appropriate, and I'll give you an opportunity to

05:42:59  19  put your objections on the record to the extent there are

05:43:05  20  any that remain.

05:43:06  21       With respect to JMOLs, let me ask Mr. Bennett.

05:43:14  22       I take it Mr. Perdue is your last witness; is that

05:43:18  23  correct?

05:43:18  24       MR. BENNETT:  That's correct, Your Honor.

05:43:20  25       THE COURT:  All right.  You will rest when his

| | | |
|---|---|---|
| 05:43:22 | 1 | testimony is complete? |
| 05:43:24 | 2 | MR. BENNETT:  We will rest. |
| 05:43:25 | 3 | THE COURT:  All right.  To the extent there will |
| 05:43:27 | 4 | be JMOLs that are made, I think we talked about this |
| 05:43:33 | 5 | earlier.  I'm happy for them to be done, handled, however |
| 05:43:39 | 6 | the parties to prefer.  If you want to do it in writing, |
| 05:43:42 | 7 | that's fine.  If you want to do it orally, that is fine. |
| 05:43:45 | 8 | What I would ask is that we not keep the jury |
| 05:43:48 | 9 | waiting.  So let's make your JMOLs in the morning if you |
| 05:43:52 | 10 | want you to do that.  Let's make them over the break, if |
| 05:43:53 | 11 | you want to do that, over the noon hour, that's fine, or we |
| 05:43:57 | 12 | can do it after, you know, the case gets submitted to the |
| 05:44:01 | 13 | jury, or at the end of the day tomorrow, whatever.  I just |
| 05:44:05 | 14 | don't want to make the jury wait. |
| 05:44:06 | 15 | MR. BENNETT:  Plaintiff will agree and be |
| 05:44:09 | 16 | flexible, you know, no waiver or anything like that until |
| 05:44:11 | 17 | there's a good stopping point.  We're amenable to that. |
| 05:44:15 | 18 | We're close on instructions.  We're going to |
| 05:44:18 | 19 | narrow the gap as soon as we're done here. |
| 05:44:20 | 20 | The verdict form is a bit of a sticking point. |
| 05:44:22 | 21 | There's some very diverging views about what it should look |
| 05:44:26 | 22 | like.  And a few attempts to try and bridge that gap have |
| 05:44:29 | 23 | been unsuccessful.  So we just categorically view the form |
| 05:44:34 | 24 | differently. |
| 05:44:34 | 25 | THE COURT:  Right.  I see one is a shorter form, |

05:44:37  1  and one is a much longer form.

05:44:40  2        MR. BENNETT:  Right.

05:44:40  3        MR. OLIVER:  Your Honor, if I may just address

05:44:43  4  that.  Here is the major problem.  We see this as a case of

05:44:49  5  representative products.  We have been talking about 6-axis

05:44:52  6  and 3-axis, and we want those two representative products,

05:45:00  7  a verdict form for 6-axis and 3 -- the products separated

05:45:04  8  like that.  They just want just one infringement, no

05:45:08  9  infringement.  That's a major disagreement.

05:45:11  10        THE COURT:  Okay.  Well, you know, I don't -- it

05:45:15  11  doesn't sound like you're going to make much progress on

05:45:18  12  that, but do -- do what you can.

05:45:18  13        MR. BENNETT:  Understood.

05:45:20  14        THE COURT:  What else do we need to resolve before

05:45:22  15  we adjourn?

05:45:24  16        MR. OLIVER:  Couple of things from me, Your Honor.

05:45:27  17  One, we haven't had a chance to meet and confer yet.  I

05:45:30  18  sent an email to the other side, but I trust they were busy

05:45:34  19  so they haven't responded.  It was what's going to happen

05:45:35  20  tomorrow when Dr. Stevenson, our expert, takes the stand.

05:45:39  21  And Mr. Saba made a reference to this.  He said:  Their

05:45:43  22  expert hasn't reviewed the source code.

