```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                      TYLER DIVISION

 3   LONE STAR TECHNOLOGICAL      )(
     INNOVATIONS, LLC,            )(
 4        PLAINTIFF,              )(    CIVIL ACTION NO.
                                  )(    6:19-CV-59-RWS
 5                                )(
     VS.                          )(
 6                                )(
                                  )(    TYLER, TEXAS
 7                                )(
     ASUSTEK COMPUTER, INC.,      )(    MAY 20, 2021
 8        DEFENDANT.              )(    8:57 A.M.

 9                  TRANSCRIPT OF JURY TRIAL

10        BEFORE THE HONORABLE ROBERT W. SCHROEDER, III

11              UNITED STATES DISTRICT JUDGE

12
     FOR THE PLAINTIFF:      Mr. Joshua J. Bennett
13                           Mr. Bradley D. Liddle
                             Ms. Monica Litle
14                           CARTER ARNETT, PLLC
                             8150 N. Central Expressway
15                           5th Floor
                             Dallas, Texas 75206
16
                             Mr. John D. Saba, Jr.
17                           WITTLIFF & CUTTER, PLLC
                             1209 Nueces Street
18                           Austin, Texas 78701

19                           Mr. John Lee
                             BANIE & ISHIMOTO, LLP
20                           2100 Geng Road
                             Suite 210
21                           Palo Alto, California 94303

22   COURT REPORTER:         Ms. Kate McAlpine, RPR, CSR, CCR
                             Federal Official Court Reporter
23                           Texarkana Division
                             500 N. State Line Avenue
24                           Texarkana, Texas 75501

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

```
 1   FOR THE DEFENDANT:        Mr. Vinay V. Joshi
                               Mr. Andrew T. Oliver
 2                             AMIN, TUROCY, & WATSON
                               160 W. Santa Clara Street
 3                             Suite 975
                               San Jose, California 95113
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| | 1 |
| 08:57:11 | 2 |
| 08:57:11 | 3 |
| 08:57:13 | 4 |
| 08:57:15 | 5 |
| 08:57:17 | 6 |
| 08:57:18 | 7 |
| 08:57:21 | 8 |
| 08:57:24 | 9 |
| 08:57:25 | 10 |
| 08:57:27 | 11 |
| 08:57:27 | 12 |
| 08:57:30 | 13 |
| 08:57:32 | 14 |
| 08:57:33 | 15 |
| 08:57:33 | 16 |
| 08:57:36 | 17 |
| 08:57:38 | 18 |
| 08:57:41 | 19 |
| 08:57:44 | 20 |
| 08:57:45 | 21 |
| 08:57:47 | 22 |
| 08:57:47 | 23 |
| 08:57:47 | 24 |
| 08:57:51 | 25 |

                        P R O C E E D I N G S

            THE COURT:  Good morning, everyone.

            MR. BENNETT:  Good morning, Your Honor.

            THE COURT:  Is there anything we need to discuss

before we have the jury brought in?

            MR. BENNETT:  No, Your Honor.

            MR. JOSHI:  Your Honor, you had said that you

would come a little bit early to get the exhibits admitted

into evidence.

            THE COURT:  You're right.  I did.  And my

apologies.  Let's do that really quickly.

            MR. JOSHI:  Okay.

            THE COURT:  And we'll -- then we'll get the jury

in.

            MR. JOSHI:  Sure.

            THE COURT:  You all be seated.

            Mr. Joshi, you want to -- you can do it from there

if you want, or you can go to the podium.

            MR. JOSHI:  If everyone can hear me, I have the

microphone.

            THE COURT:  We can hear you.

            MR. JOSHI:  Finally -- the first day I figured out

how to use it, but --

            THE COURT:  That's okay.  It's a little tricky.

            MR. JOSHI:  Yes.  So for the defense, DX-87,

08:57:55   1   DX-88, DX-89, DX-90, DX-91, DX-139, and we also showed our

08:58:04   2   witness exhibits from the P-26 set, but I believe all of

08:58:10   3   those are admitted into evidence already.

08:58:13   4             THE COURT:  Okay.

08:58:14   5             MR. BENNETT:  That's correct.

08:58:15   6             THE COURT:  All right.  And the other exhibits

08:58:17   7   you're moving into evidence at this time?

08:58:20   8             MR. JOSHI:  Yes, Your Honor.

08:58:21   9             THE COURT:  Any objection to those?

08:58:23   10            MR. BENNETT:  Unless otherwise indicated on the

08:58:25   11   record, no.

08:58:26   12            THE COURT:  All right.  Very well.

08:58:26   13            MR. JOSHI:  Thank you.

08:58:28   14            THE COURT:  They will be received.

08:58:28   15            MR. JOSHI:  Thank you.

08:58:31   16            THE COURT:  Plaintiffs have any they wish to move

08:58:35   17   in at this time?

08:58:35   18            MR. BENNETT:  I think all of ours are in,

08:58:38   19   Your Honor.  So I don't think we need to -- all the ones

08:58:42   20   that we've introduced are already in the record.

08:58:44   21            THE COURT:  Good.  All right.  Let's have the jury

08:58:47   22   brought in.

08:58:48   23            COURT SECURITY OFFICER:  All rise for the jury.

08:58:48   24            (Jury in.)

08:59:14   25            THE COURT:  Please be seated.

08:59:19 1          Okay.  At this time, Mr. Oliver, you may continue.

08:59:19 2              GLENN PERDUE, PLAINTIFF'S WITNESS,

08:59:19 3                    PREVIOUSLY SWORN

08:59:26 4              CONTINUED DIRECT EXAMINATION

08:59:26 5 BY MR. OLIVER:

08:59:31 6 Q.  Morning, Mr. Perdue.  How are you?

08:59:33 7 A.  Good morning, Mr. Oliver.  Good.

08:59:35 8 Q.  Did you revise your damages calculations -- did you

08:59:40 9 revise your damages calculations last night?

08:59:43 10 A.  No, I did not.

08:59:44 11 Q.  Okay.  So let me -- when did you prepare your report in

08:59:48 12 this case, can you remind us?

08:59:51 13 A.  September of 2020.

08:59:52 14 Q.  And you received Mr. Reed's report about a month later

08:59:59 15 indicating that there were products in your report that

09:00:01 16 aren't accused of infringement, right?

09:00:03 17 A.  Yes, and we discussed that yesterday, and I understand

09:00:06 18 it's an issue -- that there's a dispute about that, and I'm

09:00:09 19 not qualified to weigh on that dispute.

09:00:14 20 Q.  Okay.  What's the dispute on?

09:00:16 21 A.  Well, it was represented to me that the products that

09:00:23 22 were in the ASUS spreadsheets were the accused products.

09:00:27 23 So that's the dispute.

09:00:30 24 Q.  Who --

09:00:30 25 A.  They're saying that it's a different set of accused

| | | |
|---|---|---|
| 09:00:30 | 1 | products. |
| 09:00:30 | 2 | Q.   Did Mr. Rice tell you that? |
| 09:00:31 | 3 | A.   No.   That was represented to me by counsel. |
| 09:00:35 | 4 | Q.   Which counsel? |
| 09:00:36 | 5 | A.   Mr. Lee. |
| 09:00:37 | 6 | Q.   Mr. Lee did? |
| 09:00:38 | 7 | Okay.   Are you aware that this morning Lone Star |
| 09:00:55 | 8 | dismissed an additional 10 products from this case? |
| 09:00:58 | 9 | A.   I was not, no, sir. |
| 09:01:00 | 10 | Q.   This is not a new thing, this has been discussed for a |
| 09:01:04 | 11 | few days, but you didn't update your numbers to remove |
| 09:01:04 | 12 | those products that were dismissed? |
| 09:01:08 | 13 | A.   I was not asked to, no, sir. |
| 09:01:10 | 14 | Q.   Okay. |
| 09:01:11 | 15 | MR. OLIVER:   May I have the Elmo, please? |
| 09:01:11 | 16 | BY MR. OLIVER: |
| 09:01:47 | 17 | Q.   We have this -- we have this list here that |
| 09:01:54 | 18 | Dr. Ducharme showed the jury before you got here that lists |
| 09:01:58 | 19 | accused products, and we were discussing there's 135 |
| 09:02:03 | 20 | products here, and I did note that there's at least one |
| 09:02:09 | 21 | that's duplicated there that's shown at 57 and 58, so 134 |
| 09:02:17 | 22 | products. |
| 09:02:17 | 23 | And then we talked about 10 that were dismissed |
| 09:02:21 | 24 | this morning, right?   So we're down to about 124 products. |
| 09:02:26 | 25 | I don't know if -- actually, some of those are already off |

09:02:28   1   of this list, I guess.

09:02:31   2         And do you have any -- did you do anything to

09:02:41   3   confirm last night whether this list is correct?

09:02:44   4   A.  No.  I was not allowed to talk to counsel.  There was

09:02:47   5   no contact at all.

09:02:48   6   Q.  Okay.  I would like to bring up the exhibit that you

09:02:58   7   used to do your calculations and manipulate it a little bit

09:03:04   8   on the screen and ask you if what I'm doing is a fair way

09:03:09   9   to analyze it.  Is that okay with you?

09:03:16  10   A.  We'll see in a minute, won't we?

09:03:18  11   Q.  Okay.

09:03:20  12         MR. OLIVER:  Can we have Plaintiff's Exhibit 94.

09:03:20  13   BY MR. OLIVER:

09:03:41  14   Q.  Okay.  Do you recognize this exhibit?

09:03:44  15   A.  I do.

09:03:46  16   Q.  And this is an Excel spreadsheet, right?

09:03:50  17   A.  Yes.

09:03:51  18   Q.  And you're familiar with operating Excel?

09:03:54  19   A.  I am.

09:03:55  20   Q.  Okay.  What I'm going to do -- do you notice in the row

09:04:00  21   that says Model Name, there's a lot of blank lines?

09:04:04  22   A.  Yes.

09:04:04  23   Q.  What I'm going to do is I'm going to go to that row,

09:04:09  24   and I'm going to click on the little drop-down filter, go

09:04:14  25   down to the bottom, and I'm going to turn off links so it

09:04:25  1   only shows rows with data in them.  Do you see that?

09:04:29  2   A.  I do.

09:04:29  3   Q.  And then that should give a complete listing of the

09:04:34  4   products that are in that Model Name row, shouldn't it?

09:04:37  5   A.  That's what it looks like it did, but I can't remember

09:04:42  6   if those ones with the model name had the totals or what

09:04:46  7   they had in them and how they were populated.

09:04:49  8   Q.  Okay.  And for the next document I show you, I'm going

09:04:53  9   to represent to you I did that, I sorted it alphabetically,

09:05:02  10  and I put numbers next to it, and then I pasted it into

09:05:09  11  another document that we could display here, and what I

09:05:12  12  came up with --

09:05:17  13          MR. OLIVER:  May we switch back to the Elmo?

09:05:17  14  BY MR. OLIVER:

09:05:24  15  Q.  What I came up with was this list.  It's kind of in the

09:05:28  16  format that Dr. Ducharme presented.  Do you see it?

09:05:32  17  A.  Yes, I see it.

09:05:33  18  Q.  Do you recognize those product numbers, at least some

09:05:38  19  of them?

09:05:38  20  A.  I remember the B1M and the B1MR from our discussion

09:05:44  21  yesterday.

09:05:45  22  Q.  Okay.  And so we talked about a few products that you

09:05:49  23  had added yesterday into your calculation that aren't

09:05:53  24  accused, right?

09:05:54  25  A.  There's a dispute about that.  I understand that what I

| 09:05:57 | 1 | was presented are the accused products, and you're saying |
| 09:06:01 | 2 | that they aren't.  And so I'm not in the position to weigh |
| 09:06:07 | 3 | in on that. |
| 09:06:08 | 4 | Q.  Okay. |
| 09:06:09 | 5 | MR. OLIVER:  There's a message on the TV that's |
| 09:06:12 | 6 | blocking part of the image. |
| 09:06:15 | 7 | THE COURT:  Are you asking -- |
| 09:06:17 | 8 | MR. OLIVER:  I'm -- I don't know how to -- there's |
| 09:06:18 | 9 | something on the TV that's blocking part of the image.  I |
| 09:06:21 | 10 | don't know what to do to show the full image. |
| 09:06:26 | 11 | THE COURT:  We'll have Mr. Powers look at it. |
| 09:06:49 | 12 | MR. OLIVER:  Thank you. |
| 09:06:52 | 13 | BY MR. OLIVER: |
| 09:06:52 | 14 | Q.  So the list of accused products that Dr. Ducharme |
| 09:06:56 | 15 | showed us was about 134 products, right? |
| 09:07:00 | 16 | A.  That's what I'm being -- what's being represented to |
| 09:07:04 | 17 | me. |
| 09:07:04 | 18 | Q.  Okay.  And you're seeing here about 135 products, |
| 09:07:08 | 19 | right? |
| 09:07:08 | 20 | A.  Yes. |
| 09:07:09 | 21 | Q.  But the problem is that's not the complete list. |
| 09:07:16 | 22 | There's another 135 products in the exhibit from you -- |
| 09:07:22 | 23 | which you calculated damages, and another 50 products |
| 09:07:30 | 24 | beyond that, right? |
| 09:07:32 | 25 | A.  I don't -- I don't know.  I would have to go and look |

09:07:35   1   into that further.  I've got those counts somewhere in my
09:07:38   2   report.
09:07:39   3   Q.  Okay.  Is it okay -- if there's inaccuracies when
09:07:44   4   you're redirected by your counsel you'll be able to address
09:07:48   5   those, right?
09:07:48   6   A.  Yes, I would suppose so.
09:07:51   7   Q.  Okay.  And so what I did -- I didn't have the chance to
09:07:53   8   make fancy graphics -- was I put together a list where I
09:07:58   9   went through and I checked and I marked off all the
09:08:02  10   unaccused products with red for which you included damages
09:08:06  11   in your report.  Do you see that?
09:08:08  12   A.  Unaccused.  So the ones that are in lighter red than
09:08:15  13   darker red are --
09:08:16  14   Q.  I think the lighter red is bleed-through because it's
09:08:20  15   two-sided, but I made a dark red mark on the non-accused
09:08:25  16   products?
09:08:25  17   A.  Okay.  So just the dark red are what you're saying are
09:08:30  18   non-accused?
09:08:30  19   Q.  Right.
09:08:30  20   A.  Okay.  Gotcha.
09:08:33  21   Q.  You can see that.  And then if I go to the second page,
09:08:33  22   you can see that almost all of the products that you
09:08:36  23   calculated damages for are not accused, right?
09:08:38  24   A.  Based upon your representation, that's correct.
09:08:41  25   Q.  And on the final page, the same is true, right?

09:08:45   1   A.   Yes.

09:08:45   2   Q.   So 134 products or so, maybe a few less than that, are

09:08:54   3   accused of infringement.   And you calculated damages for

09:09:01   4   320 products; is that right?

09:09:03   5   A.   I'd have to look at my report to see what the product

09:09:07   6   count is.

09:09:20   7        The last -- I mean, the last product count that I

09:09:24   8   have for a full year is 149 monitors for 2018, and then in

09:09:35   9   the new spreadsheet, I wasn't able to do product counts

09:09:38  10   because of the way that they were presented.

09:09:40  11        So the last product count that I have in my report

09:09:43  12   for 2018 was 149 monitors.

09:09:46  13   Q.   But you didn't even include 218 damages -- or you

09:09:53  14   didn't include 2018 numbers in your damages report because

09:09:56  15   damages aren't even claimed for 2018, right?

09:10:00  16   A.   That's right.   Damages start in 2019, but when I look

09:10:04  17   at the prior years:  2016, it was 130.   2017, it was 149.

09:10:09  18   2018, it was 149.   So since the numbers are comparable and

09:10:14  19   they actually even go down, it would make sense that the

09:10:19  20   damage counts are consistent with that.

09:10:22  21   Q.   Okay.   But you included -- you included all the damages

09:10:24  22   for any products that are in that spreadsheet --

09:10:24  23   A.   No, I told --

09:10:30  24   Q.   -- that we showed in P-90 -- PX-94, right?

09:10:32  25   A.   I told you what the product counts were for the prior

09:10:36   1   years, and we could maybe do a product count for those

09:10:39   2   subsequent years, but I would expect it to be in that same

09:10:42   3   range of 130 to 150, and that's in my report on this page

09:10:55   4   right here.

09:10:56   5   Q.  And you were aware that in October, Mr. Reed pointed

09:11:00   6   out at least 40 significantly high sales products that you

09:11:04   7   included in your damages calculation that --

09:11:04   8   A.  I recall Mr. Reed --

09:11:07   9   Q.  -- were not accused?

09:11:08   10  A.  -- pointing out certain products were more expensive

09:11:12   11  than others, yes, I do.

09:11:13   12  Q.  And you -- and he also pointed out a number of higher

09:11:17   13  sellers, over 40, that you included in your damages

09:11:21   14  calculation that are not accused?

09:11:23   15  A.  Well, again, that's a contention.  I'm not qualified to

09:11:26   16  weigh in on that, but I do recall that in Mr. Reed's

09:11:29   17  report.

09:11:29   18  Q.  Okay.  So as you sit here, you cannot say which

09:11:33   19  products are accused, even though you calculated damages

09:11:37   20  for supposedly accused products?

09:11:40   21  A.  I can give you a count.  I can tell that in 2018, that

09:11:44   22  it was about 149 monitors.  That's in my report.

09:11:47   23  Q.  2018, we just established that's not part of the

09:11:52   24  damages that are being claimed here, right?

09:11:55   25  A.  And that's because product counts, I wasn't able to do

09:11:59   1   them.  When I look back on all these product counts for all
09:12:03   2   these years that I have, the low amount is 129, the high
09:12:06   3   amount is 149.  It makes sense that the subsequent years
09:12:09   4   would be 129 to 149 because the numbers are about the same.
09:12:12   5   Q.  So you didn't provide product counts for 2019 and 2020
09:12:16   6   and 2021, did you?
09:12:18   7   A.  Didn't have the data to be able to do that.  The data
09:12:22   8   was presented differently in that second spreadsheet than
09:12:26   9   it was in the first spreadsheet, and it made that kind of
09:12:30  10   count problematic.
09:12:31  11   Q.  Sir, how long did you have to prepare your report?
09:12:35  12   A.  I don't know, a month or so.
09:12:37  13   Q.  And the data problem you had was that some of those
09:12:40  14   rows were blank --
09:12:42  15   A.  No --
09:12:43  16   Q.  -- that we saw, right?
09:12:44  17   A.  That wasn't the problem.  I mean, you can see in my
09:12:47  18   report, I did product counts and they stopped when the new
09:12:51  19   data came in and there was something about the new data
09:12:55  20   that prevented me from being able to do the product counts
09:12:59  21   like I had done with the old data or I would have done it.
09:13:02  22   Q.  So you don't even know what products the new data
09:13:05  23   relates to?
09:13:06  24   A.  Yeah, it's in my report, and it's in that spreadsheet.
09:13:10  25   Q.  So we just, in two minutes, pulled up the spreadsheet,

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 09:13:14 | 1  | isolated the product numbers and counted them, and you have  |
| 09:13:17 | 2  | a month and you were not able to do that for your report?    |
| 09:13:22 | 3  | MR. LEE:  Objection, Your Honor.  Argumentative.             |
| 09:13:25 | 4  | THE COURT:  I agree.  I'll sustain that.                     |
| 09:13:28 | 5  | Let's move along, Mr. Oliver.                                |
| 09:13:31 | 6  | MR. OLIVER:  Okay.                                           |
| 09:13:31 | 7  | BY MR. OLIVER:                                               |

09:13:14   1   isolated the product numbers and counted them, and you have

09:13:17   2   a month and you were not able to do that for your report?

09:13:22   3           MR. LEE:  Objection, Your Honor.  Argumentative.

09:13:25   4           THE COURT:  I agree.  I'll sustain that.

09:13:28   5           Let's move along, Mr. Oliver.

09:13:31   6           MR. OLIVER:  Okay.

09:13:31   7   BY MR. OLIVER:

09:13:32   8   Q.  Sir, would it be fair to withdraw your damages opinion

09:13:35   9   right now, given that you don't know whether the products

09:13:38  10   you included in the damages number were accused of

09:13:41  11   infringement?

09:13:41  12   A.  No.  I think that's something for the jury to weigh.

09:13:44  13   Q.  Okay.  So the jury gets to go back and look through

09:13:49  14   that spreadsheet and try and eliminate all the non-accused

09:13:53  15   products and then replicate your calculations based on

09:13:56  16   that, sir?

09:13:57  17           MR. LEE:  Objection, Your Honor.  Argumentative.

09:14:00  18           THE COURT:  Overruled.

09:14:08  19   A.  So this is a point of contention.  I was represented

09:14:10  20   that those were the accused products.  You're telling me

09:14:13  21   they're not.  I'm not qualified to weigh in on that.

09:14:16  22   BY MR. OLIVER:

09:14:17  23   Q.  Okay.  So just to be clear, when you did the report,

09:14:20  24   you included the products in the spreadsheet, correct?

09:14:23  25   A.  Yes.

09:14:24   1   Q.  And you did not know which products were accused and
09:14:30   2   which were not accused?
09:14:31   3   A.  It was represented to me that all items in the
09:14:34   4   spreadsheet were accused.
09:14:35   5   Q.  Okay.  And we all know, sitting here today, that the
09:14:38   6   list of accused devices is less than 135 products, and you
09:14:44   7   still don't want to withdraw your opinion based on the 320
09:14:50   8   products you analyzed?
09:14:51   9   A.  No.  I think the jury gets to weigh that as a part of
09:14:56   10  their consideration if what you're contending is true.
09:14:59   11  Q.  How many patent cases have you offered damages opinions
09:15:02   12  in?
09:15:03   13  A.  About 20.
09:15:04   14  Q.  And in those 20 cases, have you ever sought damages for
09:15:09   15  products that were not accused of infringement?
09:15:11   16  A.  No.
09:15:12   17  Q.  Not until this one?
09:15:14   18  A.  Well, again, you're representing that to me, and that's
09:15:17   19  a point of dispute.  So it's a representation.  It's not
09:15:21   20  necessarily a fact.
09:15:22   21  Q.  So would you agree that seeking damages for 320
09:15:27   22  products when only 135 products is a little more than a
09:15:33   23  dispute of fact?
09:15:35   24  A.  If your contention is true, it should be based on the
09:15:40   25  amount of the accused products.

09:15:41  1   Q.   And -- but you did not base your calculation on
09:15:46  2   these 135 accused devices?
09:15:47  3   A.   I based on the accused products that were represented
09:15:50  4   to me.   That's a point of contention and dispute.   There's
09:15:54  5   a dispute over that, and I'm not qualified to weigh in on
09:16:00  6   that dispute.
09:16:03  7   Q.   Sir, when you were talking yesterday about settlement
09:16:10  8   agreements, you mentioned that a settlement is compelled
09:16:14  9   and so you eliminated settlement licenses from your
09:16:19  10  calculations?
09:16:19  11  A.   Yes.
09:16:19  12  Q.   Did that include the settlements that Lone Star made
09:16:22  13  with other parties?
09:16:24  14  A.   Yes, I gave those the same weight that I did the ASUS
09:16:29  15  settlement agreements.
09:16:29  16  Q.   So when Lone Star sues a company, they're compelled to
09:16:34  17  settle it?
09:16:35  18  A.   No.   They can -- they can go to trial, but there's
09:16:38  19  still compulsion there if you go to litigation.
09:16:41  20  Q.   And the Defendant, like ASUS, was compelled to settle?
09:16:45  21  Because I don't see an ASUS settlement agreement here.
09:16:48  22  A.   That's what I just said.   Going to litigation, there's
09:16:51  23  compulsion there.   Whether to settle before or go the whole
09:16:54  24  way, there's compulsion in that whole situation.
09:16:56  25  Q.   It's really a choice of the parties whether they want

| | | |
|---|---|---|
| 09:17:00 | 1 | to settle or not.  It's not compelled, right? |
| 09:17:03 | 2 | A.  Well, it's compelled by virtue of the threat of |
| 09:17:07 | 3 | litigation.  That's where the compulsion comes from. |
| 09:17:10 | 4 | Q.  And that's why Barco settled with Lone Star for |
| 09:17:14 | 5 | 135,000? |
| 09:17:15 | 6 | A.  I don't know why Barco settled. |
| 09:17:18 | 7 | Q.  I thought you just said it was compelled? |
| 09:17:21 | 8 | A.  I said there's compulsion.  There's compulsion there, |
| 09:17:23 | 9 | but exactly why they settled, I don't know. |
| 09:17:25 | 10 | Q.  Did you ever consider that Barco got some advantages |
| 09:17:28 | 11 | from the agreement by settling, rather than going to trial? |
| 09:17:32 | 12 | A.  It was not relevant to my analysis, so I really didn't |
| 09:17:35 | 13 | give it much thought. |
| 09:17:37 | 14 | Q.  Because Barco would have paid a lot of money to have a |
| 09:17:41 | 15 | room full of lawyers and experts sitting here for a week, |
| 09:17:46 | 16 | wouldn't they? |
| 09:17:47 | 17 | A.  If they took it to trial, there would be expense |
| 09:17:50 | 18 | associated with it. |
| 09:17:50 | 19 | Q.  More than 135,000, probably, right? |
| 09:17:54 | 20 | A.  Probably so. |
| 09:17:54 | 21 | Q.  And so actually the money that they paid was probably |
| 09:17:57 | 22 | less than they would have even paid to go to trial, right? |
| 09:18:00 | 23 | A.  Probably so. |
| 09:18:01 | 24 | Q.  So they weren't necessarily valuing the patent at |
| 09:18:05 | 25 | 135,000.  They were saving the 135,000 they would have paid |

09:18:09  1    their cadre of lawyers and experts and witnesses to be

09:18:13  2    here, right?

09:18:13  3    A.  And that's one of the reasons why we don't consider

09:18:16  4    those settlements as good economic evidence.

09:18:19  5    Q.  But you considered a settlement with Acer in your

09:18:28  6    analysis, right?

09:18:29  7    A.  No, I didn't give it any weight.  I said that earlier.

09:18:33  8    I did not consider that.  I considered it, but it didn't

09:18:37  9    affect my royalty rate calculation.

09:18:38  10   Q.  Didn't you give some testimony about Acer having an

09:18:50  11   implied royalty rate of $0.61 per unit?

09:18:52  12   A.  Yeah.  And in my direct, I said that I did that

09:18:56  13   calculation but I didn't give it any weight because I had

09:19:00  14   the data.

09:19:01  15   Q.  So the jury should disregard the $0.61 per unit that

09:19:05  16   you said?

09:19:06  17   A.  I disregarded all those licenses as it related to the

09:19:09  18   entire royalty rate.

09:19:10  19   Q.  Okay.  Do you recall showing this slide to the jury?

09:19:40  20   A.  I do.

09:19:41  21   Q.  Now, this slide, where I'm marking it, shows royalty

09:19:54  22   rates between 2 percent and 50 percent, right?

09:19:57  23   A.  That's correct.

09:20:00  24   Q.  But you actually excluded the 50 percent rate from your

09:20:06  25   calculations, right?

09:20:07   1   A.   Yes.

09:20:07   2   Q.   Okay.  And so why is it on the chart if it's excluded?

09:20:13   3   A.   Because what I'm representing here is the range, and I

09:20:16   4   say that nine selected agreements before adjustment for

09:20:22   5   exclusivity are 2 to 15 percent.  I explained it under the

09:20:27   6   green bar.

09:20:27   7   Q.   But what about the 0.5 percent licenses in that group?

09:20:32   8   A.   That was Chimei Innolux, and that was an Eastern

09:20:35   9   District of Texas case, so I set it aside like I did the

09:20:38  10   other agreements that were obtained under compulsion.

09:20:42  11   Q.   So that case was here in the Eastern District of Texas,

09:20:44  12   but it's not relevant to what a jury in the Eastern

09:20:47  13   District of Texas should consider?

09:20:47  14   A.   That's not the reason that it's not relevant.  The

09:20:51  15   reason that it's bad economic evidence is for the same

09:20:54  16   reason that the ASUS licenses and the Lone Star licenses

09:20:58  17   shouldn't be considered.  It's because of the issue of

09:21:00  18   compulsion.

09:21:00  19   Q.   So I kind of -- I've taken one of your other documents,

09:21:07  20   and I'm kind of folding it up to highlight the key parts.

09:21:12  21        Do you recognize the list of licenses there?  It's

09:21:23  22   a little tough to see, right?

09:21:24  23   A.   No, I see it.

09:21:26  24   Q.   What I've done is I have folded it to hide the top part

09:21:31  25   so we can see the royalty rates next to the actual rates.

09:21:34   1   A.  Yes.

09:21:34   2   Q.  And this group of licenses here is what you based

09:21:38   3   this 2 to 15 percent and the 50 percent on, right?

09:21:46   4   A.  Yes, the 2 percent -- the 2 percent to the 15 percent

09:21:52   5   is the middle range.  Is that what you said?

09:21:55   6   Q.  I was just -- I just wanted to confirm that this data

09:21:58   7   was where you got that green line from.

09:22:01   8   A.  Yes, it is.  And I considered all of the non-litigation

09:22:06   9   licenses in that data spread.

09:22:08  10   Q.  Okay.  So you excluded this one?

09:22:15  11   A.  Well, that's another --

09:22:16  12   Q.  50 percent, right?

09:22:18  13   A.  That's another layer of exclusion.  I considered all

09:22:22  14   the non-litigation licenses in that 2 to 50 spread.

09:22:25  15   Q.  So you excluded the 50 percent, right?

09:22:32  16   A.  In the next round, I excluded it, and that's why I had

09:22:37  17   the 2 to 15 on the green bar.

09:22:40  18   Q.  Okay.  And then you have one there that's 0.5 percent,

09:22:45  19   right?

09:22:45  20   A.  Excluded because of litigation.

09:22:46  21   Q.  But not shown on the green bar?

09:22:48  22   A.  Because I excluded it because of the litigation issue.

09:22:54  23   Q.  Okay.  What about this one?  I don't see a 0.5 on the

09:23:00  24   bar.

09:23:00  25   A.  You're right.  That should be on there.

09:23:02   1   Q.   Okay.   And then zoom back out and show your bar of

09:23:05   2   license rates.   It goes up to 15 percent, right?

09:23:10   3   A.   For the selecteds, yes.

09:23:11   4   Q.   But then you talk about nine of them being between 2

09:23:16   5   and 15 percent, right?

09:23:17   6   A.   Yes -- yes.

09:23:20   7   Q.   And -- but if we look at the data, what we see here is

09:23:29   8   there's one at 15 percent, right?

09:23:31   9   A.   Yes.

09:23:37   10   Q.   And then the other eight of those licenses are

09:23:40   11   5 percent or less, right?

09:23:47   12   A.   Yes.

09:23:48   13   Q.   Your key set of data was really somewhere

09:23:52   14   between 2 percent and 5 percent and not between 2 percent

09:23:55   15   and 50 percent, right?

09:23:57   16   A.   Well, it depends on how you slice the data.   The other

09:24:01   17   thing we could do here is look at these non-exclusive

09:24:08   18   licenses and say, okay, we want a non-exclusive license.

09:24:10   19   There's three of them there.   The median is 5 percent.   I

09:24:14   20   could have done that, too, but I didn't.

09:24:16   21   Q.   That's part of the magic you did when you came up with

09:24:20   22   these numbers, right?

09:24:21   23   A.   No, the magic is the Georgia-Pacific hypothetical

09:24:25   24   negotiation.

09:24:25   25   Q.   That's -- this is not part of it?

09:24:28   1   A.  It is.

09:24:29   2   Q.  This is part of the magic?

09:24:30   3   A.  I don't do the magic.  Georgia-Pacific is the magic.

09:24:33   4   Q.  The Georgia-Pacific case had nothing to do with either

09:24:41   5   of these parties?

09:24:42   6   A.  Oh, yeah, it does.  These are the --

09:24:43   7   Q.  Who were the parties in the Georgia-Pacific lawsuit?

09:24:46   8   A.  Pardon me?

09:24:48   9   Q.  The parties -- the parties that went to court in the

09:24:53   10  Georgia-Pacific lawsuit where you got the standard from?

09:24:56   11  A.  It was Georgia-Pacific and some -- and a plywood

09:24:59   12  company.

09:24:59   13  Q.  But neither of the companies here today, right?

09:25:01   14  A.  Oh, no.

09:25:02   15  Q.  Then you take Georgia-Pacific and apply it to this

09:25:05   16  case?

09:25:05   17  A.  Yes.

09:25:06   18  Q.  And that's where the magic happens?

09:25:08   19  A.  In the hypothetical negotiation.  That was what I was

09:25:10   20  referencing as "the magic" yesterday.

09:25:12   21  Q.  Okay.  In your presentation with Mr. Lee, you asked for

09:25:39   22  a lump-sum royalty or a lump-sum payment, right?

09:25:46   23  A.  Yes, we discussed a lump-sum payment.

09:25:50   24  Q.  And we've talked about the report you did in this case,

09:25:53   25  right?

09:25:53   1   A.   Yes.

09:25:53   2   Q.   Did you ever talk about a lump sum in the report?

09:25:56   3   A.   I talked about settlement agreements that occurred on a

09:25:59   4   lump-sum basis, I believe.

09:26:01   5   Q.   But you didn't talk about Lone Star being entitled to a

09:26:04   6   lump sum, right?

09:26:05   7   A.   No.

09:26:06   8   Q.   Okay.

09:26:06   9   A.   I presented it as --

09:26:08   10   Q.   You've answered my question, sir.

09:26:13   11   A.   Okay.

09:26:13   12   Q.   What was the date that that lump sum payment would be

09:26:18   13   made?

09:26:19   14   A.   Well, in theory, sometime at the end of trial.

09:26:23   15   Q.   So when you -- approximately 2021 is the date of the

09:26:28   16   lump sum payment?

09:26:29   17   A.   Yes.

09:26:36   18           MR. OLIVER:  I pass the witness, Your Honor.

09:26:37   19           THE COURT:  Redirect.

09:26:45   20                   REDIRECT EXAMINATION

09:26:52   21   BY MR. LEE:

09:27:09   22   Q.   Mr. Perdue, today and yesterday, Mr. Oliver kept on

09:27:11   23   asking you about performing magic on the numbers.  Did you

09:27:16   24   perform magic on numbers?

09:27:18   25   A.   I did not.

09:27:19  1   Q.  Now, moments ago, he brought up P-94?

09:27:22  2   A.  Yes.

09:27:22  3   Q.  And asked you questions about that?

09:27:24  4   A.  Yes.

09:27:26  5        MR. LEE:  I'd like to bring up that exhibit, P-94.

09:27:32  6        THE WITNESS:  Okay.

09:27:40  7   BY MR. LEE:

09:27:42  8   Q.  Can you remind us who provided the data for this

09:27:46  9   document?

09:27:46  10  A.  ACI.  That's ASUS's U.S. subsidiary.

09:27:57  11  Q.  Now, let's -- you know -- and Columns A and B provide

09:28:00  12  what type of information?

09:28:01  13  A.  Column A is a product type, I guess you might say, and

09:28:06  14  then Product B is a model.

09:28:07  15  Q.  Okay.  If we were to go down to the model name and

09:28:07  16  click on -- for example, let's just -- like if you scroll

09:28:19  17  down, you select "all," and just select models beginning

09:28:25  18  with PA.

09:28:26  19  A.  Okay.

09:28:27  20  Q.  We're going to limit the number of data on the screen.

09:28:31  21       What does this show you right here in terms of the

09:28:34  22  spreadsheet at this point?

09:28:36  23  A.  Well, it shows us about one, two, three, four -- shows

09:28:45  24  us about 15 different items, some of which have data and

09:28:50  25  some of which don't.  Only four of those items have data.

09:28:53  1   Q.  And so that's what you mean by not being able to come

09:28:57  2   up with a product count earlier when Mr. Oliver was asking

09:29:01  3   those questions?

09:29:02  4   A.  Yeah.  So when I was doing the product counts in my --

09:29:05  5   in my work, I was looking for products that had active

09:29:09  6   sales activity for that particular year, and in the prior

09:29:13  7   years, like I said, it was basically 120 to 150 products in

09:29:17  8   any given year that were actively being sold.

09:29:20  9   Q.  Now, let's make it a little bit -- even easier.

09:29:26  10         MR. LEE:  Let's hide the Column C, which is the

09:29:29  11  customer name, all the way through to the columns that show

09:29:33  12  the 2018 data.

09:29:35  13  BY MR. LEE:

09:29:43  14  Q.  Now, what's shown on the screen right now for the --

09:29:48  15  for these products?

09:29:48  16  A.  Yeah.  So what you see there is for 2019 and 2020,

09:29:53  17  one, two, three, four, five products had activity of those

09:29:58  18  15 or so that would have had prior activity but didn't have

09:30:01  19  activity in 2019 and 2020.

09:30:04  20  Q.  Now, if I wanted to -- how would you calculate the

09:30:10  21  revenue for 2019?

09:30:14  22  A.  You would take these five products that have the

09:30:17  23  activity, and you would sum up that Net Revenue column,

09:30:22  24  which totals to 600 -- looks like 657,000 in the bottom

09:30:30  25  right.

09:30:32   1   Q.   Now, that would be the 2019 Net Revenue number?

09:30:37   2   A.   For the -- for the products with the prefix PA.

09:30:41   3   Q.   Now, did you -- when you were calculating the damages

09:30:47   4   number, did you use the full 2019 number?

09:30:50   5   A.   No.  It was prorated based upon the notice date.

09:30:56   6   Q.   And the notice date was February 20, 2019, right?

09:31:03   7   A.   Initially, yes, initially.

09:31:06   8   Q.   How -- so how would you -- walk us through how you

09:31:10   9   would prorate the 2019 Net Revenue numbers based on a

09:31:15  10   February 20th notice date.

09:31:16  11   A.   You just did the pro rata math.  You get Excel to tell

09:31:20  12   you how many days are from January 1 to February 20, and

09:31:24  13   you just look at the remaining days of the year, and you

09:31:28  14   subtract the dates, and it tells you how many days are

09:31:31  15   left.  And then you take that over 365, and you multiply

09:31:34  16   that times the numbers.

09:31:36  17   Q.   Now, if the date was June 20th, for example, 2019, how

09:31:42  18   would you do the pro rata data for the 2019-calendar year?

09:31:45  19   A.   Yep, same thing.  You would basically see how many days

09:31:48  20   that represents, and then get the pro rata ratio for the

09:31:51  21   remaining days of the year over 365 and multiply that times

09:31:55  22   the metrics that you care about.

09:31:58  23   Q.   Now, in 2020, you -- for -- the sales data goes up

09:32:02  24   through March 13, 2020; is that correct?

09:32:11  25   A.   The sales -- yes, it was to -- it was about -- it was

09:32:13  1   mid-March.  March -- because I remember two and a half

09:32:16  2   months of 2020.

09:32:17  3   Q.  And when you look at the bottom of that tab screen for

09:32:20  4   the worksheet, what does it say?

09:32:29  5   A.  Yeah, it says 03/13, 03/20, so that's the date range,

09:32:34  6   and then it's up at the period up at the top, too.  It

09:32:37  7   says, Period:  March 13 - March 20th at the top.

09:32:41  8   Q.  Did you review any ASUS sales data pertaining to the

09:32:45  9   sales of accused products after March 13, 2020?

09:32:48  10  A.  No.

09:32:50  11  Q.  Do you know why that was the case?

09:32:53  12  A.  It wasn't provided.

09:32:55  13  Q.  Provided by who?

09:32:56  14  A.  ASUS.

09:32:56  15  Q.  So how did you -- how did you calculate the 2020

09:33:05  16  numbers for your damages analysis when you didn't have the

09:33:08  17  full year of sales data that -- for 2020?

09:33:12  18  A.  You just annualize it.  You've basically got two and a

09:33:16  19  half months, so you take two and half over 12, and you

09:33:20  20  basically annualize it.

09:33:21  21  Q.  Was this a proper way to come up with 2020 numbers when

09:33:27  22  ASUS didn't provide their own sales data numbers?

09:33:30  23  A.  It was all I could do.

09:33:36  24  Q.  That covers us through 2020.

09:33:43  25           Now, 2021 is not listed on this spreadsheet.  How

| | | |
|---|---|---|
| 09:33:45 | 1 | did you come up with those numbers?  Did you perform magic? |
| 09:33:49 | 2 | A.  No, I just used the 2020 annualized data. |
| 09:33:52 | 3 | Q.  And how did you use it?  Did you assume any growth in |
| 09:33:56 | 4 | the product sales? |
| 09:33:56 | 5 | A.  I assumed no growth. |
| 09:33:57 | 6 | Q.  So you were being conservative assuming no growth? |
| 09:34:01 | 7 | A.  I believe so, especially when you look at prior sales |
| 09:34:04 | 8 | levels. |
| 09:34:04 | 9 |     So, for instance, in 2018, which is not included, |
| 09:34:08 | 10 | sales for monitors were 271,000 -- $271 million.  And then |
| 09:34:15 | 11 | in 2019, sales for monitors were $229,000, basically.  And |
| 09:34:21 | 12 | then my annualized number for 2020 was $243 million. |
| 09:34:29 | 13 |     So you can see that that annualized number is less |
| 09:34:32 | 14 | than the full year number for 2018.  So I felt like it was |
| 09:34:38 | 15 | reasonable. |
| 09:34:38 | 16 | Q.  Okay.  So it was reasonable for you to then use the |
| 09:34:45 | 17 | 2020 full year sales number to calculate what the net |
| 09:34:52 | 18 | revenue sales would have generated through say May 17th, |
| 09:34:58 | 19 | 2021? |
| 09:34:58 | 20 | A.  It's all I had.  It's all I could do. |
| 09:35:06 | 21 | Q.  How would you go about calculating the post-trial, you |
| 09:35:09 | 22 | know, numbers for net revenue? |
| 09:35:10 | 23 | A.  Yeah, you basically do -- I did the calculation through |
| 09:35:17 | 24 | patent expiration.  I did the calculation in two parts, and |
| 09:35:20 | 25 | we saw that yesterday when you put up one of my -- one of |

09:35:23  1    the calculation mechanics from my report where I did the

09:35:26  2    pretrial calculation and the post-trial calculation, and

09:35:28  3    then the total of both of those is the 2.8.

09:35:31  4    Q.  So would you figure out the May 18, 2021, through the

09:35:37  5    patent expiration date, you know, how many years that is,

09:35:43  6    or whatever the ratio, 1.6, 1.7, based on the math, then

09:35:47  7    multiply that by the 2021 number?

09:35:49  8    A.  Yeah.  Same idea, just pro rata.

09:35:51  9    Q.  Pro rata?

09:35:53  10   A.  That's right.

09:35:59  11           MR. LEE:  Can we keep the screen on, Denver?

09:36:03  12           Can we go back to the full -- and hide the model

09:36:06  13   names and just go back to full screen as the file -- as it

09:36:26  14   starts up with?

09:36:26  15   BY MR. LEE:

09:36:26  16   Q.  Do you remember, you know, Mr. Oliver made a -- asked

09:36:28  17   you questions about projectors for this spreadsheet.  Do

09:36:33  18   you remember looking at, you know, projector numbers under

09:36:39  19   the project LJ?

09:36:40  20   A.  I do.

09:36:41  21   Q.  Do you remember roughly how much in damages those

09:36:48  22   projectors accounted for your, you know, $2.8 million lump

09:36:53  23   sum?

09:36:54  24   A.  It was basically a rounding error.  It was like $6,000.

09:36:59  25   It was a very small amount of money.

09:37:00  1   Q.  So when Mr. Oliver talked earlier about 10 projectors

09:37:04  2   being no longer in the case, the impact on that

09:37:09  3   $2.8 million, based on your analysis, is how much?

09:37:13  4   A.  Like $6,000, and the number is still 2.8 if you take

09:37:17  5   that out.

09:37:18  6   Q.  Do you remember yesterday, Mr. Oliver was talking to

09:37:22  7   you about marketing, whether products -- if they're not --

09:37:41  8   if the feature is not advertised doesn't mean it's not

09:37:45  9   important -- sorry.  Excuse me.  Strike that.

09:37:50  10       Mr. Oliver questioned you yesterday:  So companies

09:37:54  11  put important features in products but don't advertise

09:37:58  12  them?

09:38:00  13       Do you remember him asking you that?

09:38:01  14  A.  I remember that line of questioning, yes.

09:38:03  15  Q.  Do you know whether ASUS puts up information on its

09:38:07  16  website about these color control features?

09:38:10  17  A.  I do.  And it excerpted some of that in my report.

09:38:14  18       MR. LEE:  Denver, P-14A, please.  If you could go

09:38:24  19  to Page 5 or 6.  Excuse me.  Page 19.

09:38:39  20  BY MR. LEE:

09:38:40  21  Q.  Is this an example of what you're talking about?

09:38:45  22  A.  Yeah, that's the kind of advertising or promotion that

09:38:48  23  a company like ASUS would do to promote this type of a

09:38:51  24  feature.

09:38:51  25  Q.  And that would include the language for -- where ASUS

| | | |
|--|--|--|
| 09:38:54 | 1 | is telling folks out there:  For example, you can adjust |
| 09:38:59 | 2 | the six colors, red, green, blue, cyan, magenta, and |
| 09:39:05 | 3 | yellow, without affecting the output of the other colors? |
| 09:39:08 | 4 | A.  Yes. |
| 09:39:09 | 5 | Q.  So, you know, by Mr. Oliver's logic, that's an |
| 09:39:13 | 6 | important feature there, and they're -- it's being |
| 09:39:14 | 7 | publicized? |
| 09:39:15 | 8 | A.  True. |
| 09:39:16 | 9 | Q.  Mr. Oliver also asked you this thing about hypothetical |
| 09:39:28 | 10 | negotiations.  Do you remember that? |
| 09:39:29 | 11 | A.  I do. |
| 09:39:30 | 12 | Q.  Who is being sued in this case? |
| 09:39:33 | 13 | A.  ASUS. |
| 09:39:34 | 14 | Q.  And who is the Plaintiff in this case? |
| 09:39:38 | 15 | A.  Lone Star. |
| 09:39:38 | 16 | Q.  What's the purpose of the hypothetical negotiation? |
| 09:39:40 | 17 | A.  It's basically saying if these parties met voluntarily |
| 09:39:47 | 18 | and wanted to do an actual transaction outside the context |
| 09:39:52 | 19 | of litigation, where would they land?  That's what you're |
| 09:39:56 | 20 | trying to figure out. |
| 09:39:57 | 21 | Q.  And you're using the Georgia-Pacific factors? |
| 09:40:00 | 22 | A.  Yes. |
| 09:40:00 | 23 | Q.  And why -- can you remind us why are you using the |
| 09:40:06 | 24 | Georgia-Pacific factors? |
| 09:40:07 | 25 | A.  Well, first of all, it's sound economic logic, and the |

09:40:11   1   Court did a good job of laying out these 15 factors.  And

09:40:14   2   in a reasonable royalty case, we're instructed to use those

09:40:19   3   factors.

09:40:20   4   Q.  So that's the factors that you as a damages expert need

09:40:23   5   to go and analyze in determining damages?

09:40:27   6   A.  That's correct.

09:40:29   7   Q.  And the purpose of doing this negotiation is to figure

09:40:35   8   out what Lone Star and ASUS would come to an agreement,

09:40:38   9   right?

09:40:38   10  A.  Right.

09:40:39   11  Q.  So did it make any sense to you when Mr. Oliver was

09:40:43   12  asking, you know, why didn't you consider Oplus

09:40:47   13  Technologies in this case -- because -- and he had provided

09:40:52   14  some reasons, right?  Did that make sense to you?

09:40:53   15  A.  I really didn't understand it, because, again, in the

09:40:56   16  construct of the hypothetical negotiation, you've got these

09:41:00   17  time lags.  There's a lot of assumptions that are made.  We

09:41:03   18  know Lone Star is the owner of the patent now.  Did it step

09:41:05   19  into the shoes of the original owner?  I don't know.

09:41:10   20         But in the construct of the hypothetical

09:41:12   21  negotiation, it makes sense to consider it, I believe the

09:41:16   22  way I did.

09:41:16   23  Q.  And this hypothetic -- hypothetical negotiation -- the

09:41:19   24  hypothetical negotiation, to be clear, is not a real-world

09:41:24   25  negotiation?

687

09:41:24  1    A.  No.

09:41:25  2    Q.  We're trying to figure out what Lone Star and ASUS

09:41:28  3    would come to an agreement?

09:41:30  4    A.  Yes.

09:41:32  5            MR. LEE:  No further questions.

09:41:34  6            THE COURT:  Redirect -- recross?

09:41:37  7            MR. OLIVER:  Yes, Your Honor.  Thank you.

09:41:40  8                    RECROSS-EXAMINATION

09:41:46  9    BY MR. OLIVER:

09:41:47  10   Q.  That last question that you were asked, the

09:41:49  11   hypothetical negotiation, you said in March of 2013?

09:41:53  12   A.  I did.

09:41:54  13   Q.  And like we talked about yesterday, some of the factors

09:41:58  14   involve the owner of the patent at the time of the

09:42:00  15   hypothetical negotiation?

09:42:01  16   A.  Yes.

09:42:03  17   Q.  So if Lone Star did not own the patent as of that date,

09:42:09  18   you wouldn't consider Lone Star at all in the negotiation,

09:42:12  19   right?

09:42:13  20   A.  But we're in this hypothetical world where you can look

09:42:16  21   forward into the future, and you make certain assumptions.

09:42:19  22   So I don't know that it's not proper to assume that Lone

09:42:22  23   Star is the ultimate owner of the patent because they were.

09:42:25  24   Q.  So aren't you supposed to set the analysis at the date

09:42:29  25   of the hypothetical negotiation?

| | | |
|---|---|---|
| 09:42:31 | 1 | A.  But one of the assumptions is this idea of perfect |
| 09:42:35 | 2 | information that you can peer into the future and you have |
| 09:42:38 | 3 | this perfect information.  I think one of the references to |
| 09:42:42 | 4 | it in some of the legal briefs that I've read is the book |
| 09:42:47 | 5 | of wisdom, the idea that you can look forward into the |
| 09:42:52 | 6 | future in this hypothetical construct. |
| 09:42:54 | 7 | Q.  Okay.  So you get to apply both magic and some unknown |
| 09:42:59 | 8 | wisdom? |
| 09:42:59 | 9 | A.  Hey, those aren't my words that -- in terms of the book |
| 09:43:04 | 10 | of wisdom.  That's the Court. |
| 09:43:06 | 11 | Q.  Okay.  But you just used them? |
| 09:43:08 | 12 | A.  I did. |
| 09:43:08 | 13 | Q.  Okay.  But let's get to the point.  March 2013 was the |
| 09:43:13 | 14 | date of the hypothetical negotiation.  If Lone Star did not |
| 09:43:15 | 15 | own the patent at that date, they would not be the party |
| 09:43:21 | 16 | considered in that negotiation, right? |
| 09:43:23 | 17 | A.  They could be if they are a successor to the original |
| 09:43:28 | 18 | owner's interest in the patent.  If they're a successor and |
| 09:43:32 | 19 | they can essentially step into their shoes, they would. |
| 09:43:36 | 20 | They essentially become that company. |
| 09:43:38 | 21 | Q.  Okay.  I understand you have said that, but we were |
| 09:43:41 | 22 | talking about the factors in Georgia-Pacific that talk |
| 09:43:44 | 23 | about the owner of the patent at the time of the |
| 09:43:45 | 24 | negotiation, right? |
| 09:43:47 | 25 | A.  Yes. |

09:43:47   1    Q.   Okay.   Thank you.

09:43:49   2         I want to go back to P-94.

09:43:58   3         MR. OLIVER:   Can you switch us over?

09:44:01   4    BY MR. OLIVER:

09:44:03   5    Q.   Do you recall Mr. Lee did a demonstration with you on

09:44:06   6    this exhibit?

09:44:07   7    A.   I do.

09:44:07   8    Q.   And I'm going to do the same thing.   You -- you went to

09:44:12   9    the -- you deselected everything, and you searched for PA;

09:44:18  10    is that right?

09:44:18  11    A.   Yes.

09:44:18  12    Q.   And then you showed a handful of models, right?

09:44:26  13    A.   Yes.

09:44:26  14    Q.   And then we looked for those models at 2019 and 2020

09:44:34  15    revenue, right?

09:44:35  16    A.   Yes.

09:44:35  17    Q.   And a bunch of those were empty?

09:44:38  18    A.   Yes.

09:44:38  19    Q.   And that's why you didn't include those in your

09:44:41  20    calculations?

09:44:42  21    A.   If it was empty, there was nothing to include.

09:44:46  22    Q.   For that product?

09:44:48  23    A.   Pardon me?

09:44:52  24    Q.   There was nothing to include for that product if it was

09:44:55  25    empty?

09:44:55  1   A.  Yeah, if it was empty, if it was a 0, there's nothing

09:44:59  2   to include.

09:44:59  3   Q.  Okay.  So for this product that I've highlighted,

09:45:05  4   PA328Q, if we scroll over to 2019 and 2020, we see nothing

09:45:14  5   in 2019 and nothing in 2020, right?

09:45:16  6   A.  Yes.  That's on Row 1044, just for reference.

09:45:22  7   Q.  Okay.  So in your calculations, you didn't include any

09:45:25  8   revenue for those years for that product?

09:45:27  9   A.  Yeah.  Scroll back.  Let's make sure.

09:45:31  10  Q.  I did.  Oh, I'm sorry, back to the --

09:45:34  11  A.  Yeah, just scroll back.  Yeah, I just wanted to make

09:45:38  12  sure where we were.

09:45:39  13         Yeah, so if it was 0 for 2019 and 2020, it would

09:45:44  14  have been a 0.

09:45:45  15  Q.  Okay.  But that's not true, right?

09:45:47  16  A.  Well, on that -- it's true for the line that we just

09:45:51  17  looked at.

09:45:52  18  Q.  You just showed me one line for that product, right?

09:45:56  19  A.  No, no, no.  For the line that you're making me look

09:46:00  20  at, 1044, there were 0s, so I used 0s from that line.

09:46:04  21  Q.  Isn't this the demonstration that Mr. Lee just had you

09:46:11  22  do to the jury?

09:46:12  23  A.  No, this is a different demonstration.

09:46:14  24  Q.  I did the same search, and I'm showing the same data,

09:46:19  25  right?

09:46:19   1   A.   But Mr. Lee didn't ask me the questions that you're

09:46:21   2   asking me about Row 1044.

09:46:23   3   Q.   But -- and then this data that's shown here is actually

09:46:25   4   just data for one customer, right?

09:46:27   5   A.   That's correct.

09:46:28   6   Q.   And so if I take off that search and I select "all," go

09:46:37   7   back to the full data set, I'm going to search for that

09:46:41   8   number, PA-- PA328Q.  Find it, right?

09:46:53   9   A.   Okay.

09:46:54  10   Q.   And then if we look at that, we see there were several

09:47:00  11   customers for that product, right, not just the one line

09:47:03  12   you showed us?

09:47:05  13   A.   All right.  I see that.

09:47:06  14   Q.   And then when we scroll back over to the right -- let

09:47:10  15   me just select those full lines -- we see that there's some

09:47:22  16   pretty significant numbers here, right?  Not the 0 number

09:47:25  17   that you gave us?

09:47:26  18   A.   Yeah.  No, these numbers would have been included if

09:47:29  19   those fields were populated.

09:47:31  20   Q.   So for all of the non-accused products that may have

09:47:35  21   had data there, you included it whether the model number

09:47:40  22   was shown or -- or not because the customers under that

09:47:46  23   model number are people that bought that product, right?

09:47:49  24   A.   I don't think I -- could you rephrase the question,

09:47:52  25   please?

09:47:52   1   Q.  Okay.  So you showed us a demonstration where you

09:47:56   2   showed just one line for each product, right, you and

09:48:00   3   Mr. Lee?

09:48:00   4   A.  When Mr. Lee did his, he was looking at one line,

09:48:03   5   that's right.

09:48:04   6   Q.  Okay.  And some of those showed no data in 2019 or

09:48:07   7   2020, right?

09:48:08   8   A.  That's -- that's correct.

09:48:09   9   Q.  But he didn't actually show us the full set of data

09:48:13   10  that you included in your calculations for 2019 and 2020

09:48:15   11  for those products, right?

09:48:17   12  A.  Well, let's be clear.  You're showing me something

09:48:21   13  different than he showed me, and some of those products

09:48:24   14  have revenue and it would have been included in my

09:48:27   15  analysis.

09:48:28   16  Q.  But Mr. Lee didn't show that on the screen just now?

09:48:35   17  A.  What he showed was something different.

09:48:37   18  Q.  Okay.

09:48:39   19       MR. OLIVER:  No further questions, Your Honor.

09:48:40   20       THE COURT:  Mr. Lee.

09:48:49   21       MR. LEE:  P-94, Denver.

09:48:52   22            FURTHER REDIRECT EXAMINATION

09:48:52   23  BY MR. LEE:

09:48:53   24  Q.  And just to be clear, for the -- for that -- you know,

09:48:57   25  testimony earlier about how you would calculate the net

09:48:59  1   revenue for 2019, 2020, through the end of trial, once you

09:49:05  2   get those numbers, how did you calculate the damages?

09:49:10  3   A.  Yeah, so any numbers for revenue -- for quantity -- net

09:49:16  4   quantity, net revenue, or net cost that was in these

09:49:20  5   spreadsheets for 2019 and 2020 was included in my

09:49:24  6   calculation.

09:49:24  7   Q.  And you multiplied it by the apportionment rate?

09:49:29  8   A.  I multiplied the net revenue by the 14 percent

09:49:34  9   apportionment rate, that's correct.

09:49:35  10  Q.  Then what would you do next to figure out the number?

09:49:39  11  A.  Then I applied the 2.3 percent royalty rate against

09:49:43  12  that apportioned royalty base, and that comes up to an

09:49:46  13  effective royalty rate of three-tenths of 1 percent.

09:49:50  14  Q.  And that was the methodology of how you used the data

09:49:54  15  to calculate the damages numbers?

09:49:56  16  A.  Yes.

09:49:57  17          MR. LEE:  No further questions, Your Honor.

09:50:00  18          MR. OLIVER:  No further questions.

09:50:01  19          THE COURT:  All right.  You may step down.

09:50:03  20          Call your next witness.

09:50:04  21          MR. BENNETT:  Your Honor, Plaintiff rests.

09:50:07  22          THE COURT:  Okay.  Very well, Mr. Bennett.  Thank

09:50:10  23  you very much.

09:50:12  24          Subject to some legal matters that the attorneys

09:50:15  25  and I need to discuss later on outside your presence, the

09:50:20  1   Defendant may call its first witness.

09:50:23  2            MR. JOSHI:  Your Honor, we call Jaime Morquecho

09:50:35  3   who will be joining us remotely.

09:50:38  4            THE COURT:  All right.  Is it set up?

09:50:42  5            MR. JOSHI:  Mr. Morquecho -- Morquecho has joined,

09:50:45  6   we just need to --

09:50:46  7            THE COURT:  All right.  There he is.

09:51:07  8            Mr. Joshi, Mrs. Schroeder will need to swear in

09:51:09  9   the witness.

09:51:11  10            (Witness sworn.)

09:51:22  11            THE COURT:  Okay.  Mr. Joshi, you may proceed.

09:51:24  12            MR. JOSHI:  Thank you, Your Honor.

09:51:25  13            JAIME MARQUECHO, DEFENDANT'S WITNESS, SWORN

09:51:27  14                       DIRECT EXAMINATION

09:51:27  15   BY MR. JOSHI:

09:51:28  16   Q.  Good morning, Mr. Morquecho.

09:51:30  17   A.  Good morning.

09:51:31  18   Q.  Would you please state your full name?

09:51:34  19   A.  My full name is Jaime Morquecho.

09:51:38  20   Q.  And where do you live and work, Mr. Morquecho?

09:51:41  21   A.  I live in San Jose, California, and I work for ASUS

09:51:52  22   Computer International.

09:51:52  23   Q.  Okay.  And what is the relationship between ASUS --

09:51:56  24   well, strike that.

09:51:57  25            Do you know the relationship between ASUS Computer

| | | |
|---|---|---|
| 09:52:07 | 1 | International and ASUSTeK Computer, Inc.? |
| 09:52:09 | 2 | A.  ASUS Computer International is a U.S. subsidiary. |
| 09:52:14 | 3 | Q.  Okay.  So the subsidiary, may I refer to that as ACI, |
| 09:52:25 | 4 | in short? |
| 09:52:25 | 5 | A.  Yes.  That's what we call it, yes. |
| 09:52:27 | 6 | Q.  And ACI is located in which country? |
| 09:52:30 | 7 | A.  It's in the United States. |
| 09:52:32 | 8 | Q.  How many people work at ACI? |
| 09:52:37 | 9 | A.  Approximately 300 to 350. |
| 09:52:46 | 10 | Q.  And where are these employees located within the United |
| 09:52:51 | 11 | States? |
| 09:52:51 | 12 | A.  The majority are in Freemont, California. |
| 09:52:54 | 13 | Q.  Do you know a gentleman by the name of Michael McCrady? |
| 09:53:03 | 14 | A.  Yes, I'm familiar with Michael. |
| 09:53:06 | 15 | Q.  Who is Mr. McCrady? |
| 09:53:09 | 16 | A.  We're colleagues at ACI. |
| 09:53:13 | 17 | Q.  And where does he work, geographically, do you know? |
| 09:53:17 | 18 | A.  He works remotely in Texas. |
| 09:53:20 | 19 | Q.  What services does ACI provide? |
| 09:53:29 | 20 | A.  We provide customer service for the products that are |
| 09:53:37 | 21 | sold, and there's sales and marketing. |
| 09:53:40 | 22 | Q.  Okay.  Are you aware of specific initiatives that |
| 09:53:55 | 23 | ASUSTeK Computer, Inc., has in the United States? |
| 09:54:01 | 24 | A.  Well, our initiatives, we want to grow in the |
| 09:54:05 | 25 | commercial space, K through 12 specifically, for education. |

09:54:13  1   Q.  And would those initiatives occur through ACI?

09:54:17  2   A.  Yes.

09:54:17  3   Q.  Did you -- strike that.

09:54:26  4       Are you familiar with how sales activity happens

09:54:30  5   in the United States for ASUSTeK's products?

09:54:34  6   A.  For sales activity, we have sales account managers that

09:54:43  7   will interface with distributors or resellers and collect

09:54:50  8   demand from -- from those parties, and they will place

09:54:53  9   orders from headquarters, which is overseas.  And, you

09:54:59  10  know, we would import those products based on -- on those

09:55:04  11  demand or those orders, and they would be, then, sent to

09:55:08  12  the related distributors or resellers.

09:55:10  13  Q.  When -- strike that.

09:55:18  14      Would you give -- strike that.

09:55:22  15      Do you know who resellers and distributors and

09:55:25  16  customers of ASUS products are in the United States?

09:55:29  17  A.  We're aware of the resellers and distributors.  Those

09:55:34  18  would be our customers.

09:55:35  19  Q.  Could you give some examples?

09:55:38  20  A.  One example of a distributor could be SYNNEX, for

09:55:47  21  example.  An example of a reseller could be -- you can say

09:55:52  22  Amazon.

09:55:56  23  Q.  How do ASUS products arrive in the United States?

09:56:05  24  A.  They -- they are imported, and they'll arrive by ocean,

09:56:12  25  for example.

09:56:13   1   Q.  Are they already packaged when they arrive?

09:56:15   2   A.  Yes.

09:56:16   3   Q.  Are they packaged in boxes when they arrive -- when

09:56:21   4   they arrive?

09:56:22   5   A.  That's correct, yes.

09:56:24   6   Q.  Does anyone at ACI open those boxes before the products

09:56:32   7   are sent to the customers?

09:56:33   8   A.  In general, no, since those products are sent to a

09:56:41   9   third-party warehouse, so all those materials and products

09:56:46  10   are delivered to third-party warehouses.

09:56:51  11   Q.  Okay.  And the products that arrive in the United

09:56:57  12   States, are they only for sale in the United States, or are

09:57:01  13   they further distributed to different countries?

09:57:06  14   A.  Depends on the order, but for the majority, if they go

09:57:11  15   through United States or imported through United States,

09:57:15  16   there are other territories that the products then may --

09:57:19  17   may go to, as well, depending on who's the purchaser.

09:57:23  18   Q.  Could you name some of those territories outside the

09:57:26  19   United States?

09:57:27  20   A.  It would be South America.

09:57:32  21   Q.  Could it be Canada?

09:57:35  22   A.  It -- well, it could be Canada for North America, but

09:57:42  23   for South America, it would be other countries, yes.

09:57:47  24        MR. JOSHI:  Just one second, Mr. Morquecho.

09:57:50  25        Your Honor, may I consult momentarily?

09:57:59  1              THE COURT:  Yes.

09:57:59  2    BY MR. JOSHI:

09:58:00  3    Q.  Mr. Morquecho, thank you very much for your time.  I

09:58:03  4    have no further questions.

09:58:04  5    A.  Thank you.

09:58:05  6              THE COURT:  Cross-examination?

09:58:06  7                    CROSS-EXAMINATION

09:58:10  8    BY MR. BENNETT:

09:58:15  9    Q.  Good morning, Mr. Morquecho.

09:58:16  10             I have really just one question.  You will agree

09:58:19  11   with me, won't you, sir, that companies that use the

09:58:22  12   patented technology -- patented technology of a patent

09:58:25  13   owner should use that technology only if they have licensed

09:58:30  14   that technology.

09:58:32  15             MR. JOSHI:  Objection, Your Honor, outside the

09:58:37  16   scope of the direct.

09:58:37  17             THE COURT:  Overruled.

09:58:39  18             THE WITNESS:  In my -- my personal opinion, yes.

09:58:42  19   I would assume so.

09:58:44  20   BY MR. BENNETT:

09:58:44  21   Q.  And if a company uses patented technology that they

09:58:49  22   haven't licensed, they should pay for that, right?

09:58:53  23   A.  It is my personal opinion, yes.

09:58:58  24             MR. BENNETT:  No more questions, Your Honor.

09:59:00  25             THE COURT:  Redirect?

```
09:59:01   1              MR. JOSHI:  Nothing further.

09:59:02   2              THE COURT:  Okay.  Thank you, sir.  You're

09:59:04   3    dismissed.

09:59:06   4              THE WITNESS:  Thank you.

09:59:06   5              THE COURT:  Call your next witness.

09:59:08   6              MR. JOSHI:  Your Honor, our next witness is our

09:59:22   7    expert witness, Dr. Robert Stevenson.

09:59:25   8              THE COURT:  Okay.  Dr. Stevenson.

09:59:27   9              Dr. Stevenson, if you would raise your right hand

09:59:46  10    to be sworn.

09:59:47  11              (Witness sworn.)

10:00:01  12              MR. JOSHI:  Your Honor, we -- the parties have an

10:00:04  13    agreement that we can give our experts binders.  May I

10:00:08  14    approach?

10:00:08  15              THE COURT:  Yes, you may.

10:00:14  16    ROBERT LEWIS STEVENSON, PH.D., DEFENDANT'S WITNESS, SWORN

10:00:15  17                       DIRECT EXAMINATION

10:00:15  18    BY MR. JOSHI:

10:00:22  19    Q.  Good morning, Dr. Stevenson.

10:00:25  20    A.  Good morning.

10:00:25  21    Q.  Could you please state your full name for the record?

10:00:31  22    A.  Robert Louis Stevenson.

10:00:34  23    Q.  And where do you live, Dr. Stevenson?

10:00:36  24    A.  I live in Michigan.

10:00:38  25    Q.  Okay.  What is your profession?
```

| | | |
|---|---|---|
| 10:00:42 | 1 | A.  I'm a professor of electrical engineering at the |
| 10:00:47 | 2 | University of Notre Dame. |
| 10:00:48 | 3 | Q.  When did you start teaching at Notre Dame? |
| 10:00:51 | 4 | A.  A little over -- almost 31 years ago, 1990. |
| 10:00:55 | 5 | Q.  What is your specialty? |
| 10:00:57 | 6 | A.  Well, I'm an electrical engineering professor, so I |
| 10:01:03 | 7 | design electrical systems.  My research activities in -- |
| 10:01:07 | 8 | what I spend a lot of my time on is video and imaging |
| 10:01:10 | 9 | systems.  I've been doing that work since the '80s. |
| 10:01:14 | 10 | Q.  And what level of students do you teach? |
| 10:01:17 | 11 | A.  Excuse me? |
| 10:01:19 | 12 | Q.  Which level of students do you teach?  Undergraduate? |
| 10:01:22 | 13 | Graduate?  Postgraduate? |
| 10:01:23 | 14 | A.  Well, I teach all levels.  This semester ended last |
| 10:01:26 | 15 | week.  I'm teaching a junior level undergraduate class, but |
| 10:01:32 | 16 | depending on the semester, I'll teach graduate classes, and |
| 10:01:35 | 17 | five or six postdoctoral students also. |
| 10:01:40 | 18 | Q.  So your full-time job is an electrical engineering |
| 10:01:45 | 19 | professor; is that correct? |
| 10:01:46 | 20 | A.  Yes. |
| 10:01:46 | 21 | Q.  You do consulting work in addition to teaching |
| 10:01:54 | 22 | students? |
| 10:01:54 | 23 | A.  Yes. |
| 10:01:55 | 24 | Q.  Could you give us some examples of the type of |
| 10:01:59 | 25 | consulting work you've done? |

10:02:01  1   A.  Well, both inside my work with Notre Dame and outside,

10:02:05  2   I work with a lot of different companies and

10:02:11  3   U.S. government.  You know, within the university context,

10:02:13  4   I do research.  So in addition to teaching class, I spend a

10:02:16  5   lot of my time doing research activities in this area of

10:02:19  6   video image processing.

10:02:21  7          To do that, I get funding from the U.S. government

10:02:24  8   and from companies.  I have worked with companies like

10:02:29  9   Apple, Intel, Motorola.  But I've also worked with lots of

10:02:40  10  agencies within the U.S. government.  You know, I spent

10:02:41  11  some time at the Air Force in the Air Force Research Lab.

10:02:44  12  I've also most recently have had money from the U.S. Navy.

10:02:49  13  I also had money from things like the national security

10:02:51  14  agency.  That's kind of within the university job and doing

10:02:55  15  the research.

10:02:56  16         Outside of that, I've -- I have done various

10:02:58  17  consulting, both technical and this sort of litigation-type

10:03:01  18  consulting.

10:03:02  19         From there, that opens up another range of kind of

10:03:05  20  companies, big and small, that I worked with and got to

10:03:10  21  learn about what they're doing and help them do what

10:03:13  22  they're doing.  Lots of companies you would have heard of,

10:03:20  23  like Google, Apple again, Microsoft.  It's a very long

10:03:27  24  list.  Samsung.

10:03:30  25  Q.  When did you first start doing work for Apple?

10:03:34   1   A.   Back in the '90s, I started a relationship with Apple.

10:03:42   2   They were funding my research at the university and giving

10:03:45   3   me equipment.   This is where I began working on this kind

10:03:50   4   of color problem, color adjustment problem, color

10:03:53   5   calibration problem.

10:03:54   6        I was working with them.   They had recently

10:03:56   7   started developing a product to deal with the fact that

10:04:01   8   when we build monitors, they can vary from monitor to

10:04:06   9   monitor.   What one person decides red is, someone else can

10:04:10  10   decide is a slightly different shade of red.

10:04:13  11        That's fine if you just have maybe one monitor,

10:04:15  12   but when you start having lots of monitors, you go from one

10:04:19  13   to one, you see variations, and that's not good.

10:04:21  14        And so this is where we wanted to do some sort of

10:04:23  15   additional processing before we put the signal on the

10:04:26  16   screen in order to do some sort of adjustment.   This really

10:04:30  17   became a big issue -- well, it was always kind of a big

10:04:34  18   issue, even back in -- before this, but in the kind of

10:04:36  19   computer world, it became a big issue in the -- in

10:04:40  20   the '90s.   And companies like Apple were looking to solve

10:04:44  21   that problem, and they were working with people like me to

10:04:47  22   come up with solutions.

10:04:48  23   Q.   What do you like about teaching?

10:04:50  24   A.   Well, I like -- I like working with students.   I like

10:04:56  25   helping students and helping them -- bringing them along.

10:04:59   1   You know, I -- as I said, I teach undergraduates and

10:05:01   2   graduates.  Also recently I -- about five years I think

10:05:07   3   now, I took on the role as associate chair of the

10:05:12   4   department in which I oversee the undergraduate program.

10:05:15   5   So I kind of manage the undergraduate program and work with

10:05:19   6   all the students who are studying electrical engineering.

10:05:25   7        THE COURT:  Dr. Stevenson, can I ask you to speak

10:05:28   8   a little more directly into the mic, please?  Thank you.

10:05:31   9        THE WITNESS:  Sure.

10:05:32  10   BY MR. JOSHI:

10:05:32  11   Q.  Dr. Stevenson, have you provided expert opinions in

10:05:35  12   this case?

10:05:35  13   A.  Yes, I have.

10:05:36  14   Q.  Okay.  And you have a binder that I gave you.  In the

10:05:41  15   front of the binder, there is a patent.

10:05:50  16        Do you recognize this document?

10:05:52  17   A.  Yes, it's the patent at issue in this case, the

10:05:58  18   so-called '435 patent.

10:05:59  19   Q.  And have you issued any opinions related to this patent

10:06:03  20   in this case?

10:06:03  21   A.  Yes, I have.

10:06:04  22   Q.  And what are the subjects on which you have issued

10:06:09  23   opinions?

10:06:09  24   A.  I have written two reports.  One looking at the

10:06:14  25   infringement, and one looking at the validity of the

```
10:06:17   1   patent.  So I have offered opinions about infringement and
10:06:20   2   validity.
10:06:22   3   Q.  In the folder that I gave you, there's a Tab 2E.
10:06:33   4        Please tell me if you recognize that document.
10:06:38   5   A.  2B?
10:06:40   6   Q.  One second.  I may have misspoken.
10:07:16   7        Were you here in the courtroom yesterday when
10:07:20   8   Dr. Ducharme testified?
10:07:21   9   A.  Yes, I was.
10:07:23  10   Q.  And he testified about a patent that we refer -- we
10:07:32  11   referred to as the Brett patent.  Do you recall that?
10:07:35  12   A.  Yes.
10:07:35  13   Q.  Have you yourself reviewed the Brett patent?
10:07:40  14   A.  Yes, I have.
10:07:41  15   Q.  Okay.
10:07:48  16        MR. JOSHI:  Mr. Oliver, may please have DX-3 --
10:07:53  17   I'm sorry -- DX-9 brought up?
10:07:58  18   BY MR. JOSHI:
10:07:58  19   Q.  Is this document familiar to you, sir?
10:08:00  20   A.  Yes, this is the Brett patent you just mentioned.
10:08:06  21   Q.  And what is it date on which this patent issued?
10:08:12  22   A.  It would have been December 15, 1998.
10:08:18  23   Q.  Well, what is the significance of that date in this
10:08:22  24   litigation?
10:08:22  25   A.  Well, I think you've seen already that the so-called
```

| | | |
|---|---|---|
| 10:08:26 | 1 | priority date of the '435 was, I believe, in -- was it |
| 10:08:34 | 2 | 2001? |
| 10:08:34 | 3 | Q.  Please feel free to take a look at the patent. |
| 10:08:38 | 4 | A.  The priority date was in -- yeah, 2001, August 6, 2001. |
| 10:08:44 | 5 | So this is well before that date.  This issued -- this was |
| 10:08:48 | 6 | publically available in 1998.  So this is a piece of prior |
| 10:08:51 | 7 | art.  It's clearly something that occurred before the '435 |
| 10:08:54 | 8 | invention. |
| 10:08:54 | 9 | Q.  You used the word -- you used the words "prior art." |
| 10:08:56 | 10 | Could you tell members of the jury what prior art is? |
| 10:09:00 | 11 | A.  Well, one of the issues we look at is whether, you |
| 10:09:05 | 12 | know, the '435 patent is a valid patent.  And there's a |
| 10:09:10 | 13 | couple different ways that something could have gone wrong, |
| 10:09:13 | 14 | and it got granted, but it wasn't really valid. |
| 10:09:17 | 15 |          One of the things is, is to look at pieces of |
| 10:09:19 | 16 | prior art and see if someone had come up with the invention |
| 10:09:22 | 17 | before the inventors of the '435 had came up with the |
| 10:09:29 | 18 | invention, the idea being that whoever came up with the |
| 10:09:32 | 19 | invention first is the one who deserves the -- the patent |
| 10:09:34 | 20 | protection offered by the U.S. government.  And so the fact |
| 10:09:36 | 21 | that this is beforehand, it makes it what's called prior |
| 10:09:39 | 22 | art. |
| 10:09:39 | 23 | Q.  And in rendering your expert opinion, did you compare |
| 10:09:45 | 24 | what is disclosed in the Brett patent with the asserted |
| 10:09:50 | 25 | claims of the '435 patent? |

10:09:50  1   A.  Yes.

10:09:51  2   Q.  Please tell us what you concluded.

10:09:57  3   A.  I concluded that the '435 patent was invalid based on

10:10:02  4   being anticipated by Brett.

10:10:04  5   Q.  In addition to anticipation, did you also make any

10:10:12  6   determinations about obviousness?

10:10:14  7   A.  Yes, I also formed the opinion that if there was any

10:10:21  8   element missing, it was an obvious thing to include into

10:10:23  9   Brett.

10:10:23  10  Q.  Did you -- could you tell -- you used the word

10:10:28  11  "anticipation" and "obviousness."  Could you tell members

10:10:31  12  of the jury what those words mean?

10:10:32  13  A.  The idea of anticipation is that when you're looking at

10:10:41  14  this issue of validity and you're looking at the -- this

10:10:43  15  piece of prior art, whether you can find all the elements

10:10:46  16  in this one piece of prior art -- if I could find

10:10:49  17  everything being taught that the invention of the '435 is

10:10:54  18  directed at within Brett, that's anticipation.

10:11:00  19        Now, you go a little further than that because

10:11:02  20  there's things that are pretty obvious to anyone, and

10:11:05  21  especially those of skill in the art, people who would be

10:11:08  22  reading this patent.  You know, if they leave out -- leave

10:11:10  23  out a minor detail that people of skill in the art know,

10:11:15  24  then it's not anticipated because it's not literally there,

10:11:22  25  but it would have obvious to a person of ordinary skill in

```
10:11:26   1   the art.  And so that's why we also say this idea of
10:11:29   2   obviousness.
10:11:35   3          MR. JOSHI:  Mr. Oliver, please help me switch back
10:11:38   4   and forth a little bit between the '435 patent and the '471
10:11:44   5   patent, which is the Brett patent.  So will you please
10:11:47   6   bring up for me Claim 1 of the '435 patent, which is in
10:11:50   7   DX-1.
10:11:52   8   BY MR. JOSHI:
10:12:09   9   Q.  Dr. Stevenson, what does the preamble of Claim 1 say?
10:12:16  10   A.  Well, you know, when I start looking at a claim, I
10:12:18  11   start at the beginning, and quite often, there's a -- kind
10:12:22  12   of sentence that, you might say, that sets the stage before
10:12:24  13   we start getting to the individual elements.  That's called
10:12:27  14   the preamble.  It's that beginning language you see in
10:12:30  15   Claim 1:  A method for independently controlling hue or
10:12:34  16   saturation of individual colors in a real time digital
10:12:37  17   video image, comprising the steps of.
10:12:42  18          Kind of setting the stage for all the elements of
10:12:44  19   the claim.  It's called the preamble.
10:12:48  20          MR. JOSHI:  Could we please go up to the abstract
10:12:51  21   of the Brett patent?
10:12:54  22   BY MR. JOSHI:
10:12:55  23   Q.  Dr. Stevenson, could you tell us what an abstract is in
10:12:58  24   a patent?
10:12:59  25   A.  Well, on the front page of the patent, there's some
```

10:13:03   1   information you've already seen, things like the issue
10:13:06   2   date, the priority date.  Quite often, a diagram that --
10:13:09   3   kind of the main diagram in the patent.  One of the things
10:13:14   4   is an abstract, just a -- kind of a relatively short
10:13:17   5   paragraph that kind of explains what the context of the
10:13:21   6   patent is.  It'll be read quickly, and you get an idea of
10:13:25   7   what you're going to be seeing in the patent.
10:13:27   8   Q.  Is there anything in the abstract of the Brett patent
10:13:33   9   that you would like the ladies and gentlemen of the jury to
10:13:35  10   know?
10:13:35  11   A.  So this is an overview of Brett, this piece of prior
10:13:38  12   art.  And if you just start reading from the first
10:13:40  13   sentence:  A digital video processing system for correcting
10:13:43  14   video color and other attributes.
10:13:47  15        So talking about a digital video processing
10:13:50  16   system.  That's what, you know, the '435 is about, is a
10:13:56  17   video processing system.  And it's one for correcting
10:13:59  18   color, so it's kind of the same area, same field as
10:14:06  19   the '435.
10:14:07  20   Q.  Let's go back to the preamble of Claim 1.
10:14:18  21        MR. JOSHI:  Andrew?
10:14:21  22   BY MR. JOSHI:
10:14:24  23   Q.  Okay.  You just read the preamble to the jury,
10:14:27  24   Dr. Stevenson.  Can you tell the jury where what's
10:14:34  25   disclosed in this preamble is disclosed in Brett?

10:14:40  1   A.  Sure.  The --

10:14:43  2       MR. JOSHI:  Go back to Brett, please.

10:14:56  3   A.  You know, there's a couple of ideas in the preamble

10:14:59  4   that we saw, the idea of independently controlling hue and

10:15:05  5   saturation of individual colors and the idea of the real

10:15:12  6   time digital video processing system, right?

10:15:15  7       If you go to the abstract and you go down a little

10:15:17  8   bit, you will see a sentence, starts with:  Only the pixels

10:15:28  9   and/or regions of a video picture to be modified are

10:15:32  10  processed so that most pixels which are unmodified remain

10:15:36  11  free from any potential corruption -- that is, you know,

10:15:40  12  this idea of we're going to modify some of the pixels,

10:15:43  13  we're not going to modify all of the pixels.

10:15:46  14      THE WITNESS:  If we go down to the diagram that's

10:15:48  15  at the bottom of the page, blow that up a little bit.

10:15:53  16  A.  Now, this gets into the nitty-gritty details that only

10:16:02  17  an engineer like me would love.  But this is kind the block

10:16:06  18  diagram of how this system is going to operate.  And what

10:16:09  19  we have along the top is what we call the video pipeline.

10:16:12  20  It's where the video comes in on the left on the input, and

10:16:16  21  on the right is the output.  And all the video gets

10:16:19  22  processed as it flows somewhat through that pipeline.

10:16:23  23      And I pointed out -- we'll get back to this in a

10:16:28  24  little bit when we talk about some of the other elements --

10:16:31  25  but you'll -- kind of in the middle of the page, you'll see

10:16:34  1  things like hue and saturation.  That's -- you know, that's

10:16:37  2  what allows the Brett -- excuse me, the -- yeah,

10:16:43  3  Brett allows the adjustment of that, which allows -- it

10:16:44  4  does them separately, on two separate lines there, so this

10:16:47  5  idea of independently controlling is there.

10:16:49  6          And so we'll -- we'll come back to it as we talk

10:16:54  7  about some of the other elements, but that idea is also

10:16:58  8  going to be found in Brett.

10:16:59  9          Then finally, there's this idea of the real time

10:17:03  10  digital video system, which you can look at a couple of

10:17:08  11  different things.  I think if we go to Brett --

10:17:20  12          THE WITNESS:  Can I get a copy of Brett?

10:17:22  13          MR. JOSHI:  Yeah, it's in your binder.  Let me

10:17:28  14  give you a copy of Brett.  One second.

10:17:56  15          Your Honor, may I approach?

10:17:57  16          THE COURT:  You may.

10:18:16  17  A.  I'll point you to a couple of different things as we

10:18:19  18  talk about the real time digital video processing system.

10:18:24  19          THE WITNESS:  If we go to Column 9 around --

10:18:26  20  starting around Line 10 -- yeah, that's good right here.

10:18:44  21  The -- you'll see it kind of begins toward the top of the

10:18:48  22  -- scroll down a little further.  Right there.  Stop right

10:19:05  23  there.

10:19:06  24  A.  You see at the top of that, what's there, it says:  The

10:19:09  25  DCP -- DCP stands for digital color processer; that's

10:19:14   1   what's going to happen here -- is capable of operating in

10:19:17   2   the following modes.  And it lists four modes there.

10:19:21   3          The first one is kind of on the most point:

10:19:26   4   Standard definition, main path; standard definition

10:19:29   5   modification path in real time.  It's talking about the

10:19:33   6   video path that I just pointed out, the pipeline, the fact

10:19:36   7   that that's going to operate in real time.

10:19:38   8          There are other ones that -- you know, other modes

10:19:42   9   of operation that are not real time, and so it discloses

10:19:46  10   both kind of real time operation and non-real time

10:19:49  11   operation.  And then at the bottom, after (d), you can see

10:19:51  12   that in all these cases, the pixel depth is 10 bits.

10:19:55  13   That's telling you it's a digital signal, so it's a digital

10:20:00  14   video processing system that's going to do color

10:20:03  15   processing.

10:20:03  16          One of the modes of operation is in real time.

10:20:10  17   There are other things we could point to that kind of

10:20:13  18   emphasizes this idea that it's a digital video processing

10:20:16  19   system that operates in real time.

10:20:24  20          If we go to Column 22, there's a section there

10:20:28  21   about Line 6 that starts:  Alternative implementations.

10:20:48  22   Yeah, so this is talking about kind of these different

10:20:50  23   modes of operations.  Right after you see -- there's kind

10:20:52  24   of an acronym, ASIC there.  Right after that, you can see a

10:20:56  25   sentence that begins:  At present, such an embodiment

10:20:59   1   provides a cost effective solution for processing digital

10:21:03   2   video images in real time, i.e., at the rate of video as

10:21:08   3   seen on television screens.

10:21:09   4         So, again, it's the idea that we have a digital

10:21:12   5   video signal, we're going to do color correction on it.  We

10:21:16   6   can do this in real time for a TV signal.

10:21:20   7   BY MR. JOSHI:

10:21:20   8   Q.  Okay.  Thank you, Dr. Stevenson.

10:21:21   9         Were you there in the courtroom yesterday when

10:21:25   10  Dr. Ducharme testified?

10:21:26   11  A.  Yes.

10:21:32   12  Q.  Did you -- were you listening when he was talking about

10:21:36   13  Brett and real time?

10:21:37   14  A.  Yes.

10:21:38   15  Q.  What is your understanding of his opinion about Brett

10:21:40   16  and real time?

10:21:41   17  A.  I find his position somewhat confusing, I guess.

10:21:45   18  The -- Brett does talk about real time and non-real time

10:21:52   19  operation, clearly.  There's parts of the language you

10:21:55   20  could point to that says non-real time operation.  And in

10:21:58   21  part, that's because one of the applications they

10:22:02   22  envisioned was this idea of a telecine, which is how we

10:22:11   23  transfer movies to video.

10:22:15   24         Upfront you have a movie projector in some sense,

10:22:15   25  and then you throw a piece of electronics after it that can

10:22:18   1   do this color correction.  That's the idea.  This is a

10:22:22   2   digital video processing system.  It's going to take that

10:22:25   3   movie signal that comes out, make it digital, and process

10:22:28   4   it doing the color correction.

10:22:30   5        Depending on the type of video you want, the

10:22:32   6   system at this time was able to do it in real time or

10:22:35   7   non-real time.  If you wanted to do like an IMAX movie,

10:22:39   8   probably couldn't do that in real time.  So that's why you

10:22:43   9   have this non-real time operating mode.

10:22:46  10        But if you wanted to do something that you can put

10:22:48  11   on broadcast television at the time, it could do that in

10:22:52  12   real time.  So that's why it had multiple modes of the

10:22:55  13   operation.  I mean, it's certainly okay that Brett teaches

10:23:00  14   multiple modes.  That doesn't cause a problem.

10:23:03  15        Dr. Ducharme seemed to only focus on the fact that

10:23:07  16   while it did non-real time, it seemed to ignore the fact

10:23:10  17   that it also could do this real time operation.  I'm not

10:23:15  18   sure I understand why he selectively picked only parts of

10:23:19  19   the piece of art to look at that.

10:23:21  20        MR. JOSHI:  Mr. Oliver, could we please go to

10:23:42  21   Figure 12?  I'm sorry, maybe not Figure 12.  Could you --

10:23:49  22        THE WITNESS:  Figure 13?

10:23:52  23        MR. JOSHI:  Yeah, could you please go to

10:23:54  24   Figure 13?

10:23:55  25   BY MR. JOSHI:

10:23:55    1    Q.  Dr. Stevenson, what is shown in Figure 13 of Brett
10:23:58    2    which is DX-3?
10:24:00    3    A.  This is another part of the teaching of Brett that
10:24:02    4    shows kind of a block diagram to teach someone how to use
10:24:06    5    Brett.  And, again, it shows a digital video processing
10:24:11    6    system.  It's showing input video, digital video, right?
10:24:17    7    YUV, you've seen that term floating around.  That's a color
10:24:22    8    video.  The format there, it's 10-bit 444 format.  That is
10:24:26    9    a notation that an engineer would understand is a digital
10:24:30   10    video signal format.  So it takes digital video in, and it
10:24:34   11    produces HDTV out.  That's, you know, what you watch in
10:24:39   12    your home today, right, is HDTV.  It's a digital video
10:24:43   13    system, a video display device.
10:24:47   14           So, again, it's a real time digital video system
10:24:49   15    that takes digital video and processes and displays images.
10:24:55   16    It's somewhat irrelevant that it also talks about this idea
10:24:58   17    of taking film and putting it through it.
10:25:01   18    Q.  Thank you, Dr. Stevenson.
10:25:14   19           MR. JOSHI:  I just want to make a correction to
10:25:06   20    something I said incorrectly.  I called this Exhibit DX-3.
10:25:12   21    It should be DX-9.
10:25:20   22           Let's go back to Claim 1 of the '435 patent.
10:25:27   23    BY MR. JOSHI:
10:25:28   24    Q.  The first limitation or Limitation (a) of Claim 1 of
10:25:32   25    the '435 patent is:  Receiving and characterizing the real

10:25:35  1  time digital video input image featuring input image

10:25:44  2  pixels.

10:25:44  3       Dr. Stevenson, does Brett disclose this

10:25:46  4  limitation?

10:25:47  5  A.  Yes.  This idea is just the fact we're going to get

10:25:50  6  digital video in, and we're going to look at it in some

10:25:52  7  color space.  We talked about -- you've heard about RGB,

10:25:57  8  you've heard about YUV.  Brett does that.

10:26:00  9       If we look at Figure 4 -- 4A, which is part of

10:26:06  10  that diagram that was shown on the front page we've already

10:26:19  11  seen a little bit of.  This -- on the front page, they kind

10:26:21  12  of combine Figure 4A and 4B, kind of side by side.  So in

10:26:25  13  this figure we're looking at kind of the front half of it.

10:26:31  14  We'll see at the top there is an input side, goes into

10:26:35  15  Block 1.  This is where it's receiving the video and doing

10:26:41  16  this characterization.  It's moving it into --

10:26:43  17       MR. LIDDLE:  Objection, Your Honor.  Narrative

10:26:46  18  answer.

10:26:46  19       THE COURT:  You need to break it up.

10:26:48  20       MR. JOSHI:  I didn't -- I'm sorry.  I didn't

10:26:50  21  hear --

10:26:51  22       THE COURT:  The objection was it's a narrative

10:26:53  23  answer.  Can you break it up just a little bit?

10:26:55  24       MR. JOSHI:  Sure.  Sure.

10:27:06  25  BY MR. JOSHI:

10:27:07   1   Q.  With respect to Limitation 1(a), could you just show us

10:27:12   2   where Brett discloses what's written in 1(a), which is

10:27:12   3   receiving and characterizing the real time digital video

10:27:16   4   input image featuring input image pixel -- pixels?

10:27:19   5   A.  It receives it into Block 1 there and does the

10:27:23   6   characterization by converting it into YUV, which is that

10:27:28   7   digital color space we talked about.  You can see a

10:27:32   8   description of that block in the patent.  If you look at

10:27:56   9   Column 8, around Line 25 -- more like 29, it talks about

10:28:16  10   that Element 1, which is that input block we were just

10:28:18  11   looking at in Figure 4.  It talks about how it's able to

10:28:21  12   receive the data and provide a 10-bit or a YCrCb or YUV --

10:28:30  13   these are digital color spaces that we've seen -- and up to

10:28:33  14   75.5 megahertz range.  That's just a clocking.  That's how

10:28:38  15   the data is coming in.  And it also talks about the next

10:28:42  16   stage which is converting it to RGB data which is, again,

10:28:45  17   another form of the digital data that we talked about.

10:28:48  18   Q.  Dr. Stevenson, Limitation 1(b) of the '435 patent

10:28:52  19   reads:  Selecting to independently change the hue or

10:28:57  20   saturation of an individual color in the real time digital

10:29:00  21   video input image, by selecting an independent color hue

10:29:09  22   control delta value or an independent color saturation

10:29:14  23   control delta value, respectively, wherein said independent

10:29:19  24   color hue control delta value represents an extent of

10:29:23  25   change in the hue of said selected individual color and

10:29:27  1   wherein said independent color saturation control delta

10:29:31  2   value represents an extent of change in the saturation of

10:29:34  3   said selected individual color.

10:29:37  4         Does Brett disclose this limitation?

10:29:41  5   A.  Yes.

10:29:41  6   Q.  Could you show us where?

10:29:44  7   A.  So this idea of selecting is where the users can be

10:29:48  8   able to somehow select a color in a user interface of some

10:29:52  9   sort and be able to manipulate the hue and saturation of

10:29:58  10  that color.  There's a section of Brett -- starts with a

10:30:05  11  label:  User interface.  Let's see, starts in Column 17,

10:30:14  12  around Line 41.

10:30:31  13        Fine for now.

10:30:31  14        So this user interface is what a person who is

10:30:36  15  going to use this system to do color correction is going to

10:30:40  16  interact with.  If we just read through that first

10:30:43  17  paragraph, the user interface of the digital color

10:30:45  18  processer is designed for user friendliness.  When

10:30:50  19  initially turned on, it emulates such prior 6-vector

10:30:55  20  secondary color correctors as the RCA Chromacomp, which

10:31:03  21  merely gives the operator direct control over the relative

10:31:07  22  proportions of six specific colors:  the primaries, red,

10:31:11  23  green, and blue; and the secondaries, cyan, magenta, and

10:31:14  24  yellow.

10:31:14  25        This is very similar to the sort of interface we

| | | |
|---|---|---|
| 10:31:20 | 1 | saw in what's been called the 6-axis color control devices. |
| 10:31:24 | 2 | ASUS didn't invent that 6-axis color control.  It actually |
| 10:31:30 | 3 | predates all this digital stuff back into the '70s.  This |
| 10:31:34 | 4 | Chromacomp device that's talked about here was a very |
| 10:31:38 | 5 | common production piece of equipment. |
| 10:31:40 | 6 | MR. LIDDLE:  Your Honor, objection.  Narrative. |
| 10:31:43 | 7 | THE COURT:  Can you break it up just a little bit. |
| 10:31:43 | 8 | BY MR. JOSHI: |
| 10:31:47 | 9 | Q.  Yeah, please -- please break it up so we just show them |
| 10:31:50 | 10 | where -- where the things are.  So please finish. |
| 10:31:52 | 11 | Continue. |
| 10:32:03 | 12 | A.  The -- so this interface allows you select one of those |
| 10:32:08 | 13 | colors, red, green, blue, cyan, magenta, and yellow and |
| 10:32:12 | 14 | make adjustment to it.  So this idea of selecting an |
| 10:32:16 | 15 | individual color, one of those six, is in the device. |
| 10:32:22 | 16 | Q.  Dr. Stevenson, Limitation 1(c) of the -- let me start |
| 10:32:26 | 17 | again. |
| 10:32:26 | 18 | Dr. Stevenson, Claim Limitation (c) of Claim 1 of |
| 10:32:30 | 19 | the '435 patent reads:  Identifying a plurality of said |
| 10:32:36 | 20 | individual image pixels having said selected individual |
| 10:32:40 | 21 | color in the real time digital video input image with the |
| 10:32:44 | 22 | hue or the saturation selected to be independently changed |
| 10:32:48 | 23 | by performing arithmetic and logical operations using input |
| 10:32:53 | 24 | image pixel values of each said input image pixel of the |
| 10:32:58 | 25 | real time digital video input image. |

| 10:33:01 | 1 | Does Brett disclose this limitation? |
| 10:33:03 | 2 | A.  Yes. |
| 10:33:04 | 3 | Q.  Could you show us where? |
| 10:33:05 | 4 | A.  Probably the easiest place to see it is if you go back |
| 10:33:11 | 5 | to that Figure 4A, the main figure.  This time we look |
| 10:33:19 | 6 | towards the bottom of the page, you'll see something -- a |
| 10:33:23 | 7 | block labeled 15 called the Color Identification Table. |
| 10:33:27 | 8 | This is the piece of circuitry that Brett uses to identify |
| 10:33:31 | 9 | pixels of a certain color. |
| 10:33:33 | 10 | Q.  Dr. Stevenson, Limitation (d) of Claim 1 of the '435 |
| 10:33:44 | 11 | patent reads as follows:  Determining corresponding output |
| 10:33:49 | 12 | image pixel values for each of said plurality of said input |
| 10:33:57 | 13 | image pixels identified as having said selected individual |
| 10:34:00 | 14 | color in the real time digital video input image with the |
| 10:34:04 | 15 | hue or the saturation selected to be independently changed |
| 10:34:09 | 16 | by separately evaluating independent color hue control |
| 10:34:16 | 17 | functions, or independent color saturation control |
| 10:34:20 | 18 | functions respectively, using said input image pixel values |
| 10:34:24 | 19 | of said plurality of said input image pixels and using |
| 10:34:29 | 20 | corresponding said selected independent color hue control |
| 10:34:34 | 21 | delta value, or said corresponding selected independent |
| 10:34:38 | 22 | color saturation control delta value, for forming a |
| 10:34:42 | 23 | corresponding plurality of output image pixels having said |
| 10:34:46 | 24 | selected individual color with the hue or the saturation |
| 10:34:50 | 25 | selected to be independently changed. |

| | | |
|---|---|---|
| 10:34:53 | 1 | Does Brett disclose this claim limitation? |
| 10:34:55 | 2 | A.   Yes. |
| 10:34:56 | 3 | Q.   Could you show us where? |
| 10:34:57 | 4 | A.   Probably the easiest thing to look at is maybe the |
| 10:35:01 | 5 | figure on the front of the patent which combines Figure 4A |
| 10:35:07 | 6 | and 4B at the bottom a little bit -- seeing the whole |
| 10:35:11 | 7 | system there. |
| 10:35:12 | 8 | THE WITNESS:   Scroll down a little. |
| 10:35:18 | 9 | A.   Just to kind of explain where that processing is going, |
| 10:35:22 | 10 | look at the bottom, at Block 15, which is the |
| 10:35:26 | 11 | identification, there's where colors are being identified |
| 10:35:30 | 12 | and you can see it goes through another table, which is |
| 10:35:33 | 13 | going to figure out what are the -- how the colors are |
| 10:35:36 | 14 | going to be adjusted.  What you can see coming out of that |
| 10:35:40 | 15 | is delta H and delta S, that's -- the delta triangle is a |
| 10:35:45 | 16 | Greek symbol engineers use for delta, but that delta H and |
| 10:35:49 | 17 | delta S is the delta hue and delta saturation values. |
| 10:35:55 | 18 | You see how they go up?  Out of those, those |
| 10:35:59 | 19 | arrows go up, and you can see them being arithmetically |
| 10:36:03 | 20 | added and multiplied by the hue and saturation values that |
| 10:36:07 | 21 | are in that part of the pipeline.  And then it goes a |
| 10:36:09 | 22 | little bit further, that comes out, there's some additional |
| 10:36:12 | 23 | circuitry because we -- ultimately, even though we like as |
| 10:36:18 | 24 | people to -- that -- adjust hue and saturation, the systems |
| 10:36:24 | 25 | are built around RGB. |

10:36:25  1          So the next little bit of circuitry kind of

10:36:28  2   converts things back to red, green, and blue.  You can see

10:36:31  3   coming out of the combiner there, the 14, you see delta R,

10:36:36  4   delta G, and delta B.  Those are how we're going to adjust

10:36:42  5   the pixels in the actual image.

10:36:45  6          So it's figuring out those -- you know, based on

10:36:47  7   how I adjust it, the hue and saturation, it's figuring out

10:36:52  8   the delta H -- the delta red, green, and blue.  And then

10:36:55  9   you can see how that data flows back up into those adders

10:37:01  10  labeled 6 in the -- kind of the main video pipeline, and

10:37:04  11  that's where we're actually effecting change in determining

10:37:07  12  the output pixels, which then flow through the rest of the

10:37:11  13  pipeline and go to the output TV display.

10:37:15  14  Q.  Dr. Stevenson, Limitation (e) of Claim 1 of the '435

10:37:20  15  patent reads as follows:

10:37:23  16         And displaying a real time digital video output

10:37:28  17  image, including said corresponding plurality of said

10:37:32  18  output image pixels having said selected individual color

10:37:36  19  with the hue or the saturation selected to be independently

10:37:41  20  changed in the real time digital video input image, whereby

10:37:45  21  the hue or the saturation of said selected individual color

10:37:49  22  in the real time digital video input image has been changed

10:37:53  23  without affecting the hue or the saturation of any other

10:37:58  24  individual color in the real time digital video input

10:38:02  25  image.

10:38:02  1          Dr. Stevenson, does Brett disclose this claim

10:38:08  2  limitation?

10:38:08  3  A.  Yes.

10:38:09  4  Q.  Could you show us where?

10:38:10  5  A.  Sure.  There's -- let me stick with this figure for a

10:38:14  6  moment, at least.

10:38:16  7          There -- this identification table, and if you

10:38:19  8  look at the identification table, it's only going to

10:38:22  9  identify pixels that we selected to change.  And then it's

10:38:26  10  only going to compute values that get added on only for

10:38:30  11  those pixels that are selected to be changed, those colors

10:38:33  12  that have been selected to be changed.  So it's not going

10:38:35  13  to affect the other pixels.

10:38:36  14          We also saw that language in the abstract that

10:38:41  15  says it's not going to modify anything else.  It kind of

10:38:44  16  confirms that understanding.

10:38:47  17          The -- ultimately, the video is going to be

10:38:49  18  output, right?  So the output you see there at the far

10:38:53  19  right is the output.  That's what's going to end up going

10:38:56  20  to the screen.  If you look at, for instance, something

10:38:59  21  like Figure 13 --

10:39:02  22          MR. LIDDLE:  Objection, narrative.

10:39:03  23          MR. JOSHI:  I don't believe that one is,

10:39:05  24  Your Honor.

10:39:05  25          THE COURT:  I don't, either.  Overruled.

10:39:10   1   A.  If you look at something like Figure 13, it talks about

10:39:12   2   the output being HDTV.  That's, you know, going to a

10:39:18   3   display device.  You could also find language in the -- in

10:39:24   4   the patent itself that talks about how ultimately you're

10:39:27   5   going to display the output signal, and I don't think

10:39:29   6   that's too surprising.

10:39:43   7          MR. JOSHI:  Could we please go to Figure 12?

10:39:55   8   BY MR. JOSHI:

10:39:55   9   Q.  Dr. Stevenson, were you in the courtroom yesterday when

10:39:58  10   I had a conversation with Dr. Ducharme about something

10:40:02  11   called HSL?

10:40:04  12   A.  Yes.

10:40:07  13   Q.  What is HSL?

10:40:08  14   A.  They -- it stands for hue, saturation, and lightness.

10:40:12  15   It's a color space that you can represent colors in.

10:40:17  16   Q.  Okay.  And can an individual color be selected by using

10:40:26  17   HSL?

10:40:27  18   A.  Yes.  It's like RGB where you saw numbers, and it

10:40:33  19   corresponds to a color.  You can come up with the same set

10:40:36  20   of numbers that you would say red is a certain hue, certain

10:40:40  21   saturation, a certain lightness.

10:40:42  22   Q.  Okay.  Does Dr. Ducharme dispute that?

10:40:51  23   A.  He disputed, I believe, the idea that you could use

10:40:56  24   Brett to select an individual color.

10:40:58  25   Q.  And how would you respond to that?

10:41:00  1  A.  Well, again, I think Dr. Ducharme is being very

10:41:05  2  selective in his reading and only reading parts of the

10:41:10  3  patent.

10:41:11  4       You know, we saw in the beginning, the user

10:41:14  5  interface -- interface very much like he accuses.

10:41:17  6  The 6-axis color control where I can select, red, green,

10:41:24  7  blue, cyan, magenta, yellow.  He didn't seem to like that.

10:41:29  8  He looks further in, you know, and this is a case where the

10:41:34  9  patent has multiple ideas being expressed and -- because

10:41:38  10  it's an advanced technology and it did what was kind of

10:41:42  11  standard, the 6-vector thing, and then it also added

10:41:48  12  further functionality, and that's described later on.

10:41:50  13       One of those sets of functionality kind of

10:41:55  14  corresponds to this control panel.  In this control panel,

10:41:59  15  you can set a range of colors that you want to adjust.  The

10:42:03  16  idea is that the buttons that are labeled 306, I can

10:42:10  17  enter -- I can basically press a button, turn the knob, and

10:42:13  18  select the hue value.  I can press the button, turn a knob,

10:42:16  19  and select the saturation value and a lightness value.

10:42:20  20       So I can select a color -- the individual color

10:42:23  21  with the buttons 306, and I can go forward and select

10:42:26  22  another color with 308, the buttons at 308.  I can set the

10:42:32  23  hue, saturation and lightness, so like two individual

10:42:35  24  colors.  And then I can select the delta value with the

10:42:39  25  buttons at 310.  So that allows me to -- those buttons

10:42:43   1   allow me to set kind of how much I want to change that

10:42:47   2   range of colors.

10:42:48   3           You know, so Brett does offer additional

10:42:55   4   functionality.  You can select more than one color, but you

10:42:59   5   can also select one color, and that's what the patent

10:43:02   6   requires.  And the fact that it -- Brett teaches kind of a

10:43:04   7   more advanced feature doesn't really impact my analysis and

10:43:09   8   makes me think he is...

10:43:12   9           THE COURT:  Mr. Joshi, when you get to a good

10:43:15   10  breaking spot.

10:43:15   11          MR. JOSHI:  Now is good, I'll move to Claim 2 now.

10:43:21   12          THE COURT:  Good.  Okay.

10:43:22   13          Ladies and gentlemen of the jury, we'll take our

10:43:24   14  morning recess at this time.  Don't discuss the case among

10:43:29   15  yourselves until all of the evidence has been presented,

10:43:33   16  and I have instructed you on the law.  We'll be in recess

10:43:37   17  about 15 minutes.

10:43:39   18          COURT SECURITY OFFICER:  All rise for the jury.

10:43:41   19          (Jury out.)

11:01:15   20          (Recess.)

11:01:46   21          COURT SECURITY OFFICER:  All rise.

11:01:46   22          THE COURT:  Please have the jury brought in,

11:01:52   23  please.

11:01:57   24          (Jury in.)

11:02:18   25          THE COURT:  Please be seated.

11:02:20   1          Mr. Joshi, you may continue.

11:02:21   2          MR. JOSHI:  Thank you, Your Honor.

11:02:23   3   BY MR. JOSHI:

11:02:24   4   Q.  Dr. Stevenson, welcome back.

11:02:26   5          The court reporter has a small request for you.

11:02:30   6   When you turn around to speak with the jury, please move

11:02:34   7   the microphone.  She's having a hard time hearing you.

11:02:37   8   A.  I'll try to keep it in a straight line here.

11:02:39   9   Q.  All right.

11:02:47  10          MR. JOSHI:  Mr. Oliver, would you put the Brett

11:02:49  11   patent back on the screen for me?  Thank you.

11:02:52  12   BY MR. JOSHI:

11:02:53  13   Q.  Dr. Stevenson, Claim 2 of the '635 [sic] patent reads

11:02:59  14   as follows:  The method of Claim 1, whereby the real time

11:03:04  15   digital video input image is of a format selected from the

11:03:09  16   group consisting of RGB format, Yr -- YCrCb format, and YUV

11:03:19  17   format, whereby the individual colors of one said format

11:03:29  18   can be characterized by the individual colors of a second

11:03:32  19   said format by using appropriate linear transformation

11:03:38  20   between said formats.

11:03:40  21          Dr. Stevenson, does Brett disclose Claim 2?

11:03:46  22   A.  Yes.

11:03:47  23   Q.  Would you show us where?

11:03:49  24   A.  We can go back to, for example, that Figure 4A.

11:03:59  25          This is talking about the input video image

11:04:03   1   signal.  And you remember the top left is where we saw the

11:04:08   2   input coming in.  You can easily see the YUV and the RGB

11:04:13   3   type characterization of the input signal.  These

11:04:17   4   represent -- we could use that as numbers there to

11:04:19   5   represent things like red and green and blue and the other

11:04:23   6   colors.

11:04:24   7   Q.  Okay.  Are you finished with your answer, sir?

11:04:28   8   A.  Yes.

11:04:29   9   Q.  Dr. Stevenson, Claim 3 of the '435 patent reads as

11:05:04  10   follows:  The method of Claim 1, whereby the real time

11:05:14  11   digital video input image features basic colors, red,

11:05:18  12   green, and blue, and complementary colors, yellow, cyan,

11:05:22  13   and magenta, in RGB color space, whereby values of said

11:05:31  14   complementary colors are expressed in terms of and

11:05:33  15   evaluated from linear combinations of values of said basic

11:05:38  16   colors.

11:05:39  17        Dr. Stevenson, does Brett disclose Claim 3 of the

11:05:43  18   '435 patent?

11:05:43  19   A.  Yes.  Once we have a device that expresses color in

11:05:48  20   something like RGB, the way you represent the various

11:05:51  21   colors is through linear combinations of those three

11:05:55  22   colors.

11:05:55  23        So if you want to represent yellow, cyan, or

11:05:58  24   magenta, it's a linear combination.  It's some red, some

11:06:02  25   green, some blue that forms that -- all those other

11:06:05   1   individual colors.

11:06:18   2   Q.  Dr. Stevenson, Claim 5 of the '435 patent reads as

11:06:26   3   follows:  The method of Claim 1, whereby in Step (b),

11:06:29   4   numerical range of said independent color hue control delta

11:06:34   5   value and numerical range of said independent control

11:06:38   6   saturation control delta value corresponds to an arbitrary

11:06:42   7   interval of integers.

11:06:45   8       Does Brett disclose Claim 5?

11:06:50   9   A.  Yes.

11:06:50   10  Q.  Could you show us where?

11:06:52   11  A.  The easiest place to see that probably -- Column 8,

11:07:31   12  Lines 18, maybe somewhere around there.

11:07:48   13      That paragraph that starts at Line, I guess, 21:

11:07:52   14  Hue can be modified through a full 360-degree range in the

11:07:57   15  cylindrical color space.  Saturation and luminance can be

11:08:02   16  varied from 0 to 400 percent.  Then it talks about that

11:08:07   17  they can be stored with 10-bit accuracy.  That's the

11:08:11   18  digital representation we use in -- inside the device.

11:08:14   19      So you can see how we can input numbers for hue

11:08:17   20  that range from 0 to 360 and saturation 0 to 400.  So that

11:08:25   21  satisfies the requirements of Claim 5.

11:08:33   22  Q.  Dr. Stevenson, Claim 6 of the '435 patent reads as

11:08:36   23  follows:  The method of Claim 1, whereby in Step (b),

11:08:43   24  numerical range of said independent color hue control delta

11:08:47   25  value is in an interval between minus 1 and plus 1.

11:08:53   1              Does Brett satisfy Claim 6?

11:08:56   2    A.  This one is a little different in that Dr. Ducharme in

11:09:03   3    his analysis of this claim, he basically accepted the fact

11:09:07   4    that, you know, the products can be, you know -- the

11:09:12   5    sliders he points to --

11:09:14   6              MR. LIDDLE:  Objection, nonresponsive.

11:09:16   7              THE COURT:  I'm sorry?

11:09:18   8              MR. LIDDLE:  Objection, nonresponsive.

11:09:19   9              MR. JOSHI:  Your Honor, it is responsive.  He's

11:09:22  10    going to tie it up.

11:09:23  11              THE COURT:  Okay.  I'll overrule.

11:09:26  12              THE WITNESS:  The -- so while he recognized the

11:09:31  13    sliders go from 0 to 100 in the ASUS products, he said it

11:09:39  14    satisfied these elements because you can scale 0 to 100 to

11:09:44  15    minus 1 to 1.

11:09:44  16              I don't agree with that opinion, but I can do the

11:09:47  17    same an -- the same sort of interpretation that he did with

11:09:50  18    regards to Brett in this claim element.

11:09:52  19              We just saw the numbers can be ranged from 0

11:09:56  20    to 360 and 0 to 400.  Well, I can scale them between

11:10:00  21    minus 1 and 1 to meet this limitation.  I don't necessarily

11:10:05  22    agree with that, but, you know, it kind of meets their

11:10:08  23    approach in interpreting this claim.

11:10:27  24    BY MR. JOSHI:

11:10:27  25    Q.  Dr. Stevenson, Claim 13 of the '435 patent reads as

11:10:31   1   follows:  The method of Claim 1, whereby Step (d) is

11:10:37   2   performed following said identifying each said input image

11:10:41   3   pixel, one at a time, of said plurality of said input image

11:10:45   4   pixels, or is performed following said identifying entire

11:10:50   5   said plurality of said input image pixels, as having said

11:10:56   6   individual color in the digital video input image whose hue

11:11:00   7   or saturation was selected to be independently changed.

11:11:04   8           Dr. Stevenson, does Brett disclose Claim 13?

11:11:11   9   A.  Yes.

11:11:13   10  Q.  Could you show us where?

11:11:16   11  A.  If you look starting around Column -- Column 8,

11:11:35   12  Line 36, I think we can get all of this at the same time,

11:11:37   13  but kind of going from there through the next page was the

11:11:42   14  discussion of how -- kind of the basic processing, and it

11:11:46   15  talks about -- it uses the word "serially."  That's kind of

11:11:52   16  engineer speak for one at a time.

11:11:54   17          We either do things in parallel, which means we

11:11:58   18  can do them all at the same time, or we do it one at a

11:12:03   19  time, serially.

11:12:04   20          So Brett teaches doing the processing it's talking

11:12:07   21  about, this color correction, one at a time.  So you do the

11:12:11   22  identification.  You do the determination.

11:12:19   23  Q.  Are you finished, sir?

11:12:21   24  A.  Yes.

11:12:22   25  Q.  Dr. Stevenson, Claim 14 of the '435 patent discloses

11:12:26   1   the following:  If method of Claim 1, whereby in Step (d),

11:12:33   2   for independently controlling the hue of said selected

11:12:38   3   individual color in the real time digital video image, said

11:12:44   4   independent color hue control function is a function of

11:12:47   5   said input image pixel values of said plurality of said

11:12:52   6   input image pixels and of said corresponding selected

11:12:58   7   independent color hue control delta value.

11:13:03   8         Does Brett disclose Claim 14?

11:13:05   9   A.  Yes.

11:13:06  10   Q.  Could you show us where?

11:13:08  11   A.  Probably the easiest thing to do is go back to the

11:13:12  12   figure on the front of the patent, the overall system.

11:13:21  13         The -- maybe working a little backwards because

11:13:25  14   we've already talked about how it -- the function of how to

11:13:29  15   change values, that was the circuitry, kind of at the

11:13:33  16   bottom and on the right-hand side, that was going to feed

11:13:37  17   up the change values into 6 that we're going to modify the

11:13:41  18   RGB values.

11:13:42  19         So that kind of circuitry on the right, that one

11:13:47  20   that's highlighted, the blocks below it, the multiplication

11:13:52  21   additions in 12.  That was all the function that's going to

11:13:57  22   modify the color values.

11:13:59  23         So this is now talking about how does that

11:14:01  24   function get performed, how does -- what are the inputs to

11:14:04  25   that functions, and it's basically -- Claim 14 requires

11:14:09   1   that the input stream is used to form that function.

11:14:13   2          And you can see -- you can see how that works by

11:14:16   3   looking at the flow of data again, so we have our input

11:14:20   4   pixels.  You can see the -- you know, kind of the -- it's

11:14:24   5   labeled corrected R -- corrected R -- corrected G, and

11:14:28   6   corrected B, that's part of the signal in the pipeline.

11:14:31   7   And then you see lines coming down below that into 3A,

11:14:36   8   which then feed itself down into what's called the digital

11:14:40   9   matrix coordinate translator.  That's kind of the math

11:14:45  10   we're going to do in order to figure out how we're going to

11:14:48  11   adjust the colors.

11:14:49  12          So the input pixels come in, go through that path

11:14:52  13   on the 3A to 11, and you can see how we have hue and

11:15:01  14   saturation kind of separately.  I don't know which one is

11:15:05  15   which.  14 requires you change hue, I think, the functions

11:15:09  16   for hue.  And the second -- 15 is saturation, which is just

11:15:13  17   kind of the other parallel one there.  So this -- this

11:15:18  18   meets the limitation of the input pixels being used to

11:15:23  19   control the values you get for the output.

11:15:28  20   Q.  Dr. Stevenson, Claim 15 of the '435 patent reads as

11:15:33  21   follows:  The method of Claim 1, whereby in Step (d), for

11:15:39  22   independently controlling the saturation of said selected

11:15:42  23   individual color in the real time digital video image, said

11:15:49  24   independent color saturation control function is a function

11:15:52  25   of said input image pixel values of said plurality of said

| | | |
|---|---|---|
| 11:15:56 | 1 | input image pixels and of said corresponding selected |
| 11:16:02 | 2 | independent color saturation control delta value. |
| 11:16:07 | 3 | Does Brett disclose Claim 15? |
| 11:16:09 | 4 | A.  So 14 and 15 are very similar.  One basically says |
| 11:16:14 | 5 | hue -- do this function with hue, and the other one says |
| 11:16:18 | 6 | saturation.  So, you know, I kind of showed you the same |
| 11:16:21 | 7 | circuitry.  The fact that we end up having a hue path and a |
| 11:16:25 | 8 | saturation path, you know, means one path satisfies 14 and |
| 11:16:28 | 9 | the other one satisfies 15. |
| 11:16:34 | 10 | Q.  Dr. Stevenson, we went through Claims 1, 2, 3, 5, 6, |
| 11:16:46 | 11 | 13, 14 and 15 of the '435 patent.  Those claims are |
| 11:16:51 | 12 | asserted in this case? |
| 11:16:53 | 13 | A.  Yes. |
| 11:16:53 | 14 | Q.  Is it your opinion that Brett anticipates or makes |
| 11:16:58 | 15 | obvious all of those claims? |
| 11:17:00 | 16 | A.  Yes. |
| 11:17:05 | 17 | MR. JOSHI:  Your Honor, the Defendant moves to |
| 11:17:07 | 18 | admit DX-9 into evidence. |
| 11:17:09 | 19 | THE COURT:  Any objection? |
| 11:17:11 | 20 | MR. LIDDLE:  No objection. |
| 11:17:13 | 21 | THE COURT:  It'll be received. |
| 11:17:24 | 22 | BY MR. JOSHI: |
| 11:17:24 | 23 | Q.  I'll move to a new topic, Dr. Stevenson. |
| 11:17:31 | 24 | Have you given any opinions in this litigation on |
| 11:17:33 | 25 | a topic known as double patenting? |

| | | |
|---|---|---|
| 11:17:36 | 1 | A.  Yes. |
| 11:17:37 | 2 | Q.  Could you tell the members of the jury what double |
| 11:17:40 | 3 | patenting is? |
| 11:17:41 | 4 | A.  The basic idea is that you -- while you can get a |
| 11:17:48 | 5 | patent, you can't get two patents on the same invention. |
| 11:17:55 | 6 | Q.  Okay.  In your binder, Doctor, I would like you to go |
| 11:18:07 | 7 | to Tab 2, and then within that tab, go to a sub-tab I, as |
| 11:18:19 | 8 | in indigo, I. |
| 11:18:39 | 9 | Are you there, sir? |
| 11:18:40 | 10 | A.  Yes. |
| 11:18:41 | 11 | Q.  Okay.  Do you recognize this document? |
| 11:18:44 | 12 | A.  Yes. |
| 11:18:44 | 13 | Q.  Have you reviewed this document? |
| 11:18:47 | 14 | A.  Yes. |
| 11:18:48 | 15 | Q.  Are you here to offer an opinion about this document |
| 11:18:52 | 16 | today? |
| 11:18:53 | 17 | A.  Yes. |
| 11:18:53 | 18 | Q.  And what is this document? |
| 11:18:56 | 19 | A.  This document is Patent -- U.S. Patent 6,122,012. |
| 11:19:09 | 20 | MR. JOSHI:  May I please have -- Mr. Oliver, may I |
| 11:19:29 | 21 | please have DX-3 displayed?  Thank you. |
| 11:19:33 | 22 | BY MR. JOSHI: |
| 11:19:45 | 23 | Q.  Dr. Stevenson, when was this patent issued? |
| 11:19:52 | 24 | A.  September 19, 2000. |
| 11:19:54 | 25 | Q.  And when would the term of this patent end? |

| | | |
|---|---|---|
| 11:19:57 | 1 | A.  The -- I'm not a lawyer, so I'm not sure you should |
| 11:20:06 | 2 | quote me on this, but you get about 20 years for a patent. |
| 11:20:10 | 3 | I'm not sure if that's from the priority date or issue |
| 11:20:13 | 4 | date.  So somewhere in 1999 or 2000 -- 2019 or 2020 the |
| 11:20:20 | 5 | patent would have expired. |
| 11:20:23 | 6 | Q.  And who are the inventors of this patent? |
| 11:20:27 | 7 | A.  Segman and Yaacov. |
| 11:20:32 | 8 | Q.  Okay.  And who is mentioned as the assignee of this |
| 11:20:36 | 9 | patent? |
| 11:20:36 | 10 | A.  Sorry.  Say again? |
| 11:20:39 | 11 | Q.  Who is mentioned as the assignee of this patent? |
| 11:20:44 | 12 | A.  A company called Oplus Technologies. |
| 11:20:49 | 13 | MR. JOSHI:  And, Mr. Oliver, could you please |
| 11:20:52 | 14 | bring DX-1 back on the screen? |
| 11:20:59 | 15 | BY MR. JOSHI: |
| 11:20:59 | 16 | Q.  Who are the inventors of the '435 patent? |
| 11:21:02 | 17 | A.  The same two people, Segman and Yaacov. |
| 11:21:08 | 18 | Q.  And who is the assignee of the '43 patent [sic]? |
| 11:21:12 | 19 | A.  The same company, Oplus Technologies. |
| 11:21:15 | 20 | Q.  And what is the date of issuance of this patent? |
| 11:21:22 | 21 | A.  April 20, 2004. |
| 11:21:25 | 22 | Q.  And what is the filing date of this patent? |
| 11:21:31 | 23 | A.  August 6, 2001. |
| 11:21:34 | 24 | Q.  Okay.  And how does that date compare to the filing |
| 11:21:41 | 25 | date of the '012 patent?  If you could please go back to |

11:21:50  1  that.

11:21:50  2  A.  It's roughly two years later.

11:21:52  3  Q.  Okay.  Thank you.

11:22:03  4       To form your opinion about double patenting, what

11:22:06  5  did you do?

11:22:08  6  A.  Well, in double patenting, it's about this idea of an

11:22:14  7  inventor trying to get -- claim the same invention in two

11:22:18  8  different patents.

11:22:19  9       MR. LIDDLE:  Objection, nonresponsive.

11:22:21  10       MR. JOSHI:  This is just a preliminary to his

11:22:23  11  answer, Your Honor.

11:22:23  12       THE COURT:  Overruled.

11:22:24  13       THE WITNESS:  So what I needed to do was look at

11:22:27  14  the claims of the '435, that's the invention of the '435,

11:22:34  15  relative to the claims of the '012 and to see if they were

11:22:38  16  going to cover the same invention.

11:22:41  17  BY MR. JOSHI:

11:22:41  18  Q.  And when you compared the asserted claims of the '435

11:22:48  19  patent with the assert claims of the '012 patent, what did

11:22:54  20  you discover?

11:22:55  21  A.  I found that they were the same invention.

11:22:57  22  Q.  Okay.

11:23:11  23       MR. JOSHI:  Let's -- let's stay with this patent.

11:23:16  24  BY MR. JOSHI:

11:23:28  25  Q.  Dr. Stevenson, the preamble of Claim 1 of the '435

11:23:34  1   patent reads as follows:  A method for independently

11:23:38  2   controlling hue or saturation of individual colors in a

11:23:43  3   real time digital video image compromising the steps of.

11:23:50  4        Does the '012 patent disclose the preamble of

11:24:00  5   Claim 1 of '435 patent?

11:24:03  6   A.  Yes.

11:24:03  7   Q.  Could you show us where?

11:24:07  8   A.  We're going to turn to the claims of the '012, and

11:24:11  9   we'll look at two claims, Claim 1 and 4.  Start with

11:24:23  10  Claim 1.  You can see it's a method of selectively

11:24:27  11  controlling an individual color of a digital video image.

11:24:31  12  So that is the same sort of thing we're doing in the '435,

11:24:38  13  right?  We're controlling an individual color, we're

11:24:40  14  controlling it -- selectively controlling that -- of a

11:24:47  15  digital video input signal.

11:24:51  16       Go down a little bit further to Claim 4, you can

11:24:55  17  see this idea of saturation being one of those things we're

11:25:01  18  going to control here.  So Claim 4 is:  A method of

11:25:12  19  Claim 1, whereby said color control parameters include a

11:25:17  20  plurality of tangents, whereby each of said plurality of

11:25:20  21  tangents is used to control saturation of all individual

11:25:24  22  color in the digital video input image.

11:25:27  23       So this idea of selectively controlling and

11:25:32  24  controlling saturation is expressed in the '012.

11:25:36  25  Q.  Dr. Stevenson, do you know what "obviousness-type

11:25:40  1  double patenting" is?

11:25:42  2  A.  Yes.

11:25:43  3  Q.  Please tell the members of the jury what obviousness

11:25:48  4  type-double patenting is.

11:25:50  5  A.  Well, it's kind of like the obviousness we talked about

11:25:54  6  before in that you don't have to word for word be exactly

11:25:57  7  the same.  If there's something that's well known to a

11:26:00  8  person of ordinary skill in the art, someone who -- an

11:26:03  9  engineer who would be reading this patent, they would know

11:26:06  10  it because it's something they do all the time, that's

11:26:09  11  okay.  You can kind of fill in that missing word or two

11:26:12  12  with this idea of it would be obvious to a person of

11:26:22  13  ordinary skill in the art.

11:26:27  14  Q.  Dr. Stevenson, Limitation (a) of Claim 1 of the '435

11:26:30  15  patent reads as follows:  Receiving and characterizing the

11:26:35  16  real time digital video input image featuring input image

11:26:41  17  pixels.

11:26:49  18        Is that limitation disclosed in claims of the '012

11:26:53  19  patent?

11:26:53  20  A.  Yes, that shows up in -- kind of broken up into

11:26:56  21  Element (a) and (b) of the -- of the '012.

11:26:56  22  Q.  Yeah, please --

11:27:11  23  A.  Claim 1 --

11:27:15  24        MR. JOSHI:  Claim 1 and 2 of the '012.  Thank you.

11:27:18  25  A.  So (a) talks about this idea of receiving.  So it says:

| | | |
|---|---|---|
| 11:27:21 | 1 | Receiving the digital video input image, featuring pixels. |
| 11:27:26 | 2 | So we have the receiving idea. |
| 11:27:27 | 3 | And then (b) is the characterizing idea. |
| 11:27:31 | 4 | Characterizing a digital video input image and its target |
| 11:27:34 | 5 | output image.  So we received it and characterized it which |
| 11:27:38 | 6 | is what 1(a) of the '435 requires. |
| 11:27:42 | 7 | BY MR. JOSHI: |
| 11:27:50 | 8 | Q.  Okay.  Were you in the courtroom yesterday, sir, when |
| 11:27:52 | 9 | Dr. Ducharme talked about double patenting? |
| 11:27:54 | 10 | A.  Yes. |
| 11:27:55 | 11 | Q.  Were you listening when he expressed his opinion about |
| 11:27:59 | 12 | differences between the '435 patent and the '012 patent? |
| 11:28:04 | 13 | A.  Yes. |
| 11:28:05 | 14 | Q.  What is your understanding of what he said? |
| 11:28:12 | 15 | A.  He basically said that because the '012 talks about |
| 11:28:21 | 16 | lookup tables and in order to do the modification of pixels |
| 11:28:31 | 17 | and the identification of pixels, the '435 requires |
| 11:28:38 | 18 | arithmetic and logical operators.  That, to him, was a |
| 11:28:43 | 19 | substantial difference so that's why they were not the same |
| 11:28:46 | 20 | invention. |
| 11:28:47 | 21 | Q.  Could you please maybe speak into the microphone a |
| 11:28:47 | 22 | little bit? |
| 11:28:47 | 23 | A.  Yeah. |
| 11:28:47 | 24 | Q.  Just pull it towards you, if you like. |
| 11:28:47 | 25 | MR. JOSHI:  May I approach, Your Honor?  Just want |

| | | |
|---|---|---|
| 11:28:50 | 1 | to give him -- |
| 11:28:50 | 2 | THE COURT:  It would help. |
| 11:28:50 | 3 | BY MR. JOSHI: |
| 11:29:06 | 4 | Q.  Do you agree or disagree with Dr. Ducharme? |
| 11:29:08 | 5 | A.  I disagree with him. |
| 11:29:09 | 6 | Q.  Could you tell the members of the jury why you disagree |
| 11:29:13 | 7 | with Dr. Ducharme? |
| 11:29:14 | 8 | A.  Arithmetic and logical operators are the basis of |
| 11:29:20 | 9 | digital systems.  That's what we do in digital systems, and |
| 11:29:24 | 10 | that's how we manipulate data.  We use lookup tables the |
| 11:29:28 | 11 | same way.  We use them with logical and arithmetic |
| 11:29:33 | 12 | operators.  You don't use a lookup table without also doing |
| 11:29:38 | 13 | those sort of operations. |
| 11:29:41 | 14 | So in some sense, a lookup table is nothing more |
| 11:29:45 | 15 | than a form of arithmetic and logical operators.  We use |
| 11:29:50 | 16 | them because they can be very -- they can be quicker.  And |
| 11:29:53 | 17 | so when we're building these very fast systems, these |
| 11:29:58 | 18 | systems deal with a lot of data in a very short amount of |
| 11:30:01 | 19 | time, we try to speed that up by this well-known technique |
| 11:30:06 | 20 | called lookup tables.  But at the end of the day, we are |
| 11:30:09 | 21 | still doing arithmetic and logical operators, so I don't |
| 11:30:13 | 22 | see where he sees this big difference. |
| 11:30:16 | 23 | Q.  Thank you, Doctor.  I lost track a little bit.  Did we |
| 11:30:23 | 24 | already do 1(b)? |
| 11:30:24 | 25 | A.  No, I do not believe we have. |

11:30:27   1    Q.   Okay.   So, Dr. Stevenson, Limitation (b) of Claim 1 of

11:30:30   2    the '435 patent reads as follows:   Selecting to

11:30:35   3    independently change the hue or the saturation of an

11:30:40   4    individual color in the real time digital video input

11:30:43   5    image, by selecting an independent color hue control delta

11:30:49   6    value or an independent color saturation control delta

11:30:54   7    value, respectively, wherein said independent color hue

11:31:00   8    control delta value represents an extent of change in the

11:31:03   9    hue of said selected individual color and wherein said

11:31:10   10   independent color saturation control delta value represents

11:31:11   11   an extent of change in the saturation of said selected

11:31:14   12   individual color.

11:31:21   13        Dr. Stevenson, do claims of the '012 patent

11:31:27   14   disclose the limitation of Claim 1(b) of the '435 patent?

11:31:32   15   A.   Yes.   And, again, we'll go to a couple different claim

11:31:36   16   elements in the '012.   Start with 1(e) of the '012.   We'll

11:31:52   17   see the language of 1(e) talks about individual color

11:32:00   18   control functions which is what 1(b) is talking about

11:32:04   19   setting up, these individual color control functions,

11:32:07   20   according to an individual color for calculating values.

11:32:11   21   So we're talking about colors.   We're talking about

11:32:13   22   calculating values for that.

11:32:17   23        We go down to 1(f).   We are selecting values to

11:32:22   24   control -- to color control parameters in the set of

11:32:28   25   individual color control functions.   So we're setting up

| | | |
|---|---|---|
| 11:32:30 | 1 | these functions.  We're using the individual color |
| 11:32:37 | 2 | control -- individual colors to set control parameters, |
| 11:32:39 | 3 | which gives us these functions that we can manipulate. |
| 11:32:44 | 4 | And then finally, 4(e) -- Element 4.  Here, it's |
| 11:32:51 | 5 | just talking about a little more generally in terms of |
| 11:32:56 | 6 | color control parameters.  4 -- Element 4 is where -- |
| 11:33:01 | 7 | Claim 4 is where we get into this idea of that control |
| 11:33:04 | 8 | parameter, it can be saturation, which is the subject of |
| 11:33:07 | 9 | the '435. |
| 11:33:07 | 10 | Q.  Okay. |
| 11:33:11 | 11 | A.  So we'll see -- we're going to control saturation here. |
| 11:33:17 | 12 | So, you know, 1 is a little bit broader in the sense that |
| 11:33:21 | 13 | it doesn't specify hue or saturation; 4 has that limitation |
| 11:33:26 | 14 | of controlling saturation. |
| 11:33:29 | 15 | Q.  Dr. Stevenson, before I asked you my previous question, |
| 11:33:40 | 16 | I had asked you a little bit about Dr. Ducharme.  And I |
| 11:33:45 | 17 | asked you what your understanding was of what he said about |
| 11:33:52 | 18 | the differences between '012 and '435.  I believe you |
| 11:33:56 | 19 | mentioned lookup table.  Did Dr. Ducharme point to any |
| 11:33:59 | 20 | other difference? |
| 11:34:01 | 21 | A.  No. |
| 11:34:06 | 22 | MR. LIDDLE:  Objection.  That mischaracterizes the |
| 11:34:11 | 23 | testimony of Dr. Ducharme. |
| 11:34:12 | 24 | THE COURT:  I'll overrule it. |
| 11:34:14 | 25 | MR. LIDDLE:  Thank you. |

11:34:16   1          THE WITNESS:  I believe he said the word "in

11:34:18   2   part," but he never explained what the "in part" was.

11:34:21   3          THE COURT:  I'm sorry.  Did you say something

11:34:23   4   else?

11:34:23   5          MR. LIDDLE:  I did not.

11:34:31   6   BY MR. JOSHI:

11:34:31   7   Q.  Dr. Stevenson, I think you said something about "in

11:34:33   8   part."  I just heard that.  Could you explain what you

11:34:37   9   meant?

11:34:37  10   A.  Well, I recall when you kind of crossed him on the

11:34:40  11   subject and you said something similar to what you just

11:34:43  12   said to me about just lookup tables, he said his opinion

11:34:47  13   was based in part on lookup tables, but I didn't hear him

11:34:51  14   ever tell us what the other part might have been.  So in

11:34:54  15   terms of what he told us, it seemed like it was just lookup

11:35:00  16   tables.

11:35:00  17   Q.  Okay.  Dr. Stevenson, Limitation (c) of Claim 1 of

11:35:05  18   the '435 patent reads as follows:  Identifying a plurality

11:35:11  19   of said input image pixels having said selected individual

11:35:19  20   color in the real time digital video input image with the

11:35:23  21   hue or the saturation selected to be independently changed

11:35:27  22   by performing arithmetic and logical operations using input

11:35:34  23   image pixel values of each said input image pixel of the

11:35:38  24   real time digital video input image.

11:35:43  25          Do the claims of the '012 patent disclose

| | | |
|---|---|---|
| 11:35:49 | 1 | limitation 1(c) of the '435 patent? |
| 11:35:52 | 2 | A.  Yes. |
| 11:35:55 | 3 | THE WITNESS:  When we go to the claims -- the '012 |
| 11:35:57 | 4 | and start with 1(c). |
| 11:36:13 | 5 | A.  In 1(c), it's talking about the selecting an individual |
| 11:36:16 | 6 | color of the digital video image to be controlled. |
| 11:36:19 | 7 | THE WITNESS:  Move down to 1(e). |
| 11:36:25 | 8 | A.  We can see where it's talking about for calculating |
| 11:36:29 | 9 | values in said set of individual color lookup tables.  So |
| 11:36:33 | 10 | we're calculating these function values.  We're putting |
| 11:36:36 | 11 | them into a table. |
| 11:36:42 | 12 | THE WITNESS:  Go down to Claim 4. |
| 11:36:46 | 13 | A.  We get back to this idea of saturation and explanation |
| 11:36:54 | 14 | of how -- what values we're actually calculating.  So it |
| 11:36:59 | 15 | gives an idea of the function, whereby each of said |
| 11:37:03 | 16 | plurality of changes is used to control saturation for all |
| 11:37:06 | 17 | individual color in the digital video input image. |
| 11:37:09 | 18 | So we're putting in these values that we selected, |
| 11:37:15 | 19 | we're computing values that we're going to have, and we're |
| 11:37:20 | 20 | going to put them in a lookup table.  And that's -- like I |
| 11:37:23 | 21 | said, the lookup table is about efficient processing.  It's |
| 11:37:26 | 22 | still doing arithmetic and logical operators to generate |
| 11:37:29 | 23 | those values, to put them in the table.  And ultimately |
| 11:37:32 | 24 | even to use the table, they're still doing arithmetic and |
| 11:37:36 | 25 | logical operators. |

| | | |
|---|---|---|
| 11:37:37 | 1 | Q.  Are you finished with your answer, sir? |
| 11:37:39 | 2 | A.  Yes. |
| 11:37:48 | 3 | Q.  Dr. Stevenson, Claim Limitation 1(d) of the '435 patent |
| 11:37:51 | 4 | reads as follows:  Determining corresponding output image |
| 11:37:58 | 5 | pixel values for each of said plurality of said input image |
| 11:38:03 | 6 | pixels identified as having said selected individual color |
| 11:38:06 | 7 | in the real time digital video input image with the hue or |
| 11:38:11 | 8 | the saturation selected to be independently, changed, by |
| 11:38:16 | 9 | separately evaluating independent color hue control |
| 11:38:20 | 10 | functions or independent color saturation control |
| 11:38:23 | 11 | functions, respectively, using said input image pixel |
| 11:38:26 | 12 | values of said plurality of said input image pixels, and |
| 11:38:30 | 13 | using corresponding said selected independent color hue |
| 11:38:38 | 14 | control delta value, or said corresponding selected |
| 11:38:41 | 15 | independent color saturation control delta value, for |
| 11:38:42 | 16 | forming a corresponding plurality of output image pixels |
| 11:38:45 | 17 | having said selected individual color with the hue or the |
| 11:38:49 | 18 | saturation selected to be independently changed. |
| 11:38:53 | 19 | Dr. Stevenson, do claims of the '012 patent |
| 11:38:59 | 20 | disclose Limitation 1(d) of the '435 patent. |
| 11:39:04 | 21 | A.  Yes. |
| 11:39:05 | 22 | Q.  Would you show us where? |
| 11:39:08 | 23 | A.  There's a whole bunch of words, and luckily we've seen |
| 11:39:12 | 24 | most of them before so we don't have to go through every |
| 11:39:15 | 25 | single one of them. |

11:39:16   1        The idea that's -- you know, that kind of the new
11:39:19   2   piece of this is the fact that we're going to actually
11:39:23   3   compute output, right, this getting of it, determining
11:39:24   4   corresponding output image pixels.
11:39:27   5        THE WITNESS:  If we look at 1(i) of the '012.
11:39:32   6   A.  That reads:  Determining values of pixels in said
11:39:43   7   target output image from said new values in said set of
11:39:50   8   individual color lookup tables.
11:39:52   9        So this is the output side.  We're going to use
11:39:54  10   those lookup tables.  We're going to use those tables to
11:39:57  11   determine the output.  And so all the other ideas that are
11:39:59  12   expressed there, we've already kind of hit before.
11:40:02  13   BY MR, JOSHI:
11:40:02  14   Q.  Okay.  The last limitation of Claim 1, which is 1(e) of
11:40:06  15   the '435 patent, reads as follows:  Displaying a real time
11:40:15  16   digital video output image including said corresponding
11:40:20  17   plurality of said output image pixels having said selected
11:40:24  18   individual color with the hue or the saturation selected to
11:40:28  19   be independently changed in the real time digital video
11:40:31  20   input image, whereby the hue or the saturation of said
11:40:34  21   selected individual color in the real time digital video
11:40:39  22   input image has been changed without affecting the hue or
11:40:42  23   the saturation of any other individual color in the real
11:40:47  24   time digital video input image.
11:40:50  25        Dr. Stevenson, does -- do the claims of the '012

| | | |
|---|---|---|
| 11:40:54 | 1 | patent disclose Limitation 1(e) of the '435 patent? |
| 11:40:58 | 2 | A.  Yes. |
| 11:40:59 | 3 | Q.  Could you show us where? |
| 11:41:01 | 4 | A.  There's two main ideas expressed in this element.  One |
| 11:41:06 | 5 | is the simple fact that we're going to display the output. |
| 11:41:10 | 6 | The other one is that because of all the |
| 11:41:12 | 7 | processing, while we've changed the pixels we've |
| 11:41:15 | 8 | identified, we have not changed the other ones.  So you can |
| 11:41:18 | 9 | see both of those expressed in the '112 -- excuse me -- |
| 11:41:26 | 10 | the '012, Element 1(j), which you see in the beginning |
| 11:41:33 | 11 | reads:  Displaying said target output image on a video |
| 11:41:36 | 12 | display device. |
| 11:41:37 | 13 | So there's your display of the output, and then |
| 11:41:40 | 14 | towards the end you can see:  Whereby all other colors in |
| 11:41:44 | 15 | the digital video image remain unchanged. |
| 11:41:47 | 16 | So this is the idea we have not affected the other |
| 11:41:50 | 17 | colors that we haven't identified. |
| 11:42:02 | 18 | Q.  Dr. Stevenson, Claim 2 of the '435 patent reads as |
| 11:42:08 | 19 | follows:  The method of Claim 1, whereby the real time |
| 11:42:11 | 20 | digital video input image is of a format selected from the |
| 11:42:16 | 21 | group consisting of RGB format, YCrCb format, and YUV |
| 11:42:26 | 22 | format, whereby the individual colors of one said format |
| 11:42:30 | 23 | can be characterized by the individual colors of a second |
| 11:42:33 | 24 | said format by using appropriate linear transformations |
| 11:42:37 | 25 | between said formats. |

11:42:40  1          Dr. Stevenson, does -- do the claims of the '012
11:42:46  2  patent disclose Claim 2 of the '435 patent?
11:42:49  3  A.  Yes.
11:42:49  4  Q.  Could you show us where?
11:42:51  5  A.  If we go to Claim 2 of the '012, the idea being --
11:43:00  6  expressed in Claim 2 of the '435 is the idea that, you
11:43:04  7  know, we have this -- the digital image data is in one of
11:43:08  8  three formats:  RGB, YUV, or YCrCb.
11:43:13  9          And so if you look at Claim 2, of the '01 -- '012,
11:43:19  10 we can see that:  Whereby an individual color represents a
11:43:21  11 linear combination of base colors, said base colors
11:43:26  12 comprising red, green, blue, yellow, cyan, and magenta.
11:43:30  13         So we have the same sort of set of base colors
11:43:34  14 that we can express as a linear combination any of the
11:43:37  15 other colors.
11:43:38  16 Q.  Okay.  Dr. Stevenson, Claim 3 of the '435 patent reads
11:43:54  17 as follows:  The method of Claim 1, whereby the real time
11:43:58  18 digital video input image features basic colors red, green,
11:44:02  19 and blue, and complementary colors yellow, cyan, and
11:44:07  20 magenta in RGB color space, whereby values of said
11:44:12  21 complementary colors are expressed in terms of and
11:44:17  22 evaluated from linear combination -- combinations of values
11:44:19  23 of said basic colors.
11:44:26  24         Dr. Stevenson, do the claims of the '012 patent
11:44:30  25 disclose Claim 3 of the '435 patent?

| | | |
|---|---|---|
| 11:44:32 | 1 | A.  Yes. |
| 11:44:33 | 2 | Q.  Could you show us where? |
| 11:44:35 | 3 | MR. LIDDLE:  Objection, Your Honor, outside the |
| 11:44:36 | 4 | scope of his report. |
| 11:44:38 | 5 | THE COURT:  Was this disclosed? |
| 11:44:39 | 6 | MR. JOSHI:  Yeah, I'm looking at it right now. |
| 11:44:41 | 7 | It's in -- it's in one of the charts attached to his expert |
| 11:44:46 | 8 | report.  Exhibit E. |
| 11:44:49 | 9 | MR. LIDDLE:  It all would be obvious in view of |
| 11:44:53 | 10 | these limitations.  It doesn't say it's disclosed. |
| 11:45:01 | 11 | THE COURT:  Mr. Joshi? |
| 11:45:01 | 12 | MR. JOSHI:  What is the objection?  I'm sorry. |
| 11:45:03 | 13 | MR. LIDDLE:  Outside the scope. |
| 11:45:05 | 14 | MR. JOSHI:  It is -- |
| 11:45:05 | 15 | THE COURT:  You're saying it's an opinion that's |
| 11:45:08 | 16 | not been previously disclosed? |
| 11:45:10 | 17 | MR. LIDDLE:  I'm saying it exceeds the scope of |
| 11:45:13 | 18 | his expert testimony.  He explains that it's obvious in |
| 11:45:18 | 19 | light of this but does not say it's disclosed. |
| 11:45:22 | 20 | MR. JOSHI:  Well, I had a discussion with him |
| 11:45:25 | 21 | earlier about obviousness-type double patenting, and it can |
| 11:45:32 | 22 | be discussed in a literal way, or it can be discussed -- |
| 11:45:34 | 23 | disclosed in an obvious way. |
| 11:45:36 | 24 | THE COURT:  Well, I think what I understand the |
| 11:45:40 | 25 | Plaintiff to be objecting to is that he may have given an |

11:45:44  1   obviousness opinion but not an anticipation opinion.

11:45:49  2          Is that correct?  Is that what you're saying?

11:45:53  3          MR. LIDDLE:  That is, yes.

11:45:55  4          MR. JOSHI:  Okay.  All right.  I'll rephrase my

11:45:58  5   question, Your Honor.

11:45:59  6          THE COURT:  Fair enough.

11:46:03  7   BY MR. JOSHI:

11:46:04  8   Q.  Dr. Stevenson, what is your opinion regarding double

11:46:29  9   patenting regarding Claim 3 of the '435 patent and claims

11:46:40  10  of the '012 patent?

11:46:43  11  A.  That Claim 3 of the '435 patent would be invalid

11:46:52  12  because it would be obvious to one of skill in the art

11:46:57  13  based on the claims of the '012 patent.

11:47:02  14  Q.  Okay.

11:47:02  15         MR. JOSHI:  Are you able to hear him?

11:47:04  16         THE REPORTER:  Not really.

11:47:04  17         THE COURT:  It's hard.

11:47:05  18         MR. JOSHI:  Yeah, okay.

11:47:06  19  BY MR. JOSHI:

11:47:07  20  Q.  Could you -- could you show us why?

11:47:09  21  A.  Sure.  We just saw the language in Claim 2 of the '012

11:47:14  22  a moment ago.

11:47:15  23         THE WITNESS:  If we pull that back up.

11:47:20  24  A.  You can see in that language it talks about red, green,

11:47:24  25  blue, yellow, cyan, and magenta, those same colors that are

11:47:28   1   being discussed.  You know, the claim requires that you can

11:47:36   2   evaluate the -- the secondary colors, the yellow, cyan, and

11:47:43   3   magenta, based on a linear combination of the basic colors

11:47:47   4   red, green, and blue.

11:47:48   5        That doesn't quite say that here.  It just talks

11:47:51   6   about the six colors, but those working in the art

11:47:55   7   understand those relationships very well.  We deal with

11:47:58   8   those colors all the time.  We understand how they're --

11:48:02   9   they form linear combinations and how you create yellow,

11:48:06  10   cyan, and magenta from red, green, and blue.  It's

11:48:09  11   something that's incredibly common.  So I think it would be

11:48:14  12   obvious to one skilled in the art that that element is

11:48:18  13   found.

11:48:22  14   BY MR, JOSHI:

11:48:22  15   Q.  Dr. Stevenson, Claim 5 of the '435 patent reads as

11:48:26  16   follows:  The method of Claim 1, whereby in Step (b),

11:48:31  17   numerical range of said independent color hue control delta

11:48:36  18   value and numerical range of said independent color

11:48:39  19   saturation control delta value corresponds to an arbitrary

11:48:44  20   interval of integers.

11:48:50  21        Dr. Stevenson, is it your opinion that Claim 5 of

11:48:56  22   the '435 patent is obvious in view of one or more claims of

11:49:04  23   the '012 patent?

11:49:06  24   A.  Yes.

11:49:06  25   Q.  Could you tell us why?

11:49:08   1   A.  Sure.

11:49:10   2          THE  WITNESS:  If we go back to Claim 1 of the '012

11:49:16   3   and look at Elements (e) and then (f).

11:49:34   4   A.  What you see there is disclosed -- and what's claimed

11:49:38   5   the idea is first in (e) finding a set of individual color

11:49:43   6   control functions.  So we have these functions.  And then

11:49:45   7   in 1(f), assigning values to the color control parameters.

11:49:51   8   So we have these functions.  We're going to -- we're going

11:49:53   9   to figure them out based on values we have inserted.

11:49:56   10         What is not disclosed and why it's obvious is this

11:49:59   11   idea of a range of integers -- an arbitrary interval of

11:50:06   12   integers I think the language is.  That's how engineers

11:50:09   13   work, especially when you're talking about a computer

11:50:11   14   system.  All we deal with is --

11:50:12   15         MR. LIDDLE:  Your Honor, objection.  He said, not

11:50:14   16   disclosed.  We move to strike that comment.

11:50:17   17         THE COURT:  Mr. Joshi?

11:50:18   18         MR. JOSHI:  Yeah, just a second, Your Honor.

11:50:39   19         Here -- here's what he does say, Your Honor.

11:50:42   20         THE COURT:  Okay.

11:50:42   21         MR. JOSHI:  The range, 32767 to 3276 -- through

11:50:56   22   32767 --

11:50:57   23         MR. LIDDLE:  Your Honor, I'm not sure I want

11:50:59   24   Mr. Joshi testifying for Mr. Stevenson.

11:51:03   25         THE COURT:  Well, I have to know what's --

| | | |
|---|---|---|
| 11:51:06 | 1 | MR. LIDDLE:  Can we approach with the -- |
| 11:51:07 | 2 | THE COURT:  I'm sorry? |
| 11:51:09 | 3 | MR. LIDDLE:  Can we approach with the -- |
| 11:51:10 | 4 | THE COURT:  If it's necessary. |
| 11:51:30 | 5 | Come over here. |
| 11:54:18 | 6 | (Bench conference.) |
| 11:54:18 | 7 | MR. JOSHI:  This is Claim 6 talking about the |
| 11:54:18 | 8 | minus 1 to plus 1 range. |
| 11:54:18 | 9 | MR. LIDDLE:  I think we're on Claim 5.  What did |
| 11:54:18 | 10 | you have on the last -- |
| 11:54:18 | 11 | MR. JOSHI:  I didn't get this one.  Just one |
| 11:54:18 | 12 | second. |
| 11:54:18 | 13 | THE COURT:  He wants to know if we're on Claim 5 |
| 11:54:18 | 14 | or Claim 6.  That's what he is asking. |
| 11:54:18 | 15 | MR. JOSHI:  Claim 5, and it would be -- that's 14 |
| 11:54:18 | 16 | so that's not 5.  So here he says he's specifying the range |
| 11:54:18 | 17 | of independent color hue control delta value hes no more |
| 11:54:18 | 18 | than obvious.  He's talking about one of ordinary skill. |
| 11:54:18 | 19 | THE COURT:  Is that enough? |
| 11:54:18 | 20 | MR. LIDDLE:  If he says that, it's fine, but he |
| 11:54:18 | 21 | keeps saying it's -- those are anticipated and disclosed |
| 11:54:18 | 22 | and he is making a 102 argument. |
| 11:54:18 | 23 | MR. JOSHI:  The question I asked him is it obvious |
| 11:54:18 | 24 | and he said yes, it's obvious. |
| 11:54:18 | 25 | THE COURT:  Make sure he does not use the word |

11:54:18  1    "disclosed."

11:54:18  2           MR. LIDDLE:   Thank you, Your Honor.

11:54:18  3           MR. JOSHI:   Thank you.

11:54:30  4           (Bench conference ended.)

11:54:30  5           MR. LIDDLE:   And, I'm sorry, Your Honor, can we

11:54:33  6    get a ruling on moving to strike his disclosure?

11:54:35  7           THE COURT:   Yes, it's overruled.

11:54:35  8    BY MR. JOSHI:

11:54:44  9    Q.  So just to be -- just to be clear, Dr. Stevenson, we

11:54:48  10   are -- with respect to Claim 5 we're talking about

11:54:51  11   obviousness-type double patenting, correct?

11:54:54  12   A.  Yes.

11:54:54  13   Q.  Okay.  Please continue your answer and just keep in

11:55:13  14   mind that we're talking about obviousness and not

11:55:17  15   anticipation in our analysis here.  So go ahead.

11:55:19  16   A.  Sure.  The -- well, in Claim 5, this idea of the -- the

11:55:24  17   values are in arbitrary interval of integers, that's not

11:55:33  18   literally disclosed, but it would be obvious to one of

11:55:36  19   ordinary skill in the art.

11:55:38  20          All right.  So when we build these systems, we

11:55:40  21   build digital systems, all we deal with are numbers.  You

11:55:45  22   know, there's nothing else in those systems, a

11:55:48  23   representation of numbers.  And when we build things like

11:55:50  24   knobs and we rotate them or push them or whatever, or

11:55:54  25   sliders, they're numbers at the end of the day that we

| | |
|---|---|
| 11:55:59 | 1 |
| 11:56:02 | 2 |
| 11:56:06 | 3 |
| 11:56:10 | 4 |
| 11:56:13 | 5 |
| 11:56:24 | 6 |
| 11:56:29 | 7 |
| 11:56:34 | 8 |
| 11:56:42 | 9 |
| 11:56:50 | 10 |
| 11:56:56 | 11 |
| 11:56:58 | 12 |
| 11:57:00 | 13 |
| 11:57:02 | 14 |
| 11:57:06 | 15 |
| 11:57:09 | 16 |
| 11:57:15 | 17 |
| 11:57:20 | 18 |
| 11:57:24 | 19 |
| 11:57:29 | 20 |
| 11:57:35 | 21 |
| 11:57:41 | 22 |
| 11:57:48 | 23 |
| 11:57:53 | 24 |
| 11:57:59 | 25 |

1  manipulate within the digital system.

2       So I guess why it doesn't say that literally in

3  the claim, it would certainly be obvious to one of ordinary

4  skill in the art.

5  Q.  Dr. Stevenson, Claim 6 of the '435 patent reads as

6  follows:  The method of Claim 1, whereby in Step (b),

7  numerical range of said independent color hue control delta

8  value is an interval between minus 1 and plus 1.

9       Dr. Stevenson, is it your opinion that Claim 6 of

10  the '435 patent is obvious in view of one or more claims of

11  the '012 patent?

12  A.  It is my opinion that it is obvious.

13  Q.  Could you tell us why?

14  A.  Well, it's the same sort of issue as the -- as the

15  previous claim.  And what's changed in the language here is

16  the previous claims was an arbitrary interval of integers.

17  This one is between negative 1 and 1.  That's an obvious

18  variation.  If I could have an interval -- arbitrary

19  interval of intervals, I could pick negative 1 to 1.

20  Q.  Dr. Stevenson, Claim 13 of the '435 patent reads as

21  follows:  The method of Claim 1, whereby Step (d) is

22  performed following said identifying each said input image

23  pixel one at a time of said plurality of said input image

24  pixels, or, is performed following said identifying entire

25  said plurality of said input image pixels, as having said

```
11:58:03   1   individual color in the digital video input image whose hue
11:58:08   2   or saturation was selected to be independently changed.
11:58:18   3          Dr. Stevenson, is it your opinion that Claim 13 of
11:58:25   4   the '435 patent is obvious --
11:58:28   5   A.  Yes.
11:58:31   6   Q.  -- over one or more claims of the '012 patent?
11:58:36   7   A.  I believe it would be obvious, yes.
11:58:37   8   Q.  Could you tell us why?
11:58:41   9   A.  The -- as we've already seen in one of the primary
11:58:49  10   elements, we determine an output, right, and we determine
11:58:52  11   an output based on a look-up table.
11:58:55  12          The -- what this -- Claim 13 is requiring that we
11:59:01  13   either do that one at a time or all at a time, right, that
11:59:04  14   idea is kind of you have one or the other.
11:59:08  15          Look-up tables are used, engineers know this, one
11:59:11  16   at a time.  You look up one value in the table, you find
11:59:15  17   that value, you use it.  So it's -- while it's not
11:59:19  18   literally disclosed, it certainly would be obvious to one
11:59:23  19   of skill in the art that that's how you're going to use a
11:59:26  20   look-up table to determine the values.
11:59:33  21   Q.  Claim 14 of the '435 patent reads as follows:  The
11:59:39  22   method of Claim 1, whereby in Step (d) for independently
11:59:44  23   controlling the hue of said selected individual color in
11:59:46  24   the real time digital video image, said independent color
11:59:53  25   hue control function is a function of said input image
```

| | | |
|---|---|---|
| 11:59:57 | 1 | pixel values of said plurality of said input image pixels |
| 12:00:01 | 2 | and of said corresponding selected independent color hue |
| 12:00:08 | 3 | control delta value. |
| 12:00:11 | 4 | Dr. Stevenson, is it your opinion that Claim 14 of |
| 12:00:17 | 5 | the '435 patent is obvious in view of one or more claims of |
| 12:00:24 | 6 | the '012 patent? |
| 12:00:26 | 7 | A.  Yes, it is. |
| 12:00:27 | 8 | Q.  Could you tell us why? |
| 12:00:28 | 9 | A.  Well, we can look at a couple of different claims of |
| 12:00:35 | 10 | the '012, right, this Claim 14 adds the idea that the |
| 12:00:43 | 11 | control function we have is a function of our input pixels |
| 12:00:48 | 12 | in the hue control delta value. |
| 12:00:55 | 13 | The -- if we look at 1(e) of the '012, you see the |
| 12:01:04 | 14 | idea of we have individual color control functions.  So we |
| 12:01:08 | 15 | have those functions. |
| 12:01:09 | 16 | In 1(f), what we have are values to color control |
| 12:01:15 | 17 | parameters of said individual color control function.  So |
| 12:01:21 | 18 | we have values to control those.  Those are the delta |
| 12:01:24 | 19 | values. |
| 12:01:24 | 20 | And then Claim 3, it says:  A function of |
| 12:01:31 | 21 | values -- we can see that the look-up tables, which is |
| 12:01:42 | 22 | ultimately what we populate with these control functions, |
| 12:01:46 | 23 | is a function of values of said pixels of chromatic |
| 12:01:53 | 24 | components of the digital video input image. |
| 12:01:56 | 25 | And so that's saying that the input side -- the |

758

12:01:57   1   digital signal is being used -- the input pixels are being

12:02:02   2   used.

12:02:03   3        So we have the idea of, you know, the control

12:02:05   4   functions.  We have the idea of the control data value

12:02:09   5   affecting those functions, and that the input to those are

12:02:12   6   the input functions.  The one element that is not literally

12:02:20   7   disclosed is this idea of hue.

12:02:22   8        The color control function is read a little

12:02:25   9   broadly than that, right?  So it's saying any sort of color

12:02:29  10   control is what's claimed in the '012.  Well, hue is just a

12:02:33  11   type of color control, very typical, used in all these

12:02:39  12   systems because it's a nice, intuitive control for users.

12:02:43  13        So I think it would be obvious to one of skill in

12:02:46  14   the art that if I'm going to talk about color controls, one

12:02:49  15   of the things I'm going to think about is things like hue

12:02:52  16   and saturation.

12:02:54  17   Q.  Dr. Stevenson, Claim 15 of the '435 patent reads as

12:03:08  18   follows:  The method of Claim 1, whereby in Step (d), for

12:03:36  19   independently controlling the saturation of said selected

12:03:39  20   individual color in the real time digital video image, said

12:03:43  21   independent color saturation control function is a function

12:03:48  22   of said input image pixel values of said plurality of said

12:03:54  23   input image pixels and of said corresponding selected

12:03:58  24   independent color saturation control delta value.

12:04:01  25        Dr. Stevenson, is it your contention that Claim 15

12:04:09   1   of the '435 patent is obvious in view of one or more claims

12:04:13   2   of the '012 patent?

12:04:14   3   A.   I believe it's obvious.

12:04:15   4   Q.   Could you tell us why?

12:04:16   5   A.   It's -- it's much like this previous claim, as I've

12:04:20   6   already discussed.   The difference between Claim 14 and 15

12:04:24   7   is swapping out hue and saturation.   So for a lot of the

12:04:28   8   same reasons, saturation is just another color control type

12:04:33   9   idea.   So it's -- would be obvious, kind of, really based

12:04:38   10   on exactly what we just did for 14.

12:04:41   11        In addition, however, we also have Claim 4, which

12:04:47   12   talks about one of those control parameters can be

12:04:51   13   saturation.   If we look at Claim 4 of the '012, the idea of

12:04:55   14   control and saturation is also there, so we're actually

12:04:58   15   even closer.

12:05:00   16   Q.   Dr. Stevenson, we just now reviewed Claims 1, 2, 3, 5,

12:05:14   17   6, 13, 14, and 15 of the '435 patent.   Is it your opinion,

12:05:24   18   sir, that the inventors of the '435 patent received two

12:05:29   19   different patents for the same invention?

12:05:30   20   A.   Yes.

12:05:34   21        MR. JOSHI:   Your Honor, Defendant moves to add

12:05:42   22   DX-3 into the evidence.

12:05:45   23        THE COURT:   Any objection?

12:05:47   24        MR. LIDDLE:   No objection.

12:05:48   25        THE COURT:   Very well.   It'll be received.

12:05:51   1            MR. JOSHI:  Your Honor, I'm about to switch to

12:05:54   2   non-infringement and it's the noon hour, so this would be a

12:05:58   3   good time for a break for me.

12:06:00   4            THE COURT:  All right.  Let's go ahead and break

12:06:02   5   now.

12:06:03   6            Ladies and gentlemen of the jury, your lunch

12:06:05   7   should be here, and we'll plan to be in recess about an

12:06:07   8   hour.

12:06:08   9            Don't discuss the case among yourselves until all

12:06:11  10   of the evidence has been presented and I've instructed you

12:06:15  11   on the law.

12:06:17  12            We'll be in recess.

12:06:19  13            COURT SECURITY OFFICER:  All rise for the jury.

12:06:21  14            (Jury out.)

12:08:36  15            THE COURT:  Okay.  We'll be in recess.

12:08:36  16            (Recess.)

01:15:36  17            MR. BENNETT:  Your Honor, we have an issue that we

01:15:39  18   need to raise with the Court.

01:15:40  19            THE COURT:  All right.

01:15:41  20            MR. BENNETT:  At 7:19 this morning, I sent an

01:15:45  21   email to opposing counsel, indicating that we hadn't

01:15:48  22   received any demonstratives for use with Dr. Stevenson's

01:15:52  23   direct, despite the Court's order, or part and Paragraph 3

01:15:53  24   of the trial management order, which requires that:  A

01:15:54  25   party shall provide demonstrative exhibits to be used in

01:15:58  1   connection with direct examination, including

01:16:00  2   non-documentary demonstratives or live product

01:16:05  3   demonstration, by 6:30 p.m. the calendar day before their

01:16:10  4   intended use.

01:16:11  5            We got nothing.

01:16:12  6            This morning, I walked into court having not

01:16:14  7   received an answer to my email at 7:19 this morning.  At

01:16:18  8   8:30, I spoke with Mr. Joshi, who told me they were not

01:16:22  9   using any demonstratives.

01:16:22  10           THE COURT:  Okay.

01:16:24  11           MR. BENNETT:  At this point we have a monitor set

01:16:26  12   up with a picture from the Wizard of Oz and a whole bunch

01:16:31  13   of something.  I don't know what's going to happen or what

01:16:32  14   demonstratives will be used despite the fact that none have

01:16:33  15   been disclosed.

01:16:34  16           MR. JOSHI:  Okay.  So that's a screen saver.

01:16:37  17   We're not going to do anything with the Wizard of Oz.

01:16:37  18           THE COURT:  We're not going to see the Wizard of

01:16:40  19   Oz?

01:16:40  20           MR. JOSHI:  We're not watching Wizard of Oz.  We

01:16:44  21   are not -- we don't have any documentary demonstratives.

01:16:46  22   I've used just the exhibits.  All he's going to do is the

01:16:51  23   user interface that Dr. Ducharme adjusted, the red and the

01:16:54  24   green and the yellow colors on back and forth.  This is not

01:16:58  25   something that we could have shared.  It's just something

```
01:17:01   1   that we needs to be done live, and it's a repeat of
01:17:05   2   something the jury has already seen multiple times.
01:17:08   3          THE COURT:  Seems like that's fair, Mr. Bennett.
01:17:11   4          MR. BENNETT:  If --
01:17:11   5          MR. JOSHI:  And it's an exhibit that's been
01:17:13   6   admitted, 11.
01:17:17   7          THE COURT:  Yeah.
01:17:17   8          MR. BENNETT:  That's not --
01:17:17   9          THE COURT:  I think the witness -- or what
01:17:19  10   Mr. Joshi is saying the witness is going to do is what
01:17:22  11   other witnesses have done during the course of the trial.
01:17:25  12          MR. BENNETT:  That's not what we were told, and
01:17:27  13   that's fine.
01:17:27  14          THE COURT:  Sure.
01:17:28  15          MR. BENNETT:  But no demonstratives have been
01:17:30  16   disclosed, so as long as it's limited to that.
01:17:31  17          THE COURT:  Well, as long as we don't see any
01:17:33  18   demonstratives, we won't have a problem.
01:17:35  19          MR. JOSHI:  Yes.
01:17:36  20          THE COURT:  Let's have the jury in, please.
01:17:39  21          COURT SECURITY OFFICER:  Please rise for the jury.
01:17:39  22          (Jury in.)
01:18:06  23          THE COURT:  Please be seated.
01:18:08  24          Mr. Joshi, you may continue.
01:18:10  25          MR. JOSHI:  Thank you, Your Honor.
```

01:18:12   1   BY MR. JOSHI:

01:18:12   2   Q.  Welcome back, Dr. Stevenson.  So we're going to switch

01:18:18   3   gears now.  We talked about validity.  Now I want to talk

01:18:23   4   about infringement.

01:18:24   5          So I would like the members of the jury to

01:18:26   6   understand the difference.  When you did your validity

01:18:32   7   analysis, you compared the claims of the '435 patent with

01:18:38   8   what?

01:18:39   9   A.  To validity and look at reasons why it might be

01:18:45  10   invalid.  I compared it to that Brett reference and found

01:18:49  11   it was invalid.  And then I also compared it to the

01:18:52  12   inventor's own piece of art, the '012, and found it

01:18:59  13   invalid.

01:18:59  14   Q.  And there are a couple of terms -- you used the word --

01:19:05  15   term "invalid."  What does that mean?

01:19:08  16   A.  Basically it means -- I think it was a mistake that the

01:19:12  17   Patent Office granted the patent.  It shouldn't -- didn't

01:19:16  18   have all the information I had, so I understand the source

01:19:19  19   of the mistake.  When you spend as much time as I have and

01:19:23  20   having seen all the references -- but if they had all that

01:19:26  21   stuff, I believe they would have come to a different

01:19:30  22   conclusion about granting the patent.

01:19:31  23   Q.  So the validity analysis, if I understand correctly, is

01:19:34  24   about whether inventors should or should not have received

01:19:40  25   a patent in the first place; is that correct?

764

01:19:43    1    A.   Correct.

01:19:43    2    Q.   And when you did your infringement analysis, you

01:19:46    3    compared the '45 patent -- '435 patent claims with what?

01:19:54    4    A.   So the other side of the issue is infringement, whether

01:19:57    5    ASUS products practice the claims.   And so at that point

01:20:01    6    I'm comparing the accused products that are in this case

01:20:05    7    against the claims of the '435 patent.

01:20:10    8          MR. JOSHI:   Could I please have DX-1 brought back

01:20:19    9    up, please?   All right.   Mr. Oliver, will you please go to

01:20:45   10    Claim 1?

01:20:46   11    BY MR. JOSHI:

01:20:50   12    Q.   Okay.   So now, in Claim 1, what we see is there are --

01:20:58   13    there's a preamble, and then there are Limitations (a),

01:21:03   14    (b), (c), (d), and (e).

01:21:10   15          MR. JOSHI:   Would you mind zooming out just a

01:21:14   16    little bit so we can see the whole claim?   Okay.

01:21:20   17    BY MR. JOSHI:

01:21:20   18    Q.   So that's the whole claim.   It's got five limitations,

01:21:25   19    (a) through (e).

01:21:27   20          Dr. Stevenson, please tell the members of the

01:21:35   21    jury, for ASUS to not infringe Claim 1, how many of these

01:21:40   22    limitations does it not -- must it not infringe?

01:21:45   23    A.   I found that a little confusing, but I think the basic

01:21:51   24    question is -- you know, the basic point is that to not

01:21:55   25    infringe, all you got to do is -- if you don't practice

01:21:58  1  every single element, you don't infringe.  So you have to

01:22:02  2  practice every single element to infringe.  Conversely, to

01:22:08  3  not infringe, as long as you don't practice one of those

01:22:13  4  elements, you're not infringing.

01:22:14  5  Q.  So if ASUS products do not practice any one of these

01:22:18  6  five limitations, then ASUS would not infringe entire

01:22:22  7  Claim 1; is that correct?

01:22:23  8  A.  Correct.

01:22:24  9  Q.  So if the members of this jury were to decide that ASUS

01:22:38  10  does not practice one or more limitations of Claim 1, what

01:22:41  11  would happen to Claim 2?

01:22:44  12  A.  You -- Claim 2 is one of these dependent claims we've

01:22:48  13  been looking at, and to practice -- you know, to infringe

01:22:52  14  Claim 2, you have to do everything in Claim 2, plus

01:22:55  15  everything in Claim 1.  So you have to do kind of both.

01:23:00  16  Claim 2 adds something on, you might say.

01:23:02  17       So if you're not infringing Claim 1, you're

01:23:05  18  already missing an element.  Adding something on with

01:23:10  19  Claim 2, you're still missing that same element.  So once

01:23:14  20  you don't infringe Claim 1, you really can't infringe any

01:23:18  21  of the dependent claims either.

01:23:20  22  Q.  Are all the claims in this litigation that are not

01:23:22  23  Claim 1, dependent claims of Claim 1?

01:23:26  24  A.  Yes.  Claim 1 is what's called independent.  Everything

01:23:30  25  else is dependent.

01:23:31  1  Q.  So the answer that you just now gave with respect to

01:23:35  2  Claim 2, would that also apply to Claims 3, Claim 5,

01:23:43  3  Claim 6, Claims 13, 14, and 15?

01:23:48  4  A.  Yes.  If Claim 1 is not infringed, the rest of them

01:23:51  5  can't be infringed either.

01:24:07  6  Q.  Dr. Stevenson, do you know that the Court has provided

01:24:10  7  definitions for the terms "hue" and "saturation"?

01:24:13  8  A.  Yes.

01:24:14  9  Q.  Did you review those definitions when you did your

01:24:23  10  analysis for infringement?

01:24:25  11  A.  Yes.

01:24:25  12  Q.  When you reviewed the definitions the Court has

01:24:37  13  provided for hue and saturation, did you notice the word

01:24:47  14  "brightness" in those definitions anywhere?

01:24:50  15  A.  I don't recall that word being used.

01:24:51  16  Q.  Okay.  Let me -- let me refer you to your expert report

01:24:56  17  where you have the definitions.

01:25:10  18       There's a tab in your binder there, Tab No. 4, and

01:25:31  19  I would ask you to go to Page 16.  Please let me know when

01:25:55  20  you're ready.

01:25:56  21  A.  I'm ready.  I've looked at them.

01:26:03  22  Q.  Okay.  In the definitions of hue and saturation that

01:26:07  23  the Court has provided, does the term "brightness" appear

01:26:10  24  anywhere?

01:26:11  25  A.  No.

01:26:11   1   Q.   Does the term "gain" appear anywhere?

01:26:16   2   A.   No.

01:26:17   3   Q.   What did you say?

01:26:18   4   A.   No.

01:26:28   5   Q.   Does the term "contrast" appear anywhere?

01:26:31   6   A.   No.

01:26:32   7   Q.   Now, Dr. Stevenson, you've been here during the trial,

01:26:43   8   correct?

01:26:43   9   A.   Most of it.

01:26:44  10   Q.   Most of it?  And you know that there has been a lot of

01:26:49  11   discussion about 3-axis products and 6-axis products?

01:26:53  12   A.   Yes.

01:26:53  13   Q.   Do you know -- do you know what they are?  Not asking

01:26:57  14   you -- I'm just asking, do you know what they are?

01:27:01  15   A.   I know what they're referring to, yes.

01:27:03  16   Q.   Okay.  And the products that we have been referring to

01:27:06  17   as 3-axis and 6-axis, do they operate the same or

01:27:11  18   differently for the purposes of what's happening in this

01:27:18  19   case?

01:27:18  20   A.   No, they operate very differently in terms of how they

01:27:22  21   can adjust color.

01:27:23  22   Q.   We --

01:27:27  23        MR. JOSHI:  Could we make Claim 1 a bit larger?

01:27:32  24   It's okay if you can only cover half of it.  That's fine.

01:27:38  25   Okay.  That's good.  That's good.

```
01:27:40    1   BY MR. JOSHI:
01:27:40    2   Q.  So with respect for -- with respect to Claim 1, are
01:27:45    3   there any noninfringement arguments that apply to both the
01:27:52    4   3-axis products and what we've been referring to as 6-axis
01:27:56    5   products?
01:27:56    6   A.  Yes, there are positions I take and that apply to all
01:28:01    7   products.
01:28:01    8   Q.  Would you tell us one noninfringing position that
01:28:06    9   applies to all products?
01:28:08   10   A.  You can see in Element 1(b), this is the selecting
01:28:12   11   element, it talks about selecting independently changed hue
01:28:20   12   or saturation.
01:28:20   13        If you look a little bit further at that element,
01:28:22   14   it talks about using a -- by selecting an independent color
01:28:28   15   hue control value or an independent color saturation
01:28:33   16   control value.  I didn't see anything in the products that
01:28:36   17   looked like a -- that was a delta value or hue or
01:28:55   18   saturation.
01:28:55   19        MR. JOSHI:  May I please have Exhibit 14A.  And
01:29:18   20   could you go to the very last page.  Yeah, there.  And
01:29:21   21   could you zoom in on the top half of the page.
01:29:26   22   BY MR. JOSHI:
01:29:31   23   Q.  Dr. Stevenson, as you know, we have repeatedly looked
01:29:36   24   at this user interface in this trial; is that correct?
01:29:40   25   A.  Yes.
```

01:29:40  1   Q.  And that No. 50 that is shown there, is it or is it not
01:29:52  2   a delta value?
01:29:53  3   A.  It is not.
01:29:55  4   Q.  Would you tell the members of the jury why it is not
01:29:57  5   the delta value?
01:29:59  6   A.  Maybe we should talk a little bit about what it means
01:30:03  7   to be a delta value.
01:30:05  8   Q.  Let me ask a question.  What is a delta value in the
01:30:09  9   context of Claim 1?
01:30:10  10  A.  I think the easiest way to explain delta value is to
01:30:14  11  use an analogy.
01:30:20  12       I drive with cruise control all the time, and, you
01:30:23  13  know, I can set up -- I can go 60 miles an hour, and I can
01:30:27  14  hit my cruise button, and I've set my absolutely speed.
01:30:31  15  All right.  So that's setting an absolute speed.
01:30:35  16       I have another button that I can push, and that
01:30:37  17  increases the temperature [sic] by plus 1, versus the other
01:30:45  18  way, and it goes minus 1.  I press it hard, it goes plus 5.
01:30:47  19  I press it real hard, it goes minus 5.  Those are two
01:30:50  20  different types of controls.
01:30:53  21       One I can set the absolute value by turning it on
01:30:57  22  and setting at 60, and then the other one I'm just setting
01:31:01  23  a delta value.  I'm going up 5 or down 5, or up 1, minus 1.
01:31:07  24  That's a delta value because that's telling you the
01:31:07  25  difference, right.  If it operates -- if I'm at 30 and I

01:31:08    1    hit plus 5, I get to 35.  I don't get to 65.  I didn't set

01:31:16    2    that absolute value.  I set a difference from where I am.

01:31:17    3            So delta is this idea of a difference value, not

01:31:22    4    an absolute value.  The -- you know, the claims of the

01:31:26    5    patent talk about a specific way of controlling the hue and

01:31:29    6    the contrast, and that's with these delta values.

01:31:32    7    Q.  But you don't believe this is a delta value?

01:31:36    8    A.  No, it's an absolute value.  It's like setting the

01:31:41    9    speed limit -- my speed of the car 50 miles an hour.

01:31:45   10    Q.  And with respect to the products that we have been

01:31:47   11    referring to as 3-axis and 6-axis, what kind of product is

01:31:51   12    this?

01:31:51   13    A.  This is one of the 6-axis products.

01:31:55   14    Q.  Okay.  Do the 3-axis hours -- let's start again.

01:32:03   15            Same question with respect to 3-axis products.

01:32:09   16    How do they do the adjustments?

01:32:12   17    A.  The interface looks very different because actually the

01:32:16   18    functionality, what is going on is very different.

01:32:20   19            But the -- here Dr. Ducharme pointed to a slider,

01:32:25   20    and the slider went from 0 to 100.  I think it defaulted at

01:32:30   21    50.  So it's the same sort of idea that I can set the

01:32:35   22    absolute value, I can set my speed, but I can't really

01:32:38   23    set -- I don't interface it by saying go plus 5.  I set the

01:32:44   24    absolute value.

01:32:45   25    Q.  So Dr. Ducharme showed a slider to the jury.  Do you

01:32:49   1   recall that?

01:32:49   2   A.   Yes.

01:32:49   3   Q.   I would like you to show the jury the same slider and

01:32:53   4   explain the answer that you gave now.

01:32:55   5   A.   Coming down here?

01:32:56   6           MR. JOSHI:   Your Honor, may our witness come down?

01:32:59   7           THE COURT:   Yes, yes.   As long as he has a

01:33:03   8   microphone.

01:33:03   9           MR. JOSHI:   If you just turn on the microphone

01:33:06  10   that -- and then it has a clip so you can put it on your

01:33:09  11   pocket if you like or just hold it.   Just click it once and

01:33:15  12   then you stop.

01:33:16  13           May we please switch to the Elmo, ma'am?

01:33:49  14           That's fine.   Let me help zoom in.

01:33:49  15   BY MR. JOSHI:

01:33:54  16   Q.   Please go ahead.

01:34:01  17   A.   Okay.   So this is one of the so-called 3-axis products,

01:34:05  18   and this is the main menu that you can pull up.   The menu

01:34:13  19   he went into was the -- the color menu, and then the color

01:34:32  20   temperature menu.

01:34:34  21           MR. LIDDLE:   Objection, Your Honor.

01:34:35  22           THE COURT:   What's the objection?

01:34:37  23           MR. LIDDLE:   I think we're about to do a

01:34:39  24   demonstrative here.

01:34:40  25           THE COURT:   Overruled.

01:34:48  1   A.  And then select the user mode.  And this is where

01:34:55  2   you've got to -- the RGB settings that were available, and

01:35:01  3   you can see it's set to 50, and where you can adjust it up

01:35:06  4   and down from there from 0 to 100, setting the absolute

01:35:10  5   value of the red, the absolute value of the green, and the

01:35:17  6   absolute value of the blue.  In this case, the gain, not

01:35:17  7   the hue or the saturation, but set the absolute value, not

01:35:40  8   a delta value.

01:35:40  9   BY MR. JOSHI:

01:35:41  10  Q.  Thank you, Dr. Stevenson.

01:35:42  11       I want to amplify a couple of things you just said

01:35:46  12  there.  I believe your first argument was it's not a delta.

01:35:49  13  Could you please tell us again what you said?

01:35:59  14  A.  In the -- for the 3-axis products, you can -- going

01:36:02  15  through the menus, you can select this color temperature

01:36:06  16  user mode which allows you to select the gain of the red,

01:36:11  17  green, and blue components.  You can set, as we saw in the

01:36:14  18  other menu, an absolute value.  I could set it to 50, I

01:36:18  19  could set it to 100, I could set it to 75.  You know, kind

01:36:20  20  of like setting the speed to 50 miles an hour.

01:36:23  21       What I can't do is bump it by five -- five values,

01:36:27  22  or something like that, or plus 1, minus 1, things like

01:36:30  23  that.  There's nothing -- no control like that.  So I can't

01:36:33  24  enter a delta value unlike what the claim requires.

01:36:37  25  Q.  And you said something else.  I heard you use the word

01:36:40   1   "gain," g-a-i-n.  What did you say?

01:36:44   2   A.  Well, unlike in the 6-axis where I went into a

01:36:48   3   saturation menu and I could adjust values of something

01:36:51   4   like red, here I was -- I was selecting a color temperature

01:36:56   5   that allowed me to select -- change the gain of red, green,

01:37:00   6   or blue on different quantities, different things.  They're

01:37:04   7   not -- it's not saturation.

01:37:07   8   Q.  Let's go back to Claim 1.

01:37:14   9        MR. JOSHI:  I'm sorry to bother you again, ma'am,

01:37:17   10  but we'll need the -- thank you.

01:37:19   11       Can we please go back to Claim 1?

01:37:27   12  BY MR. JOSHI:

01:37:28   13  Q.  Is there another noninfringement argument that you

01:37:31   14  have, Dr. Stevenson, that would apply to both the 3-axis

01:37:36   15  and the 6-axis products?

01:37:38   16  A.  Yes.  If we scroll down a little bit to Element (c),

01:37:43   17  this is the identification step where we identify -- well,

01:37:49   18  the claim requires you to identify various image pixels

01:37:53   19  that you're going to modify.  I don't believe this is

01:37:56   20  infringed -- this is practiced by the products either.

01:37:59   21  Q.  Okay.  Could you tell the jury why this is not

01:38:02   22  infringed?

01:38:04   23  A.  This -- this gets a little more complicated.

01:38:09   24       The -- I talked about the -- kind of the pipeline

01:38:15   25  that -- that we generate building these systems.  In

01:38:19  1  opening, I heard the Plaintiff talk about 50 million pixels

01:38:24  2  we have to process.  That's right.  We do.  We have a lot

01:38:26  3  of data being processed.  We have to do that incredibly

01:38:34  4  fast.  The structures we build are almost incomprehendible

01:38:37  5  [sic] in some sense.

01:38:38  6      That means from a time a -- kind of a pixel kind

01:38:42  7  of comes into the monitor until it's on the screen is on

01:38:46  8  the order of like 100 nanoseconds.  A nanosecond is one

01:38:53  9  billionth of a second, so incredibly, incredibly short

01:38:55  10  time.  And that's why we build what we call pipelines.

01:38:58  11      You know, I talk to my students about a firehose.

01:39:01  12  You know, we have a firehose of data coming towards us.

01:39:06  13  It's on full blast.  We got to get all that data and get it

01:39:10  14  onto the screen.  And one of the most complex parts of

01:39:14  15  these systems is that timing in dealing with all that data.

01:39:18  16  So how we do that is incredibly complex and very -- and

01:39:21  17  very sensitive.

01:39:22  18      And so this idea that we're going to -- and

01:39:29  19  Dr. Ducharme explained it as we're going to take pixels in

01:39:33  20  the brain of the -- the display is going to put it in one

01:39:37  21  bucket and put some other in the other buckets, and that's

01:39:39  22  how he said identification was being done.

01:39:42  23      And then once the buckets are full, we're going to

01:39:44  24  process the data in one bucket and not process in the other

01:39:48  25  one.  That just does not happen in these sorts of systems.

01:39:51  1   The firehose is on, the data is coming through, we build

01:39:56  2   these pipelines that can modify the data a little bit as

01:39:59  3   it's, you know, whizzing by us, but we don't build these

01:40:05  4   buckets that we've identified pixels and not identified

01:40:08  5   pixels.

01:40:08  6            He didn't really point to anything that did that.

01:40:11  7   He just kind of said that as an explanation.  I don't

01:40:15  8   believe it happens.

01:40:15  9   Q.  Okay.  And you just testified that Dr. Ducharme didn't

01:40:28 10   explain how that would happen?

01:40:30 11            MR. LIDDLE:  Objection, leading.

01:40:33 12            THE COURT:  Sustained.

01:40:33 13   BY MR. JOSHI:

01:40:33 14   Q.  Could you --

01:40:33 15            THE COURT:  Can you rephrase the question?

01:40:36 16            MR. JOSHI:  Sorry, Your Honor.

01:40:38 17   BY MR. JOSHI:

01:40:38 18   Q.  Could you restate the flaw --

01:40:40 19            THE COURT:  Rephrase the question.

01:40:43 20   BY MR. JOSHI:

01:40:43 21   Q.  What was the flaw in Dr. Ducharme's presentation?

01:40:46 22   A.  Well, he told us -- he told us about this brain, and I

01:40:50 23   know he was trying to use an analogy, and he was telling us

01:40:53 24   about how moving things into buckets, you know, analogy

01:40:53 25   kind of works.

01:40:53  1          You can't put a firehose -- you can't put a bucket

01:40:53  2   in front of a firehose and move things over and store them

01:41:04  3   for later.  It just overflows the system; the video stops.

01:41:09  4          So that was -- you know, that's how he was trying

01:41:13  5   to explain it.  The problem I had was he didn't turn around

01:41:16  6   and back it up with evidence.  He didn't show us

01:41:19  7   anything -- didn't show me anything that showed these

01:41:22  8   buckets -- or how this bucket -- this idea of a bucket was

01:41:26  9   being implemented in the system.  All -- he gave us a story

01:41:29  10  about buckets.  Very little of it.

01:41:37  11  Q.  So in conclusion, Dr. Stevenson, do you believe

01:41:42  12  the '435 patent is invalid?

01:41:44  13  A.  I do believe it's invalid.

01:41:46  14  Q.  And do you believe that ASUSTeK does not infringe

01:41:50  15  the '435 patent?

01:41:50  16  A.  Correct.  I believe it's doesn't infringe the '435.

01:41:53  17  Q.  Thank you, Dr. Stevenson.

01:41:53  18          MR. JOSHI:  We'll pass the witness, Your Honor.

01:41:57  19          THE COURT:  Cross-examination?

01:42:00  20                   CROSS-EXAMINATION

01:42:11  21  BY MR. LIDDLE:

01:42:34  22  Q.  Good afternoon, Dr. Stevenson.  My name is Bradley

01:42:37  23  Liddle.  I'm an attorney with -- representing Lone Star

01:42:43  24  Technological Innovations in this case.  It's nice to meet

01:42:46  25  you.  I don't think we've ever met before.

01:42:48  1   A.  Good afternoon.  I don't believe we have either.

01:42:48  2   Q.  Yes.  Okay.  Well --

01:42:51  3   A.  It's nice to meet you.

01:42:52  4   Q.  All right.  I want to start -- you just testified

01:42:54  5   with -- about infringement, and I kind of want to start

01:42:56  6   there.

01:42:57  7        So the first thing I want to focus on is a

01:42:59  8   statement that you just made, while it's fresh in the mind

01:43:02  9   of the jury.

01:43:03  10        So something you just said was, in this

01:43:05  11   identification step, which is the -- how we identify the

01:43:11  12   pixels to be changed using arithmetic and logical

01:43:15  13   operations, you said that Dr. Ducharme didn't cite

01:43:18  14   anything, is that right, or didn't point to anything?

01:43:21  15   A.  I didn't see him point to any evidence that it does

01:43:24  16   that, no.

01:43:25  17   Q.  Do you remember Dr. Ducharme serving an expert report

01:43:28  18   in this case?

01:43:28  19   A.  Yes.

01:43:28  20   Q.  You do?  Okay.  So with his expert report, do you

01:43:33  21   remember that he reviewed the MediaTek source code?

01:43:42  22   A.  I remember he served two expert reports on

01:43:46  23   infringement.  In one, he did not.  A later one, a

01:43:48  24   supplemental infringe report, he did --

01:43:48  25   Q.  Okay.

01:43:51  1    A.  -- talked about source code.

01:43:52  2    Q.  All right.  Well, let's just break that down.  So -- so

01:43:57  3    Dr. Ducharme served an initial expert report, correct?

01:43:59  4    A.  Yes.

01:44:00  5    Q.  And then he reviewed the MediaTek source code, correct?

01:44:04  6    A.  I don't know the order in which he did things.

01:44:08  7    Q.  Okay.  A reasonable inference would be that he did

01:44:12  8    these things in order, right?

01:44:13  9    A.  I don't know.  He served one expert report, then he

01:44:16  10   served a second one which included code analysis.

01:44:19  11   Q.  But -- but the second -- the second infringement report

01:44:24  12   that he served contained MediaTek source code; is that

01:44:27  13   correct?

01:44:27  14   A.  Yes.

01:44:28  15   Q.  Okay.  Under the identifying step, which is Claim 1(c),

01:44:34  16   did he put source code citations to show how the pixels are

01:44:39  17   identified?

01:44:40  18   A.  No.

01:44:41  19   Q.  He didn't?

01:44:42  20   A.  No.

01:44:42  21   Q.  Do you have a copy of his report?  Let me -- let me --

01:44:54  22   let me clarify something real quick.  Did you read

01:44:58  23   Dr. Ducharme's report?

01:44:59  24   A.  Yes.

01:45:00  25            MR. JOSHI:  If it helps, Counsel, it's the last

01:45:03  1   tab in his binder.

01:45:06  2        THE WITNESS:  I do have a report -- I don't know

01:45:45  3   if it's the -- I believe I have the original report, not

01:45:49  4   the one with the source code.

01:45:51  5   BY MR. LIDDLE:

01:45:52  6   Q.  Okay.

01:45:52  7        MR. JOSHI:  You have it.  It's the last one.  It's

01:45:55  8   No. 5 in your binder.

01:45:58  9   A.  I do have it.

01:45:58  10  BY MR. LIDDLE:

01:46:29  11  Q.  Okay.  Can you turn to Dr. Ducharme's supplemental

01:46:32  12  expert report on infringement, the one that contains the

01:46:34  13  MediaTek source code and review Paragraphs 67, 68, and 69

01:46:41  14  and 70.

01:46:57  15  A.  Okay.

01:46:57  16  Q.  Would you like to change your answer on whether he

01:47:01  17  cited source code to show this step?

01:47:04  18  A.  To show the identification step?

01:47:07  19  Q.  Yes.  You made the statement he did not -- he did not

01:47:11  20  cite source code to show infringement of this step, and I

01:47:15  21  just pointed to you that he -- that he did.  Would you like

01:47:18  22  to change your answer?

01:47:20  23  A.  To be clear, I believe your question was whether or not

01:47:23  24  he showed source code to support his position that the

01:47:27  25  products did identification.  He cites source code in this

01:47:32  1  section, but that source code does not show that it does

01:47:35  2  any identification.

01:47:39  3  Q.  Okay.  I'm looking at -- I'm looking at Paragraph 66.

01:48:34  4  Okay.  Do you -- can you read that?

01:48:36  5  A.  Yeah.

01:48:36  6  Q.  And then I'm also looking at Paragraph 67.  And so

01:48:40  7  Dr. Ducharme says:  This includes a logical operation where

01:48:45  8  the values assigned to U out and V out are determined by a

01:48:49  9  set of logical and operations and logical comparison

01:48:53  10  operations.

01:48:54  11       Do you see that, sir?

01:48:55  12  A.  Yes.

01:48:55  13  Q.  Okay.  Thank you.

01:48:59  14       I want to move on to something else that you said.

01:49:05  15  When you came down and were demonstrating the monitors, you

01:49:10  16  had made some -- you had submitted some testimony on delta

01:49:14  17  value.

01:49:15  18  A.  Yes.

01:49:15  19  Q.  So we -- we saw you go in and select R, G, and B, and

01:49:22  20  we saw the red, green, and blue slider that we've been

01:49:26  21  looking at through this trial.

01:49:28  22  A.  The yes.

01:49:28  23  Q.  And so -- and so why would the delta -- so -- so the

01:49:33  24  delta value in that case is 1, is it not?

01:49:36  25  A.  It's 1?  I don't know what you mean by that.

01:49:40  1   Q.  So throughout the trial, we've had several -- we've had

01:49:45  2   opposing counsel, we've had experts come up and change the

01:49:49  3   R, G, and B slider, correct?

01:49:51  4   A.  Yes.

01:49:51  5   Q.  And it generally changes from 50 to 51 and then 51 to

01:49:57  6   52, correct?

01:49:57  7   A.  I've seen most people change it bigger than that, but

01:50:01  8   they change it -- you know, 75, 100, or something like

01:50:03  9   that.

01:50:04  10  Q.  But it's one at a time, right?

01:50:06  11  A.  No, not one at a time.  I don't recall anyone sliding

01:50:09  12  to 51 and then to 52.  Just slid it --

01:50:15  13  Q.  Okay.  All right.  I'd like to move on to -- okay.

01:50:37  14          Dr. Stevenson, how many times have you testified

01:50:40  15  in trial before?

01:50:42  16  A.  In a District Court setting like this, I believe this

01:50:45  17  is my twelfth or thirteenth time, something like that.

01:50:50  18  Q.  And how many times have you testified in a deposition?

01:50:56  19  A.  I don't know.  Maybe -- probably over 50 times.

01:51:01  20  Q.  And how many times have you testified at, like, a

01:51:11  21  non-jury trial or an administrative hearing?

01:51:13  22  A.  Probably the other place where I testify maybe the most

01:51:18  23  is at the -- what's called the International Trade

01:51:22  24  Commission.  It's a branch of the U.S. government that

01:51:26  25  looks at trade -- international trade.  And I've testified

| | | |
|---|---|---|
| 01:51:30 | 1 | there -- it's about another dozen times. |
| 01:51:33 | 2 | Q.  Okay.  But the International Trade, known as the ITC, |
| 01:51:38 | 3 | that deals with patent infringement, generally, right? |
| 01:51:41 | 4 | A.  Yeah. |
| 01:51:41 | 5 | Q.  Okay.  And then how many times have you testified at a |
| 01:51:45 | 6 | claim construction hearing or -- or a deposition for claim |
| 01:51:50 | 7 | construction? |
| 01:51:50 | 8 | A.  Well, at a hearing, I don't know, maybe -- I've been |
| 01:52:01 | 9 | doing this a long time.  Maybe half a dozen times.  You |
| 01:52:05 | 10 | know, in terms of depositions for claim construction, that |
| 01:52:07 | 11 | number I gave you before, 50, kind of included -- |
| 01:52:12 | 12 | Q.  Okay. |
| 01:52:12 | 13 | A.  -- both those and others things.  I don't know how to |
| 01:52:16 | 14 | break it out. |
| 01:52:17 | 15 | Q.  So -- so -- so all together, maybe around 100 times |
| 01:52:22 | 16 | you've testified? |
| 01:52:22 | 17 | A.  In deposition or trial? |
| 01:52:24 | 18 | Q.  Yeah. |
| 01:52:25 | 19 | A.  It might be that many.  It's been close to 25 years |
| 01:52:28 | 20 | I've been doing this, so... |
| 01:52:30 | 21 | Q.  All right.  So -- so in these -- in this testimony, you |
| 01:52:35 | 22 | always represent the accused infringer of the patent, |
| 01:52:40 | 23 | right? |
| 01:52:40 | 24 | A.  No, not at all. |
| 01:52:41 | 25 | Q.  How many times have you represented, for instance, a |

01:52:44    1   patent owner?

01:52:45    2   A.   How many times have I represented the patent owner?

01:52:49    3   Q.   Yeah.  So there's -- on two sides, there's either the

01:52:52    4   patent owner or the accused infringer.

01:52:53    5   A.   I haven't counted it up.  I think of it as pretty even.

01:52:58    6   I do both.

01:52:58    7   Q.   You do both?  Can you name one such case where you

01:53:02    8   respect represented a patent owner?

01:53:05    9   A.   Sure.  I testified down in Beaumont, Texas, a couple of

01:53:07   10   years for a company called Cummins.  They're -- they make

01:53:11   11   money machines.  They make money counters, and they use

01:53:15   12   image processing to identify bills.  And they were -- they

01:53:17   13   had a patent, and they asserted it against someone, and I

01:53:25   14   testified for them.

01:53:26   15   Q.   Okay.  Now, I want to go back to something and make it

01:53:28   16   clear.  We were discussing the identification step in --

01:53:35   17   for infringement of the '435 patent, and we got out

01:53:38   18   Dr. Ducharme's supplemental expert report where he cited

01:53:43   19   the source code.

01:53:44   20        Now, you did not -- you did not review the source

01:53:47   21   code in this case, did you?

01:53:47   22   A.   No, I reviewed the code.

01:53:50   23   Q.   You reviewed the source code in this case?

01:53:52   24   A.   Yes.

01:53:52   25   Q.   Is there some reason why you didn't supplement your

01:53:57  1  report with the source code?

01:53:59  2  A.  I wasn't asked to.

01:54:00  3  Q.  Okay.  So I want to talk about your testimony just now

01:54:36  4  on infringement.  So Mr. Joshi did not go through all of

01:54:39  5  the claims of -- of the patent with you, right, in the

01:54:41  6  context of infringement?

01:54:42  7  A.  No.  He -- kind of leading up to it, he talked about

01:54:46  8  how if you don't infringe Claim 1 --

01:54:46  9  Q.  Right.

01:54:49  10  A.  -- you don't infringe the rest, but we didn't go

01:54:52  11  element by element through all the claims.

01:54:54  12  Q.  So your opinion was only that 1(b) and 1(c) are not met

01:54:59  13  by the ASUS products, right?

01:55:00  14  A.  Well, in terms of what I offered in the courtroom,

01:55:04  15  those are the only two I discussed.

01:55:05  16  Q.  But you didn't offer any other testimony regarding

01:55:08  17  that; is that correct?

01:55:08  18  A.  Correct.  Those are the two elements I testified about

01:55:11  19  here today.

01:55:12  20  Q.  Okay.  So it would be fair to say if the jury disagreed

01:55:16  21  with you, they would find your -- the ASUS products are

01:55:20  22  infringed, right?

01:55:21  23  A.  Well, they could also agree with the validity

01:55:25  24  positions, and then you can't infringe --

01:55:26  25  Q.  Well, that wasn't my question.  So my question was:

01:55:29   1   You only submitted testimony just now on Elements 1(b) and

01:55:33   2   1(c), and just so -- just a matter of logic, if the jury

01:55:40   3   disagrees with you, they would find that the ASUS monitors

01:55:44   4   infringe, right?

01:55:45   5   A.  I think there's an element missing to your logic.  They

01:55:48   6   could also find the patent invalid, and you can't infringe

01:55:52   7   an invalid patent.

01:55:53   8   Q.  I wasn't talking about invalidity, but I think you

01:55:58   9   answered my question.

01:56:00   10         Now, in this -- in this matter we have been

01:56:10   11   discussing the ASUS accused products, right?

01:56:13   12   A.  Yes.

01:56:14   13   Q.  Now -- so there's been a lot of testimony on whether

01:56:26   14   you characterize the products into sort of 3-axis

01:56:30   15   and 6-axis.  Do you agree with that?

01:56:32   16   A.  That's how you guys have grouped the two set of

01:56:35   17   products, you might say.

01:56:36   18   Q.  So in your expert report it says that you obtained and

01:56:39   19   tested two ASUS products, right?

01:56:41   20   A.  Yes.

01:56:42   21   Q.  Now, your -- now, your report doesn't set out the test

01:56:48   22   conditions or -- or anything like that with the -- how

01:56:53   23   those products were tested or anything of that nature,

01:56:56   24   correct?

01:56:56   25   A.  I don't recall what discussion I had.  Mostly what I

01:57:01  1   did was just use them to see what sort of features they had

01:57:05  2   and see what sort of capabilities they had.

01:57:07  3   Q.  Okay.  So that would be more like a demonstration, not

01:57:10  4   a test.  Would you agree with that?

01:57:11  5   A.  Well, I don't know what qualifies something as a test

01:57:15  6   versus a demonstration.  I wanted to explore the

01:57:20  7   functionality of the product.  You don't see everything in

01:57:22  8   the user manual, so I wanted copies of the products so I

01:57:26  9   could see what functionality they had.

01:57:28  10  Q.  Okay.  Let's explore the differences between a

01:57:32  11  demonstration and a test.  I think that what we have seen

01:57:36  12  in this courtroom has been a demonstration of some of the

01:57:38  13  functionality of the product.  Would you agree with that?

01:57:41  14  A.  Yes, there's certainly been demonstrations of some of

01:57:43  15  the functionality.

01:57:43  16  Q.  Okay.  So -- so were you in the courtroom when

01:57:49  17  Dr. Ducharme testified about testing the products?

01:57:52  18  A.  I assume you're talking about his test with the color

01:57:56  19  measurement?

01:57:56  20  Q.  Right.  So you would agree with me that that would be

01:57:59  21  more of a test and not a demonstration?

01:58:02  22  A.  I wouldn't call that much of a test, but that's how he

01:58:08  23  called it.

01:58:14  24  Q.  Okay.  But I mean Dr. Ducharme did use a pretty

01:58:17  25  expensive color sensor, right, to -- to determine the

01:58:20  1  measurements when he changed the hue and the saturation to

01:58:23  2  show that the other colors didn't change, right?

01:58:28  3  A.  He took a sensor, and he made some measurements.  I

01:58:32  4  don't think they were particularly illustrative of

01:58:34  5  anything.

01:58:34  6  Q.  I think he did more than that, right?  So do you

01:58:38  7  agree --

01:58:38  8  A.  I don't believe -- no, I disagree.  He didn't do much

01:58:42  9  more than that, no.

01:58:50  10  Q.  So just to confirm, you didn't use any kind of testing

01:58:54  11  equipment like Dr. Ducharme, correct?

01:58:55  12  A.  Like I said, I don't believe his tests were

01:58:58  13  illustrative of anything.

01:58:59  14  Q.  That wasn't my question, sir.

01:59:01  15  A.  Okay.  Well, I did not feel the need to do that sort of

01:59:01  16  test.  I don't see that eliminated any issue in the case,

01:59:04  17  so I did not do that test.

01:59:05  18  Q.  But you not use testing equipment, correct?

01:59:10  19  A.  I don't see why you would use testing equipment in this

01:59:13  20  case, so, no, I did not do it.

01:59:13  21          MR. LIDDLE:  Your Honor --

01:59:14  22          THE COURT:  Let me instruct the witness.  This

01:59:16  23  will go much more quickly if you'll just answer yes or no.

01:59:19  24  If you can't answer yes or no, explain that you can't and

01:59:22  25  he can ask you a different question if he wants to.

| | | |
|---|---|---|
| 01:59:25 | 1 | A.  I did not do testing the way you're characterizing it. |
| 01:59:45 | 2 | BY MR. LIDDLE: |
| 01:59:47 | 3 | Q.  Okay.  So I want to look at your expert report -- your |
| 01:59:49 | 4 | rebuttal report on infringement. |
| 01:59:49 | 5 | Do you need a break, Dr. Stevenson? |
| 01:59:51 | 6 | A.  No.  I'm fine. |
| 01:59:51 | 7 | Q.  Do you have that in your binder? |
| 01:59:58 | 8 | A.  Infringement?  Yes. |
| 02:00:05 | 9 | MR. JOSHI:  It's under Tab 4. |
| 02:00:07 | 10 | THE WITNESS:  I got it.  Thank you. |
| 02:00:10 | 11 | BY MR. LIDDLE: |
| 02:00:22 | 12 | Q.  All right.  So as we've seen, Claim 1 is a method |
| 02:00:26 | 13 | claim, correct? |
| 02:00:26 | 14 | A.  Correct. |
| 02:00:27 | 15 | Q.  All right.  So -- so the case is about ASUSTeK offering |
| 02:00:36 | 16 | a product that meets all of the elements of the claim but |
| 02:00:40 | 17 | requires a user to use the method to infringe, right? |
| 02:00:45 | 18 | A.  Correct.  You have to actually perform the steps so a |
| 02:00:50 | 19 | user is needed. |
| 02:00:51 | 20 | Q.  Yeah.  So we've heard testimony on, you know, how the |
| 02:00:56 | 21 | users are encouraged to use these steps.  We've seen |
| 02:01:01 | 22 | advertisements.  We've seen, you know, Plaintiff's |
| 02:01:04 | 23 | Exhibit 14 which shows the -- you know, basically here's |
| 02:01:07 | 24 | how -- here's how it works with 6-axis, you know, |
| 02:01:10 | 25 | independent color change.  You agree with that, right? |

02:01:13   1   We've seen some evidence of that?

02:01:16   2   A.  Maybe remind me what Exhibit 14 is.  I just don't

02:01:22   3   remember which one that is.

02:01:24   4          MR. LIDDLE:  Denver, can you put you Plaintiff's

02:01:27   5   Exhibit 14, please?

02:01:40   6   A.  Yes, I certainly recall seeing this before.

02:01:43   7   BY MR. LIDDLE:

02:01:44   8   Q.  Okay.  Just to break this down and make it really

02:01:47   9   clear, who are these end users of the method?

02:01:49  10   A.  Who are what end users?

02:01:51  11   Q.  I mean, who are -- just who are the end users

02:01:53  12   generally?

02:01:53  13   A.  People who need a computer monitor.

02:01:55  14   Q.  Right.  So could it be somebody like me or you could be

02:01:59  15   an end user?

02:02:00  16   A.  Sir, we own a lot of computer monitors.

02:02:04  17   Q.  Right.  Could it be somebody that lives in, say Tyler,

02:02:09  18   Texas?

02:02:09  19   A.  Sure.

02:02:10  20   Q.  People -- people sitting on the jury?

02:02:12  21   A.  I imagine a lot of people have computer monitors.  I

02:02:13  22   don't know how popular ASUS is, but I'm sure there's plenty

02:02:13  23   of computer monitors floating around.

02:02:16  24   Q.  Right.  So you gave an opinion on why color adjustment

02:02:20  25   wouldn't be performed by the end users.  Do you remember

| | | |
|---|---|---|
| 02:02:23 | 1 | that? |
| 02:02:23 | 2 | A.  Yes. |
| 02:02:24 | 3 | Q.  Okay.  So that's on Page 24 of your expert report? |
| 02:02:35 | 4 | A.  Okay. |
| 02:02:36 | 5 | Q.  All right.  So you go through, and we have -- we have |
| 02:02:37 | 6 | sort of four reasons here why someone wouldn't -- wouldn't |
| 02:02:41 | 7 | necessarily perform this method.  Would you mind reading |
| 02:02:46 | 8 | No. 4 for me real quick? |
| 02:02:48 | 9 | A.  Where is No. 4? |
| 02:02:50 | 10 | Q.  At the very -- very bottom of Paragraph 84? |
| 02:02:53 | 11 | A.  Paragraph 84. |
| 02:02:55 | 12 | Q.  Page 24. |
| 02:03:01 | 13 | A.  Okay. |
| 02:03:02 | 14 | Q.  Can you read that out loud for us, please? |
| 02:03:05 | 15 | A.  Sure. |
| 02:03:07 | 16 | (As read):  Almost all -- almost all end users' |
| 02:03:10 | 17 | monitors and projectors are not sophisticated enough with |
| 02:03:14 | 18 | respect to color calibration to make such an adjustment or |
| 02:03:18 | 19 | even determine if such an adjustment is needed. |
| 02:03:23 | 20 | Q.  So your testimony as to why someone wouldn't use this |
| 02:03:27 | 21 | is they're not sophisticated enough to figure it out or |
| 02:03:31 | 22 | even know that it needs to be done? |
| 02:03:33 | 23 | A.  For these sort of controls for this idea of color |
| 02:03:37 | 24 | calibration, I would not even know how to use it to do |
| 02:03:40 | 25 | color calibration. |

02:03:41    1          So I include myself in those unsophisticated

02:03:45    2     users.  You would not use these controls for color

02:03:49    3     calibration, which is basically the position that

02:03:51    4     Dr. Ducharme has taken.

02:03:54    5     Q.  Okay.  I want to switch gears to the invalidity side.

02:04:21    6          MR. LIDDLE:  Denver, can you put on Plaintiff's --

02:04:26    7     I mean, I'm sorry, Defense Exhibit 9, please, the Brett

02:04:30    8     reference?  And would you mind zooming in on the figure at

02:04:51    9     the bottom, please?

02:04:53   10     BY MR. LIDDLE:

02:05:10   11     Q.  Okay.  Dr. Stevenson, so this is a figure from the

02:05:14   12     Brett reference, which your -- your testimony is

02:05:20   13     anticipates the '435 and somehow renders it invalid, right?

02:05:26   14     A.  Correct.

02:05:26   15     Q.  Okay.  So I like this picture, and I like it because it

02:05:29   16     sort of breaks down how pixels come in -- colors come in

02:05:34   17     and are adjusted according to Brett.  Would you agree with

02:05:38   18     that?

02:05:38   19     A.  It's an overview of the system so you can see pieces of

02:05:42   20     all the parts on the system in this picture.

02:05:45   21     Q.  Right.  So I want to walk through this a little bit,

02:05:48   22     so -- so bear with me.

02:05:50   23          So would you agree that when you see the input on

02:05:57   24     the very left-hand side, that's where the signal comes in

02:06:01   25     to the system?

02:06:02    1    A.   That's the video input signal, yes.

02:06:06    2    Q.   Video input signal.  By the way, where would this be

02:06:11    3    located?   This -- this is a -- it's a -- it's an image

02:06:16    4    control system.   Where would that be located?

02:06:21    5    A.   I'm not sure I follow you.

02:06:24    6    Q.   So this would not be located, like, on the monitor,

02:06:27    7    right?

02:06:27    8    A.   You can put this functionality on the monitor.

02:06:31    9    Q.   But that's not what Brett describes, is it?

02:06:36   10    A.   I don't remember -- well, Brett describes a number of

02:06:40   11    embodiments.   They do talk about connecting to a display.

02:06:45   12    I don't know if they talk about putting it inside the

02:06:47   13    display or not.

02:06:48   14    Q.   Well, so -- but -- but you don't know if Brett actually

02:06:51   15    talks about putting this inside of a display, right?

02:06:55   16    A.   There was no requirement in the claims to put it inside

02:06:58   17    the display, so I do did not look into Brett for that

02:06:58   18    issue.

02:07:03   19    Q.   Okay.  But, in reality, this is -- in the Brett

02:07:05   20    reference, this is more like in a control room.  I mean,

02:07:07   21    we're talking about pretty old technology.  We're at

02:07:13   22    telecine.  We're doing -- you know, we're doing movie film

02:07:15   23    conversion.  This is more like -- at that time, it was more

02:07:19   24    of a room.  Do you agree with that?

02:07:20   25    A.   This is a piece of -- at the end of the day, something

02:07:22  1  like Figure 4A and B is a piece of hardware that can be

02:07:27  2  these days very small.  So I could use the teachings of

02:07:30  3  Brett to put it into a lot of different products.  And so

02:07:34  4  what we're interested in is what does Brett teach us, not

02:07:38  5  all the specific embodiments disclosed in Brett.

02:07:41  6  Q.  Okay.  Well, let's go through it.  So we just -- we

02:07:45  7  just talked about the input signal coming in, correct?

02:07:49  8  A.  Yes.

02:07:49  9  Q.  Okay.  And then to me, it looks like the signal comes

02:07:53  10  in to be input, deco -- decode, demultiplex.  Is that

02:08:00  11  right?

02:08:00  12  A.  That's the first -- name of the first block.

02:08:03  13  Q.  Right.  And then it seems like the signal is then

02:08:07  14  converted into YUV, which is a color space, right?

02:08:11  15  A.  Yes.

02:08:12  16  Q.  Okay.  But then what I see happening is for -- for --

02:08:19  17  so does the entire signal come into this area, come in

02:08:25  18  through this input?

02:08:26  19  A.  The entire -- as I mentioned, it's the video pipeline.

02:08:29  20  So the entire video signal is going to flow through this

02:08:35  21  data, kind of piece by piece.

02:08:36  22  Q.  Okay.  So if the entire video comes in and it's then

02:08:40  23  characterized into a YUV color space, is that -- is that

02:08:47  24  the entire signal that's characterized there in the

02:08:50  25  pipeline?

02:08:50   1   A.   I mean, I just want to be careful about when you say,

02:08:53   2   an entire.

02:08:54   3          This is -- data is coming in what we call

02:08:56   4   serially.  It's coming in in a stream.  And so you don't

02:09:00   5   ever have the entire video at the same time.  You have a

02:09:02   6   piece of it at any time you're operating on it.  That's why

02:09:05   7   we talk about a pipeline.  Think about the water flowing

02:09:08   8   through a pipeline.  You have some of the water there, but

02:09:11   9   you don't have it all.  And so you're operating on that

02:09:13   10  piece.  So at any moment, there's some pixel data

02:09:17   11  represented in YUV space and that -- that's part of the

02:09:21   12  circuit.

02:09:21   13  Q.   Okay.  But the part of the data coming in -- the part

02:09:31   14  of the data that you're talking about all flows through

02:09:34   15  that first -- first step there; is that correct?

02:09:36   16  A.   If you look over time, all the data will go through

02:09:40   17  that first step, if that's what you're getting at.

02:09:43   18  Q.   That is what I'm getting at.  Thank you.

02:09:45   19          So if it all goes through and it's converted to

02:09:50   20  YUV, do you see the next part that says, master saturation

02:09:54   21  control?

02:09:54   22  A.   Yes.

02:09:54   23  Q.   So then the U and V components are then -- have some

02:09:57   24  kind of master saturation applied to them; would you agree

02:10:00   25  with that?

795

02:10:00  1   A.  Yes.  Brett describes global saturation that you could

02:10:04  2   add shown in that block that you just highlighted.

02:10:07  3   Q.  Okay.  But the '435 patent that you're trying to

02:10:10  4   invalidate with Brett is independently controlling

02:10:15  5   saturation for an individual color, not a master saturation

02:10:20  6   control, correct?

02:10:21  7   A.  Right.  But that's why I wouldn't point to that as part

02:10:24  8   of the invalidating teaching.

02:10:26  9   Q.  Okay.  Well, let's keep going.

02:10:29  10        So then after -- after it has gone through the

02:10:32  11  master saturation control, so it's likely that there's been

02:10:37  12  some color change already, correct?

02:10:39  13  A.  It's possible.  It's the same sort of stuff in the

02:10:44  14  accused products.  So I'm not sure what your point is.

02:10:46  15  Q.  That wasn't my question.  We're talking about the Brett

02:10:46  16  reference.

02:10:50  17        And my point is, is that the saturation has

02:10:53  18  changed for the U and V component before we even get to the

02:10:56  19  steps that you're talking about, right?

02:10:58  20  A.  If a user selected to change the global saturation, it

02:11:01  21  would be changed at that point.

02:11:08  22  Q.  Okay.  So then my understanding of what happened next

02:11:11  23  is it's then converted again from YUV to RGB.  Do you agree

02:11:19  24  with that?

02:11:20  25  A.  Yes, that's what that digital matrix box, No. 2, is

02:11:24  1   doing.

02:11:25  2   Q.  Okay.  So unlike the '435 patent, though, once these

02:11:30  3   things are converted, they go into different -- different

02:11:33  4   pipelines, correct?

02:11:36  5   A.  I'm not sure what you're getting at.

02:11:38  6   Q.  Well, I'm getting at the highlighted red section where

02:11:43  7   we have RGB.  So there's a top pipeline where the colors

02:11:49  8   are -- are not going to be -- H, S and L are not going to

02:11:55  9   be modified.  And then we have this secondary -- you have

02:12:06  10  this secondary pipeline at the bottom for modification,

02:12:09  11  conversion to HSL and then color modification, right?

02:12:13  12  A.  No, I wouldn't agree with that -- the way you

02:12:16  13  characterized it, sir.

02:12:18  14          THE COURT:  Dr. Stevenson, can I ask you to speak

02:12:20  15  up?  This court reporter is having a hard time hearing you.

02:12:24  16          THE WITNESS:  Sorry.

02:12:24  17          THE COURT:  Just raise -- raise your volume,

02:12:26  18  please.

02:12:26  19          THE WITNESS:  I'll try.

02:12:49  20  BY MR. LIDDLE:

02:12:50  21  Q.  I want to read to you from Column 9 of the Brett

02:12:53  22  reference.

02:12:59  23          So Column 9, do you see at Line 35, says:  The

02:13:03  24  primary signal path starts with the inputting of RGB

02:13:07  25  digital signals at an input.

02:13:08    1            So we just went over that, correct?

02:13:10    2    A.  Yes.

02:13:11    3    Q.  It says:  Which may be a respective 10-bit RGB output

02:13:25    4    signals from a telecine, DTR, or any other digital video

02:13:28    5    signal.

02:13:29    6            Do you see where it says that?

02:13:31    7    A.  Yes.

02:13:31    8    Q.  Okay.  Let's come back to that in a minute.

02:13:41    9            So then farther down on that same column, do you

02:13:45   10    see Column 9, Line 46?  Do you see -- do you see that?

02:13:57   11    A.  Yes.

02:13:59   12    Q.  And then further down, Column 9, Lines 57 says:  The R,

02:14:17   13    G, and B signals are then provided to respective primary

02:14:22   14    LUTs.

02:14:24   15            Now, what's a LUT, Dr. Stevenson?

02:14:27   16    A.  Shorthand for look-up table.

02:14:30   17    Q.  Look-up table.

02:14:32   18            Okay.  Now, I want to switch back to -- now I want

02:14:35   19    to go to Column 10, starting at Line 46.  Do you see that,

02:14:46   20    Dr. Stevenson?

02:14:47   21    A.  Yes.

02:14:47   22    Q.  It says:  At Point B, after processing by the primary

02:14:51   23    lookup tables 3, all of the corrected R, G, and B signals,

02:14:56   24    including those that are not to be modified, are provided,

02:15:01   25    possibly downsampled, to the secondary signal path.

02:15:06  1          Do you see that?

02:15:06  2   A.   Yes.

02:15:07  3   Q.   Okay.   Then it goes on to say:   If the primary signal

02:15:10  4   path is high-definition, then it is advantageous, as

02:15:14  5   discussed above, for the modification path to be standard

02:15:18  6   definition.

02:15:19  7          Do you see that?

02:15:19  8   A.   Yes.

02:15:20  9   Q.   So this sort of implies that there's a primary path and

02:15:24  10  a secondary path, right?

02:15:25  11  A.   There are multiple paths, if that's what you mean.   But

02:15:29  12  both of them eventually are going to be changing hue and

02:15:33  13  saturation.   That's one characterization I didn't agree

02:15:36  14  with you on.

02:15:43  15  Q.   Okay.   Well, let's talk about that, too.   So also in

02:15:47  16  Column 10 where we say -- I'm on Column 10, Line 52:

02:16:00  17  Therefore, the HD image is sub-sampled down at Point B and

02:16:07  18  is interpolated up at Point C.

02:16:09  19          Right?

02:16:09  20  A.   Yes.

02:16:10  21  Q.   So that, to me -- so I guess help me out.   You're

02:16:16  22  saying that all -- the entire signal goes to the primary

02:16:20  23  path, which I think is the top path in the figure --

02:16:25  24          MR. LIDDLE:   Denver, can you highlight the main

02:16:27  25  figure?

02:16:27  1  BY MR. LIDDLE.

02:16:30  2  Q.  -- but the top path -- you see those lines that are

02:16:37  3  going RGB through the system.  That's the primary path.

02:16:40  4  Would you agree with that?

02:16:41  5  A.  Yes.

02:16:42  6  Q.  Does some of the signal just travel through the primary

02:16:45  7  path?

02:16:45  8  A.  The entire signal does.

02:16:47  9  Q.  The entire signal does?

02:16:49  10  A.  Yes.

02:16:49  11  Q.  So some of -- so some of the signal is then downsampled

02:16:54  12  to the secondary path; is that correct?

02:16:59  13  A.  Not quite.  If you have a high-definition signal or one

02:17:03  14  of these non-real time signals, yes.  If you're talking

02:17:06  15  about the standard definition, there's no downsampling.

02:17:09  16  But the entire signal will also be repeated on the

02:17:13  17  secondary path.  Now in the hue, saturation, luminance

02:17:18  18  color spaces instead of RGB.

02:17:20  19  Q.  Okay.  Can you repeat that part about the non-real time

02:17:23  20  images?

02:17:25  21  A.  Well --

02:17:27  22  Q.  Those -- those are -- you're saying those are not

02:17:29  23  downsampled to the secondary path?

02:17:31  24  A.  No.  I think you got that backwards.  So as we talked

02:17:35  25  about, Brett discloses real time and non-real time modes of

02:17:42   1   operation.  Basically at this time frame when you did very

02:17:46   2   high-definition, like IMAX movies, you couldn't make this

02:17:51   3   thing work in real time.  To make it work in a reasonable

02:17:53   4   time frame, they had the primary path and they downsampled

02:17:56   5   into the secondary path.

02:17:57   6          But it worked fine in real time, as discussed in

02:18:01   7   patent as one of the modes, to do a standard definition

02:18:05   8   signal in real time.  And their entire signal will go

02:18:08   9   through the primary path.  And the entire signal without

02:18:13  10   the downsampling would go through the secondary path.

02:18:16  11   Q.  Okay.  So it's your testimony that the real time video

02:18:20  12   just goes through the primary path?

02:18:29  13   A.  In real time, the entire video will go through both

02:18:34  14   paths, one in RGB format and one in HSL format.

02:18:37  15   Q.  Okay.  Now, when you get to the secondary path, we've

02:18:40  16   already converted from YUV to RGB, and now we're converting

02:18:45  17   again to HSL, correct?

02:18:47  18   A.  Yes.

02:18:48  19   Q.  Okay.  Were you in the courtroom when Dr. Stevenson --

02:18:51  20   or Dr. Ducharme was testifying about converting from RGB to

02:18:54  21   HSL?

02:18:54  22   A.  Yes.

02:18:55  23   Q.  Okay.  So Dr. Ducharme -- his analysis showed that when

02:19:00  24   you convert from RGB to HSL, that -- and then you try to

02:19:04  25   change hue or saturation, individual colors -- multiple

02:19:14   1   individual colors change their value.  Did you see that?
02:19:16   2   A.  I don't think you're characterizing his testimony
02:19:20   3   correctly.
02:19:20   4   Q.  Did you do any conversion like that?  Did you test that
02:19:24   5   concept?
02:19:24   6   A.  There was no testing.  It was an analysis.
02:19:24   7   Q.  Right.
02:19:27   8   A.  I repeated the analysis.  I don't think you
02:19:30   9   characterized his analysis correctly, and I don't think his
02:19:33   10  analysis was all that relevant.
02:19:34   11  Q.  Now, did you do that similar analysis?
02:19:36   12  A.  I looked at what he did.  I understood what he was
02:19:39   13  saying.  I disagreed with the relevance of it, and I don't
02:19:43   14  see what the point was.
02:19:44   15  Q.  But you didn't do that analysis, did you?
02:19:46   16  A.  I did the analysis.  That's when I said I looked at it.
02:19:50   17  I did the analysis.  There was nothing to do other than
02:19:53   18  look at it and understand what he was saying.
02:19:56   19  Q.  I want to now turn to the -- your assertion on the
02:20:03   20  double patenting.  Dr. Stevenson, can you have the '435
02:20:33   21  patent ready for me, please?
02:20:35   22          MR. LIDDLE:  Can you bring up Plaintiff's
02:20:37   23  Exhibit 1, Denver?
02:20:39   24  BY MR. LIDDLE:
02:20:48   25  Q.  Dr. Stevenson, were you -- were you in the courtroom on

02:20:50  1  Monday when ASUS's counsel gave its opening statement?

02:20:54  2  A.  Yes.

02:20:54  3  Q.  Okay.  So I've -- I've copied that down, and I'm going

02:20:58  4  to read that to you.

02:20:59  5       ASUS's counsel testified:  Double patenting is a

02:21:02  6  concept that basically is when somebody tries to cheat on

02:21:06  7  the Patent Office a little bit.  The U.S. government says

02:21:09  8  you file a patent application, you get 20 years of

02:21:14  9  exclusivity.  Sometimes what people do is a couple of years

02:21:17  10  later, they file another patent application and then try to

02:21:20  11  get another patent on the same thing.

02:21:22  12       Now, I want you to -- were you there?  Did you

02:21:25  13  hear -- did you hear that statement?

02:21:26  14  A.  I don't remember word for word, but I remember that

02:21:29  15  concept being discussed.

02:21:31  16  Q.  But you have no reason to disagree with --

02:21:35  17  A.  If you're reading from the transcript, I believe you.

02:21:36  18  Q.  So I'd like you to look -- this is Plaintiff's

02:21:40  19  Exhibit 1, the '435 patent, correct?

02:21:41  20  A.  Yes.

02:21:41  21  Q.  Okay.  So I wrote down something you said earlier when

02:21:52  22  you testified about this, when you testified about

02:21:55  23  invalidity generally, and you said the Patent Office, you

02:21:58  24  know, really -- really didn't have all the information.  Is

02:22:00  25  that your testimony?

02:22:01    1    A.   I believe I said something like that, yes.

02:22:02    2    Q.   You said that the Patent Office didn't have all the

02:22:05    3    information that you do, correct?

02:22:06    4    A.   I think I said something like that, correct.

02:22:08    5    Q.   Okay.  So I want to point to -- so in your -- in the

02:22:14    6    double patenting, just to be clear, the defense is that the

02:22:19    7    '012 patent, which is also owned by Lone Star, it's obvious

02:22:28    8    to have -- it's a double patenting obviousness challenge,

02:22:33    9    right?

02:22:33   10    A.   I think there's parts of -- claims that are obvious,

02:22:36   11    and parts of claims that were anticipated.

02:22:39   12    Q.   All right.  So can you look at -- can you -- let's

02:22:48   13    see --

02:22:49   14         MR. LIDDLE:  Denver, can you highlight where it

02:22:52   15    says the '012 patent and maybe scroll down just a little

02:22:56   16    bit?  Kind of in the top right-hand corner, 6,122,012.

02:23:05   17    BY MR. LIDDLE:

02:23:06   18    Q.   Okay.  So this is the '012 patent that we've been

02:23:10   19    discussing, right?

02:23:10   20    A.   Yes.

02:23:11   21    Q.   Do you see it on the face of the patent?

02:23:12   22    A.   Correct.

02:23:13   23    Q.   Okay.  So your testimony that the Patent Office did not

02:23:17   24    have all the information, that doesn't really apply to the

02:23:22   25    '012 patent, does it?

02:23:23  1   A.  No.  I disagree with your characterization.

02:23:25  2   Q.  Well, the Patent Office knew about the '012 patent when

02:23:28  3   it issued the '435, correct?

02:23:30  4   A.  They knew about it, yes.

02:23:33  5         MR. LIDDLE:  Can you -- can you scroll down to the

02:23:38  6   second page, please?  Okay.  Can you go to Column 2?  I

02:23:57  7   think it's line -- I think it's Line 10.  Can you zoom in

02:24:00  8   on that, please?

02:24:07  9   BY MR. LIDDLE:

02:24:08  10  Q.  Okay.  So this is on the second page of the '435

02:24:10  11  patent.  Do you see that?

02:24:10  12  A.  Yes.

02:24:11  13  Q.  So in the actual specification where the patentee

02:24:15  14  describes the patent, they -- they list the '012 patent,

02:24:19  15  correct?

02:24:19  16  A.  Yes.  I believe you will find two or three paragraphs

02:24:22  17  where they discuss the '012.

02:24:26  18  Q.  Okay.  Now, Dr. Stevenson, when were you retained in

02:24:33  19  this matter?

02:24:33  20  A.  I think it was maybe over a year ago.  I don't recall

02:24:38  21  exactly.

02:24:38  22  Q.  Okay.  And what is -- what is your hourly rate?  What

02:24:42  23  is your -- what do you get paid to testify?

02:24:44  24  A.  Well, my work in this case here is $600 an hour.

02:24:48  25  Q.  You said $600 an hour?

| | | |
|---|---|---|
| 02:24:51 | 1 | A.  Yes. |
| 02:24:51 | 2 | Q.  So you're paid $600 an hour for your testimony; is that |
| 02:24:54 | 3 | right? |
| 02:24:54 | 4 | A.  I'm not paid for my testimony.  I'm paid for my time. |
| 02:24:57 | 5 | Q.  Okay.  And about how many hours have you put into this |
| 02:25:01 | 6 | case? |
| 02:25:01 | 7 | A.  I don't know.  It's been much less than many cases I've |
| 02:25:08 | 8 | worked on.  Maybe a hundred hours.  I'm not sure. |
| 02:25:11 | 9 | Q.  A hundred hours?  Okay. |
| 02:25:14 | 10 | MR. LIDDLE:  Pass the witness. |
| 02:25:15 | 11 | THE COURT:  Redirect? |
| 02:25:19 | 12 | MR. JOSHI:  No redirect, Your Honor. |
| 02:25:22 | 13 | THE COURT:  Very well.  Call your next witness. |
| 02:25:28 | 14 | MR. OLIVER:  Defense calls Brett Reed. |
| 02:25:40 | 15 | THE COURT:  All right. |
| 02:25:50 | 16 | (Witness sworn.) |
| 02:26:05 | 17 | MR. OLIVER:  Your Honor, I have a binder of expert |
| 02:26:08 | 18 | reports for the witness.  May I approach and hand it to |
| 02:26:10 | 19 | him? |
| 02:26:10 | 20 | THE COURT:  Of course, yes. |
| 02:26:28 | 21 | BRETT REED, DEFENDANT'S WITNESS, SWORN |
| 02:26:28 | 22 | DIRECT EXAMINATION |
| 02:26:30 | 23 | BY MR. OLIVER: |
| 02:26:32 | 24 | Q.  Mr. Reed, good afternoon.  Would you please introduce |
| 02:26:34 | 25 | yourself to the jury? |

02:26:35  1   A.  Yes.  Good afternoon.  My name is Brett Reed.  I'm an

02:26:39  2   economist.  I live and work near Pasadena, California.  I

02:26:46  3   have four grandchildren.

02:26:46  4   Q.  Did you prepare some demonstratives for your testimony

02:26:48  5   today?

02:26:48  6   A.  Yes, I did.

02:26:49  7   Q.  Okay.  I would like to pull up the first slide for you.

02:27:03  8        Can you describe your background and your

02:27:05  9   experience for us?

02:27:07  10  A.  Sure.  I -- I went to college in basically the

02:27:12  11  economics program, so I got a bachelor's in economics and

02:27:18  12  geography from the University of California at Irvine.  And

02:27:22  13  then I went to the graduate program in economics at UCLA.

02:27:23  14  I got a master's degree there, and I served as a teaching

02:27:28  15  assistant for several years.  After that, I began working

02:27:31  16  in my current field, which is about 36 years ago, where I

02:27:35  17  performed as a economic consultant.  And from the very

02:27:40  18  beginning, got involved in working on patent infringement

02:27:42  19  matters like this.  And it's been the primary part of my

02:27:45  20  work, other than administrative and management type --

02:27:50  21        THE COURT:  So we're losing sound.  I'm not sure

02:27:54  22  if it's because you're turning or there's something wrong

02:27:56  23  with the mic.

02:27:56  24        THE WITNESS:  Is this better?

02:27:58  25        THE COURT:  Maybe move the mic away and give him

02:28:01  1   the lapel mic, if he could just hold that.

02:28:10  2          If you will press it one time, the green light

02:28:13  3   will come on.

02:28:14  4          THE WITNESS:  Is this better?

02:28:16  5          THE COURT:  Much better.  Thank you.

02:28:20  6   A.  So think I was into the -- my -- my work as an economic

02:28:24  7   consultant when I was focusing on patent infringement

02:28:29  8   damages matters.  That's what I've been doing for most of

02:28:33  9   the last 36 years.  And for the last 12 years at the firm

02:28:39  10  that's identified here, Competition Economics.  It's a firm

02:28:41  11  I cofounded with five other people, including a professor

02:28:45  12  of economics from the University of Texas.

02:28:53  13         MR. OLIVER:  Seems like we lost the display for

02:28:56  14  the jury.  All right.

02:29:02  15  BY MR. OLIVER:

02:29:03  16  Q.  What other -- do you have any other types of

02:29:06  17  responsibilities at Competition Economics?

02:29:08  18  A.  Yes.  I -- I manage the firm, so I deal with all the

02:29:12  19  financial issues.  I also deal with training of employees.

02:29:19  20  And then I'm in charge of the -- the intellectual property

02:29:23  21  practice which includes dealing with patent matters like

02:29:28  22  infringement matters in U.S. District Court, as well as at

02:29:31  23  the United States International Trade Commission, the ITC,

02:29:38  24  that Professor Stevenson talked about just a little while

02:29:43  25  ago.

02:29:43   1    Q.  And I notice at the bottom of your slide you have this

02:29:53   2    IAM Patent 1000 Leading Patent Expert Witness.  What does

02:29:55   3    that refer to?

02:29:56   4    A.  That refers to a firm called -- that produces something

02:29:56   5    called the Intellectual Asset Management or IAM Patent

02:30:04   6    1000.  And in about 2013, they started including in this

02:30:07   7    study that they perform of practitioners in the area of

02:30:15   8    patent issues.  They started including people who work like

02:30:17   9    I do in patent infringement damages matters.  And from 2014

02:30:20  10    to 20 -- well, present, I've been included in these annual

02:30:24  11    reviews of leading patent infringement damages experts.

02:30:27  12    Q.  Let me move to your next slide.  Can you describe to us

02:30:31  13    what this slide shows?

02:30:33  14    A.  Yes.  This slide shows the seals of the various United

02:30:40  15    States District Courts and the U.S. International Trade

02:30:42  16    Commission where I have provided testimony on issues

02:30:44  17    relating to economics and patent infringement matters.

02:30:48  18    Q.  And I see on the top left, you have a handful of cities

02:30:53  19    in the Eastern District of Texas mentioned?

02:30:58  20    A.  Yeah.  So the U.S. District Court for the Eastern

02:31:00  21    District of Texas has courtrooms in several cities.  I've

02:31:05  22    testified several times before on patent infringement

02:31:07  23    damages in this courthouse.  I've also testified five, six

02:31:12  24    times down the road in Marshal and once in Beaumont, Texas,

02:31:18  25    as well.

02:31:18   1   Q.  And what types of cases have you worked on that led to
02:31:22   2   the testimony in these federal courts?
02:31:24   3   A.  Well, U.S. District Courts deal with patent
02:31:28   4   infringement matters, so every time anybody testifies on a
02:31:31   5   patent infringement matter, it would be before a judge in
02:31:37   6   the U.S. District Court.  Some of these cases would also
02:31:39   7   involve other IP matters, like trade secret.  So that's
02:31:49   8   another form of intellectual property that sometimes is
02:31:52   9   disputed about, infringement issues and damages.
02:31:55   10          And then the ITC relates patents, but it's not
02:31:58   11   damages.  It's about a patent owner seeking to exclude a
02:32:02   12   foreign company from bringing product into the United
02:32:05   13   States because of patent infringement.  I perform economic
02:32:09   14   analysis that relates to that.
02:32:10   15   Q.  And have you testified in courts that aren't federal
02:32:14   16   courts or other types of proceedings?
02:32:16   17   A.  I have, but because of my focus on patent infringement
02:32:19   18   damages issues, most of my testimony is in U.S. District
02:32:27   19   Court.
02:32:27   20   Q.  Is all of your work testifying?
02:32:29   21   A.  No.  In fact, it's a small part of my ultimate work
02:32:32   22   because most of my work relates to research and analysis,
02:32:36   23   preparing reports.  So in the 36 years that I've been --
02:32:40   24   been involved in my profession, I've testified in ITC and
02:32:44   25   U.S. District Court cases about 30 times.

02:32:47   1   Q.   And I'm going to move to your third slide, and in
02:32:52   2   conjunction with your third slide, can you give us a little
02:32:55   3   bit of description of some of the clients that you have
02:32:57   4   worked for in these matters?
02:32:59   5   A.   Absolutely.   So this gives an example of the clients
02:33:03   6   that I've worked with.   Principally, I'm working with the
02:33:07   7   attorneys representing these clients, but also would
02:33:10   8   interact with employees and executives at these companies.
02:33:14   9   And all of these relate to patent dispute matters, so I
02:33:18   10  limit it to patent infringement matters.   And, of course,
02:33:21   11  you can see Dell from Austin -- the Austin area, Vizio,
02:33:28   12  General Electric, Ford, Motorola, and, in particular, I was
02:33:32   13  working with Motorola and a group called Freescale, which
02:33:39   14  makes semiconductor chips and they were out of Austin,
02:33:41   15  Texas.   Baker Hughes is another example.
02:33:44   16  Q.   And who have you worked for on cases related to
02:33:47   17  displays, monitors, TVs, that type of work?
02:33:51   18  A.   Quite a few, and some of them are identified here,
02:33:55   19  Sony, LG, Panasonic, Visio -- well, Dell, and even Jaguar
02:34:04   20  and Land Rover had to do with a display on the dashboard of
02:34:06   21  the Jaguar.
02:34:06   22  Q.   And I think you told me at one point that you had
02:34:10   23  worked -- done some work on a case related to MediaTek; is
02:34:13   24  that correct?
02:34:13   25  A.   Excuse me.   Actually two cases.   So when -- I did a

02:34:17   1   couple projects with Panasonic, and one of them was

02:34:22   2   Panasonic against MediaTek and it had to do with chip sets.

02:34:26   3   And one of the matters I did with Motorola and Freescale

02:34:31   4   also had to do with MediaTek and chip sets.

02:34:36   5   Q.   What is your training and experience that's most

02:34:40   6   relevant to the work you've done on this case?

02:34:42   7   A.   Well, it's the training as an economist, the experience

02:34:45   8   working in this area, interacting with -- with the issues

02:34:48   9   on a day-to-day basis.   And so those are the principal

02:34:56   10  bases for my expertise.

02:34:59   11  Q.   And over those 36 years, how many -- I think you

02:35:07   12  said 36 years, correct me if I'm wrong.   But how many

02:35:09   13  patent cases have you worked on as an economic expert?

02:35:13   14  A.   As an expert where I would issue the expert report in

02:35:16   15  patent infringement matters, it's more than 150 matters.

02:35:19   16  Q.   And do you always work for the Defendants?

02:35:21   17  A.   No.   I have worked on -- with both the patent owner,

02:35:26   18  including the case here in this courthouse, so that was

02:35:32   19  adverse to Microsoft.

02:35:33   20       And in some cases, like, for example, Panasonic,

02:35:38   21  one of the Panasonic matters was Panasonic against Samsung.

02:35:43   22  And Panasonic asserted patents against Samsung, and Samsung

02:35:48   23  asserted patents against Panasonic in the same matter, and

02:35:52   24  I was working for Panasonic both as patent owner and as a

02:35:56   25  defender of infringement claims.

02:35:57   1          MR. OLIVER:  Your Honor, I'd like to offer

02:35:58   2   Mr. Reed as an expert witness to offer opinion testimony on

02:36:01   3   patent infringement damages.

02:36:01   4          THE COURT:  Any objection?

02:36:03   5          MR. LIDDLE:  No, Your Honor.

02:36:05   6          THE COURT:  Very well.

02:36:07   7   BY MR. OLIVER:

02:36:09   8   Q.  Mr. Reed, what was your assignment for this case?

02:36:11   9   A.  Well, my assignment in this case was to analyze the

02:36:13  10   work of Mr. Perdue and if appropriate to make corrections

02:36:17  11   to his analysis.

02:36:18  12          So here I was streamlining what I was doing by

02:36:21  13   focusing on major errors of Mr. Perdue and then addressing

02:36:30  14   those errors.

02:36:30  15   Q.  And in some cases, you might do your own entirely new

02:36:34  16   hypothetical negot -- hypothetical negotiation analysis; is

02:36:38  17   that right?

02:36:38  18   A.  Well, the hypothetical negotiation analysis is part of

02:36:40  19   what you heard about Georgia-Pacific where we analyze

02:36:44  20   these 15 factors.  And so certainly when I'm working with

02:36:48  21   the patent owner, I've got to go through all the analysis

02:36:51  22   in a lot of detail.

02:36:54  23          On the -- in cases where I'm working with an

02:36:56  24   alleged infringer, I may also go through all of those

02:37:00  25   issues.  Here, I focused on the critique of Mr. Perdue's

02:37:04   1   work.

02:37:05   2   Q.  What type of documents and materials did you analyze

02:37:10   3   when you were coming to your opinion in this case?

02:37:11   4   A.  I considered all the documents that Mr. Perdue had, but

02:37:17   5   then some additional ones, as well, including more detail

02:37:23   6   on the Philips licensing program he talked about, and I'll

02:37:27   7   get into more of that later, including information about

02:37:30   8   some of the license agreements that he analyzed and

02:37:32   9   included.

02:37:33   10          I also considered information about -- from the

02:37:38   11   web and from user manuals of not only ASUS monitors but

02:37:42   12   also Acer monitors.

02:37:45   13          And then, finally, I had conversations with

02:37:48   14   Professor Stevenson about some of the particulars focused

02:37:53   15   on my critique of Mr. Perdue.

02:37:55   16   Q.  And do you agree with the methodology that Mr. Perdue

02:37:59   17   used?

02:38:00   18   A.  No, I don't.  I would never use an approach like

02:38:05   19   Mr. Perdue used, but for -- in streamlined purposes, it

02:38:11   20   made sense to show what happens to his calculations if you

02:38:14   21   make corrections that are consistent with his own approach

02:38:17   22   and his own supporting material.

02:38:19   23   Q.  Okay.  And so if someone is using his methodology,

02:38:25   24   it -- are you -- are you just applying some analysis in

02:38:29   25   terms of how it could be corrected?

02:38:35   1   A.  Yes.  So, again, based on his approach and the inputs

02:38:39   2   that he used, what I'll be doing is demonstrating what

02:38:43   3   happens if -- you know, the minimum corrections that need

02:38:46   4   to be made based on his own approach and his own inputs and

02:38:51   5   what happens to the damages under those conditions.

02:38:56   6   Q.  Did I understand that right, you said minimum

02:38:58   7   corrections that could be made?

02:38:59   8   A.  Correct.  So, obviously, there could be other errors,

02:39:03   9   and based on his testimony, I'm certainly aware of other

02:39:07   10  errors, but I'm focusing on the minimum corrections under

02:39:10   11  his approach and his inputs.

02:39:14   12  Q.  I've got your next slide.

02:39:17   13        In connection with that, can you give us a summary

02:39:21   14  of your overall opinion in this case?

02:39:24   15  A.  Sure.  And this reflects the two time periods that

02:39:28   16  Mr. Perdue addressed, that the damages starting some time

02:39:32   17  in 2019, and I'll explain that more later, through

02:39:36   18  essentially -- is that today or tomorrow?  I think perhaps

02:39:40   19  today.

02:39:41   20  Q.  Today is the 20th.

02:39:43   21  A.  And then the next part is what Mr. Perdue presented for

02:39:46   22  the damage -- the future damage period, which would be

02:39:48   23  tomorrow through the patent expiration, which is in late

02:39:51   24  2022.

02:39:54   25        So what this shows is his damages numbers that he

02:39:59  1  presented yesterday, I believe, and then what I call a

02:40:02  2  partial correction.  I only made changes to these inputs

02:40:09  3  of his own methodology, and the damages would be in the

02:40:13  4  range -- you can see it's quite a bit lower.  And, in fact,

02:40:18  5  at the very bottom, I point out that his damages based on

02:40:21  6  these input errors overstate damages at least five times

02:40:25  7  and as much as 13 times.

02:40:28  8  Q.  Okay.  And that's -- that's also including the

02:40:31  9  assumption that somebody uses every one of these products

02:40:35  10  to infringe, right?

02:40:36  11  A.  Well, a couple parts.  One is that all these products

02:40:40  12  would actually end up in the United States, be used in the

02:40:47  13  United States.  And the second part would be that everyone

02:40:49  14  that has one of the units is performing the method of

02:40:57  15  making these particular adjustment on their monitor.

02:41:01  16  Q.  Does your analysis include all of the products that

02:41:04  17  Mr. Perdue included?

02:41:06  18  A.  It includes all the products that I understand were

02:41:09  19  accused by Lone Star, but this does take out those products

02:41:13  20  where I understand Lone Star and Dr. Ducharme did not

02:41:18  21  identify the products to be accused products.

02:41:20  22  Q.  Okay.  And it may be clear, but let's just follow up.

02:41:26  23        Is it your understanding that Mr. Perdue included

02:41:28  24  products in his calculations that aren't even accused of

02:41:33  25  infringement?

02:41:33  1    A.  Yes.  And he said that it relates to a disagreement.

02:41:37  2    So I identify those issues as I go through my testimony

02:41:40  3    today based on a disagreement.  But, yes, my understanding

02:41:48  4    is he included additional products beyond the ones that

02:41:56  5    were identified by Lone Star to be accused products.

02:41:56  6    Q.  And I noticed you have a couple of little red notes

02:41:57  7    down at the bottom.  One of them says assumes damages

02:42:00  8    apply.  What does that refer to?

02:42:02  9    A.  That refers the basic assumption that someone like me

02:42:06  10   has to undertake in all these -- all my work.  In this

02:42:10  11   setting, we assume -- we as damage analysts assume that the

02:42:14  12   patent is not invalid and that the patent is infringed.  So

02:42:17  13   we go forward with the damage analysis with that

02:42:20  14   assumption.

02:42:20  15   Q.  Okay.  I'm going to move to your next slide and ask you

02:42:24  16   to -- is this -- are these the assumptions that you're

02:42:28  17   talking about?

02:42:28  18   A.  Yes.  These are the assumptions that are most relative

02:42:32  19   to -- to this type of patent infringement matter.  Others

02:42:34  20   are more complex and have other issues, but we assume that

02:42:38  21   the patent is valid, or as I said before, not invalid,

02:42:42  22   because it's presumed to be valid.  We assume that the

02:42:48  23   patent is infringed, that it's enforceable, and the patent

02:42:52  24   owner has the right to exclude others from using such a

02:42:55  25   patent.

02:42:55   1   Q.   Okay.   And if one of these -- if the jury decides that

02:43:00   2   one of these assumptions doesn't apply in this case, then

02:43:04   3   what happens?

02:43:04   4   A.   Well, for example, if the jury finds the patent is not

02:43:10   5   valid, or not infringed, then damages don't apply at all,

02:43:14   6   and then my work's -- then it just won't matter to the

02:43:18   7   ultimate findings here.

02:43:20   8   Q.   Okay.   But in your assumptions for providing this, you

02:43:25   9   had to assume the patent is not invalid and that it is

02:43:29  10   infringed by ASUS, right?

02:43:36  11   A.   Absolutely.   And, again, that's standard in my work.

02:43:40  12   Q.   I'm going to go to your next slide.

02:43:41  13        What's your first step for assessing damages after

02:43:45  14   making those assumptions?

02:43:46  15   A.   Well, the first question is the question of what is the

02:43:48  16   type of damages.   And in patent infringement matters,

02:43:50  17   there's essential two types, lost profits and/or a

02:43:59  18   reasonable royalty, because sometimes you might have lost

02:44:01  19   profit for some of the products but not all.

02:44:05  20        And in this case, lost profits are not relevant

02:44:08  21   because Lone Star does not manufacture a competing product.

02:44:11  22   So that then leads to this question of what is a reasonable

02:44:15  23   royalty?   And this assessment of the Georgia-Pacific

02:44:18  24   factors, which again comes from a case from a long time

02:44:25  25   ago, back -- I think it's in the '80s when this case -- it

02:44:28    1   was like this -- a case where a judge made rulings about

02:44:32    2   these 15 factors and how they should be analyzed for

02:44:36    3   purposes of reasonable royalties.

02:44:38    4          And you don't have to use the Georgia-Pacific

02:44:41    5   approach.  Mr. Perdue suggested that you would have to use

02:44:44    6   it.  It's just often used because we have this great

02:44:49    7   framework that came from this prior Court.

02:44:52    8   Q.  And did you use the Georgia-Pacific factors here?

02:44:54    9   A.  Yes, in the context of the -- the correction of

02:44:59   10   Mr. Perdue's analysis.

02:45:00   11   Q.  Okay.  Let's move on to some of that correction.

02:45:06   12          And you discuss -- this is your next slide -- I'm

02:45:12   13   sorry.  Let's move on to that in a second.

02:45:16   14          Can you -- before we get to that, can you, using

02:45:19   15   this slide, talk to the jury a bit about how you get to the

02:45:22   16   calculation of a reasonable royalty?

02:45:24   17   A.  Absolutely.  So this shows the pretty basic formula or

02:45:30   18   calculation.

02:45:31   19          Start with the properly accused products and the

02:45:35   20   portion of revenues for the units that would be associated

02:45:38   21   with the accused products.

02:45:40   22          The second step would be to determine a proper

02:45:42   23   royalty rate.  Again, it could be on a per unit basis, it

02:45:47   24   could be a percentage royalty, but make sure it's all

02:45:50   25   consistent, and that will provide a reasonable royalty for

02:45:54  1  a damages analysis.

02:45:58  2       MR. OLIVER:  Your Honor, I just -- before we get

02:46:01  3  to there, I realized that there may be a point of order.  I

02:46:07  4  think there was an objection to one of the slides, but --

02:46:10  5  counsel mentioned it by email but didn't raise it in court.

02:46:14  6  Should we keep going or --

02:46:17  7       THE COURT:  Do we know -- Mr. Lee, do you know

02:46:20  8  what he is referring to?

02:46:22  9       MR. LEE:  I do.

02:46:23  10       Are you going to plan to resume --

02:46:24  11       THE COURT:  Mr. Lee, I need you up to the

02:46:27  12  microphone.

02:46:28  13       MR. LEE:  We do have an objection.  My question

02:46:31  14  was if it's going to be used pretty soon, we can

02:46:33  15  certainly -- we should raise it.

02:46:35  16       THE COURT:  We'll probably take break in a few

02:46:41  17  minutes.

02:46:41  18       Mr. Oliver, can we push it off until the break?

02:46:45  19       MR. OLIVER:  Yes.

02:46:45  20       THE COURT:  Okay.

02:46:46  21       MR. OLIVER:  Sorry.  I just wanted to make sure I

02:46:51  22  didn't get to it before we got to the break.

02:46:58  23  BY MR. OLIVER:

02:46:58  24  Q.  Okay.  So using this type of calculation, will you

02:47:05  25  summarize the key calculation and input errors that you

02:47:10  1  found in Mr. Perdue's trial presentation and I'll move you

02:47:13  2  on to your next slide.

02:47:13  3  A.  Yes, this -- I was going to ask for the next slide.

02:47:13  4  Thank you.

02:47:13  5      So this is kind of a roadmap chart or slide, and I

02:47:18  6  won't get into too much detail now because as I step

02:47:24  7  through these two steps, we'll be able to see the

02:47:26  8  information again.

02:47:27  9      But, basically, you can see in those three boxes

02:47:30  10  the issue:  improperly apportioned revenues, that also

02:47:36  11  include non-accused products or revenues from non-accused

02:47:38  12  products; an overstated royalty rate, and that leads to

02:47:42  13  overstated reasonable royalty calculation; and then

02:47:46  14  focusing on the red is really what I would be suggesting

02:47:48  15  here, that even under his own approach, using his own

02:47:52  16  inputs, the apportion rate has to be smaller and the

02:47:56  17  royalty rate has to be smaller.  And making those

02:47:59  18  corrections is what leads to ultimately my main conclusions

02:48:05  19  here.

02:48:05  20  Q.  Okay.  So can you just give us a brief -- very brief

02:48:14  21  overall summary of that?  I may have lost it in the

02:48:17  22  details.

02:48:18  23  A.  Well, I suggested that we'll see it as we come to the

02:48:21  24  next slide, for example, on one of these sections.

02:48:25  25  Q.  Oh, okay.  Let's go to your next one and do it that

02:48:25  1   way.

02:48:28  2            Is that the right one?

02:48:30  3            So what are the input errors that you're referring

02:48:36  4   to on this slide?

02:48:37  5   A.  So this is focused on the royalty rate.  So the input

02:48:42  6   error is the use of non-comparable information about

02:48:46  7   royalty rates from other license agreements that can't be

02:48:48  8   and were not shown to be comparable to the patented

02:48:52  9   technology here.

02:48:53  10           And then, in particular, even his own input or

02:48:58  11  this adjustment that he performs to the exclusive license

02:49:06  12  agreements that he understated that adjustment and that

02:49:09  13  overstated his royalty rate and it overstates damages.  And

02:49:13  14  I'll address that later.

02:49:13  15  Q.  Okay.  And one of the -- one of the terms you use there

02:49:18  16  is average industry -- average industry royalty rates.  But

02:49:24  17  he said he used a median.  Does that make a difference with

02:49:29  18  respect to this point?

02:49:30  19  A.  No.  The problem with using non-comparable license

02:49:35  20  agreements means you can't -- you can't show that either an

02:49:39  21  average rate or a median rate from a -- from several

02:49:43  22  license agreements that are not comparable.  It's not going

02:49:45  23  to be appropriate for using in a calculation of reasonable

02:49:48  24  royalty.

02:49:51  25           It doesn't matter if it's a median or a mean or an

02:49:54   1   average, that same problem is going to filter through all

02:49:57   2   the results in the presentation.

02:49:59   3   Q.  And I see you mention there, reasonable comparability.

02:50:09   4   Mr. Perdue said he used, I believe, economic comparability

02:50:13   5   in his analysis.  Is that appropriate?

02:50:15   6   A.  I don't recall him saying economic comparability.

02:50:19   7   There were problems from an economic comparability basis

02:50:23   8   also.  But typically, starting point is to show technical

02:50:29   9   comparability, and you get input from technical experts,

02:50:33  10   people like me, and input from technical experts to address

02:50:36  11   the technical comparability.  And in my view, Mr. Perdue

02:50:40  12   didn't address economic or technical comparability.

02:50:43  13   Q.  And you prepared a summary in your report related to

02:50:47  14   the details on the lack of comparability, right?

02:50:50  15   A.  Absolutely, yes.

02:50:51  16   Q.  I'm going to put that up here, and would you explain

02:50:54  17   that to us?  Oh, well, the writing is small.  Hopefully the

02:50:58  18   jury has good eyes.

02:51:00  19   A.  I can -- at least I can read this.

02:51:02  20        So these are the 10 license agreements that

02:51:09  21   Mr. Perdue addressed as -- you know, he first looked for

02:51:12  22   more detail and he couldn't find the detail, so he kind of

02:51:16  23   went to less detail and ultimately ends up with 10

02:51:20  24   agreements that are not economically or technically

02:51:23  25   comparable.  And I can address some specifics, but what --

823

02:51:27  1   what this page from my report did was lay out these certain

02:51:30  2   issues of non-comparability, which is the header in the

02:51:35  3   column with most of the words here, and we can look through

02:51:39  4   some of these examples and see the problems that exist.

02:51:43  5   Q.  Will you point out a couple of examples of that for us?

02:51:47  6   A.  Yeah, I'll do a few here.  The first entry is the top

02:51:51  7   entry which was Princeton, et al., because it was actually

02:51:59  8   several large universities, Princeton, USC, University of

02:52:02  9   Michigan, that entered into an exclusive license, and

02:52:05  10  you'll hear much about exclusive licenses and the problem

02:52:09  11  with exclusive licenses when doing this type of analysis.

02:52:13  12       But you can also see -- and under that column

02:52:15  13  certain issues of non-comparability.  This license

02:52:18  14  agreement covered 185 U.S. patents, 64 pending U.S. patents

02:52:25  15  which means they would likely be issuing soon.  These were

02:52:30  16  noted as key patents from USC, Princeton, and the

02:52:35  17  University of Michigan.  And I use the word term here, "not

02:52:41  18  naked patent license."

02:52:42  19       But what we refer to as the naked patent licenses

02:52:45  20  is similar to what we have in this case, where you would

02:52:49  21  assume the parties negotiate where one gets a license to

02:52:53  22  the patent and that's only a license to the patent.  It

02:52:58  23  doesn't include trade secrets or trademarks or know-how or

02:53:06  24  assistance from the inventors.  You just get the rights to

02:53:09  25  use that patent.  It's very different than what you see

02:53:12   1   here.

02:53:12   2   Q.   Okay.   And did you hear me discuss that a little bit

02:53:16   3   with Mr. Perdue yesterday?

02:53:17   4   A.   Yes.

02:53:17   5   Q.   And do you recall he said he didn't discount patent

02:53:22   6   value at all for to know-how or the assistance?

02:53:25   7   A.   Correct.   Or any other of the differences.   All he did

02:53:30   8   was try to make an adjustment for the exclusivity

02:53:37   9   difference.   And, again, in my opinion, he greatly

02:53:40   10   understated that reduction.

02:53:41   11   Q.   Okay.   And before we get into any more details, did you

02:53:45   12   reach any type of overall conclusion about the

02:53:52   13   technological comparability or the economic comparability

02:53:55   14   of these other licenses that Mr. Perdue relied on?

02:53:57   15   A.   Yes.   Each of them have the problem about the economic

02:54:01   16   comparability.   These typically are exclusive, include

02:54:04   17   other things like trade secrets and assistance and

02:54:09   18   know-how.   Sometimes they don't even deal with the right

02:54:11   19   product area.   For example, the bottom three on this list,

02:54:14   20   one has to do with a headphone for gaming.   One is -- is

02:54:20   21   related to a subwoofer.   The bottom entry is related to --

02:54:29   22   let's see, mouse technology.   So they don't even relate to

02:54:33   23   displays or monitors or TVs.

02:54:35   24   Q.   What about the one right -- the third one that talks

02:54:38   25   about TV guide?   Is that related to TVs?

02:54:42  1   A.  Gem Star-TV Guide.  So this is an agreement between an
02:54:45  2   inventor who started the company -- founded the company Gem
02:54:52  3   Star.  So it's between the inventor who is the founder and
02:54:56  4   principal owner initially of Gem Star.  Gem Star and TV
02:54:59  5   Guide ended up joining together as a company.  And I have
02:55:03  6   experience in that particular area because I worked for
02:55:05  7   Netflix and Vizio in cases where Gem Star sued them for
02:55:13  8   infringement relating to the -- an interactive program
02:55:16  9   guide for TVs.
02:55:17  10          So, once again, it's very different technology.
02:55:19  11  It's not technically comparable, and it's not economically
02:55:23  12  comparable because here we have a relationship between the
02:55:26  13  owner/inventor of the patent and his own company.
02:55:36  14  Q.  And did you already mention who Gem Star sued over
02:55:40  15  this?
02:55:40  16  A.  Gem Star sued most of the cable operators and TV
02:55:43  17  manufacturers.  Vizio was an example of that, also Netflix,
02:55:50  18  as I mentioned.  So these were viewed by Gem Star to be
02:55:54  19  foundational patents that relate to interactive TV guides.
02:56:02  20  Q.  Okay.  And it mentions that that's exclusive.  Can you
02:56:07  21  explain why you say that?
02:56:08  22  A.  Yes.  And this goes to this fundamental difference
02:56:12  23  between exclusive patent license and non-exclusive.  So
02:56:15  24  this is an example where the inventor said:  I'm going to
02:56:19  25  license my technology to this company, and they're going to

02:56:22   1   have all rights to this patented technology.  And, again,

02:56:24   2   it's more than one patent.  It's a whole group of patents

02:56:28   3   that would relate to interactive program guides in this

02:56:31   4   example.

02:56:32   5        So the company that has exclusive license can make

02:56:37   6   sure that no other company is going to get rights to those

02:56:41   7   patents and have close to ownership of that patented

02:56:47   8   technology.  And most of the times, they can also sue other

02:56:51   9   companies because they have rights through their exclusive

02:56:54   10   license to control that patented technology.  It's very

02:56:56   11   different from a non-exclusive license.

02:56:58   12        And there's one other example here that I would

02:57:00   13   point to in that regard.

02:57:02   14   Q.  Which example would you like to point out?

02:57:04   15   A.  It's the one -- it's five down, and it's associated

02:57:06   16   with the Perdue Count No. 10.  It was this type of example.

02:57:10   17   And Silicon Image is the licensee.  He characterized it as

02:57:16   18   a non-exclusive license, but in many ways it has important

02:57:23   19   exclusivity aspects.  As I note here, it's not truly

02:57:26   20   non-exclusive because the licensee has full rights to

02:57:31   21   sublicense others, and it's exclusive going forward in the

02:57:34   22   field of use.  And the licensee has the full rights to

02:57:39   23   enforce the patents.

02:57:39   24        And then the last thing I note about this

02:57:42   25   agreement is the royalty rate went down every year.  So

02:57:46   1   Mr. Perdue includes it as an example of a 4.2 percent

02:57:51   2   royalty rate on the high-end.  But after five years, six

02:57:55   3   years, it essentially goes down 0.5 percent and then to 0.

02:58:01   4   And that's an important adjustment that I will talk about

02:58:04   5   in a moment.

02:58:05   6   Q.  And I notice the third one from the bottom, you seem to

02:58:08   7   have a lot of notes on.  Can you touch on that one for us?

02:58:11   8   A.  I already did.  As I mentioned, it relates to a

02:58:15   9   headphone for gaming.  But the other notes about this are

02:58:18  10   in addition to patent rights, which were exclusive -- this

02:58:23  11   is another example of an exclusive license -- there were

02:58:27  12   rights to trademark, engineering files, tooling,

02:58:34  13   prototypes, and that the licensee was also moving, paying

02:58:38  14   for the right to change manufacturing.

02:58:42  15          So again, very complex, exclusive agreement that

02:58:46  16   typically will not be comparable economically to a

02:58:49  17   non-exclusive license for rights to use a patent.

02:58:53  18   Q.  So I notice you keep emphasizing these are all

02:58:57  19   exclusive, exclusive, exclusive.  Is there a concern with

02:59:01  20   respect to that?

02:59:01  21   A.  Absolutely.  Because of the difference between an

02:59:04  22   exclusive license, which, again, would generally relate to

02:59:07  23   technology that's viewed significantly enough that one

02:59:12  24   party is saying I want to have exclusive rights to this.  I

02:59:15  25   want to be able to enforce these patent rights against

02:59:18   1   others.  I don't want other companies using it.  I want

02:59:21   2   this agreement before I start developing my product.

02:59:24   3   It's -- it's very different from an example of a

02:59:28   4   non-exclusive patent -- patent license.

02:59:30   5   Q.  Okay.  And what is a non-exclusive patent license?

02:59:34   6   A.  Well, that would be an example where one company may

02:59:39   7   try to enforce its patents many years later and offer a

02:59:43   8   license to everyone that it believes would be using that

02:59:47   9   technology.

02:59:48  10         So not -- no one company would have the rights to

02:59:51  11   be the only company to use that patented technology, and

02:59:55  12   the company taking a license under that circumstance has no

02:59:59  13   control about what other companies might be able to get

03:00:02  14   similar rights.

03:00:03  15   Q.  But Mr. Perdue said that he considered exclusivity and

03:00:07  16   reduced the rates based on that, right?

03:00:10  17   A.  Yes.  And he went forward with a calculation, but that

03:00:14  18   calculation, which also had flaws -- that calculation

03:00:17  19   doesn't deal with this inherent bias where exclusive

03:00:20  20   licenses just relate to -- to a different type of patented

03:00:30  21   technology.

03:00:30  22         And the fact that -- I think Mr. Perdue talked

03:00:33  23   about nine agreements, kind of at the end of his testimony.

03:00:37  24   Seven of those nine, and eight if you include the Silicon

03:00:45  25   Image example I was talking about, seven or eight of the

03:00:48  1   nine are exclusive licenses.  That's a significant

03:00:52  2   comparability problem.

03:00:52  3   Q.  And I'd like to pull up your next slide and ask you to

03:00:55  4   address the problems comparing a non-exclusive license to

03:01:00  5   Lone Star's '435 patent with these exclusive licenses we

03:01:04  6   see?

03:01:04  7   A.  I'll try to be brief here because I think I touched on

03:01:07  8   some of this.  But a exclusive patent license generally

03:01:11  9   relates to more important technology, and the licensee

03:01:15  10  views that it wants those exclusive rights to be able to

03:01:18  11  improve a product it's developing.  And it will have

03:01:21  12  competitive advantages from that.  And thus it typically

03:01:24  13  does correspond with product development efforts.  And the

03:01:29  14  licenses and the settlements for the patent-in-suit here is

03:01:36  15  substantially different.

03:01:37  16       So this patent, as presented in this case, was not

03:01:40  17  licensed until late in the life of the patent.  You

03:01:43  18  heard -- we heard testimony about NEC, Sharp, Acer, then

03:01:50  19  later Barco took -- took non-exclusive agreements here.

03:01:55  20  Those were all within the last four or five years.  They

03:01:58  21  were always licensed or released with non-exclusive

03:02:04  22  rights -- non-exclusive.

03:02:05  23       And the licensing took place with global companies

03:02:08  24  and with -- with global activity.  They might manufacture

03:02:13  25  in Japan or Taiwan, but they were getting rights not to

03:02:17   1   just the '435 patent but to all the patents that Lone Star

03:02:21   2   had, which are worth more than the '435, the U.S. Patent,

03:02:28   3   but also companion patents that come from other countries

03:02:31   4   and would cover that activity in other countries.

03:02:34   5   Q.  So you've been talking about the '435 patent, but what

03:02:40   6   is the overall point about Mr. Perdue's use of seven

03:02:45   7   exclusive licenses for his royalty calculation?

03:02:47   8   A.  That it's an important example of non-comparable

03:02:52   9   technical and economic comparison, so there's a fundamental

03:02:56  10   problem there.  But what I focus on in my correction is his

03:03:00  11   input and the use of his information.

03:03:02  12   Q.  Okay.  And -- but with those exclusive licenses, they

03:03:07  13   make the license rate higher or lower?

03:03:10  14   A.  Well, two aspects will make the rate higher.  One is

03:03:17  15   just the exclusivity difference that Mr. Perdue is

03:03:19  16   addressing, but also the bias point that I'm addressing.

03:03:22  17   It's just fundamentally more important technology.

03:03:25  18   Q.  But didn't he say that he had applied a downward

03:03:31  19   adjustment to the rates?

03:03:32  20   A.  He did.

03:03:32  21   Q.  And what's wrong with what he did?

03:03:35  22   A.  Well, suggesting that based on his own inputs for doing

03:03:40  23   that, he did not apply the adjustment appropriately.  I

03:03:45  24   mean, that's what I'll address now if --

03:03:47  25   Q.  Okay.  Yeah, and you prepared a slide on that, right?

03:03:51  1   A.   Absolutely.

03:03:52  2   Q.   Okay.  Let's move to that.  Would you address that?

03:03:55  3   A.   Yeah.  So I understood from Mr. Perdue's report that he

03:04:00  4   had two inputs that he addressed and he testified about

03:04:05  5   yesterday -- about them yesterday.  I wasn't quite sure how

03:04:09  6   he ultimately derived his 35 percent reduction, but his two

03:04:14  7   inputs were -- first, this one example of a license

03:04:17  8   agreement between MBI and DuPont, which, again, is not

03:04:23  9   anything related to technology in this case.

03:04:25  10          But he observed that if -- in that agreement, if

03:04:30  11  the license agreement changed during the course of the

03:04:32  12  agreement from an exclusive license to a non-exclusive

03:04:36  13  license, the royalty rate went down.  That's a reflection

03:04:39  14  of facts I've been talking about.  The promise -- it's the

03:04:46  15  same technology?  It's just that they're recognizing

03:04:48  16  that -- we might start exclusive, and you might develop a

03:04:52  17  product for the first five years and maybe in the sixth

03:04:55  18  year, we'll grab rights to another company.  And we'll give

03:04:59  19  you credit for that, so we'll lower the royalty rate.

03:05:02  20  That's the example that he pointed to.  It was a 25 percent

03:05:05  21  reduction, which may or may not happen, but that's what the

03:05:08  22  parties agreed to.

03:05:09  23  Q.   Okay.  And you mentioned to me you wanted to explain

03:05:15  24  one of the excerpts from Mr. Perdue's reports that you have

03:05:25  25  on the slide.  Can I put that up and have you explain why

03:05:26  1  you thought it was important?

03:05:27  2  A.  Yes.  And he was questioned about this yesterday.  You

03:05:31  3  will probably recall this.  I didn't quite understand why

03:05:34  4  he discounted this particular evidence, as I'll mention in

03:05:37  5  a moment.

03:05:37  6       But the other thing he pointed to was an empirical

03:05:42  7  study, 1,458 license agreements, and these come from SEC

03:05:48  8  filings, just like that prior example, the MBI/DuPont.  How

03:05:55  9  do we know these rates?  They're -- generally, they're not

03:05:57  10  publicly made or known.  But sometimes the comp -- like,

03:05:59  11  for example, if you're -- if you're the owner of the

03:06:00  12  company and you're licensing your own company to your

03:06:03  13  patents, you need to disclose that if you're a public

03:06:07  14  company, and it'll show up in an SEC annual report of 10-K.

03:06:12  15  Sometimes the entire license agreement might be attached.

03:06:14  16       So people can -- this ktMINE company Mr. Perdue

03:06:19  17  addressed, they compile these data based on the public

03:06:23  18  reports they get.

03:06:24  19       So Mr. Varner here did a study of over a thousand

03:06:30  20  license agreements, and what he reported is some of those

03:06:33  21  agreements were exclusive agreements, and then a subset of

03:06:36  22  those exclusive agreements are agreements where there's a

03:06:40  23  term that talks about what happens if we go from exclusive

03:06:44  24  to non-exclusive.

03:06:45  25       But what -- what was reported -- you see at the

03:06:48   1   very bottom here of that type of subset, subset exclusive

03:06:53   2   license, further subset, the type of exclusive license that

03:06:56   3   has terms when you change from exclusive to non-exclusive,

03:07:01   4   over two-thirds of that, the rate reduction was 50 percent.

03:07:09   5          Somehow Mr. Perdue takes this evidence that says

03:07:11   6   two-thirds -- most of these reduced 50 percent, but I'm

03:07:15   7   going to consider the DuPont example, and I'll use 35

03:07:19   8   instead of the 50.  That's inconsistent with the own --

03:07:26   9   their own primary data source that he's using that says the

03:07:29  10   vast majority have a 50 percent reduction, and as he

03:07:32  11   testified yesterday, for the other one-third -- or actually

03:07:36  12   less than one-third, we don't know if it's a bigger

03:07:39  13   adjustment downward or like DuPont, smaller, but certainly

03:07:42  14   there's no basis to use anything other than 50 percent

03:07:46  15   reduction if you're going to use his methodology.

03:07:50  16   Q.  Okay.  And then based on that last statement that you

03:08:02  17   needed to use at least a 50 percent reduction, how would

03:08:06  18   that impact the overall resulting royalty rate?

03:08:10  19   A.  Right.  And, again, I would view this as a minimum

03:08:11  20   correction, because, again, just using his own approach and

03:08:14  21   his own inputs -- and the next slide actually will show my

03:08:19  22   adjustment to his calculation.

03:08:21  23   Q.  You want the next slide?

03:08:23  24   A.  Yes, please.

03:08:27  25   Q.  Okay.  So would you explain what this slide shows with

03:08:30  1  respect to your adjustment?

03:08:31  2  A.  Yes.  It only does two differences from Mr. Varner's

03:08:40  3  calculation.  One difference is the Silicon Image example

03:08:44  4  I've been talking about.

03:08:47  5        I said that the rate went down over time from

03:08:47  6  the 4.2 percent that Mr. Perdue used to after five years,

03:08:54  7  it went to 0.5, and after six years, it would go

03:08:54  8  to 0 percent.

03:08:57  9        And, remember, Mr. Perdue said that the

03:09:01  10  hypothetical agreement here was from 2013.  So the parties

03:09:04  11  negotiate in 2013.  Then I'm going to focus on damages in

03:09:09  12  2019, 2020, 2021.  So for this agreement, by 2020, the rate

03:09:14  13  would be 0 percent.  But I used 0.5 percent, which is

03:09:21  14  effectively what the rate would have been in 2019.

03:09:23  15        Other than that, the other corrections for all

03:09:28  16  these seven exclusive licenses -- and, again, I didn't do

03:09:31  17  the adjustment for Silicon Image, which, again, has

03:09:37  18  exclusive aspects, but for all seven that he adjusted, I

03:09:41  19  adjusted 50 percent rather than the 35 percent he used.

03:09:45  20        And you can see at the bottom here, the median and

03:09:47  21  then the midpoint, his 2.3 percent calculation goes

03:09:52  22  to 1.5 percent.

03:09:54  23  Q.  Okay.  Let's move on to your next correction.  I think

03:09:58  24  you prepared a slide for it.  And this is part of one of

03:10:01  25  the first slides you showed, I believe.

835

03:10:05  1        What does -- what does this relate to?

03:10:08  2   A.  Well, this relates to a apportionment point, and you'll

03:10:13  3   recall that Mr. Perdue used a 14 percent adjustment based

03:10:17  4   on the Philips TV and set-top box patent licensing program.

03:10:22  5        And the first thing I'd say is the use of that

03:10:29  6   program, which is, you know, a famous Philips patent

03:10:33  7   licensing program for TVs.  Philips talks about the fact

03:10:38  8   that it's licensed all the major TV manufacturers in the

03:10:45  9   world, and it relates to Philips's patent and technology

03:10:49  10  clusters for how Philips thinks its patent should fall and

03:10:54  11  how important some of those patent are compared to others.

03:10:56  12       That relates to Philips's program, not to ASUS

03:11:00  13  monitors, not to how the patented technology at issue in

03:11:03  14  this case might relate to monitors.  So there's a

03:11:06  15  fundamental -- again, a fundamental technical comparability

03:11:10  16  issue here.

03:11:10  17  Q.  And down at the bottom, you have something about

03:11:14  18  royalty base disagreements.  Why are you saying royalty

03:11:18  19  base disagreements rather than errors by Mr. Perdue?

03:11:20  20  A.  I actually had errors in my slide a couple days ago,

03:11:26  21  and I changed it to disagreements because I heard

03:11:28  22  Mr. Perdue's explanation that he's not opining about the

03:11:33  23  royalty base.  He just understands there's a disagreement

03:11:36  24  between the parties.

03:11:37  25       So the parties have different views about what

03:11:40   1   should be included in the royalty calculation, and I'll

03:11:45   2   address that.

03:11:45   3   Q.   Okay.   And I'll come back to that a little bit later,

03:11:49   4   but remind the jury about how Mr. Perdue used the Philips

03:11:53   5   patents and royalty rates to do an apportionment in this

03:11:56   6   case.

03:11:57   7   A.   Sure.   So Mr. Perdue looked to this set-top box TV and

03:12:01   8   set-top box licensing program, and it had 145 patents

03:12:06   9   roughly in that program.   But Philips put the technology

03:12:10   10   into different clusters.   There were 16 clusters he

03:12:13   11   testified to, and, I agree, there were -- there were 16

03:12:16   12   clusters.   And some of the patents are included in certain

03:12:23   13   clusters, other patents are included in others.

03:12:25   14        Philips specified royalty rates.   And what

03:12:28   15   Mr. Perdue said, I want to look for one where the title of

03:12:31   16   the cluster seems to make sense, and I'll take the royalty

03:12:34   17   rate for that, and I'll divide that royalty rate to the

03:12:37   18   royalty rate for everything, and that would be a fair way

03:12:39   19   to represent a portion of the monitor -- of the ASUS

03:12:44   20   monitor that might relate to video control.

03:12:47   21        So this concept of apportionment is important.   It

03:12:51   22   has to be done in cases like this.   He attempted to do it.

03:12:54   23   He just used the methodology that didn't have technical

03:12:59   24   support or economic support.

03:13:00   25   Q.   Was it right for him to use the Philips -- the TV and

03:13:04  1  set-top box license program?

03:13:07  2  A.  I personally wouldn't use that approach because it

03:13:12  3  represents Philips and not necessarily everything that

03:13:15  4  might go into an ASUS monitor.  But --

03:13:18  5  Q.  Did Mr. Perdue present any solid evidence of comparing

03:13:23  6  the technologies as opposed to just looking at the words?

03:13:27  7  A.  My understanding from his testimony yesterday is that

03:13:30  8  he looked at the term, the title of the technology cluster,

03:13:36  9  and based on that title, he seemed to think that that was

03:13:39  10  the one that might be the most relevant.

03:13:42  11        And I actually looked at the patents, and I

03:13:45  12  prepared a slide that shows the -- some of the information

03:13:47  13  about the patents.

03:13:54  14  Q.  Okay.  Well, before we do that, you say in the top

03:13:57  15  bullet there in red, the apportion rate must be smaller

03:14:02  16  under his own approach.  How did -- why did you conclude

03:14:05  17  that?

03:14:05  18  A.  Because in my opinion, if you're going to use something

03:14:08  19  like a third-party's approach, like Philips, and you

03:14:12  20  haven't really demonstrated that any one particular

03:14:15  21  technology cluster is relevant to the ASUS monitors and how

03:14:18  22  you might allocate all the technology in an ASUS monitor,

03:14:22  23  then you shouldn't take something because the title is --

03:14:26  24  is TV -- I think it's Backlighting and Dimming, and later

03:14:31  25  Philips changed that title to TV Display.  So TV display

03:14:36  1   doesn't really relate to what Mr. Perdue said was somehow

03:14:41  2   controls -- video controls or a monitor.  TV display is

03:14:45  3   something different.

03:14:45  4   Q.  So did you correct for what you -- the error you point

03:14:49  5   out there?

03:14:53  6   A.  I did, yes.  And so, again, using his approach, using

03:14:57  7   this Philips program, which I disagree with -- but rather

03:15:01  8   than use a particular cluster or category without technical

03:15:06  9   input and support, I used the average over 16 categories.

03:15:10 10          MR. OLIVER:  Okay.  If Your Honor wants, we can

03:15:13 11   stop now.  It's a good point.  Or we can --

03:15:15 12          THE COURT:  Okay.  Let's do that.  Let's take our

03:15:19 13   afternoon recess at this time.

03:15:20 14          Ladies and gentlemen, we'll be in recess about

03:15:23 15   15 minutes.

03:15:25 16          COURT SECURITY OFFICER:  All rise for the jury.

03:15:28 17          (Jury out.)

03:15:51 18          THE COURT:  Okay.  You all may be seated.

03:15:54 19          The witness can stand down if he wishes to.

03:15:58 20          Can we hear this dispute about the -- one of the

03:16:01 21   slides?

03:16:02 22          And if you would, just put it on the Elmo so you

03:16:05 23   could see it.

03:16:06 24          MR. OLIVER:  Sure.  Is that on or -- it was this

03:16:25 25   slide, right?

03:16:27  1          MR. LEE:  Yes, it is.

03:16:33  2          Your Honor, we object to the two bullet points,

03:16:37  3    the very last part of the page.

03:16:39  4          We had previously raised the objections to another

03:16:42  5    slide.  This was inadvertently missed on our part.  The

03:16:48  6    Defendant ASUS had withdrawn those ones.

03:16:50  7          The problem with these two bullet points are

03:16:53  8    they're outside the scope of Mr. Reed's expert report.  He

03:16:57  9    is basically making the inferential link -- leap here that

03:17:01  10   the products are not at all used in the United States

03:17:03  11   because certain ASUS products are shipped to the United

03:17:07  12   States and are then shipped back abroad.  He doesn't talk

03:17:11  13   about that in his expert report.

03:17:15  14         MR. OLIVER:  Your Honor, I believe that he did

03:17:22  15   talk about it.  He mentioned the distributors and

03:17:27  16   researched the websites that showed that the distributors

03:17:31  17   are international and included citations to those in his

03:17:35  18   report.

03:17:35  19         MR. LEE:  What Mr. Reed has done is he's shown

03:17:39  20   that there's distributors that are customers of ASUS, that

03:17:43  21   these customers do have distribution sites.

03:17:46  22         What he has not written in his report is that a

03:17:48  23   single ASUS product purchased by these customers have been

03:17:52  24   shipped outside the United States.

03:17:55  25         THE COURT:  So do we have a copy of the report?

03:17:57  1            MR. LEE:  I can put it on the Elmo.

03:18:43  2            THE COURT:  Okay.  So, Mr. Oliver, where is it

03:18:46  3   disclosed?

03:18:47  4            MR. OLIVER:  So -- I'm sorry.  I'm trying to see

03:19:00  5   the slide to see -- remember what he said.

03:19:05  6            So we're looking at Pages 21 and 22 in the report,

03:19:12  7   and on the top of Page 22 -- we're looking at Page 21 on

03:19:17  8   the Elmo, but on the top of Page 22, he says that ASUS's

03:19:24  9   distributors include customers that are known to provide

03:19:27  10  product to customers outside the U.S.

          11            And then he later on down the page says, I'm not

          12  aware of any discovery attempted by Lone Star to address

          13  distribution of the accused products to consumers outside

          14  the United States.

          15            THE COURT:  So I'm not -- I'm looking at something

03:19:49  16  different from what you're reading.

03:19:49  17            MR. OLIVER:  Yeah.  Yeah.

03:19:50  18            THE COURT:  Tell me what you're reading from.

03:19:50  19            MR. OLIVER:  Page --

03:19:52  20            THE COURT:  Could you put it on the screen maybe

03:19:54  21  so we can all see it?

03:19:56  22            MR. OLIVER:  Yes.  Would you like me to hand it to

03:19:59  23  you, Your Honor?

03:20:00  24            THE COURT:  No, just put it on the screen so we

03:20:03  25  can all see it.

03:20:04   1          MR. OLIVER:  So starting from where my finger is,

03:20:14   2   these include customers that are known to provide product

03:20:17   3   to customers outside the U.S.

03:20:19   4          If we drop further -- further on down the page to

03:20:23   5   the next paragraph, I'm not aware of any discovery

03:20:28   6   attempted by Lone Star to address distribution of the

03:20:31   7   accused products to consumers outside the United States.

03:20:45   8          And the full paragraph there.

03:20:47   9          THE COURT:  Okay.  Mr. Lee, I'm going to overrule

03:20:54  10   your objection.  I think it's disclosed.  So I'll allow the

03:20:57  11   slide to be used.

03:20:58  12          MR. OLIVER:  Thank you, Your Honor.

03:20:59  13          THE COURT:  Okay.  We'll take a short recess.

03:21:01  14          COURT SECURITY OFFICER:  All rise.

03:21:03  15          (Recess.)

03:46:18  16          COURT SECURITY OFFICER:  All rise.

03:46:19  17          THE COURT:  Let's have the jury brought in,

03:46:21  18   please.

03:46:22  19          (Jury in.)

03:46:45  20          THE COURT:  Please be seated.

03:46:48  21          Mr. Oliver, you may continue.

03:46:51  22   BY MR. OLIVER:

03:46:52  23   Q.  Mr. Reed, just before we took the break, you were

03:46:55  24   saying that you made a correction for Mr. Perdue's

03:46:59  25   overstatement of the apportionment rate -- not the royalty

```
03:47:02   1   rate but the apportionment rate.  What did you do first
03:47:05   2   when you were correcting that apportionment rate,
03:47:09   3   specifically with respect to the Philips -- oops, can we
03:47:19   4   have --
03:47:20   5   A.  The first thing I did was perform additional research
03:47:25   6   on the Philips TV and set-top box licensing program.  I had
03:47:30   7   worked with it in the past in my prior work, but I wanted
03:47:34   8   to look and see what are the patents -- what are these
03:47:36   9   patent technology clusters, what kinds of patents were
03:47:39   10  included with them.  And then I also had a conversation
03:47:46   11  with Professor Stevenson about some of the categories of
03:47:47   12  these clusters.
03:47:49   13  Q.  And did you prepare a slide summarizing that?
03:47:50   14  A.  I did.
03:47:51   15  Q.  I'll bring that up.
03:47:53   16      What does this slide show?
03:47:55   17  A.  Well, this first slide is similar to one I believe you
03:47:56   18  saw earlier with Mr. Perdue that shows the pricing
03:48:01   19  information - the Euro pricing and U.S. pricing in
03:48:07   20  Columns 1 and 2.  What it shows is also what I added in
03:48:10   21  Column 3 about the number of Philips patents that are
03:48:13   22  included in some of these technology clusters.  And one of
03:48:16   23  the first things I saw is that the description of the
03:48:19   24  technology clusters for the patents didn't necessarily
03:48:22   25  match what Mr. Perdue relied on.
```

03:48:24  1         So, for example, there -- there was no technology

03:48:34  2  cluster called TV backlight and dimming, but I did see in

03:48:40  3  my investigation that there were -- there was a technology

03:48:41  4  cluster called TV display, and there were 13 Philips

03:48:47  5  U.S. patents in that cluster.  And then I looked at the

03:48:51  6  patents themselves, saw that these include backlight,

03:48:55  7  dimming, power savings, brightness, contrast, digital

03:48:58  8  monitor, related patented technologies.

03:49:01  9         So it seems that at least some, if not most or all

03:49:04  10  of those patents, would be part of what used to be called

03:49:09  11  the TV backlight and dimming.

03:49:14  12  Q.  Just to make sure we're clear, in the lower right, you

03:49:19  13  have 13 patents in the TV display category.  And that does

03:49:23  14  not correspond to one of Mr. Perdue's categories on the

03:49:28  15  left.  Is that what that's showing?

03:49:30  16  A.  That's what it shows.  But, again it seems like there's

03:49:34  17  some similarity or correlation because the patents -- had

03:49:38  18  patents that in their titles addressed dimming and

03:49:42  19  backlighting, but then other patents, as well, as you see

03:49:46  20  listed here on the note on the bottom.

03:49:49  21  Q.  Okay.  So Mr. Perdue's category of TV backlight and

03:49:52  22  dimming, you didn't list any patents next to it, but

03:49:56  23  you're -- is it -- what you're saying that you're kind of

03:49:58  24  assuming those 13 patents would be in that category based

03:50:02  25  on the way -- maybe the way he categorized them?

03:50:05  1   A.  Perhaps.  Well, he relies on the title of the cluster,

03:50:10  2   TV backlight and dimming.  What I noted is some of the

03:50:14  3   patents that are now in a TV display category deal with the

03:50:17  4   issues of backlight and dimming.  So it seems like at least

03:50:22  5   some or most of them would have perhaps in the past been in

03:50:26  6   this TV backlight and dimming category.

03:50:29  7   Q.  So applying that 14 percent apportionment that

03:50:34  8   Mr. Perdue assigned to that category would relate to 13

03:50:38  9   patents, right?

03:50:39  10  A.  Perhaps as many as 13.  It seemed like about 10 of them

03:50:45  11  dealt with the dimming and backlighting, so I think it's at

03:50:48  12  least 10, maybe as many as 13.

03:50:51  13  Q.  Okay.  And did Mr. Perdue investigate the number of

03:50:54  14  patents in these categories?

03:50:56  15  A.  No, he addressed the total number of patents in the

03:50:59  16  Philips program, but I show the patents in each of the

03:51:03  17  categories and then the 145 total at the bottom.

03:51:11  18  Q.  And do you recall what he said about consulting with a

03:51:13  19  technical expert on these patents?

03:51:15  20  A.  Mr. Perdue said he did not talk to a technical expert,

03:51:18  21  and I think his testimony was he relied on the words "TV

03:51:22  22  backlight and dimming" and viewed that to be most related

03:51:27  23  to what he was looking for which was video control, I

03:51:31  24  believe is his testimony.

03:51:31  25  Q.  You may have already mentioned this and if so, just

03:51:34   1   tell me, but if you haven't, can you show us what

03:51:39   2   Mr. Perdue did with this chart to reach his 14 percent

03:51:44   3   rate?

03:51:44   4   A.   Sure.  I think he explained it.  He took the $0.58 per

03:51:48   5   unit, which is the price that Philips charges for this 10

03:51:53   6   to perhaps 13 patents in the TV display category, and he

03:51:57   7   divided that $0.58 -- and if you look at the bottom, took

03:52:01   8   the total from all 16 of these clusters -- $4.12.  That is

03:52:06   9   roughly 14 percent.  He uses that 14 percent for

03:52:10   10   apportionment.

03:52:10   11   Q.   Do you agree with that?

03:52:11   12   A.   No, I don't.  I suggested that before.  But more

03:52:15   13   particularly, there's -- most important that the TV

03:52:20   14   backlight and dimming -- what it used to be called, which

03:52:23   15   is now called TV display -- is inappropriate for

03:52:28   16   apportioning revenue or monitor to -- to control -- video

03:52:34   17   control technology.  There's just no technical input or

03:52:37   18   support for that.  And on this issue, I had a discussion

03:52:39   19   with Professor Stevenson.

03:52:41   20   Q.   Okay.  And does that 14 percent from that TV display

03:52:47   21   cluster have any meaningful relationship with the accused

03:52:51   22   ASUS monitors in this case?

03:52:53   23   A.   There's certainly no support for that in Mr. Perdue's

03:52:57   24   analysis.  And from the input I have from Professor

03:53:02   25   Stevenson, there is no support for that.

```
03:53:04   1    Q.  Okay.  I believe you said that the Philips TV --

03:53:10   2    earlier that the Philips TV patents are important.  Did you

03:53:15   3    say that?

03:53:15   4    A.  Yes, Philips has on its website that the major TV

03:53:21   5    brands -- manufacturers have all taken licenses to the

03:53:24   6    Philips patent in the TV and set-top box area.

03:53:29   7    Q.  Okay.  Is this licensing program well known?

03:53:32   8    A.  Yes.  As I mentioned, I've seen this program in the

03:53:38   9    past when I worked in the area dealing with monitors and

03:53:43   10   TVs, and it frequently comes up in that industry.

03:53:47   11   Q.  Okay.  With respect to the TV display cluster or what

03:53:52   12   we think Mr. Perdue might have called TV backlighting and

03:53:56   13   dimming, did you seek any technical expertise on what the

03:54:01   14   patents in that cluster cover?

03:54:03   15   A.  Yes.  I discussed them with Professor Stevenson.

03:54:07   16   Q.  Okay.  The Professor Stevenson that just testified

03:54:16   17   earlier today?

03:54:16   18   A.  Yes, correct.

03:54:17   19   Q.  Okay.  And what did he tell you about those patents in

03:54:19   20   terms of the technology?

03:54:20   21   A.  Well, he told me --

03:54:20   22           MR. LEE:  Objection.  Hearsay.

03:54:22   23           THE COURT:  Sustained.  Can you rephrase the

03:54:30   24   question?

03:54:30   25   BY MR. OLIVER:
```

03:54:30  1   Q.  Did you rely upon -- why did you rely upon his

03:54:35  2   technical expertise with respect to whether certain patents

03:54:39  3   were important or not?

03:54:41  4   A.  I was seeking to get information about the particular

03:54:45  5   patents that Philips had in the TV display category, and

03:54:49  6   the importance of that technology, and, in particular, how

03:54:54  7   that could compare to monitors and the Lone Star patent

03:54:57  8   technology, as well.

03:54:57  9   Q.  Were any of those patents in that cluster particularly

03:55:01  10  notable?

03:55:01  11  A.  Yes.

03:55:02  12  Q.  How so?

03:55:02  13  A.  Well, Professor Stevenson addressed that several of

03:55:09  14  these backlight and dimming -- in particular, backlight

03:55:12  15  technologies.  And one patent in particular he informed me

03:55:16  16  is notable for TV manufacturing and that -- in particular,

03:55:19  17  for high-end TVs, so we can think about those as perhaps

03:55:24  18  the size of this, a lot of functionality in them and

03:55:28  19  perhaps -- prices have come down a lot, but even now they

03:55:33  20  would probably be 1,500 to $2,000, and that this patented

03:55:40  21  technology of Philips, that includes the -- the

03:55:42  22  backlighting technology applies to the entire panel and is

03:55:46  23  notable technology.

03:55:47  24  Q.  And so -- but we're talking in this case about a

03:55:54  25  technology that relates to one of many features within a

03:55:59  1  control panel that may be used versus a patent that might

03:56:03  2  relate to the entire panel on the TV.  How does that

03:56:12  3  impact -- does that have an impact on the 14 percent rate

03:56:15  4  that Mr. Perdue applied?

03:56:17  5  A.  Well, the impact is -- Mr. Perdue is looking for a

03:56:20  6  mechanism to come up with an apportionment percentage, and

03:56:23  7  he wants it to relate to something like video control.  But

03:56:27  8  the category he's using are significant Philips patents.

03:56:33  9  And the whole approach of Mr. Perdue is impacted by where

03:56:37  10  Philips puts its patents and how many total patents Philips

03:56:43  11  has.

03:56:43  12         So if Philips has real important patents that they

03:56:46  13  put in the TV display category, then that $0.58 royalty

03:56:52  14  would be larger because of these patents that are applied

03:56:55  15  to expensive TVs.  That would support a higher royalty

03:56:59  16  rate, and that makes the 14 percent too big.  So that's

03:57:02  17  really the fundamental problem is there's different

03:57:05  18  technologies in these patents that are included in a TV

03:57:09  19  display, and it doesn't really represent video control or

03:57:11  20  some apportionment of an ASUS monitor.

03:57:14  21  Q.  Okay.  Would there be any impact if you used the rate

03:57:19  22  in euros that is shown in Mr. Perdue's data, as opposed to

03:57:24  23  the U.S. rate?

03:57:25  24  A.  Yes.  And that's an example of how sensitive the

03:57:27  25  results here are to the inputs.  Take the $0.35 euro and

03:57:35  1   divide by the 392 euro, it's 9 percent.  But even in the

03:57:40  2   same category, he gets 14 percent.  If you use euro, you

03:57:45  3   would get 9 percent.

03:57:49  4   Q.  So you prepared a slide showing your minimum correction

03:57:53  5   to that analysis; is that right?

03:57:55  6   A.  Well, I believe I have a slide that shows the

03:57:58  7   calculation of the percentages that Mr. Perdue had, and it

03:58:04  8   reflects additional information that I considered in the

03:58:06  9   minimum correction.

03:58:07  10  Q.  Okay.  So I'll pull that slide up.  Can you explain to

03:58:12  11  the jury -- give them an understanding of what this shows

03:58:16  12  and what you considered to be the minimum correction?

03:58:22  13  A.  Sure.  And I'll step through them and go by color codes

03:58:27  14  to try to make it easier.  But basically the first part,

03:58:30  15  Column 1 is the same information we've already been talking

03:58:33  16  about.  It's the U.S. price for the 16 categories with

03:58:38  17  the $4.12 total.

03:58:39  18          And what it -- what this slide shows is the

03:58:42  19  portion of the $4.12 royalty -- again, a Philips royalty of

03:58:46  20  the Philips particular patents, and you can see

03:58:49  21  the 14.1 percent for TV backlight and dimming, which,

03:58:53  22  again, is TV display category relating to probably 10 or

03:58:59  23  more patents, perhaps 13, but I believe certainly 10.  And

03:59:03  24  it shows you some of the different portions of the $4.12,

03:59:08  25  different percentages, depending on these different

03:59:11  1   clusters.

03:59:11  2   Q.  Okay.  What is the blue line?

03:59:16  3   A.  So the blue line is a category that Mr. Perdue put into

03:59:20  4   his report as audio.  But when you look at the patents, the

03:59:27  5   patented technology cluster is called either A/B -- A/B, or

03:59:33  6   audio/video.  And this was one of the categories that I had

03:59:39  7   a discussion with Professor Stevenson about it, and there's

03:59:42  8   a note here about the Philips '928 patent.

03:59:45  9   Q.  What are you pointing to?

03:59:47  10  A.  Under observation, that's my observation.  I note that

03:59:51  11  of those 14 patents in this category, one is the

03:59:55  12  Philips '928 patent, and I asked Professor Stevenson about

03:59:59  13  that patent.

03:59:59  14  Q.  Okay.  And I see you have a note there at the bottom of

04:00:04  15  the page on that patent?

04:00:04  16  A.  Yes.  That's the title of the patent.

04:00:06  17  Q.  Can you let us know what that is?

04:00:09  18  A.  Sure.  The title is:  Enhancement of Video Images By

04:00:13  19  Boost of Secondary Colors.

04:00:14  20  Q.  Is that -- based on the information you have, is that

04:00:17  21  one technically comparable to the '435 patent here?

04:00:20  22  A.  All the information I have is from Professor Stevenson,

04:00:23  23  so I basically asked that question.  And he said -- well,

04:00:26  24  he can't say it's technically comparable, but that it's --

04:00:30  25  because it relates to automatic color enhancement and not

04:00:38  1   color adjustment.  But then is closer in a technological

04:00:44  2   sense to the category that Mr. Perdue is trying to emulate

04:00:47  3   or measure, than the TV backlighting and dimming patents or

04:00:50  4   the TV display patents because those TV display patents

04:00:55  5   dealt with the entire panel and important technologies for

04:00:59  6   high-end TVs.

04:01:00  7   Q.  Okay.  What does the orange highlighting relate to

04:01:06  8   there?

04:01:06  9   A.  I should finish one more point there.

04:01:09  10  Q.  Oh.

04:01:10  11  A.  And this is Mr. Perdue's calculation in the blue, the

04:01:12  12  first number, it's 3.2 percent.  So had someone picked that

04:01:18  13  category, that technology cluster with all the 14 patents

04:01:22  14  as the apportionment rate, it would only be 3 percent.

04:01:26  15  Q.  Okay.  So did you pick that category to represent the

04:01:29  16  apportionment here?

04:01:30  17  A.  No, I didn't.

04:01:31  18  Q.  Why not?

04:01:33  19  A.  Because it's -- under Mr. Perdue's approach, it would

04:01:40  20  be reasonable without any additional -- additional

04:01:43  21  information to take the average of all these 16 clusters.

04:01:48  22  It would be -- that average would be representative of what

04:01:53  23  any particular apportioned cluster, based on Philips's

04:01:57  24  approach, would give you as an apportionment rate.  Because

04:02:00  25  there was no support for, you know, technol -- from a

04:02:02   1   technical standpoint, to use the 14 percent.

04:02:06   2        I think it would -- the same thing could be said

04:02:09   3   about if you chose, for example, the lowest figure, which

04:02:12   4   is in orange at the bottom, 1.2 percent.  There's no

04:02:16   5   technical support for that, either.  Perhaps the

04:02:19   6   audio/video category is closer to what he was trying to

04:02:24   7   achieve, but certainly it would be reasonable to both

04:02:27   8   parties to take the overall average, the 6.25 percent.

04:02:32   9   Q.  Okay.  And is that 6.25 percent fair for the parties

04:02:36  10   here?

04:02:37  11   A.  I believe so.  Again, if you accept his approach for

04:02:42  12   apportioning and not really going into the components of an

04:02:46  13   actual accused ASUS monitor based on the -- the Philips

04:02:50  14   licensing program, that would be perhaps -- and, again, I

04:02:57  15   would call it minimum correction.  6.25 might be too large,

04:03:01  16   but under his approach, it's certainly the largest

04:03:05  17   apportionment rate that should be used.

04:03:07  18   Q.  And you've also been talking about Mr. Perdue's

04:03:12  19   disagreement about the royalty base.  Can you give us a

04:03:16  20   brief summary of that issue?

04:03:18  21   A.  Yes.  And I believe there are four issues that -- that

04:03:21  22   relate to these disagreements, and I can walk -- walk

04:03:25  23   through them.  I prepared a slide that addressed the four

04:03:28  24   issues.

04:03:30  25        MR. OLIVER:  Can we pull that up?

BY MR. OLIVER:

Q.  Can you tell us what this slide is noting?

A.  Yes.  The first -- the first -- this walks through the four categories or issues, and the first one you've heard about.

It's the difference between what Lone Star's technical expert appears to have accused -- he talks about 135 accused devices, and I think it was noted in the testimony, that might be 134.  But in the calculation of Mr. Perdue as to -- I believe the latest count is 228 products that occurred at different points in time -- some of them might be 2020, some might be 2019, but overall, there's over 220 products.  That doesn't match up to the products that were addressed by the Lone Star technical expert.

So I've looked at the -- what the calculations would be under my correction if it's applied to all of the products that Mr. Perdue included versus just the ones that appear to be accused by -- by Lone Star.

Q.  Did Mr. Perdue do any type of breakouts based on 6-axis or 3-axis?

A.  No.  And that is the second category I have here.  You know, it's possible that the jury may decide that only 6-axis products might infringe, and Mr. Perdue didn't present any calculation of what the royalty base might be

04:05:02  1   or the royalty amount would be in the event that only

04:05:07  2   the 6-axis products would be relevant to the ultimate

04:05:10  3   decision about damages.

04:05:12  4         The same could be said about 3-axis.  And then

04:05:15  5   there's additional products where my understanding is they

04:05:18  6   are really haven't been identified by the technical expert

04:05:21  7   for Lone Star as either 3-axis or 6-axis.  So I also

04:05:25  8   addressed that.

04:05:26  9   Q.  Okay.  And how about your third point there about the

04:05:29  10  notice?

04:05:34  11  A.  Yeah the third point about notice date is Mr. Perdue

04:05:37  12  only used what I would call the first date, and that's the

04:05:40  13  date, February 20, 2019, and that's the date in which Lone

04:05:45  14  Star filed its complaint for patent infringement.

04:05:48  15        But my understanding is that ASUS did not receive

04:05:53  16  that complaint until about four months later.  See the date

04:05:56  17  here, June 10, 2019, is when ASUS actually received notice

04:06:07  18  about it at that date.  Again, this is something that

04:06:10  19  perhaps the parties disagree about, but I provided

04:06:14  20  calculations so that one can see both ways.

04:06:16  21  Q.  Okay.  And that's four months out of about 27

04:06:19  22  or 28 months, right?

04:06:25  23  A.  Well, it becomes larger, I believe, when you go through

04:06:29  24  patent expiration.

04:06:31  25        So Mr. Perdue calculated through near the end

04:06:33   1   of 2022, so it becomes a longer time period.

04:06:37   2   Q.  All right.  And then what does Point 4 address there?

04:06:42   3   A.  Point 4 addresses the issue that -- that the -- the

04:06:46   4   issue here relates to a method, and in order to have

04:06:53   5   damages on the units, it's my understanding from working on

04:06:56   6   these types of matters, is that you have to have evidence

04:06:59   7   of use of those units in the United States, and, in

04:07:03   8   particular, use of the method.  And Mr. Perdue didn't

04:07:08   9   present any information about -- about that issue.  And

04:07:12   10  then there's elements of that issue.

04:07:15   11          One is noted here, the first bullet under 4, that

04:07:20   12  ASUS sells to distributors that are located in the United

04:07:23   13  States, but those directors are multinational companies

04:07:27   14  that, in turn, they turn around and then they ship their

04:07:31   15  monitors to their retail customers or other customers in

04:07:35   16  Canada and other parts of the Americas, sometimes in other

04:07:39   17  continents, as well.

04:07:40   18          And so those products would likely not even be

04:07:46   19  opened in the United States, let alone being used.  So they

04:07:50   20  might end up in Canada, and someone may or may not use the

04:07:55   21  monitor in Canada in a way that would be found to infringe

04:08:02   22  the method patent.

04:08:02   23          And then the second aspect is what about even

04:08:06   24  products that end up in the United States, and a customer

04:08:09   25  that might have that product in California, for example,

04:08:13  1  may not ever adjust color or let alone adjust color in a

04:08:20  2  particular way.

04:08:20  3        And Mr. Perdue didn't do anything to address those

04:08:23  4  two issues.  He included all the units that initially came

04:08:26  5  to the United States.

04:08:27  6  Q.  Okay.  And you gave me some slides that relate to

04:08:30  7  the -- each of these four points.

04:08:33  8        Why don't we move to the next slide, and can you

04:08:36  9  address the first point and what you analyzed there.

04:08:38  10 A.  Yes.  So for these next several slides, to make it

04:08:43  11 perhaps go faster, each of these, I performed these minimum

04:08:48  12 corrections to the royalty rate and the apportionment.

04:08:49  13       So you see in the middle in bold, ASUS

04:08:53  14 royalties -- so that would be the royalties that ASUS would

04:08:58  15 be paying in Mr. Perdue's calculation, if you have a

04:09:01  16 6.25 percent apportionment rate and then a 1.5 percent

04:09:07  17 minimally corrected royalty rate.  So if we're using

04:09:10  18 Mr. Perdue's approach, where all the products would be

04:09:13  19 included -- and this is the period through today, so it's

04:09:17  20 starting 2019 through today, the royalties under his

04:09:22  21 calculation would be about half a million dollars.

04:09:25  22       But if you take out the non-accused products, the

04:09:29  23 products that Lone Star's technical expert has not

04:09:32  24 addressed, did not include on his list, then corrected for

04:09:37  25 the remaining product is the 373,000 figure there roughly.

857

04:09:44   1          And the last point I'll add is the 34 percent

04:09:47   2     larger, what this means is Mr. Perdue's calculation is

04:09:52   3     34 percent larger for this -- what I'm calling a

04:09:54   4     disagreement.

04:09:55   5     Q.   Okay.  And when you subtracted those non-accused

04:10:00   6     products, about how many products -- do you recall about

04:10:03   7     how many products that was?

04:10:05   8     A.   This removed -- I believe it's 41 products --

04:10:08   9     Q.   41?

04:10:08  10     A.   -- from the calculation.

04:10:09  11     Q.   But today we were able to identify with Mr. Perdue

04:10:19  12     about 180 non-accused products were on the -- in the data

04:10:22  13     that he --

04:10:22  14     A.   That would be -- after removing the 41 non-accused

04:10:26  15     products, I believe there's still about 180.  Some of those

04:10:30  16     are products that I understand haven't been identified as

04:10:34  17     either 6-axis or 3-axis.

04:10:36  18     Q.   Let's go to your next point.  You gave me a slide for

04:10:44  19     Point .2.

04:10:45  20          What is this slide on?  This agreement to -- can

04:10:51  21     you explain it to us?

04:10:52  22     A.   Sure.  Absolutely.  It starts exactly the way I just

04:10:56  23     addressed it.  See the $373,000 number there, but then it

04:11:05  24     makes another adjustment, where it pulls out what the

04:11:06  25     royalties would be under Mr. Perdue's approach with these

04:11:06   1   minimum correction to these two rates if you don't include

04:11:10   2   products that are not 3-axis or 6-axis.  And that removes

04:11:14   3   119,000.  So now the number becomes approximately a quarter

04:11:20   4   of a million dollars, again, for the past period through

04:11:24   5   today.

04:11:24   6   Q.  Okay.  And what's the number at the bottom relate to?

04:11:27   7   A.  The number at the bottom relates to what if only

04:11:31   8   the 6-axis products that have been accused, which are those

04:11:36   9   ProArt monitors, that what would happen if only -- if this

04:11:40   10   calculation of Mr. Perdue's was performed to only the

04:11:42   11   revenue of the ProArt monitors, which there are nine of

04:11:45   12   them, and, see, it's approximately $11,000 in total

04:11:50   13   royalties for the period through today.

04:11:53   14   Q.  Okay.  Did you investigate the marketing information

04:11:55   15   about the 3 or 6-axis products?

04:11:58   16   A.  I did.  I looked at information from the website, how

04:12:02   17   -- the product specifications -- I say website, I should be

04:12:08   18   clear, the ASUS websites -- for the product specifications,

04:12:11   19   and I also looked at the user manual or a selection -- I

04:12:16   20   think it was 12 monitors that I looked at, ASUS monitors.

04:12:19   21   Q.  Okay.  And let me pull up your slide on that.

04:12:22   22          Is this the right slide that discusses some of

04:12:25   23   that analysis?

04:12:25   24   A.  It is.  This comes from my expert report, Tab 4.  Note

04:12:30   25   at the bottom that there are additional notes I had on

04:12:33  1   this, and I tried to make it a little easier to read.  So

04:12:38  2   it doesn't have all the notes on that report tab.  But it

04:12:41  3   shows the 12 models.  It shows that he's accounted for

04:12:46  4   30 -- 36 percent of the revenue -- of all the revenue

04:12:50  5   Mr. Perdue included.  So these would also represent about

04:12:53  6   -- about 36 percent of any damage calculation, if they were

04:12:57  7   all included in that calculation.

04:12:59  8   Q.  Okay.  You've got a blue box and a green box

04:13:08  9   highlighted there.  Can you take each of those and explain

04:13:11  10  to us what they're -- what they're referring to?

04:13:12  11  A.  Yes.  And actually I would start before that.

04:13:15  12         There's a column that says ASP Q1 2020.  So that's

04:13:20  13  the average price.  And you can see the price ranges from

04:13:25  14  $91 from the second from the bottom to $782 for -- for the

04:13:32  15  PA328Q.  So there's a big price different here.

04:13:37  16         And then next to that, there's a column that

04:13:40  17  should -- that shows the number of display features that

04:13:43  18  were listed in the product specs, so different types of

04:13:46  19  features that -- that are being mentioned.  And then we

04:13:51  20  have -- and that's the -- really the first part of the

04:13:54  21  green area you asked me about.

04:13:56  22         So these are what are in the specifications on the

04:14:00  23  website for each of the products, and I highlighted some of

04:14:04  24  that information, display features, display colors, and,

04:14:08  25  again, you can see the ProArt.  The $782 monitor has a

860

04:14:16   1   billion colors.

04:14:19   2          Next to that, there are video features that are

04:14:22   3   listed on the specification, and, again, they range from

04:14:24   4   3 to 13 different additional video features that are talked

04:14:28   5   about.

04:14:29   6          And then I have a little section that I call color

04:14:32   7   video features mentioned, and, this, again, was -- I was

04:14:35   8   looking at the advertisement, seeing what's said about --

04:14:40   9   about video -- color video features, and, in particular, I

04:14:43   10  was focused on the color adjustment.

04:14:46   11         So of these 12 monitors, two specifically said

04:14:51   12  something about color adjustment.  And they, in fact,

04:14:54   13  talked about 6-axis.  They were the PA, ProArt monitors,

04:15:00   14  the two of them, that accounted for about .7 percent of all

04:15:04   15  the revenue that Mr. Perdue includes.  Again, this is just

04:15:07   16  the two on this chart.  There are other ProArt monitors.

04:15:10   17  Q.  Okay.  How many?

04:15:12   18  A.  I think I mentioned a moment ago, there were nine that

04:15:17   19  I'm aware of.

04:15:17   20  Q.  Nine that are -- you're talking about nine accused

04:15:20   21  products, right?

04:15:21   22  A.  Nine accused ProArt products, yes.

04:15:24   23  Q.  Okay.  And what percentage of the total revenue that

04:15:29   24  Mr. Perdue used do those account for?

04:15:32   25  A.  All of those ProArt monitors account for about 2

04:15:36   1   percent of the total revenue.

04:15:37   2   Q.   Okay.   That's not 2 percent each?   That's all nine

04:15:41   3   lumped together are 2 percent?

04:15:42   4   A.   Absolutely.   All the numbers together about 2 percent.

04:15:46   5   Q.   Okay.   And then how did you determine the revenue for

04:15:48   6   the 6-axis, the 3-axis, the non-accused -- the other

04:15:52   7   monitors that you summarized earlier?

04:15:54   8   A.   Well, that was easy.   I was able to use the same data

04:15:58   9   source that Mr. Perdue had.   I looked a the time period

04:16:01   10  that was relevant, added all the revenue.   So I had added

04:16:05   11  all those 220-plus products that had revenue during the

04:16:10   12  time period that was relevant.

04:16:12   13        And I was able to categorize, for example, all the

04:16:16   14  PA monitors because I could see which ones are PA.

04:16:19   15        With respect to the 3-axis issue, I got input from

04:16:22   16  counsel for ASUS.   And they identified for me which of

04:16:26   17  these had been identified by Lone Star to be 3-axis

04:16:29   18  products.

04:16:30   19        So with that information, I could compare it to

04:16:34   20  the model numbers, group them all as to -- as 3-axis

04:16:38   21  products, come up with a -- calculate the subtotals for

04:16:41   22  these different categories.

04:16:43   23  Q.   Let me take you away from this slide for just a second.

04:16:48   24        Do you recall this morning we did a couple of

04:16:51   25  demonstrations on the screen with an Excel spreadsheet

04:16:55  1  where we changed the data that was shown while Mr. Perdue

04:16:58  2  was testifying?

04:17:01  3  A.  Yes, I am aware of that.

04:17:04  4  Q.  Was that --

04:17:04  5          THE COURT:  Mr. Perdue, I'm sorry to interrupt

04:17:08  6  you.  I think the mic you are holding is about to go out.

04:17:12  7          Would you -- Mr. Oliver, if you will give him

04:17:14  8  yours, put that one back in this charger, and then use the

04:17:15  9  podium mic, we should be okay.

04:17:18  10          MR. OLIVER:  Okay.  I think this one is dead,

04:17:21  11  also.

04:17:30  12          THE COURT:  If you could -- if you will just use

04:17:32  13  the podium mic as much as you can.

04:17:45  14          (Discussion off the record.)

04:17:47  15          THE COURT:  Tell you what, Mr. Lee, could the

04:17:51  16  witness use yours?  Yes, let's do that instead.  What we

04:17:55  17  were getting out of that mic earlier was just not

04:18:00  18  satisfactory.

04:18:02  19          And then, Mr. Lee, for objections, if you will

04:18:03  20  just stand up.

04:18:05  21          MR. LEE:  Certainly.

04:18:06  22          THE COURT:  Thank you.

04:18:08  23  BY MR. OLIVER:

04:18:08  24  Q.  So that spreadsheet that we were showing this morning,

04:18:11  25  is that part of the data that you reviewed on -- in terms

04:18:14  1  of sales?

04:18:15  2  A.  Yes.

04:18:16  3  Q.  And do you recall that Mr. Perdue said that it would

04:18:21  4  have been difficult to separate out the non-accused

04:18:24  5  products from that spreadsheet?

04:18:26  6  A.  I believe he testified something to that effect, yes.

04:18:29  7  Q.  What do you think about that?

04:18:30  8  A.  Well, it would surprise me.  Certainly it wasn't

04:18:33  9  difficult for me.  When you have the data, especially when

04:18:36  10  you get it electronically, sometimes in this business you

04:18:40  11  get paper and sometimes you can't even read that paper.

04:18:44  12  Here we have electronic information, so it's relatively

04:18:47  13  easy to get the right time period, put all the products

04:18:51  14  together, sort them, classify them.

04:18:56  15         And then another step would just be in the case of

04:18:58  16  the non-accused, look for those products that Lone Star and

04:19:02  17  its technical expert have identified as accused, put a

04:19:05  18  little flag in that they're accused, and then you would

04:19:08  19  summarize them that way, as well, so it's very easy to do.

04:19:11  20  Q.  Okay.  Do you think he would have been able to do it in

04:19:13  21  the seven months since he received your report in October?

04:19:17  22  A.  Well, actually it would be easier for him because when

04:19:21  23  he received my report, I provided tables in my report that

04:19:25  24  showed that categorization.  So he could have just checked

04:19:28  25  my work and make sure I didn't make any errors, and he

04:19:31    1  would have those answers.

04:19:32    2  Q.  Okay.  And move to your next slide.  You made a slide

04:19:36    3  here about correcting the notice date.  What does that do

04:19:39    4  to the overall calculation?

04:19:40    5  A.  Yeah.  So this shows that -- again, there are two

04:19:44    6  columns here.  Both of them go through today.  The first

04:19:49    7  column has Mr. Perdue -- well, Mr. Perdue's initial all

04:19:55    8  included products with that minimum correction of the

04:19:58    9  royalty rate and the apportionment rate.  And the column

04:20:02   10  next to that takes all these figures I've already talked

04:20:06   11  about and changes them to reflect the change in the notice

04:20:09   12  date.  So instead of using the date in February 2009 to

04:20:13   13  start damages associated with notice, we would be using at

04:20:16   14  the -- the later date, which is June 10th, 2019.

04:20:21   15  Q.  And, again, here you've broken out the six -- the

04:20:25   16  nine 6-axis products to show their report -- portion of the

04:20:28   17  revenue at the bottom?

04:20:29   18  A.  That's correct.  So each of these categories I have

04:20:32   19  been addressing, I show the result for each of them.  And

04:20:36   20  you can see overall the reduction is between 10

04:20:39   21  and 15 percent, somewhere in that range.

04:20:41   22          So that's the -- to the extent that this

04:20:44   23  disagreement between the parties improperly includes an

04:20:49   24  earlier period before ASUS received notice, then it would

04:20:52   25  be overstating damages for the period through today of 10

04:20:57  1  to 15 percent, depending on which categories.

04:21:00  2  Q.  Okay.  Let me go to your -- you had four points.  Let

04:21:09  3  me pull up the slide on your fourth point, and can you

04:21:13  4  explain to us a little bit about your analysis here and why

04:21:15  5  that impacts the overall number?

04:21:17  6  A.  Sure.  And I won't repeat the background here because

04:21:20  7  we already addressed it, but in the larger font on this

04:21:24  8  slide, it addressed the research that I performed about

04:21:26  9  some of the large ASUS customers.

04:21:28  10  Q.  So let's just take one of those, for example.  Ingram

04:21:37  11  Micro, what do your notes there represent?

04:21:39  12  A.  So Ingram Micro, on its website, talks about the fact

04:21:42  13  that they sell in 160 countries.  They have distribution

04:21:48  14  centers in the United States -- throughout the United

04:21:50  15  States, but it includes one in -- one near Buffalo, New

04:22:02  16  York.  Buffalo, New York, of course, is close to Toronto,

04:22:02  17  Canada.  So that would be one of the places where they

04:22:04  18  could easily supply to their retail customers in Canada.

04:22:09  19        So it's an example of the likelihood that ASUS's

04:22:12  20  customers, who are known to be distributing their products,

04:22:17  21  the products that they resell throughout the world and

04:22:21  22  certainly Canada and other locations in the Americas, that

04:22:24  23  the likelihood that those products are not going to be used

04:22:28  24  in the United States.  And the big point here on the

04:22:30  25  differences is that Mr. Perdue didn't do any analysis of

04:22:35  1   what might happen, and Lone Star didn't get discovery about

04:22:40  2   where these distributors might send their products.

04:22:44  3   Q.  But we don't actually know how many products stay in

04:22:50  4   the U.S.  We don't know if it's 100 percent, 50 percent,

04:22:58  5   or 5 percent that go to any of these particular

04:23:01  6   distributors and eventually end up being used in the United

04:23:04  7   States?

04:23:04  8   A.  Correct.  We don't have that information.  And as I

04:23:07  9   mentioned a moment ago, nothing was done by Lone Star or

04:23:10 10   its damage expert to even try to estimate what that might

04:23:13 11   be.

04:23:13 12   Q.  Okay.  Have you ever corrected color on a monitor?

04:23:26 13   A.  No.  I've had about six monitors in the last four years

04:23:30 14   or so.  I've never adjusted color.  Certainly not color at

04:23:36 15   all, let alone using some kind of particular R, G, or B.

04:23:41 16   Q.  Okay.  Sorry to go off track.  I was just a little

04:23:46 17   curious there.

04:23:49 18         So did you or Mr. Perdue make any reductions in

04:23:53 19   your calculations to account for potential sales outside of

04:23:59 20   the United States by these distributors?

04:24:01 21   A.  No.  Mr. Perdue doesn't even mention it.  I mention it

04:24:06 22   in my report, but all my calculations do not make a

04:24:11 23   reduction for products that might go to Canada or South

04:24:16 24   America or even, again, other places overseas.  And that's

04:24:19 25   in part why I say this is a maximum correction.  This is

04:24:22   1   another reduction that should apply, but I'm not making

04:24:29   2   that further reduction.

04:24:31   3   Q.  Okay.  Let me bring up -- you gave me a summary slide

04:24:37   4   that applies to all of them.  And can you summarize -- just

04:24:43   5   give us an overview of these, and is this the final result

04:24:47   6   that you came to?

04:24:48   7   A.  Well, it's the final result with respect to what we've

04:24:50   8   been addressing.  And, yes, so it applies the 6.25 percent

04:24:57   9   apportionment rate, 1.5 royalty rate.  I think a minute ago

04:25:01   10  I might have said maximum correction, but it's just a

04:25:03   11  minimum correction.

04:25:06   12          Then it shows two time periods.  One is the past

04:25:11   13  to today, and then the other is tomorrow through the patent

04:25:15   14  expiration, which are the two time periods that Mr. Perdue

04:25:17   15  addressed.  And you can see the figures here.  For all the

04:25:21   16  products, we're taking out the non-accused products.  We're

04:25:25   17  focusing on those products that are 3-axis or 6-axis and at

04:25:28   18  the bottom is 6-axis only.

04:25:35   19  Q.  Okay.  Couple of issues left.  Did you do a

04:25:38   20  side-by-side comparison of Mr. Perdue's revenues for ASUS

04:25:43   21  versus the existing agreement with Acer?

04:25:47   22  A.  Yes.  I analyzed information from Acer annual reports

04:25:53   23  and ASUS annual reports.  Those annual reports describe

04:25:57   24  their sales of display products and their sales in North

04:26:01   25  America or the Americas.  So I was able to use that public

04:26:06   1   information to do analysis of Acer and ASUS.

04:26:09   2   Q.  I'm going to bring up a slide you gave me that kind of

04:26:14   3   summarizes this.  Would you go over that and explain what

04:26:18   4   it represents?

04:26:18   5   A.  Yeah.  So we have the license agreement between Lone

04:26:22   6   Star and Acer, and I mentioned as public information that's

04:26:27   7   available.  And it's also -- (audio drop) -- comes out of

04:26:32   8   that agreement between Lone Star and Acer.

04:26:36   9        So what -- what one can do -- and, in fact,

04:26:40   10  Mr. Perdue attempted to do this -- one can calculate the

04:26:45   11  implied royalty rate by comparing the Acer payment to Lone

04:26:52   12  Star, the royalty payment to Lone Star, divided by all of

04:26:55   13  the units that would apply for Acer under what that license

04:27:01   14  agreement covered, which would go through patent

04:27:10   15  expiration.

04:27:11   16       I can do that and calculate a per unit royalty

04:27:15   17  that would be associated with that dollar amount paid to

04:27:16   18  Lone Star as the lump-sum royalty over the units from -- in

04:27:20   19  the case of Acer, it would be late 2015 through the patent

04:27:25   20  expiration in late 2022.

04:27:28   21  Q.  Okay.  And what are the -- how did Mr. Perdue calculate

04:27:42   22  the unit royalty rate that he applied to Acer?  And let me

04:27:47   23  pull up -- you gave me a slide on that so we can use it.

04:27:49   24  A.  Sure.  So Mr. Perdue did his calculation, and I'll

04:27:52   25  explain what he said about it in his report.  He -- he

04:27:56  1  claimed that Acer paid to Lone Star and Lone Star received

04:28:00  2  $285,000.  He claimed that the units that were applicable

04:28:03  3  for Acer were 464,484 monitor units.  And so he did the

04:28:14  4  calculation I just described, and he got $0.61 per unit.

04:28:20  5  So then he compared that to what he claimed was his royalty

04:28:23  6  rate and calculated for ASUS, based on his 2.3 percent

04:28:26  7  royalty rate and 14 percent apportionment.  He says it was

04:28:33  8  $0.60, then it went down to $0.57, and his overall

04:28:37  9  conclusion is down there on the bottom in red.  This

04:28:42 10  supports the reasonableness because Acer, for his

04:28:42 11  calculation, paid $0.61, so it supports what he did for

04:28:47 12  ASUS.

04:28:49 13  Q.  Okay.  And you prepared a slide with the errors that

04:28:53 14  you found on that?

04:28:54 15  A.  Yes.

04:28:55 16  Q.  Okay.  I'm going to pull that up, and would you walk us

04:28:57 17  through that?

04:28:58 18  A.  Sure.  So I'm going to be talking about the correction

04:29:02 19  column that I just added.  The first point is Lone Star did

04:29:07 20  not receive $285,000, from the best anyone can tell from

04:29:14 21  the license agreement.  License agreement states that Lone

04:29:17 22  Star would receive 80 percent, $281,250, and that means

04:29:26 23  that Lone Star received $225,000.

04:29:32 24          The difference is the Taiwanese tax.  Taiwan is

04:29:35 25  one of the few countries that I've seen that applies a tax

04:29:39  1   to intellectual property license agreements.  And so this

04:29:42  2   is kind of like thinking -- when I go and buy my Ford truck

04:29:48  3   and I pay $30,000, Ford gets $30,000.  They don't get the

04:29:55  4   extra $3,000 in taxes that I paid.  So what Lone Star got

04:29:59  5   is 225,000 to the penny dollar amount after these Taiwanese

04:30:06  6   taxes.

04:30:07  7   Q.  And the next --

04:30:09  8   A.  Would you like me to continue?

04:30:11  9   Q.  Yes, please.

04:30:13  10  A.  So the next problem is the license agreement between

04:30:16  11  Lone Star and Acer talk about 464,484 units.  That

04:30:23  12  agreement was entered into approximately December 2016.

04:30:27  13  What Acer got, they got rights to the '485 patent, but they

04:30:33  14  also got rights to other patents that Lone Star had, and

04:30:37  15  importantly, outside the United States.  But they got

04:30:41  16  rights for those patents forever.  Lone Star got the

04:30:46  17  $225,000, but Acer got rights for these -- all those

04:30:51  18  patents I just mentioned through the patent expiration.

04:30:57  19          So 464,000 units of -- clearly it covers this

04:31:01  20  period from late 2015 when Acer was sued through late 2016.

04:31:07  21  Mr. Perdue -- I would say forgot, but he didn't change it

04:31:12  22  when I pointed this it out in my report, so he must not

04:31:16  23  have considered it to be important -- that Acer would have

04:31:20  24  additional units in 2017, 2018, 2019, 2020, 2021, to

04:31:26  25  approximately October -- late October 2022.

04:31:31  1          And Acer and ASUS are very similar companies.

04:31:36  2  They -- they sell products in the United States.  They sell

04:31:40  3  gaming monitors.  They sell a lot of monitors and other

04:31:45  4  products like -- like notebook computers, handheld gaming,

04:31:52  5  things as well.

04:31:53  6          So when I looked at the annual reports, I could

04:31:57  7  see that the two companies have similar sales trends when

04:32:01  8  you compare them to one another.  And all indications would

04:32:04  9  be that Acer would continue to be selling monitor products

04:32:08  10 through -- through 2022.

04:32:11  11 Q.  And how do you know that Acer is still selling

04:32:15  12 monitors?  How do you know that Acer is still selling

04:32:19  13 monitors in the United States?

04:32:20  14 A.  Well, one of the things I did is I looked at the

04:32:26  15 complaint -- or it might have been an agreement, but either

04:32:29  16 the complaint or the agreement between Lone Star and Acer,

04:32:31  17 and it identified products that Lone Star had accused.  So

04:32:35  18 these are Acer monitors with particular model numbers that

04:32:41  19 were accused of infringing.

04:32:43  20         And so I researched those monitors and found out

04:32:46  21 that those monitors are still being sold.  Acer, of course,

04:32:50  22 has many other monitors, but those are examples of

04:32:53  23 specifically accused products that continue to be sold.

04:32:56  24 Q.  Okay.  As you apply the correction, what is the

04:33:04  25 resulting price per -- royalty per unit if you apply the

04:33:10   1   data that you have?

04:33:12   2   A.  Sure.  It's the same math, taking the corrected royalty

04:33:15   3   payment to Lone Star, divided by the units.  And when I

04:33:18   4   calculated the units, I didn't apply any growth.  I just

04:33:22   5   took the same units for roughly a year and continued that

04:33:25   6   through 2022.  The calculation results in $0.07 per unit

04:33:32   7   rather than the $0.61 that Mr. Perdue calculated.

04:33:35   8   Q.  And if you apply that -- if you apply that correction

04:33:37   9   to Mr. Perdue's calculation, again -- I'm sorry, how does

04:33:42  10   that affect the analysis?

04:33:45  11   A.  Sure.  What it indicates is that rather than supporting

04:33:48  12   Mr. Perdue's conclusion about the $0.60 and the $0.57, it

04:33:54  13   indicates that his calculation, using his methodology and

04:33:59  14   those errors I pointed out, about eight times -- more than

04:34:02  15   eight times overstatement.

04:34:04  16   Q.  And you've been sitting here in the courtroom all week

04:34:08  17   listening to the testimony, right?

04:34:10  18   A.  I have been, yes.

04:34:11  19   Q.  And you heard mention that at one point Lone Star had

04:34:16  20   sued Barco and then settled with Barco?

04:34:20  21   A.  Yes.

04:34:21  22   Q.  Were you retained in that case, as well?

04:34:23  23   A.  Yes.  The -- Barco, a company in Belgium, hired me to

04:34:29  24   do a similar analysis to -- to critique and correct -- and

04:34:34  25   correct the analysis that Mr. Perdue did in his damage

04:34:37  1   report against Barco.

04:34:39  2   Q.  And did you reach a similar result in that case, as

04:34:42  3   well?

04:34:42  4   A.  Yes.  It's very similar, and I have a slide that shows

04:34:47  5   this, as well.

04:34:47  6   Q.  Okay.  Let me pull up your slide.  Would you explain

04:34:51  7   what you did in the Barco case?

04:34:53  8   A.  Sure.  So in that case, even though the products were

04:34:56  9   different, Barco sells movie projectors.  Basically if you

04:35:01  10  go to a movie theater and a movie is being projected on the

04:35:05  11  screen, those -- Barco is a significant supplier of such

04:35:10  12  equipment.  And nevertheless, even though the product is

04:35:13  13  different, it's a lot more expensive, different kinds of

04:35:17  14  technology, Mr. Perdue did the same thing.  He used the

04:35:21  15  same methodology, 2.3 percent royalty rate.  Same

04:35:22  16  apportionment methodology, 14 percent allocation.  He

04:35:25  17  calculated total royalties of $1.13 million.

04:35:31  18        So I applied the same correction that I've already

04:35:35  19  addressed with you, used the 1.5 percent royalty rate, the

04:35:39  20  6.25 percent apportionment rate.  I also adjusted some

04:35:43  21  forecasts that Mr. Perdue did because he -- he projected

04:35:50  22  large, ongoing sales.  And Barco was having trouble because

04:35:58  23  during the pandemic, people weren't going to the movie

04:36:00  24  theaters and movie theaters weren't buying new projectors.

04:36:05  25        But in any event, based on my corrections of his

874

| | | |
|---|---|---|
| 04:36:09 | 1 | methodology, I calculated $273,000, approximately, as the |
| 04:36:12 | 2 | total royalty amount. |
| 04:36:13 | 3 | Q.  Okay.  And so just -- I want to make sure we're clear. |
| 04:36:19 | 4 | So Mr. Perdue said Barco should pay Lone Star |
| 04:36:23 | 5 | $1.13 million? |
| 04:36:25 | 6 | A.  Correct. |
| 04:36:26 | 7 | Q.  And then Barco actually paid $135,000? |
| 04:36:30 | 8 | A.  Yes.  And we heard that in testimony this week. |
| 04:36:36 | 9 | Q.  Okay.  So how does that compare -- that difference |
| 04:36:40 | 10 | compare with your analysis of the other royalty corrections |
| 04:36:44 | 11 | in this case? |
| 04:36:45 | 12 | A.  You can see it quite clearly here at the bottom. |
| 04:36:48 | 13 | Mr. Perdue's number was over eight times larger than -- |
| 04:36:52 | 14 | than this payment. |
| 04:36:55 | 15 | And mine -- my calculation was actually larger, |
| 04:36:58 | 16 | but it's consistent with what I was doing.  I was talking |
| 04:37:01 | 17 | about a minimum correction.  So $273,000 was -- was kind of |
| 04:37:08 | 18 | the largest amount from this minimum correction, and it |
| 04:37:11 | 19 | makes sense that it would be above that $135,000 ultimate |
| 04:37:17 | 20 | payment to Lone Star. |
| 04:37:18 | 21 | Q.  Okay.  I'm sure the jury will be relieved to hear this. |
| 04:37:21 | 22 | Let's move on to your final slide. |
| 04:37:27 | 23 | And I'm going to ask, did you prepare -- did you |
| 04:37:30 | 24 | calculate the reasonable royalties based on 7 cents per |
| 04:37:34 | 25 | unit that you mentioned? |

04:37:35   1    A.  I did, yes.

04:37:36   2    Q.  Okay.  And can you explain that to us here?

04:37:39   3    A.  Yeah.  So I did this calculation for Mr. Perdue's net

04:37:44   4    sales figure, all the units that were included, even if

04:37:48   5    they weren't specifically addressed by the technical expert

04:37:52   6    of Lone Star.  That's what you see in the top line,

04:37:55   7    that 7 cents per unit for all of those products.  The past

04:38:02   8    amount is $181,000, roughly.  The future amount is

04:38:08   9    $138,000.  And, by the way, that future amount is not

04:38:11   10   discounted to the present value.  If anyone knows about

04:38:15   11   financial modeling, future amounts, to view them as of

04:38:18   12   today, need to be reduced.

04:38:22   13           But he didn't make that adjustment.  I don't

04:38:26   14   either.  I just note it's probably too large for that

04:38:28   15   reason, if you view it as he now talks about as a lump sum.

04:38:29   16           Then I take out the non-accused products, and the

04:38:32   17   remaining products, again, for the past, total royalties at

04:38:36   18   7 cents are 126,241, and for this future period, 7 cents

04:38:46   19   per unit, it's $93,474.

04:38:55   20   Q.  Okay.  And just a couple of -- and this calculation

04:38:58   21   here, that's based on the assumption you have to make that

04:39:00   22   every single product infringes, right?

04:39:03   23   A.  Right.  So this doesn't make any adjustments, as I

04:39:07   24   addressed before, for products that may never end up in the

04:39:11   25   United States or that may never have any kind of adjustment

04:39:13   1   of color using the accused method.

04:39:17   2   Q.  Okay.  And do you recall in Mr. Perdue's slides that he

04:39:21   3   presented to the jury, did he ever present the number of

04:39:25   4   units sold?

04:39:28   5         If you don't recall, that's fine.

04:39:29   6   A.  I don't recall.

04:39:30   7   Q.  Okay.  Now, there is a situation in which the jury

04:39:40   8   potentially could find infringement but might be limited by

04:39:44   9   the law to only awarding one unit of sales for each type of

04:39:49   10  product.  If that situation were to apply, is that 7 cents

04:39:54   11  per unit a fair royalty rate to apply?

04:39:59   12  A.  At 7 cent per unit, that would apply to --

04:40:03   13  Q.  Each --

04:40:04   14  A.  One unit for each category of product or each model

04:40:09   15  number?

04:40:09   16  Q.  Yes.

04:40:10   17  A.  Well, I would view that as a legal issue.  But 7 cents

04:40:13   18  per unit would certainly be a reasonable royalty on a -- on

04:40:19   19  a per unit basis over all.

04:40:22   20  Q.  Thank you, Mr. Reed.

04:40:24   21         MR. OLIVER:  I'm going to pass the witness.

04:40:26   22         THE COURT:  Cross-examination.

04:40:34   23                    CROSS-EXAMINATION

04:40:39   24  BY MR. LEE:

04:40:45   25  Q.  Good afternoon, Mr. Reed.

04:40:47    1    A.  Good afternoon.

04:40:48    2    Q.  Your testimony just now about the Acer analysis, are

04:40:55    3    you opining that the reasonable royalty rate that should be

04:40:59    4    applied should be 7 cents per unit?

04:41:04    5    A.  I am suggesting that a -- that 7 cents per unit, given

04:41:09    6    the facts of this case, would be a reasonable royalty, yes.

04:41:13    7    Q.  And that's based on your analysis of the Acer license

04:41:18    8    agreement between Lone Star and Acer?

04:41:21    9    A.  I would say it's an extension of the analysis that

04:41:26   10    Mr. Perdue did with the corrections, but, yes, it's -- it's

04:41:30   11    looking at the agreement between Lone Star and Acer and

04:41:34   12    looking at the implied royalty over the entirety of that

04:41:39   13    agreement.

04:41:39   14    Q.  In fact, Mr. Perdue didn't use the Acer agreement to

04:41:46   15    come up with his reasonable royalty rate.  He testified

04:41:51   16    yesterday that he went through the Georgia-Pacific factors,

04:41:55   17    and with respect to the Acer license agreement, he

04:41:59   18    considered it, but because it was a litigation license, he

04:42:04   19    did not factor that in, in his royalty rate determination.

04:42:14   20          You're doing something entirely differently,

04:42:18   21    aren't you?

04:42:18   22    A.  No, I disagree.  And also, you've addressed what

04:42:20   23    Mr. Perdue was doing yesterday and maybe part of this

04:42:22   24    morning, not what he did in his report.

04:42:25   25          I showed a slide that shows what he did in his

04:42:28  1  report.  He calculated the 61 cents.  He compares that to

04:42:37  2  what he gets if he converts his royalty to a per unit

04:42:41  3  royalty, which was 60 cents and then the 57-cent figure,

04:42:47  4  and he pointed it out and said this supports my analysis

04:42:52  5  and my approach.

04:42:53  6       And then I pointed out in my report that there was

04:42:54  7  an error, and it was really 7 cents under his own analysis,

04:42:58  8  and then he seemed to backtrack on it yesterday.

04:43:00  9  Q.  Earlier, you testified that the six PA monitors was

04:43:05  10  roughly .2 percent of the overall revenue that's in this

04:43:13  11  disputed period, correct?

04:43:14  12  A.  You said .2?

04:43:16  13  Q.  Sorry.  2 percent.  About 2 percent.

04:43:19  14  A.  Yes, it's about 2 percent.

04:43:21  15  Q.  So the -- Mr. Perdue's calculation of the net revenue

04:43:24  16  for all the products, which includes the six -- or the nine

04:43:28  17  PA monitors is about $883 million.  Do you remember hear --

04:43:35  18  him testifying to that?

04:43:37  19  A.  Sorry.  I didn't -- I was following you, and then you

04:43:40  20  said 883, and you were associating it with the PA.  You're

04:43:44  21  talking about all the revenue from all the products that

04:43:47  22  Mr. Perdue includes?

04:43:49  23  Q.  Including the nine PA products was $883 million.

04:43:52  24  A.  Including the PA and including his forecasts out

04:43:56  25  through 2022.

| | | |
|---|---|---|
| 04:43:56 | 1 | Q.  So if we multiply $883 million by 2 percent, the |
| 04:44:15 | 2 | revenue for PA products during this period will be about |
| 04:44:19 | 3 | $17.6 million? |
| 04:44:20 | 4 | A.  Well, that's kind of the average math.  I think there's |
| 04:44:23 | 5 | a problem with that average math. |
| 04:44:25 | 6 | Q.  Let me finish, please. |
| 04:44:25 | 7 | A.  Sure.  Sure. |
| 04:44:27 | 8 | Q.  Applying Mr. Perdue's apportionment of 14 percent and |
| 04:44:33 | 9 | then multiplying that by 2.3 percent royalty rate, do you |
| 04:44:40 | 10 | know what number I get?  It's $56,000. |
| 04:44:49 | 11 | A.  56 -- that sounds about right. |
| 04:44:51 | 12 | Q.  So I think that's -- your earlier slide, 22, had the |
| 04:45:12 | 13 | total amount at roughly $20,000 under your view? |
| 04:45:18 | 14 | A.  I don't see the slide, but that would be consistent |
| 04:45:22 | 15 | because my belief is that he's overstated the figures by at |
| 04:45:28 | 16 | least 5 times, up to 13 times.  So that -- your calculation |
| 04:45:32 | 17 | used his 14 percent and his 2.3 percent.  So it would be |
| 04:45:36 | 18 | overstated by about 5 times.  I think that sounds like it |
| 04:45:39 | 19 | matches your math. |
| 04:45:40 | 20 | Q.  Earlier, you had that nice graphic, that slide with the |
| 04:45:46 | 21 | companies that you worked for -- have done work for. |
| 04:45:49 | 22 | A.  Yes. |
| 04:45:49 | 23 | Q.  And I think you mentioned Sony, Panasonic, Vizio, LG, |
| 04:45:57 | 24 | and some of the monitor companies that you've been retained |
| 04:46:00 | 25 | in the past, and, obviously, you're working for ASUS, as |

| 04:46:04 | 1 | well.  I don't see any small companies on that list.  Do |
| 04:46:10 | 2 | you do any work for small companies? |
| 04:46:13 | 3 | A.  Absolutely, I do, yes. |
| 04:46:14 | 4 | Q.  What's your hourly rate in this case? |
| 04:46:16 | 5 | A.  My hourly rate is $625 per hour. |
| 04:46:20 | 6 | Q.  How many hours have you worked on this case from the |
| 04:46:23 | 7 | beginning of being retained by ASUS until today? |
| 04:46:30 | 8 | A.  I don't know that, but I can tell you the total amount |
| 04:46:33 | 9 | that our firm has billed ASUS, starting back in 2020 |
| 04:46:38 | 10 | through -- let's see, we're now in May, through April 30th, |
| 04:46:45 | 11 | that was 40 -- approximately $40,000. |
| 04:46:47 | 12 | Q.  Do you know how much has been unbilled? |
| 04:46:50 | 13 | A.  The unbilled amount would be my work this month and |
| 04:46:55 | 14 | that would be principally -- you saw me sitting here in |
| 04:46:58 | 15 | this trial -- would be principally the time this week. |
| 04:47:02 | 16 | Q.  Has any of your expert opinions in the past been |
| 04:47:24 | 17 | excluded by a Court? |
| 04:47:25 | 18 | A.  I work on very large matters, and there's often cases |
| 04:47:29 | 19 | where parts of my opinions are challenged, and there have |
| 04:47:32 | 20 | been occasions where small part -- small parts of what's in |
| 04:47:35 | 21 | my report I wasn't allowed to address at trial.  But I've |
| 04:47:38 | 22 | always been allowed to provide my analysis, my results, and |
| 04:47:43 | 23 | provide complete aspects of all of my testimony. |
| 04:47:46 | 24 | Q.  So is the answer yes or no? |
| 04:47:49 | 25 | A.  I think the way you asked the question -- it's a |

04:47:54  1    complicated issue.  The way you asked it, yes.

04:47:58  2          Parts of my reports, like, for example, addressing

04:48:02  3    a particular license agreement -- out of 10 license

04:48:05  4    agreements, three license agreements I'll be instructed by

04:48:09  5    the Court not to address those three license agreement.

04:48:14  6    That's an example of what happens in very large patent

04:48:17  7    infringement cases.

04:48:17  8    Q.  Are there any other examples in which a Court has

04:48:23  9    excluded your opinion?

04:48:24  10   A.  I don't believe it's fair to say the Court's excluded

04:48:27  11   my opinion.  I think it's fair to say there are issues

04:48:30  12   that -- that the Court would say, for legal reasons, you

04:48:34  13   can't address that issue.

04:48:35  14         Like one example of that is the hypothetical

04:48:41  15   negotiation date.  We heard about that sometime in 2013 in

04:48:46  16   this particular case.  Sometimes things are very

04:48:49  17   complicated because there might be an additional

04:48:53  18   infringement date, and then later a settlement takes place

04:48:57  19   because of a different litigation, and then because of that

04:49:01  20   different litigation, there might be a different date in

04:49:04  21   which the first infringement might happen.  These are

04:49:08  22   complex legal issues, and sometimes there's been rulings in

04:49:11  23   that regard, as well, regarding my testimony, or at least

04:49:14  24   what's in my report.

04:49:15  25   Q.  Were you retained as an expert in the Alarm.com case?

04:49:25    1    A.  Yes, I was.  It was Alarm.com versus SecureNet.

04:49:44    2    Q.  Is it true that the Court there excluded your opinions

04:49:49    3    that are inconsistent with a starting date of -- a starting

04:49:54    4    date for lost profits recovery and excluded your opinions

04:49:58    5    on damages with respect to that?

04:50:02    6    A.  It sounds like you're addressing one of the legal

04:50:05    7    issues that I mentioned.

04:50:06    8    Q.  I'm --

04:50:07    9    A.  The date -- the date in which lost profits could begin,

04:50:11   10    again, that was a complicated --

04:50:14   11         MR. LEE:  Objection, nonresponsive, Your Honor.

04:50:17   12         THE COURT:  Can you just rephrase the question

04:50:20   13    once or restate the question once?

04:50:24   14    BY MR. LEE:

04:50:25   15    Q.  Did the Court there exclude your opinions with respect

04:50:28   16    to the starting date for lost profits recovery?

04:50:37   17    A.  It's a hard question to answer, yes, no, but there was

04:50:43   18    a limited exclusion with respect to this point you're

04:50:47   19    mentioning, the date when you would start calculating the

04:50:50   20    damages, which is a legal issue.

04:50:53   21    Q.  As to what the Court wrote, are you disputing the

04:50:58   22    Court's opinion?

04:50:59   23    A.  No.  I always will respond to opinions like that by the

04:51:04   24    Court with the utmost respect.

04:51:05   25    Q.  The Court also wrote there on another topic that the

04:51:11  1    Court therefore concludes that Mr. Reed's failure of

04:51:15  2    other's analysis shall be excluded as to the failure of

04:51:20  3    other factors but may use for the licensing factor of

04:51:24  4    secondary consideration.

04:51:25  5           Did that happen in that case?

04:51:27  6    A.  I believe that's true.  It was relating to an issue --

04:51:31  7    kind of a technical issue about the failure of others to be

04:51:34  8    able to achieve what the patent achieved and related all to

04:51:38  9    patent damages.

04:51:38  10   Q.  Is the Court in that case also found that Mr. Reed's

04:51:50  11   opinion on copying is based on insufficient fact and was

04:51:56  12   excluded; is that correct?

04:51:56  13   A.  That's my recollection, as well, yes.  Again, relating

04:51:58  14   to the issue of whethers others copied the patented

04:52:01  15   approach.

04:52:01  16   Q.  And that opinion was written in January of 2018; is

04:52:05  17   that right?

04:52:05  18   A.  I don't recall exactly the date, but that's possible

04:52:10  19   that that's the date.

04:52:11  20   Q.  Now, in June of 2019, another court excluded your

04:52:21  21   opinions, this time on damages; is that right?

04:52:23  22   A.  And I -- that wouldn't be consistent with my

04:52:26  23   understanding.  I've always been permitted to provide my

04:52:32  24   opinions on damages.

04:52:32  25   Q.  In this case, the Court wrote:  Mr. Reed, TC Tech's

04:52:36  1   damages expert, takes three separate approaches to

04:52:40  2   estimating a reasonable royalty.  For the following

04:52:45  3   reasons -- I'm skipping some of the language -- for the

04:52:48  4   following reasons, Sprint's motion is granted with respect

04:52:52  5   to Approaches 2 and 3.

04:52:54  6         Did the Court do that?

04:52:56  7   A.  I believe the Court did do that, and Court also did

04:52:59  8   something similar with the opposing expert.  I think it was

04:53:02  9   three of his four approaches.

04:53:04  10  Q.  So two out of three of your damages opinions in that

04:53:07  11  case was excluded by the Court in Delaware?

04:53:14  12  A.  Were in Delaware excluded, yes, two of the approaches

04:53:17  13  and allowed the third approach.  So the third approach is

04:53:20  14  allowed, which means I'm able to testify in court on that

04:53:24  15  issue.

04:53:24  16  Q.  But the Court in Delaware in the same case in October

04:53:26  17  of 2019 excluded another part of your damages opinion; was

04:53:32  18  that correct?

04:53:32  19  A.  Same case?

04:53:42  20  Q.  The June 2019 opinion came from the TC Tech case in the

04:53:47  21  District of Delaware, and I'm also reading an opinion in

04:53:50  22  October of 2019 by the same court, excluding another aspect

04:53:54  23  of your opinion.  You don't remember being excluded a

04:53:57  24  second time?

04:53:58  25  A.  No.  I have no awareness of that, but that case still

04:54:05  1  hasn't gone the trial.  But my understanding is I am

04:54:09  2  preparing to -- to testify on my damages report for the

04:54:14  3  principal methodology that I used.

04:54:18  4          MR. LEE:  Objection.  Nonresponsive, Your Honor.

04:54:21  5          THE COURT:  Can you restate the question and give

04:54:26  6  him a chance, and then if he doesn't limit his answer, I'll

04:54:33  7  strike his response and you can ask a different question.

04:54:37  8          MR. LEE:  Thank you, Your Honor.

04:54:38  9  BY MR. LEE:

04:54:39  10  Q.  Isn't it true the Court in the Delaware case excluded

04:54:43  11  your opinion a second time?

04:54:47  12  A.  Not aware of that.

04:54:49  13  Q.  I'm reading from an opinion offered by the judge in

04:54:55  14  that case in October of 2019, about four months after the

04:55:02  15  first exclusion.  This time the Court writes:  TC Tech's

04:55:10  16  damages expert, Mr. Brett Reed, took three separate

04:55:13  17  approaches on -- to estimating a reasonable royalty.  In my

04:55:16  18  June 18, 2019 Daubert opinion, I granted Sprint's motion to

04:55:22  19  exclude Mr. Reed's testimony as to Approaches 2 and 3.

04:55:26  20  Sprint's motion appeared to be limited to the first

04:55:29  21  subsection of Approach 2, and I likewise limited my

04:55:34  22  opinion.  Sprint now requests I similarly exclude the

04:55:38  23  second subsection of Approach 2.

04:55:40  24          Later down the conclusion, the Court states:  For

04:55:43  25  the above reasons, Sprint's motion to strike the

04:55:49  1    supplemental opinions of Mr. Bates on the doctrine of

04:55:54  2    equivalents and Sprint's request to exclude Mr. Reed's

04:55:59  3    Approach 2 on damages, the opinion is granted.

04:56:03  4            Any reason to doubt the Court's analysis in that

04:56:04  5    case?

04:56:05  6    A.  I don't doubt the Court's analysis in that case, but

04:56:08  7    this has nothing to do with the third approach, which is

04:56:11  8    the approach that I'm continuing to work on for what

04:56:15  9    ultimately will be a delayed trial.  I think that had to do

04:56:20  10   with one of the other approaches, and there was some legal

04:56:24  11   issue between Sprint and TC Tech about that.

04:56:29  12           MR. LEE:  Objection.  Nonresponsive, Your Honor.

04:56:31  13           THE COURT:  Sustained.

04:56:31  14   BY MR. LEE:

04:56:58  15   Q.  ASUS is your client in this case.  Did you talk to them

04:57:00  16   about -- about licensing?

04:57:04  17   A.  About licensing?

04:57:06  18   Q.  Yeah.  To figure out what the royalty rate should be in

04:57:10  19   this case?

04:57:10  20   A.  No.  As I testified, I corrected Mr. Perdue's analysis.

04:57:17  21   Q.  Who told you to correct Mr. Perdue's analysis?

04:57:19  22   A.  It's actually myself.  When I saw Mr. Perdue's

04:57:27  23   analysis, I evaluated that the most appropriate approach

04:57:32  24   would be to correct his errors.  That should have fallen

04:57:38  25   under his own approach.

04:57:39  1   Q.  That's not what you write in your report, sir.  You

04:57:44  2   wrote:  Due to the fundamental problems underlying the

04:57:49  3   foundation of the approach and the analysis in the Purdue

04:57:52  4   report, I have been asked to focus my work on two specific

04:57:57  5   tasks.

04:57:58  6          Who asked you to perform these two specific tasks?

04:58:02  7   A.  It would be counsel for ASUS, as well as counsel for

04:58:05  8   Barco -- my input.

04:58:10  9   Q.  So your analysis was not independent.  You were told by

04:58:13  10  counsel, find flaws, criticize Mr. Perdue's report?

04:58:18  11  A.  I wouldn't agree with that interpretation, but

04:58:26  12  certainly I wrote in my report that I was asked by counsel

04:58:30  13  to -- to make corrections to the errors.

04:58:32  14  Q.  Were you here earlier when Dr. Stevenson testified that

04:58:43  15  users were not sophisticated to use the controls on these

04:58:51  16  display devices?

04:58:52  17  A.  I was here for that testimony.

04:58:55  18  Q.  Do you agree with his opinion?

04:58:57  19  A.  Well, he will have much more experience with color

04:59:01  20  issues, monitor issues.  But I think it's certainly not

04:59:08  21  unreasonable to think that some customers would not be

04:59:12  22  sophisticated in that way.

04:59:14  23  Q.  Mindful of time, I'm going to try to wrap this up

04:59:19  24  quickly.

04:59:19  25          Did you ask whether ASUS had any licenses that

04:59:25  1  were relevant to the technology at hand in this case?

04:59:35  2  A.  By the time that I was involved, ASUS had already

04:59:38  3  produced several license agreements in response to a

04:59:41  4  request for relevant license agreements, so those had

04:59:43  5  already been provided.

04:59:45  6          MR. LEE:  Objection.  Nonresponsive, Your Honor.

04:59:47  7          THE COURT:  Sustained.

04:59:48  8  BY MR. LEE:

04:59:53  9  Q.  Did you know that Microsoft and ASUS entered into a

04:59:57  10  licensing agreement in October of 2015?

05:00:02  11  A.  I don't recall.

05:00:07  12  Q.  There's an article that says that.  Is there any reason

05:00:10  13  for you to dispute that?

05:00:12  14  A.  Perhaps you can show me the article, but certainly my

05:00:16  15  experience with Microsoft and PC manufacturers is that

05:00:21  16  Microsoft has a lot of agreements with ODMs and computer

05:00:29  17  manufacturers.

05:00:31  18  Q.  ASUS also entered into a license agreement with Sisvel

05:00:36  19  in 2018.  Have you ever seen that agreement?

05:00:40  20  A.  I haven't seen that agreement, but I'm aware of -- of

05:00:47  21  news releases or information that address that agreement.

05:00:50  22  Q.  And it says down here that Sisvel is a world leader in

05:00:54  23  managing intellectual property and maximizing the value of

05:00:59  24  patent rates with companies in Italy, United States, Hong

05:01:04  25  Kong.  A big company, right?

| | | |
|---|---|---|
| 05:01:07 | 1 | A.  You're reading me that.  I'm actually not aware of that |
| 05:01:11 | 2 | company, other than what I saw referenced in this |
| 05:01:14 | 3 | particular case. |
| 05:01:14 | 4 | Q.  Are you aware that Philips and ASUS -- you know, |
| 05:01:21 | 5 | Philips of the Philips table that we've been talking about, |
| 05:01:25 | 6 | entered into a licensing arrangement with ASUS? |
| 05:01:30 | 7 | A.  I am.  And not surprising, given Philips's patent |
| 05:01:34 | 8 | program. |
| 05:01:35 | 9 | Q.  In this article, it goes on to state that:  ASUS |
| 05:01:45 | 10 | admitted that Philips was entitled to injunctive relief and |
| 05:01:50 | 11 | offered to pay damages for past infringement at a FRAND |
| 05:01:54 | 12 | rate of $0.75 per infringing the device.  Philips, however, |
| 05:01:59 | 13 | argued that it was not sufficient, and the amount of |
| 05:02:04 | 14 | damages owed was to be decided at the FRAND trial. |
| 05:02:04 | 15 | That's the context of the agreement between |
| 05:02:09 | 16 | Philips and ASUS? |
| 05:02:10 | 17 | A.  Contents of the agreement or -- |
| 05:02:12 | 18 | Q.  Context. |
| 05:02:12 | 19 | A.  Context.  Yes, and if you would permit me, I could |
| 05:02:16 | 20 | address what it means to have a FRAND rate. |
| 05:02:24 | 21 | Q.  Your counsel can do it -- do that on redirect. |
| 05:02:26 | 22 | Were you here earlier when Dr. Ducharme testified |
| 05:02:29 | 23 | about there's 135 product families? |
| 05:02:31 | 24 | A.  Yes. |
| 05:02:33 | 25 | Q.  Earlier today your counsel prepared an updated Tab 17 |

05:02:44  1  and 15.  Did you assist in preparing that?

05:02:49  2  A.  You said counsel prepared?

05:02:51  3  Q.  Your attorneys -- sorry -- sent over an updated Tab 17

05:02:56  4  and 15 of your expert report.  Are you aware of that?

05:02:59  5  A.  Yes.

05:03:07  6  Q.  In that, there's display products.  You also list them

05:03:11  7  by types.  Are you aware that some of these, what you call

05:03:22  8  non-accused products -- for example, a VG monitor that

05:03:27  9  Dr. Ducharme has analyzed and considered that as part of

05:03:30  10  his, you know, expert opinion that it infringes?

05:03:37  11  A.  He's claiming that there's products with similar

05:03:39  12  numbers that he thinks are part of that family?

05:03:43  13  Q.  Correct.

05:03:45  14  A.  I'm not aware of testimony from Dr. Ducharme in that

05:03:48  15  regard.  He addressed, I believe, it's 134 product --

05:03:55  16  accused devices of a term.  I think in his testimony he

05:03:58  17  also talked about perhaps 160 products.

05:04:03  18  Q.  Yesterday or a couple days ago, counsel, in questioning

05:04:12  19  Dr. Ducharme, said (as read):

05:04:13  20        Thank you, sir.  I want to talk to you about --

05:04:16  21  switch topics here, and I want to talk to you about the

05:04:19  22  accused ASUS devices, okay?  We talked about -- you talked

05:04:23  23  earlier about there being displays at issue.  My question

05:04:26  24  is how many types of accused product families have been

05:04:30  25  accused in the matter?

05:04:31  1          Answer:  135.

05:04:35  2          So he's not talking about products but product

05:04:38  3  families, correct?

05:04:41  4  A.  That's confusing, but as I mentioned, he -- earlier in

05:04:45  5  his testimony, he talked about, I believe, a list of 135

05:04:52  6  accused products, but then he also talked about -- I

05:04:55  7  believe it was 160 or maybe 161 products.  So it wasn't

05:05:00  8  clear, but it certainly wasn't more than about 160 or 161.

05:05:06  9  Q.  Last couple of questions.

05:05:08  10         Earlier you were making the -- and on your slides

05:05:11  11 you had some products that were shipped from ASUS to

05:05:19  12 customers would be, might be, could be, shipped abroad.  Do

05:05:24  13 you remember that?

05:05:27  14 A.  Yes.  I don't know if I said might be, should be, but I

05:05:32  15 was addressing specifically that we have these worldwide

05:05:38  16 distributors headquartered in the U.S., who are receiving

05:05:41  17 product from ASUS.  That's all known.  These worldwide

05:05:45  18 distributors say that they sell product around the world,

05:05:48  19 and sometimes they have a distribution center near Canada.

05:05:53  20 So I'm just addressing that Mr. Perdue did not address that

05:05:57  21 issue.

05:06:05  22 Q.  Back in December, one of ASUS's Taiwan's employees was

05:06:10  23 deposed, and several questions was asked of him.

05:06:15  24         (As read):  Does ASUSTeK sell to other companies

05:06:18  25 besides ASUS Computer International, and do those products

05:06:26   1   end up making it to the United States?

05:06:28   2          His answer:  Well, we would also sell to our

05:06:31   3   subsidiaries in China and India, Europe, and also Russia,

05:06:36   4   et cetera.

05:06:39   5          Next question was:  And while -- and the products

05:06:43   6   that you sell to China, India, Russia, they may make it

05:06:48   7   back into the United States?

05:06:52   8          Answer:  I don't know.  However, the shipping cost

05:06:57   9   is expensive.  Who would sell the products from Russia to

05:07:01   10  the United States?

05:07:03   11         Does it make sense that products from ASUS get

05:07:07   12  shipped back to the United States -- shipped to the United

05:07:11   13  States and shipped back out?

05:07:14   14  A.   Absolutely it makes sense with respect to Canada and

05:07:17   15  the Americas because, there again, you have a distribution

05:07:22   16  center near Buffalo, New York, who are very close to

05:07:31   17  Montreal and Toronto.  So absolutely it makes sense, and I

05:07:36   18  could discuss more, if you like.

05:07:38   19         MR. LEE:  I have no more questions, Your Honor.

05:07:40   20         THE COURT:  Redirect?

05:07:42   21         MR. OLIVER:  Thank you.

05:07:44   22                REDIRECT EXAMINATION

05:07:46   23  BY MR. OLIVER:

05:07:48   24  Q.   Mr. Reed, Mr. Lee asked you about some sort of royalty

05:07:53   25  rate called a FRAND rate?

05:07:56  1    A.  Yes.

05:07:56  2    Q.  What does FRAND stand for?

05:07:58  3    A.  What does FRAND stand for?

05:08:01  4    Q.  Do you know what it stands for?

05:08:02  5    A.  Yes.  It's associated with standard -- what are called

05:08:06  6    standard essential patents.  And FRAND is a fair and

05:08:12  7    reasonable royalty rate that would be associated with

05:08:14  8    requirements of companies who get their patents included as

05:08:20  9    standard essential patents for an underlying product.  What

05:08:23  10   that means is you need that patent to be able to -- to

05:08:28  11   manufacture a product under the standard.

05:08:30  12        So because of that standard essential process,

05:08:34  13   what is typically required by the associations that monitor

05:08:39  14   the standard that gets applied is they require the FRAND

05:08:50  15   royalty rate to be known across the industry.

05:08:52  16   Q.  And by standard, you're talking about something like

05:08:57  17   standard size of a plug that everybody has in their house

05:09:00  18   or a standard WiFi unit that can connect to anybody's phone

05:09:07  19   or computer or a standard color of paint for highways or

05:09:11  20   something like that that everybody has to use or everybody

05:09:14  21   should use; is that right?

05:09:16  22   A.  Typically in its the electronic space because there's a

05:09:19  23   lot of complexity and a lot of patents that go into

05:09:24  24   something like a monitor.  And often the industry will

05:09:27  25   agree and say we want this particular approach to how --

05:09:29  1   you know, how the monitor will operate so that everybody in

05:09:32  2   the industry can manufacture parts like that MediaTek

05:09:35  3   chipset.  Everybody in the industry can manufacture parts

05:09:39  4   in a way that follow the standard, and that same

05:09:42  5   manufacturer can use those parts for their product.

05:09:47  6   Q.  Does that have any relation to this case?

05:09:50  7   A.  No, not at all.

05:09:58  8   Q.  The documents that Mr. Lee mentioned that were sent to

05:10:03  9   ASUS this morning, he implied that they were created by me.

05:10:10  10  Did any of the lawyers have anything to do with the

05:10:12  11  creation of those documents?

05:10:14  12  A.  No.  These were updates of previous tabs that were in

05:10:20  13  my expert report.  And the only reason why I even modified

05:10:23  14  them this week is because Mr. Perdue changed his

05:10:26  15  calculation.  Before he went through March 15th, now he

05:10:31  16  went through March 20th [sic].  So I just updated the

05:10:35  17  calculations to have that same change, May 20th.

05:10:40  18  Q.  Do you recall when we found out that those updated

05:10:43  19  calculations would be allowed in this trial?

05:10:45  20  A.  Monday night, I believe, around 6:30 p.m.

05:10:48  21  Q.  That was when he submitted them, right?

05:10:51  22  A.  Yes, that's my understanding is that they were

05:10:54  23  submitted by, I guess, Lone Star after trial on Monday.

05:11:00  24  Q.  And do you recall when the Court actually allowed them

05:11:03  25  to be spoken about?

05:11:05  1    A.   That was yesterday morning.

05:11:06  2    Q.   Okay.  So between yesterday morning and this morning

05:11:10  3    you were able to update your figures to address

05:11:13  4    Mr. Perdue's new calculations?

05:11:17  5    A.   I started the process probably the day before, to try

05:11:22  6    to be prepared just in case, but I think it was in the last

05:11:27  7    couple of days.

05:11:27  8    Q.   Okay.  Do you recall that I called you to ask you if

05:11:31  9    you would work for ASUS on this matter?

05:11:33  10   A.   Yes, I do recall.

05:11:34  11   Q.   And what did I ask you to do with Mr. Perdue's report?

05:11:38  12   A.   Well, my recollection -- I'm not sure I recall

05:11:42  13   precisely, but I believe it was to analyze the report

05:11:47  14   and -- and see what would be a proper method for addressing

05:11:52  15   it.

05:11:54  16   Q.   And did I suggest the approach that you take on that?

05:11:58  17   A.   No.  I believe I discussed it with both you and with

05:12:02  18   Barco's counsel once -- once I started the analysis and

05:12:06  19   looked at what Mr. Perdue did.  And then later on, it was

05:12:10  20   addressed.  But my recollection is that I addressed that as

05:12:15  21   a potential proper approach on my part.

05:12:18  22   Q.   Okay.  And so just to be clear, you chose the approach

05:12:22  23   to respond, not -- not the lawyers, right?

05:12:25  24   A.   I believe that's fair to say, yes.

05:12:27  25   Q.   Okay.  Did -- Mr. Lee brought out a bunch of decisions

05:12:39   1   from -- actually it was about three decisions from courts

05:12:44   2   about excluding some small portion of your testimony; is

05:12:48   3   that right?

05:12:48   4   A.  Yes, I believe that's what he addressed.  He didn't

05:12:50   5   really give me much of a chance to respond or explain.

05:12:54   6   Q.  Okay.  And --

05:12:56   7   A.  I'm sorry.

05:12:56   8   Q.  Sorry.  You have testified in, what, how many cases?

05:13:00   9   A.  Well, this issue involves more than testimony because

05:13:03   10  it involves -- any time there's an expert report.

05:13:06   11  Q.  So how many cases have you submitted expert reports on?

05:13:11   12  A.  Probably well over 100 for patent cases.

05:13:15   13  Q.  Okay.  And he was able to point to about three of those

05:13:20   14  where some portion of your testimony was excluded?

05:13:23   15  A.  That's what he appears to address.  You know, I think

05:13:26   16  there's -- I have a good response to that issue I didn't

05:13:29   17  get a opportunity to address.

05:13:31   18  Q.  I don't think we really need to go into that a whole

05:13:35   19  lot, but if you did the math, about 97 percent of the time

05:13:39   20  the Court allows you to give your full testimony; is that

05:13:39   21  right?

05:13:41   22          MR. LEE:  Objection, Your Honor.

05:13:49   23          THE COURT:  Can you rephrase the question?

05:13:51   24          MR. OLIVER:  Yeah.

05:13:53   25  BY MR. OLIVER:

05:13:53   1   Q.  If you did the math, what percentage of the time would

05:13:56   2   the Court allow you to do your -- give your full testimony?

05:13:59   3   A.  I would view it as essentially 100 percent because I've

05:14:06   4   always been permitted to provide full opinions of my

05:14:09   5   analysis.  Just that maybe 3 percent of the occasions,

05:14:11   6   there were portions that I was not able to address.  And in

05:14:13   7   my view, much of that relates to legal issues.

05:14:16   8   Q.  Has your testimony ever been excluded in the Eastern

05:14:22   9   District of Texas?

05:14:22  10   A.  Certainly not excluded.  Whenever I come to the Eastern

05:14:29  11   District of Texas, I have always presented my opinions.

05:14:32  12   There was one example of this complex case I mentioned

05:14:35  13   before, a case in Marshal and it had -- it was like --

05:14:37  14           MR. LEE:  Objection.  Narrative, Your Honor.

05:14:41  15           THE COURT:  Can you break it up a little bit,

05:14:44  16   Mr. Oliver?

05:14:45  17   BY MR. OLIVER:

05:14:45  18   Q.  So you mentioned a case in Marshal.  What happened in

05:14:48  19   that case?

05:14:48  20   A.  There was an initial case, and I was working with the

05:14:51  21   Plaintiff.  So in the initial case, the jury concluded and

05:14:54  22   agreed with my calculation to the dollar.  Then there was a

05:14:58  23   subsequent case.  The subsequent case had to do with these

05:15:02  24   products that were -- that were covered by the first case.

05:15:07  25   But because the Plaintiff in that case, SynQor, was paid

05:15:11   1   the damage amount that I had testified about, that does

05:15:16   2   something called a license or implied license to those

05:15:21   3   previous units because of payments made and a damage award

05:15:25   4   that covers those products.

05:15:28   5         So it made a very complex issue about -- and I

05:15:32   6   view it as a legal issue -- a complex legal issue about the

05:15:36   7   next trial.  And so there was a ruling in a very limited

05:15:39   8   way on that second part.

05:15:40   9   Q.  Okay.  Prior to today, has your testimony been -- your

05:15:45   10  report or your testimony been challenged at all in this

05:15:48   11  case between Lone Star and ASUS?

05:15:51   12  A.  No.  And I don't think they challenged my testimony.

05:15:55   13  They just started trying to challenge my reputation to and

05:15:59   14  somehow have these rulings against my prior opinions.

05:16:03   15        MR. LEE:  Objection.  Narrative, nonresponsive.

05:16:06   16        THE COURT:  Can you break it up, please?

05:16:11   17        MR. OLIVER:  Okay.

05:16:11   18        Your Honor, I believe that Plaintiff has opened

05:16:16   19  the door, and I would like to ask a question about the --

05:16:18   20  an issue that was addressed with respect to Mr. Reed while

05:16:21   21  the jury was out of the room in this Court.  Am I permitted

05:16:25   22  to do that when we looked at his report?

05:16:29   23        THE COURT:  You're going to have to help me.

05:16:33   24        MR. OLIVER:  The objection that Mr. Lee made that

05:16:35   25  we --

899

| | | |
|---|---|---|
| 05:16:35 | 1 | THE COURT:  With respect to the slides that we -- |
| 05:16:40 | 2 | Mr. Lee? |
| 05:16:41 | 3 | MR. LEE:  I'm not sure what Mr. Oliver is getting |
| 05:16:45 | 4 | at. |
| 05:16:46 | 5 | THE COURT:  Yeah, so -- |
| 05:16:47 | 6 | MR. OLIVER:  I don't want to cause a mistrial by |
| 05:16:50 | 7 | asking a question about -- |
| 05:16:51 | 8 | THE COURT:  No, I don't want you to either.  My |
| 05:16:53 | 9 | recollection was there was an objection to a slide, and I |
| 05:16:56 | 10 | overruled that objection.  Am I misremembering? |
| 05:17:01 | 11 | MR. OLIVER:  That's the -- that's what happened, |
| 05:17:02 | 12 | and I just -- that was outside of the presence of the jury, |
| 05:17:04 | 13 | but it has to do with the door that's been opened to |
| 05:17:08 | 14 | challenges to Mr. Reed's testimony. |
| 05:17:09 | 15 | THE COURT:  Okay.  Well, let's just -- why don't |
| 05:17:13 | 16 | you proceed carefully, and we'll see if it draws an |
| 05:17:17 | 17 | objection. |
| 05:17:17 | 18 | BY MR. OLIVER: |
| 05:17:17 | 19 | Q.  So do you recall today when the jury was out of the |
| 05:17:20 | 20 | room there was an objection to some of your testimony to |
| 05:17:24 | 21 | your slide? |
| 05:17:25 | 22 | A.  There was objection to two bullets. |
| 05:17:27 | 23 | Q.  Just answer very carefully here because we don't want |
| 05:17:31 | 24 | to cause any problems.  Was there an objection to -- by |
| 05:17:34 | 25 | Lone Star to your slide that you wanted to present? |

05:17:37   1   A.  Yes.

05:17:38   2   Q.  And the Court --

05:17:38   3          MR. LEE:  Objection.  Relevance, Your Honor.  It

05:17:41   4   was already overruled.

05:17:43   5          THE COURT:  Let's just proceed.

05:17:44   6          MR. OLIVER:  Okay.

05:17:45   7   BY MR. OLIVER:

05:17:45   8   Q.  The Court ruled on that?

05:17:47   9   A.  Yes.

05:17:48  10   Q.  And did the Court exclude any portion of what you

05:17:51  11   wanted to present?

05:17:51  12   A.  No.

05:17:51  13   Q.  Thank you.

05:17:53  14          MR. OLIVER:  Pass the witness.

05:17:55  15          MR. LEE:  We have no further questions,

05:17:57  16   Your Honor.

05:17:57  17          THE COURT:  Okay.  You may step down.

05:17:59  18          THE WITNESS:  Thank you, Your Honor.

05:18:03  19          THE COURT:  Call your next witness.

05:18:05  20          MR. OLIVER:  The Defense rests, Your Honor.

05:18:08  21          THE COURT:  Okay.  Is the Plaintiff going to call

05:18:10  22   any rebuttal witnesses?

05:18:12  23          MR. BENNETT:  We're not, Your Honor.

05:18:14  24          THE COURT:  Okay.  Does the Plaintiff rest on its

05:18:16  25   entire case?

05:18:18    1              MR. BENNETT:  Plaintiff rests, Your Honor.

05:18:20    2              THE COURT:  All right.  And does the Defendant

05:18:21    3    rest on its entire case?

05:18:24    4              MR. OLIVER:  We would like to make Rule 50 motions

05:18:27    5    before presenting the case to the jury, but we rest on all

05:18:30    6    the evidence.

05:18:30    7              THE COURT:  All right.  Very well.

05:18:33    8              Ladies and gentlemen of the jury, thank you for

05:18:33    9    your focus and your attention throughout the day.  We do

05:18:39   10    have some evidentiary and legal matters that we have to

05:18:43   11    take up outside your presence, and we're going to do that

05:18:46   12    now, of course.  It's been a long day.

05:18:50   13              When you get here in the morning, the first thing

05:18:53   14    that will happen is the parties, having rested, we will --

05:18:59   15    I will instruct you on the law that you are to follow in

05:19:01   16    your deliberations.  And then after that, you will hear the

05:19:06   17    attorneys' closing arguments.  And then after that, you

05:19:11   18    will return to the jury room to begin your deliberations.

05:19:14   19              I -- I would ask that you all -- I'm not going to

05:19:19   20    ask you to be here by 8:45.  I'll just ask you to be here

05:19:24   21    at 9:00 o'clock.  And if you guys will all be here about

05:19:29   22    9:00, we'll aim to start about 9:00.  And there's always

05:19:32   23    some last minute issues that have to be dealt with, with

05:19:37   24    respect to the instructions and the verdict form, but we

05:19:40   25    intend to get all of that resolved tonight after you leave

05:19:44   1   and in the morning before you arrive.

05:19:46   2          So you all be here 8:00 o'clock in the -- at 9:00

05:19:49   3   o'clock in the morning, and we'll begin with instructions

05:19:51   4   hopefully right about that time.

05:19:54   5          I hope you all have a pleasant evening.  As a

05:19:57   6   reminder, don't discuss the case among yourselves or with

05:20:00   7   anyone else.  Don't do any investigation or research into

05:20:04   8   the case, the parties, or the attorneys, and don't post

05:20:08   9   anything about any of the proceedings you have observed.

05:20:11   10          I'll see you in the morning about 9:00 o'clock.

05:20:15   11          COURT SECURITY OFFICER:  All rise for the jury.

05:20:17   12          (Jury out.)

05:20:42   13          THE COURT:  Okay.  Please be seated.

05:20:48   14          All right.  So we have Rule 50 motions from the

05:20:52   15   parties.  We need to discuss the instructions and the

05:20:58   16   verdict form and anything else the parties wish to cover.

05:21:01   17          I do want to ask you, Mr. Oliver, I was a little

05:21:04   18   confused about what happened right there at the end.  I was

05:21:08   19   not following that.  I was not understanding what the

05:21:12   20   objection was.  Can you help me understand what was going

05:21:15   21   on there?

05:21:18   22          MR. OLIVER:  To the final -- to the final line of

05:21:20   23   questioning, Your Honor?

05:21:21   24          THE COURT:  Yes.

05:21:21   25          MR. OLIVER:  Yes.  Mr. Lee challenged Mr. Reed on

05:21:27    1    several courts excluding his testimony and brought up

05:21:34    2    opinions from various courts and read from them and said

05:21:37    3    your testimony was excluded here and there and so on and

05:21:40    4    opened the door to whether his testimony is even

05:21:42    5    appropriate or whether it should be excluded.

05:21:44    6        So I wanted to point out that there was no

05:21:47    7    challenge made in this case before today and that there

05:21:50    8    actually was a challenge and nothing was excluded.

05:22:03    9        THE COURT:  Not sure I've ever seen anything like

05:22:05   10    that, Mr. Oliver.

05:22:06   11        MR. BENNETT:  We -- Mr. Lee and I had an awkward

05:22:09   12    struggle about how to deal with that.  Been in a few

05:22:12   13    trials, never heard my opposing counsel in front of the

05:22:15   14    jury approach the bench on basically a limine that doesn't

05:22:20   15    exist, and talk about a mistrial, et cetera.

05:22:22   16        I don't want to -- (indecipherable) -- and I'm not

05:22:25   17    going to, but I've never seen anything like that either.

05:22:28   18        THE COURT:  I've never seen anything like it.  I'm

05:22:31   19    not going to fuss at you, Mr. Oliver, but it seemed like

05:22:35   20    you were definitely using what I had decided to counter the

05:22:42   21    testimony that had come in about the other exclusions of

05:22:43   22    the witness's testimony in other courts.

05:22:46   23        Candidly, I was not following what was going on,

05:22:50   24    or I would not have allowed you to do that.  I don't think

05:22:54   25    it was proper, but, again, you did request me to -- to -- I

05:22:58  1  mean, you raised it, and so that's on me for not having you

05:23:03  2  all up to the bench to ensure that I completely understood

05:23:07  3  what the issue is.  So --

05:23:09  4        MR. OLIVER:  I tried to raise it very discreetly.

05:23:12  5  I didn't --

05:23:12  6        THE COURT:  You did.  And I was too slow on the

05:23:16  7  uptake, honestly.

05:23:18  8        And Mr. Lee didn't help me out, or at least in a

05:23:20  9  way that I could understand it.  I should have had you all

05:23:23  10 up to the bench, but it's -- it's neither here nor there.

05:23:29  11 I just wanted to make sure I understood what had happened.

05:23:33  12       Okay.  Now, Rule 50 motions.  Does the Plaintiff

05:23:37  13 have a Rule 50 motion it wishes to argue?

05:23:40  14       MR. BENNETT:  Yes, on their invalidity challenges.

05:23:42  15       THE COURT:  All right.

05:23:43  16       MR. BENNETT:  First, we wanted to move for a

05:23:44  17 directed verdict on double patenting.  We don't think

05:23:49  18 that -- Your Honor knows -- I don't have to repeat the

05:23:53  19 standard.  You're well aware that the standards aren't

05:23:56  20 equal when it comes to affirmative defenses of invalidity

05:23:59  21 versus infringement.  Clear and convincing is the standard,

05:24:02  22 and it's quite high.

05:24:04  23       They have not met that standard, even close, for

05:24:06  24 double patenting.

05:24:08  25       I'd cite Eli Lily 689 F.3d 1368, pen cite 1378

05:24:16  1   to 79.  It's a little different kind of patent, I'll grant

05:24:20  2   you, but it's a method patent all the same, and there's two

05:24:24  3   different methods involved.

05:24:26  4        The Court says you got the focus the analysis on

05:24:29  5   what's previously claimed and not previously disclosed.

05:24:33  6   Almost all of Stevenson's testimony was about what figures

05:24:37  7   showed, what was disclosed, not tied directly or limited to

05:24:42  8   what was claimed on the double patent.

05:24:44  9        On the patent itself, the earlier patent, he could

05:24:50  10  not mention how any claims had changed in between, that a

05:24:54  11  claim construction had brought them close together.  He

05:24:57  12  didn't mention any of that.  And the two references that he

05:25:00  13  did mention in the claim language, while they may be

05:25:03  14  similar methods, they weren't identical.

05:25:09  15       And it's -- Eli Lily mentions if I have a method

05:25:11  16  and it's got a component that's in common and both the

05:25:16  17  prior and the subsequent patents use the same component,

05:25:19  18  then maybe you have a valid double patent challenge.

05:25:23  19       That's not this case.  They have not made that

05:25:26  20  argument.  The figures themselves show differences in the

05:25:30  21  methods claimed, not necessarily what's limited to what's

05:25:34  22  disclosed.

05:25:35  23       So if they have evidence of all of the double

05:25:40  24  patenting, it's not clear and convincing evidence.  We

05:25:42  25  should not waste the jury's time with that question because

05:25:46  1   they cannot hope to meet that burden, that high burden.

05:25:51  2        The anticipation claim, as well, or defense, the

05:26:00  3   selecting step and identifying step, input image pixels,

05:26:03  4   the testimony on those particular steps, even if it's in

05:26:10  5   equal voice, it's not clear and convincing.

05:26:13  6        So that's mainly our argument with anticipation

05:26:16  7   and double patenting that whatever evidence there is, as a

05:26:18  8   matter of law, the jury could never conclude it's clear and

05:26:22  9   convincing.

05:26:24  10       MR. OLIVER:  I'm unclear, was that all about

05:26:28  11  double patenting, or was there also a motion on

05:26:33  12  anticipation?

05:26:33  13       MR. BENNETT:  It was two separate motions.

05:26:36  14       MR. OLIVER:  Okay.  Your Honor, the witness,

05:26:40  15  Dr. Stevenson, very clearly addressed this issue.  He went

05:26:44  16  through each step of the method claim, and he showed where

05:26:48  17  in the method claims of the '012 patent the obvious -- the

05:26:57  18  limitation that rendered it obvious was found.

05:27:03  19       This is not -- this is not anticipation with

05:27:06  20  respect to the double patenting issue.  It's an

05:27:10  21  obviousness-type double patenting.  It doesn't have to be

05:27:13  22  verbatim.  Even for anticipation, it wouldn't have to be

05:27:13  23  verbatim.

05:27:17  24       So Dr. Stevenson addressed each step and pointed

05:27:22  25  it out.  The jury has ample evidence to rule on double

05:27:26   1   patenting in that regard.

05:27:27   2            With respect to the Brett reference and the

05:27:30   3   anticipation or obviousness verdict that's requested with

05:27:35   4   respect to that patent, again, Mr. Stevenson walked through

05:27:44   5   the entire claim -- the entirety of every claim and showed

05:27:48   6   where in the Brett reference the disclosure -- the

05:27:51   7   invaliding disclosure was found.

05:27:53   8            And there was also testimony and challenges to

05:27:56   9   testimony by Plaintiff's expert wherein they could only

05:27:59   10  challenge one or two small aspects of each patent, and then

05:28:05   11  they even gave testimony that it called questions upon

05:28:11   12  their challenges to the invalidity arguments.  So the

05:28:14   13  evidence is clear, the jury has ample evidence to make a --

05:28:18   14  render a verdict on that issue.

05:28:19   15           THE COURT:  All right.  Thank you, Mr. Oliver.

05:28:27   16           Mr. Joshi, you want to go ahead and argue yours?

05:28:30   17           MR. OLIVER:  So we have multiple Rule 50 motions,

05:28:35   18  Your Honor.  The first one is kind of lengthy compared to

05:28:39   19  the others.  So don't despair when you hear the first one

05:28:43   20  because the other ones will be much shorter.

05:28:46   21           Would you like me to present them all or to do it

05:28:48   22  one at a time?

05:28:50   23           THE COURT:  Present them all.

05:28:51   24           MR. OLIVER:  Okay.  ASUS moves under Rule 50 for

05:28:55   25  judgment as a matter of law that Lone Star lacks standing

| | | |
|---|---|---|
| 05:28:58 | 1 | to bring this lawsuit.  Lone Star failed to prove ownership |
| 05:29:02 | 2 | of the patent-in-suit, a necessary cornerstone of every |
| 05:29:07 | 3 | patent infringement lawsuit. |
| 05:29:09 | 4 | Section 261 of the Patent Act requires, quote, |
| 05:29:12 | 5 | applications for patents, patents, or any interest therein, |
| 05:29:16 | 6 | shall be assignable in law by an instrument in writing, end |
| 05:29:20 | 7 | quote.  35 U.S.C. 261. |
| 05:29:23 | 8 | This has been interpreted to require a written |
| 05:29:28 | 9 | instrument. |
| 05:29:28 | 10 | Regarding ownership of the '435 patent-in-suit, |
| 05:29:36 | 11 | Lone Star offered only the testimony of Mr. Rice, which |
| 05:29:40 | 12 | itself was inconsistent internally and is inconsistent with |
| 05:29:43 | 13 | the other facts. |
| 05:29:44 | 14 | Mr. Rice first testified that Lone Star acquired |
| 05:29:46 | 15 | the '435 patent from Intel.  That's in the Day 1 trial |
| 05:29:50 | 16 | transcript at Page 134, Line 14.  Mr. Rice later testified |
| 05:29:55 | 17 | that he himself transferred the '435 patent to Lone Star. |
| 05:30:04 | 18 | That's in the redirect testimony Trial Day 1, Page 150, |
| 05:30:08 | 19 | Line 16.  The face of the '435 patent states that it is |
| 05:30:12 | 20 | assigned to Oplus Technologies Limited, neither Intel nor |
| 05:30:19 | 21 | Mr. Rice. |
| 05:30:19 | 22 | So there is no chain of -- no chain of transfer |
| 05:30:23 | 23 | from Oplus to Intel to Mr. Rice to Lone Star.  Lone Star |
| 05:30:30 | 24 | failed to offer any document establishing that it owns the |
| 05:30:34 | 25 | '435 patent. |

| | | |
|---|---|---|
| 05:30:39 | 1 | The Federal Circuit recently summarized the |
| 05:30:42 | 2 | well-established requirement for a written instrument as |
| 05:30:46 | 3 | follows -- and I'm going to quote the text from the opinion |
| 05:30:50 | 4 | rather than eliminate the internal citations to other |
| 05:30:54 | 5 | references. |
| 05:30:55 | 6 | In assessing whether an attempted assignment is |
| 05:31:00 | 7 | sufficient to transfer title or ownership, Courts must look |
| 05:31:04 | 8 | to whether the parties can satisfy this in-writing |
| 05:31:06 | 9 | requirement.  Without a written assignment to satisfy |
| 05:31:10 | 10 | Section 261, a party who is not the inventor simply lacks |
| 05:31:15 | 11 | standing to bring a patent infringement suit for money |
| 05:31:17 | 12 | damages.  Our case law in most cases reflects this |
| 05:31:23 | 13 | apparently inviolable rule.  That's from Vapor Point, LLC |
| 05:31:29 | 14 | v. Moorhead, 832 F.3d 1343, Page 1351, Federal Circuit |
| 05:31:38 | 15 | 2016. |
| 05:31:39 | 16 | The Federal Circuit has recognized limited |
| 05:31:43 | 17 | exceptions to this apparently inviolable rule where a |
| 05:31:47 | 18 | transfer occurs by operation of law such as by inheritance |
| 05:31:51 | 19 | in a will.  However, Lone Star alleges that it purchased |
| 05:31:55 | 20 | the '435 patent, not that any automatic operation of law |
| 05:32:01 | 21 | was involved. |
| 05:32:01 | 22 | Accordingly a writing establishing ownership is |
| 05:32:05 | 23 | required, and no such writing is in evidence.  Therefore, |
| 05:32:07 | 24 | Lone Star lacks standing to bring this lawsuit, and |
| 05:32:11 | 25 | judgment of lack of standing should be entered. |

| | | |
|---|---|---|
| 05:32:14 | 1 | ASUS also asks the Court to enter -- issue an |
| 05:32:17 | 2 | order to show cause why the case should not be deemed |
| 05:32:21 | 3 | exceptional and ASUS awarded its attorney's fees, costs, |
| 05:32:25 | 4 | and expenses. |
| 05:32:26 | 5 | In Raniere versus Microsoft, 887 F.3d 1298, |
| 05:32:34 | 6 | Federal Circuit 2018, appealed from Judge Lynn in the |
| 05:32:37 | 7 | Northern District of Texas, the Court affirmed an |
| 05:32:41 | 8 | exceptional case finding and award of fees after dismissal |
| 05:32:44 | 9 | for lack of standing due to failure to prove ownership. |
| 05:32:48 | 10 | THE COURT:  Could I ask was that failure to use |
| 05:32:50 | 11 | ownership at -- to prove ownership at trial? |
| 05:32:53 | 12 | MR. OLIVER:  A key -- a cornerstone component of a |
| 05:32:55 | 13 | patent infringement case is that you have to prove you have |
| 05:33:02 | 14 | ownership of the patent and have standing to bring the |
| 05:33:04 | 15 | lawsuit. |
| 05:33:05 | 16 | THE COURT:  Right.  And so there was never a |
| 05:33:07 | 17 | motion to dismiss filed in this case. |
| 05:33:10 | 18 | MR. OLIVER:  Lone Star alleged ownership in the |
| 05:33:13 | 19 | complaint and -- up until trial alleged ownership and never |
| 05:33:18 | 20 | was able to present ownership of the patent at trial. |
| 05:33:21 | 21 | And we did ask the witness before they rested |
| 05:33:25 | 22 | their case on cross-examination whether he had provided any |
| 05:33:28 | 23 | written instrument showing that they owned the patent. |
| 05:33:32 | 24 | THE COURT:  Okay. |
| 05:33:33 | 25 | MR. OLIVER:  Next motion, ASUS moves for Rule 50 |

05:33:55  1  judgment as a matter of law of no contributory infringement

05:34:00  2  under 35 U.S.C. 271(c).  A Plaintiff dropped its claim of

05:34:08  3  contributory infringement.  So Lone Star is entitled to

05:34:09  4  judgment on its counterclaim of noninfringement with

05:34:12  5  respect to contributory infringement.

05:34:26  6       Similarly, with respect to direct infringement by

05:34:30  7  ASUS, ASUS moves for judgment as a matter of law under

05:34:33  8  Rule 50 because Plaintiff dropped its claim of direct

05:34:37  9  infringement by ASUS.  So ASUS is entitled to judgment on

05:34:41  10  its counterclaim of noninfringement with respect to direct

05:34:45  11  infringement.

05:34:45  12       With respect to the remaining claim of inducement

05:34:48  13  of infringement and the acts of direct infringement

05:34:54  14  underlining that claim by others, not ASUS, that could form

05:34:58  15  a basement for inducement, ASUS first moves for judgment as

05:35:07  16  a matter of law under Rule 50 that Lone Star failed to

05:35:14  17  prove that it met -- that the ASUS products met the claim

05:35:19  18  limitation without affecting any other colors, as the

05:35:23  19  witness testified that every color could be modified and

05:35:28  20  that his -- that his application of that related to every

05:35:35  21  color.

05:35:36  22       ASUS also moves for judgment of noninfringement

05:35:44  23  with respect to every product not specifically analyzed by

05:35:48  24  the expert in this -- and addressed in this -- in his

05:35:54  25  testimony.  And by the expert, I refer to Dr. Ducharme.

05:35:59   1          ASUS moves for judgment as a matter of law of no

05:36:04   2   infringement on all products that were not specifically

05:36:08   3   identified by products number by Dr. Ducharme as

05:36:12   4   infringing.

05:36:13   5          With respect to that, Dr. Ducharme showed a

05:36:16   6   demonstrative listing 135 products that he said were

05:36:20   7   accused of infringement, but there was no testimonial

05:36:25   8   evidence that lists the product numbers, and there's no

05:36:31   9   exhibit demon- -- identifying the products that are accused

05:36:35   10   of infringement.

05:36:40   11          ASUS moves for judgment as a matter of law with

05:36:44   12   respect to inducement, with respect to all products that

05:36:51   13   are sold by ASUS's distributors to end users outside of the

05:36:57   14   United States.

05:36:57   15          ASUS asserts that this must apply to all products

05:37:02   16   because there was no evidence as to which of the products

05:37:06   17   that went to directors ended up with consumers within the

05:37:10   18   United States.

05:37:14   19          ASUS moves for summary judgment -- or not summary

05:37:23   20   judgment -- judgment as a matter of law under Rule 50 on

05:37:28   21   inducement because -- because there is no proof that the

05:37:33   22   product manuals upon which the Plaintiff relies to prove

05:37:39   23   inducement were sent with the products.  The testimony by

05:37:42   24   the ASUS witnesses is that the product manuals are indeed

05:37:46   25   not included in the boxes and that somebody would have to

05:37:48  1   go to the website to download those manuals, which brings

05:37:54  2   me to my next point.

05:37:57  3            There's no proof that the user -- there's no

05:37:59  4   evidence that users have downloaded the manuals for any

05:38:02  5   product.  For example, there's no identification of any web

05:38:13  6   logs from ASUS showing that customers within the United

05:38:18  7   States actually downloaded those manuals.

05:38:21  8            ASUS moves for judgment as a matter of law under

05:38:27  9   Rule 50 of no inducement of infringement for each product

05:38:32  10  wherein the manual does not describe or show separate red,

05:38:38  11  green, or blue color adjustments because that is the

05:38:43  12  teaching upon which Lone Star is basing its claim of

05:38:50  13  inducement.

05:38:53  14           ASUS moves for judgment as a matter of law that

05:38:58  15  the Plaintiff take no damages prior to actual notice on the

05:39:04  16  date of service in this lawsuit, June 10th, 2019, because

05:39:13  17  Plaintiff had licensed the patent to parties, including

05:39:18  18  Acer, and there's no evidence from Plaintiff that licensed

05:39:23  19  products were marked with the patent number prior to the

05:39:26  20  date of actual notice.

05:39:29  21           ASUS moves for judgment as matter of law under

05:39:34  22  Rule 50 that no damages be taken on the non-accused

05:39:39  23  products.  The testimony today showed that 180 or so

05:39:44  24  products included in Mr. Perdue's damages analysis were not

05:39:50  25  accused of infringement.

05:39:52  1                    THE  COURT:  Can  you  go  back  to  the  product  manuals

05:39:56  2      for  just  a  minute?

05:39:56  3                    MR.  OLIVER:  Yes,  sir.

05:39:57  4                    THE  COURT:  Can  you  actually  identify  for  me  which

05:40:00  5      product  manuals  you're  moving  for  judgment  as  a  matter  of

05:40:05  6      law  on?

05:40:08  7                    MR.  OLIVER:  Well  --

05:40:09  8                    THE  COURT:  Specifically  which  manuals?  I  think

05:40:11  9      the  record  needs  to  reflect  that.

05:40:14  10                   MR.  OLIVER:  So  there  are  manuals  --  I  believe

05:40:17  11     they're  all  in  P-26-1  through  P-26-139.

05:40:27  12                   Those  are  manuals  for  numerous  products  that  were

05:40:34  13     allowed  into  evidence  over  objection.  And  there  was  no

05:40:41  14     evidence  that  those  manuals  were  put  into  products  that

05:40:46  15     were  shipped  to  customers  in  the  United  States.  The

05:40:50  16     testimony  was  that  they  were  downloaded  by  Lone  Star.

05:40:52  17                   THE  COURT:  So  your  objection  or  the  ground  upon

05:40:54  18     which  you're  moving  for  JMOL  is  as  to  every  single  one  of

05:40:59  19     those  --

05:40:59  20                   MR.  OLIVER:  Yes.

05:40:59  21                   THE  COURT:  --  product  manuals?

05:41:00  22                   MR.  OLIVER:  Yes,  Your  Honor.

05:41:02  23                   THE  COURT:  Okay.

05:41:03  24                   MR.  OLIVER:  Because  the  burden  of  proof  is  that

05:41:04  25     Plaintiff  must  show  that  ASUS  induced  consumers  by

05:41:10  1  providing the inducing materials to those consumer -- or to

05:41:14  2  the -- in this case because it's a method patent, to the

05:41:17  3  end user.

05:41:18  4       THE COURT:  One of your arguments, Mr. Oliver, was

05:41:20  5  that some of the manuals lacked instructions?

05:41:25  6       MR. OLIVER:  Yes.

05:41:26  7       THE COURT:  Which manuals lacked instructions?

05:41:29  8       MR. OLIVER:  There are so many, I would have to --

05:41:32  9  I would have to come up with a list of them, but I can

05:41:35  10  provide that list before the case goes to the jury.

05:41:38  11       THE COURT:  For purposes of protecting your

05:41:40  12  record, I think you should do that.

05:41:43  13       MR. OLIVER:  Okay.  We will do that.  I can't do

05:41:46  14  that as I stand here today.

05:41:48  15       THE COURT:  Of course not.  Certainly.

05:41:49  16       MR. OLIVER:  ASUS moves for judgment as a matter

05:41:59  17  of law under Rule 50 that damages may be awarded for no

05:42:05  18  more than one unit of each product.  The law on this point

05:42:08  19  is clear and is in the jury instructions in that one can

05:42:13  20  seek judgment of inducing infringement based on

05:42:21  21  circumstantial evidence, but in a situation where a product

05:42:25  22  can be used in a non-infringing manner, the Plaintiff must

05:42:35  23  show evidence of how many users actually used the

05:42:38  24  infringing method.

05:42:39  25       In this case, the man -- the monitors can all be

05:42:42   1   used in a non-infringing manner.  That would be plugging

05:42:45   2   them in and not touching the color adjustment.

05:42:48   3        Because of that non-infringing manner and because

05:42:54   4   there was no evidence by survey or by actually seeing

05:42:57   5   customers use them or presenting evidence of how many

05:43:00   6   customers used the manuals, the law requires that damages

05:43:04   7   be limited to one unit of each product.  So essentially it

05:43:09   8   would be 134 total units of sales in this case.

05:43:13   9        THE COURT:  Okay.  Is there -- I've just not heard

05:43:17   10  that argument before.  Is there -- can you tell me what --

05:43:20   11  what Federal Circuit law there is that supports that

05:43:23   12  argument?

05:43:24   13       MR. OLIVER:  I can.  I will need to pull it up on

05:43:27   14  my computer, but I can tell it to you.

05:43:34   15       MR. BENNETT:  Your Honor, while he's doing that,

05:43:37   16  we would be happy to -- there's so many motions, I'm having

05:43:43   17  a hard time trying to keep track of them so we can respond

05:43:46   18  to them.

05:43:46   19       I would ask he put at least a list in writing so

05:43:50   20  that Lone Star will have the opportunity to actually cite

05:43:54   21  some evidence and rebut it.  I don't -- otherwise, I don't

05:43:57   22  know what we're doing or what we're talking about.  I mean,

05:44:00   23  I've never seen anything like this before.

05:44:03   24       THE COURT:  Mr. Oliver?

05:44:06   25       MR. OLIVER:  The list will certainly be in the

05:44:08  1  transcripts that we receive this evening, but I don't have

05:44:12  2  a -- I have a handwritten list right here, but --

05:44:16  3        THE COURT:  I'm -- okay, well, I'll just ask you

05:44:20  4  to respond to, Mr. Bennett, as best you can.  I mean, most

05:44:23  5  of this, honestly, Mr. Oliver, strikes me as summary

05:44:31  6  judgment-type issues.  So it's curious to me why there were

05:44:34  7  not summary judgment motions filed on these issues.

05:44:38  8        MR. OLIVER:  That was --

05:44:40  9        THE COURT:  That would have saved us all -- to the

05:44:43  10  extent, you know, there was merit to any of the many issues

05:44:49  11  you've raised here, that certainly would have streamlined

05:44:52  12  the trial in a very significant way.

05:44:54  13        MR. BENNETT:  Well -- sorry, Your Honor.  I know

05:44:56  14  it's still his motion, but here's what my problem is.

05:45:00  15  There is a pretrial order on file under Rule 16 that

05:45:04  16  governs.

05:45:04  17        THE COURT:  That's correct.  So --

05:45:06  18        MR. BENNETT:  So hardly any of these things he's

05:45:09  19  listing off are in that pretrial order.  So what I would

05:45:13  20  like -- that's why I'm asking if we could adjourn and get a

05:45:17  21  list, we could probably do a lot of work for the Court in a

05:45:21  22  short time by comparing his list to the pretrial order.

05:45:24  23        I've been trying to keep track, and I've seen

05:45:26  24  about two issues on the list of what they listed as

05:45:30  25  contended issues of law.

05:45:32  1              THE COURT:  Mr. Oliver?

05:45:33  2              MR. OLIVER:  There are numerous issues that have

05:45:36  3  arisen during trial by failure -- due to failure of proof

05:45:39  4  by the Plaintiff.  We didn't know --

05:45:41  5              THE COURT:  Well, with respect to standing, for

05:45:43  6  example, is that the pretrial order?

05:45:44  7              MR. BENNETT:  We unequivocally assert that we own

05:45:48  8  the patent, and they do not dispute it.  It's admitted.

05:45:58  9              MR. OLIVER:  Lone Star asserted that they owned

05:46:01  10 the patent and asserted that they would bring evidence, and

05:46:05  11 they didn't.  They failed to prove --

05:46:06  12             THE COURT:  The pretrial order says it's not

05:46:08  13 disputed.  It was a joint filing, Mr. Oliver.

05:46:12  14             MR. OLIVER:  That was based on their assertions at

05:46:15  15 the time.  This is based on the evidence at trial that's --

05:46:18  16 has been presented.

05:46:19  17             THE COURT:  These -- some of these motions,

05:46:22  18 Mr. Oliver, border on frivolous.  I have to be candid with

05:46:28  19 you.

05:46:28  20             MR. OLIVER:  Your Honor, they're all supported by

05:46:29  21 the case law and by the facts.  And if needed, we can cite

05:46:34  22 them, but there is no --

05:46:36  23             THE COURT:  Well, it's definitely -- it's

05:46:38  24 definitely needed.

05:46:39  25             You know, here's what I would suggest.  Out of an

05:46:46  1  abundance of caution, in order for both sides to protect

05:46:50  2  their record, I think a filing needs to be made.  I think

05:46:54  3  these motions should be filed in writing, and you can file

05:46:59  4  them tonight or first thing in the morning, and I will hear

05:47:03  5  short argument in the morning, or I'll explain what my

05:47:08  6  ruling is going to be in the morning before we instruct the

05:47:12  7  jury.

05:47:14  8      I'm certainly not trying to cut off anybody's

05:47:17  9  argument here today, but I do think Mr. Bennett has

05:47:20  10  filed -- has made a valid point.  If these issues are not

05:47:26  11  covered in the pretrial order, then I -- I think there's a

05:47:31  12  little unfair surprise here.

05:47:33  13      And so in order to be fair for both sides,

05:47:38  14  Mr. Oliver, for you to protect your record and for

05:47:42  15  Mr. Bennett to be able to adequately respond to things that

05:47:46  16  were not raised in the pretrial order, I think that the

05:47:50  17  safest approach is to ask for the parties to file written

05:47:55  18  submissions on the docket.

05:47:57  19      MR. OLIVER:  Okay.  We can do that.

05:48:00  20      THE COURT:  Does anybody have any concern about

05:48:02  21  doing that?  I know you've got other things to do tonight.

05:48:07  22      MR. BENNETT:  Your Honor, that's -- given the

05:48:09  23  number of directed verdict motions, I think that's the only

05:48:12  24  way to proceed.

05:48:15  25      I will say if I have to spend all night going

05:48:19  1  through these and they're not in the pretrial order, I

05:48:22  2  might come back asking for something because that's what

05:48:29  3  governs.  That's the pleadings now.  It will be Rule 11

05:48:32  4  type for me to have come back and respond to something that

05:48:38  5  we raised in the pretrial --

05:48:38  6        THE COURT:  Mr. Oliver, I agree with what he's

05:48:42  7  saying.

05:48:42  8        MR. OLIVER:  Your Honor, I don't think that what

05:48:43  9  he's saying is correct in that when the Plaintiff asserts

05:48:47  10  that it can prove a point at trial and then drops the

05:48:51  11  evidence on that point, things change during trial.  People

05:48:54  12  say that they can -- they can prove certain points and then

05:48:58  13  they get to trial and they don't prove it.  Plaintiff said

05:49:02  14  they could prove ownership -- in fact, Plaintiff actually

05:49:06  15  had some documents that apparently were never produced in

05:49:09  16  the case that were purportedly assignments or licenses to

05:49:13  17  Lone Star or something on its first exhibit list, and it

05:49:16  18  withdrew them all.

05:49:17  19        And as a -- for example, on that matter, it's a

05:49:20  20  cornerstone of every patent infringement case that you must

05:49:24  21  prove you have standing to sue on the patent.  You can

05:49:29  22  plead it, you can assert it up to trial, but when you get

05:49:32  23  to trial, that's where the rubber meets the road.  And

05:49:35  24  these are the type of issues that are -- that are appearing

05:49:38  25  here.

| | | |
|---|---|---|
| 05:49:38 | 1 | THE COURT:  So I'm look at ASUS' statement of |
| 05:49:45 | 2 | contested issues of fact and law on Page 8 of the pretrial |
| 05:49:47 | 3 | order just as -- by way of example, and there was four |
| 05:49:50 | 4 | listed:  Whether ASUS has infringed the asserted claims of |
| 05:49:54 | 5 | the '435 patent, that's number one; number two, whether the |
| 05:49:58 | 6 | claims of the '435 patent are valid and enforceable; number |
| 05:50:02 | 7 | three, whether ASUS had notice of allegations of |
| 05:50:04 | 8 | infringement of the '435 patent; and number four, whether |
| 05:50:08 | 9 | Lone Star is entitled to any damages for alleged |
| 05:50:14 | 10 | infringement by ASUS. |
| 05:50:15 | 11 | And it seems to me -- again, I haven't gone -- I'm |
| 05:50:17 | 12 | just looking at this -- |
| 05:50:19 | 13 | MR. OLIVER:  Lone Star's entitlement to damages is |
| 05:50:22 | 14 | directly tied to standing.  Without standing, you're not |
| 05:50:27 | 15 | entitled to damages. |
| 05:50:27 | 16 | MR. BENNETT:  May I respond, please? |
| 05:50:29 | 17 | THE COURT:  Yes. |
| 05:50:30 | 18 | MR. BENNETT:  Section M of the joint pretrial |
| 05:50:36 | 19 | order lists the contentions of the parties.  The contention |
| 05:50:39 | 20 | of the parties are the pleadings now, and you have to |
| 05:50:42 | 21 | assert a defense to what's the contention of the parties if |
| 05:50:46 | 22 | you want to respond to it, and they do not. |
| 05:50:48 | 23 | We say we own it in Part 1 of Section M, and they |
| 05:50:51 | 24 | do not deny that we own it in their contentions, either the |
| 05:50:55 | 25 | contentions of law or the disputed contentions of fact. |

05:51:00    1          Procedural divisional circuit law applies.  I will

05:51:02    2    cite to Your Honor, 400 F.3d 238 at 245.  It's a Fifth

05:51:08    3    Circuit case.  It's right on point:  Evidence or legal

05:51:10    4    theories that are not in the pretrial order are waived and

05:51:15    5    every fact is omitted that isn't challenged.

05:51:18    6          And they haven't challenged that fact.  We

05:51:21    7    had 12 hours.  I didn't need to waste time trying to prove

05:51:25    8    up ownership, other than get a little testimony in for some

05:51:28    9    context for the jury because they waived the issue.  I

05:51:31   10    wasn't to spend time introducing documents and going

05:51:35   11    through the transfer history of the patent when I had to

05:51:38   12    get through everything else.  And we feel sandbagged by

05:51:42   13    this now and after they failed to do what they were

05:51:44   14    supposed to do, it's a little galling considering all

05:51:45   15    that's happened in this case.

05:51:47   16          MR. OLIVER:  I can -- I can understand why Mr. --

05:51:53   17    why my colleague would be upset that he failed to prove his

05:51:57   18    case, but --

05:51:57   19          THE COURT:  Mr. -- Mr. Oliver, you're really --

05:51:59   20          MR. OLIVER:  -- this is --

05:52:00   21          THE COURT:  Your conduct is really getting mighty

05:52:04   22    close to the Rule 11 line.  And this is not how we try

05:52:10   23    cases.

05:52:11   24          Mr. Bennett is entitled to notice of what the

05:52:14   25    issues are.  Instead, to wait until the evidence has closed

| | | |
|---|---|---|
| 05:52:18 | 1 | or nearly closed and to raise things that frankly should |
| 05:52:22 | 2 | have been raised months ago is quite shocking to me.  But |
| 05:52:29 | 3 | it is not the first shocking thing I have observed in this |
| 05:52:33 | 4 | trial. |
| 05:52:33 | 5 | At the end of the day, Mr. Bennett is entitled to |
| 05:52:40 | 6 | some clear delineation of exactly which grounds you're |
| 05:52:49 | 7 | moving on.  Certainly given the disparity between the |
| 05:52:54 | 8 | positions you are now taking and the positions that you |
| 05:52:59 | 9 | have taken throughout this litigation, including what you |
| 05:53:04 | 10 | submitted in the agreed joint final pretrial order. |
| 05:53:09 | 11 | So I am going to ask that you file the JMOL |
| 05:53:14 | 12 | by 10:00 p.m. tonight, and I will give the Plaintiffs an |
| 05:53:19 | 13 | opportunity to respond by 6:00 a.m. |
| 05:53:24 | 14 | MR. OLIVER:  Okay.  Thank you, Your Honor. |
| 05:53:29 | 15 | THE COURT:  Any concern about being able to do |
| 05:53:31 | 16 | that by 10:00 p.m.? |
| 05:53:34 | 17 | MR. JOSHI:  Yeah, we were actually hoping to have |
| 05:53:36 | 18 | dinner tonight for -- you know, since we -- |
| 05:53:36 | 19 | MR. OLIVER:  We'll do it. |
| 05:53:39 | 20 | MR. JOSHI:  But we'll do it.  We'll do it.  That's |
| 05:53:41 | 21 | fine. |
| 05:53:43 | 22 | THE COURT:  All right. |
| 05:53:45 | 23 | Mr. Bennett, any concern about that? |
| 05:53:48 | 24 | MR. BENNETT:  Yes, but I don't know what choice I |
| 05:53:52 | 25 | have, Your Honor. |

05:53:53  1          THE COURT:  I think the Plaintiff is entitled to a

05:53:56  2  written filing.

05:53:58  3          MR. OLIVER:  Okay.

05:53:59  4          MR. JOSHI:  We will do that.

05:54:01  5          THE COURT:  Because it's what -- honestly, I think

05:54:05  6  is a real surprise.

05:54:07  7          MR. JOSHI:  Okay.

05:54:08  8          THE COURT:  All right.  Jury instructions.  I

05:54:11  9  think there's just a couple of disputes, and we will look

05:54:15  10  at those very quickly.  I'll let you tell me what you

05:54:20  11  think.  I'll tell you what I'm inclined to do.

05:54:24  12          You can try to talk me out of that, and then I'll

05:54:28  13  make a final decision tonight and give you a opportunity to

05:54:33  14  put your objections on the record.

05:54:35  15          Let's just turn briefly -- who's arguing these?

05:54:41  16          Mr. Bennett, are you arguing these for the

05:54:44  17  Plaintiff?

05:54:44  18          MR. BENNETT:  Yes, Your Honor.

05:54:44  19          THE COURT:  Who's arguing for Plaintiff -- for the

05:54:46  20  Defendant?  Mr. Joshi.

05:54:47  21          The first thing on page 10, at the bottom on the

05:54:53  22  instruction on claim interpretation, there is some language

05:55:00  23  in a bracket with respect to the preferred embodiment issue

05:55:09  24  that came up before.

05:55:11  25          Mr. Bennett, I am not inclined to include that

05:55:14   1   additional language.  There was a curative instruction that

05:55:18   2   was given.  I think the jury understood it, and so my

05:55:20   3   inclination is not to include that, but I'll hear from you

05:55:25   4   about it.

05:55:26   5            MR. BENNETT:  I'm not going to take too much time

05:55:32   6   arguing about it.  The only reason we put it in is because

05:55:34   7   the original curative instruction mentioned that a later

05:55:39   8   instruction would follow.  Whether the jury remembers that

05:55:42   9   or not, I don't know.  Frankly, I probably doubt it.

05:55:44  10            THE COURT:  Well, the later instruction does

05:55:45  11   follow because it says you must disregard any argument or

05:55:48  12   evidence presented by either party suggesting that the

05:55:51  13   claims mean anything other than the definitions provided in

05:55:55  14   the chart, which is, I think, what the later instruction

05:55:58  15   is.

05:55:58  16            MR. BENNETT:  Fair enough.

05:56:00  17            THE COURT:  Okay.  Do you want -- wish to add

05:56:02  18   anything about that?

05:56:03  19            MR. JOSHI:  No, Your Honor.  We agree.

05:56:05  20            THE COURT:  Okay.  Second one, I think, is on

05:56:09  21   Page 30.

05:56:09  22            MR. BENNETT:  That's right.

05:56:13  23            THE COURT:  There's an argument that ASUS has made

05:56:16  24   here with respect to service of the complaint as opposed to

05:56:26  25   filing date of the complaint.

05:56:27   1          You got a case to support that, Mr. Joshi, because
05:56:32   2     it's news me.  I think it's the filing of the complaint
05:56:36   3     that's the operative date under the statute.
05:56:40   4          MR. JOSHI:  No, I don't have a case, Your Honor.
05:56:42   5     We'll withdraw that one.
05:56:44   6          THE COURT:  All right.  Very well.  Resolve that
05:56:47   7     in that way.
05:56:47   8          MR. BENNETT:  As an aside, Your Honor, I would
05:56:49   9     ask, that was one -- that was one -- I lost count of the
05:56:52  10     bases for a Rule 50 motion that Mr. Oliver said.
05:56:55  11          So if they've agreed to withdraw it from the
05:56:57  12     charge, I would hope not to see it in their motion that I
05:57:01  13     have to respond to by 6:00 a.m.
05:57:03  14          THE COURT:  Right.  Agree with that.
05:57:05  15          Okay.  On the appendix, there's, I guess, some
05:57:14  16     disagreement about that.  I'll just make a couple of brief
05:57:18  17     comments about the first two:  hue and saturation.
05:57:23  18          I know the parties disagree about that.
05:57:27  19          Mr. Bennett, I'll tell you my inclination is to go
05:57:29  20     with the Plaintiff on this because -- I mean, with the
05:57:32  21     Defendant on this because their proposal mirrors the claim
05:57:37  22     construction order, unless there's a really good reason not
05:57:40  23     to do that.  I'm looking forward to you telling me what
05:57:45  24     that might be.
05:57:46  25          MR. BENNETT:  I thought our -- the only thing we

05:57:48  1  did was take the numbers out.  I thought the words were

05:57:51  2  substantively the same.  If they weren't, that's our fault.

05:57:57  3  All -- literally all I did was took the Attachment A that

05:57:59  4  the Defendant gave us and just tried to make it more

05:58:03  5  readable.  I was worried the jury would think that the

05:58:07  6  numbers meant something.

05:58:10  7          THE COURT:  Okay.  Well, we may -- I think those

05:58:11  8  numbers are in the claim construction order.

05:58:15  9          MR. BENNETT:  That's true.  They are.  And we're

05:58:17  10  not going to fight Your Honor about putting the numbers in

05:58:19  11  or out.  It was just a readability thing for purposes of

05:58:22  12  the jurors.  That's all we thought.

05:58:22  13          THE COURT:  Yeah, we'll leave them in there.

05:58:25  14          MR. BENNETT:  That's fine.

05:58:25  15          THE COURT:  All right.  That's the first two:  hue

05:58:28  16  and saturation.

05:58:29  17          On individual color, I think the sentence that was

05:58:33  18  added there by the Defendant is not part of the claim

05:58:40  19  construction order.  So my inclination is to side with the

05:58:44  20  Plaintiff on that one.

05:58:46  21          Mr. Joshi, you want to argue that one?

05:58:53  22          MR. JOSHI:  Yes.  Yes, Your Honor.

05:58:54  23          And so this -- this also relates to the motion

05:58:59  24  that we filed last night about clarification of claim

05:58:59  25  construction.

05:59:03  1          So what's going on is you have a definition of

05:59:06  2   individual color, then there's the -- the Court, then, on

05:59:11  3   its own says there are more issues.  It's not that simple.

05:59:16  4   That's what the claim construction order says.

05:59:19  5          And then the -- then the Court talks about

05:59:21  6   individual color appearing in the selecting limitation and

05:59:23  7   then it appearing in the identifying limitation.  And it

05:59:26  8   says on one of them, it has to be an exact individual

05:59:32  9   color, and on the other -- you know, now that's -- that's

05:59:34  10  been a subject of debate as to indefiniteness, not the

05:59:38  11  preferred embodiments, not limited to preferred

05:59:42  12  embodiments.

05:59:43  13         But this kind of ties in with the motion that we

05:59:46  14  filed last night that without -- without these

05:59:49  15  clarifications as to what is -- what are the metes and

05:59:51  16  bounds of this term, then it eviscerates a couple of terms

05:59:55  17  from the claims because now every pixel comes in.

05:59:58  18         Because if we just leave to it apply logic and --

06:00:00  19  and, you know, leave it up to the reader to apply the logic

06:00:11  20  to determine which pixels are in and which aren't, then

06:00:11  21  essentially all the pixels come in, and then the claim

06:00:14  22  terms just lose their meaning.

06:00:16  23         THE COURT:  Anything you wish to add?

06:00:20  24         MR. BENNETT:  I'm just here to talk about

06:00:22  25  Appendix A and what we should give the jury.

06:00:26  1          We responded in a brief about what we think about

06:00:29  2  their argument, and I'll leave it there.

06:00:30  3          The language has to come out because it's a

06:00:33  4  reflection of their preferred embodiment argument, which is

06:00:37  5  just wrong.

06:00:37  6          THE COURT:  I agree.  I'm going to side with the

06:00:39  7  Plaintiffs on this one, Mr. Joshi.

06:00:42  8          All right.  I think that covers everything on the

06:00:46  9  appendix.  With respect to the verdict forms, let me tell

06:00:50  10  you my thoughts about --

06:00:51  11          MR. BENNETT:  Sorry, Your Honor.  There's one more

06:00:53  12  issue on the appendix.

06:00:54  13          We removed having "said selected individual

06:00:58  14  color," and the Defendants included it.  That's not a

06:01:03  15  construed term.  It's something that the Defendants have

06:01:05  16  inserted because they continue to assert that we are

06:01:07  17  limited by the preferred embodiment, which the Court has

06:01:11  18  already said is wrong.

06:01:12  19          So they've inserted the claim term/phrase.  It's

06:01:16  20  not a claim term at all.  Interpreted according to the

06:01:19  21  preferred embodiments of the patent, they quote, and they

06:01:20  22  quote where it is.  I have not seen anything like that

06:01:23  23  before.  So we removed it, and they've included it.  We'd

06:01:27  24  ask that it be removed.

06:01:28  25          THE COURT:  So what happened, I think, is it was

06:01:33   1   originally in the ASUS version, and you all removed it, and

06:01:33   2   it didn't end up on our copy.

06:01:33   3           MR. BENNETT:  Okay.

06:01:38   4           THE COURT:  So I haven't seen that.

06:01:38   5           MR. BENNETT:  Okay.  Well, then it -- it was -- we

06:01:39   6   submitted completing forms, and I wasn't sure which form

06:01:41   7   Your Honor was looking at.

06:01:41   8           THE COURT:  If it was not a term that was

06:01:43   9   construed, it'll not be on the chart.

06:01:46  10           MR. BENNETT:  Thank you, Your Honor.

06:01:47  11           THE COURT:  With respect to the verdict form --

06:01:49  12   let me just make some -- I tell you, to be honest, let

06:01:51  13   me -- I think probably the easier thing to do is let me

06:01:55  14   tell you what my general views are, and then you can tell

06:02:00  15   me why you think they're wrong, and I'll consider what you

06:02:05  16   have to say.  And if I change my mind, I'll go with you.

06:02:11  17   Otherwise, we'll leave it the way it is, and you can put

06:02:11  18   your objections on the record.

06:02:13  19           I think that the appropriate question on

06:02:18  20   infringement is a one-part question instead of a two-part

06:02:27  21   question.  My concern with two questions, Mr. Joshi --

06:02:32  22   Joshi is that it invites the jury to make a mistake later

06:02:35  23   on.  I certainly think that you all are -- you can argue in

06:02:40  24   closing, you know, what you think the appropriate damages

06:02:44  25   are.  If you think that only, you know, 6-axis infringes as

| 06:02:50 | 1 | opposed to 3 or as opposed to both of them, it's certainly |
| 06:02:54 | 2 | an argument you can make, but I don't think that justifies |
| 06:02:58 | 3 | a -- I don't think it justifies both -- both questions, |
| 06:03:03 | 4 | because my concern is if you end up with, you know, a |
| 06:03:07 | 5 | damages number and then it turned out you get a "no" on one |
| 06:03:11 | 6 | and a "yes" on the other, it's going to be difficult to |
| 06:03:16 | 7 | unwind it.  And so that is my inclination. |
| 06:03:23 | 8 | On the -- on Question 1, infringement versus |
| 06:03:27 | 9 | induced infringement, I think that limiting the question to |
| 06:03:31 | 10 | inducement essentially -- or effectively amounts to a JMOL |
| 06:03:36 | 11 | of noninfringement on direct infringement.  And, you know, |
| 06:03:40 | 12 | the -- I mean, you certainly can make, you know, a Rule 50 |
| 06:03:45 | 13 | motion on that, of course, and I'll take it up, and you can |
| 06:03:48 | 14 | make another Rule 50 after trial if that becomes necessary. |
| 06:03:54 | 15 | But I think -- I think the post-trial is probably, |
| 06:04:00 | 16 | you know, the better way to handle that.  And I'm -- at |
| 06:04:07 | 17 | this point, I think the safer approach is to use language |
| 06:04:10 | 18 | reflecting infringement. |
| 06:04:12 | 19 | On damages there is some language there that is |
| 06:04:21 | 20 | sort of redundant about the jury can only award damages if |
| 06:04:25 | 21 | there's an infringement and validity, and that's in there |
| 06:04:30 | 22 | twice.  So we're going to take that out one of those |
| 06:04:33 | 23 | places. |
| 06:04:34 | 24 | And then, finally, on the lump sum question, |
| 06:04:38 | 25 | there's some language in the verdict form that was provided |

| 06:04:44 | 1 | by the Plaintiff limiting damages to a lump sum, and |
| 06:04:50 | 2 | there's some objection about the Defendant about that. |
| 06:04:55 | 3 | Can you help me understand exactly where the |
| 06:04:59 | 4 | conflict is there? |
| 06:05:01 | 5 | MR. OLIVER:  May I respond, Your Honor? |
| 06:05:10 | 6 | THE COURT:  Of course, yes. |
| 06:05:11 | 7 | MR. OLIVER:  Yes.  So we've already had a motion |
| 06:05:14 | 8 | about this attempting to limit Lone Star's expert |
| 06:05:18 | 9 | testimony, but prior to trial, both parties came with a |
| 06:05:24 | 10 | verdict form that said damages should be assessed up to the |
| 06:05:28 | 11 | time of trial. |
| 06:05:29 | 12 | We entered trial with that understanding.  Lone |
| 06:05:31 | 13 | Star then was permitted to present evidence through the end |
| 06:05:40 | 14 | of the term of the patent.  And the issue there is the |
| 06:05:44 | 15 | verdict form needs to reflect that that's what the jury has |
| 06:05:46 | 16 | been asked to render because, otherwise, the jury has a |
| 06:05:48 | 17 | damages number that goes through 2022.  If they only -- if |
| 06:05:51 | 18 | it's awarded through trial, it's based on that larger |
| 06:05:55 | 19 | number, and then Lone Star could potentially come and ask |
| 06:05:57 | 20 | for a running royalty after trial when they've already |
| 06:06:02 | 21 | infected the jury with evidence through the end of the |
| 06:06:06 | 22 | patent. |
| 06:06:06 | 23 | So the form needs to reflect the evidence that was |
| 06:06:09 | 24 | presented and what Lone Star asked the jury to award.  So |
| 06:06:13 | 25 | it needs to be through the end the term of the patent. |

06:06:16   1          THE COURT:  Mr. Bennett?

06:06:17   2          MR. BENNETT:  I'm just going to go back to the

06:06:19   3   pretrial order again where we put in our contentions that

06:06:23   4   two parts of the lump sum payment.  We may not have used

06:06:30   5   those words exactly, "lump sum," but it was -- the reason

06:06:34   6   we didn't do that is because we were just trying to parrot

06:06:38   7   what our expert would say at trial, which is what he did

06:06:42   8   say.  I don't know why they're trying to feign surprise

06:06:42   9   here.

06:06:44  10          I will pull a, on the record, mea culpa for

06:06:46  11   letting the draft verdict form go out with the wrong

06:06:52  12   wording.  That was my fault.  But it doesn't change what

06:06:55  13   the operative pleadings say and what the evidence in the

06:07:00  14   case is.

06:07:01  15          THE COURT:  Okay.  All right.  Thank you for those

06:07:03  16   comments.

06:07:03  17          With respect to the verdict form, were there any

06:07:06  18   other comments that either side had --

06:07:12  19          MR. JOSHI:  Yes, Your Honor.

06:07:13  20          THE COURT:  -- other than the lump sum issue?

06:07:15  21          MR. JOSHI:  If I may, Your Honor?

06:07:18  22          THE COURT:  Yes.

06:07:18  23          MR. JOSHI:  We believe it's essential for their

06:07:22  24   two -- two products -- two -- you know, the two

06:07:23  25   representative products that their expert started with, the

06:07:27  1   P11 and the P12.  One is 3-axis, and one is 6-axis.

06:07:30  2         And those are very different products.  They

06:07:32  3   operate differently.  We've been talking about the

06:07:35  4   differences between them.  The infringement arguments are

06:07:38  5   different.  The noninfringement arguments are different.

06:07:42  6   And, you know, so, in fact, there's no agreement between

06:07:44  7   parties as to representative products at all in this case.

06:07:48  8   Typically, that agreement is made well in advance.

06:07:50  9         That being said, there are two.  There are two

06:07:53  10  now.  There's a 3-axis and a 6-axis, and the jury has been

06:07:58  11  hearing those terms, and they know that they're different,

06:08:00  12  and we've been stressing the differences between them

06:08:03  13  throughout this trial.

06:08:04  14        And so the products fall into two categories, and

06:08:07  15  it's very possible that they'll find one to be infringing

06:08:10  16  and one not to be infringing.

06:08:12  17        And we don't believe that simply telling them just

06:08:15  18  take care of in the damages is adequate.  We believe that

06:08:19  19  the form is not that complicated.  There's just one patent.

06:08:23  20        And, you know, even with -- even with dividing --

06:08:25  21  even dividing the products into two categories, there's

06:08:28  22  still just five questions.  So we don't think this

06:08:30  23  complicates the issue.  It will bring clarity to them

06:08:33  24  because it will be more recognizable for them to see a form

06:08:37  25  with terms that they've been listening to.

06:08:39    1          THE COURT:  Mr. Bennett, any comments you wish to

06:08:42    2    make?

06:08:43    3          MR. BENNETT:  There have been far more complex

06:08:45    4    cases come through this court with more products and more

06:08:48    5    patents and more claims with exactly almost the same form.

06:08:54    6          This is a one-patent case.  It's one kind of

06:08:57    7    product.  It's a monitor that, yes, it infringes in

06:09:03    8    different ways according to us, but it -- for the reasons

06:09:08    9    Your Honor has already said, it doesn't justify

06:09:11   10    differentiation either on the damages or on the

06:09:12   11    infringement question.

06:09:13   12          Let's give the jury a simple form.  They can apply

06:09:16   13    the evidence.  If there is something to clean up, we can do

06:09:19   14    it post verdict.

06:09:20   15          THE COURT:  Mr. Joshi, if I were to submit a

06:09:23   16    verdict form to the jury that has both questions, would you

06:09:27   17    agree that the products are represented?

06:09:31   18          MR. JOSHI:  I think we have to at this point, yes.

06:09:35   19          THE COURT:  Mr. Bennett?

06:09:39   20          MR. BENNETT:  If it's a question of infringement,

06:09:42   21    perhaps.  I guess the problem for us is because we've

06:09:46   22    treated them as representative products, although we did

06:09:49   23    get into evidence today through Mr. Perdue the formula he

06:09:52   24    used, and I could easily back into the math, we've only

06:09:56   25    presented the question as a one-time lump sum 2.8 million

06:10:01  1   over all products.

06:10:06  2          Although the evidence is there, I'd rather not

06:10:13  3   spend the night trying to back into that math.  That's

06:10:16  4   not the way it's been presented to the jury.  It would

06:10:19  5   effectively -- effectively be, and I'm sure they would

06:10:22  6   argue a sort of summary judgment motion through a verdict

06:10:26  7   form, and I don't think that's appropriate.

06:10:27  8          THE COURT:  Mr. Joshi, I'm going to think about

06:10:30  9   it.

06:10:30  10         MR. JOSHI:  Okay.  I'll just make one comment, not

06:10:32  11  to belabor the point.

06:10:33  12         THE COURT:  Sure, sir.

06:10:34  13         MR. JOSHI:  This representation, it started with

06:10:36  14  Dr. Ducharme, their expert.  His expert report began

06:10:40  15  with 3-axis and 6-axis.  He actually coined those terms.

06:10:43  16  So they can't -- they can't say they're surprised by it on

06:10:49  17  the damages side.

06:10:50  18         THE COURT:  Okay.

06:10:53  19         MR. BENNETT:  One housekeeping -- I think we're

06:10:56  20  done with the charge, at least for our part.

06:10:58  21         THE COURT:  And as far as I'm concerned, we are.

06:11:01  22         Anything anybody else wishes to say about either

06:11:03  23  the charge or the verdict form?

06:11:05  24         MR. BENNETT:  As far as the charge goes, just for

06:11:07  25  preservation purposes, we objective to an invalidity

06:11:11    1    question going to the jury, at least on the grounds that we

06:11:14    2    challenged in our Rule 50.  We don't think there's

06:11:17    3    sufficient evidence as part of that.  But that -- we'll

06:11:19    4    just get that on the record.

06:11:20    5         I have a housekeeping item.  We're technically

06:11:25    6    supposed to exchange the demonstratives in about 20 minutes

06:11:30    7    or closing slides.

06:11:32    8         THE COURT:  Sure.  Whatever -- whatever y'all can

06:11:34    9    agree on that, that's fine.

06:11:34   10         MR. BENNETT:  Okay.  Thank you.

06:11:36   11         THE COURT:  Let's do something that everybody's

06:11:36   12    happy with because I don't want to make the jury wait while

06:11:40   13    we argue for 30 minutes about a slide that's just been

06:11:41   14    disclosed, all right?

06:11:42   15         So y'all get your slides disclosed.  I don't

06:11:46   16    remember what y'all's management procedure stipulates about

06:11:50   17    that, but whatever it is, y'all follow it to the -- to

06:11:52   18    the T and get it produced, and if there are objections,

06:11:55   19    y'all try to resolve those.

06:11:59   20         MR. BENNETT:  Understood.  Thank you.

06:12:00   21         MR. JOSHI:  So just one housekeeping, Your Honor.

06:12:02   22    Since you're inclined to deny our JMOLs anyway and we're

06:12:08   23    filing them for the record, could we push the deadline from

06:12:12   24    10:00 p.m. to 11:00 p.m.?  Would that be okay?

06:12:15   25         MR. BENNETT:  I have no objection.

| | | |
|---|---|---|
| 06:12:15 | 1 | THE COURT:  That's fine.  That'd be fine. |
| 06:12:17 | 2 | MR. BENNETT:  As long I can get until 7:00 a.m. on |
| 06:12:19 | 3 | my -- |
| 06:12:19 | 4 | THE COURT:  You have until 7:00. |
| 06:12:19 | 5 | MR. BENNETT:  Thank you, Your Honor. |
| 06:12:22 | 6 | THE COURT:  Right.  Right.  Okay.  Good.  All |
| 06:12:24 | 7 | right.  So that's fine. |
| 06:12:25 | 8 | You all get that filed by 11:00 and a response by |
| 06:12:34 | 9 | 7:00, and that will solve that. |
| 06:12:35 | 10 | We will make some final decisions about the |
| 06:12:38 | 11 | verdict form and the instructions either this evening or |
| 06:12:43 | 12 | very early in the morning, and as soon as we have made |
| 06:12:48 | 13 | those decisions, we will circulate to you by email. |
| 06:12:53 | 14 | The verdict form we've settled on have the |
| 06:12:58 | 15 | instructions in it, and I'll give you an opportunity to put |
| 06:13:00 | 16 | any objections on the record either before or after we |
| 06:13:03 | 17 | instruct, as long as the parties agree that neither side is |
| 06:13:09 | 18 | waiving any arguments by putting the objections to the |
| 06:13:13 | 19 | charge and the verdict form on the record after the jury |
| 06:13:20 | 20 | has begun its deliberations.  That's my preference so that |
| 06:13:24 | 21 | we don't keep the jury waiting. |
| 06:13:27 | 22 | Any -- any -- either side have a problem with |
| 06:13:29 | 23 | that? |
| 06:13:29 | 24 | MR. BENNETT:  Plaintiff agrees. |
| 06:13:31 | 25 | MR. JOSHI:  Fine with the Defendant. |

939

06:13:32  1              THE COURT:  Good.  Okay.

06:13:35  2         What else?  We've got 30 minutes a side for

06:13:38  3  closings.

06:13:45  4         Mr. Bennett, I don't know if you're doing all of

06:13:48  5  the closing or if you're splitting it, and you don't need

06:13:50  6  to tell me.  You're welcome to split it between other

06:13:53  7  members of your team.

06:13:54  8         I would ask that you use 20 minutes of your

06:13:57  9  30 minutes in your opening section.  Anything of your 20

06:14:02  10 that you don't use, you're going to lose that because I'm

06:14:09  11 only going to let you use 10 when you get back up.

06:14:12  12             MR. BENNETT:  That's exactly the split I was going

06:14:15  13 to ask you.

06:14:16  14             THE COURT:  Good.  And I'll give either side

06:14:18  15 whatever warnings you want at the end of your first 20 or

06:14:20  16 whatever.

06:14:20  17             MR. BENNETT:  If I use the lapel mic, can I -- I'm

06:14:24  18 a pacer by nature, and I will keep my distance from the

06:14:29  19 jury, but --

06:14:29  20             THE COURT:  Yes, I'm going to let you.  I'm going

06:14:31  21 to break the promise I made myself about two weeks ago.

06:14:34  22 I'm going to let you move around a little bit.

06:14:36  23             MR. BENNETT:  Thank you, Your Honor.

06:14:37  24             THE COURT:  We'll make sure all of the lapel mics

06:14:41  25 get back into the charger, so that we can have a full set

06:14:44  1   for in the morning.

06:14:45  2          And, yes, as long as you have the lapel mic.

06:14:49  3          Mr. Joshi, your lapel mic needs to be on your

06:14:53  4   lapel, not in your pocket.

06:14:56  5          MR. JOSHI:  My pocket --

06:14:56  6          THE COURT:  That's -- yeah, your --

06:14:56  7          MR. JOSHI:  It falls off.  It's very sturdy in

06:14:58  8   there.

06:14:59  9          THE COURT:  Get it up here.

06:15:00  10         MR. JOSHI:  Okay.

06:15:01  11         THE COURT:  What else?  Anything?

06:15:02  12         MR. JOSHI:  Just finally, Your Honor, just a minor

06:15:04  13  thing.  I'm positive I moved DX-3 and DX-9 into evidence.

06:15:08  14  If I failed to do that, I would like to move it in now.

06:15:13  15         THE COURT:  Mrs. Schroeder is nodding her head

06:15:16  16  that you did.

06:15:16  17         MR. JOSHI:  Thank you.

06:15:18  18         THE COURT:  Are y'all -- is the Plaintiff's

06:15:19  19  exhibit -- exhibits all taken care of to your knowledge?

06:15:21  20         MR. BENNETT:  I'll have to check with the people

06:15:24  21  who keep me in line, Your Honor, but I'm pretty sure that

06:15:26  22  that's the case.

06:15:27  23         THE COURT:  All right.  Thank you all.  See you in

06:15:29  24  the morning.

06:15:31  25         COURT SECURITY OFFICER:  All rise.

06:15:32   1                  (Time noted 6:15 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        COURT REPORTER'S CERTIFICATION

2            I HEREBY CERTIFY that the foregoing is a true and

3    correct transcript from the stenographic notes of the

4    proceedings in the above-entitled matter to the best of my

5    ability.

6

7                    /s KATHRYN McALPINE/
                     KATHRYN McALPINE, RPR, CSR, CCR
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25