```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
                           TYLER DIVISION

LONE STAR TECHNOLOGICAL          )
INNOVATIONS, LLC,                )
                                 )
              Plaintiff,          )
                                 )   Civil Action No.
vs.                              )   6:19-cv-00059-RWS
                                 )
ASUSTEK COMPUTER, INC.,          )
                                 )
              Defendant.          )
_____
```

POST TRIAL HEARING

BEFORE THE HONORABLE ROBERT W. SCHROEDER, III

August 18, 2021

10:00 a.m.

APPEARANCES

MR. BRADLEY DAVID LIDDLE                FOR THE PLAINTIFF
Carter Arnett, PLLC
Campbell Centre II
8150 N. Central Expressway, Suite 500
Dallas, Texas  75206
(214) 550-8188
bliddle@carterarnett.com

MR. VINAY VIJAY JOSHI                FOR THE DEFENDANT
MR. ANDREW T. OLIVER
Amin, Turocy & Watson, LLP
160 West Santa Clara Street, Suite 975
San Jose, California  95113
(216) 696-8730
vjoshi@thepatentattorneys.com
aoliver@thepatentattorneys.com

1                         I N D E X

2               D E F E N D A N T ' S   E V I D E N C E

3       TESTIMONY BY PROFESSOR ROBERT LOUISE STEVENSON        Page

4                   Direct Examination by Mr. Joshi ----------   6
                    Cross-Examination by Mr. Liddle ----------  22
5                   Redirect Examination by Mr. Joshi --------  41

6

7               P L A I N T I F F ' S   E V I D E N C E

8       TESTIMONY BY DR. AL DUCHARME

9                   Direct Examination by Mr. Liddle ---------  50
                    Cross-Examination by Mr. Joshi -----------  54
10

11      INOPERABILITY ARGUMENT BY MR. JOSHI -----------------  71

12      ARGUMENT BY MR. LIDDLE ------------------------------  74

13      REBUTTAL ARGUMENT BY MR. JOSHI ----------------------  77

14      STRIKE PAGES ARGUMENT BY MR. OLIVER -----------------  78

15      ARGUMENT BY MR. LIDDLE ------------------------------  81

16      JMOL ARGUMENT BY MR. OLIVER -------------------------  82

17      RICE ARGUMENT BY MR. OLIVER -------------------------  89

18      DAMAGES ARGUMENT BY MR. OLIVER ----------------------  92

19      ARGUMENT BY MR. LIDDLE ------------------------------  97

20      REBUTTAL ARGUMENT BY MR. OLIVER --------------------- 104

21

22

23

24

25

1            JUDGE SCHROEDER:  Ms. Schroeder, if you would, call

2       the case for us.

3            MS. SCHROEDER:  Cause No. 6:19-cv-59, Lone Star

4       Technological Innovations, LLC, vs. ASUSTek Computer Inc.,

5       et al.

6            JUDGE SCHROEDER:  Announcements for the record.

7            MR. LIDDLE:  Good morning, Your Honor.  This is Brad

8       Liddle for the Plaintiff Lone Star, and we are ready to

9       proceed.

10           JUDGE SCHROEDER:  Good morning, Mr. Liddle.  Welcome.

11           MR. LIDDLE:  Thank you.

12           MR. JOSHI:  Good morning, Your Honor.  This is Vijay

13      Joshi for ASUS, and my colleague Andrew Oliver.

14           JUDGE SCHROEDER:  Good morning, Mr. Joshi.  Mr.

15      Oliver, good morning to you as well.  Welcome to all of

16      you.

17           We are here this morning for the post-trial hearing

18      in this matter.  I understand that we have a couple of

19      witnesses with respect to the 101 Motion, and I think the

20      parties believe in terms of -- that the remote access of

21      those witnesses' testimony, that it would be best to handle

22      that at the very beginning of the hearing, and we'll go

23      ahead and get that out of the way before proceeding to

24      the -- to the two JMOLs.

25           Is that -- is my understanding about that correct?

```
 1              MR. JOSHI:  That is -- that is our understanding.
 2         That is correct.
 3              JUDGE SCHROEDER:  Okay.
 4              MR. LIDDLE:  Same for the plaintiff, Your Honor.
 5              JUDGE SCHROEDER:  Okay.  Very well.  All right, we
 6         have not allotted a certain amount of time for today's
 7         hearing, but having reviewed the briefing and, of course,
 8         being well familiar with the issues, it seems to me we
 9         ought to be able to be done by 12:30 or so.  The parties
10         agree with that?
11              MR. JOSHI:  We'll try our best, Your Honor.  Because
12         there are two witnesses, it's more than just counsel
13         talking, so we don't know where the answers will lead.  But
14         maybe not 12:30, but 1:30 maybe.  I'm not -- I'm not sure.
15              JUDGE SCHROEDER:  Okay.  Well, my general practice is
16         to allot a certain amount of time to each time, and then
17         you-all can allocate it however you wish.
18              So, Mr. Liddle, let me hear from you.
19              MR. LIDDLE:  Yes, Your Honor.  I think until 12:30 is
20         sufficient for the plaintiff.
21              JUDGE SCHROEDER:  Okay.  Mr. Joshi --
22              MR. JOSHI:  So --
23              JUDGE SCHROEDER:  -- can you live with an hour and 15
24         minutes?
25              MR. JOSHI:  Are you talking about just the
```

1          inoperability part, or everything?

2                    JUDGE SCHROEDER:  Everything.

3                    MR. JOSHI:  All right.  So that -- that means hour

4          and a half -- so you're thinking an hour and a half each

5          side, Your Honor?

6                    JUDGE SCHROEDER:  Hour and 15 minutes each side.

7                    MR. JOSHI:  Okay.  So about 40 minutes.  Yeah.

8                    JUDGE SCHROEDER:  Do you think you can do it?

9                    MR. JOSHI:  I think I can.  If I can't, I'll let you

10         know, but I'll aim for it.

11                   JUDGE SCHROEDER:  So let's do this.  Let me allocate

12         an hour and 15 minutes per side, to each side -- I mean,

13         obviously, and if we get into it, and clearly it's taking

14         much longer than that, we'll recalculate and maybe break

15         for lunch and come back and finish in the afternoon.  Fair

16         enough?

17                   MR. LIDDLE:  Yes, Your Honor.

18                   JUDGE SCHROEDER:  All right.

19                   MR. JOSHI:  Yes.

20                   JUDGE SCHROEDER:  Mr. Joshi, if you want to proceed

21         on your 101 Motion, you may do so at this time.

22                   MR. JOSHI:  Thank you, Your Honor.  I need someone

23         from IT to let Dr. Stevenson in.

24                   JUDGE SCHROEDER:  Okay, Mr. Joshi.

25                   MR. JOSHI:  Good morning, Dr. Stevenson.

```
 1              DR. STEVENSON:  Good morning.
 2              MR. JOSHI:  Your Honor, does Dr. Stevenson need to be
 3         sworn in or...
 4              JUDGE SCHROEDER:  He does, and I think if it's
 5         possible, he needs to silence his speaker or mute his
 6         microphone or something so that we're not getting a
 7         feedback that we're getting right now.
 8          (Off the record discussion for technical difficulties.)
 9              JUDGE SCHROEDER:  Okay.  Looks like we're good to go.
10              Mr. Joshi, you may proceed.  Actually, let's have the
11         witness sworn in.
12              If you would, please raise your right hand.
13              MS. SCHROEDER:  You do solemnly swear that the
14         testimony you're about to give in the case before the court
15         will be the truth, the whole truth and nothing but the
16         truth, so help you God.
17              THE WITNESS:  Yes, I do.
18                  ROBERT LOUIS STEVENSON, having been called upon
19         to testify in the form of a hearing and having been duly
20         sworn, testified as follows, to wit:
21                            DIRECT EXAMINATION
22    BY MR. JOSHI:
23  Q.  Good morning, Dr. Stevenson.
24  A.  Good morning.
25  Q.  Dr. Stevenson, have you --
```

```
 1              JUDGE SCHROEDER:  Mr. Joshi, you've going to have to
 2         be by a microphone.
 3              MR. JOSHI:  Sorry, Your Honor.
 4  Q.   (Mr. Joshi continued.)  Dr. Stevenson, have you submitted a
 5  Declaration on the issue of Section 101 and inoperability in this
 6  case?
 7  A.   Yes, I have.
 8  Q.   You have a copy of that Declaration with you?
 9  A.   Yes, I do.
10  Q.   And what is the date on that Declaration?
11  A.   July 19th, 2021.
12  Q.   Okay.  And between then and now, have you reviewed your
13  Declaration?
14  A.   Yes, I have.
15  Q.   Was it accurate when you submitted it on July 19, 2021?
16  A.   Yes, I believe it was.
17  Q.   Is it accurate now?
18  A.   Yes.
19  Q.   Okay.  So -- okay.  I'd like you to take a look at page 18 of
20  your Declaration.  Do you see a section D there titled Section 101
21  Invalidity - Inoperability and Lack of Utility?
22  A.   Yes, I do.
23  Q.   Okay.  And that section goes from paragraph 73 to paragraph 86.
24  Is that correct?
25  A.   That section seems to go to 91.
```

```
 1  Q.   Correct.  Section -- subsection goes to 91.  Are there two
 2  separate ideas in section D?
 3  A.   Yeah, there's two different kind of points I make there.
 4  Q.   And does one of them end at paragraph 86, and the second one
 5  begins at paragraph 87?
 6  A.   Yes.
 7  Q.   Okay.  So with respect to your first idea, which is covered in
 8  paragraph 73 to 86, would you tell the Court why you believe Claim 1
 9  is not useful?
10  A.   Just let me remember which order I put them in.  So the first
11  point, I guess I make, is the one about the -- the literal language
12  of the claim.  In particular, the -- how the output pixels are
13  formed in the output image, and the -- you know, the language I
14  think is fairly straightforward.  The claim, it just says the output
15  pixels are the ones that have been selected -- you know, kind of
16  following the steps above, the input pixels.
17       And as a result of that language, the output pixels are
18  basically set to -- identical to the input pixels, and so the net
19  result of everything is no processing.  You know, whatever other
20  steps you had done are kind of thrown away, and the output pixels
21  just are equal to the input pixels as if you did nothing.
22       So since the entire -- you know, since -- the claim -- there's
23  nothing at the end of the day, it doesn't seem like it's operable to
24  me.
25  Q.   Okay.  Can I ask you to take a look at the patent and turn to
```

1  Claim 1, which is in Column 27.

2  A.    Okay.  I'm there.

3  Q.    Are you there?  Okay.  So --

4  A.    Yeah.

5  Q.    -- I refer you to element -- I'm sorry.  I refer you to

6  Limitation C of Claim 1 where it says, "Input image pixels having

7  said selected individual color."  Do you see that?

8  A.    Yes.

9  Q.    Then we go to Limitation D, and the second line, it says,

10  "Input image pixels identified as having said selected individual

11  color."

12  A.    Correct.

13  Q.    Now, go towards the bottom of B.  It says, "Output image pixels

14  having said selected individual color."

15  A.    Yes.

16  Q.    And then if we go to -- finally to E, second -- second

17  sentence, "Output image pixels having said selected individual

18  color."  Do you see that?

19  A.    Yes.

20  Q.    So if I may summarize your position, are you saying that this

21  claim is not useful because the contents of the input image pixels

22  and output image pixels are the same?

23  A.    Correct.

24  Q.    Okay.  Did Dr. Ducharme -- well, let me take a step back.

25       Why do you believe that is not useful?

1  A.   Well, you know, there's no convention in having the output

2  equal to the input.  That's just, you know, a box that does nothing.

3  So, you know, it doesn't produce any result, it doesn't produce any

4  change.  I don't see how it's useful for anything.

5  Q.   Okay.  Do you have Dr. Ducharme's Declaration with you?

6  A.   Yes.

7  Q.   Okay.  Please take a look at paragraph 9 and 10, for example,

8  and tell me if Dr. Ducharme responded to your Declaration on that

9  topic.

10  A.   This seems -- no, those paragraphs seem to contain the response

11  he had for that particular point.

12  Q.   Which paragraph?  I'm sorry?

13  A.   9 and 10.

14  Q.   9 and 10.  Okay.  And what -- what does he say?

15  A.   The way I understood what he said was, essentially, that he

16  seems to get my point that the language is, you know, literally

17  wrong, but he seem to be saying that one skilled in the art would

18  understand that the output pixels would be -- you know, would be

19  formed based on, you know, the previous -- how they were determined

20  in the previous step.

21          JUDGE SCHROEDER:  Mr. Joshi, can I interrupt you, and

22          let me ask the witness.  Could I ask you to articulate or

23          enunciate a little more clearly and speak up?  I'm having a

24          little difficulty hearing you.

25          THE WITNESS:  Sure.  Let me try to move the

```
 1              microphone a little closer.  Maybe that help too.
 2                   JUDGE SCHROEDER:  Maybe we could the volume raised,
 3              too, in the courtroom.
 4   Q.   (Mr. Joshi continued.)  So, Dr. Stevenson, let me -- let me
 5   read you a sentence from Dr. Ducharme's Declaration of July 29,
 6   2021.  And I'm looking at the bottom of page 3 of 4.  I'm looking at
 7   paragraph 10, and he says, "Defendants misread the clause 'forming a
 8   corresponding plurality of output image pixels having said selected
 9   individual color with the hue or the saturation selected to be
10   independently changed' to suggest that the output image pixels have
11   the selected individual color.  Not so.  One of ordinary skill would
12   understand that output image pixels are formed from input image
13   pixels data for pixels of the selected individual color having the
14   hue or saturation to be changed."
15        On the next page, page 4, he says, "The complete language of
16   step (d) informs one of ordinary skill that the independent color
17   control function adjusts selected pixels using control delta values
18   to arrive at the values of the output image pixels."
19        So, Dr. Stevenson, does the plain language literally state that
20   output image pixels are formed from input image pixel data?
21   A.   There's this plain language earlier in the claim that is what
22   he's quoting from, that talks about, you know, kind of the -- the
23   step that you're going to form in this earlier language.  The
24   language at the end of the claim that's part (d) that talks about
25   what the output pixels actually are, however, doesn't use that
```

1  language of forming -- using the formed output pixels.  It talks

2  about using the actual input pixels that were selected.

3     So he seems to be pointing back to his earlier language and

4  saying -- the way I understand it, he's saying that that would

5  inform someone skilled in the art that, you know, the potential

6  change he might make to the language later in the claim about what

7  the output pixels actually are.  That's how I understood that

8  paragraph.

9  Q.   Is it your understanding that Dr. Ducharme is suggesting that

10 the plain language has to be -- would have to be modified to make it

11 right?

12 A.   Yeah.  I mean, he's essentially -- I believe he seems to be

13 saying that the language in (d) is just wrong, that -- and someone

14 skilled in the art would understand reading the other parts of the

15 claim that what they intended to say was something like the output

16 pixels were formed from the input pixels.

17             MR. LIDDLE:  Your Honor --

18 A.   But that's not what the language says of the data.

19             MR. LIDDLE:  -- that's not the testimony of Dr.

20             Ducharme.  That's not what the -- that's not what his

21             Declaration says at all.  The defendant misreads and

22             misinterprets step (d).  It does not say that -- that is

23             not what it says on the Declaration.

24             JUDGE SCHROEDER:  I'm going to sustain the objection

25             and give you an opportunity to rephrase your question.

1   Q.   (Mr. Joshi continued.)  And, Dr. Stevenson, having read Dr.

2   Ducharme's Declaration, what does he say about how one of ordinary

3   skill in the art would read Claim 1?

4   A.   The way I understood it was that his argument with me is that

5   you would read the claim as a whole, and there's this other language

6   outside of Step (e) which is the displaying step and talks about the

7   output pixels, that these are the language he quotes in his

8   beginning of paragraph 10 that says "forming a corresponding

9   plurality of output pixels."  And they would use that language to,

10  in some sense, inform the correction that, you know, I think is

11  needed in -- some correction that's needed in (e), which is -- which

12  talks about what's being displayed, the output pixels being

13  displayed, where that language clearly says that the output pixels

14  are the same as the selected input pixels.

15       So it seems to me he's using his prior language that's -- you

16  can find in the claim.  He quotes correctly the claim, but not step

17  (d), which I think is where the real problem is with the claim.

18  Q.   Doctor, in your expert opinion, would one of ordinary skill in

19  the art read this claim literally the way it is written, or would he

20  or she read it in a different way?

21  A.   Well, I think one skilled in the art would read the claim

22  literally, recognize that there's some sort of problem, but would be

23  unsure about how to fix that problem, you might say.