05:45:47  23        So the history of this is that they submitted a

05:45:49  24  supplemental expert report when their expert addressed

05:45:54  25  the -- that was after discovery.  We didn't submit a

| | | |
|---|---|---|
| 05:45:58 | 1 | rebuttal report.  They didn't depose our guy.  We didn't |
| 05:46:02 | 2 | depose their guy.  So now, you know, Dr. Stevenson will |
| 05:46:04 | 3 | talk about the source code if he is allowed. |
| 05:46:07 | 4 | THE COURT:  On what basis? |
| 05:46:08 | 5 | MR. BENNETT:  For clarity, we definitely deposed |
| 05:46:12 | 6 | Dr. Stevenson. |
| 05:46:15 | 7 | THE COURT:  What would be the basis for allowing |
| 05:46:18 | 8 | him to render an opinion that he's not already rendered -- |
| 05:46:18 | 9 | MR. OLIVER:  Well, the -- |
| 05:46:25 | 10 | THE COURT:  -- or that's new? |
| 05:46:25 | 11 | MR. OLIVER:  Well, the supplemental -- the |
| 05:46:27 | 12 | supplemental report of Dr. Stevenson wasn't allowed by the |
| 05:46:30 | 13 | Court's schedule.  They just submitted it without |
| 05:46:32 | 14 | permission. |
| 05:46:33 | 15 | THE COURT:  The report of whom? |
| 05:46:35 | 16 | MR. JOSHI:  Dr. Ducharme, I'm sorry. |
| 05:46:37 | 17 | THE COURT:  Okay.  Did you move to strike it? |
| 05:46:40 | 18 | MR. JOSHI:  We didn't move to strike it, no. |
| 05:46:44 | 19 | So then, in the alternative, what we don't want -- |
| 05:46:47 | 20 | if Dr. Stevenson can't talk about source code, then -- |
| 05:46:49 | 21 | THE COURT:  If he has not disclosed an opinion |
| 05:46:52 | 22 | about source code, he won't testify about an opinion on |
| 05:46:55 | 23 | source code, I can tell you that. |
| 05:46:57 | 24 | MR. JOSHI:  Okay.  But would you then also allow |
| 05:47:01 | 25 | them to criticize him for not -- not talking about source |

05:47:03   1   code?

05:47:03   2           THE COURT:  Why would he not be permitted to?

05:47:06   3           MR. JOSHI:  Because -- here's the thing,

05:47:09   4   Your Honor, he --

05:47:10   5           THE COURT:  Why would -- I guess why would they

05:47:12   6   not be permitted to?

05:47:14   7           MR. JOSHI:  Well, because that's not fair.  That's

05:47:16   8   prejudicial because they could have -- after Dr. Ducharme

05:47:20   9   submitted his supplemental report and added source code to

05:47:24   10  it, there was still time left for them to take a deposition

05:47:27   11  of our expert or ask him if he had any opinion about that,

05:47:33   12  which they didn't do.

05:47:34   13          So if we're not allowed to talk about source code,

05:47:37   14  they shouldn't be allowed to criticize us for not talking

05:47:40   15  about it either.  Either let us talk about it, and then let

05:47:43   16  us -- let them cross us on it, or if we don't get to talk

05:47:48   17  about it, then they shouldn't be able to say, well, he

05:47:50   18  didn't even look at the source code without the jury

05:47:52   19  knowing why that is.

05:47:53   20          THE COURT:  Mr. Bennett?

05:47:55   21          MR. BENNETT:  So very different facts apply to our

05:47:58   22  source code review than their rebuttal of that review.  We

05:48:03   23  asked for it.  They didn't give it.  We had to get a

05:48:06   24  subpoena from MediaTek.  It took them forever to respond.

05:48:09   25  We've kind of been over some of these facts during this

05:48:12  1  trial.

05:48:13  2       They didn't -- when we supplemented because we

05:48:17  3  barely got the source code, they didn't move to strike,

05:48:20  4  ostensibly because they agreed with us that it probably --

05:48:25  5  given the timing of things, it was going come in anyway.

05:48:29  6  So after we supplemented, they didn't ask for rebuttal.

05:48:34  7  They never approached us about a supplemental rebuttal.

05:48:35  8  They never did supplement that.

05:48:37  9       So the idea that Dr. Stevenson, having seen the

05:48:40 10  source code during trial, is now going to take the stand,

05:48:44 11  the first time we're ever going to hear an opinion about

05:48:48 12  source code is on the stand, that's severely prejudicial.

05:48:51 13       THE COURT:  That will not happen, I can promise

05:48:54 14  you.