24  Q.   Could you explain what you mean by "would be unsure how to fix

25  that problem"?

A.   Well, I mean, because a lot of things you could do with the

output pixels in order to have kind of complete flexibility there in

terms of what you might want to do.

Now, you know, if you -- if you go back into the patent, they

talk about, you know, the -- using these -- changing the hue and

things like that, and so, you know, you would suspect that maybe

they meant something like that; right?  So, you know, it's

reasonable to think that they might have meant that.  But there's

other things you could do.

You could just be marking the pixels so that a further

processing step could make adjustments.  And maybe the claim's all

about just identifying the pixels and not necessarily making

adjustments at this point.  And so the output is really just marked

pixels.  You can do other things like, you know, make them more

transparent because of other special effects you might want to do,

which the patent talks about, in terms of using this technology for

special effects.

So while I think someone would recognize there's -- there was a

problem with the way (e) is written, it's not clear which one of

those sort of ideas, you know, one might incorporate into (e) to

kind of fix it up.

Q.   Let's go back to your report.  Could you tell the Court what is

the idea that is covered by paragraphs 87 through 91 of your

Declaration, dated July 19, 2021.

A.   This is where I go into my -- my second point, which is, you

 1   know, this is -- this is a problem that was a little bit created by

 2   the patent (e) in terms of, you know, not clearly talking about how

 3   you might separate pixels into individual colors.  You know, they

 4   give these inequalities, and they don't give any values that

 5   inequalities are some -- you know, some flexibility there.  But,

 6   clearly, for, you know, some fairly obvious values, the claim

 7   doesn't work because, you know, colors are, you know -- you know,

 8   when you talk about actual, you know, pixels they can be identified

 9   both as things like red and blue or red and green.  And so this last

10   phrase in the claim is -- you know, this -- those individual colors

11   aren't supposed to change.  If you change red, you know, green is

12   not supposed to change.

13       And so, you know, kind of created by the, you know, vagueness

14   of the inequalities that are used for selection, you know, the --

15   the claim's not going to be met because it's not going to -- you're

16   not going to achieve the result that's talked about at the end,

17   which is that you're not going -- you make adjustment to one color,

18   you're going to adjust the other colors.  And so that was kind of

19   the comment addressing those paragraphs.

20   Q.   Let me ask you to take a look at the patent.  Go to Claim 1.

21   Take a look at Limitation E.

22   A.   Okay.

23   Q.   Is there a Whereby clause in that claim?  Or -- yeah, Whereby.

24   A.   Yes.

25   Q.   Could you read that clause out loud?

1    A.    "Whereby the hue" -- "Whereby the hue or the saturation of said

2    selected individual color in the realtime digital video imaging" --

3    "video input image has been changed without affecting the hue or

4    saturation of any other individual color in the realtime digital

5    video input image."

6    Q.    And that second idea that we just discussed, which is paragraph

7    86 onward in the Declaration, does it relate to that clause?

8    A.    Yes.

9    Q.    Okay.  And do you have the Court's Claim Construction Order

10   handy?  I e-mailed it to you just before the hearing.

11   A.    Yes.

12   Q.    Okay.  Can you go --

13   A.    I have it.

14   Q.    -- to page 16 of 44 of that order?

15   A.    Okay.

16   Q.    Okay.  And towards -- towards the bottom there's a section (b)

17   Analysis, and in the first paragraph Court construes the term that

18   you just lead -- that you just read.

19        Could you read out the quote claim construction for that

20   phrase?

21   A.    The Court construed that phrase to mean "without affecting the

22   hue or saturation of any other individual color in remaining

23   plurality of input in its pixels."

24   Q.    Thank you.  Is your Declaration consistent with that

25   definition?

```
 1   A.   Yes.  Certainly.
 2   Q.   Okay.  Now, going back to your Declaration, in paragraph 87 --
 3   I apologize -- in paragraph 88, you make a reference to Exhibit C.
 4   A.   Yes.
 5   Q.   Would you please go to Exhibit C.
 6   A.   Okay.
 7   Q.   And then there are two slides there.  Do you see that?
 8   A.   Yes.
 9   Q.   Do you recall the origin of these slides?
10   A.   Yes, I do.  These were slides that Dr. Ducharme presented
11   during his direct testimony in the jury trial.
12   Q.   Okay.  By taking a look at the second of the two slides, which
13   has six colors, could you explain your opinion?
14   A.   Sure.  The idea -- you know, what is concerning and what I see
15   as a problem is, you know, this -- a selection of individual colors.
16   And if you do something like pick a red, and you go through the
17   steps, and the inequalities that either are, you know, identified in
18   the patent or, you know, Dr. Ducharme's identified a different set
19   of inequalities in his infringement analysis, but either set of
20   those inequalities result in some input pixels being classified as
21   both something like red and -- and green, or red and yellow.
22        And so the -- you know, there's this kind of overlap of the
23   individual colors based on the inequalities in the patent or the
24   inequality that Dr. Ducharme used in his infringement analysis.
25   Yet, when you get -- when you get to his Whereby clause, you have a
```

```
 1  problem.  And -- you know, because if I change red -- if I select it
 2  to change red, I shouldn't be changing yellow, but, in fact, I do.
 3  And so that's why --
 4              MR. LIDDLE:  Your Honor, that's a violation --
 5  A.   -- it's a problem in the patent.
 6              MR. LIDDLE:  -- of the Claim Construction Order.
 7              JUDGE SCHROEDER:  Hold on.  Let's let him finish his
 8       answer.
 9              MR. LIDDLE:  Okay.
10              JUDGE SCHROEDER:  Is the witness finished with his
11       answer?
12              THE WITNESS:  Yeah, I can be finished.
13              JUDGE SCHROEDER:  Okay.  What's the objection?
14              MR. LIDDLE:  The objection is this violates the Claim
15       Construction Order.  Dr. Stevenson's mixing concepts
16       between selecting an individual color and the
17       identification step of identifying the pixels which was
18       construed as plain and ordinary meaning.
19              JUDGE SCHROEDER:  Okay.
20              MR. JOSHI:  Your Honor, I can clear that up right now
21       with him.
22              JUDGE SCHROEDER:  You're welcome to do that, and,
23       obviously, you'll have an opportunity to cross-examine the
24       witness.
25              MR. LIDDLE:  Thank you, Your Honor.
```

```
 1              MR. JOSHI:  Thank you, Your Honor.
 2   Q.  (Mr. Joshi continued.)  So, Dr. Stevenson, can you go to page
 3   12 of the Claim Construction Order.
 4   A.   Okay.
 5   Q.   Okay.  There's a section there called Analysis.  Does the Court
 6   define the term "individual color"?
 7   A.   Yes.
 8   Q.   What is the Court's definition of an individual color?
 9   A.   "Linear combination of colors or color components."
10   Q.   Okay.  So looking at this chart, I'd like you to focus on the
11   color yellow.
12   A.   Okay.
13   Q.   Is yellow an individual color under the Court's definition of
14   individual color?
15   A.   Yes.
16   Q.   Is magenta an individual color under the Court's definition of
17   individual color?
18   A.   Yes.
19   Q.   Is red, the very first color -- color shown, left-most column,
20   is that an individual color under the Court's construction of
21   individual color?
22   A.   Yes.
23   Q.   Okay.  Now, I'd like you to take a look at page 13 of the Claim
24   Construction Order.  The second line there begins with, "For
25   example."  Could you read that allowed?
```

1    A.    "For example, the RGB space, red is both an individual color,

2    see id. at Column 10, line 20 through 34," in quotes, Red, R, as the

3    individual color.  "And the color component, id. at Column 1, lines

4    22 to 23," in quotes, in the RGB color space, the basic colors or

5    color components are red."

6    Q.    So the Court here said that red is both an individual color and

7    a color component; correct?

8    A.    Yes.

9    Q.    Okay.  Let's go back to the slide, the yellow slide.

10        What are the various color components in that slide?  I

11   apologize.  Let me start the question again.

12        Let's go back to Exhibit C, to your Declaration, and I want you

13   to take a look at the six colors.  One of them is yellow.  And tell

14   me, what are the components of yellow?

15   A.    Well, in this system, and what's to be discussed with this

16   slide that color components are red, green, and blue.

17   Q.    And are those color components, red, green, and blue, also

18   individual colors?

19   A.    Yes, they can be, as shown on this slide.

20   Q.    Okay.  And what is your recollection of Dr. Ducharme's

21   testimony as to what happened when he changed the color red all the

22   way to the left?  Which one -- which others changed, and which

23   others did not change?

24   A.    Well, I think it would depend -- I don't remember his testimony

25   exactly, but it would certainly depend on which monitor we're

1   talking about.

2   Q.   Okay.  Do you recollect him saying that for certain monitors,

3   yellow changed when red would change?

4   A.   Yes.  That would be true of all the three axis monitors.

5   Q.   Okay.  And that magenta changed when red was changed?

6   A.   Yes, with the same caveat.

7   Q.   Okay.  And I believe you just answered a minute ago that each

8   one of those yellow and magenta colors contain individual colors:

9   red, green, and blue.  Is that your testimony?

10  A.   They have those color components which are also individual

11  colors, yes.

12  Q.   Okay.  Now, there was an objection made a few minutes ago

13  relating to selecting where it says identifying step.

14       Could you go to page -- pages 13 and 14 of the Markman Order?

15  A.   Okay.

16  Q.   Or, actually, I'll let -- I'll let Mr. Liddle ask you that on

17  cross, if he wishes to.  I don't want to take up time.

18       But there was a criticism in the opposition brief that your

19  Declaration does not address all the embodiments in the patent.

20       How would you respond to that?

21  A.   I'm not sure how that's not true.  I mean, that there's only

22  really the -- the -- the embodiments it discussed is this -- these

23  six cases and this set of inequalities and how you go about

24  selecting and identifying the various colors.  I feel like I

25  addressed it.

```
 1              MR. JOSHI:  Okay.  All right.  That's all I have,
 2         Your Honor.  Thank you, Dr. Stevenson.  I'll pass the
 3         witness.
 4              JUDGE SCHROEDER:  Cross-examination.
 5                      CROSS-EXAMINATION
 6      BY MR. LIDDLE:
 7  Q.   Good morning, Dr. Stevenson.  Can you hear me okay?
 8  A.   Yes, I can hear you fine.  Thanks.
 9  Q.   So I want to start with the first concept of your Declaration,
10  which is, I think, from my understanding, the lack of utility.
11       And so if you could turn -- if you could turn to page 18 of
12  your Declaration, I think we should start there.  I'm sorry, page 19
13  of your Declaration, paragraph 75.
14  A.   Okay.
15  Q.   In paragraph 75 you make the statement in this method as
16  recited in Claim 1, "the output is the same as the input."  Do you
17  see that?
18  A.   Yes.
19  Q.   Now, when we talk about the input, do you -- do you know what
20  the claim construction of input image pixels is?
21  A.   I don't remember specifically.  I remember it being pretty much
22  consistent with my understanding.
23  Q.   Can you turn to page 10 of your Declaration, please.
24  A.   Okay.
25  Q.   And can you read the Court's construction of "input image
```

 1  pixels," please.

 2  A.   Court construed that to mean, input data that includes color or

 3  color component values that can be plotted in an input grid on a

 4  display device.

 5  Q.   Okay.  So it says the word "input data."  Do you see that?

 6  A.   Yes.

 7  Q.   Okay.  Can you turn to the '435 Patent, Column 9, line 42,

 8  please.

 9  A.   Okay.  I'm there.

10  Q.   Okay.  So do you see a sort of variable representation on line

11  42 of what an input image pixel denoted as capital letter I is?

12  A.   Yes.

13  Q.   Okay.  So that would be -- that would be where you would plug

14  in the RGB input pixel values, and I think I and J represent sort of

15  the grid that those input image pixels would be represented on a

16  screen.  Is that your understanding?

17  A.   That's basically right, yeah.

18  Q.   Okay.  So then can you now turn to -- can you now turn --

19  continuing with the '435 Specification, can you turn to Column 11,

20  please.

21  A.   Okay.

22  Q.   Okay.  So Column 11 is where on line 14, that's where the

23  determining step, which is claim 1(d), that's where that discussion

24  begins on the specification.  Is that right?  Would you agree with

25  that?

1  A.   That's in at least part of where it's discussed.

2  Q.   Okay.  And so -- so you would agree that starting at Column 11,

3  line 14, it talks about step (d), the determining step; correct?

4  A.   Yeah, it's certainly talking about that step there.

5  Q.   Okay.

6           MR. JOSHI:  Objection, Your Honor.  Is he talking

7       about the step of the Claim or the step in the

8       Specification?

9           JUDGE SCHROEDER:  You want to clarify your question?

10          MR. LIDDLE:  Sure.

11 Q.   (Mr. Liddle continued.)  So in Column 11 it has a discussion

12 about step (d), which is the determining step, which would also

13 correspond to claim 1, step (d), which, if you look on Column 27,

14 states determining corresponding output image pixels.

15          MR. JOSHI:  Still object, Your Honor.  I don't know

16      what he means by the step corresponds to the claim.

17          JUDGE SCHROEDER:  Can you rephrase?

18 Q.   (Mr. Liddle continued.)  Dr. Stevenson, can you read line 14 of

19 Column 11, please.  14 and 15:

20 A.   "In step (d) there is a determining corresponding output image

21 pixel values for each of the plurality input" -- "of input image."

22 Q.   Right.  And so -- and so line 16 continues with pixels

23 identified as having the individual color, and it goes on.

24      Now, does that -- does that language, "determining

25 corresponding output image pixel values," does that match in Column

1  27 the first part of 1(d)?

2  A.    Maybe I could -- I haven't done a word-by-word, you know,

3  comparison of the two, and I'm not sure it's worth doing.  I

4  certainly would say that when I look at Claim 1, step (d), and look

5  for parts of the specification that discuss the teachings of, you

6  know, how one would understand, you know, that element, certainly

7  this column we're looking at, this section Column 11 starting at

8  line 14 is part of the -- part of the specification I would look at,

9  if that helps you.

10 Q.    Okay.  So when we talk about the discussion of step (d) in the

11 patent specification, where in your report did you analyze the

12 various equations and color control functions that convert the input

13 image pixels to the output image pixels?

14 A.    You're talking about the Declaration in -- we're talking about;

15 right?

16 Q.    Yes.  Your Declaration.  Are -- are these color control

17 functions -- are they -- are they in your Declaration that you

18 submitted in response to this motion?

19 A.    I'm not sure what color control functions you're talking about

20 from the spec.

21 Q.    Okay.  Let's look at it.

22 A.    I mean, you're referring to a paragraph with no equations.

23 Q.    Okay.  So let's look at Column 13 of the '435 Specification.

24 A.    Okay.

25 Q.    So in Column 13, do you see where it says -- well, starting

```
 1   with line 6, do you see a series -- line 6 through 22, do you see a
 2   series of color control functions listed in the patent
 3   specification?
 4   A.   I see part of the spec which teaches, you know, an idea of the
 5   color control functions.
 6   Q.   Well, Dr. Stevenson, it's not an idea.  Do you see the actual
 7   functions, line 6 through 22?
 8   A.   Well, it's -- I don't think the claims are limited to that
 9   function.  I mean, I think that -- you know, it's -- and it's
10   certainly not -- that wasn't listed out in the product, so, you
11   know, these were just one idea of how you might implement the color
12   control functions.
13                  MR. LIDDLE:  Objection.  Nonresponsive, Your Honor.
14                  JUDGE SCHROEDER:  I'll sustain that.  You can move
15         on.
16   Q.   (Mr. Liddle continued.)  Okay.  So on Column 13, lines 6
17   through 22, there's a set of functions.
18        Are those listed anywhere in your Declaration?
19   A.   No.  I would see no point to putting that sort of equations in
20   my Declaration, so, no.
21                  MR. LIDDLE:  Your Honor, I can't hear what --
22                  JUDGE SCHROEDER:  I can't -- I'm sorry, could I ask
23         the witness again to enunciate your answers a little more
24         clearly?  We're -- I'm having considerable trouble
25         understanding what you're saying.
```

```
 1              THE WITNESS:  Okay.  Sorry.  I'll try to be clear.
 2   A.   Without looking at this -- my Declaration, I don't believe so,
 3   because I don't think there would be much point to copying those
 4   equations into my Declaration.
 5   Q.   (Mr. Liddle continued.)  Okay.  So -- so I guess I'm not
 6   talking about copying.  So when you were -- when you -- when you
 7   submitted your Declaration, and you were looking at whether the
 8   input image pixels changed or there -- they were formed into output
 9   image pixels, there's no -- would you agree that there's no
10   discussion in your Declaration of these color control functions that
11   are listed in the Specification?
12   A.   Without reading my Declaration, I don't believe so, because I'm
13   not sure why I would include those equations in that discussion.
14   Q.   Dr. Stevenson, do you understand that in columns 13, 14, 15,
15   and 16, 17, 18, and 19 suggest -- have a set of color control
16   functions for changing the hue of an individual color?
17   A.   I understand that that is where the patentee teaches this idea
18   of the color control functions and gives an example of color control
19   functions that is their preferred embodiment.
20   Q.   Okay.  So would it be reasonable to -- if you had values for
21   the input image pixels, to plug in those values if you knew what the
22   -- the delta hue or delta saturation, to plug in those values to the
23   color control functions in order to determine what the output image
24   pixels are?
25   A.   Well, I certainly think that is an idea that the patentee is
```

1   teaching throughout the patent.  And I was focused on the claim

2   language in my Declaration.