05:48:54 15       MR. JOSHI:  That's fine, Your Honor.  But then, on

05:48:56 16  the other side of the same coin, he is willing to.

05:49:04 17       So, Your Honor, just to give you kind of some

05:49:10 18  balance.  Today we heard testimony on damages for a report

05:49:13 19  that was updated on Monday.  Okay.  So --

05:49:19 20       MR. OLIVER:  (Inaudible.)

05:49:20 21       MR. JOSHI:  I'm sorry, the update.

05:49:20 22       But my point is, if you don't want Dr. Stevenson

05:49:22 23  to talk about source code, that's fine, he won't.  But what

05:49:26 24  I'm concerned about is them, then, repeatedly -- or maybe

05:49:29 25  not repeatedly, but saying -- criticizing him for not

05:49:33   1   having reviewed the source code and not having talked --

05:49:34   2          THE COURT:  Well, I think it's an answer that, you

05:49:36   3   know, is maybe a series of questions that, you know, I'll

05:49:40   4   ask the Plaintiffs not to overdo.  But the fact is he

05:49:44   5   didn't and didn't submit a report on it and it's not coming

05:49:48   6   in.

05:49:48   7          So, I mean, I think they certainly -- the -- you

05:49:58   8   know, I mean, I think it was -- if it was not disclosed, he

05:50:03   9   is not going to testify about it.  And I think it's a fair

05:50:07  10   thing for the Plaintiffs to point out.  I just wouldn't

05:50:11  11   overdo.

05:50:12  12          MR. BENNETT:  Understood.

05:50:13  13          THE COURT:  And the number, by the way, on the --

05:50:15  14   on the -- to respond, I guess, Mr. Joshi, to the argument

05:50:23  15   you were making that there was new information today with

05:50:25  16   respect to the Plaintiff's damages expert, there was no

05:50:29  17   surprise there.  There was nothing new.  The number did not

05:50:33  18   change.  That's why I allowed that in.

05:50:36  19          MR. JOSHI:  Thank you, Your Honor.

05:50:37  20          THE COURT:  But, Mr. Joshi, you know the

05:50:39  21   disclosure rules on expert opinions are very vigorous in

05:50:44  22   this district, and opinions are routinely kept out that are

05:50:50  23   not adequately disclosed.

05:50:52  24          MR. JOSHI:  And that's fine, Your Honor.  I accept

05:50:55  25   your ruling.  And I also appreciate your directive that

| | | |
|---|---|---|
| 05:51:00 | 1 | don't overdo the fact that he -- you know, as long as we |
| 05:51:03 | 2 | have that balance. |
| 05:51:04 | 3 | THE COURT:  Well, we'll have that balance, but, I |
| 05:51:07 | 4 | mean, yes. |
| 05:51:09 | 5 | MR. BENNETT:  We've heard Your Honor, and we'll |
| 05:51:11 | 6 | follow that directive. |
| 05:51:13 | 7 | THE COURT:  Sure. |
| 05:51:16 | 8 | MR. JOSHI:  One housekeeping -- our friend |
| 05:51:19 | 9 | Mr. Oliver does want to speak with you, but one small |
| 05:51:22 | 10 | housekeeping -- and maybe there's an easier way to do this |
| 05:51:26 | 11 | but I have a number of exhibits that are pre-admitted and |
| 05:51:30 | 12 | that were used with the expert.  Would you like me to read |
| 05:51:33 | 13 | them out now or submit an email or -- |
| 05:51:35 | 14 | THE COURT:  How about you read -- how about -- |
| 05:51:36 | 15 | let's do this because I think the Plaintiff's probably got |
| 05:51:40 | 16 | some housekeeping on exhibits, as well.  How about in the |
| 05:51:43 | 17 | morning we go on the record a little early and we tend to |
| 05:51:47 | 18 | exhibits for both sides, at least up to this point in |
| 05:51:52 | 19 | trial; is that fair enough? |
| 05:51:55 | 20 | MR. BENNETT:  Agreed.  Yes, Your Honor. |
| 05:51:55 | 21 | THE COURT:  Okay.  It won't take very long, I |
| 05:51:59 | 22 | don't think.  Are most of these agreed? |
| 05:52:01 | 23 | MR. JOSHI:  Yes. |
| 05:52:02 | 24 | THE COURT:  Okay.  Let's deal with that in the |
| 05:52:04 | 25 | morning. |