3   Q.   Okay.  So would it be fair to say you didn't focus on any of

4   the discussion and specification, just the claim language in your

5   Declaration?

6           MR. JOSHI:  I object, Your Honor.

7   A.   No, I don't think that's fair.

8           JUDGE SCHROEDER:  Hold on just a moment.  What's the

9         objection?

10          MR. JOSHI:  The objection is that the Court hasn't

11         found this to be a mutual function claim, so this -- this

12         thing about incorporating respecting to the claims, I don't

13         know where this questioning is going.

14         JUDGE SCHROEDER:  Well, I'm going to -- it's

15         cross-examination.  I'll overrule the objection.  You can

16         ask him about it in redirect.

17   Q.   (Mr. Liddle continued.)  Okay.  Dr. Stevenson, if you looked at

18   one of these color control functions, and you put in some assumed

19   valuables for these variables, would you come up with different

20   values for the output image pixels?

21   A.   If I -- if I add numbers, you know, that -- to some of these

22   equations, I could put -- I could put colors in, and I would get

23   colors out.  That would potentially be different, depending on what

24   values I used.

25   Q.   Right.  And so let's look at paragraph 75 going back to your

1   Declaration.

2   A.   Okay.

3   Q.   So I'm reading the last part of paragraph 75.  It says, "In

4   this method as recited in claim 1, the output is the same as the

5   input."  Do you see that?

6   A.   Yes.

7   Q.   Okay.  So if we use the color control functions that are in

8   claim element 1(d) that we just went through, didn't you just say

9   that there would be a change in -- in -- from the output -- from the

10  input to the output?

11            MR. JOSHI:  Mischaracterizes.  Objection.  You're

12       talking about the spec, now he's talking about the claim.

13            JUDGE SCHROEDER:  You want to clarify your question?

14            MR. LIDDLE:  Sure.

15  Q.   (Mr. Liddle continued.)  Dr. Stevenson, the color control

16  functions that we just went through, and some of it we just went

17  through in the specification, are those the same color control

18  functions that are recited in step 1(d) of the claim?

19  A.   No.  It's certainly not limited to those.

20  Q.   Okay.  Not limited, but could they -- could they include those?

21  Is there anything that would prevent somebody -- a person having

22  ordinary skill in the art from using those color control functions

23  to change the input image pixels to the output image pixels?

24  A.   It would be an example of potential color control functions

25  that would meet the limitations in claim element (d).

1    Q.    Okay.  Now, that's -- that's the hue side of it.  So column --
2    starting on Column 13 is where we have Column 13 through -- sort of
3    the end of 19.
4         Is it -- is it your understanding that's where we have the hue
5    color control functions?
6    A.    That looks right.  Yeah.
7    Q.    Okay.  So then is it also your understanding at the bottom of
8    Column 19 of the Specification through the bottom of Column 25 is
9    where we have the saturation control functions, color control
10   functions?
11   A.    That's approximately right.  Yeah.
12   Q.    Okay.  And so in Column 21, can you please turn to line 19?
13   A.    Okay.
14   Q.    Would you mind, for me, reading column -- or line 19 through --
15   well, let me -- let me rephrase.
16        In Column 19 do you see where it says, "In Case 1"?
17   A.    Yes.
18   Q.    Column 21, line 19.  I apologize.  Would -- do you understand
19   that to be one particular embodiment of the saturation color control
20   functions?
21   A.    The -- I don't think the -- as I recall, the way this language
22   of case 1 and case 2 is used, it's all those -- couple of cases they
23   go through are all the same embodiment, they're just talking about
24   different cases of the type of colors you're going to adjust and
25   what things you're going to adjust.  So I think case 1 is --

1    therefore, I think you're adjusting the red saturation.

2         So if you chose to adjust the red saturation, they're not

3    different embodiments, they're just different situations you're

4    going to come up with in the embodiment they're teaching about.

5    Q.   Okay.  So -- so would you agree that there is no discussion,

6    for example, case 1, changing the saturation of red color control

7    function in your Declaration?

8    A.   Without rereading it, I don't recall, but I wouldn't think so

9    because that's not the issue I'm addressing.

10   Q.   Okay.  And then going to Column 21, line 61, where it talks

11   about case 2, and I think this is changing green saturation from the

12   input image pixel to the output image pixel, would you agree that

13   there's no discussion of this in your Declaration?

14   A.   Same sort of answer.  Without rereading it, I don't know, but

15   since I'm not addressing this particular function, I don't think I

16   would.

17   Q.   Okay.  Same question to -- on Column 22, line 36 in case 3.

18   Would you agree that that is also not in your Declaration?

19   A.   Same sort of answer.

20   Q.   Okay.  Can I have you read the last sentence of paragraph 76 of

21   your Declaration?

22   A.   "One would expect that if the desired result is controlling hue

23   or saturation, then actual control or changes of such" -- "of such

24   hue or saturation would occur."

25   Q.   Okay.  And so as we stated earlier with the hue color control

1   functions, if you had a set of values for these variables, and you

2   put them in, for example, to case 1, which is on -- which is in

3   Column 21 of the saturation, would you expect a change in -- in the

4   values?

5   A.   Maybe this could help clarify it.  In the way -- I do believe

6   the patent talks about ways of adjusting hue and saturation.  The

7   problem is not that teaching the patent doesn't do anything like

8   that.  The problem is that the claim -- the way the claim is written

9   doesn't -- doesn't really utilize some of those teachings the way

10  the patentee may have intended to.

11      So I agree that the -- the patent specification talks about

12  ways of changing hue and saturation.  The problem is the claim --

13  the output doesn't do that.

14  Q.   I'm sorry, did you say the output doesn't do that?  Is that

15  what -- I couldn't hear that.

16  A.   The output doesn't have change hue or -- the output doesn't

17  have changed hue or saturation, and that's why I came to the opinion

18  that it was -- it lacked utility.

19  Q.   Okay.  But where -- so when -- under 1(d) when the patentee

20  describes independent color hue control functions or independent

21  color saturation control functions, where -- where would a person

22  having ordinary skill in the art turn to, to understand what those

23  color control functions are?

24  A.   They could turn to the patent and get an understanding from the

25  patent.  You know, basically would be the sections we went through,

```
 1    and gain some understanding of what those functions could be.
 2    Q.   Okay.  All right.  Now I want to turn to sort of the second
 3    concept in your Declaration and part of this motion which is a
 4    discussion of individual color.  And I think that starts on page
 5    78 -- I'm sorry, paragraph 87 in your Declaration.  Can you turn to
 6    that, please.
 7    A.   Okay.
 8    Q.   Okay.  Actually, can you please -- can you please go to
 9    paragraph 88, and can you read --
10    A.   Okay.
11    Q.   -- paragraph 88?  Sorry.  Can you read the fourth sentence in
12    paragraph 88.
13    A.   The one that begins with Attached?
14    Q.   Begins with Dr. Ducharme.
15    A.   Okay.  "Dr. Ducharme testified that if a color contains Red in
16    a non-zero quantity then that color is Red."
17    Q.   Okay.  So what is the basis of making that statement?  Where do
18    you find that in the testimony?
19    A.   It's what I recall him saying, and I'd probably have to go back
20    and look for an exact cite.  I mean, that's -- that was the
21    infringement analysis.  That's what happens in those products in
22    terms of what gets adjusted.
23    Q.   So there's no citation there --
24    A.   He said met the limitation.  And what he said met the
25    limitations of the claim.
```

1   Q.   So there's no citation in paragraph 88 on the fourth sentence
2   where you state what Dr. Ducharme testified to.  Is that correct?
3   A.   I don't see where I cite something there.  I mean, I say
4   something a sentence or two beforehand.  I'd have to look at that to
5   see exactly what that says.
6   Q.   Okay.  So was it your recollection that when Dr. Ducharme was
7   testifying about these various colors that we find in paragraph 90
8   of your Declaration, he was actually talking about the
9   identification step and not the selecting an individual color?  Is
10  that your understanding?
11  A.   In terms of what he's -- what we're talking about in this
12  paragraph, the -- it would be about the -- what colors are
13  identified -- you know, what pixel values that are identified as
14  red, what pixels are identified as being red.  So it would be the
15  selecting, the selecting of all the individual -- of all the pixels
16  that -- that are red.
17  Q.   Okay.  And in -- so going back to the patent specification,
18  there are several inequalities as embodiments in the patent
19  specification.
20      Are any of those inequalities in your Declaration to identify
21  input image pixels?
22  A.   I didn't write out any of those equations as I recall.  I talk
23  about them, you know, more generally.
24  Q.   Okay.  Do you understand that the identification of input in
25  this pixel was construed as plain and ordinary meaning?

```
 1  A.   I believe that's correct.  I don't remember any particular --
 2  yeah, I'm going to say construction, so I believe that's correct.
 3  Q.   Well, I didn't hear your answer.  I'm sorry.  What was -- what
 4  was the answer?
 5  A.   Sorry.  I believe that's correct.
 6  Q.   Okay.  Well, I mean, you can turn to page -- well, it's
 7  paragraph 38 of your Declaration.
 8  A.   Okay.  Yeah, that's right.
 9  Q.   Okay.  Let's go to -- let's go to that paragraph 75 -- or, I'm
10  sorry, paragraph 90 of your Declaration.  Are you there?
11  A.   Yeah.
12  Q.   Okay.  So paragraph 90 started with, "If Lone Star tries to
13  argue that a changed to hue saturation of individual color 100 Red,
14  0 Green, 0 Blue, would not affect the hue/saturation of the
15  individual color Green, which is 0, 100, and 0, or Blue, 0, 0, 100,
16  then Lone Star would be wrong."
17       Dr. Stevenson, were you in the courtroom when Dr. Ducharme
18  performed his demonstrations at trial?
19  A.   Yes.  Yes.
20  Q.   Okay.  And I think -- I think you saw the same thing that I did
21  is that when Dr. Ducharme adjusted under this exact scenario the
22  value of red, green and blue did not change.  Is that your
23  understanding?
24  A.   Well, I found Dr. Ducharme's demonstrations misleading because
25  he didn't show all the colors that he had -- that he had identified
```

1    as blue.

2    Q.   Well, Dr. Stevenson, we had -- we had specific color values,

3    and I think this is in Exhibit C of your Declaration, where you had

4    -- it's the first exhibit with R value 100, green value 100, and

5    blue value 100.  So you had -- so you had three colors R, G & B.

6        Did those two values of green and blue change when Dr. Ducharme

7    affected the saturation of red?

8    A.   The problem I had with that demonstration was that there are in

9    these devices 16 million colors.  He shows three.  The -- his

10   selection of individual -- of pixels, based on his inequalities,

11   selected the majority of those 16 million colors, selected output

12   over -- probably over 16 million, but certainly over 15 million

13   colors.  But it showed one -- one blue.

14       And so he didn't show that blue didn't change, he showed that

15   that individual -- one individual color did not change, not the ones

16   that were selected for change and had not changed.

17   Q.   Okay.  Can you go to paragraph 42 of your Declaration.

18   A.   Okay.

19   Q.   And can you read the Court's construction of "without affecting

20   the hue or saturation of any other individual color"?

21   A.   The Court construed that to mean "without affecting the hue or

22   saturation of any individual color in the remain plurality of input

23   pixels."

24   Q.   Okay.  Let's continue with paragraph 90.  So the second

25   sentence says, "The reason being that under the Court's definition

1    of individual color, according to Dr. Ducharme, 0, 100, 0 Green is

2    the same individual color as 100, 100, 0, namely Green, also Red or

3    Yellow."

4         So, again, where -- where is this testimony from Dr. Ducharme?

5    A.   Well, I think -- I don't think I'm -- I'm quoting him there in

6    that sentence.  I'm taking -- you know, having understood his def --

7    you know, how he defined how pixels were selected to be red, green,

8    blue, yellow, I'm pointing out that basically the colors overlapped.

9    There are pixels that would be identified as both red and green, and

10   that's where the problem comes up.

11   Q.   Okay.  So just as a hypothetical, if we were to select under

12   your -- under you statement here, paragraph 90, if we were to select

13   -- if we were selecting red as a saturation of an individual color

14   and changing the saturation of red, could we design and come up with

15   a series of logical -- mathematical and logical operations so that

16   0, 100, 0 and 100, 100, 0, where the 100, 100, 0 would change, but

17   not the 0, 100, 0?

18   A.   Maybe.  I -- you know, I -- I'm not sure -- I don't believe the

19   patent teaches that or, you know, Dr. Ducharme's definition doesn't

20   do that.

21   Q.   Well, let me ask you this.  If we --

22   A.   I don't think.

23   Q.   Go ahead.

24   A.   I was done.

25   Q.   Okay.  So let me ask you this.  If we said that -- if we put in

1    an equal sign instead of an inequality, whereby if -- if the input

2    image pixel contained the same amount of red as it does -- as it

3    does green into the design of our -- of our product, would that be

4    allowed under the Court's Claim Construction Order?

5    A.   Well, I feel like we're a little bit going backwards in time.

6    I mean, that's part of the reason why I supported that equality you

7    might say, in -- during claim construction.  Because that makes

8    technical sense, and is the claim -- is, you know, potentially valid

9    there, and there's other issues, but, you know, this issue goes

10   away.

11        Once you say there's, you know, inequalities and you're

12   selecting and selecting is of more than just one linear combination,

13   that's where you potentially get into problem.  The patent doesn't

14   teach you how to resolve that problem, and both the patent and Dr.

15   Ducharme's examples have this problem with overlapping pixels.

16        So if you want to go back and say our claim construction was

17   right, I guess I would agree with you.

18   Q.   Okay.  So can you turn to -- let's go back to the patent

19   specification.  Can you go to Column 9 of the specification.

20   A.   Okay.

21   Q.   Okay.  Do you understand that at about Column 34 is when we

22   start talking about step (c), which is the identification step?

23   A.   I assume you mean -- I assume you meant line 34?

24   Q.   Yes.  Line 34.  I'm sorry.  Column 9, line 34.

25   A.   You said column.

1    Q.    Sorry.

2    A.    Yeah.  Yes, so this is part of the spec that, you know, one

3    would go to, to understand step (c) of the claim 1 a little better.

4    Q.    Okay.  Can you now go to the same column, Column 9, starting at

5    line 45.  Can you read where it says, "By performing arithmetic and

6    logical operations," down to line 49.

7    A.    "By performing arithmetic and logical operations selected from

8    the group consisting of addition, subtraction, multiplication,

9    division, equal to, greater than, less than, absolute value of in

10   combinations thereof, is an input image of pixel values R,G,B."

11   Q.    Thank you.  And so is it fair to say that a person having

12   ordinary skill in the art could come up with some equations there to

13   identify input image pixels using an equal sign?

14   A.    Well, you know, there might be.  I -- it would take some time.

15   You know, I think it would just, you know, open you up to different

16   problems, you know, different ways of staging a similar problem,

17   which is, you know, now someone's spending a lot of time figuring

18   out what the patent doesn't teach you.  They don't teach you these

19   inequalities, they don't teach you these equations that would work.

20   And, you know, the patent's misleading in some ways, maybe, if you

21   go there.

22   Q.    So can you go to Column 10, line 25.

23   A.    Okay.

24   Q.    Where it says, "In case 1."  Do you see that?

25   A.    Yes.  Uh-huh.

1  Q.    So this is one embodiment of identifying a set of input image

2  pixels.  Do you agree with that?

3  A.    Again, I don't think that's the way they use the cases in this

4  patent.  There's a couple of cases described, and they're just

5  talking in terms of different situations of a single embodiment, so

6  there's embodiment and there's different situations, whether -- I

7  forget if these are about different values, and they fall into one

8  of these cases or that might fall into more than one of these cases.