| | | |
|---|---|---|
| 05:52:04 | 1 | MR. JOSHI:  Thank you, Your Honor. |
| 05:52:05 | 2 | THE COURT:  Thank you, Mr. Joshi. |
| 05:52:06 | 3 | MR. OLIVER:  Your Honor, thank you for your time |
| 05:52:07 | 4 | this evening. |
| 05:52:08 | 5 | One last issue, and I'll make a brief verbal |
| 05:52:11 | 6 | motion and we can submit it in paper if you would prefer |
| 05:52:14 | 7 | that as well.  But ASUS moves to -- the Court to reconsider |
| 05:52:18 | 8 | the invalidity argument that was made at claim construction |
| 05:52:22 | 9 | and to clarify the claim construction. |
| 05:52:26 | 10 | The testimony we heard today from Plaintiff's |
| 05:52:30 | 11 | expert, he said that one could write software that within |
| 05:52:34 | 12 | the Court's claim construction could -- when somebody |
| 05:52:38 | 13 | selects red, that software can modify every single pixel |
| 05:52:45 | 14 | and be within the Court's claim construction.  That |
| 05:52:48 | 15 | argument eviscerates two limitations of the claim.  It |
| 05:52:54 | 16 | eviscerates the identifying pixels limitation, and it |
| 05:52:57 | 17 | eviscerates the without affecting any other color |
| 05:53:00 | 18 | limitation. |
| 05:53:01 | 19 | On that basis, ASUS reurges that the claim is |
| 05:53:10 | 20 | indefinite and asks the Court to clarify the claim |
| 05:53:13 | 21 | construction.  And we can -- |
| 05:53:13 | 22 | THE COURT:  Mr. Joshi, let me ask you -- I mean, |
| 05:53:14 | 23 | I'm sorry -- Mr. Oliver, let me ask you to submit a short |
| 05:53:18 | 24 | brief on it, say, by, 10:00 p.m. tonight, and then I'll |
| 05:53:21 | 25 | look forward to a response from the Plaintiffs by 7:00 a.m. |

05:53:25   1   Would that -- is that achievable?

05:53:31   2            MR. OLIVER:  It is -- it'll be tough, but we can

05:53:34   3   do it.

05:53:35   4            THE COURT:  Okay.  I think I'd rather -- I'd

05:53:37   5   rather have an opportunity to review it on paper, and then

05:53:42   6   give the Plaintiffs an opportunity to respond to it.

05:53:46   7            What else?

05:53:47   8            MR. BENNETT:  I have nothing else, Your Honor.

05:53:49   9            THE COURT:  Okay.  See you all in the morning.

05:53:51  10            Mr. Oliver, let me ask you.  How much longer do

05:53:55  11   you expect with Mr. Perdue?

05:53:57  12            MR. OLIVER:  Completely frankly, I'm going to have

05:54:02  13   to find out how much time we have remaining.

05:54:06  14            THE COURT:  You have 5 minutes and 44 -- you have

05:54:08  15   4 minutes and -- you have 5 hours and 44 minutes remaining.

05:54:13  16            MR. BENNETT:  And how about Plaintiffs?

05:54:15  17            THE COURT:  I'm sorry?

05:54:16  18            MR. BENNETT:  How about the Plaintiff?

05:54:17  19            THE COURT:  You have 4 hours and 22 minutes

05:54:20  20   remaining.

05:54:22  21            I think we can get this to the jury tomorrow.

05:54:26  22   It's going to require, you know, streamlining things.  We

05:54:30  23   might have to do a little bit of testimony on Friday

05:54:32  24   morning, but to get this to the jury Friday, it just needs

05:54:35  25   to be a little bit of testimony Friday morning.