9  But each of these cases is not a single embodiment, no.

10  Q.    Okay.  But you would agree that this is -- this gives you a --

11  an example of an inequality to identify, for example, in case 1, you

12  know, the red -- independent red so you can control the delta value

13  where you identify input image pixels having the color red.  You

14  would agree with that?

15  A.    The cases taken together give you, you know, a set of

16  inequalities that would allow you to identify colors.

17  Q.    Okay.  But going back to -- going back to the paragraph we read

18  earlier, which talks about selecting from the group, and Column 946,

19  I mean, this -- this allows the person having ordinary skill in the

20  art, it would teach them that they could modify this inequality, for

21  example, to use different logical operators or mathematical

22  functions.  Do you agree with that?

23  A.    Well, the equations, as they're written, don't work.  You

24  know --

25  Q.    That wasn't my question, Doctor.

Case 6:19-cv-00059-RWS   Document 259   Filed 09/14/21   Page 41 of 107 PageID #:  4724

41

```
1   A.   -- it's pretty easy to show examples.  I understand.  I don't
2   see the equations working.  They -- they teach an idea that you
3   could use inequalities to do this identification step.  These
4   equations would not be -- can't we used.  Whether someone could come
5   up with a different set of equations, it would take some time, but
6   maybe.
7                    MR. LIDDLE:  Okay.  I have no further questions.
8                    JUDGE SCHROEDER:  Redirect?
9                    MR. JOSHI:  Yes, Your Honor.
10                        REDIRECT EXAMINATION
11      BY MR. JOSHI:
12   Q.   Dr. Stevenson, this is Vijay Joshi again.  Please go to Exhibit
13   D of your Declaration.
14   A.   Okay.
15   Q.   Okay.  You were asked -- Mr. Liddle asked you a number of
16   questions about what did -- when did Dr. Ducharme say this, and
17   where are your citations.
18       Do you recall attaching this trial transcript portion to your
19   Declaration?
20   A.   Yes.
21   Q.   So, for example -- let's see.  All right.  So go to the top of
22   page that has 492 number on it.
23   A.   Okay.
24   Q.   And, Question -- and this is Mr. Saba questioning Dr. Ducharme.
25   "I changed red, blue" -- I'll start again.
```

Donald Court Reporting & Transcription, LLC
1-888-438-7836 - donaldcrt@gmail.com

1      Question, "I changed red hue or saturation, which colors will
2   change?"
3      Answer, "The red color on the left, denoted red 100, green --
4   I'm sorry, green 0, blue 0, and then I'm going to look down, any one
5   of those that contain red is going to change.
6      "So on the far right, with magenta and yellow, red is 100 --
7   I'm speaking about magenta.  Red is 100, green is 0, blue is 0.
8   That will change.  And then yellow, red is 100, green is 100, and
9   blue is 100.  It's on the right.  That will change as well.
10      "So the colors that will change are red?"
11      Answer, "Yes."
12      Question, "Purple?"
13      "Yes."
14      Question, "And yellow?"
15      Answer, "Yes."
16      Did you rely on that testimony of Dr. Ducharme when you
17   prepared your Declaration?
18   A.   Yes.  That's certainly part of the testimony that, you know --
19   where I gained understanding about how his -- his infringement
20   analysis and how he was defining these inequalities.
21   Q.   Okay.  Let's go to paragraph 10 of the patent.
22   A.   I'm sorry, paragraph 10 of the patent?
23   Q.   Paragraph 10 of the '435 Patent, which is DX1.
24   A.   What do you mean by paragraph 10?
25   Q.   Well, you know, I'm -- my apologies.  I meant to say Column 10.

```
 1   A.   Oh.  Okay.

 2   Q.   And, Mr. Liddle just asked you questions about these

 3   inequalities that are shown, for example, on line 32 of Column 10.

 4   A.   Yes.

 5   Q.   Okay.  Now, let's just take a look at that one where it says R.

 6   Does R stand for red?

 7   A.   Yes.

 8   Q.   Then it says -- there's a greater than sign, and then it says

 9   ARG.  What is ARG?

10   A.   Probably stands for something like arbitrary -- I think it's

11   just supposed to indicate an arbitrary value.

12   Q.   It says a positive constant.  Do you --

13   A.   That's for a positive value.

14   Q.   Okay.  But does it -- does the patent say what that value

15   should be or what range of values are acceptable for ARG?

16   A.   No.  Just that it should be positive, so anything from zero on

17   up.  Or I guess one on up.

18   Q.   Okay.  And then there's another constant there, ARB.  Do you

19   see that?

20   A.   Yes.

21   Q.   Okay.  And does the -- the teaching of the patent mention what

22   numbers would be acceptable for ARB?

23   A.   Only that it's positive constant again.

24   Q.   Okay.  And then if we keep going down -- so, for example, if I

25   were to go down to line 59 at the end of the equation, there's a
```

1    notion of T, as in Tom, Y.  Y is in the subscript.  Do you see that?

2    A.    Yes.

3    Q.    Okay.  Do you know what TY is?

4    A.    It's -- again, it's another constant that has provided an

5    equation.

6    Q.    Okay.  And does the specification say what would be acceptable

7    numbers for TY?

8    A.    Just for the positive constant.

9    Q.    Okay.  And there are a lot of positive numbers; right?

10   A.    An infinite number, in fact.

11   Q.    Okay.  So -- now, let me ask you one question here.

12        I would like you to take a look in Column 10.  I would like you

13   to take a look at case 1, and I'd like you to compare that with case

14   4.  Okay?

15   A.    Okay.

16   Q.    Now, do you see one condition in case 1 is that RN is greater

17   than ARB/BN; correct?

18   A.    Yes.

19   Q.    And if I go to case 4 -- and B stands for blue; correct?

20   A.    Correct.

21   Q.    And if I go to case 4, you have a condition there where RN is

22   greater than some constant, again plus blue; correct?

23   A.    Yes.

24   Q.    So case 1 and case 4 are overlapping; correct?

25   A.    Well, those two equations could be identical in those two

1    cases, certainly.

2    Q.   And case 1 is for red, and case 4 is for yellow.  Is that

3    correct?

4    A.   Correct.

5    Q.   Okay.  Now, go back to claim 1.

6         Dr. Stevenson, do you know what a means plus function claim is?

7    A.   Yes.  I've seen that before.

8    Q.   Okay.  And based on the claim language and the Court's claim

9    construction -- strike that.

10        Does the claim use the word "means" anywhere?

11              MR. LIDDLE:  Objection.  Relevance.

12              MR. JOSHI:  The relevance is there was a lot of

13         discussion about bringing in these control functions from

14         various columns into the claim, and I'm trying to establish

15         that there's no reason to do that.

16              JUDGE SCHROEDER:  I'll allow it.

17              MR. JOSHI:  Okay.

18   Q.   (Mr. Joshi continued.)  Go ahead, Doctor.

19   A.   I think it's your turn to ask the question.

20   Q.   No, the judge already ruled.  You can answer.

21   A.   I said "no" means it's not found there, no.

22   Q.   Okay.  And then in step (d), Mr. Liddle asked you some

23   questions about the mention of the term "control function."

24        Do you see that in element D?

25   A.   Yes.

```
 1  Q.   Okay.  And does the claim itself provide any detail on what
 2  that control function is?
 3  A.   I mean, there's some language in the -- in -- in that element
 4  that talk about, you know, the control function.  But it's -- it's
 5  pretty broad, the way it's written.
 6  Q.   Having -- having had your question and answer session with Mr.
 7  Liddle, do you still believe that contents of the output pixels are
 8  the same as the contents of the input pixels in claim 1?
 9  A.   Yeah.  I mean, in my analysis really focuses on claim B which
10  talks about what the output pixels are that are going to the
11  display, not so much what he talked about in claim element D.
12  Q.   Okay.  You stand by your opinion after your questioning by Mr.
13  Liddle that claim 1 does not have utility?
14  A.   I do.
15                MR. JOSHI:  Thank you.  Thank you, Your Honor.
16                JUDGE SCHROEDER:  Okay.  Brief recross?
17                MR. LIDDLE:  No, Your Honor.  No re-redirect.
18                JUDGE SCHROEDER:  Okay.  Is there -- do you want to
19          hear from your second witness at this time?
20                MR. JOSHI:  Dr. Ducharme is their witness.
21                MR. LIDDLE:  Your Honor, we -- we're going to decline
22          to call Dr. Ducharme at this time.  I don't think we need
23          his testimony.
24                JUDGE SCHROEDER:  That's fine.  All right.  Okay.
25                MR. JOSHI:  Well, then -- then his Declaration should
```

```
1          be -- oh, but I can cross him?  Then his Declaration is
2          stricken, or I get to cross him?  That's what I --
3               MR. LIDDLE:  We're going to stand on our briefing and
4          our Declaration.
5               JUDGE SCHROEDER:  Okay.  That's fine.
6               MR. JOSHI:  So, Your Honor, do I actually get to
7          cross Dr. Ducharme?
8               JUDGE SCHROEDER:  No.
9               MR. JOSHI:  Okay.
10              JUDGE SCHROEDER:  Well, tell me -- I mean, you can
11         argue for why you think you should be able to, but --
12              MR. JOSHI:  Because we -- are you -- maybe I didn't
13         hear properly.
14              Are they withdrawing his Declaration as well?
15              JUDGE SCHROEDER:  I don't think they are.
16              MR. LIDDLE:  We are not withdrawing his Declaration.
17         We're just going to stand on our briefing and his
18         Declaration.
19              JUDGE SCHROEDER:  Well, let me ask you this, Mr.
20         Joshi.
21              Was there some representation to you that he would be
22         testifying, that you've relied on in some way?
23              MR. JOSHI:  Yes.  Yes, when we had the discussion
24         about doing this remotely, we exchanged e-mails, and we --
25         before that, we had a -- I had a discussion with Mr.
```

1          Bennett, and he tried to persuade me to let's do this

2          without the witnesses.  We didn't agree with that, and so

3          we both agreed the witnesses would testify today.

4                    JUDGE SCHROEDER:  Mr. Liddle.

5                    MR. LIDDLE:  Your Honor, this is their burden of

6          proof.  This is a motion for invalidity.  They have to meet

7          their clear and convincing evidence.

8                    JUDGE SCHROEDER:  I agree with that, but there's a

9          question, I think, of sort of basic fairness, did the

10         parties agree that both witnesses would be called, and Mr.

11         Joshi tells me that there was that agreement.  And if you

12         -- if you have a different view of it, of course I'd like

13         to hear that.

14                   MR. LIDDLE:  Your Honor, we agreed that we would

15         handle this during live testimony, that we wouldn't -- you

16         gave us the options to do depositions or live testimony.

17         We agreed to do live testimony.  But, I mean, we just had

18         him on standby.  He wrote his Declaration, and I don't

19         think we ever affirmatively said we were going to call him,

20         we just --

21                   MR. JOSHI:  That's not true.  I have an e-mail from

22         him saying Dr. Ducharme also wants to appear remotely.

23                   JUDGE SCHROEDER:  So we're here, the witness

24         presumably is available.  My preference is let's go ahead

25         and -- I mean, you can, you know, do a very short direct,

```
 1          if you wish to do that.

 2               MR. LIDDLE:  Sure.

 3               JUDGE SCHROEDER:  Or let it -- and, then, if there's

 4          -- you know, you want to raise this again, I'll certainly

 5          entertain a motion to strike if that's necessary, and, you

 6          know, we can -- we can address it in that way.  But I think

 7          we're wasting more time here arguing about the witness.

 8               MR. LIDDLE:  Your Honor, we'll call Dr. Ducharme for

 9          a quick direct and give --

10               JUDGE SCHROEDER:  Okay.

11               MR. LIDDLE:  -- Mr. Joshi an opportunity to cross.

12               JUDGE SCHROEDER:  Is he available?

13               DR. DUCHARME:  I am available.

14               JUDGE SCHROEDER:  There he is.  Okay.  You may

15          proceed when you're ready.

16               MR. LIDDLE:  Your Honor, can we have Dr. Ducharme

17          sworn in, please?

18               JUDGE SCHROEDER:  Yes.  Mrs. Schroeder.

19               MS. SCHROEDER:  You do solemnly swear that the

20          testimony you're about to give in the case before the court

21          will be the truth, the whole truth, and nothing but the

22          truth, so help you God.

23               THE WITNESS:  I am struggling to hear that.  I

24          apologize.

25               JUDGE SCHROEDER:  That's all right.  Hold on.  She's
```

```
 1            administering the oath, but she did not have a microphone.
 2            So give her just a moment.
 3                    DR. DUCHARME:  Understood.
 4                    MS. SCHROEDER:  You do solemnly swear that the
 5            testimony you're about to give in the case before the court
 6            will be the truth, the whole truth, and nothing but the
 7            truth, so help you God.
 8                    DR. DUCHARME:  I do.
 9                    JUDGE SCHROEDER:  All right.  You may proceed.
10                     AL DUCHARME, having been called upon to testify in
11            the form of a hearing and having been duly sworn, testified
12            as follows, to wit:
13                              DIRECT EXAMINATION
14       BY MR. LIDDLE:
15  Q.   Good morning, Dr. Ducharme.
16  A.   Good morning.
17  Q.   Do you remember submitting a Declaration in this case?
18  A.   I do.
19  Q.   Can you pull up that Declaration for me, please.
20  A.   Okay.
21  Q.   And what is the date of this Declaration?
22  A.   July 29th.
23  Q.   And can you read paragraph 13 for me?
24  A.   "I swear under penalty of perjury that the foregoing is true
25  and correct."
```

1    Q.    And this is your signature underneath the Respectfully
2    Submitted?
3    A.    Yes.
4    Q.    Dr. Ducharme, do you remember testifying at trial in this case?
5    A.    Yes.
6    Q.    Can you turn to Dr. Stevenson's Declaration, and paragraph 90,
7    please.
8    A.    I believe I have -- is that the paragraph that starts with "If
9    Lone Star tries to"?
10   Q.    Yes.  That's right.
11   A.    Okay.
12   Q.    Did you hear the testimony --
13   A.    Okay.
14   Q.    -- did you hear testimony a few minutes ago from Dr. Stevenson
15   discussing this paragraph?
16   A.    I did.
17   Q.    Did you hear him reference some transcripts that are attached
18   as an exhibit to this Declaration?
19   A.    Yes.
20   Q.    In those exhibits with the trial testimony, were you discussing
21   selecting an individual color or identifying the input image pixels
22   containing the individual color?
23   A.    Well, in the first part, I -- if I'm looking at the correct
24   section, we're discussing 3-axis display, and I explained that I was
25   using a slider.

1    Q.    Uh-huh.

2    A.    And then pointing to the -- to the screen to show what had --

3    had been identified.  I think -- it's not clear exactly what you're

4    asking.  You're asking which step of the claim?

5    Q.    Right.  So let's just -- let's just -- do you mind turning to

6    the trial transcript, which is attached to his Declaration as

7    Exhibit D, please.

8    A.    Yes, I'm there.

9    Q.    And so if you go to -- it's marked as 295.  And there's some

10   highlighted section starting on line 15.

11   A.    Yeah.  Okay.  There's a lot of numbers on the page.  I

12   apologize.  I just want to make sure I get to the right section.

13   There are pages associated with the transcript.

14   Q.    Yes.  It's 295.  It's up at the top right-hand corner.  Says

15   295.

16   A.    Okay.  I'm not seeing that.  I've got a page ID of 4625.

17   Q.    Well, it's page -- in the -- it's Document 251, page 93 of 101.

18   A.    Okay.  All right.  I apologize.  295.

19   Q.    Okay.

20   A.    Line 15.

21   Q.    Right.  So in this -- in this -- in this excerpt of your trial

22   testimony, you are changing the saturation of red.  Is that correct?

23   A.    Yes.

24   Q.    Okay.  So your testimony is that several other -- several other

25   colors will not change when you adjust the value of red.  Is that

1    right?

2    A.    That's correct.

3    Q.    And so when we talk about identifying the pixels that will

4    change, is that in the selecting step or the identifying step in the

5    -- in the claims?

6    A.    Identifying step.

7    Q.    Okay.  So if you don't mind, can you go back to paragraph 88 of

8    the Stevenson Declaration.

9    A.    Okay.  I'm on paragraph 85.

10   Q.    Can you read the fourth sentence down, starting with "Dr.

11   Ducharme."

12   A.    I'm sorry, I must not be on the right -- on the correct page.

13   I'm looking at --

14   Q.    Paragraph 88.

15   A.    -- his Declaration.  Paragraph 88.  And the fourth sentence or

16   fourth line down.