| | | |
|---|---|---|
| 05:54:39 | 1 | So, you know, you've got the time.  And so, you |
| 05:54:43 | 2 | know, I think -- think -- I think I've given you too much |
| 05:54:54 | 3 | time, and I'm not fussing with anybody, but I think this |
| 05:54:57 | 4 | last cross-examination has been a little over long. |
| 05:55:01 | 5 | MR. OLIVER:  And I'm imagining, based on how much |
| 05:55:04 | 6 | time is left, that it will not go much longer. |
| 05:55:08 | 7 | MR. BENNETT:  Quick question about closings and |
| 05:55:11 | 8 | the charge.  Does Your Honor read the charge, and then we |
| 05:55:17 | 9 | close or the other way around? |
| 05:55:18 | 10 | THE COURT:  Yes, the first. |
| 05:55:20 | 11 | MR. BENNETT:  Okay.  Thank you.  It helps with |
| 05:55:22 | 12 | closing, slides, and things.  Appreciate it.  Thank you. |
| 05:55:25 | 13 | THE COURT:  And I'm not fussing at you, |
| 05:55:28 | 14 | Mr. Oliver.  I just think -- I think you all -- I think it |
| 05:55:32 | 15 | was a little long.  But you went 40 minutes after 5:00 -- |
| 05:55:44 | 16 | 45 minutes after 5:00 and hopefully that knocked a chunk |
| 05:55:48 | 17 | off of the outline. |
| 05:55:50 | 18 | MR. SABA:  Your Honor, John Saba.  I just wanted |
| 05:55:53 | 19 | to ask.  Can we -- would you be okay with us submitting our |
| 05:55:57 | 20 | response to Mr. Oliver's request by 10:30 instead of 7:00? |
| 05:56:01 | 21 | THE COURT:  Yes. |
| 05:56:01 | 22 | MR. SABA:  Thank you, Your Honor. |
| 05:56:02 | 23 | THE COURT:  Yes.  I mean, as long as the -- well, |
| 05:56:03 | 24 | when do we need a ruling on it? |
| 05:56:07 | 25 | MR. OLIVER:  Think we need to know it before we |

05:56:10   1   get the final jury instructions.

05:56:13   2          THE COURT:  Oh, well, then, yeah, certainly.

05:56:15   3          MR. SABA:  Thank you, Your Honor.

05:56:15   4          THE COURT:  Certainly.  That gives us plenty of

05:56:17   5   time.

05:56:17   6          MR. JOSHI:  One -- one more reminder, Your Honor.

05:56:20   7   We -- on the inoperability issue, when Dr. Stevenson takes

05:56:23   8   the stand, we had talked about some time without the jury

05:56:27   9   for him to make his case on inoperability.

05:56:32  10          MR. BENNETT:  So we talked about that.  The only

05:56:36  11   hiccup for us is that Dr. Ducharme was designated as a

05:56:41  12   rebuttal expert on that issue.  He is not going to be here

05:56:50  13   live.  If the Court will allow us to present him remotely,

05:56:56  14   we could probably make that work.  He had to head back

05:57:00  15   today to Florida.

05:57:01  16          THE COURT:  Well, let me ask this.  Is this

05:57:04  17   something that we could handle post-trial?

05:57:05  18          MR. BENNETT:  I believe we could.

05:57:06  19          THE COURT:  I think we were just doing it now for

05:57:08  20   the convenience of the witness, frankly.

05:57:11  21          MR. JOSHI:  Yes.

05:57:11  22          MR. BENNETT:  And that was going to be our

05:57:13  23   submission, which was let's see what happens and then go

05:57:17  24   from there.

05:57:17  25          THE COURT:  Mr. Joshi, my preference would be

05:57:20  1  let's see whether this is necessary and if it is, we can

05:57:24  2  handle it in post-trial proceedings.  Would that be

05:57:28  3  acceptable to ASUS?

05:57:31  4            MR. OLIVER:  Yes.

05:57:34  5            MR. JOSHI:  Yes.

05:57:34  6            THE COURT:  Very well.  See you all in the

05:57:36  7  morning.

05:57:37  8            MR. BENNETT:  Thank you, Your Honor.

05:57:38  9            COURT SECURITY OFFICER:  All rise.

10            (WHEREUPON, these proceedings were adjourned,

11  5:57 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          COURT REPORTER'S CERTIFICATION

2          I HEREBY CERTIFY that the foregoing is a true and

3    correct transcript from the stenographic notes of the

4    proceedings in the above-entitled matter held on May 19,

5    2021, to the best of my ability.

6

7    May 19, 2021          s/ KATHRYN McALPINE/_____
     Date                  KATHRYN McALPINE, RPR, CSR, CCR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25