17   Q.    Fifth line, fourth sentence.

18   A.    "Dr. Ducharme testified."  I'm there.

19   Q.    Okay.  Can you read that for us, please.

20   A.    "Dr. Ducharme testified that if a color contains Red in a

21   non-zero quantity, then that color is Red."

22   Q.    Did you ever make such testimony?

23   A.    I don't believe so.

24   Q.    And when you were talking about having non-zero qualities, were

25   you talking the identification step of the patent?

```
 1   A.    Yes.
 2   Q.    And so, basically, do you think that the defendants have
 3   mischaracterized your testimony here?
 4   A.    Yes.
 5   Q.    And so this -- and this is what you acknowledge in paragraph 3
 6   of your own Declaration?
 7   A.    Let me -- yes.
 8   Q.    Okay.  And then paragraphs 4 and 5 sort of explain the
 9   different implementations of a 3-axis and a 6-axis?
10   A.    Yes.
11               MR. LIDDLE:  Okay.  Okay.  I have no further
12        questions.
13               JUDGE SCHROEDER:  Cross-examination.
14               MR. JOSHI:  Yes, Your Honor.  Thank you.
15                         CROSS-EXAMINATION
16   BY MR. JOSHI:
17   Q.    Good morning, Dr. Ducharme.
18   A.    Good morning.
19   Q.    Maybe good afternoon where you are, so...
20   A.    It's getting there.
21   Q.    Yeah.  Dr. Ducharme, let me -- let me begin where Mr. Liddle
22   left off.
23         If we -- do you have the patent handy, the '435 Patent to DX1?
24   A.    I do.
25   Q.    Okay.  And do you see in step (c) of Claim 1, the first word is
```

1   "identifying"; correct?

2   A.   That's correct.

3   Q.   Okay.  And then in the -- later it follows -- the word

4   "selected" appears, "having said selected individual color."  Do you

5   see that?

6   A.   In the step (c)?

7   Q.   Yes.

8   A.   Correct.

9   Q.   Yeah.  Okay.  So "identifying" appears and "having said

10  selected individual color" appears, and then in the Court's Claim

11  Construction Order the Court explains the difference between what an

12  individual color is in the selecting step and what it means to have

13  a selected individual color in the identifying step; correct?

14  A.   It's my -- yeah, my understanding is that individual color was

15  defined.

16  Q.   Right.  Okay.

17  A.   Construed by the Court.

18  Q.   Okay.  So let's go to your Declaration at -- let's begin with

19  paragraph 10.

20  A.   Okay.

21  Q.   And it says at the bottom, "One of ordinary skill in the

22  art" -- no.  Let me read it again.  It doesn't say "the."  I'll

23  start again.  I'm looking at your Declaration dated July 29, 2021,

24  and I'm reading from paragraph 10.  "One of ordinary skill would

25  understand the output image pixels are formed from input image pixel

1    data for pixels of the selected individual color having the hue or

2    saturation to be changed.  The complete language of step (d) informs

3    one of ordinary skill that the independent color control function

4    adjusts selected pixels using controlled delta values to arrive at

5    the values of the output image pixels."  Do you see that?

6    A.    Yes.

7    Q.    I read that correctly?

8    A.    Yes.

9    Q.    Will you agree with me that claim 1 is not as well written as

10   it could have been?

11   A.    I don't have an opinion on how clearly the claim is written.

12   Q.    Okay.  Let me show you two -- let me show you four places.

13   Let's start with element C -- or limitation C.

14        You see where it says, "Input image pixels having said selected

15   individual color"?  Do you see that?

16   A.    Yes.

17   Q.    Okay.  And the exact same phrase, "having said selected

18   individual color," appears in B, in the second line for input image

19   pixels; correct?

20   A.    I'm sorry, can you restate that question?

21   Q.    Yes.

22   A.    It wasn't clear.

23   Q.    Yes.  So we're going to talk about the contents of input image

24   pixels.  So we started with limitation C.  In the first line of

25   limitation C it says that input image pixels having -- meaning the

```
 1    contents.  "Input image pixels having said selected individual

 2    color"; correct?

 3    A.    Yes.

 4    Q.    So the contents of the input image pixels are selected

 5    individual color -- said -- said selected individual color.

 6    A.    I -- I guess your rephrasing of it is a little -- a little

 7    confusing to me.

 8    Q.    Okay.  Well, let's stay with the word -- we'll stay with the

 9    word having.  So it says, "Input image pixels having said selected

10    individual color," in C at the top.

11    A.    That's correct.

12    Q.    Then in D, it says, "Input image pixels," and then it says,

13    "identified as, having said selected individual color"; correct?

14    A.    Yes.

15    Q.    Okay.  Now we go toward the bottom of D.  It says there, fourth

16    line from the bottom of D, "Output image pixels having said selected

17    individual color"; correct?

18    A.    Yes.

19    Q.    And having said individual -- having said selected individual

20    color is the exact same phrase that we read above in B with respect

21    to input image pixels; correct?

22    A.    I'd have to think about that.  I'm not exactly sure.  They way

23    you're asking it, I'm not sure what you mean.

24    Q.    Are you thinking, or are you finished with your answer?

25    A.    I think I have to say I'm finished with the answer.
```

1    Q.   Okay.  What I'm asking you is this.  There's a mention of input

2    image pixels and output image pixels in B.  Then the word "having"

3    appears after each.  And then there's a short phrase.  And that

4    short phrase is exactly the same for both, which is said selected

5    individual color.  Do you see that?

6    A.   Yes.

7    Q.   Okay.  So at least under a literal reading of the claim

8    language, would you agree with me that input image pixels and output

9    image pixels are the same?

10   A.   No.

11   Q.   I'm talking about literal language.  Same answer?

12                MR. LIDDLE:  Asked and answered.

13                JUDGE SCHROEDER:  I'll give him a chance to -- a

14        little latitude.

15   A.   To answer your question --

16   Q.   (Mr. Joshi continued.)  I mean to --

17   A.   -- no, so it's not the same.

18   Q.   Okay.  So we go to element E where it says in the third line,

19   "Output image pixels," then there's the word "having."  And then

20   there's the phrase "said selected individual color."  Do you see

21   that?

22   A.   Yes.

23   Q.   So twice Claim 1 recites output image pixels having said

24   selected individual color, once in limitation D and once in

25   limitation E.  Yes?

1  A.   Is that -- I'm sorry.  Are they -- are they the same words in

2  both claim elements?  Yes.

3  Q.   Okay.  Now, let's take a look at paragraph 10 of your

4  Declaration of July 29, 2021.  And then you have a phrase that

5  begins with "One of ordinary skill would understand the input image

6  pixels are formed from input image pixel data."

7       Would you agree with me literally those words don't appear in

8  the phrases for input image pixels and output image pixels that I

9  just read you?

10 A.   Well, you know, some of those words are used in those claim

11 elements.

12 Q.   Okay.  Is it your position, sir, that one of ordinary skill in

13 the art would read those phrases regarding input image pixels and

14 output image pixels differently from what's written?

15 A.   No.  I believe they would understand those as they're written

16 with respect to the specification we had.

17 Q.   Okay.  All right.  Okay.  Well, I'll -- I think I pressed that

18 enough.  Let's go to -- if this Court were to decide that the

19 contents of the input image pixels and the output image pixels, as

20 recited in claim 1, are the same, then would you agree with me that

21 claim 1 has no utility?

22 A.   I -- I have no idea what the Court will decide.  I know that

23 they have decided that they must not be the same.

24 Q.   You said the Court has already decided that?

25 A.   Well, I mean, in the previous -- during the trial they decided

 1   that the accused products infringed, so, therefore, you know, I was

 2   suggesting that the Court had decided that, in fact, they are

 3   different.

 4   Q.   Okay.  So you mean the jury has decided?  Is that what you

 5   meant?

 6   A.   Yes.

 7   Q.   Okay.  Would you mind pulling up Exhibit D to Dr. Stevenson's

 8   Declaration, which is a deposition transcript.

 9   A.   Yes.  Hold on one moment.

10   Q.   Sure.

11   A.   Okay.  I'm on Exhibit D.

12   Q.   Okay.  All right.  And I'm asking you to take a look at -- it's

13   PDF page 97, by the way, because our Motion and the Declaration are

14   all attached together.  Do you have 101 page PDF document there?

15   A.   I believe so.

16   Q.   If you do, you would go to page --

17   A.   101 pages.

18   Q.   Yeah.  You'll go to PDF page 97.

19   A.   Okay.  I'm there.

20   Q.   Okay.  And I'm going to read you something that you said at

21   trial, which starts on page 16.  We're on page 489.  "But in the

22   same patent, Column 9, it teaches that the designer or whoever is

23   using this method can combine these logical operations.

24        "So, I mean, I could imagine a scenario where, I don't know for

25   what purpose, you could design an identifying -- or arithmetic or

```
 1   logical operation using a combination of logical operators that
 2   would select the pixels of 0.  It doesn't make sense to me to do
 3   that, but the patent teaches that the designer has the ability to
 4   combine these operators and still meet this limitation."
 5        Do you see that?
 6   A.   Yes.
 7   Q.   Okay.  And if we go to Column 9 of the patent, I believe the
 8   lines that you are referring to -- well, let me ask you.
 9        What lines were you referring to in Column 9?
10   A.   Well, I'm looking at the patent.  I'm looking in Column 9.  I
11   don't recall.  It must have been earlier in the transcript.  Someone
12   must have directed me there.  But -- unless -- you want me to take
13   the time to look, I can look.  If you can identify a line, I'll go
14   there.
15   Q.   So -- but regardless, that is your understanding of the patent;
16   correct?
17   A.   Yeah.  Oh, here it is.  Line 37 of performing arithmetic and
18   logical operations.
19   Q.   Okay.  And line 37 is talking about step (c)?
20   A.   Yes.
21   Q.   Okay.  And step (c) has to do with identifying the pixels.  Is
22   that correct?
23   A.   Yes.
24   Q.   Okay.  And the patent specification gives the designer a wide
25   latitude to do whatever he or she wants to do; correct?  In terms of
```

1    --

2    A.    In general.

3    Q.    Okay.  And some of the things the patents allows don't make

4    sense to you, according to your testimony; correct?

5    A.    I don't believe that's what I was trying to convey.

6    Q.    Okay.  All right.  We'll let your testimony speak for itself.

7          So my -- so let's go to Exhibit C of your -- of Dr. Stevenson's

8    Declaration.

9    A.    Okay.  So that's starting at page 83 in that PDF?

10   Q.    That would be PDF page 83.  So I'm looking at page 84 on PDF,

11   actually.  Those are -- that's the slide with six colors.

12   A.    So -- okay.  Six colors.  Yeah.  I don't -- I mean, that's

13   similar to what was shown.  It must be a poor reproduction.  There

14   seems to be some shading between the colors there, but I don't

15   believe it's present during the demonstration.

16   Q.    This was a -- this was a document produced by your counsel

17   during the trial which was representative of what you showed on the

18   display.

19   A.    Probably.  You know, my recollection is that there -- there was

20   no gradation of color between the bars.  It's a minor point, but I

21   believe, you know, this is close to what I was using at trial.

22   Q.    Okay.  Now, let's look at this thing.  The color all the way on

23   the left, that would be the individual color red; correct?

24   A.    So just to be clear, you're representing it as it was presented

25   in court, so rotating this page of the PDF clockwise 90 degrees?  So

```
 1  left is red.  Is that how I should understand it?
 2  Q.   Yes, please.  Yes.  So it would be starting from the left, red,
 3  green, blue.
 4  A.   Okay.
 5  Q.   Cyan, magenta, and yellow.
 6  A.   That's correct.
 7  Q.   Okay.
 8  A.   That's what I see.
 9  Q.   Okay.  And then what you testified is that magenta is having
10  individual color red; correct?
11          MR. LIDDLE:  Objection, Your Honor.  Mischaracterizes
12      his testimony.
13          MR. JOSHI:  I'm just asking him if that -- that's
14      what he believes.
15          JUDGE SCHROEDER:  I'll allow it.
16  A.   It's my representation, based on my recollection is that I was
17  stating that magenta had the component color contributions of red
18  100, green 0, and yellow 100.
19  Q.   (Mr. Joshi continued.)  Okay.  So the reason why I'm trying to
20  use the word "having" is because that's what's in the claims.
21      So is magenta an individual color that is having components of
22  some red, some blue, and 0 green?  Would that be the correct way to
23  state it?
24  A.   I have no problem with that phrasing.  I don't -- yeah.
25  Q.   Well, let's then -- I don't want you to say something you don't
```

```
 1   -- you're not sure about.  Why don't we go -- let me just show you
 2   what you said at the trial.  So let's go to Exhibit D again.
 3   A.   On page?
 4   Q.   Yeah, let me -- let me give you that page.  Okay.  This would
 5   be PDF page 89, which is page 291 of the transcript.
 6   A.   Okay.  I'm there.
 7   Q.   So here Mr. Saba is questioning you, and he says, starting on
 8   line 16, "I'm going to ask you a question, sir.  Please explain to
 9   the jury why there are six colors here, and the significance of the
10   RGB colors."
11        Answer -- this is your answer.  "There's six colors because
12   this is a 3-axis monitor, and what I want you to see is that when I
13   changed the sliders, one of the colors, green" -- sorry -- "one of
14   the colors, red, green, and blue, on the 3-axis monitor, colors that
15   contain red are going to change."  Okay?  "I would expect that.  So
16   when I move the red -- yeah."
17        Mr. Saba says, Question, "Yeah, please don't do that.  Let me
18   give a question.  Would you please tell the jury -- same drill.  You
19   drop -- so red right now is at 100, correct?"
20        Answer, "Yes."
21        Question.  "All right.  If you drop the red to 0, I'm not going
22   to do it -- I will say in a second -- what will change on the
23   screen.  And I have got stickies if you'd like to use those.  If
24   not, you can just point?"
25                 MR. LIDDLE:  Your Honor, is there a question in here?
```

```
 1              JUDGE SCHROEDER:  Well --
 2              MR. JOSHI:  Yeah.  Yeah.  I just want to read this.
 3  Q.   (Mr. Joshi continued.)  Answer, "Yes, I'll just point.  What's
 4  going to change is any color on the screen that contains or includes
 5  the red color."
 6       Do you see that, sir, your words, "contains or includes"?
 7  A.   Yes.
 8  Q.   "So I can see this is going to change.  It has red.  The red
 9  stripe on the left.
10       "So the far right, we see magenta which has red, and we see
11  yellow on the far right, and that -- I'm sorry, did I say red?  I
12  see yellow on the right side, and that contains red as well?"
13       Do you see that?
14  A.   Yes.
15  Q.   Okay.  So now let's go back to C again, and let me just use
16  your words.  You used words like contain and has, so I'll use those
17  words.
18  A.   Okay.  I'm going back where?
19  Q.   Yeah, we're on -- we're on the second slide of Exhibit C.
20  Please let know when you're there.  It's PDF pages 84.
21  A.   I'm there.
22  Q.   Okay.  Now, left to right, the color all the way to the left is
23  red; correct?
24  A.   Yes.  That's correct.
25  Q.   The color all the way to the right is yellow; correct?
```

1    A.    That's correct.

2    Q.    And yellow is an individual color under the court's definition

3    of individual color?

4    A.    Yes.  That's correct.

5    Q.    Okay.  And the components of yellow -- or stated differently,

6    yellow contains some red and some green; correct?

7    A.    Yes, that's correct.

8    Q.    Okay.  And can be -- can green be an individual color under the

9    Court's definition of individual color?

10   A.    Yes.

11   Q.    So yellow contains two individual colors, red and green;

12   correct?

13   A.    So you're -- you're using different terms.  The R, G, and B

14   signifiers on the slide represent the amounts of component colors

15   that the monitor is to use for each pixel to additively create this

16   color.  So I -- you know, you're -- you're conflating terms here.

17        If you ask me if red, the word red, could represent something

18   that's an individual color, I would say yes.  If you say -- if

19   you're asking me if red is a word that could define a component

20   color, I would have to say yes.  They're different terms.

21        Just because the word red is used doesn't mean it's the same as

22   a component color or an individual color.  So I'm confused.  Well,

23   I'm not confused, I know what you're trying to say, but it's --

24   you're confusing terms.

25   Q.    Let me -- let me try to ask a clarifying question.

```
 1        The color yellow is created by having some portion of the red
 2   color and some portion of the green color; correct?
 3   A.   Sure.  Let me ask you what you mean by a red color or green
 4   color.
 5   Q.   Well, let's -- let's take analogy of paint.  If I want to
 6   create yellow paint, would I take red paint and mix that with green
 7   paint and have no blue paint?  And if I mix it, would I get yellow?
 8   A.   I -- I don't know what you're asking.  You're asking about some
 9   subtractive color instead of additive color?  This is white, so it's
10   a bit different than mixing paints, but --
11   Q.   Well, let me ask you --
12   A.   -- I don't how -- I'm not sure I understand your example.
13   Q.   All right.  Well, let me ask it this way.
14        We both agree that the color on the left is red; correct?
15   A.   I agree that the color -- the bar on the left is -- when
16   displayed on a monitor, using the contributions of component color,
17   red's 100, green's 0, and blue is 0, appears to a human as being a
18   color, what we call red.
19   Q.   All right.  And then if we go to the right where we see yellow,
20   you agree that color is not red; correct?  Because it does not
21   appear red to a human.
22   A.   Agreed.  Yellow does not look red to a human.
23   Q.   But it has some red in it; correct?
24   A.   It can.  Yes.
25   Q.   So if it has --
```

```
 1    A.    We have no way to define it.
 2    Q.    Well, on the screen it says R100, so it has some red in it.
 3    A.    Yes.  The example of the monitor would be components colors --
 4    component colors, red, green, and blue, would represent the color
 5    yellow to a human with those ratios.
 6    Q.    Okay.  So if yellow has some red in it, but if it doesn't look
 7    red to a human, that means it must have some other color in it also;
 8    correct?
 9    A.    There's a variety of reasons why colors don't look the same or
10    look as they should to different people.  I...
11    Q.    I'm asking you about this yellow bar here.  It has red, and it
12    --
13    A.    Yes.
14    Q.    -- has green; correct?
15    A.    It -- can you be more clear by what you mean when you say red
16    and green?
17               MR. JOSHI:  Objection.  Nonresponsive, Your Honor.
18    A.    I'm --
19               JUDGE SCHROEDER:  I -- give him a chance to answer
20          the question.
21               MR. JOSHI:  Okay.
22               JUDGE SCHROEDER:  And, Mr. Joshi, by the way, you
23          have six minutes remaining.
24               MR. JOSHI:  Okay.
25               JUDGE SCHROEDER:  So -- and you haven't argued
```

1        anything yet.

2               MR. JOSHI:  Okay.  All right.  Your Honor, I'll --

3        I'm going to wrap myself up here very quickly before Mr.

4        Oliver gets really angry, but I -- I'm going to finish up

5        in just two minutes, but I don't think four minutes is

6        going to be sufficient for the motions.

7               JUDGE SCHROEDER:  Oh, of course not.  I'm going to

8        give you some additional time.  I'm just --

9               MR. JOSHI:  Okay.

10               JUDGE SCHROEDER:  -- I'm saying I think you --

11               MR. JOSHI:  Okay.

12               JUDGE SCHROEDER:  -- ought to move it along a little

13        bit.

14               MR. JOSHI:  Okay.  Okay.  Well, I think I've gotten

15        the answers I need, so thank you.  Thank you, Dr. Ducharme.

16        I'll wrap it up here.  Thank you.

17               MR. LIDDLE:  Nothing further, Your Honor.

18               JUDGE SCHROEDER:  Okay.  Thank you, Dr. Ducharme.

19        You're dismissed.

20               Okay.  As I said, we are running low on time.  I

21        think perhaps I was too optimistic about how quickly this

22        would move along.  The plaintiff has 28 minutes remaining,

23        and the defendant has six minutes remaining.  I -- that

24        does not include, of course, the technical issues that we

25        struggled with at the very beginning, so I'm going to give

```
 1              you an additional 30 minutes per side.  So 36 minutes for
 2              the defendant, and 58 minutes for the plaintiff.  And I
 3              think that is enough time to adequately cover the motions,
 4              but it's very important that you, you know, use your time
 5              carefully.  Any questions about that?
 6                   MR. OLIVER:  Do you want to proceed right now?  You
 7              indicated --
 8                   JUDGE SCHROEDER:  No, I think we should go ahead and
 9              break now.  I have a prior commitment.  We'll come back at
10              two o'clock and be ready to proceed at that point.
11                   Any questions about the remaining format?
12                   MR. JOSHI:  Your Honor, do you want further briefing
13              on the inoperability, or you're content with what you have
14              now?
15                   JUDGE SCHROEDER:  Does either party think there's any
16              need for further briefing?
17                   MR. JOSHI:  I -- we believe that it would help the
18              Court, just based on the testimony, to put it all together.
19              It could be short.
20                   JUDGE SCHROEDER:  I'm looking forward to argument
21              this afternoon.  I don't see any need for any additional
22              briefing.
23                   MR. JOSHI:  Okay.  Thank you, Your Honor.
24              (Wherein a break was taken from 12:20 to 1:43 p.m.)
25                   JUDGE SCHROEDER:  At this time, Mr. Joshi, if you
```

1          want to present your argument.

2              MR. JOSHI:  Yes.  Thank you, Your Honor.

3              So this -- this will be the time allocation you made,

4          this will be a part of that; correct?  You gave each party

5          some time -- a certain amount of time, so this -- this

6          argument will be a part of that.

7              JUDGE SCHROEDER:  Yes.  Uh-huh.  You have 36 minutes.

8              MR. JOSHI:  Okay.  So I'm going to argue the

9          inoperability, and then Mr. Oliver is going to take over

10         for everything else.

11             JUDGE SCHROEDER:  That's fine.

12             MR. JOSHI:  Okay.  So, Your Honor, it is our position

13         that Claim 1 is invalid under section 101, for lack of

14         utility and because it's inoperable.  And the two arguments

15         go to two different parts of the claim.

16             With respect to the lack of utility or usefulness,

17         what the law says, the federal circuit law says, is that

18         the claim has to have identifiable benefit -- that's the

19         phrase -- and it has to, in another case, a useful result

20         has to be calculated by the invention.

21             So the first argument that we have is that the input

22         image pixels and the output image pixels, the content is

23         the same, which is this phrase having for selected

24         individual color.  So what the patent talks about as -- and

25         the Court recognizes this in the Markman order, is it takes

1        the input pixels and has this granular control on hue and

2        saturation.  And the -- and the specification teaches how

3        to -- how to do that.  They have controls, they have these

4        deltas that they teach it.  But the claim recites the input

5        image pixels and output image pixels to be exactly the

6        same.  The content is the same.

7            Now, this Court already invalidated previously claim

8        17 and its dependent claims for having that IPXO problem.

9        They word it in a way where system and method language was

10       combined.

11           Well, this -- this is also a claim that is not well

12       written, but how to fix it, it's not so easy.  It's not

13       what they suggest, which is that one of ordinary skill in

14       the art would understand, that the output image pixels were

15       formed from using the -- the input image pixels.  They do

16       the calculation, they do the math, but the claim doesn't

17       recite that.  And we believe that the correction required,

18       first of all, would require the Court to insert new words,

19       and second of all, it's not clear what those words would

20       be.  So for that reason, we believe that this claim is

21       invalid under 101.

22           The other reason why we believe the claim is invalid

23       under 101 is because of this phrase, the Whereby clause

24       which appears at the end of the claim, which is "Whereby,

25       the hue or the saturation of said selected individual color

1      in realtime digital video input image has been changed
2      without affecting the hue or saturation of" -- very
3      important word coming up -- "in," "in other individual
4      color."  Okay?  And they -- they wrote this claim -- they
5      didn't say, Without affecting one other individual color.
6      They didn't say, Without affecting some other individual
7      colors.  They wrote the claim to say, Without affecting any
8      other individual colors.
9          And so we had a -- I had a discussion with Dr.
10     Ducharme today, I had a discussion with Dr. Stevenson
11     today, and the way the teachings are of this patent, the
12     logical -- how to identify the individual color, it
13     necessarily causes an overlap.  Yellow and magenta overlap
14     with red.  And whatever the components are of yellow and
15     magenta, they're blue and green.
16         So when you have such overlap under the Court's Claim
17     Construction as Dr. Ducharme used at the trial -- he tried
18     to back away from it today, but, you know, I read his
19     transcript, he clearly says red -- yellow has red in it,
20     magenta has red in it.  Today he tried to say, "Well, I
21     don't know what you mean by this.  I don't know what you
22     mean by that."  But the patent leaves it up to the designer
23     on -- on how to select whatever individual color's to be
24     selected and the identifying step.
25         But when you go through the teachings of the patent,

1          when you go through the Court's Claim Construction, when

2          you go through how Dr. Ducharme applied it for

3          infringement, there's no doubt that any -- any selection is

4          going to have an overlap of a different color.  You know,

5          magenta is going to have -- the reason why yellow doesn't

6          look like red is because it has red, and then it has

7          something else.  The reason why magenta doesn't look like

8          red is because it has red and then it has something else.

9               So when you -- when you adjust the hue or saturation

10         for red, which, in turn, adjusts the hue or saturation for

11         another color, it's -- the hue or saturation of its

12         component colors is also adjusted.

13              So that's our argument, Your Honor.

14              JUDGE SCHROEDER:  Okay.  Thank you.

15              MR. JOSHI:  Thank you.

16              JUDGE SCHROEDER:  Mr. Oliver, I'll hear from the

17         Plaintiff.

18              MR. OLIVER:  Oh, okay.  I thought you wanted us to go

19         straight through.  I'm sorry.

20              MR. LIDDLE:  Thank you, Your Honor.  Brad Liddle on

21         behalf of the Plaintiff.  With respect to the first -- sort

22         of their first theory of inoperability, and it's -- it is

23         kind of difficult to understand what they're arguing, but

24         with respect to the first one, I mean, the -- where the

25         pixels remain unchanged from the input image pixels to the

1              output image pixels, step 1(d) of the claim talks about how
2              you form and gives color control functions and recites that
3              in the claim.  And then we just went through with Dr.
4              Stevenson all kinds of different examples of those color
5              control functions.  And I think -- I'll have to read the
6              transcript when we get it, but I think he even admitted if
7              you plug in variables, if you put a numeric value to those
8              variables, that -- the pixels will change.  The input will
9              change into a set of output pixels.  And so I think that's
10             dispenses with that argument.  I don't think defendants met
11             their burden of proof on that.
12                  And when they talk about these -- these different --
13             you know, that the claim language continuing to use the
14             having -- the, you know, hue or saturation, I mean, we're
15             just -- we're working with antecedent basis there.  I mean,
16             we're trying -- if we didn't have that, then they'd say,
17             "Well, which output pixels are we talking about?"  And so
18             what the -- what the claim is trying to do is say that --
19             in the first part, that you receive and characterize the
20             realtime digital video input image; then you select which
21             color you want to change the hue or saturation of; then you
22             identify which of the pixels contain that certain color.
23             And I think this is where defendants continue to get hung
24             up is they don't understand this portion of the
25             identification step.

1          So we identify the input image pixels, then we use

2     color control functions to determine corresponding output

3     image pixels, and then we display those on the screen.  The

4     claim could not be more clear on that.  So that's the first

5     -- that's their first concept.

6          With regard to these arguments where they continue to

7     show the colors and talk about Ducharme's testimony, he

8     was -- it's clear from the testimony today he was talking

9     about this identification step.  And what we saw at trial,

10    if a color does not contain the component that has been

11    selected for changing of saturation or hue, it didn't

12    change.  We showed it in open court.  And so, you know,

13    this argument continues to perplex me.

14         And, you know, it's -- again, Mr. Joshi keeps saying

15    that these two colors, there's some equivalence here, but

16    that's in the identification step.  You identify the pixels

17    that have enough of the red that need to be changed, and

18    then those are actually changed with the color control

19    functions, and then this Whereby clause that they keep

20    talking about, well, the Court already sort of dispensed

21    with that.  During the identification, we identified the

22    pixels that have enough red to be changed, considering with

23    our hypothetical, but then the Court, Your Honor, you

24    construed this claim to say the pixels that are not

25    identified are the ones that are not changed.

1           So -- so this argument -- this argument doesn't make

2    sense, it's against the clear reading of the claim language

3    and the Court's Claim Construction Order, and their motion

4    should be denied.

5           JUDGE SCHROEDER:  Thank you, Mr. Liddle.

6           MR. JOSHI:  Nothing from me, Your Honor.

7           JUDGE SCHROEDER:  I do have a question for you, Mr.

8    Joshi.

9           Doesn't the claim construction for the without

10   affecting limitation construe this term as any other

11   individual color in the remaining plurality of input image

12   pixels?

13          MR. JOSHI:  Yes, it does, Your Honor.

14          JUDGE SCHROEDER:  Does that -- does that phrase "in

15   the remaining plurality" change your understanding at all?

16          MR. JOSHI:  It does not.  It does not.  So what --

17   what happens is that you -- you select -- you select --

18   let's say you select blue, and then blue and all its

19   variants.  And so then you select certain number of pixels.

20   But -- but what I'm saying -- we're saying is two things.

21   One is the way that selection and identifying is happening

22   -- I apologize.  I meant to say identifying.  Selection is

23   step (b), identifying is step (c).  The way that

24   identifying is happening, it's going to select all the

25   pixels.  Because of the overlap, the blue -- for example,

```
1            there's going to be a blue portion in magenta, there's
2            going to be a green portion in cyan.  Let's -- or -- I'm
3            sorry.  There's going to be a blue portion in yellow,
4            there's going to be a green portion in something else.
5                 And because the patent allows for even having a
6            slightest red and something else to be selected, that other
7            color also becomes an individual color that got selected.
8            And all of its variables also get selected, unless you're
9            just selecting everything.  And it's supposed to be a
10           patent about granular selection.
11                JUDGE SCHROEDER:  Okay.  Thank you.
12                MR. JOSHI:  Thank you.
13                JUDGE SCHROEDER:  Anything you wish to --
14                MR. LIDDLE:  Nothing further, Your Honor.
15                JUDGE SCHROEDER:  Okay.  Mr. Oliver.
16                MR. OLIVER:  Thank you.  Your Honor, would you like
17           me to run through everything, or would you like to take one
18           motion and then -- one portion of it and then move to --
19                JUDGE SCHROEDER:  I just wanted to do the JMOL
20           separately from the 101 motion, but you're -- you're
21           welcome to proceed, you know, however you want to, and then
22           we'll hear from the plaintiff.
23                MR. LIDDLE:  Your Honor, could we address plaintiff's
24           motion to strike the pages on the JMOL?  I don't know if
25           you want to talk about --
```

```
 1              JUDGE SCHROEDER:  Yeah, I mean, I'm happy to hear
 2         your argument about it.  I will tell you candidly, we were
 3         in the middle of the trial when that was filed, and I think
 4         we missed it.
 5              But I am curious, Mr. Oliver, why didn't you file a
 6         motion to seek leave to file a motion in excess of the page
 7         limits?  Because you've clearly exceeded the page limits by
 8         about double.
 9              MR. OLIVER:  Your Honor, the way we read the rules,
10         we attempted to comply with them, and we thought we
11         complied with them.
12              JUDGE SCHROEDER:  Well, the rules are -- the limit is
13         30 pages, so you filed a 60-page motion, so how does that
14         comply with them?
15              MR. OLIVER:  So our understanding is that we have
16         multiple separate motions here in one brief and that
17         they're -- they're -- they're separable in that each one
18         can be decided without -- without determining the other.
19              So there's standing that can be decided without --
20              JUDGE SCHROEDER:  So the way you read the rules, you
21         get 30 pages for that and 30 page for another issue?
22              MR. OLIVER:  Well, the rule says -- the rule that we
23         -- as we read it, Rule 50 says "Apply the limits of Rule
24         7(a)3."  And Rule 7(a)3 says, "If a party files more than
25         one summary judgment motion, the following limits apply:
```

1          Motion shall not exceed 60 pages collectively."

2              JUDGE SCHROEDER:  That's for summary judgment

3          motions.

4              MR. OLIVER:  Right.  But Rule 50 says the page limits

5          imposed by Rule 7(a)3 on motion for summary judgment shall

6          also apply to motions for JMOL.

7              So our understanding of that, as we read it, was that

8          because we're filing multiple -- we've got multiple

9          grounds, multiple motions, we thought we had 60 pages.

10             Now, the plaintiff pointed out in their briefing a

11         case called Mosio v. AViNet in which the clerk struck a

12         JMOL as being over length.  And what the defendant did in

13         that case was they moved for permission to re-file the

14         brief, and they asked Judge -- it was Judge Mazzant decided

15         it.  And they said, "Your Honor, would you prefer that we

16         file our motions in one brief," in the matter that ASUS did

17         here, "or would you prefer us to split our motions into

18         eight separate briefs, each a certain number of pages

19         collectively under the 60" -- you know, "the 60 page

20         limit?"  There, Judge Mazzant said, "I'd prefer to have one

21         brief."

22             We thought that as a matter of convenience for the

23         Court and the parties, it would be better to have one

24         docket item with all of our motions, as opposed to five,

25         six, however many different docket items we were filing.

```
 1              So if Your Honor would prefer, we can re-file with
 2         multiple briefs on --
 3              JUDGE SCHROEDER:  Let me hear from the plaintiff.
 4              MR. LIDDLE:  Your Honor, I think we would have just
 5         rather had them have filed an original 30-page brief so we
 6         didn't have to use attorney time and everything else, to
 7         answer 28 pages of excessive briefing.  Some of them, you
 8         know, as we're going to hear in a minute, are just not even
 9         proper JMOLs under the record.
10              So, you know, I think filing a 58-page was, as we
11         said in our briefing, fairly abusive, and we'd like those
12         pages struck after -- after page 30.
13              JUDGE SCHROEDER:  So let me tell you what I'm going
14         to do.  I mean, as I said, we were in the middle of another
15         trial when that was filed, and we just missed it, and we
16         would have gotten it resolved one way or the other.
17              Candidly, it's water under the bridge at this point.
18         We've thoroughly reviewed all of the briefing.  I think it
19         would have been the better practice to have reached an
20         agreement.  Certainly, Mr. Oliver to have approached the
21         plaintiff and to have sought their agreement on an
22         extension of the page limits.  That is not the way that
23         rule is properly read, Mr. Oliver.
24              When parties believe they need more than 30 pages,
25         they very commonly seek an extension on that.  And if we
```

1      believe it's justified, we very commonly grant it.  I'm not

2      familiar with Judge Mazzant's case, but -- but that's

3      certainly the way parties historically have interpreted the

4      rules.

5           So as I say, I do think it's water under the bridge

6      at this point.  Just, you know, for future reference.

7           MR. OLIVER:  Thank you, Your Honor, and our

8      apologies.  We would have approached the Court if we had

9      thought that we had read the rule wrong.  But we know now

10     for future reference.

11          JUDGE SCHROEDER:  Thank you.

12          MR. OLIVER:  Appreciate it.

13          Your Honor, first, I would like to address the

14     motions for JMOL.  We also have a motion to strike the

15     Declaration of Mr. Rice, which we believe wraps into the

16     motion for JMOL on standing.  So -- well, I'll move -- I'll

17     address the standing first, and then, as I get to the end

18     of that, I'll address the motion to strike Mr. Rice's

19     Declaration, if that's okay.

20          JUDGE SCHROEDER:  Yes.

21          MR. OLIVER:  So as we -- as we look at this, there's

22     no disagreement here that at trial there was no documentary

23     evidence provided that Lone Star owns the patent.  The only

24     document we saw was the patent itself, which says it's

25     owned by a company named Oplus.  And Lone Star attempted to

1       fill that in, then, with testimony of Mr. Rice saying, Lone
2       Star owns the patent.

3           So -- so under the Federal Circuit law which says a
4       written instrument is required, that's also required under
5       section 261 of the Patent Act, there's no written
6       instrument provided at trial.  So then the question we have
7       here is can that be cured after trial?  Was it just Lone
8       Star falling asleep at the wheel and not presenting the
9       evidence, or is there something worse going on here.  And
10      by "worse," we don't know what that might be.  And I'll
11      explain why in a minute.  And then Lone Star also
12      introduces the question of was this waived, which I'll
13      address.

14          So basically, the Supreme Court law clarifies at
15      different times during the case there are different burdens
16      of proof.  At the beginning you plead something that's
17      taken as true.  When you get to summary judgment, you put
18      in a declaration that's taken as true.  By the time you get
19      to trial, your -- your case, your burden is based on the
20      evidence that you adduce at trial.  And so we're operating
21      under that Supreme Court precedent, what was presented at
22      trial is what controls.

23          And ASUS moved after the plaintiff presented their
24      evidence, while the jury was still seated, while the
25      plaintiff could have presented more evidence to the jury or

1          asked the Court for permission, we moved for JMOL of no

2          standing based on failure to prove ownership.

3               And if they had wanted to put in further evidence,

4          the proper time would have been there in front of the jury.

5          And that becomes particularly important here because we're

6          not just talking about a simple assignment document from an

7          inventor to a company, we're talking about various contract

8          issues, we're talking about corporate transfers, we're

9          talking about a lot of other noise in the background that

10         could cause problems or could cause issues with standing.

11              I'm putting up here a slide on the Elmo that's got an

12         excerpt from the pretrial order, Document 186-5, which was

13         Plaintiff's trial exhibit list.  And in the pretrial order,

14         the plaintiff listed these seven documents, P3 through P9,

15         that appear to relate in some way to the patent ownership.

16              Now, I want to be crystal clear about this.  We've

17         searched through the production, and we haven't found any

18         of those documents in Plaintiff's production.  And --

19              JUDGE SCHROEDER:  And you say, "any of those

20         documents."  Which documents are you referring to?

21              MR. OLIVER:  The ones here indicated with the purple

22         arrows, P3 through P9, on Plaintiff's exhibit list in 186

23         --

24              JUDGE SCHROEDER:  None of those were produced?  Is

25         that what you're saying?

1          MR. OLIVER:  We can't find them.  I don't believe

2     they've ever been produced.  We've searched for them.

3     We've specifically searched for them and haven't found

4     them.

5          As you -- as the Court is well aware, Rule 26

6     requires a party to produce all the documents that support

7     its claim.  Here, the burden of proof of ownership is on

8     the plaintiff.  It's not on the defendant.  So they were

9     required to produce everything.  On the last page of the

10    pretrial order, they certified, Full and complete

11    disclosure has been made in accordance with the Federal

12    Rules of Civil Procedure.

13         They also certified on that page that Each exhibit in

14    the list of exhibits will be disclosed and shown to

15    opposing counsel pursuant to the exhibit list exchanged by

16    the parties on May 14th.  So on May 14th before trial

17    started, we were expecting these documents.

18         JUDGE SCHROEDER:  And so what'd you do when you

19    didn't receive them?

20         MR. OLIVER:  Well, we assumed they didn't exist and

21    that they would attempt in some other way to prove

22    ownership at trial.  But nothing changed between the

23    parties between -- between the time of the pretrial order

24    and the trial.  There was no agreement that issues are

25    waived, resolved, or, you know, stipulations as to issues

1          or burdens of proof, or anything like that.
2                    JUDGE SCHROEDER:  Well, let's go ahead and address
3          the pretrial order.
4                    Why -- I mean, if you were contesting ownership, why
5          didn't you say that was a contested issue?
6                    MR. OLIVER:  We did in that we said that the
7          entitlement to damages was contested, which is a direct
8          reference -- and I'll explain that -- glad to explain that.
9                    So I've got a couple of excerpts of the pretrial
10         order here, and I'm answering the question, but I'm going
11         to work through it --
12                   JUDGE SCHROEDER:  That's fine.
13                   MR. OLIVER: -- a little bit.  We've got the
14         contentions of the party.  I've kind of -- I've pulled
15         things and put arrows in.
16                   In Document 186, Lone Star contended it was the
17         owner.  Lone Star contended the patent was infringed.  ASUS
18         contended the patent was not infringed.  ASUS denied that
19         Lone Star was entitled to damages.  And the denial of
20         entitlement to damages is something I'll focus on in a
21         minute.  And then we have -- I've got one more page of
22         excerpts from the pre-trial -- from the pre-trial order.
23                   In the uncontested facts, there was nothing about
24         ownership in uncontested facts.  In the contested facts,
25         both parties listed that, whethers ASUS has infringed, Lone

1          Star listed that.  I've got that with a yellow arrow.  ASUS
2          also listed whether ASUS has infringed as one contested
3          issue.  And then both parties listed whether Lone Star's
4          entitled to damages.
5              Now, why is this important?  The case law says, and
6          the patent statute says, If you have infringed, and you've
7          proven the elements of your case, you're entitled to
8          damages.  Section 284 says you get a minimum of a
9          reasonable royalty.  So entitlement to damages is a
10         separate issue from whether they infringe or the amount of
11         damages.
12             By listing this here, ASUS was asking are they
13         entitled to any damages at all, even if the patent is
14         infringed, which is a separate question than the section
15         284 question, which assumes they're entitled to damages if
16         they're the owner and un-infringed.
17             This was how ASUS challenged the standing.  They
18         said, Even if it's infringed, even if it's valid, there's
19         still a question as to whether you, Lone Star, are the one
20         entitled to damages.  That's the standing issue.  It wasn't
21         -- ASUS's position is it wasn't waived.
22             The next -- the next issue, then, is under 5th
23         Circuit law, we heard a lot of argument from Mr. Bennet at
24         trial that it was somehow waived if ASUS didn't raise it in
25         the -- in the pretrial order.  But the 5th Circuit law that

```
1        we read and found says a party only has to raise it if it's
2        something that's within their burden of proof.
3             You -- the 5th Circuit requires you to raise as
4        contested issues of fact and law what you have the burden
5        to prove, not what the other party has the burden to prove.
6        And there's no question the burden of proof of ownership is
7        on the plaintiff in every patent case.  It's black letter
8        law.
9             So that's -- that is why -- why we believe that
10       standing hasn't shown, why it's not waived.
11            The next question that we have is, and we won't
12       resolve this, because we don't have the documents, is, is
13       there something worse going on?  Is there something in
14       those --
15            JUDGE SCHROEDER:  Well, before we get into that, can
16       I ask you this?  Did ASUS not agree to jury instructions
17       that said that Lone Star owned the patent?
18            MR. OLIVER:  There is a jury instruction on the
19       hypothetical negotiation that says the patent owner
20       would -- you know, it says in the hypothetical
21       negotiations, in this hypothetical world between ASUS and
22       Lone Star, and then I said ASUS defendant, Lone Star owner,
23       something like that, that was an instruction not saying
24       that Lone Star owned it.  It was an instruction saying if
25       you -- when you're presented with this damages
```

1        hypothetical, this is who you assume is the owner, this is

2        who you assume is the defendant or the infringer.  Because

3        you have to assume that ASUS infringes.  You have to assume

4        that the patent's valid.  You have to assume that it's

5        owned.

6            Actually, at trial what we saw was the evidence

7        showed even under the set of facts that Lone Star would

8        have the Court believe, Lone Star didn't even own the

9        patent at the time of the hypothetical negotiation because

10       that was in 7/2011, and -- I believe 2011, and it was

11       before the time of the assignment document.

12           So neither party would have been right to say Lone

13       Star was the owner at the time of the hypothetical

14       negotiation.  But there's no instruction in the jury

15       instructions that says you're to assume that Lone Star is

16       the owner.

17           The other thing is, those instructions went to the

18       jury after ASUS had already made verbal and filed Rule

19       50(a) motions on this issue.

20           JUDGE SCHROEDER:  Well, it certainly never -- okay.

21       Understood.

22           MR. OLIVER:  So the other thing, the other point on

23       this, then, is the Declaration that Mr. Rice submitted

24       after trial, and the motion to strike that Declaration.

25           Now, that Declaration should be struck by the Court

1       for three reasons.  First is it's hearsay.  This is --
2       these are statements that he could have provided at trial
3       and been subject to cross-examination, and he waited until
4       after trial to provide.  The jury doesn't get to hear or
5       assess credibility.  ASUS doesn't get the chance to
6       cross-examine.  It's untimely because it was after they
7       rested their case at trial, the case in which they had the
8       burden of proof on this issue.  And, third, it's not
9       credible because it contradicts the trial testimony.
10          If we look at the trial testimony -- this chart is a
11      chart that ASUS put together in document 239.  Mr. Rice
12      testified, "I acquired a patent portfolio from Intel."
13      There was no testimony about acquiring a company.  He said
14      an LLC in Washington purchased the portfolio.  He didn't
15      say who, and he said that that -- that original entity
16      transferred it to Lone Star.
17          So the flow chart that we have is -- the patent
18      somehow got to Intel from Oplus.  We don't know if there
19      was ownership in between.  They went from Intel to this
20      unknown LLC that Mr. Rice testified about in Washington.
21      And then supposedly they went from there to Lone Star.  But
22      we don't have documents that -- that comport with this
23      chain of title that he testified about at trial.
24          The Declaration he made after trial is a different
25      declaration.  Basically, what he says now, now that the

1       jury's released, now that he's not subject to

2       cross-examination, he says Intel owned Oplus, PGT acquired

3       Oplus, Oplus owning the patents, and then Oplus assigned

4       the patents to Lone Star.  But we don't have any document

5       showing that Intel acquired Oplus.  We have nothing showing

6       that PGT acquired Oplus from Intel, and we have no

7       documents showing that Mr. Rice was the manager of Oplus or

8       had rights to assign Oplus assets.

9               We have another twist in it in that a company called

10      Oplus filed a lawsuit in 2011, and that Oplus was an

11      Illinois corporation, not an Israeli corporation, according

12      to the documents they filed in that lawsuit.  And so we

13      don't know whether Mr. Rice owns this Illinois Oplus and

14      was signing documents, and for some reason trying to

15      transfer patents of the defunct Israeli corporation or

16      whether Oplus, the Israeli company, became an Illinois

17      company, or whether the Illinois company even exists.

18              So there's -- the Declaration should not be accepted

19      because it's inconsistent with the trial testimony in many

20      ways.

21              JUDGE SCHROEDER:  Mr. Oliver, I don't want you to

22      waste any more of your time on this argument.  You've only

23      got ten minutes remaining.

24              MR. OLIVER:  Okay.  Thank you, Your Honor.

25              Moving to damages, the Federal Circuit law is very

1    clear that the plaintiff can only get damages for specific
2    instances of direct infringement or if something that are
3    shown or stuff that necessarily infringes.  And we point
4    this out in the -- in Document 247 at pages 5 through 7,
5    ACCO -- the ACCO case says that.  Dynacore says for
6    indirect infringement, liability must be restricted to that
7    stemming from direct infringement.  Cardiac Pacemaker says
8    the law's unequivocal, only damages are for the devices
9    that actually perform the patented method.
10        This is -- this comports with Your Honor's motion in
11   limine where you said the experts can't get damages --
12   can't say that just because a product was sold in the U.S.,
13   damages are available.
14        Lone Star provides two examples of what they say
15   proves that every device infringed.  First, they have their
16   expert, Dr. Ducharme, saying everybody does this method
17   when the products are purchased, but that's just
18   speculation.  It's not based on any evidence.  He admitted
19   he didn't have evidence of people actually doing it.
20        He also made a statement that these monitors must be
21   calibrated every two to three hundred hours, but that was
22   not a statement by ASUS, and what we're looking for here is
23   does ASUS induce people to infringe.  Does ASUS prompt the
24   infringement.  So a statement by the third party saying
25   calibrate a screen every two to three hundred hours is not

1      evidence that ASUS induced infringement.

2          So for these reasons, there's no -- there's no

3      evidence that supports a verdict that more than one of each

4      unit of the accused product categories is -- worked more

5      than one unit of each of the product categories infringes.

6          I am going to -- because of my time limit, I'm going

7      to skip ahead to invalidity.  There's two issue there.

8      There's double patenting and anticipation.  Those are

9      discussed at Document 239, around pages 55 and 57.

10         On both issues, Dr. Stevenson presented expert

11     testimony on all the elements.  Lined them all up, lined up

12     the patents to the prior art in both cases.  He was largely

13     un-rebutted, and what the Supreme Court has said about

14     un-rebutted testimony in, for example, Quock Ting v. United

15     States, that's 140 U.S. 417.  They say, Undoubtedly as a

16     general rule, positive testimony as to a particular fact

17     uncontradicted by anyone, should control the decision of

18     the court."  And then they said there are exceptions to

19     this rule, and they list the exceptions that are not

20     applicable here.

21         The 6th Circuit has a case.  We haven't found a 5th

22     Circuit case on this, but there's a 6th Circuit case,

23     Southern Canteen v.  Commissioner, which is 410 F2d 615.

24     Says "Unimpeached, competent, and relevant testimony that's

25     uncontradicted may not be arbitrarily discredited and

1          disregarded."

2              So here we have testimony by Dr. Stevenson pointing

3          out how the prior patents and the prior art both line up

4          with all the elements of the claims.  Dr. Ducharme didn't

5          rebut the double patenting testimony, except he did take

6          issue with look-up tables being different from logical

7          operations.  But that's completely inconsistent with his

8          other testimony, and we point this out at document No. 239,

9          page 55, where he says -- wait a minute -- page 57, he

10         says, "In some sense, a look-up table is nothing more than

11         a form of arithmetic and logical up-graders."  So the very

12         thing he says is different -- the only thing he says is

13         different about the prior patent.  In his other testimony

14         he says it's the same thing.

15             Similarly, on the anticipation issue, Dr. Stevenson

16         was un-rebutted on most issues.  Dr. Ducharme said the

17         prior art patent didn't show digital video, which multiple

18         times in the patent, as we point out in our brief,

19         including the abstract says it relates to digital video,

20         and that it doesn't show realtime video.  And what he did

21         was he took one example out of the patent that was not in

22         realtime and disregarded all of the realtime examples.

23             So a jury couldn't just disregard all the other

24         examples that were given at trial and say this one

25         irrelevant example renders the patent not anticipated.  He

1          also said it does not allow selection of an individual

2          color.  But, again, as pointed out at trial and in the

3          brief, the patent is replete disclosure of selecting the

4          individual colors.

5              So the only -- the two points on anticipation and the

6          one point on double patenting that Dr. Ducharme rebutted

7          were -- are directly contradicted by his own testimony and

8          by the documents -- by the document itself.  So a jury

9          could not have found -- a reasonable jury could not have

10         found lack of double patenting or lack of anticipation.

11             On the other issues -- I'm down to a minute --

12         JUDGE SCHROEDER:  You have four minutes.

13         MR. OLIVER:  Oh.  Okay.  Four minutes.  Great.

14             I'm going to turn back to damages now that I've gone

15         through the biggest issues I wanted to discuss with Your

16         Honor.

17             But on the non-accused products, they included

18         damages, calculations for 320 products when 135 products

19         were accused.  Lone Star tries to blame us on an ASUS

20         spreadsheet in saying, "You included these documents in the

21         spreadsheet."  What we did was we complied with the

22         document production rules which said turn over the

23         documents that may be relevant.  So we turned over the

24         sales for display products.  We did not say all these

25         display products infringed or are accused.  We turned over

1        our set of documents that had sales for display products

2        and allowed them to go to that document and find the

3        damages figures they wanted, and they -- they inexplicably

4        included damages figures for 320 products.

5              Turning to direct and contributory infringement,

6        there's no factual dispute here.  The parties agree that

7        Lone Star did not prove direct or contributory

8        infringement.  The only question is, is ASUS entitled to

9        judgment on its counterclaim.  We think the answer is yes,

10       but that's -- that's an issue of law for the Court to

11       decide.

12             The final point I wanted to make is with respect to

13       the manuals that -- the user manuals for the products.

14       ASUS puts these manuals on a website in Taiwan that's

15       available, and there's no proof in the record that any of

16       these documents, these manuals, were ever downloaded by

17       somebody in the United States, outside of Lone Star's

18       expert who was hired to download them for -- for the case.

19             Availability does not mean infringements.  There are

20       many things available on websites outside of the U.S. that

21       were never downloaded in the U.S.  There are -- you know, I

22       hate to bring it up, but just as an example, there are in

23       other countries, child pornography websites that are

24       clearly illegal in the U.S., but the fact that they're

25       available there doesn't mean that somebody here has

```
 1            downloaded them.

 2                  And so without proof of the manuals having been

 3            downloaded in the United States, Lone Star's case fails.

 4            They cannot show that ASUS actually sent a manual to

 5            somebody and actually induced somebody in the U.S. to use

 6            it.

 7                  I think my time is up, but I'd like to -- I'd like

 8            talk to talk more, but I'll sit down.

 9                  JUDGE SCHROEDER:  Thank you, Mr. Oliver.

10                  MR. LIDDLE:  Thank you, Your Honor.  Brad Liddle for

11            the plaintiff.

12                  I guess we'll start with standing since that's the

13            first JMOL that Mr. Oliver brought up.

14                  And so I don't -- I don't understand how this is not

15            waived, having not raised it as an issue of contested fact

16            in the pretrial order, their joint filing, where Lone Star

17            claims to be the owner of the patent.  These documents are

18            publicly available at the USPTO website showing that Lone

19            Star is the record owner of the '435 Patent.  ASUS never

20            provided an interrogatory, never deposed Mr. Rice, never

21            brought this up at trial, never brought it up at the

22            pretrial order, and --

23                  JUDGE SCHROEDER:  Did they ever raise, to your

24            knowledge, with anyone on the plaintiff's team that this

25            potentially was an issue?
```

1              MR. LIDDLE:  Never.  Never contested standing, never

2       contested ownership of the patent, never contested any of

3       these issues.  No summary judgment, no depositions, no

4       interrogatories.  Nothing of the sort.

5              So at this point, you know, we didn't have -- you

6       know, there's this talk of that we should have produced

7       some -- well, I guess -- let me take a step back.

8              For the Rule 50(a) -- so their theory has kind of

9       changed.  So for the Rule 50(a), they think we should have

10      produced some kind of written instrument was sort of the

11      main complaint from ASUS.  Some written statement

12      establishing standing.  But during the pretrial order,

13      since they gave no mention or challenge to this, it was a

14      clear signal to us, and sort of our time limits at trial;

15      right?  We already had to cut down issues and testimony and

16      everything else, you know, that we didn't need to show

17      ownership of the patent.  It was an uncontested issue of

18      fact in the joint pretrial order.

19             Then when they filed a Rule 50(b) motion, they start

20      bringing up other things.  They talk about issues with the

21      chain of title, but these are -- these are pure

22      speculation.  And what sort of the Surf case says, is once

23      we have a publicly available assignment on file, it's their

24      burden to show.  So not only did they not bring it up at

25      any point during the case, agree to it in the pretrial

```
 1          order, never brought this up, but then when they start
 2          accusing us of having some inconsistencies in our chain of
 3          title, well, that is their burden to show that we don't
 4          have ownership of the patent.
 5               And as my partner once, you know, argued when we were
 6          discussing these JMOLs, the Rule 50 verbal, you know, the
 7          final pretrial order, this becomes the pleading; right?  So
 8          we're talking about Rule 11 stuff here, and I think that
 9          was some discussion during the case.
10               They continued to push this issue.  They filed five
11          or six motions now.  It's -- it's as meritless as it was
12          right after -- right after trial as it is -- as it is now.
13          So there's no basis here to challenge standing.
14               JUDGE SCHROEDER:  What about -- you want to address
15          the documents?  I mean, there was a --
16               MR. LIDDLE:  Honestly, Your Honor, I don't know if
17          those documents were produced.  I know at least two of them
18          that I saw on that list that Mr. Oliver flashed up, those
19          are at least publicly available, so we may have just said
20          We're not producing those because they're publicly recorded
21          with the USPTO where we've -- the assignment was recorded
22          years and years and years ago.  The other documents, I
23          don't -- I don't know.  I'm not sure.  Okay.
24               I'd like to next go to the issue of infringement.
25          And so during trial there were, you know, sort of four
```

```
1            levels of our proof of inducement here; right?  So we had
2            -- the user manuals are admitted, the frequently asked
3            questions page that -- that we pointed to several times
4            during the trial instructing someone how to independently
5            perform 6-axis color control without affecting the -- the
6            hue or saturation of the other colors, and then expert
7            testimony of Dr. Ducharme, not only saying -- testifying
8            that in his experience, someone would calibrate their
9            monitor at least once upon purchase, but then also there's
10           recommendations that every two to three hundred hours that
11           these monitors would be calibrated and then Winne's
12           testimony, their own witness, you know, trial testimony
13           201, 12 through 16, where he talks about that these user
14           manuals do, in fact -- admitted on the record during
15           trial -- these user manuals do, in fact, instruct a user
16           how to independently change colors without affecting other
17           colors.
18                You know, we cited some cases, Teva.  You know,
19           plaintiff may improve induced infringement with
20           circumstantial evidence.  You know, we don't need direct
21           evidence here.  There's several cases.  The Teva case, the
22           Teneous case, the ePass case that they cited is actually in
23           opposite of this concept.  That was the case where there
24           was actually no written instrument or anything that
25           instructed someone, and that one, they had a certain method
```

1    claim that had to be done in a certain order, and there was

2    just -- it was action of evidence there.  So I don't -- I

3    don't think this -- this idea that, you know, we had to

4    prove with direct evidence infringement of -- you know, an

5    instance of infringement.  We used circumstantial evidence,

6    and that's what the law says.

7         So kind of switching to damages, kind of a similar

8    concept there.  You know, there's this idea that Mr. Oliver

9    is putting forward that you can only get one -- per

10   one unit, but I've never seen any court case.  I don't even

11   know where that comes from.  You know, if you talk about

12   the hypothetical negotiation, Lucent and some other cases

13   say that, you know, there's no ridged requirement that

14   damages in all circumstances be limited to a specific

15   instance of infringement proven with direct evidence.

16        And they go on to say that in the construct of the

17   hypothetical negotiation, this is untenable.  How would the

18   parties at that point when they are deciding the reasonable

19   royalty under the Georgia Pacific factors, how would they,

20   in fact, go back and understand how many times someone is

21   actually going to use -- use the method?  It's just

22   untenable.  The Federal Circuit has rejected that several

23   times.  They cited no authority for this -- for this

24   concept, so that one should be denied.

25        This idea of product families and number of products

1    accused, sticking with damages, so product families were
2    identified by us.  We asked in responses -- we had a motion
3    to compel on damages, and this is what we were given, a
4    spreadsheet of how much revenue per product was -- was
5    provided, and that's what we used.  We showed that product
6    families infringed, and these were identified through the
7    160 something manuals that were admitted in evidence at
8    trial.  And, you know, construed in the light most
9    favorable to the verdict, the jury came back with
10   essentially less than a third of what we asked for.  $2.8
11   million is what we asked for, and awarded 825,000.

12       So I think the evidence suggests the jury may have
13   seen that there were a lot of products.  I still don't
14   think that there were unaccused products in that -- in that
15   list.  I think they were all accused through both product
16   families.  But I think the jury took that into account,
17   and, you know, we shouldn't disturb the great weight of the
18   evidence there.

19       With respect to invalidity, I think our brief was
20   pretty clear on which element they failed to prove.  And,
21   in fact, when we talk about the -- the obvious -- this type
22   double patenting, ASUS didn't even follow the correct legal
23   standard.  Under that approach -- it's a two-step approach.
24   You have to construe the claims of the earlier patent,
25   which is the 012.  There is no discussion of any of that.

1      So they failed to -- they failed to go through step one of

2      the obvious mistyped double patenting analysis.  And then

3      the Court, after that occurs, determined whether

4      differences in subject matter between the two claims,

5      especially if the claims are patently distinct.

6           In our briefing we point out several elements between

7      the 012 and the '435 that show that the '435, is, in fact,

8      patently distinct from the 012.  The jury heard the

9      evidence, the experts -- it was a battle of the experts,

10     and they -- they did not prove by clear and convincing

11     evidence that the '435 Patent is invalid.

12          On the Brett reference, I think there was -- I

13     handled the cross-examine of Dr. Stevenson.  I think there

14     were several elements that -- that Dr. Stevenson couldn't

15     line up with the patent.  This is all set out in our

16     briefing, and I think we'll stand on that.

17          JUDGE SCHROEDER:  Okay.

18          MR. LIDDLE:  Otherwise, I think that's -- that's all

19     from the plaintiff in response.

20          JUDGE SCHROEDER:  Okay.  Thank you, Mr. Liddle.

21          MR. LIDDLE:  Thank you, Your Honor.

22          JUDGE SCHROEDER:  Mr. Oliver, you're out of time, but

23     I'll give you a couple of minutes to respond, if you wish.

24          MR. OLIVER:  Thank you, Your Honor.  I'll keep it --

25     I'll keep it brief.

1            First, regarding standing, the statement that there
2       was no challenge to standing in the original answer in the
3       case, ASUS denied ownership.  It's the plaintiff's burden.
4       It's not an affirmative defense.  Denial -- that you can
5       prove your burden is a challenge.  That's been in the case
6       since the beginning.  Mr. Joshi actually sends an e-mail.
7       It's not been filed with the motions, but if it's of
8       interest to, Your Honor, Mr. Actually -- Mr. Joshi actually
9       filed an e-mail asking about the ownership of the patent
10      and asking whether one of plaintiff's counsel has a part
11      ownership in the patent, because we didn't have any
12      documents on ownership.
13           JUDGE SCHROEDER:  But he didn't serve any discovery
14      or ask any questions at depositions or serve
15      interrogatories or request for admissions, or anything of
16      the like, the things that normally occur when there's an
17      issue contested?
18           MR. OLIVER:  He didn't, but to be fair, there were
19      minimal depositions in this case, and ASUS thought that the
20      plaintiff would not be able to prove its case, so it didn't
21      go and take depositions because it's not ASUS's burden to
22      prove that issue.
23           Regarding the evidence of -- alleged evidence of
24      induced infringement, Mr. Liddle pointed -- pointed to FAQ
25      on the website regarding six ASUS products.  That relates

```
1              to about nine products out of over 130 products, so that --
2              that doesn't cure the -- the lack of evidence of inducement
3              on the other 126 products.  And it also -- it has the same
4              issue as the user's manual, so, yeah, it tells people how
5              to do it, but there's no evidence that a user of the
6              product who owned the product in the United States ever
7              downloaded that.
8                   And Mr. Liddle's testimony that the manuals
9              instructed people how to use the products, that's true.
10             The manuals do.  But it suffers from the same issue.
11             There's no evidence that any user that owned the product in
12             the U.S. downloaded it.
13                  Mr. Liddle made a point on the damages issue about
14             the Lucent case, and he says that there's no need for
15             evidence of how many times a user has used a product.  We
16             agree.  If the user has used a product once to do an
17             infringing method, that's infringement.  But that's not the
18             issue here.  The issue here is not how many times an
19             individual user has used the product, it's whether an
20             individual user has ever used the product.
21                  Finally, on the two-step approach to the double
22             patenting issue, and the complaint that ASUS didn't ask for
23             claim construction, the expert construed the claim as
24             having its plain and ordinary meaning.  If Lone Star had
25             wanted to challenge that and ask the Court to construe it,
```

| | |
|---|---|
| 1 | they had the option to do that, but they didn't, either on |
| 2 | rebuttal testimony or through a motion to the Court for a |
| 3 | construction of that patent. |
| 4 | Finally, my last point is Mr. Liddle says our brief |
| 5 | shows the differences on the double patenting, and the -- |
| 6 | the anticipation, and that's simply that, a brief.  It's |
| 7 | attorney argument.  It is not testimony that was presented |
| 8 | at trial.  If you read that portion of the brief, you'll |
| 9 | see it's not supported by testimony that went to the jury. |
| 10 | It's attorney argument that was presented after the jury |
| 11 | was released. |
| 12 | JUDGE SCHROEDER:  Thank you, Mr. Oliver. |
| 13 | MR. OLIVER:  Thank you. |
| 14 | JUDGE SCHROEDER:  Appreciate the parties |
| 15 | presentations today, and I don't -- can't make you a |
| 16 | promise about when the order on these motions will be out, |
| 17 | but as soon as possible. |
| 18 | Appreciate everyone being here today.  Safe travels |
| 19 | to you. |
| 20 | (Wherein court adjourned at 3:08 p.m.) |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

```
 1              C E R T I F I C A T E

 2      STATE OF ARKANSAS        )
                                 ) ss
 3      COUNTY OF WASHINGTON     )

 4           I, CYNTHIA A. DONALD, Certified Court Reporter, in and for
        the aforesaid county and state, do hereby certify that the within
 5      transcript was reduced to typewritten form by me or under my
        direction and supervision; that the foregoing transcript is a true
 6      and accurate record to the best of my understanding and ability.

 7           I FURTHER CERTIFY that I am neither counsel for, related
        to, nor employed by any of the parties to the action in which this
 8      proceeding was taken; and, further, that I am not a relative or
        employee of any attorney or counsel employed by the parties
 9      hereto, nor financially interested, or otherwise, in the outcome
        of this action; and that I have no contract with the parties,
10      attorneys, or persons with an interest in the action that affects
        or has a substantial tendency to affect impartiality, that
11      requires me to relinquish control of an original deposition
        transcript or copies of the transcript before it is certified and
12      delivered to the custodial attorney, or that requires me to
        provide any service not made available to all parties to the
13      action.

14           The foregoing certification of this transcript does not
        apply to any reproduction of the same by any means, unless under
15      the direct control and/or supervision of the certifying reporter.

16           IN WITNESS WHEREOF, I have hereunto set my hand and
        affixed my seal of office this 13th day of September, 2021.

17

18

19                          _____
              OFFICIAL SEAL       CYNTHIA A. DONALD, CCR
        CYNTHIA A. DONALD, CCR, RPR
20      ARKANSAS SUPREME COURT    Certified Court Reporter
        CERTIFIED COURT REPORTER   Arkansas Supreme Court
             LS No. 183
21                                License No. 183

22

23

24

25
```